Adam Fried, Administrator, Estate of Desmond Franklin,

vs.

Jose Garcia,

In The United States District Court
Northern District of Ohio
Eastern Division
Case No. 1:22-cv-00061

## Sergeant Dalia Lopez

Taken onThursday, February 9, 2023

Reporter Rebecca Fumich

DEFENDANT'S
EXHIBIT

**B**





Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918  fax: 216-241-3935

1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland, OH 44114



a member of:
www.table8litigationsolutions.com

1

2       IN THE UNITED STATES DISTRICT COURT

3          NORTHERN DISTRICT OF OHIO

4            EASTERN DIVISION

5

6 ADAM FRIED,            )

                     )

7 Administrator, Estate   )

                     )

8 of DESMOND FRANKLIN,    )

                     )

       Plaintiff,   ) Case No. 1:22-CV-00061

9                    )

10   vs.            )

                     )

11 JOSE GARCIA,           )

                     )

       Defendant.   )

12

13              - - - - -

14   Transcript of the deposition of SERGEANT

15 DALIA LOPEZ, a witness herein, called by the

16 Plaintiff as if upon examination pursuant to the

17 Federal Rules of Civil Procedure, taken before

18 Rebecca L. Fumich, Registered Professional

19 Reporter, Notary Public in and for the State of

20 Ohio, held at Cleveland City Hall, 601 Lakeside

21 Avenue, Cleveland, Ohio  44114, Thursday,

22 February 9, 2023, commencing at 10:08 a.m.

23

24              - - - - -

25

```
 1   APPEARANCES:

 2          On behalf of the Plaintiff:

 3           ELIZABETH BONHAM, ESQ.

 4           Friedman, Gilbert + Gerhardstein

 5           50 Public Square, Suite 1900

 6           Cleveland, OH  44113

 7           216-241-1430

 8           elizabeth@ffgfirm.com

 9
             On behalf of the Defendant:
10
             J.R. RUSSELL, ESQ.
11
             AFFAN ALI, ESQ.
12
             City of Cleveland
13
             Department of Law
14
             601 Lakeside Avenue, Room 106
15
             Cleveland, OH  44114
16
             216-664-2767
17
             jrussell2@clevelandohio.gov
18
                    and
19
             MATTHEW A. SMARTNICK, ESQ.
20
             Gallagher Sharp
21
             1215 Superior Avenue, 7th Floor
22
             Cleveland, OH  44114
23
             216-241-5310
24
             msmartnick@gallaghersharp.com
25
```

1    and

2         DAVID P. STADLER, ESQ.

3         Ankuda, Stadler & Moeller Ltd.

4         1621 Euclid Avenue, Suite 300

5         Cleveland, OH  44113

6         216-722-3112

7         dstadler@law-asm.com

8

9              - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 1:22-cv-00061-DAP  Doc #: 44-2  Filed: 01/31/24  5 of 89.  PageID #: 281
Deposition of Sergeant Dalia Lopez
Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1              EXAMINATION INDEX

 2    SERGEANT DALIA LOPEZ

 3        BY MS. BONHAM . . . . . . . . . . . .   6

 4

 5              OBJECTION INDEX

 6        BY MR. RUSSELL . . . . . . . . . . .    9

 7        BY MR. RUSSELL . . . . . . . . . . .   15

 8        BY MR. RUSSELL . . . . . . . . . . .   15

 9        BY MR. RUSSELL . . . . . . . . . . .   16

10        BY MR. RUSSELL . . . . . . . . . . .   18

11        BY MR. RUSSELL . . . . . . . . . . .   18

12        BY MR. RUSSELL . . . . . . . . . . .   21

13        BY MR. RUSSELL . . . . . . . . . . .   22

14        BY MR. RUSSELL . . . . . . . . . . .   22

15        BY MR. RUSSELL . . . . . . . . . . .   22

16        BY MR. RUSSELL . . . . . . . . . . .   22

17        BY MR. RUSSELL . . . . . . . . . . .   23

18        BY MR. RUSSELL . . . . . . . . . . .   24

19        BY MR. RUSSELL . . . . . . . . . . .   25

20        BY MR. RUSSELL . . . . . . . . . . .   25

21        BY MR. RUSSELL . . . . . . . . . . .   33

22        BY MR. RUSSELL . . . . . . . . . . .   34

23        BY MR. RUSSELL . . . . . . . . . . .   36

24        BY MR. RUSSELL . . . . . . . . . . .   37

25        BY MR. RUSSELL . . . . . . . . . . .   38
```

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1        BY MR. RUSSELL . . . . . . . . . . . . 43

 2        BY MR. RUSSELL . . . . . . . . . . . . 43

 3        BY MR. RUSSELL . . . . . . . . . . . . 50

 4        BY MR. RUSSELL . . . . . . . . . . . . 53

 5        BY MR. RUSSELL . . . . . . . . . . . . 54

 6        BY MR. RUSSELL . . . . . . . . . . . . 59

 7        BY MR. RUSSELL . . . . . . . . . . . . 61

 8        BY MR. RUSSELL . . . . . . . . . . . . 61

 9        BY MR. RUSSELL . . . . . . . . . . . . 62

10        BY MR. RUSSELL . . . . . . . . . . . . 63

11        BY MR. RUSSELL . . . . . . . . . . . . 63

12        BY MR. RUSSELL . . . . . . . . . . . . 63

13        BY MR. RUSSELL . . . . . . . . . . . . 64

14        BY MR. RUSSELL . . . . . . . . . . . . 68

15        BY MR. RUSSELL . . . . . . . . . . . . 68

16        BY MR. RUSSELL . . . . . . . . . . . . 69

17        BY MR. RUSSELL . . . . . . . . . . . . 70

18        BY MR. RUSSELL . . . . . . . . . . . . 70

19        BY MR. RUSSELL . . . . . . . . . . . . 71

20        BY MR. RUSSELL . . . . . . . . . . . . 72

21        BY MR. RUSSELL . . . . . . . . . . . . 72

22        BY MR. RUSSELL . . . . . . . . . . . . 73

23        BY MR. RUSSELL . . . . . . . . . . . . 74

24        BY MR. RUSSELL . . . . . . . . . . . . 77

25                        - - - - -
```

1    SERGEANT DALIA LOPEZ

2    after having been first duly sworn, as

3    hereinafter certified, was examined and testified

4    as follows:

5                    EXAMINATION

6    BY MS. BONHAM:

7    **Q   Good morning.  My name is Elizabeth Bonham.**

8    **I represent the Plaintiff in this matter.**

9        **Would you state and spell your name for the**

10   **record.**

11   A   Dalia, D-A-L-I-A, L-O-P-E-Z, Lopez.

12   **Q   Thank you.  And I guess it's Sergeant Lopez.**

13   A   Yes.

14   **Q   Thanks for being here, Sergeant.**

15       **Have you ever had your deposition taken**

16   **before?**

17   A   No.

18   **Q   It's a little different than other types of**

19   **interviews, so I just want to do a few ground**

20   **rules and instructions so that we can be on the**

21   **same page.  Okay?**

22   A   Okay.

23   **Q   You know that everything is being taken down**

24   **by the court reporter that we say and that's**

25   **going to be the only record of what happened**

1    today.  It's going to be a written record.  So

2    the helpful things to do are just talk one at a

3    time, give verbal answers rather than like a head

4    nod so that she can record it.

5        If I say something or ask something

6    confusing, just let me know and ask for

7    clarification before you answer.  If you answer

8    something, I'm going to assume that you

9    understood me.  So just if you are confused at

10   all, you can ask any time.

11   A    Okay.

12   Q    Does that all sound okay?

13   A    Yes.

14   Q    The other thing about depositions is that it

15   is sworn testimony under oath.  Do you understand

16   that?

17   A    Yes.

18   Q    Is there any reason that you would not be

19   able to give honest and truthful testimony today?

20   A    No.

21   Q    Additionally, you are represented by counsel,

22   as I understand it; is that right?

23   A    Yes.

24   Q    And so we have your counsel from the City and

25   a couple other lawyers for the Defendant in the

Deposition of Sergeant Dalia Lopez                Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   room.  Anybody can make an objection if they want

2   to, so just go ahead and let them do that.  I

3   probably won't get into it with them.  It's not

4   going to be like a brawl like the movies so you

5   don't have to worry about that.  But unless they

6   tell you not to answer the question, you just go

7   ahead and answer it anyway.

8         Does that make sense?

9   A   Yes.

10  Q   So give them a minute to object and then go

11  ahead with your answer unless they tell you not

12  to.

13  A   Okay.

14  Q   What, if anything, did you do to get ready

15  for the deposition today?

16  A   I reviewed body camera footage and met with

17  my attorneys.

18  Q   Without telling me what you guys talked

19  about, who did you meet with?

20  A   Tim and, I believe, Elena.

21  Q   Anybody else there at that meeting?

22  A   I'm not sure if there was a third person that

23  may have stopped in or not, but I don't -- I

24  can't recall.

25  Q   How long ago was that meeting?

1  A    It's been a couple months.

2  Q    Was Officer Garcia at the meeting?

3  A    No.

4  Q    Besides body camera footage, did you review

5  any other documents to get ready for the

6  deposition?

7  A    No.

8  Q    When you reviewed that body camera footage,

9  was it in that meeting a few months ago?

10  A    Yes.

11  Q    Have you ever reviewed any documents,

12  footage, or recordings, anything like that more

13  recently?

14  A    No.

15  Q    Besides the attorneys you mentioned for the

16  City Law Department, have you ever talked to

17  another attorney about this matter to get ready

18  for the deposition?

19  A    No.

20              MR. RUSSELL:    Objection.

21  Q    Did you talk to anybody else other than

22  counsel to get ready for the deposition today?

23  A    No.

24  Q    Not a spouse or a friend?

25  A    To get ready, no.  I just simply stated I had

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    to come to a deposition.

2    **Q    Who did you tell that you were coming?**

3    A    My husband knows, co-workers.  Just in the

4    office, "Hey, this is where I'm going today."

5    **Q    Did you talk about the matter at issue in the**

6    **lawsuit with your co-workers before the**

7    **deposition?**

8    A    No.

9    **Q    Did you talk to Officer Garcia before the**

10   **deposition?**

11   A    No.

12   **Q    Can you take me briefly through your career**

13   **as a Cleveland police officer, when you started**

14   **until the present day?**

15   A    I started the police academy February 5th of

16   2018; graduated in August of that year.  Was

17   assigned to the 5th District for training

18   purposes.  Halfway through the training I was

19   sent over to the 2nd District where I completed

20   my training and was assigned.

21       I remained there on second shift until

22   September of this year -- not this year, '22, and

23   in October -- well, in September I was detailed

24   to the internal affairs unit.  October I was

25   promoted to sergeant where I remained in the

Tackla Court Reporting, LLC              PH: 216.241.3918                    Page: 10

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    internal affairs unit, and that is where I am

2    today.

3    Q    Before you went to the police academy here,

4    did you have another career before that or

5    another job?

6    A    Yes.  I was a Cleveland police radio

7    dispatcher.

8    Q    For how long about?

9    A    Almost 17 years.

10   Q    Why did you move from the 5th to the 2nd

11   District during your training period?

12   A    It was normal practice at that time.  They --

13   you would work both sides of the city usually, or

14   at least two different districts, during your

15   training.

16   Q    Can you explain about where the 2nd District

17   is in the city?

18   A    It's the near west side, so just west of the

19   river.  From downtown as west as -- roughly like

20   West 80th Street, Lorain, Detroit, and then as

21   far south as Brookpark Road.

22   Q    During your training period, did you do any

23   training together with Officer Garcia?

24   A    No.

25   Q    When you were assigned to the 2nd District,

Deposition of Sergeant Dalia Lopez            Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   second shift, when is second shift for that?

2   A    Roughly 2:00 p.m. to midnight.  There were

3   pre-COVID times and post-COVID times, start

4   times, for that shift.

5   Q    I see.  So in 2020 what was your shift?

6   A    I believe it was 1400 to midnight.

7   Q    Without telling me -- I won't ask for your

8   address or your personal information, but can you

9   tell me what neighborhood you were living at at

10  that time in 2020?

11  A    Old Brooklyn.

12  Q    So would you -- and you worked in the 2nd

13  District station?  That's where you started your

14  job every day?

15  A    Correct.

16  Q    Would you take Pearl Road routinely to work?

17  A    Yes.

18  Q    Briefly what was your actual daily shift

19  looking like at that time from when you got to

20  work to when you ended your shift?

21  A    So usually at 1400, or the start of my shift,

22  there was a roll call.  We would meet in an area

23  of the district, either inside or out, depending

24  on the weather.  The supervisor would pretty much

25  just fill everybody in on what's going on,

1   anything that needed to be known for the day,

2   assignments for the day, and then that usually

3   lasted anywhere from 10 to 20 minutes.

4        After that, I would prepare the zone car that

5   I was driving for that day, sign in, refuel if

6   necessary, things like that, just to get ready to

7   go on the road.  And then from that time until

8   the end of the night it was just handling radio

9   assignments.

10  **Q    Before roll call would you go to the actual**

11  **2nd District every day or would you sometimes go**

12  **right to wherever you were meeting?**

13  A    No.  It was -- the meetings were at the 2nd

14  District.

15  **Q    Okay.  All right.  I misunderstood.**

16  **So you were a patrol officer.  After you got**

17  **in your car, you took radio calls and responded.**

18  A    Yes.

19  **Q    In April 2020 was it two officers to a car or**

20  **one or did it vary?**

21  A    Good question because it did vary around that

22  time.  I'm not sure if at that time was the

23  period where we were split off or not from our

24  partner.

25  **Q    Did you have, during that time, the same**

Deposition of Sergeant Dalia Lopez      Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   partner every day?

2   A    Yes.

3   Q    Who was that?

4   A    Carlee Seroka.

5   Q    At that time how many patrol officers were

6   working second shift in the 2nd District

7   approximately?

8   A    Approximately 25.

9   Q    Did you ever work together with Jose Garcia?

10  A    Before the incident?

11  Q    Yeah.

12  A    No.

13  Q    So before April 9th of 2020 you and he had

14  never worked together in the same car?

15  A    Right.  No.

16  Q    And you and he had never worked together on

17  any other project or matter?

18  A    We worked the same shift.  Could we have been

19  at the same assignment at the same time?  It's

20  possible, but not that I can recall us working

21  together, no.

22  Q    Do you know who his partner was at that time?

23  A    I believe Domnori.  I am not sure.

24  Q    Do you remember the first time you ever met

25  Jose Garcia at all, period?

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A    The first time, no.

2   Q    **Was he already an officer in the 2nd District**

3   **when you became an officer in the 2nd District?**

4   A    Yes.

5   Q    **Did you guys ever hang out outside of work?**

6   A    No.

7   Q    **Not even one time?**

8   A    Not that I can recall.  Again, could we have

9   been at the same location for a work event?

10  Maybe, but...

11  Q    **Did you ever talk on the phone or otherwise**

12  **correspond outside of work prior to the incident**

13  **at issue?**

14              MR. RUSSELL:    Objection.

15  A    Outside of work, I would have to answer no.

16  And only to clarify that a lot of people on the

17  shift had each others numbers, so sometimes

18  somebody may text work related, "Hey, do you have

19  this phone number," things like that.  So I don't

20  know if we ever had any type of correspondence,

21  but nothing outside of work, no.

22  Q    **Why did you want to become a police officer?**

23              MR. RUSSELL:    Objection.

24              Go ahead and answer.  You can

25              answer.

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A   I'm sorry.  To help people.  I mean, that

2   sounds cliche, but that's what I've done my whole

3   life really as an adult so...

4   **Q   So, as you know, we are really here to talk**

5   **about the 2020 killing of Desmond Franklin, and I**

6   **know there have been prior investigations about**

7   **this other than the civil litigation that we are**

8   **here today about that you've been involved in.**

9   **Can you take me through your participation in**

10  **other investigations besides mine about this**

11  **incident from the first time you were involved up**

12  **until the present?**

13                  MR. RUSSELL:    Objection.

14                  Go ahead.

15  A   I recall being interviewed on the scene by

16  the Sheriff's Department, and then there was an

17  official interview by the Sheriff's Department,

18  and OPS requested I go in for an interview, and

19  that is all.

20  **Q   So related to the on-scene interview with the**

21  **Sheriff, is that the first time that someone**

22  **started asking you questions about your**

23  **involvement in this incident in an official**

24  **capacity?**

25  A   Yes.

1    Q    Who was that person that talked to you?

2    A    I do not remember his name.

3    Q    Did he make a report reflecting your

4    conversation?

5    A    I do not know.

6    Q    So you never had the opportunity to review

7    any report he may have made?

8    A    Right.

9    Q    Were you asked to fill out a report on the

10   scene?

11   A    Written report, no.  I don't -- it's been

12   long.  I'm sorry.  Hold on.  Actually, no, I

13   don't think so.

14   Q    Were you asked to provide -- that county

15   officer on the scene to provide him anything else

16   besides the statement at that time?

17   A    No.

18   Q    Verbal statement, right?

19   A    Right.

20   Q    Do you remember whether he ever followed up

21   with you about that statement in any way

22   subsequently?

23   A    I don't -- I cannot recall if that's the same

24   person that I went in to interview with, so it's

25   possible.

Deposition of Sergeant Dalia Lopez            Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q    Sometime later you were in a video recorded
2   interview with another county official or the
3   same county official, right?
4   A    Right.  Yes.
5   Q    You were represented by counsel in that
6   interview, right?
7   A    Yes.
8   Q    Who was your counsel in that interview?
9   A    It was the union -- CPPA union lawyer.  Maybe
10  Hilow.
11  Q    Besides Mr. Hilow, did you -- were you
12  represented by any other lawyers with respect to
13  the county Sheriff's investigation?
14                  MR. RUSSELL:    Objection.
15                  Go ahead.
16  A    No.
17  Q    And, again, I won't ask you what you said to
18  any of your lawyers ever.  But did you meet with
19  or talk to any other lawyers beside Mr. Hilow
20  with respect to the county Sheriff's
21  investigation?
22                  MR. RUSSELL:    Objection as
23         to when you met.
24  A    Honestly, I don't even think I met with Hilow
25  before that interview.  I just showed up and he

Deposition of Sergeant Dalia Lopez        Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   was there.  But no.
 2   Q    Before the video recorded interview by the
 3   county that we're discussing, did you review any
 4   materials, videos, documents?
 5   A    No.
 6   Q    Did you talk to Jose Garcia before that
 7   interview?
 8   A    I don't know if we ever even exchanged -- had
 9   any type of exchange between the incident and me
10   going in for an interview.  From my recollection,
11   no.
12   Q    Did you talk to anybody else prior to that
13   interview about the events at issue?
14   A    Just to clarify, are we talking like speaking
15   to anybody about any part of that incident?
16   Q    Yeah.
17   A    Yes.  I may have talked to a family member
18   just to vent about what I saw, speak about what I
19   saw that day, but other than that, no.
20   Q    Then the other investigation you mentioned
21   participating in was the Office of Professional
22   Standards investigation and that was more
23   recently, right?
24   A    Maybe a year ago.
25   Q    Can you take me through your involvement in
```

1  that investigation?

2  A    I was ordered to appear.  The union sent a

3  representative to meet me there.  And then I was

4  interviewed by, I believe, Investigator Delaney,

5  and I can't recall the gentleman's name.

6  Q    Was it just the one time that you were

7  ordered to appear and talk to them that you had

8  involvement in the OPS investigation?

9  A    Yes.

10 Q    And that was a video recorded interview,

11 right?

12 A    Correct.

13 Q    And the union representative was with you the

14 whole time?

15 A    Yes.

16 Q    Did he and you meet prior to the interview to

17 get ready?

18 A    I met him there in the building.

19 Q    Did you review any documents and materials to

20 get ready for that interview?

21 A    No.

22 Q    Did you talk to anyone else besides that

23 attorney to get ready for that interview?

24 A    Which attorney?

25 Q    Besides the union representative.  I'm sorry.

1    A    No.

2    Q    **Did you talk to Jose Garcia prior to the OPS**

3    **interview?**

4    A    No.

5    Q    **Besides the county investigation and the OPS**

6    **investigation, are you aware of any other**

7    **internal investigations into the 2020 killing of**

8    **Desmond Franklin?**

9    A    I am aware that there was an internal affairs

10   case.

11   Q    **Can you explain to me your involvement in**

12   **that, if any?**

13                    MR. RUSSELL:    Objection.

14                    Go ahead.

15   A    When I was assigned to internal affairs, one

16   of the sergeants who was in the unit who is no

17   longer there now advised that he had a case for

18   the Garcia involved shooting.  That's how I know.

19   Q    **You didn't find out about that until you**

20   **became an internal affairs --**

21   A    Correct.

22   Q    **-- person.**

23        **Who is the sergeant that told you about that?**

24   A    Mussell.

25   Q    **Is he still in the department?**

1   A    Yes.

2   Q    Did you ever come to find out anything else

3   about that internal affairs investigation?

4                   MR. RUSSELL:    Objection.

5                   Go ahead.

6   A    No.  I did not want to.

7   Q    Do you know if there are any documents that

8   exist related to that investigation?

9                   MR. RUSSELL:    Objection.

10  A    I'm sure there is.

11  Q    But you were never made aware of or spoken to

12  in connection with the internal affairs

13  investigation as a witness, right?

14  A    Right.

15  Q    Besides the county investigation, the OPS

16  investigation, and the IA investigation, are you

17  aware of any other investigations --

18                  MR. RUSSELL:    Objection.

19  Q    -- into the 2020 killing of Desmond Franklin?

20                  MR. RUSSELL:    Objection.

21                  Go ahead.

22  A    I apparently am not.

23  Q    Were you ever interviewed about the killing

24  of Desmond Franklin or the surrounding events by

25  anyone that we haven't discussed yet?

1      MR. RUSSELL:   Objection.

2      Go ahead.

3  A   I do not believe so, no.  No.

4  Q   **Do you remember whether you talked to any**

5  **homicide detectives either at the scene of the**

6  **event that day or subsequently?**

7  A   No.

8  Q   **No, you did not; or no, you don't remember?**

9  A   No, I did not.

10  Q   **What does UDFIT stand for?**

11  A   Use of Deadly Force Investigation Team.

12  Q   **Is there a way that people say that acronym**

13  **so I don't sound goofy when I say it?**

14  A   UDFIT.

15  Q   **Did you talk to anyone from UDFIT about this**

16  **incident?**

17  A   No.

18  Q   **Did you, yourself ever make any written**

19  **record about any part of this incident?**

20  A   I believe the day that -- when it happened,

21  when I was just sitting off to the side waiting

22  to see if I was needed for anything, I may have

23  made notes just because it was fresh in my mind

24  what I had saw.  When there's a lot going on, I

25  think sometimes maybe just you might forget

1  details.  But outside -- and it was very like

2  simple things, like what I saw when I pulled up,

3  you know, just to not lose those details.  But

4  outside of that, no.

5  **Q   Were those like notes on a personal notepad?**

6  A   It was just, I believe, like a random paper

7  that I had in my car.  Just grabbed it and wrote.

8  **Q   That seems like a police officerly thing to**

9  **do.**

10  A   Yes.

11  **Q   You wouldn't still have those notes, would**

12  **you?**

13  A   I do not.

14  **Q   But no one asked or directed you to make an**

15  **official written account based upon these events?**

16  A   No, not that I can recall.  I'm almost

17  positive they did not, but I'm not 100 percent

18  sure if I did or not the day of.  It's just been

19  so long.

20  **Q   Are you aware of any sort of policy or**

21  **protocol that governs what you as an officer**

22  **should do if you're involved or witness something**

23  **like this, deadly force incident?**

24              MR. RUSSELL:   Objection.

25              You can answer, if you know.

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  A   It depends.  If you are a witness, obviously

2  on duty is different than off duty.  As a

3  witness, though, to any crime off duty, there is

4  a directive that states that -- you know,

5  depending on the situation, sometimes it's best

6  to call it in versus getting involved, you know.

7  Again, it depends on the situation.

8  Q   So that directive you're referring to governs

9  if you see something whether you should even

10  become involved; is that right?

11  A   Correct.

12          MR. RUSSELL:    Objection.

13  Q   Are there any directives, procedures,

14  policies you're aware of that govern what you

15  have to do once you do become involved?

16          MR. RUSSELL:    Objection.

17          Go ahead.

18  A   There are many general police orders.

19  There -- again, it depends if you are, I believe,

20  on or off duty as to how you would report, but

21  if -- and I think it's different if you were

22  involved versus if you were a witness to it.  So

23  there's just different reporting guidelines.

24  Q   Okay.  I'd like to talk about the day of the

25  shooting, April 9th, 2020.  Can we start by you

1  **taking me through the events from when you very**

2  **first became aware that anything was going on?**

3  A    As I'm driving northbound on 25th/Pearl,

4  ahead of me I can see to the right a group of

5  people, a car, and at first I really can't tell

6  what's going on.  As I get closer and I'm almost

7  up right next to it, I look over and it

8  clearly -- you know, I could see that there's a

9  car that's smashed up.  So I look over and I see

10  the driver covered in blood.  So I think to

11  myself like that's a pretty bad accident.

12      I pulled over, went to check, make sure that

13  everything was okay, everybody was okay.  As soon

14  as I get out of my vehicle -- again, there's a

15  good amount of people there.  It's almost a

16  little bit chaotic like.  There's a young -- a

17  teenage male screaming.  There is a male that

18  approaches me and says something along the lines

19  of like he doesn't look so well.  I'm guessing he

20  was referring to the driver.

21      So I walk back -- or run back to my car where

22  I had my work bag, my backpack.  I retrieved my

23  police radio.  And I recall putting up my car

24  windows because, again, I had my work items in

25  there.  It was kind of a warmer day, like windows

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    were down, so I put up my windows.  I believe I

2    put my battery into my radio, turned it on,

3    starting walking back, went over the radio to

4    broadcast -- to request for assistance at that

5    point, you know, make sure that the call was

6    there and that EMS was going to be en route.

7        As I'm doing that, that is the point where I

8    see Officer Garcia coming like from the south

9    walking north again on 25th on the sidewalk, and

10   he's yelling something.  And, again, I'm on the

11   radio so it's almost -- like it's hard for me to

12   tell what exactly he's saying, and then he --

13   from what I can recall, he is yelling like

14   "Where's the gun?  Where's the gun?"  And he's

15   looking at the teenage male.  And then at that

16   point I think to myself, well, this is more than

17   just a car accident.

18       So I believe Garcia directed me or told --

19   you know, told me to stay with the teenage boy

20   who was extremely frantic.  So the teenager

21   walked -- he was in a grassy area that was like

22   behind the fence where the actual car was.

23   Here's the car.  Here's the fence.  Here's the

24   grassy area.  The teenager was over there.  And I

25   stayed over there with him, and I was more or

1  less trying to calm him down because he was

2  crying, he was asking for his mother, that's all

3  he wanted, and I just kept telling him like just

4  try to relax, try to calm down.

5      That was really my main interaction on the

6  scene was to make sure like he just remained

7  there.  Again, I didn't know what was going on.

8      And so between the time I called it over the

9  radio and officers -- first responders arrived,

10  it couldn't have been more than 90 seconds.  It

11  was fairly -- like between a minute, minute and a

12  half they were there.

13      The officers arrived.  One of the officers --

14  I remember, I believe, handcuffing the juvenile,

15  but I don't remember like who I grabbed the cuffs

16  off or where I -- it just happened so quick.

17  And, again, it was just for the reason of trying

18  to figure out what was going on.  Just -- and

19  that was it.

20      First responders arrived.  I walked away.  I

21  stepped away.  I really had not much information

22  to offer.  So I waited there.  The supervisor

23  showed up and told me just to remain on scene.

24  After a few minutes of just kind of standing

25  around, I walked to my vehicle, sat in my

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    vehicle, and then spoke to the Sheriff's office.

2    Q    Thank you.  I'm going to ask you some

3    follow-up questions to nail it down.  I'll try

4    not to be too tedious.  Okay?

5        When you first became aware of what you, at

6    that point, thought was a car crash, you were

7    heading in to work, right?

8    A    Correct.

9    Q    So you were coming from your house --

10   A    Yes.

11   Q    -- in Old Brooklyn to the 2nd District.

12   A    Yes.

13   Q    You routinely took that same route?  You were

14   going northbound on Pearl?

15   A    Yes.

16   Q    About what time was that when you left your

17   house?

18   A    Roughly like quarter till.

19   Q    You had to be there at 1400?

20   A    Um-hmm.

21   Q    When you were heading northbound on Pearl

22   Road, did you ever see either the decedent's car

23   or Officer Garcia's car?

24   A    No.

25   Q    Did you ever see Officer Garcia?

1    A    No.

2    Q    Did you ever see either the decedent or the

3    teenager prior to when you arrived at the car

4    crash?

5    A    No.

6    Q    What made you, even though you were at that

7    time off duty, decide to get involved?

8    A    Just what I saw.  It wasn't a regular car

9    crash.  There was a lot of blood.  Really it was

10   that that made me pull over.

11   Q    When you pulled over, did you pull your car

12   right up to the scene at Riverside?

13   A    Pretty much, yeah.

14   Q    And when you saw the teenager, you're

15   referring to Devin Badley?  Do you now understand

16   that that's who that is?

17   A    Yes.

18   Q    When you saw Devin, where was he the very

19   first time you saw him?

20   A    I believe it was next to the driver's side

21   window.

22   Q    Can you explain to me what he was doing, what

23   he was saying in the best detail you can

24   remember?

25   A    From what I can remember -- and, again, it

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  was only an assumption -- I think he was trying

2  to like maybe administer some type of first aid

3  to the driver.

4  Q   Do you remember what he looked like, what he

5  was wearing at that time?

6  A   I believe it was a white t-shirt, but

7  nothing -- I don't remember bottoms or anything

8  like that.

9  Q   Did you form any impressions at that time

10  about the driver?

11  A   What do you mean?

12  Q   Did you form any impression about what was

13  going on with him, what he was doing, his

14  physical state?

15  A   When I initially walked up, no, because I

16  didn't get close enough.  I was still like

17  several feet away and somebody like was standing

18  in front of me telling me like he doesn't look

19  good.  I don't remember the full exchange with

20  this person, but when he said that, again, I had

21  not gotten over to the vehicle and like looked at

22  him up close.  So, no, I just could tell like

23  obviously he's bloody, he's not doing well, and

24  that's why I went to get my radio.  That's my

25  best way of helping at that point.

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q   So at that time you observed these things

2   that you just told me about, before you further

3   engaged you went to get your work bag; is that

4   right?

5   A   To get the radio, yes.

6   Q   What else was there in your work bag besides

7   your radio and the battery?

8   A   I usually have like random things.  Obviously

9   not random, work related.  But handcuffs, my gun

10  is either on my hip or in my bag.  If I'm like

11  rushing out of the house, I'll just grab it, put

12  it in my bag and it's there.  Maybe a jacket, old

13  run sheets, and just like miscellaneous items,

14  pens, Chapstick, things like that.

15  Q   Your police radio, is that something that's

16  issued to you by the department?

17  A   It is.

18  Q   Is that -- is it the same type of radio

19  issued to all of the patrol officers at that

20  time?

21  A   Yes.

22  Q   Are you -- is there a reason that the battery

23  was separated from it at the time?

24  A   I took it home every night and charged it.

25  So I just kind of had a routine, leave the

1  battery in the charger, pull it off.  If I put it

2  together, I would; if not, I would, again, just

3  put it in my bag.

4  Q    Do you remember where you had your gun at

5  that time?

6  A    I believe my gun was in my bag that day.

7  Q    Is the gun also something that was issued to

8  you by the department?

9  A    Yes.

10  Q    Is the same type of gun issued to all the

11  patrol officers at that time?

12              MR. RUSSELL:    Objection.

13              Go ahead.

14  A    There are different -- it's the same make,

15  but not everybody has the same like exact gun,

16  no.

17  Q    Would there be a basis for whether you got a

18  certain type of gun?

19  A    Preference, size.  There's like a smaller and

20  then a larger one.  One that carries more rounds

21  than the other.

22  Q    Do you have a holster for the gun that's also

23  department issued?

24  A    Yes.

25  Q    Does every officer at that time have the same

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   type of holster?

2                    MR. RUSSELL:    Objection.

3                    Go ahead.

4   A   Are you talking about an off duty holster?

5   Q   **If they're different, can you explain it to**

6   **me?**

7   A   There is a difference.

8   Q   **Thank you.**

9   A   So for work purposes, you would have a

10  holster that is on your duty belt.  Those are fed

11  into your belt, so to try to get that off of your

12  belt every night would be almost undoable.  So

13  everybody, I believe, has like their own

14  preference of off duty holster.  So like I have

15  one on now where it's just -- you kind of hook --

16  you can hook it, you can feed it into your belt,

17  whatever you prefer.  But usually it's two.  You

18  have one on your duty belt and one for outside of

19  work.

20  Q   **The one that -- the holster that an officer**

21  **wears off duty, is that also department issued or**

22  **is that something they get?**

23  A   No.  It is not department issued.

24  Q   **But the gun is still department issued,**

25  **right?**

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A   Correct.  Well, I don't know -- are you

2  asking about mine?

3   **Q   That's good.**

4   A   Okay.

5   **Q   Let me strike that and rearrange it.  Thank**

6  **you.**

7      **Off duty officers are allowed to wear their**

8  **duty gun --**

9   A   Yes.

10  **Q   -- off duty, right?**

11  A   Yes.

12  **Q   And if they do that, they can keep it in**

13  **their own private holster if they want; is that**

14  **right?**

15  A   Yes.

16  **Q   They're not required to wear their duty**

17  **pistol while they're off duty, right?**

18  A   Yes.

19  **Q   But they can?**

20  A   Yes.

21  **Q   And you will do that, for example, when you**

22  **were heading into the office or you would keep it**

23  **in your bag.**

24  A   It's your decision.

25  **Q   Besides the radio and, I guess, radio battery**

1  **and the department issued gun, are there other**

2  **things that you would -- that are department**

3  **issued materials that you would take home with**

4  **you after your shift?**

5  A   That's kind of like an open-ended question.

6  So you -- you could take anything that's issued

7  to you home.  Like say my vest that is issued by

8  the City, I'll take it home every few weeks to

9  wash it.  Duty belt, I would take my duty belt

10  home if I had part time somewhere working where I

11  would need to utilize it.  City issued uniform,

12  clothing, jacket.  Sorry.  Maybe I missed the

13  question.

14  **Q   No.  That's okay.**

15      **Are there any rules or expectations governing**

16  **which department issued equipment you should take**

17  **home with you after your shift?**

18  A   No.

19                  MR. RUSSELL:    Objection.

20                  Go ahead.

21  A   No.

22  **Q   It's just totally discretionary for the**

23  **officer.**

24  A   Yes.

25  **Q   Are there any rules or expectations regarding**

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1   what you need to do with your department issued
2   gun while you're off duty?
3                   MR. RUSSELL:    Objection.
4                   Go ahead.
5   A   As long as it's safeguarded.  Outside of
6   that, no.
7   Q   What does safeguarded mean in that context?
8   A   Obviously like just keeping it in your
9   possession, you know, not leaving it at -- in a
10  restaurant restroom or just making sure you know
11  where your gun is and you obviously have --
12  you're responsible for it essentially.
13  Q   When you -- getting back to the April 2020
14  incident, you went to your car to retrieve your
15  radio so that you could call in the situation; is
16  that right?
17  A   Yes.
18  Q   Then at that point did you retrieve your gun?
19  A   No.
20  Q   How come?
21  A   I -- it was just an accident at that point in
22  my mind, so I didn't -- and, again, going back to
23  that question, like I'm not 100 percent if I had
24  it on my hip or in my bag.  But, for some reason,
25  again, just thinking back from my own memory, as
```

1  my memory would serve me, I do believe that it

2  may have been in the bag.  But, no, if it -- if I

3  didn't have it, I definitely didn't grab it.

4  **Q   Up until this point did you identify yourself**

5  **to anyone as a police officer?**

6  A   Yes.  When I walked up, the first person that

7  spoke to me, I explained to them that I was a

8  police officer and said what's going on.  Those

9  were like my first comments made on the scene was

10  that.

11 **Q   Why did you identify yourself as a police**

12 **officer right away?**

13 A   I feel like it's necessary so -- I mean, that

14 way at least they know that I'm there to help.

15 I'm not just another person.  That's really it.

16 **Q   You were still off duty at that time, right?**

17 A   Yes.

18 **Q   Just because you were on your way to work, so**

19 **you hadn't started your shift yet?  Is that what**

20 **that means?**

21 A   Correct.

22 **Q   But once you identified yourself as an**

23 **officer, were you acting as a police officer?**

24                 MR. RUSSELL:   Objection.

25 A   I'm going to say yes because at that point I

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  radioed it in, so yes.

2  Q   So you get your police radio out of the car

3  and you start heading back over from your car to

4  Desmond and Devin -- is that right? -- as you're

5  radioing?

6  A   So I don't recall seeing Devin when I

7  returned.  Like the -- initially I saw him there,

8  and then I didn't see him there, and then I saw

9  him again.  So I don't know where he was.  But I

10  had no reason to look for him -- you know what I

11  mean? -- to keep my eye on him at that point or

12  for any reason.  So when I returned with my

13  radio, I feel like initially I did not -- I don't

14  recall seeing him there like initially as I'm

15  walking back.

16  Q   Did you -- after you were coming back with

17  your radio, did you talk to any of the other

18  witnesses again?

19  A   No.  No.

20  Q   Did you ever record the identity of any of

21  the other witnesses that you had seen or spoken

22  to?

23  A   No.

24  Q   Did you ever later become aware of any

25  witness's identity?

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    No.

2    Q    So you're coming back, you're on your radio,

3    and that's the first time that you see Officer

4    Garcia coming up; is that right?

5    A    Correct.

6    Q    You testified that he's yelling something,

7    but you don't remember what.

8    A    Initially because I feel like I was talking.

9    Like when I first saw him, I mean, he was still

10   at a distance, but walking in this direction and

11   he was shouting something, and I believe that was

12   simultaneously the time that I was calling it

13   over requesting for assistance, so yes.

14   Q    Was it your impressions that as he was coming

15   up to you, that was the first time he was

16   entering the scene of the car crash?

17   A    When I first saw him, yes.  Yes.

18   Q    Do you know exactly where he was coming from?

19   A    I mean, I later found out, but at that time,

20   no.

21   Q    What did you later find out?

22   A    That his vehicle was down that way, but I

23   mean, all I could tell you is he was walking

24   south to north.  He was walking northbound when I

25   initially saw him.  I saw nothing else.

1  Q    And then -- so he was shouting something.

2  What else precisely happened at that time?

3  A    I believe that's like right after -- or at

4  that time I heard him say -- he was shouting at

5  Devin, "Where's the gun?  Where's the gun?"

6  That's all I heard.  And, again, still didn't

7  click to me, you know, what had happened.

8  Q    Was it apparent that Officer Garcia had

9  recognized you --

10  A    Yes.

11  Q    -- as he was coming up?

12  A    Yes.

13  Q    And you recognized him?

14  A    Right.  Yes.

15  Q    Was he wearing plain clothes?

16  A    Yes.

17  Q    Do you remember whether he was wearing any

18  CPD clothes?

19  A    I don't recall.  I don't -- I don't know.  I

20  don't think so.

21  Q    I should have asked, were you wearing any CPD

22  clothes?

23  A    I had my work pants.  Usually I never put

24  like my shirt on until I got to work.  So, no, I

25  would have just been wearing a t-shirt.  I had a

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   leather jacket on, work pants, and black shoes.

2   Nothing with any type of insignia, no.

3   **Q   We were discussing previously the department**

4   **equipment that you keep with you.  What about a**

5   **badge, do you keep that with you?**

6   A   I usually do have -- yes, I do carry a badge

7   in my bag.

8   **Q   Did you ever take your badge out and show it**

9   **to anybody?**

10  A   I don't remember.

11  **Q   Do you remember if Officer Garcia had his**

12  **badge?**

13  A   I don't know.

14  **Q   Or if he ever took it out and showed it to**

15  **anyone?**

16  A   I did not see one.

17  **Q   When he was initially walking up and you**

18  **initially realized it was him, do you remember if**

19  **he had his gun out?**

20  A   No.

21  **Q   No, you don't remember; or no, he didn't?**

22  A   No, I did not see a gun.

23  **Q   At any point did you see him pull his gun**

24  **out?**

25  A   No.

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q    At any point did you see him make physical

2  contact with Devin Badley?

3  A    No.

4              MR. RUSSELL:    Objection.

5              Go ahead.

6  A    No.

7  Q    Can you describe Officer Garcia's demeanor,

8  the impression that you formed, if any, about his

9  demeanor when he was initially walking up?

10             MR. RUSSELL:    Objection.

11             Go ahead.

12 A    Initially, like I said, he was yelling and it

13 was more like an excited -- not excited like.  I

14 really don't know how -- I don't know how to

15 describe his demeanor at that point.  I mean,

16 something was going on.  It was clear that

17 something was happening.  He was -- like his --

18 he was elevated a little.  He was yelling, but he

19 wasn't -- I'm sorry.  I'm trying to think of a

20 word to just best describe it.  I'm sorry.  I'm

21 drawing a blank.

22 Q    It's okay.  It sounds like he was elevated.

23 A    Yes.

24 Q    Was he shook up?

25 A    Initially that's not what I got off of him.

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    I mean, he was a few feet away, but I didn't

2    sense that.

3    **Q   Was he angry?**

4    A   I didn't sense that either, no.

5    **Q   Just elevated?**

6    A   Elevated.  It was like kind of -- I don't

7    know.  That's why it's hard to describe.  Looking

8    back at it, it wasn't -- you know, the word you

9    just stated, that wasn't there.  It was just like

10   an elevated response almost, but hard to

11   identify.

12   **Q   Maybe adrenaline?**

13   A   Yes.  Maybe.  That's a good way to describe

14   it.

15                MR. STADLER:     I'm sorry.

16        What did you say?

17                MS. BONHAM:     Adrenaline.

18   **Q   At this point you got your radio, you**

19   **recognize him, he recognizes you, he's coming up,**

20   **where is Devin Badley?**

21   A   So I feel like he came back into my view like

22   from this side.  Like Garcia was coming from this

23   side.  Devin Badley was coming from this side.

24   So where he came from, I don't know, but that is

25   when we then moved over to the grassy area.

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q   So you're on the sidewalk, you move over to

2  the grassy area.

3  A   Well, I -- when I initially saw him, I was

4  not on the sidewalk yet, or was -- I feel like I

5  was still in the street, but close to the curb,

6  and then, yes, moved to the grassy area.

7  Q   Okay.  So you had pulled up -- you're driving

8  a minivan at this time, right?

9  A   Um-hmm.

10  Q   There are other witnesses -- and I'm talking

11  about initially when you became aware of the

12  event.  You had pulled up, there are other

13  witnesses, your car's on the street, right?

14  A   Right.

15  Q   And then there's the sidewalk, the crashed up

16  gate, and then the grass; is that right?

17  A   Right.

18  Q   And the car is near the crashed up gate in

19  the grass; is that right?

20  A   Correct.  But it's -- the car's on one side

21  of the gate, and the grassy area I'm talking

22  about that I ended up standing with Devin was on

23  the other side of the gate.

24  Q   Okay.  So you parked your car on Pearl.

25  A   Correct.

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q    And Garcia comes up from the south of you.

2  A    Correct.

3  Q    And when he's coming up and you see Devin

4  again, you think maybe Devin's coming in from the

5  north or at least the other side.

6  A    Correct.

7  Q    Okay.  And what, if anything, is Devin doing

8  when you become aware of him again?

9  A    He was hysterical is the best way to describe

10 it.  He was -- he was yelling and screaming and

11 just in a hysterical manner.

12 Q    Was he crying?

13 A    Initially, like when I first saw him, no, but

14 when we got to the grassy area, it almost looked

15 like he was, yes.

16 Q    So you become aware of Devin again as Officer

17 Garcia is coming up.  Officer Garcia is shouting,

18 right?

19 A    It's more of like yelling.  Like shouting I

20 feel is a stronger word than yelling, but it was

21 more like yelling versus shouting.  But, yes,

22 he's yelling.

23 Q    And he's yelling at Devin?

24 A    He is directing -- when he says "Where's the

25 gun," that was directed to Devin, yes.

1    Q    Up until this point had you seen any gun?

2    A    No.

3    Q    Had you had an opportunity to take a closer

4    look at the car or at Desmond up until this

5    point?

6    A    I don't know when I looked in closer.  I

7    don't know if it was before or after that moment.

8    Q    Okay.  So it sounds like when you first get

9    there and become aware of the crash, you take a

10   look from a little bit farther away as Devin's

11   administering aid it seemed to you, right?

12   A    Right.

13   Q    And you didn't see a gun at that point or

14   where it might have been.

15   A    No.

16   Q    And you didn't see Desmond closely at that

17   point either, right?

18   A    Right.

19   Q    Then you go to get your radio, come back,

20   Officer Garcia's coming up, and you have this

21   interaction with Devin, right?

22   A    Right.

23   Q    And in between those two times you didn't

24   have an opportunity to go back and take a closer

25   look at the car.

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    Right.  If we're talking between me initially

2    pulling up, going back to get my radio and coming

3    back, no.  No.

4    Q    So Officer Garcia's coming up, he's yelling

5    at Devin, at this point you start to think there

6    might be something going on besides a car crash;

7    is that right?

8    A    That's right.

9    Q    What precisely happened then between you and

10   Garcia and Devin?

11   A    I believe that is when Garcia said like stay

12   with him or watch him or something that made me

13   remain with Devin.  But, either way, he was like

14   concerned for me at that point because how he was

15   acting.

16   Q    You mean Devin?

17   A    Devin.  Yes.  Like I said, he was very

18   excited and like very upset, hysterical crying,

19   and I was just trying to bring him down like, you

20   know.  So at that point I just feel like from

21   there on out is pretty much where I was.

22        So I would have had -- I believe that's when

23   I may have looked into the car is when I was

24   walking to that grassy area.  So after calling it

25   in, walking past the vehicle, the crashed

1  vehicle, I think that's when I looked in, and

2  then walked to the grassy area.

3  Q    So at some point as you were walking over to

4  the grassy area where you sort of physically

5  encountered Devin, that's where you were able to

6  get a closer look into the car?

7  A    Correct.

8  Q    Did you see a gun in there at that point?

9  A    I did not.

10  Q    Did you get a closer look at Desmond Franklin

11  at that point?

12  A    Yes.

13  Q    Did you form any opinions about him at that

14  point, anything at all?

15  A    He appeared lifeless.  I just really am not

16  100 percent sure when I got that close up to look

17  at him -- you know what I mean? -- timeline wise.

18  I just --

19  Q    When you did get the close-up look at him,

20  did you become aware that he had been shot?

21  A    No.

22  Q    He just appeared lifeless and bloody?

23  A    Correct.

24  Q    When Officer Garcia told you to stay with

25  Devin, was it your understanding that you were

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    detaining him?

2                    MR. RUSSELL:    Objection.

3    A    I don't know.  It was more of just -- again,

4    from -- it was just to keep an eye on him and

5    it -- I don't know.  It could have been.  I could

6    have felt that, that it was like -- I would say I

7    could see, yes, me thinking like he needs to be

8    detained or taking that and interpreting to that.

9    Q    Did you -- is there anything that Devin said

10   to you at that time when it was just you with him

11   that you can remember?

12   A    The only thing he said -- like the only words

13   really that he was saying were that he wanted his

14   mother.

15   Q    When you were staying with Devin at that

16   time, you said it was about probably just 90

17   seconds until the uniformed officers and EMS

18   started arriving, right?

19   A    Um-hmm.

20                    MR. RUSSELL:    I'm sorry?

21   A    No.

22                    MR. RUSSELL:    Did you mean

23           yes?  Just because you said

24           um-hmm.  So I just want -- since

25           she's taking it, I just want to

1          make sure the record's clear.

2          That's all.

3   A    I want to say from the time I called it in

4   until the time they arrived was super fast,

5   minute, minute and some change.  But, yes, from

6   the time I called it in.

7   Q    So this interaction is happening pretty

8   quickly.  It's over in a minute.

9   A    Very, yes.

10  Q    After Officer Garcia tells you to remain with

11  Devin, what does he do, Garcia?

12  A    I don't know.

13  Q    You didn't see him do anything?

14  A    I don't -- I can't -- I was focused on Devin.

15  Q    Do you know if Officer Garcia at that point

16  approached the car that Desmond was in?

17  A    I don't know where -- I can't recall where he

18  was standing at the time because, again, my eyes

19  were on Devin.

20  Q    Before EMS and other uniformed officers show

21  up, is there anything else that you can remember

22  that happened at this point?

23  A    No.  And at this point I still don't know

24  what actually happened.  So that's what is

25  like -- that's why it's hard for me to kind of --

Deposition of Sergeant Dalia Lopez      Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  because what I learned afterward versus what I

2  knew at the time.  You know what I mean?  So no,

3  no, nothing that I can remember.  No.

4  **Q  I appreciate that.**

5  **And when you say at this point you still**

6  **don't know what happened, what you mean is you**

7  **didn't know there was an officer involved**

8  **shooting.**

9  A  I didn't know, right, that there was a

10  shooting at all.

11  **Q  You thought it was a car crash still.**

12  A  Still.  And obviously something more to it,

13  but what, you know...

14  **Q  Then at some point you obtain handcuffs from**

15  **someone and handcuff Devin, right?**

16  A  Right.

17  **Q  You don't remember who or when precisely.**

18  A  I believe it was like right when the

19  uniformed officers arrived and walked my way.

20  Whatever officer or whoever walked towards me, I

21  believe, is where I got the handcuffs and

22  assisted with handcuffing him.

23  **Q  Why did you guys handcuff Devin?**

24  A  So initially -- and this is the best way I

25  can explain this -- between me thinking that this

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   is a car accident to then seeing Garcia and

2   hearing him question where's the gun, I didn't

3   know what role Devin played in any of it.  So it

4   was more or less just to like slow everything

5   down and figure everything out.

6   Q   Was it your impression that Officer Garcia

7   wanted Devin to be detained?

8                   MR. RUSSELL:    Objection.

9                   Go ahead.

10  A   I would say yes.  Yes.  I mean -- or maybe I

11  chose that.  I can't remember why.  I don't know.

12  I'm sorry.

13  Q   After you had assisted in handcuffing Devin,

14  what did you do then?

15  A   I think I walked away because, again, I was

16  off duty.  You know what I mean?  So I didn't

17  feel like I should just kind of stand at the

18  scene.  So I remember walking out of the green

19  grassy area, walking south where Garcia was

20  standing, and I stood there with him, and I

21  believe the officer -- this lieutenant that

22  showed up -- I believe he was a lieutenant at the

23  time -- told me to -- him and another sergeant

24  told me to stand by, like just remain on scene,

25  because I was technically like the first person

Deposition of Sergeant Dalia Lopez        Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   on scene, so just stay where you are if we need

2   anything.  And that's what I did.

3   **Q   At that time, even though you were off duty,**

4   **you had police officer responsibilities; is that**

5   **right?**

6               MR. RUSSELL:     Objection.

7               Go ahead.

8   A   That's what I felt, yes.

9   **Q   When you went to stand with Officer Garcia at**

10   **that moment, did you all say anything to each**

11   **other?**

12   A   I believe it was an exchange, like "Are you

13   okay," I think I said.  I asked him, "Are you

14   okay?"

15     And he said something like, "I just can't

16   believe" -- he still didn't say what happened.  I

17   don't recall him saying like, you know, flat out

18   like I shot him or anything.  I don't remember

19   any type of conversation like that.  It was just

20   like, "I can't believe what just happened."

21     And he appeared like not okay physically

22   like, so -- and that's why I asked are you okay.

23   And I believe I gave him like a piece of candy or

24   something because he just looked drained, like

25   his color seemed like -- he looked pale.

Deposition of Sergeant Dalia Lopez       Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q   **At that moment did it appear to you that he**

2   **was physically injured?**

3   A   No.  Not physical injured, no.  But

4   physically like almost like sick he looked.  He

5   didn't look okay.

6   Q   **Was he still exhibiting that elevated state**

7   **that you described?**

8   A   No.

9   Q   **He was drained?**

10   A   He was off of the adrenaline rush is the best

11   way to describe it.

12   Q   **Did he seek medical attention at that time**

13   **that you know of?**

14   A   I don't know.

15   Q   **Did he say anything else to you at that**

16   **moment that you can remember?**

17   A   He may have made a comment about like

18   something happening down the street, like

19   stealing from a store, something along that line,

20   but, again, I feel like I almost wasn't like

21   really like -- I didn't absorb that.  Like I

22   heard it, but I didn't really connect.  Yeah.  It

23   was a very -- like just an interesting situation

24   because, again, I didn't really know what was

25   going on still.  So the conversation was brief.

Deposition of Sergeant Dalia Lopez            Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1  It was really -- I don't think there was anything
 2  else to it.
 3  Q   So it sounds like you were checking on him,
 4  giving him some candy.
 5  A   Yeah.  Or gum.  I gave him a piece of gum.
 6  It was something.  It looked like his blood sugar
 7  had dropped or something.
 8  Q   He had made a statement like I can't believe
 9  it, but not a detailed statement of what
10  occurred, right?
11  A   Right.
12  Q   And he mentioned something about theft at a
13  store.
14  A   Right.
15  Q   Anything else you can remember from that
16  moment that he might have said?
17  A   No.
18  Q   And this interaction that we're talking about
19  between you and Officer Garcia was immediately
20  after you had stepped away from the scene with
21  Devin, right?
22  A   I don't know if it was right immediately
23  after or if it was within like a minute or two
24  because I feel like between me walking away I did
25  stop and speak to the supervisors that arrived.
```

1  So shortly after, within minutes maybe.  Yeah.

2  Q   Did anyone ever direct you to either talk or

3  not talk to Garcia at that time?

4  A   I don't think so, no.

5  Q   Did anyone direct you whether to remain at

6  the scene?

7  A   Yes.

8  Q   Did you receive any other directions besides

9  remain at the scene?

10  A   No.

11  Q   Did you see or hear Garcia talking to anyone

12  else at that time?

13  A   No, I don't.  But I walked away and sat in my

14  car so I just --

15  Q   It sounds like -- after you had that

16  interaction with Officer Garcia, you walked away

17  and sat in your car for about how long?

18  A   It was a little bit of a while, but I don't

19  know.  Maybe an hour.  I don't know.

20  Q   After that, did you talk to anyone else

21  besides -- ultimately I know you talked to the

22  Sheriff's Department, the county -- right? -- at

23  the scene?

24  A   Right.

25  Q   Between sitting in your car and talking to

1  the county officers, did you talk to anybody else

2  about what had happened?

3  A   I remember I called my husband, but that's

4  it.  And I was just like, "Hey, if you see the

5  van" -- because there was media.  I already knew

6  my van was sitting there.  I didn't want him to

7  think that I was involved in something, you know.

8  So I just called him to tell him, "Hey, I'm

9  okay," just in case, but that was it.  No, I

10  didn't speak to anyone else.

11  Q   Between leaving where you were with Devin

12  after he was handcuffed and this time of sitting

13  in your car, did you ever interact with Devin

14  again after that point?

15  A   No.

16  Q   Did you ever hear him say anything again

17  after that point?

18  A   No.

19  Q   Did you ever look at Desmond or their car

20  again after that point?

21  A   Did I look at the car?  Maybe, yeah.  From

22  a -- but I was, at this point, a distance away.

23  Like I believe I moved my vehicle further down

24  when they taped off the crime scene.  No.

25  Q   Do you remember how long you had to stay

1  there at the scene total that day?

2  A   I want to say total -- I don't know -- an

3  hour and a half, two hours tops.  I can't recall.

4  I'm not for sure.  Roughly.

5  Q   Were you involved at all in processing the

6  scene for evidence?

7  A   No.

8  Q   Did you become involved in any investigation

9  or evaluations of what had happened that day at

10  the scene --

11  A   No.

12              MR. RUSSELL:    Objection.

13              Go ahead.

14  A   No.

15  Q   -- besides talking to the county officials?

16  A   No.

17  Q   Did you end up leaving the scene before other

18  officers and officials left?

19  A   Yes.

20  Q   Were you directed to do that?

21  A   I was just waiting to talk to -- after I

22  spoke to the Sheriffs, I left.

23  Q   They said --

24  A   But I don't remember if they had like -- I

25  don't remember if I was instructed to leave or if

1  I just felt like I was done.

2  **Q   After you left, did you go to work?**

3  A   I went to the district, but then I ended up

4  just leaving and going home.

5  **Q   Why was that?**

6  A   I don't remember if I was advised to by the

7  supervisors, like -- I don't remember.

8  **Q   When you got to the district, did anyone have**

9  **you fill out any paperwork or otherwise talk to**

10  **anyone about this event?**

11  A   No.

12  **Q   After you had that conversation with Officer**

13  **Garcia where you gave him the gum or candy right**

14  **after leaving Devin's side, did you talk to him**

15  **again while the both of you were at the scene?**

16  A   No.  It was just the initial -- like once I

17  went to my car, I stayed in my car.  No.

18  **Q   So that was the only time you talked to**

19  **Officer Garcia -- I'm sorry.  That was the last**

20  **time you talked to Officer Garcia that day?**

21  A   Yes.

22  **Q   Did you see him again that day?**

23  A   No.

24  **Q   Do you know whether he came back to the**

25  **district?**

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    Oh, I have no idea what he did next.
 2   Q    Did you ever become aware that he had to fill
 3   out any kind of paperwork about this?
 4   A    I did not know anything about that, no.
 5   Q    Is it typical that if you use your department
 6   issued gun, you have to fill out a report about
 7   that?
 8                    MR. RUSSELL:    Objection.
 9                    Go ahead.
10   A    Any time you discharge your firearm, I mean,
11   it launches an investigation of some sort.
12   Q    Can you tell me how that happens and what
13   that investigation is like just briefly?
14                    MR. RUSSELL:    Objection.
15                    Go ahead.
16   A    Briefly, and I'm not very well versed on it,
17   but -- it depends, but that is when the -- it
18   depends on like the outcome too.  But the
19   UDFIT -- that's what UDFIT is for.  They're Use
20   of Deadly Force Investigation Team, so that's
21   usually who would come out and handle it.  But it
22   depends the outcome, what happened with the
23   shooting, an outside agency may have to be
24   brought in, but homicide is the one who handles
25   these investigations.
```

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    Do you remember talking to any of the

2    following officers that day:  Officer -- or

3    Detective Hale?

4    A    No.

5    Q    Diaz?

6    A    No.

7    Q    Borden?

8    A    No.

9    Q    Bahnhof?

10   A    No.  Bahnhof -- I don't know who Bahnhof is,

11   and I don't know the name of the Sheriff that I

12   spoke to, so...

13   Q    Fair enough.  Is an investigation over the

14   use of deadly force launched when someone uses

15   their department issued weapon regardless of

16   whether that person is off duty when they use the

17   weapon?

18                    MR. RUSSELL:    Objection.

19                    Go ahead.

20   A    That's a good question.  I want to say yes.

21   Q    Are CPD officers trained about how to use

22   their gun?

23   A    Yes.

24   Q    Does the training that you undergo about how

25   to use your gun apply whether or not you're on

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  duty at the time you use it?

2              MR. RUSSELL:    Objection.

3  A    I don't understand the question.

4  Q    You go through training about how to use your

5  department issued gun, right?

6  A    Right.

7  Q    And then you have to adhere to what that

8  training teaches you as an officer when you use

9  your gun, right?

10  A    Yes.

11  Q    Do you have to adhere to what that training

12  teaches you if you use your gun while you're off

13  duty?

14              MR. RUSSELL:    Objection.

15  A    Yes.

16  Q    In the training that you received as a CPD

17  officer about how to use your gun, are you taught

18  anything about shooting a gun at a moving car?

19              MR. RUSSELL:    Objection.

20  A    We're not trained to shoot at a moving car.

21  Q    Are you trained not to shoot at a moving car?

22              MR. RUSSELL:    Objection.

23  A    I don't remember ever being trained not to

24  shoot at a moving car.  No, I don't.

25  Q    Did you ever receive any training about

```
1   shooting from a moving car?

2                   MR. RUSSELL:     Objection.

3   A    No.

4   Q    When you first saw Officer Garcia at the

5   scene of the incident that day, did you notice

6   whether he had a gun holster on his hip that he

7   was wearing?

8   A    I can't recall that.  I don't.

9   Q    Was it your impression at the time that you

10  arrived at the scene that Devin Badley was

11  unarmed?

12  A    Yes.

13  Q    At what point did you first become aware that

14  this was a shooting rather than a car crash?

15  A    Not until afterwards.  Not until like

16  everything was said and done, but I can't tell

17  you exactly when I found out that.  I don't know

18  exactly when, but it was after the fact.

19  Q    Do you remember whether you heard someone say

20  that?

21  A    I don't know.

22  Q    It sounds like when you had that first

23  conversation with Officer Garcia after you

24  stepped away from Devin, at that point you still

25  didn't know that he had shot someone, right?
```

1   A   Correct.

2   Q   Then at some point you went to your car and

3   just stayed by yourself, right?

4   A   Right.

5   Q   During this time before you went to your car,

6   did you become aware that there was an officer

7   involved shooting?

8   A   I don't know when I found out.  I really

9   don't know.  I feel like I would assume that I

10  figured it out by then or found out by then, but

11  I don't know.

12  Q   After you had spent some time in your car and

13  talked to your husband, then the next person that

14  you talked to it sounds like was the county

15  investigators; is that right?

16  A   Yes.

17  Q   By that point were you fully aware that this

18  was an officer involved shooting?

19  A   I don't know.

20  Q   Can you tell me everything you remember about

21  that on scene interview with the county

22  officials?

23  A   It's so vague in my memory.  It was short,

24  but I -- I don't know.  I just remember a few

25  questions.  I can't tell you exactly what they

1  were.  I don't remember.  And I remember him

2  giving me a card and telling me that he would

3  obviously be in contact, or if I needed anything,

4  to contact him if I had any questions.  I don't

5  remember the questions that he asked.

6  **Q   We spoke briefly about the interviews and**

7  **investigations that you became aware of around**

8  **this incident, and I forgot to ask if you ever**

9  **participated in or became aware of Grand Jury**

10  **proceedings related to this incident.**

11  A   I did go to the -- I was at the Grand Jury.

12  I believe I was subpoenaed to go, yes.  I forgot

13  about that.

14  **Q   Did you provide testimony before the Grand**

15  **Jury about this?**

16  A   Yes.

17  **Q   Were you represented by an attorney in the**

18  **course of that testimony?**

19  A   No.

20  **Q   Did you have any meeting with an attorney**

21  **prior to giving that testimony?**

22  A   No.

23  **Q   Did you talk to Officer Garcia prior to**

24  **giving that testimony?**

25  A   No.

1  Q   Did you review any materials, video, or

2  documents prior to giving that testimony?

3  A   No.  I have tried not to review anything.  I

4  mean, I'm just relying on my own memory and

5  that's how I've tried to keep it.  I don't want

6  like -- no.  The answer is no.

7  Q   Did you talk to anyone at all about this

8  incident immediately before or after your Grand

9  Jury testimony?

10  A   In what context?  Like --

11  Q   At all.

12  A   I mean, I feel like I may say something like,

13  "Oh, I have to go to Grand Jury, what do I" --

14  "what is expected at Grand Jury."  Because I

15  think that was my first time ever even having to

16  go to Grand Jury.  But outside of like comments

17  like that or conversation like that, no.

18  Q   Besides the two times you talked to the

19  Sheriff's Department, the one time you talked to

20  OPS, the Grand Jury testimony, and the stuff I'm

21  asking you about today, are you aware of any

22  other time that you made an official statement

23  about the events at issue in this case?

24  A   I feel like I've already answered no to this

25  and you reminded me of the Grand Jury, so it's --

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    no.

2    Q    That's okay.  I'm not trying to trick you.

3    I'm just making sure --

4    A    I know.  I feel like, though, how did I not

5    even remember that?

6    Q    It's all very hush, hush in the Grand Jury so

7    don't worry about it.

8    A    Okay.

9    Q    Okay.  Prior to this event or subsequent to

10   this event have you ever been a witness to a

11   different event involving officer use of deadly

12   force?

13                   MR. RUSSELL:    Objection.

14   A    No.

15   Q    After you left the scene that day, did you

16   ever talk to Officer Garcia about what had

17   happened?

18                   MR. RUSSELL:    Objection.

19   A    I tried to never have that conversation with

20   him because, again, like I explained to you

21   before, I don't want to know more than I know.

22   Like I know what -- you know, what I can recall,

23   what I saw, what I did, so I never asked.  I

24   didn't want to know.  But outside of like very

25   small-talk, how are you doing, I think -- I don't

Deposition of Sergeant Dalia Lopez                Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  know.  Just like small-talk like that, seeing him

2  in passing, but never about the details of

3  anything from that day.

4  **Q    After that day when was the next time you**

5  **remember encountering him in any capacity?**

6  A   It's been too long.  Best answer I can say is

7  probably at work sometime after that.  I don't

8  know how soon after.

9  **Q    After these events did you and he ever spend**

10 **time together socially?**

11 A    No.

12 **Q    Did you ever make any written correspondence**

13 **with him about these events?**

14 A    No.

15 **Q    Did you ever hear anybody else in the 2nd**

16 **District on second shift talking about these**

17 **events?**

18 A    No.

19 **Q    Did you ever see or become aware of any other**

20 **written correspondence within the police**

21 **department about these events other than what**

22 **you've already described to me?**

23              MR. RUSSELL:   Objection.

24              Go ahead, if you can.

25 A    No, I don't think so.  No.

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    Was there ever a staff meeting about these

2    events?

3    A    No, not that I know of.

4    Q    Did anyone that was your supervisor ever ask

5    you about these events again?

6                    MR. RUSSELL:    Objection.

7                    Go ahead.

8    A    No.

9    Q    At the scene that day you had signed what's

10   called a crime scene log; is that right?

11                   MR. RUSSELL:    Objection.

12                   Go ahead.

13   A    Not that I recall.  No.  Why would I sign a

14   crime scene log?

15   Q    Do you know what a crime scene log is?

16   A    I'm sorry.  I thought you were asking if I

17   conducted the crime scene log, that's when you

18   would sign it.

19   Q    I'm sorry.

20   A    I'm sorry.  I misunderstood you.

21        I don't remember if --

22                   MR. RUSSELL:    What is -- do

23           you have a -- do you have a

24           question pending or no?

25                   MS. BONHAM:    Yeah.  She's

Deposition of Sergeant Dalia Lopez            Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1              still answering.
 2                   MR. RUSSELL:    All right.
 3  A   I don't remember if I signed it or if whoever
 4  was completing it added my name to it because I
 5  was on the scene.  I don't remember.
 6  Q   Can you explain to me briefly what a crime
 7  scene log is?
 8  A   It's just a log that documents persons on
 9  scene at a crime scene.  So usually for any
10  deaths, natural causes or not, you would complete
11  a crime scene log just to document who was there.
12  Q   Is there a certain type of officer with a
13  type of job duty that would be responsible for
14  conducting that?
15                   MR. RUSSELL:    Objection.
16                   Go ahead.
17  A   Usually it's just an officer -- usually basic
18  patrol that a supervisor assigns that duty to or
19  they just take it upon themselves to complete it,
20  but they are responsible for documenting who like
21  arrives and leaves the scene.
22  Q   So any officer that is at the scene at some
23  point, their name would be on the log.
24  A   Correct.
25  Q   Just like an attendance sheet.
```

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    Pretty much.
 2   Q    Okay.  Did you at any point, other than
 3   participating in detaining Devin, interview any
 4   witnesses that day?
 5                    MR. RUSSELL:    Objection.
 6                    Go ahead.
 7   A    No.
 8   Q    Did you physically handle any evidence?
 9   A    No.
10   Q    Were you otherwise involved at all in the
11   investigation of what had happened?
12   A    No.
13   Q    Did you ever become aware of any details
14   about the investigation about what had happened?
15                    MR. RUSSELL:    Objection.
16   A    No.
17   Q    Were you ever later asked to look at evidence
18   from that crime scene?
19   A    No.
20   Q    Were you ever later asked to look at either
21   Officer Garcia or Desmond Franklin's car after
22   you left the scene that day?
23   A    No.  And the only reason I'm hesitating on
24   answering is are we talking -- like I don't know
25   if anything was shown to me in Grand Jury, but
```

1   from the police department or any other entity,

2   no.  My answer is no.

3   **Q    Other than inside the Grand Jury proceedings,**

4   **it sounds like you never viewed any evidence --**

5   **is that right? -- or handled any evidence?**

6   A    No.  I've never handled any evidence.  And,

7   again, I can't remember in any -- if any of the

8   interviews that I mentioned, OPS, Sheriff's, I

9   don't know if they ever actually showed me like

10  photos to, you know, ask more about whatever they

11  were showing or not.  But outside of that, no.

12  **Q    Did anyone ever have you physically view the**

13  **car, either car?**

14  A    No.

15  **Q    While you were at the crime scene that day,**

16  **did you at any point contact an attorney?**

17  A    No.

18  **Q    Are you aware of whether Garcia at any point**

19  **contacted an attorney?**

20                  MR. RUSSELL:    Objection.

21                  Go ahead.

22  A    I do not know.

23  **Q    Are you aware of whether Officer Garcia was**

24  **involved in processing the crime scene in any**

25  **way?**

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    No.  No.

 2   Q    No, you don't know?

 3   A    No.  I don't know.  And, no, I don't think

 4   so, but --

 5   Q    Are you aware of whether he handled any of

 6   the evidence at the scene that day?

 7   A    I am not aware of any of that, no.

 8   Q    Are you aware of who, if anyone, talked to

 9   him about the incident at the scene --

10   A    No.

11   Q    -- besides yourself?

12   A    No.

13   Q    Did you ever hear anyone tell Officer Garcia

14   to do or not do anything at the scene that day?

15               MR. RUSSELL:    Objection.

16   A    I feel like I may have told him like talk to

17   the union, but that's the only thing that I know

18   or heard or -- you know, that anybody said to do

19   something, but that's it.

20   Q    You said you might have told him that or you

21   heard someone tell him that?

22   A    I think I may have told him that.

23   Q    Nobody ever told you not to talk to him; is

24   that right?

25   A    Right.  Not that I can recall, no.
```

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   **Q   Nobody ever -- it sounds like nobody ever**

2   **told you to do or not do anything until you**

3   **talked to the county; is that right?**

4   A   No.  There was the first responding

5   supervisors, I believe, just told me to like

6   remain on scene just in case they had any

7   questions, but outside of that, I don't remember

8   anything else other than talking to the county.

9   **Q   Do you remember if you ever talked to EMTs**

10   **about what was happening with Devin or otherwise?**

11   A   I did not, no.

12   **Q   Why was it your practice to bring your gun**

13   **and your badge and your radio home with you even**

14   **when you were off duty?**

15   A   So I feel like as a police officer you have a

16   duty even while you're off duty.  Secondly, my

17   radio, I charged it every night at home, and

18   again, if I needed to perhaps call something in,

19   I have it with me on my way to and from work.

20   And my gun I just always felt safer having it

21   with me versus leaving it in my locker at work.

22   **Q   When you say you have a duty even when you're**

23   **off duty, what does that mean to you?**

24   A   I just feel like as a police officer I took

25   an oath to like serve and protect and that

```
 1   doesn't stop when I'm off the clock.  So that's

 2   it.

 3                 MS. BONHAM:    All right.

 4           Can we take like a five-minute

 5           break?  I just want to look over

 6           my notes, but I'm going to be done

 7           shortly.

 8                 (Recess had.)

 9   BY MS. BONHAM:

10   Q   Have you ever made any unofficial written

11   statements about the events at issue in this case

12   that I haven't asked you about?  For example, on

13   a social media platform or in a diary?

14   A   No.

15   Q   Have you ever spoken to anyone in the

16   Cleveland Police Department about the issues in

17   this case that we haven't already talked about?

18   A   No.

19   Q   Is there anything else, any other fact or

20   impression that you developed or anything about

21   this case that we haven't discussed that you

22   would want to share or make clear?

23   A   Only thing I wanted to make clear is I

24   stopped that day to help because I thought it was

25   an accident, and even throughout like the events
```

Deposition of Sergeant Dalia Lopez          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   prior to uniformed police arriving, I didn't know

2   that there was -- I knew there was more to it,

3   but I didn't know exactly what.  But that's it.

4   That's all.

5   Q   If I am trying to find out additional facts

6   about what happened that day, besides the

7   individuals that we've already named in our

8   conversation so far, is there anyone else that

9   you know about that I should ask?

10                  MR. RUSSELL:    Objection.

11                  Go ahead.  Answer if you can.

12  A   No.

13  Q   You don't remember the names or identities of

14  any of the eyewitnesses that you had mentioned?

15  A   No.  I did not get anybody's name.

16  Q   And you never became aware later of the names

17  or identity of additional eyewitnesses?

18  A   No.

19                  MS. BONHAM:    Okay.  That's

20             all I have.

21                  Counsel?

22                  MR. SMARTNICK:    No.

23                  MR. STADLER:    No.

24                  MR. RUSSELL:    She'll

25             review, and we'll order a

1          transcript.

2                  - - - - -

3      (Deposition concluded at 12:04 p.m.)

4            (Signature not waived.)

5                  - - - - -

CERTIFICATE

I, Rebecca L. Fumich, Notary Public within and for the State of Ohio, do hereby certify that the within named witness, SERGEANT DALIA LOPEZ, was first duly sworn to testify to the truth and nothing but the truth in the cause aforesaid; that the testimony was by me reduced to stenotype in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above referenced witness.  I further certify that this deposition was taken at the time and place in the foregoing caption specified.  I do further certify that I am not a relative, counsel or attorney for either party, or otherwised interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed by seal of office at Cleveland, Ohio this 22nd day of February, 2023.


*Rebecca L. Fumich*
_____

Rebecca L. Fumich, Notary Public, within and for the State of Ohio.

My Commission expires:  6-5-2025.

I have read the entire transcript of my deposition taken on the _9th_ day of _Feb._, 20_23_, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated:

| PAGE | LINE | CORRECTION/CHANGE & REASON THEREFORE |
|------|------|--------------------------------------|
| 48 | 13-15 | But either way, Devin concerned me at that point, because of how he was acting |

I do hereby certify that the foregoing changes are true to the best of my knowledge.
Date _3-16-23_  Witness Signature _____

SERGEANT DALIA LOPEZ

Sworn to and subscribed before me on the _16t_ day of _March_, 20_23_.

_____
Notary Public in and for the State of Ohio.
My Commission expires _____.

JAMES R. RUSSELL, JR., Attorney At Law
NOTARY PUBLIC, STATE OF OHIO
My Commission Has No Expiration
Section 147.03 R.C.

**Case: 1:22-cv-00061-DAP  Doc #: 44-2  Filed: 01/31/24  82 of 89.  PageID #: 358**

Deposition of Sergeant Dalia Lopez        Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

## WORD INDEX

**< 1 >**
**1:22-CV-00061**  1:8
**10**  13:3
**10:08**  1:22
**100**  24:17  37:23  49:16
**106**  2:8
**12:04**  78:3
**1215**  2:8
**1400**  12:6, 21  29:19
**15**  4:7, 8
**16**  4:9
**1621**  3:4
**17**  11:9
**18**  4:10, 11
**1900**  2:5

**< 2 >**
**2:00**  12:2
**20**  13:3
**2018**  10:16
**2020**  12:5, 10  13:19
 14:13  16:5  21:7  22:19
 25:25  37:13
**2023**  1:22  79:20
**21**  4:12
**216-241-1430**  2:7
**216-241-5310**  2:8
**216-664-2767**  2:8
**216-722-3112**  3:6
**22**  4:13, 14, 15, 16  10:22
**22nd**  79:20
**23**  4:17
**24**  4:18
**25**  4:19, 20  14:8
**25th**  27:9
**25th/Pearl**  26:3
**2nd**  10:19  11:10, 16, 25
 12:12  13:11, 13  14:6
 15:2, 3  29:11  69:15

**< 3 >**
**300**  3:4
**33**  4:21
**34**  4:22
**36**  4:23
**37**  4:24
**38**  4:25

**< 4 >**
**43**  5:1, 2
**44113**  2:6  3:5
**44114**  1:21  2:8

**< 5 >**
**50**  2:5  5:3
**53**  5:4
**54**  5:5

**59**  5:6
**5th**  10:15, 17  11:10

**< 6 >**
**6**  4:3
**601**  1:20  2:8
**61**  5:7, 8
**62**  5:9
**63**  5:10, 11, 12
**64**  5:13
**6-5-2025**  79:25
**68**  5:14, 15
**69**  5:16

**< 7 >**
**70**  5:17, 18
**71**  5:19
**72**  5:20, 21
**73**  5:22
**74**  5:23
**77**  5:24
**7th**  2:8

**< 8 >**
**80th**  11:20

**< 9 >**
**9**  1:22  4:6
**90**  28:10  50:16
**9th**  14:13  25:25

**< A >**
**a.m**  1:22
**able**  7:19  49:5
**absorb**  55:21
**academy**  10:15  11:3
**accident**  26:11  27:17
 37:21  53:1  76:25
**account**  24:15
**acronym**  23:12
**acting**  38:23  48:15
**action**  79:17
**actual**  12:18  13:10  27:22
**ADAM**  1:4
**added**  71:4
**additional**  77:5, 17
**Additionally**  7:21
**address**  2:8
**adhere**  63:7, 11
**administer**  31:2
**administering**  47:11
**Administrator**  1:6
**adrenaline**  44:12, 17
 55:10
**adult**  16:3
**advised**  21:17  60:6
**affairs**  10:24  11:1  21:9,
 15, 20  22:3, 12
**AFFAN**  2:8

**affixed**  79:19
**aforesaid**  79:7
**afterward**  52:1
**agency**  61:23
**ago**  8:25  9:9  19:24
**ahead**  8:2, 7, 11  15:24
 16:14  18:15  21:14  22:5,
 21  23:2  25:17  26:4
 33:13  34:3  36:20  37:4
 43:5, 11  53:9  54:7  59:13
 61:9, 15  62:19  69:24
 70:7, 12  71:16  72:6
 73:21  77:11
**aid**  31:2  47:11
**ALI**  2:8
**allowed**  35:7
**amount**  26:15
**angry**  44:3
**Ankuda**  3:3
**answer**  7:7  8:6, 7, 11
 15:15, 24, 25  24:25  67:6
 69:6  73:2  77:11
**answered**  67:24
**answering**  71:1  72:24
**answers**  7:3
**Anybody**  8:1, 21  9:21
 19:12, 15  42:9  58:1
 69:15  74:18
**anybody's**  77:15
**anyway**  8:7
**apparent**  41:8
**apparently**  22:22
**appear**  20:2, 7  55:1
**APPEARANCES**  2:1
**appeared**  49:15, 22  54:21
**apply**  62:25
**appreciate**  52:4
**approached**  51:16
**approaches**  26:18
**approximately**  14:7, 8
**April**  13:19  14:13  25:25
 37:13
**area**  12:22  27:21, 24
 44:25  45:2, 6, 21  46:14
 48:24  49:2, 4  53:19
**arrived**  28:9, 13, 20  30:3
 51:4  52:19  56:25  64:10
**arrives**  71:21
**arriving**  50:18  77:1
**asked**  17:9, 14  24:14
 41:21  54:13, 22  66:5
 68:23  72:17, 20  76:12
**asking**  16:22  28:2  35:2
 67:21  70:16
**assigned**  10:17, 20  11:25
 21:15
**assignment**  14:19
**assignments**  13:2, 9
**assigns**  71:18

**assistance**  27:4  40:13
**assisted**  52:22  53:13
**assume**  7:8  65:9
**assumption**  31:1
**attendance**  71:25
**attention**  55:12
**attorney**  9:17  20:23, 24
 66:17, 20  73:16, 19  79:15
**attorneys**  8:17  9:15
**August**  10:16
**Avenue**  1:21  2:8  3:4
**aware**  21:6, 9  22:11, 17
 24:20  25:14  26:2  29:5
 39:24  45:11  46:8, 16
 47:9  49:20  61:2  64:13
 65:6, 17  66:7, 9  67:21
 69:19  72:13  73:18, 23
 74:5, 7, 8  77:16

**< B >**
**back**  26:21  27:3  37:13,
 22, 25  39:3, 15, 16  40:2
 44:8, 21  47:19, 24  48:2, 3
 60:24
**backpack**  26:22
**bad**  26:11
**badge**  42:5, 6, 8, 12  75:13
**Badley**  30:15  43:2  44:20,
 23  64:10
**bag**  26:22  32:3, 6, 10, 12
 33:3, 6  35:23  37:24  38:2
 42:7
**Bahnhof**  62:9, 10
**based**  24:15
**basic**  71:17
**basis**  33:17
**battery**  27:2  32:7, 22
 33:1  35:25
**behalf**  2:2, 8
**believe**  8:20  12:6  14:23
 20:4  23:3, 20  24:6  25:19
 27:1, 18  28:14  30:20
 31:6  33:6  34:13  38:1
 40:11  41:3  48:11, 22
 52:18, 21  53:21, 22  54:12,
 16, 20, 23  56:8  58:23
 66:12  75:5
**belt**  34:10, 11, 12, 16, 18
 36:9
**best**  25:5  30:23  31:25
 43:20  46:9  52:24  55:10
 69:6
**bit**  26:16  47:10  57:18
**black**  42:1
**blank**  43:21
**blood**  26:10  30:9  56:6
**bloody**  31:23  49:22
**body**  8:16  9:4, 8

Case: 1:22-cv-00061-DAP  Doc #: 44-2  Filed: 01/31/24  83 of 89.  PageID #: 359
Deposition of Sergeant Dalia Lopez
Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**BONHAM** 2:*3* 4:*3* 6:*6,*
*7* 44:*17* 70:*25* 76:*3, 9*
*77:19*
**Borden** 62:*7*
**bottoms** 31:*7*
**boy** 27:*19*
**brawl** 8:*4*
**break** 76:*5*
**brief** 55:*25*
**briefly** 10:*12* 12:*18*
61:*13, 16* 66:*6* 71:*6*
**bring** 48:*19* 75:*12*
**broadcast** 27:*4*
**Brooklyn** 12:*11* 29:*11*
**Brookpark** 11:*21*
**brought** 61:*24*
**building** 20:*18*

**< C >**
**call** 12:*22* 13:*10* 25:*6*
27:*5* 37:*15* 75:*18*
**called** 1:*15* 28:*8* 51:*3, 6*
58:*3, 8* 70:*10*
**calling** 40:*12* 48:*24*
**calls** 13:*17*
**calm** 28:*1, 4*
**camera** 8:*16* 9:*4, 8*
**candy** 54:*23* 56:*4* 60:*13*
**capacity** 16:*24* 69:*5*
**caption** 79:*3*
**car** 13:*4, 17, 19* 14:*14*
24:*7* 26:*5, 9, 21, 23* 27:*17,*
*22, 23* 29:*6, 22, 23* 30:*3, 8,*
*11* 37:*14* 39:*2, 3* 40:*16*
45:*18, 24* 47:*4, 25* 48:*6,*
*23* 49:*6* 51:*16* 52:*11*
53:*1* 57:*14, 17, 25* 58:*13,*
*19, 21* 60:*17* 63:*18, 20, 21,*
*24* 64:*1, 14* 65:*2, 5, 12*
72:*21* 73:*13*
**card** 66:*2*
**career** 10:*12* 11:*4*
**Carlee** 14:*4*
**carries** 33:*20*
**carry** 42:*6*
**car's** 45:*13, 20*
**Case** 1:*8* 21:*10, 17* 58:*9*
67:*23* 75:*6* 76:*11, 17, 21*
**cause** 79:*6*
**causes** 71:*10*
**certain** 33:*18* 71:*12*
**CERTIFICATE** 79:*1*
**certified** 6:*3*
**certify** 79:*4, 12, 14*
**change** 51:*5*
**chaotic** 26:*16*
**Chapstick** 32:*14*
**charged** 32:*24* 75:*17*
**charger** 33:*1*

**check** 26:*12*
**checking** 56:*3*
**chose** 53:*11*
**City** 1:*20* 2:*8* 7:*24* 9:*16*
11:*13, 17* 36:*8, 11*
**Civil** 1:*17* 16:*7*
**clarification** 7:*7*
**clarify** 15:*16* 19:*14*
**clear** 43:*16* 51:*1* 76:*22,*
*23*
**clearly** 26:*8*
**Cleveland** 1:*20, 21* 2:*6, 8*
*3:5* 10:*13* 11:*6* 76:*16*
*79:19*
**cliche** 16:*2*
**click** 41:*7*
**clock** 76:*1*
**close** 31:*16, 22* 45:*5*
49:*16*
**closely** 47:*16*
**closer** 26:*6* 47:*3, 6, 24*
49:*6, 10*
**close-up** 49:*19*
**clothes** 41:*15, 18, 22*
**clothing** 36:*12*
**color** 54:*25*
**come** 10:*1* 22:*2* 37:*20*
47:*19* 61:*21*
**comes** 46:*1*
**coming** 10:*2* 27:*8* 29:*9*
39:*16* 40:*2, 4, 14, 18*
41:*11* 44:*19, 22, 23* 46:*3,*
*4, 17* 47:*20* 48:*2, 4*
**commencing** 1:*22*
**comment** 55:*17*
**comments** 38:*9* 67:*16*
**Commission** 79:*25*
**complete** 71:*10, 19*
**completed** 10:*19*
**completing** 71:*4*
**concerned** 48:*14*
**concluded** 78:*3*
**conducted** 70:*17*
**conducting** 71:*14*
**confused** 7:*9*
**confusing** 7:*6*
**connect** 55:*22*
**connection** 22:*12*
**contact** 43:*2* 66:*3, 4*
73:*16*
**contacted** 73:*19*
**context** 37:*7* 67:*10*
**conversation** 17:*4* 54:*19*
55:*25* 60:*12* 64:*23* 67:*17*
68:*19* 77:*8*
**Correct** 12:*15* 20:*12*
21:*21* 25:*11* 29:*8* 35:*1*
38:*21* 40:*5* 45:*20, 25*
46:*2, 6* 49:*7, 23* 65:*1*

71:*24* 79:*10*
**correspond** 15:*12*
**correspondence** 15:*20*
69:*12, 20*
**counsel** 7:*21, 24* 9:*22*
18:*5, 8* 77:*21* 79:*15*
**county** 17:*14* 18:*2, 3, 13,*
*20* 19:*3* 21:*5* 22:*15*
57:*22* 58:*1* 59:*15* 65:*14,*
*21* 75:*3, 8*
**couple** 7:*25* 9:*1*
**course** 66:*18*
**COURT** 1:*2* 6:*24*
**covered** 26:*10*
**co-workers** 10:*3, 6*
**CPD** 41:*18, 21* 62:*21*
63:*16*
**CPPA** 18:*9*
**crash** 29:*6* 30:*4, 9* 40:*16*
47:*9* 48:*6* 52:*11* 64:*14*
**crashed** 45:*15, 18* 48:*25*
**crime** 25:*3* 58:*24* 70:*10,*
*14, 15, 17* 71:*6, 9, 11*
72:*18* 73:*15, 24*
**crying** 28:*2* 46:*12* 48:*18*
**cuffs** 28:*15*
**curb** 45:*5*

**< D >**
**daily** 12:*18*
**DALIA** 1:*15* 4:*2* 6:*1, 11*
79:*5*
**D-A-L-I-A** 6:*11*
**DAVID** 3:*2*
**day** 10:*14* 12:*14* 13:*1, 2,*
*5, 11* 14:*1* 19:*19* 23:*6, 20*
24:*18* 25:*24* 26:*25* 33:*6*
59:*1, 9* 60:*20, 22* 62:*2*
64:*5* 68:*15* 69:*3, 4* 70:*9*
72:*4, 22* 73:*15* 74:*6, 14*
76:*24* 77:*6* 79:*20*
**Deadly** 23:*11* 24:*23*
61:*20* 62:*14* 68:*11*
**deaths** 71:*10*
**decedent** 30:*2*
**decedent's** 29:*22*
**decide** 30:*7*
**decision** 35:*24*
**Defendant** 1:*11* 2:*8* 7:*25*
**definitely** 38:*3*
**Delaney** 20:*4*
**demeanor** 43:*7, 9, 15*
**Department** 2:*8* 9:*16*
16:*16, 17* 21:*25* 32:*16*
33:*8, 23* 34:*21, 23, 24*
36:*1, 2, 16* 37:*1* 42:*3*
57:*22* 61:*5* 62:*15* 63:*5*
67:*19* 69:*21* 73:*1* 76:*16*
**depending** 12:*23* 25:*5*

**depends** 25:*1, 7, 19* 61:*17,*
*18, 22*
**deposition** 1:*14* 6:*15*
8:*15* 9:*6, 18, 22* 10:*1, 7,*
*10* 78:*3* 79:*12*
**depositions** 7:*14*
**describe** 43:*7, 15, 20* 44:*7,*
*13* 46:*9* 55:*11*
**described** 55:*7* 69:*22*
**DESMOND** 1:*7* 16:*5*
21:*8* 22:*19, 24* 39:*4* 47:*4,*
*16* 49:*10* 51:*16* 58:*19*
72:*21*
**detail** 30:*23*
**detailed** 10:*23* 56:*9*
**details** 24:*1, 3* 69:*2* 72:*13*
**detained** 50:*8* 53:*7*
**detaining** 50:*1* 72:*3*
**Detective** 62:*3*
**detectives** 23:*5*
**Detroit** 11:*20*
**developed** 76:*20*
**Devin** 30:*15, 18* 39:*4, 6*
41:*5* 43:*2* 44:*20, 23*
45:*22* 46:*3, 7, 16, 23, 25*
47:*21* 48:*5, 10, 13, 16, 17*
49:*5, 25* 50:*9, 15* 51:*11,*
*14, 19* 52:*15, 23* 53:*3, 7,*
*13* 56:*21* 58:*11, 13* 64:*10,*
*24* 72:*3* 75:*10*
**Devin's** 46:*4* 47:*10* 60:*14*
**diary** 76:*13*
**Diaz** 62:*5*
**difference** 34:*7*
**different** 6:*18* 11:*14*
25:*2, 21, 23* 33:*14* 34:*5*
68:*11*
**direct** 57:*2, 5*
**directed** 24:*14* 27:*18*
46:*25* 59:*20*
**directing** 46:*24*
**direction** 40:*10*
**directions** 57:*8*
**directive** 25:*4, 8*
**directives** 25:*13*
**discharge** 61:*10*
**discretionary** 36:*22*
**discussed** 22:*25* 76:*21*
**discussing** 19:*3* 42:*3*
**dispatcher** 11:*7*
**distance** 40:*10* 58:*22*
**DISTRICT** 1:*2, 3* 10:*17,*
*19* 11:*11, 16, 25* 12:*13, 23*
13:*11, 14* 14:*6* 15:*2, 3*
29:*11* 60:*3, 8, 25* 69:*16*
**districts** 11:*14*
**DIVISION** 1:*4*
**document** 71:*11*
**documenting** 71:*20*

Deposition of Sergeant Dalia Lopez

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**documents** 9:5, *11* 19:4
20:*19* 22:7 67:2 71:8
**doing** 27:7 30:22 31:*13*,
*23* 46:7 68:*25*
**Domnori** 14:*23*
**downtown** 11:*19*
**drained** 54:*24* 55:9
**drawing** 43:*21*
**driver** 26:*10*, *20* 31:*3*, *10*
**driver's** 30:*20*
**driving** 13:5 26:3 45:7
**dropped** 56:7
**dstadler@law-asm.com**
3:7
**duly** 6:2 79:5
**duty** 25:2, *3*, *20* 30:7
34:*4*, *10*, *14*, *18*, *21* 35:7, *8*,
*10*, *16*, *17* 36:9 37:2
38:*16* 53:*16* 54:*3* 62:*16*
63:*1*, *13* 71:*13*, *18* 75:*14*,
*16*, *22*, *23*

**< E >**
**EASTERN** 1:*4*
**either** 12:*23* 23:5 29:22
30:2 32:*10* 44:4 47:*17*
48:*13* 57:2 72:20 73:*13*
79:*15*
**Elena** 8:*20*
**elevated** 43:*18*, *22* 44:5, *6*,
*10* 55:6
**ELIZABETH** 2:*3* 6:7
**elizabeth@ffgfirm.com** 2:*8*
**EMS** 27:6 50:*17* 51:*20*
**EMTs** 75:9
**en** 27:6
**encountered** 49:5
**encountering** 69:5
**ended** 12:20 45:22 60:*3*
**engaged** 32:*3*
**entering** 40:*16*
**entity** 73:*1*
**equipment** 36:*16* 42:4
**ESQ** 2:*3*, *8* 3:2
**essentially** 37:*12*
**Estate** 1:6
**Euclid** 3:*4*
**evaluations** 59:9
**event** 15:9 23:6 45:*12*
60:*10* 68:9, *10*, *11* 79:*16*
**events** 19:*13* 22:24
24:*15* 26:*1* 67:23 69:9,
*13*, *17*, *21* 70:2, *5* 76:*11*,
*25*
**everybody** 12:*25* 26:*13*
33:*15* 34:*13*
**evidence** 59:6 72:8, *17*
73:*4*, *5*, *6* 74:6
**exact** 33:*15*

**exactly** 27:*12* 40:*18*
64:*17*, *18* 65:25 77:*3*
**examination** 1:*16* 4:*1* 6:5
**examined** 6:*3*
**example** 35:*21* 76:*12*
**exchange** 19:9 31:*19*
54:*12*
**exchanged** 19:8
**excited** 43:*13* 48:*18*
**exhibiting** 55:6
**exist** 22:8
**expectations** 36:*15*, *25*
**expected** 67:*14*
**expires** 79:25
**explain** 11:*16* 21:*11*
30:22 34:5 52:25 71:6
**explained** 38:7 68:20
**extremely** 27:20
**eye** 39:*11* 50:4
**eyes** 51:*18*
**eyewitnesses** 77:*14*, *17*

**< F >**
**fact** 64:*18* 76:*19*
**facts** 77:5
**Fair** 62:*13*
**fairly** 28:*11*
**family** 19:*17*
**far** 11:*21* 77:8
**farther** 47:*10*
**fast** 5:*1*
**February** 1:22 10:*15*
79:*20*
**fed** 34:*10*
**Federal** 1:*17*
**feed** 34:*16*
**feel** 38:*13* 39:*13* 40:8
44:*21* 45:*4* 46:20 48:20
53:*17* 55:20 56:24 65:9
67:*12*, *24* 68:*4* 74:*16*
75:*15*, *24*
**feet** 31:*17* 44:*1*
**felt** 50:6 54:8 60:*1*
75:20
**fence** 27:22, *23*
**figure** 28:*18* 53:5
**figured** 65:*10*
**fill** 12:25 17:9 60:9
61:2, *6*
**find** 21:*19* 22:2 40:*21*
77:5
**firearm** 61:*10*
**first** 6:2 14:24 15:*1*
16:*11*, *21* 26:2, *5* 28:9, *20*
29:5 30:*19* 31:2 38:6, *9*
40:*3*, *9*, *15*, *17* 46:*13* 47:8
53:25 64:*4*, *13*, *22* 67:*15*
75:*4* 79:5
**five-minute** 76:*4*

**flat** 54:*17*
**Floor** 2:8
**focused** 51:*14*
**followed** 17:20
**following** 62:2
**follows** 6:*4*
**follow-up** 29:*3*
**footage** 8:*16* 9:4, *8*, *12*
**Force** 23:*11* 24:23 61:20
62:*14* 68:*12*
**foregoing** 79:9, *13*
**forget** 23:25
**forgot** 66:8, *12*
**form** 31:9, *12* 49:*13*
**formed** 43:4
**found** 40:*19* 64:*17* 65:8,
*10*
**FRANKLIN** 1:7 16:5
21:8 22:*19*, *24* 49:*10*
**Franklin's** 72:*21*
**frantic** 27:20
**fresh** 23:*23*
**FRIED** 1:*4*
**Friedman** 2:*4*
**friend** 9:*24*
**front** 31:*18*
**full** 31:*19*
**fully** 65:*17*
**Fumich** 1:*18* 79:2, *23*
**further** 32:2 58:*23*
79:*12*, *14*

**< G >**
**Gallagher** 2:*8*
**GARCIA** 1:*10* 9:2 10:9
11:*23* 14:9, *25* 19:6 21:2,
*18* 27:8, *18* 29:25 40:*4*
41:8 42:*11* 44:22 46:*1*,
*17* 48:*10*, *11* 49:24 51:*10*,
*11*, *15* 53:*1*, *6*, *19* 54:9
56:*19* 57:*3*, *11*, *16* 60:*13*,
*19*, *20* 64:*4*, *23* 66:23
68:*16* 72:*21* 73:*18*, *23*
74:*13*
**Garcia's** 29:*23* 43:7
47:*20* 48:*4*
**gate** 45:*16*, *18*, *21*, *23*
**general** 25:*18*
**gentleman's** 20:5
**Gerhardstein** 2:*4*
**getting** 25:6 37:*13*
**Gilbert** 2:*4*
**give** 7:*3*, *19* 8:*10*
**given** 79:*11*
**giving** 56:*4* 66:2, *21*, *24*
67:2
**go** 8:2, *6*, *10* 13:7, *10*, *11*
15:*24* 16:*14*, *18* 18:*15*
21:*14* 22:5, *21* 23:2
25:*17* 33:*13* 34:*3* 36:20

37:*4* 43:5, *11* 47:*19*, *24*
53:9 54:7 59:*13* 60:2
61:9, *15* 62:*19* 63:*4*
66:*11*, *12* 67:*13*, *16* 69:*24*
70:7, *12* 71:*16* 72:6
73:*21* 77:*11*
**going** 6:25 7:*1*, *8* 8:*4*
10:*4* 12:25 19:*10* 23:24
26:2, *6* 27:6 28:*1*, *18*
29:2, *14* 31:*13* 37:22
38:8, *25* 43:*16* 48:2, *6*
55:25 60:*4* 76:6
**Good** 6:7 13:*21* 26:*15*
31:*19* 35:*3* 44:*13* 62:20
**goofy** 23:*13*
**gotten** 31:*21*
**govern** 25:*14*
**governing** 36:*15*
**governs** 24:*21* 25:8
**grab** 32:*11* 38:*3*
**grabbed** 24:7 28:*15*
**graduated** 10:*16*
**Grand** 66:9, *11*, *14* 67:8,
*13*, *14*, *16*, *20*, *25* 68:6
72:25 73:*3*
**grass** 45:*16*, *19*
**grassy** 27:*21*, *24* 44:25
45:2, *6*, *21* 46:*14* 48:24
49:2, *4* 53:*19*
**green** 53:*18*
**ground** 6:*19*
**group** 26:*4*
**guess** 6:*12* 35:25
**guessing** 26:*19*
**guidelines** 25:*23*
**gum** 56:5 60:*13*
**gun** 27:*14* 32:9 33:4, *6*,
*7*, *10*, *15*, *18*, *22* 34:24
35:8 36:*1* 37:2, *11*, *18*
41:5 42:*19*, *22*, *23* 46:25
47:*1*, *13* 49:8 53:2 61:6
62:22, *25* 63:5, *9*, *12*, *17*,
*18* 64:6 75:*12*, *20*
**guys** 8:*18* 15:5 52:*23*

**< H >**
**Hale** 62:*3*
**half** 28:*12* 59:*3*
**Halfway** 10:*18*
**Hall** 1:20
**hand** 79:*19*
**handcuff** 52:*15*, *23*
**handcuffed** 58:*12*
**handcuffing** 28:*14* 52:22
53:*13*
**handcuffs** 32:9 52:*14*, *21*
**handle** 61:*21* 72:8
**handled** 73:5, *6* 74:5
**handles** 61:*24*

**handling** 13:8
**hang** 15:5
**happened** 6:25 23:20 28:16 41:2, 7 48:9 51:22, 24 52:6 54:16, 20 58:2 59:9 61:22 68:17 72:11, 14 77:6
**happening** 43:17 51:7 55:18 75:10
**happens** 61:12
**hard** 27:11 44:7, 10 51:25
**head** 7:3
**heading** 29:7, 21 35:22 39:3
**hear** 57:11 58:16 69:15 74:13
**heard** 41:4, 6 55:22 64:19 74:18, 21
**hearing** 53:2
**held** 1:20
**help** 16:1 38:14 76:24
**helpful** 7:2
**helping** 31:25
**hereinafter** 6:3
**hereunto** 79:18
**hesitating** 72:23
**Hey** 10:4 15:18 58:4, 8
**Hilow** 18:10, 11, 19, 24
**hip** 32:10 37:24 64:6
**Hold** 17:12
**holster** 33:22 34:1, 4, 10, 14, 20 35:13 64:6
**home** 32:24 36:3, 7, 8, 10, 17 60:4 75:13, 17
**homicide** 23:5 61:24
**honest** 7:19
**Honestly** 18:24
**hook** 34:15, 16
**hour** 57:19 59:3
**hours** 59:3
**house** 29:9, 17 32:11
**husband** 10:3 58:3 65:13
**hush** 68:6
**hysterical** 46:9, 11 48:18

< I >
**IA** 22:16
**idea** 61:1
**identified** 38:22
**identify** 38:4, 11 44:11
**identities** 77:13
**identity** 39:20, 25 77:17
**immediately** 56:19, 22 67:8
**impression** 31:12 43:8 53:6 64:9 76:20
**impressions** 31:9 40:14
**incident** 14:10 15:12 16:11, 23 19:9, 15 23:16, 19 24:23 37:14 64:5 66:8, 10 67:8 74:9
**INDEX** 4:1, 5
**individuals** 77:7
**information** 12:8 28:21
**initial** 60:16
**initially** 31:15 39:7, 13, 14 40:8, 25 42:17, 18 43:9, 12, 25 45:3, 11 46:13 48:1 52:24
**injured** 55:2, 3
**inside** 12:23 73:3
**insignia** 42:2
**instructed** 59:25
**instructions** 6:20
**interact** 58:13
**interaction** 28:5 47:21 51:7 56:18 57:16
**interested** 79:16
**interesting** 55:23
**internal** 10:24 11:1 21:7, 9, 15, 20 22:3, 12
**interpreting** 50:8
**interview** 16:17, 18, 20 17:24 18:2, 6, 8, 25 19:2, 7, 10, 13 20:10, 16, 20, 23 21:3 65:21 72:3
**interviewed** 16:15 20:4 22:23
**interviews** 6:19 66:6 73:8
**investigation** 18:13, 21 19:20, 22 20:1, 8 21:5, 6 22:3, 8, 13, 15, 16 23:11 59:8 61:11, 13, 20 62:13 72:11, 14
**investigations** 16:6, 10 21:7 22:17 61:25 66:7
**Investigator** 20:4
**investigators** 65:15
**involved** 16:8, 11 21:18 24:22 25:6, 10, 15, 22 30:7 52:7 58:7 59:5, 8 65:7, 18 72:10 73:24
**involvement** 16:23 19:25 20:8 21:11
**involving** 68:11
**issue** 10:5 15:13 19:13 67:23 76:11
**issued** 32:16, 19 33:7, 10, 23 34:21, 23, 24 36:1, 3, 6, 7, 11, 16 37:1 61:6 62:15 63:5
**issues** 76:16
**items** 26:24 32:13

< J >
**J.R** 2:8
**jacket** 32:12 36:12 42:1
**job** 11:5 12:14 71:13
**JOSE** 1:10 14:9, 25 19:6 21:2
**jrussell2@clevelandohio.gov** 2:8
**Jury** 66:9, 11, 15 67:9, 13, 14, 16, 20, 25 68:6 72:25 73:3
**juvenile** 28:14

< K >
**keep** 35:12, 22 39:11 42:4, 5 50:4 67:5
**keeping** 37:8
**kept** 28:3
**killing** 16:5 21:7 22:19, 23
**kind** 26:25 28:24 32:25 34:15 36:5 44:6 51:25 53:17 61:3
**knew** 52:2 58:5 77:2
**know** 6:23 7:6 14:22 15:20 16:4, 6 17:5 19:8 21:18 22:7 24:3, 25 25:4, 6 26:8 27:5, 19 28:7 35:1 37:9, 10 38:14 39:9, 10 40:18 41:7, 19 42:13 43:14 44:7, 8, 24 47:6, 7 48:20 49:17 50:3, 5 51:12, 15, 17, 23 52:2, 6, 7, 9, 13 53:3, 11, 16 54:17 55:13, 14, 24 56:22 57:19, 21 58:7 59:2 60:24 61:4 62:10, 11 64:17, 21, 25 65:8, 9, 11, 19, 24 68:4, 21, 22, 24 69:1, 8 70:3, 15 72:24 73:9, 10, 22 74:2, 3, 17, 18 77:1, 3, 9
**known** 13:1
**knows** 10:3

< L >
**Lakeside** 1:20 2:8
**larger** 33:20
**lasted** 13:3
**launched** 62:14
**launches** 61:11
**Law** 2:8 9:16
**lawsuit** 10:6
**lawyer** 18:9
**lawyers** 7:25 18:12, 18, 19
**learned** 52:1
**leather** 42:1
**leave** 32:25 59:25
**leaves** 71:21
**leaving** 37:9 58:11 59:17 60:4, 14 75:21
**left** 29:16 59:18, 22 60:2 68:15 72:22
**lieutenant** 53:21, 22
**life** 16:3
**lifeless** 49:15, 22
**line** 55:19
**lines** 26:18
**litigation** 16:7
**little** 6:18 26:16 43:18 47:10 57:18
**living** 12:9
**location** 15:9
**locker** 75:21
**log** 70:10, 14, 15, 17 71:7, 8, 11, 23
**long** 8:25 11:8 17:12 24:19 37:5 57:17 58:25 69:6
**longer** 21:17
**look** 26:7, 9, 19 31:18 39:10 47:4, 10, 25 49:6, 10, 16, 19 55:5 58:19, 21 72:17, 20 76:5
**looked** 31:4, 21 46:14 47:6 48:23 49:1 54:24, 25 55:4 56:6
**looking** 12:19 27:15 44:7
**LOPEZ** 1:15 4:2 6:1, 11, 12 79:5
**L-O-P-E-Z** 6:11
**Lorain** 11:20
**lose** 24:3
**lot** 15:16 23:24 30:9

< M >
**main** 28:5
**making** 37:10 68:3
**male** 26:17 27:15
**manner** 46:11
**materials** 19:4 20:19 36:3 67:1
**matter** 6:8 9:17 10:5 14:17
**MATTHEW** 2:8
**mean** 16:1 31:11 37:7 38:13 39:11 40:9, 19, 23 43:15 44:1 48:16 49:17 50:22 52:2, 6 53:10, 16 61:10 67:4, 12 75:23
**means** 38:20
**media** 58:5 76:13
**medical** 55:12
**meet** 8:19 12:22 18:18 20:3, 16
**meeting** 8:21, 25 9:2, 9 13:12 66:20 70:1
**meetings** 13:13
**member** 19:17
**memory** 37:25 38:1 65:23 67:4
**mentioned** 9:15 19:20 56:12 73:8 77:14

Case: 1:22-cv-00061-DAP  Doc #: 44-2  Filed: 01/31/24  86 of 89.  PageID #: 362

Deposition of Sergeant Dalia Lopez

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**met** 8:16  14:24  18:23,
24  20:18
**midnight** 12:2, 6
**mind** 23:23  37:22
**mine** 16:10  35:2
**minivan** 45:8
**minute** 8:10  28:11  51:5,
8  56:23
**minutes** 13:3  28:24  57:1
**miscellaneous** 32:13
**missed** 36:12
**misunderstood** 13:15
70:20
**Moeller** 3:3
**moment** 47:7  54:10  55:1,
16  56:16
**months** 9:1, 9
**morning** 6:7
**mother** 28:2  50:14
**move** 11:10  45:1
**moved** 44:25  45:6  58:23
**movies** 8:4
**moving** 63:18, 20, 21, 24
64:1
**msmartnick@gallaghersha**
**rp.com** 2:8
**Mussell** 21:24

**< N >**
**nail** 29:3
**name** 6:7, 9  17:2  20:5
62:11  71:4, 23  77:15
**named** 77:7  79:4
**names** 77:13, 16
**natural** 71:10
**near** 11:18  45:18
**necessary** 13:6  38:13
**need** 36:11  37:1  54:1
**needed** 13:1  23:22  66:3
75:18
**needs** 50:7
**neighborhood** 12:9
**never** 14:14, 16  17:6
22:11  41:23  68:19, 23
69:2  73:4, 6  77:16
**night** 13:8  32:24  34:12
75:17
**nod** 7:4
**normal** 11:12
**north** 27:9  40:24  46:5
**northbound** 26:3  29:14,
21  40:24
**NORTHERN** 1:3
**Notary** 1:19  79:2, 23
**notepad** 24:5
**notes** 23:23  24:5, 11  76:6
**notice** 64:5
**number** 15:19
**numbers** 15:17

**< O >**
**oath** 7:15  75:25
**object** 8:10
**OBJECTION** 4:5  8:1
9:20  15:14, 23  16:13
18:14, 22  21:13  22:4, 9,
18, 20  23:1  24:24  25:12,
16  33:12  34:2  36:19
37:3  38:24  43:4, 10  50:2
53:8  54:6  59:12  61:8, 14
62:18  63:2, 14, 19, 22
64:2  68:13, 18  69:23
70:6, 11  71:15  72:5, 15
73:20  74:15  77:10
**observed** 32:1
**obtain** 52:14
**obviously** 25:1  31:23
32:8  37:8, 11  52:12  66:3
**occurred** 56:10
**October** 10:23, 24
**offer** 28:22
**office** 10:4  19:21  29:1
35:22  79:19
**Officer** 9:2  10:9, 13
11:23  13:16  15:2, 3, 22
17:15  24:21  27:8  29:23,
25  33:25  34:20  36:23
38:5, 8, 12, 23  40:3  41:8
42:11  43:7  46:16, 17
47:20  48:4  49:24  51:10,
15  52:7, 20  53:6, 21  54:4,
9  56:19  57:16  60:12, 19,
20  62:2  63:8, 17  64:4, 23
65:6, 18  66:23  68:11, 16
71:12, 17, 22  72:21  73:23
74:13  75:15, 24
**officerly** 24:8
**officers** 13:19  14:5  28:9,
13  32:19  33:11  35:7
50:17  51:20  52:19  58:1
59:18  62:2, 21
**official** 16:17, 23  18:2, 3
24:15  67:22
**officials** 59:15, 18  65:22
**OH** 2:6, 8  3:5  61:1
67:13
**OHIO** 1:3, 20, 21  79:3,
20, 24
**Okay** 6:21, 22  7:11, 12
8:13  13:15  25:24  26:13
29:4  35:4  36:14  43:22
45:7, 24  46:7  47:8  54:13,
14, 21, 22  55:5  58:9  68:2,
8, 9  72:2  77:19
**Old** 12:11  29:11  32:12
**once** 25:15  38:22  60:16
**on-scene** 16:20
**open-ended** 36:5

**opinions** 49:13
**opportunity** 17:6  47:3, 24
**OPS** 16:18  20:8  21:2, 5
22:15  67:20  73:8
**order** 77:25
**ordered** 20:2, 7
**orders** 25:18
**otherwised** 79:16
**outcome** 61:18, 22
**outside** 15:5, 12, 15, 21
24:1, 4  34:18  37:5  61:23
67:16  68:24  73:11  75:7

**< P >**
**p.m** 12:2  78:3
**page** 6:21
**pale** 54:25
**pants** 41:23  42:1
**paper** 24:6
**paperwork** 60:9  61:3
**parked** 45:24
**part** 19:15  23:19  36:10
**participated** 66:9
**participating** 19:21  72:3
**participation** 16:9
**partner** 13:24  14:1, 22
**party** 79:15
**passing** 69:2
**patrol** 13:16  14:5  32:19
33:11  71:18
**Pearl** 12:16  29:14, 21
45:24
**pending** 70:24
**pens** 32:14
**people** 15:16  16:1  23:12
26:5, 15
**percent** 24:17  37:23
49:16
**period** 11:11, 22  13:23
14:25
**person** 8:22  17:1, 24
21:22  31:20  38:6, 15
53:25  62:16  65:13
**personal** 12:8  24:5
**persons** 71:8
**phone** 15:11, 19
**photos** 73:10
**physical** 31:14  43:1  55:3
**physically** 49:4  54:21
55:2, 4  72:8  73:12
**piece** 54:23  56:5
**pistol** 35:17
**place** 79:13
**plain** 41:15
**Plaintiff** 1:8, 16  2:2  6:8
**platform** 76:13
**played** 53:3
**point** 27:5, 7, 16  29:6
31:25  37:18, 21  38:4, 25
39:11  42:23  43:1, 15

44:18  47:1, 5, 13, 17  48:5,
14, 20  49:3, 8, 11, 14
51:15, 22, 23  52:5, 14
58:14, 17, 20, 22  64:13, 24
65:2, 17  71:23  72:2
73:16, 18
**police** 10:13, 15  11:3, 6
15:22  24:8  25:18  26:23
32:15  38:5, 8, 11, 23  39:2
54:4  69:20  73:1  75:15,
24  76:16  77:1
**policies** 24:20
**policy** 24:20
**positive** 24:17
**possession** 37:9
**possible** 14:20  17:25
**post-COVID** 12:3
**practice** 11:12  75:12
**precisely** 41:2  48:9  52:17
**pre-COVID** 12:3
**prefer** 34:17
**Preference** 33:19  34:14
**prepare** 13:4
**presence** 79:8
**present** 10:14  16:12
**pretty** 12:24  26:11
30:13  48:21  51:7  72:1
**previously** 42:3
**prior** 15:12  16:6  19:12
20:16  21:2  30:3  66:21,
23  67:2  68:9  77:1
**private** 35:13
**probably** 8:3  50:16  69:7
**Procedure** 1:17
**procedures** 25:13
**proceedings** 66:10  73:3
**processing** 59:5  73:24
**Professional** 1:18  19:21
**project** 14:17
**promoted** 10:25
**protect** 75:25
**protocol** 24:21
**provide** 17:14, 15  66:14
**Public** 1:19  2:5  79:2, 23
**pull** 30:10, 11  33:1  42:23
**pulled** 24:2  26:12  30:11
45:7, 12
**pulling** 48:2
**purposes** 10:18  34:9
**pursuant** 1:16
**put** 27:1, 2  32:11  33:1, 3
41:23
**putting** 26:23

**< Q >**
**quarter** 29:18
**question** 8:6  13:21  36:5,
13  37:23  53:2  62:20
63:3  70:24

Case: 1:22-cv-00061-DAP  Doc #: 44-2  Filed: 01/31/24  87 of 89.  PageID #: 363

Deposition of Sergeant Dalia Lopez

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**questions** 16:22 29:3
65:25 66:4, 5 75:7
**quick** 28:16
**quickly** 51:8

**< R >**
**radio** 11:6 13:8, 17
26:23 27:2, 3, 11 28:9
31:24 32:5, 7, 15, 18
35:25 37:15 39:2, 13, 17
40:2 44:18 47:19 48:2
75:13, 17
**radioed** 39:1
**radioing** 39:5
**random** 24:6 32:8, 9
**ready** 8:14 9:5, 17, 22, 25
13:6 20:17, 20, 23
**realized** 42:18
**really** 16:3, 4 26:5 28:5,
21 30:9 38:15 43:14
49:15 50:13 55:21, 22, 24
56:1 65:8
**rearrange** 35:5
**reason** 7:18 28:17 32:22
37:24 39:10, 12 72:23
**Rebecca** 1:18 79:2, 23
**recall** 8:24 14:20 15:8
16:15 17:23 20:5 24:16
26:23 27:13 39:6, 14
41:19 51:17 54:17 59:3
64:8 68:22 70:13 74:25
**receive** 57:8 63:25
**received** 63:16
**Recess** 76:8
**recognize** 44:19
**recognized** 41:9, 13
**recognizes** 44:19
**recollection** 19:10
**record** 6:10, 25 7:1, 4
23:19 39:20
**recorded** 18:1 19:2
20:10
**recordings** 9:12
**record's** 51:1
**reduced** 79:7
**referenced** 79:11
**referring** 25:8 26:20
30:15
**reflecting** 17:3
**refuel** 13:5
**regarding** 36:25
**regardless** 62:15
**Registered** 1:18
**regular** 30:8
**related** 15:18 16:20 22:8
32:9 66:10
**relative** 79:15
**relax** 28:4
**relying** 67:4

**remain** 28:23 48:13
51:10 53:24 57:5, 9 75:6
**remained** 10:21, 25 28:6
**remember** 14:24 17:2, 20
23:4, 8 28:14, 15 30:24,
25 31:4, 7, 19 33:4 40:7
41:17 42:10, 11, 18, 21
50:11 51:21 52:3, 17
53:11, 18 54:18 55:16
56:15 58:3, 25 59:24, 25
60:6, 7 62:1 63:23 64:19
65:20, 24 66:1, 5 68:5
69:5 70:21 71:3, 5 73:7
75:7, 9 77:13
**reminded** 67:25
**report** 17:3, 7, 9, 11
25:20 61:6
**Reporter** 1:19 6:24
**reporting** 25:23
**represent** 6:8
**representative** 20:3, 13, 25
**represented** 7:21 18:5, 12
66:17
**request** 27:4
**requested** 16:18
**requesting** 40:13
**required** 35:16
**respect** 18:12, 20
**responded** 13:17
**responders** 28:9, 20
**responding** 75:4
**response** 44:10
**responsibilities** 54:4
**responsible** 37:12 71:13,
20
**restaurant** 37:10
**restroom** 37:10
**retrieve** 37:14, 18
**retrieved** 26:22
**returned** 39:7, 12
**review** 9:4 17:6 19:3
20:19 67:1, 3 77:25
**reviewed** 8:16 9:8, 11
**right** 7:22 13:12, 15
14:15 17:8, 18, 19 18:3, 4,
6 19:23 20:11 22:13, 14
25:10 26:4, 7 29:7 30:12
32:4 34:25 35:10, 14, 17
37:16 38:12, 16 39:4
40:4 41:3, 14 45:8, 13, 14,
16, 17, 19 46:18 47:11, 12,
17, 18, 21, 22 48:1, 7, 8
50:18 52:9, 15, 16, 18
54:5 56:10, 11, 14, 21, 22
57:22, 24 60:13 63:5, 6, 9
64:25 65:3, 4, 15 70:10
71:2 73:5 74:24, 25 75:3
76:3
**river** 11:19
**Riverside** 30:12

**Road** 11:21 12:16 13:7
29:22
**role** 53:3
**roll** 12:22 13:10
**Room** 2:8 8:1
**roughly** 11:19 12:2
29:18 59:4
**rounds** 33:20
**route** 27:6 29:13
**routine** 32:25
**routinely** 12:16 29:13
**Rules** 1:17 6:20 36:15,
25
**run** 26:21 32:13
**rush** 55:10
**rushing** 32:11
**RUSSELL** 2:8 4:6, 7, 8, 9,
10, 11, 12, 13, 14, 15, 16, 17,
18, 19, 20, 21, 22, 23, 24, 25
5:1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
11, 12, 13, 14, 15, 16, 17, 18,
19, 20, 21, 22, 23, 24 9:20
15:14, 23 16:13 18:14, 22
21:13 22:4, 9, 18, 20 23:1
24:24 25:12, 16 33:12
34:2 36:19 37:3 38:24
43:4, 10 50:2, 20, 22 53:8
54:6 59:12 61:8, 14
62:18 63:2, 14, 19, 22
64:2 68:13, 18 69:23
70:6, 11, 22 71:2, 15 72:5,
15 73:20 74:15 77:10, 24

**< S >**
**safeguarded** 37:5, 7
**safer** 75:20
**sat** 28:25 57:13, 17
**saw** 19:18, 19 23:24
24:2 30:8, 14, 18, 19 39:7,
8 40:9, 17, 25 45:3 46:13
64:4 68:23
**saying** 27:12 30:23
50:13 54:17
**says** 26:18 46:24
**scene** 16:15 17:10, 15
23:5 28:6, 23 30:12 38:9
40:16 53:18, 24 54:1
56:20 57:6, 9, 23 58:24
59:1, 6, 10, 17 60:15 64:5,
10 65:21 68:15 70:9, 10,
14, 15, 17 71:5, 7, 9, 11, 21,
22 72:18, 22 73:15, 24
74:6, 9, 14 75:6
**screaming** 26:17 46:10
**seal** 79:19
**second** 10:21 12:1 14:6
69:16
**Secondly** 75:16
**seconds** 28:10 50:17

**see** 12:5 23:22 25:9
26:4, 8, 9 27:8 29:22, 25
30:2 39:8 40:3 42:16, 22,
23 43:1 46:3 47:13, 16
49:8 50:7 51:13 57:11
58:4 60:22 69:19
**seeing** 39:6, 14 53:1 69:1
**seek** 55:12
**seen** 39:21 47:1
**sense** 8:8 44:2, 4
**sent** 10:19 20:2
**separated** 32:23
**September** 10:22, 23
**SERGEANT** 1:14 4:2
6:1, 12, 14 10:25 21:23
53:23 79:4
**sergeants** 21:16
**Seroka** 14:4
**serve** 38:1 75:25
**set** 79:18
**share** 76:22
**Sharp** 2:8
**sheet** 71:25
**sheets** 32:13
**She'll** 77:24
**Sheriff** 16:21 62:11
**Sheriffs** 59:22
**Sheriff's** 16:16, 17 18:13,
20 29:1 52:22 67:19
73:8
**shift** 10:21 12:1, 4, 5, 18,
20, 21 14:6, 18 15:17
36:4, 17 38:19 69:16
**shirt** 41:24
**shoes** 42:1
**shook** 43:24
**shoot** 63:20, 21, 24
**shooting** 21:18 25:25
52:8, 10 61:23 63:18
64:1, 14 65:7, 18
**short** 65:23
**shortly** 57:1 76:7
**shot** 49:20 54:18 64:25
**shouting** 40:11 41:1, 4
46:17, 19, 21
**show** 42:8 51:20
**showed** 18:25 28:23
42:14 53:22 73:9
**showing** 73:11
**shown** 72:25
**sick** 55:14
**side** 11:18 23:21 30:20
44:22, 23 45:20, 23 46:5
60:14
**sides** 11:13
**sidewalk** 27:9 45:1, 4, 15
**sign** 13:5 70:13, 18
**Signature** 78:4
**signed** 70:9 71:3

Deposition of Sergeant Dalia Lopez

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**simple** 24:2
**simply** 9:25
**simultaneously** 40:12
**sitting** 23:21 57:25 58:6, 12
**situation** 25:5, 7 37:15 55:23
**size** 33:19
**slow** 53:4
**smaller** 33:19
**small-talk** 68:25 69:1
**SMARTNICK** 2:8 77:22
**smashed** 26:9
**social** 76:13
**socially** 69:10
**somebody** 15:18 31:17
**soon** 26:13 69:8
**sorry** 16:1 17:12 20:25 36:12 43:19, 20 44:15 50:20 53:12 60:19 70:16, 19, 20
**sort** 24:20 49:4 61:11
**sound** 7:12 23:13
**sounds** 16:2 43:22 47:8 56:3 57:15 64:22 65:14 73:4 75:1
**south** 11:21 27:8 40:24 46:1 53:19
**speak** 19:18 56:25 58:10
**speaking** 19:14
**specified** 79:14
**spell** 6:9
**spend** 69:9
**spent** 65:12
**split** 13:23
**spoke** 29:1 38:7 59:22 62:12 66:6
**spoken** 22:11 39:21 76:15
**spouse** 9:24
**Square** 2:5
**STADLER** 3:2, 3 44:15 77:23
**staff** 70:1
**stand** 23:10 53:17, 24 54:9
**Standards** 19:22
**standing** 28:24 31:17 45:22 51:18 53:20
**start** 12:3, 21 25:25 39:3 48:5
**started** 10:13, 15 12:13 16:22 38:19 50:18
**starting** 27:3
**State** 1:19 6:9 31:14 55:6 79:3, 24
**stated** 9:25 44:9
**statement** 17:16, 18, 21 56:8, 9 67:22

**statements** 76:11
**STATES** 1:2 25:4
**station** 12:13
**stay** 27:19 48:11 49:24 54:1 58:25
**stayed** 27:25 60:17 65:3
**staying** 50:15
**stealing** 55:19
**stenotype** 79:8
**stepped** 28:21 56:20 64:24
**stood** 53:20
**stop** 56:25 76:1
**stopped** 8:23 76:24
**store** 55:19 56:13
**Street** 11:20 45:5, 13 55:18
**strike** 35:5
**stronger** 46:20
**stuff** 67:20
**subpoenaed** 66:12
**subsequent** 68:9
**subsequently** 17:22 23:6
**sugar** 56:6
**Suite** 2:5 3:4
**super** 51:4
**Superior** 2:8
**supervisor** 12:24 28:22 70:4 71:18
**supervisors** 56:25 60:7 75:5
**sure** 8:22 13:22 14:23 22:10 24:18 26:12 27:5 28:6 37:10 49:16 51:1 59:4 68:3
**surrounding** 22:24
**sworn** 6:2 7:15 79:5

**< T >**
**take** 10:12 12:16 16:9 19:25 36:3, 6, 8, 9, 16 42:8 47:3, 9, 24 71:19 76:4
**taken** 1:17 6:15, 23 79:12
**talk** 7:2 9:21 10:5, 9 15:11 16:4 18:19 19:6, 12 20:7, 22 21:2 23:15 25:24 39:17 57:2, 3, 20 58:1 59:21 60:9, 14 66:23 67:7 68:16 74:16, 23
**talked** 8:18 9:16 17:1 19:17 23:4 57:21 60:18, 20 65:13, 14 67:18, 19 74:8 75:3, 9 76:17
**talking** 19:14 34:4 40:8 45:10, 21 48:1 56:18 57:11, 25 59:15 62:1

**69:16 72:24 75:8
**taped** 58:24
**taught** 63:17
**teaches** 63:8, 12
**Team** 23:11 61:20
**technically** 53:25
**tedious** 29:4
**teenage** 26:17 27:15, 19
**teenager** 27:20, 24 30:3, 14
**tell** 8:6, 11 10:2 12:9 26:5 27:12 31:22 40:23 58:8 61:12 64:16 65:20, 25 74:13, 21
**telling** 8:18 12:7 28:3 31:18 66:2
**tells** 51:10
**testified** 6:3 40:6
**testify** 79:5
**testimony** 7:15, 19 66:14, 18, 21, 24 67:2, 9, 20 79:7, 10
**text** 15:18
**Thank** 6:12 29:2 34:8 35:5
**Thanks** 6:14
**theft** 56:12
**thing** 7:14 24:8 50:12 74:17 76:23
**things** 7:2 13:6 15:19 24:2 32:1, 8, 14 36:2
**think** 17:13 18:24 23:25 25:21 26:10 27:16 31:1 41:20 43:19 46:4 48:5 49:1 53:15 54:13 56:1 57:4 58:7 67:15 68:25 69:25 74:3, 22
**thinking** 37:25 50:7 52:25
**third** 8:22
**thought** 29:6 52:11 70:16 76:24
**Thursday** 1:21
**till** 29:18
**Tim** 8:20
**time** 7:3, 10 11:12 12:10, 19 13:7, 22, 25 14:5, 19, 22, 24 15:1, 7 16:11, 21 17:16 20:6, 14 28:8 29:16 30:7, 19 31:5, 9 32:1, 20, 23 33:5, 11, 25 36:10 38:16 40:3, 12, 15, 19 41:2, 4 45:8 50:10, 16 51:3, 4, 6, 18 52:2 53:23 54:3 55:12 57:3, 12 58:12 60:18, 20 61:10 63:1 64:9 65:5, 12 67:15, 19, 22 69:4, 10 79:13
**timeline** 49:17
**times** 12:3, 4 47:23 67:18

**today** 7:1, 19 8:15 9:22 10:4 11:2 16:8 67:21
**told** 21:23 27:18, 19 28:23 32:2 49:24 53:23, 24 74:16, 20, 22, 23 75:2, 5
**tops** 59:3
**total** 59:1, 2
**totally** 36:22
**trained** 62:21 63:20, 21, 23
**training** 10:17, 18, 20 11:11, 15, 22, 23 62:24 63:4, 8, 11, 16, 25
**transcribed** 79:9
**Transcript** 1:14 78:1
**transcription** 79:10
**trick** 68:2
**tried** 67:3, 5 68:19
**true** 79:10
**truth** 79:6
**truthful** 7:19
**try** 29:3 34:11
**trying** 28:1, 17 31:1 43:19 48:19 68:2 77:5
**t-shirt** 31:6 41:25
**turned** 27:2
**two** 11:14 13:19 34:17 47:23 56:23 59:3 67:18
**type** 15:20 19:9 31:2 32:18 33:10, 18 34:1 42:2 54:19 71:12, 13
**types** 6:18
**typical** 61:5

**< U >**
**UDFIT** 23:10, 14, 15 61:19
**ultimately** 57:21
**Um-hmm** 29:20 45:9 50:19, 24
**unarmed** 64:11
**undergo** 62:24
**understand** 7:15, 22 30:15 63:3
**understanding** 49:25
**understood** 7:9
**undoable** 34:12
**uniform** 36:11
**uniformed** 50:17 51:20 52:19 77:1
**union** 18:9 20:2, 13, 25 74:17
**unit** 10:24 11:1 21:16
**UNITED** 1:2
**unofficial** 76:10
**upset** 48:18
**Use** 23:11 61:5, 19 62:14, 16, 21, 25 63:1, 4, 8, 12, 17

Deposition of Sergeant Dalia Lopez                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

68:*11*
**uses**  62:*14*
**usually**  11:*13*  12:*21*  13:2
32:8  34:*17*  41:*23*  42:6
61:*21*  71:*9, 17*
**utilize**  36:*11*

**< V >**
**vague**  65:*23*
**van**  58:*5, 6*
**vary**  13:*20, 21*
**vehicle**  26:*14*  28:*25*  29:*1*
31:*21*  40:22  48:*25*  49:*1*
58:*23*
**vent**  19:*18*
**verbal**  7:*3*  17:*18*
**versed**  61:*16*
**versus**  25:6, 22  46:*21*
52:*1*  75:*21*
**vest**  36:7
**video**  18:*1*  19:2  20:*10*
67:*1*
**videos**  19:*4*
**view**  44:*21*  73:*12*
**viewed**  73:*4*
**vs**  1:*9*

**< W >**
**waited**  28:22
**waiting**  23:*21*  59:*21*
**waived**  78:*4*
**walk**  26:*21*
**walked**  27:*21*  28:*20, 25*
31:*15*  38:6  49:2  52:*19,*
*20*  53:*15*  57:*13, 16*
**walking**  27:*3, 9*  39:*15*
40:*10, 23, 24*  42:*17*  43:*9*
48:*24, 25*  49:*3*  53:*18, 19*
56:*24*
**want**  6:*19*  8:*1*  15:22
22:6  35:*13*  50:*24, 25*
51:*3*  58:6  59:2  62:20
67:5  68:*21, 24*  76:*5, 22*
**wanted**  28:*3*  50:*13*  53:7
76:*23*
**warmer**  26:*25*
**wash**  36:9
**watch**  48:*12*
**way**  17:*21*  23:*12*  31:*25*
38:*14, 18*  40:22  44:*13*
46:9  48:*13*  52:*19, 24*
55:*11*  73:*25*  75:*19*
**weapon**  62:*15, 17*
**wear**  35:7, *16*
**wearing**  31:*5*  41:*15, 17,*
*21, 25*  64:7
**wears**  34:*21*
**weather**  12:*24*
**weeks**  36:8

**well**  10:*23*  26:*19*  27:*16*
31:*23*  35:*1*  45:*3*  61:*16*
**went**  11:*3*  17:*24*  26:*12*
27:*3*  31:*24*  32:*3*  37:*14*
54:9  60:*3, 17*  65:2, *5*
**we're**  19:*3*  48:*1*  56:*18*
63:*20*
**west**  11:*18, 19, 20*
**we've**  77:*7*
**WHEREOF**  79:*18*
**white**  31:*6*
**window**  30:*21*
**windows**  26:*24, 25*  27:*1*
**wise**  49:*17*
**witness**  1:*15*  22:*13*
24:22  25:*1, 3, 22*  68:*10*
79:*4, 8, 11, 18*
**witnesses**  39:*18, 21*  45:*10,*
*13*  72:*4*
**witness's**  39:*25*
**word**  43:*20*  44:8  46:*20*
**words**  50:*12*
**work**  11:*13*  12:*16, 20*
14:9  15:5, *9, 12, 15, 18, 21*
26:22, *24*  29:7  32:*3, 6, 9*
34:*9, 19*  38:*18*  41:*23, 24*
42:*1*  60:2  69:7  75:*19, 21*
**worked**  12:*12*  14:*14, 16,*
*18*
**working**  14:6, *20*  36:*10*
**worry**  8:5  68:7
**written**  7:*1*  17:*11*  23:*18*
24:*15*  69:*12, 20*  76:*10*
**wrote**  24:7

**< Y >**
**Yeah**  14:*11*  19:*16*  30:*13*
55:22  56:5  57:*1*  58:*21*
70:*25*
**year**  10:*16, 22*  19:*24*
**years**  11:*9*
**yelling**  27:*10, 13*  40:6
43:*12, 18*  46:*10, 19, 20, 21,*
*22, 23*  48:*4*
**young**  26:*16*

**< Z >**
**zone**  13:*4*