Adam Fried, Administrator
Estate of Desmond Franklin,

vs.

Jose Garcia,

In theUnited States District Court
Northern District of Ohio
Eastern Division
Case No. 1:22-cv-00061

## Officer Jose Garcia

Taken on Wednesday, February 22, 2023

Reporter Rebecca Fumich

DEFENDANT'S
EXHIBIT

**D**
_____



Tackla
& Associates

Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918  fax: 216-241-3935

1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland, OH 44114



TABLE
8 LITIGATION
SOLUTIONS
a member of:
www.table8litigationsolutions.com

Case: 1:22-cv-00061-DAP  Doc #: 44-4  Filed: 01/31/24  2 of 239.  PageID #: 369

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1

2          IN THE UNITED STATES DISTRICT COURT

3             NORTHERN DISTRICT OF OHIO

4                EASTERN DIVISION

5

6    ADAM FRIED,                )
                                )
7    Administrator, Estate      )
                                )
     of DESMOND FRANKLIN,       )
8                               ) Case No.
            Plaintiff,          )
9                               ) 1:22-CV-00061
        vs.                     )
10                              )
     JOSE GARCIA,               )
11                              )
            Defendant.          )
12

13                  - - - - -

14       Transcript of the deposition of OFFICER JOSE

15   GARCIA, the Defendant herein, called by the

16   Plaintiff as if upon examination pursuant to the

17   Federal Rules of Civil Procedure, taken before

18   Rebecca L. Fumich, Registered Professional

19   Reporter, Notary Public in and for the State of

20   Ohio, held at Gallagher Sharp, 1215 Superior

21   Avenue, 7th Floor, Cleveland, Ohio  44114,

22   Wednesday, February 22, 2023, commencing at 12:17

23   p.m.

24

25                  - - - - -

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   APPEARANCES:

 2         On behalf of the Plaintiff:

 3          ELIZABETH BONHAM, ESQ.

 4          SARAH GELSOMINO, ESQ. (Zoom)

 5          TERRY H. GILBERT, ESQ. (Zoom)

 6          Friedman, Gilbert + Gerhardstein

 7          50 Public Square, Suite 1900

 8          Cleveland, OH  44113

 9          216-241-1430

10          elizabeth@fggfirm.com

11          sarah@fggfirm.com

12          terry@fggfirm.com

13

        On behalf of the Defendant:
14
           ELENA BOOP, ESQ.
15
           J.R. RUSSELL, ESQ.
16
           AFFAN ALI, ESQ.
17
           City of Cleveland
18
           Department of Law
19
           601 Lakeside Avenue, Room 106
20
           Cleveland, OH  44114
21
           216-664-2767
22
           eboop@clevelandohio.gov
23
           jrussell2@clevelandohio.gov
24
                      and
25
```

1    THOMAS J. CABRAL, ESQ.

2    Gallagher Sharp

3    1215 Superior Avenue, 7th Floor

4    Cleveland, OH  44114

5    216-241-5310

6    tcabral@gallaghersharp.com

7            and

8    DAVID P. STADLER, ESQ.

9    Ankuda, Stadler & Moeller Ltd.

10   1621 Euclid Avenue, Suite 300

11   Cleveland, OH  44113

12   216-722-3112

13   dstadler@law-asm.com

14

15            - - - - -

16

17

18

19

20

21

22

23

24

25

Case: 1:22-cv-00061-DAP  Doc #: 44-4  Filed: 01/31/24  5 of 239.  PageID #: 372

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1              EXAMINATION INDEX

 2    OFFICER JOSE GARCIA

 3         BY MS. BONHAM . . . . . . . . . . . . .  10

 4

 5               EXHIBIT INDEX

 6    Plaintiff's Exhibit                    Marked

 7    1     Google Map of Forestdale Avenue    70

 8    2     Photograph                        208

 9    3     Photograph                        208

      4     Screen capture of video           211
10

11              OBJECTION INDEX

12         BY MS. BOOP . . . . . . . . . . . . .  46

13         BY MS. BOOP . . . . . . . . . . . . .  47

14         BY MS. BOOP . . . . . . . . . . . . .  80

15         BY MS. BOOP . . . . . . . . . . . . .  81

16         BY MS. BOOP . . . . . . . . . . . . .  83

17         BY MS. BOOP . . . . . . . . . . . . .  85

18         BY MS. BOOP . . . . . . . . . . . . .  85

19         BY MR. CABRAL  . . . . . . . . . . . . 90

20         BY MS. BOOP . . . . . . . . . . . . .  90

21         BY MS. BOOP . . . . . . . . . . . . .  90

22         BY MR. CABRAL  . . . . . . . . . . . . 90

23         BY MS. BOOP . . . . . . . . . . . . .  90

24         BY MS. BOOP . . . . . . . . . . . . .  98

25         BY MS. BOOP . . . . . . . . . . . . . 107
```

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1       BY MS. BOOP . . . . . . . . . . . . 108

2       BY MS. BOOP . . . . . . . . . . . . 109

3       BY MS. BOOP . . . . . . . . . . . . 109

4       BY MS. BOOP . . . . . . . . . . . . 109

5       BY MS. BOOP . . . . . . . . . . . . 110

6       BY MS. BOOP . . . . . . . . . . . . 111

7       BY MS. BOOP . . . . . . . . . . . . 111

8       BY MS. BOOP . . . . . . . . . . . . 111

9       BY MS. BOOP . . . . . . . . . . . . 112

10      BY MS. BOOP . . . . . . . . . . . . 114

11      BY MS. BOOP . . . . . . . . . . . . 114

12      BY MS. BOOP . . . . . . . . . . . . 116

13      BY MS. BOOP . . . . . . . . . . . . 116

14      BY MS. BOOP . . . . . . . . . . . . 121

15      BY MS. BOOP . . . . . . . . . . . . 122

16      BY MS. BOOP . . . . . . . . . . . . 123

17      BY MS. BOOP . . . . . . . . . . . . 126

18      BY MS. BOOP . . . . . . . . . . . . 127

19      BY MS. BOOP . . . . . . . . . . . . 128

20      BY MS. BOOP . . . . . . . . . . . . 128

21      BY MS. BOOP . . . . . . . . . . . . 130

22      BY MS. BOOP . . . . . . . . . . . . 131

23      BY MS. BOOP . . . . . . . . . . . . 131

24      BY MS. BOOP . . . . . . . . . . . . 132

25      BY MS. BOOP . . . . . . . . . . . . 133

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1       BY MR. RUSSELL . . . . . . . . . . . 134

2       BY MR. RUSSELL . . . . . . . . . . . 140

3       BY MR. RUSSELL . . . . . . . . . . . 141

4       BY MR. RUSSELL . . . . . . . . . . . 143

5       BY MR. RUSSELL . . . . . . . . . . . 146

6       BY MR. RUSSELL . . . . . . . . . . . 146

7       BY MR. RUSSELL . . . . . . . . . . . 147

8       BY MR. RUSSELL . . . . . . . . . . . 148

9       BY MR. RUSSELL . . . . . . . . . . . 149

10      BY MR. RUSSELL . . . . . . . . . . . 155

11      BY MR. RUSSELL . . . . . . . . . . . 155

12      BY MR. RUSSELL . . . . . . . . . . . 156

13      BY MR. STADLER . . . . . . . . . . . 156

14      BY MR. RUSSELL . . . . . . . . . . . 156

15      BY MR. RUSSELL . . . . . . . . . . . 156

16      BY MR. CABRAL  . . . . . . . . . . . 158

17      BY MR. RUSSELL . . . . . . . . . . . 158

18      BY MR. RUSSELL . . . . . . . . . . . 174

19      BY MR. RUSSELL . . . . . . . . . . . 175

20      BY MR. RUSSELL . . . . . . . . . . . 184

21      BY MR. CABRAL  . . . . . . . . . . . 187

22      BY MR. RUSSELL . . . . . . . . . . . 201

23      BY MR. CABRAL  . . . . . . . . . . . 201

24      BY MR. RUSSELL . . . . . . . . . . . 202

25      BY MR. RUSSELL . . . . . . . . . . . 203
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1      BY MR. CABRAL . . . . . . . . . . . 203

 2      BY MR. RUSSELL . . . . . . . . . . 203

 3      BY MR. RUSSELL . . . . . . . . . . 203

 4      BY MR. CABRAL . . . . . . . . . . . 203

 5      BY MR. CABRAL . . . . . . . . . . . 204

 6      BY MR. CABRAL . . . . . . . . . . . 205

 7      BY MR. CABRAL . . . . . . . . . . . 205

 8      BY MR. RUSSELL . . . . . . . . . . 205

 9      BY MR. RUSSELL . . . . . . . . . . 205

10      BY MR. RUSSELL . . . . . . . . . . 206

11      BY MR. RUSSELL . . . . . . . . . . 206

12      BY MR. RUSSELL . . . . . . . . . . 206

13      BY MR. RUSSELL . . . . . . . . . . 207

14      BY MR. CABRAL . . . . . . . . . . . 214

15                     - - - - -

16

17

18

19

20

21

22

23

24

25
```

```
 1              OFFICER JOSE GARCIA
 2    after having been first duly sworn, as
 3    hereinafter certified, was examined and testified
 4    as follows:
 5                    - - - - -
 6              MS. BOOP:    Can we do some
 7         housekeeping before you start?
 8              MS. BONHAM:    Yeah.  Let's
 9         do it.
10              MS. BOOP:    Can we have
11         everybody that's participating by
12         Zoom identify themselves so that
13         we know who's participating?
14              MS. BONHAM:    We have
15         Elizabeth Bonham for the
16         Plaintiff.
17              Good afternoon.  How are you?
18              I may have my colleagues,
19         Terry Gilbert and/or Sarah
20         Gelsomino, participate by Zoom,
21         and I'll put it on the record when
22         they join if they join.
23              MS. BOOP:    Thank you.
24         Thank you.
25              And can we also have an
```

Deposition of Officer Jose Garcia                Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1              agreement that no video recording

 2              or still images of Officer Garcia

 3              will be shared with anyone other

 4              than the named Plaintiff in this

 5              case would have been -- which

 6              would be Adam Fried, the attorney

 7              for -- the executor for the

 8              estate?

 9                  MR. CABRAL:    Prior to

10              trial.

11                  MS. BOOP:    Prior to trial.

12                  MS. BONHAM:    Yes.  Before

13              trial --

14                  MS. BOOP:    Before trial.

15                  MS. BONHAM:     -- we won't

16              share any stills or video of this

17              deposition --

18                  MS. BOOP:    Thank you.

19                  MS. BONHAM:     -- outside of

20              parties and counsel.

21                  MS. BOOP:    Thank you.

22                  MS. BONHAM:    Yeah.

23

24                  - - - - -

25
```

```
 1                    EXAMINATION

 2   BY MS. BONHAM:

 3   Q    And can I ask you to state and spell your

 4   name for the record.

 5   A    My name is Jose, first spelled J-O-S-E, last

 6   name Garcia, spelled G-A-R-C-I-A.

 7              MS. BONHAM:    And you have

 8          the names of everybody who's

 9          participating in the room, right?

10              THE REPORTER:    Yes.

11   Q  Okay.  We have counsel for you, Mr. Garcia,

12   in the room.

13       Have you ever been deposed before?

14   A    Excuse me?

15   Q  Have you ever had your deposition taken

16   before?

17   A    No.

18   Q  Okay.  I just want to go over some ground

19   rules so that we both know what's going to happen

20   today and we get a good clean transcript at the

21   end.  Okay?

22       This is a sworn statement that you're making

23   on the record, and it's going to be transcribed

24   in a written form by this court reporter, and

25   it's also going to be video recorded.
```

1        Do you understand that?

2    A    Yes, ma'am.

3    Q    Do you understand that you're making your

4    statement under oath?

5    A    Yes.

6    Q    So that we can get a good clean record, I'm

7    going to ask that we just try and talk to each

8    other one at a time.  Sometimes it can feel like

9    a conversation and we can slip into a rhythm

10   where we're trying to make hand gestures or we

11   can talk over each other and we think we have a

12   shared understanding, but it won't show up later

13   on paper.

14       Do you understand that?

15   A    Yes, ma'am.

16   Q    So I just want to make sure we talk one at a

17   time, give verbal responses, and I'll do the

18   same.  Is that fair?

19   A    Yes, ma'am.

20   Q    If I ask you a question and you don't

21   understand it, can you please ask me for

22   clarification before you give an answer if you

23   need clarification?

24   A    Yes, ma'am.

25   Q    If you answer and you haven't said that you

1   don't understand the question, I'll assume that

2   you did understand.  Is that fair?

3   A    Yes, ma'am.

4   Q    If you ever need to take a break, we can do

5   that.  I might need to take a break to pay the

6   parking meter.  We'll try to get you out of here

7   today, but just let me know if you need a break.

8   Okay?

9   A    Yes, ma'am.

10  Q    The only caveat I have is that if I have a

11  question pending, I ask that you answer it and

12  then we'll break.  Okay?

13  A    Yes, ma'am.

14  Q    Similarly, you have a lot of lawyers in this

15  room on your side of the table.  Any one of them

16  is going to be making objections to my questions

17  at a given point.  They're entitled to do that.

18       Do you understand that?

19  A    Yes, ma'am.

20  Q    If somebody makes an objection, just go ahead

21  and let them do that, give them a minute, but you

22  can still answer my question unless they

23  specifically direct you not to.

24       Does that make sense?

25  A    Yes, ma'am.

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q    Is there any reason that you would be unable

2  to testify truthfully and accurately this

3  afternoon?

4  A    There's no reason.

5  Q    Okay.  Let's get into it.

6              MR. CABRAL:    Try to keep

7          your voice up.

8              THE WITNESS:    Yes.

9  Q    What did you do, if anything, to prepare for

10  the deposition today?

11  A    Before anything today, just I talked to my

12  counselors, which they're here present.

13  Q    Was that just today?

14  A    No.  Prior to this, I saw them twice.

15  Q    Who did you see?  And I don't want to hear

16  what you talked about with them.  I just want to

17  know who you saw, when you saw them, and how long

18  the meetings were.  Okay?

19      Let's start with who did you meet with?

20  A    I met with Elena Boop, Tom Cabral, J.R. --

21              MR. STADLER:    Dave.

22  A    -- Dave, and the last gentleman.

23              MR. RUSSELL:    Ali.

24  A    Ali.

25              MS. BOOP:    Affan Ali.

1    Q    And that was today?

2    A    The other days.

3    Q    The other days.  Okay.  Which other days were

4    those?

5    A    This past week.

6    Q    Okay.  Two different days this past week?

7    A    Yes.

8    Q    Which days?  Do you remember?

9    A    I can't recall this, no.

10    Q    So you met with your counsel who is seated

11    here on two days this past week.  Am I getting

12    that right?

13    A    Yes.

14    Q    And did you also meet with them today?

15    A    Today, yes.

16    Q    And on all three occasions you met with them

17    to get ready for this deposition; is that right?

18    A    Yes.

19    Q    About how long were each of those meetings?

20    A    They weren't that long.  Probably like an

21    hour.

22    Q    Did you look at any documents during those

23    meetings?

24    A    What are you referring?  Documents?

25    Q    Did you look at any written or printed

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    document at all?

2    A    No.

3    Q    Did you look at any video or photo?

4    A    I did watch a video.

5    Q    What video?

6    A    It was the one where I'm at the light.

7    Q    Can you describe it in a little more detail

8    for me?

9    A    It shows that I'm pulling up at the light,

10   and then it shows when I proceeded moving

11   forward, and then the other car pulling up next

12   to me.

13   Q    On the video you're talking about, are there

14   little Christmas lights hanging in front of the

15   cars where you can see through the view?

16   A    I believe so.

17   Q    In the video that you're talking about, are

18   there highlights over your car that look like

19   they were made or are there no highlights?

20   A    I didn't pay that much attention to detail

21   like that so...

22   Q    Okay.  Did you watch any other videos?

23   A    No.

24   Q    Did you look at any other photos?

25   A    No.

1  Q    Did you look at any other documents at all?

2  A    No.

3  Q    Did you bring any documents, videos, or

4  photos here with you today?

5  A    No.

6  Q    Did you bring any notes that you made?

7  A    No.

8  Q    Did you make any notes during the meetings

9  with your attorneys?

10  A    No.

11  Q    Have you talked to the counsel that's seated

12  here about this deposition on any other occasion

13  besides the three occasions you just told me

14  about?

15  A    Negative.

16              MS. BOOP:    Do you mean to

17        prepare for the deposition?

18              MS. BONHAM:    Yeah.

19              MS. BOOP:    Okay.  Thank

20        you.

21  Q    Did you meet with any other lawyers besides

22  counsel in this case in order to prepare for the

23  deposition?

24  A    No.

25  Q    Have you ever talked to any other lawyers

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    besides counsel in this case about the matter

2    that we're here about today?

3    A    No.

4    Q    Did you talk to anybody else that's not an

5    attorney about the deposition that we're going to

6    take today?

7    A    No.

8    Q    You didn't talk to a spouse or a family

9    member?

10   A    No.

11   Q    You didn't talk to any colleagues?

12   A    No.

13   Q    Did you tell anyone at all that you were

14   going to sit for a deposition today?

15   A    I told my dad --

16   Q    Okay.

17   A    -- that I had this today.  Nothing in detail.

18   Q    You didn't tell your dad anything else about

19   it?

20   A    No.

21   Q    When did you talk to your dad?

22   A    Yesterday.

23   Q    Was it by text or did you call him or see

24   him?

25   A    When I visit my grandma and him.

1  Q    Did you also tell your grandma about the

2  deposition?

3  A    No.

4  Q    Just your dad.

5  A    Yes.

6  Q    Is there anybody else you can think of that

7  you told that you were getting your deposition

8  taken today?

9  A    No.

10  Q    Are you still a police officer in the

11  Cleveland Police Department?

12  A    Yes, ma'am.

13  Q    When did you start working at the Cleveland

14  Police Department?

15  A    I was hired in 2015, December '14.

16  Q    Can you take me through your educational

17  background before you went to the police academy?

18  A    What I did before?

19  Q    Your education before that.

20  A    I went to Lincoln West High School, graduated

21  from there.

22  Q    My mom went there.

23  A    I went to Scranton Elementary, graduated from

24  there, and just -- I got a high school diploma.

25  Q    Have you always lived here in Cleveland?

Deposition of Officer Jose Garcia                Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  A   Yes.

2  **Q   You were born here?**

3  A   No.

4  **Q   Where were you born?**

5  A   I was born in Puerto Rico, but I was raised

6  in Dominican Republic.

7  **Q   Tell me about that.  Where were you born and**

8  **when, when did you move to the DR, and then when**

9  **did you move up here?**

10  A   So I was born in Puerto Rico.  I was

11  raised -- I was nine months old -- in Dominican

12  Republic until I was 9 years old, and then I came

13  here when I was 10.

14  **Q   And you moved right to Cleveland and went to**

15  **Scranton Elementary?**

16  A   Yes.

17  **Q   After you graduated from Lincoln West you**

18  **didn't have any further education, right?**

19  A   No.

20  **Q   But you did receive your high school diploma?**

21  A   Yes.

22  **Q   Did you have any other kind of education,**

23  **whether vocational training or certifications,**

24  **anything like that?**

25  A   No, ma'am.

Deposition of Officer Jose Garcia                Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    **Q    What did you do for a job after high school?**

2    A    Worked at a factory.  It's called Evergreen

3    Packaging.  Started working there due to certain

4    things that was happening in my family.  So I was

5    helping out my family at the time so -- the

6    reason I chose to work than go to school, like

7    move on to college.

8    **Q    What year was that that you graduated high**

9    **school?**

10   A    '11.

11   **Q    And that was the same year you started**

12   **working at that factory?**

13   A    Yes.

14   **Q    How long did you stay at that job?**

15   A    I worked there for about four years.  I

16   worked there and then I got hired through the

17   City of Cleveland.

18   **Q    For the police department?**

19   A    Yes.

20   **Q    Did you ever attend any college?**

21   A    No.

22   **Q    Did you ever have other jobs in between high**

23   **school and starting at the police department**

24   **besides that factory?**

25   A    I worked for the city for like the recreation

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    centers from 15 to 17.

2    Q    What did you do for the rec centers in

3    Cleveland?

4    A    I worked at the -- actually, I worked for --

5    at the recreation Halloran Park located on 117th.

6    Just they have an ice skating rink, so I would

7    help out with people, with whoever was on the ice

8    ice skating.  I helped them out if they fall or

9    get their skates and stuff like that, clean up,

10   and make sure everything's squared away.

11   Q    That was between 2015 and 2017?

12   A    That was when I was in high school.

13   Q    Oh, between the ages of 15 and 17.

14   A    Yes.

15   Q    Okay.  Did you ever have any other jobs after

16   you graduated high school besides working at that

17   factory and then moving to the police department?

18   A    No.

19   Q    What made you want to become a police

20   officer?

21   A    I always was looking to either fire or

22   police, and I always like wanted to help some way

23   in the community, and that was one of the ways

24   that I was able to provide any help to the -- to

25   Cleveland because I grew up in the community.

1  Q   Did you know anybody that worked in the

2  police department at that time when you applied

3  for the job?

4  A   No, I didn't.  I know someone that was there,

5  but it's not -- we didn't have like a direct

6  relation.

7  Q   Who is that?

8  A   He's no longer on the job.

9  Q   Who is it?

10 A   It was Torres.  Last name Torres.  That's how

11 I know him.

12 Q   How did you know him?

13 A   Just had a roommate at the time, we both went

14 to the police academy together, and that was his

15 uncle.

16 Q   Oh.  Who was -- what was the roommate's name?

17 A   Last name Villafuerte.

18 Q   Can you spell that for me?

19 A   V as in Victor, I as an Ida, L as in Lincoln,

20 L as in Lincoln, A as in Adam, F as in Frank, U

21 as in union, E as an Edward, R as in Robert, T as

22 in Tom, E as in Edward.

23 Q   When did you and him start living together?

24 A   I think it was right after we finished high

25 school.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q    And he had an uncle on the police force?

2   A    Yes.

3   Q    Officer Torres.

4   A    Yes.

5   Q    And then you and Mr. Villafuerte decided to

6   go to the police academy together?

7   A    Yes.

8   Q    Do you still live together?

9   A    No.

10  Q    How long did you live together?

11  A    It was like maybe two or three years, I

12  think.

13  Q    You guys were roommates?

14  A    Yes.

15  Q    Are you still friends?

16  A    Yeah, we're still friends.

17  Q    Is he still on the police force?

18  A    Yes.

19  Q    Take me through when you first applied to

20  become a police officer and the application

21  process and when you entered the police academy.

22  A    When I saw that Cleveland was hiring, I

23  signed up.  I took preclass to prepare you to

24  take the civil test, and I did that.  I took the

25  test.  Didn't hear from the city for like a year

1    after.  Then I got a letter that I was one of the

2    candidates selected.

3    **Q    So you took the exam in 2014; is that right?**

4    A    Yes.

5    **Q    And you heard back in 2015 --**

6    A    Yes.

7    **Q    -- is that right?**

8    A    Yes.

9    **Q    And then what happened?**

10    A    I was still working on my normal job that I

11    was working currently at that time, and then once

12    they make the day -- excuse me -- the day that

13    they were going to start the academy, I got ready

14    for it.

15    **Q    That was in December of 2015 that you started**

16    **the academy?**

17    A    December '14 they send us to the State

18    Highway Patrol in Columbus.

19    **Q    Sorry.  Was it December of '14 or December of**

20    **'15?**

21    A    '14.

22    **Q    Okay.**

23    A    Yes.

24    **Q    They sent you down to OPOTA.**

25    A    To the State Highway Patrol Academy, yes, to

1  get certified for OPOTA.

2  Q    How long was that training?

3  A    Six months.

4  Q    Is that a training that all new Cleveland

5  police officers go through if they haven't had

6  that training previously?

7  A    If you don't have any prior police

8  experience, yes, you have to go through their

9  academy and get OPOTA certified.

10  Q    And you got certified at the academy; is that

11  right?

12  A    Yes, ma'am.

13  Q    Within that normal six-month period?

14  A    Yes.

15  Q    Then what happened?

16  A    We're the first academy going to -- from

17  Cleveland going to the State Highway Patrol.

18  Since -- once we completed all the OPOTA

19  certification, we came back to Cleveland,

20  completed their other part of the academy.

21  Q    Tell me about how that works.  What else did

22  you do in terms of training when you came back to

23  Cleveland after you got the OPOTA certification?

24  A    Just going over their policy, just going like

25  how they would -- they deal with Cleveland

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  citizens scenarios and stuff like that.  They

2  give us examples how to search buildings or

3  domestic violence and stuff like that.

4  Q    How long is that training that you received

5  just in Cleveland?

6  A    We were there for another month, yeah, if I

7  can recall.

8  Q    Is there a written training curriculum that

9  you receive?

10 A    I mean, they had their -- I mean, they have a

11 schedule and they had it -- they pretty much had

12 on paper what we would be doing each day.

13 Q    Who were you trained by as part of that

14 one-month Cleveland training?

15 A    By Cleveland officers.

16 Q    Was there anybody else that delivered

17 training to you as part of that one-month

18 training that was not a member of the police

19 force?

20 A    No.

21 Q    Did you have to take any other tests as part

22 of that Cleveland specific one-month training?

23 A    No.

24                MS. BONHAM:    Let's take a

25            break off the record.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                     (Recess had.)
 2                 MS. BONHAM:     Back on the
 3            record.
 4   BY MS. BONHAM:
 5   Q    You were telling me about the training that
 6   you went through when you first became a
 7   Cleveland police officer.  So it sounds like you
 8   had the OPOTA Academy and then you came up and
 9   did about a month at the City of Cleveland.  It
10   sounds like there was a written schedule for how
11   that training would go and that it was conducted
12   solely by members -- other members of the
13   Cleveland Police Department.  Am I getting that
14   right so far?
15   A    Yes, ma'am.
16   Q    After that, after that one month was over,
17   you didn't have any exams or tests about that one
18   month, right?
19   A    No.  We just had the taser test that we did.
20   Q    What's that?
21   A    The taser is the -- it's the electrical tool
22   that we have.  We use as a secondary tool in our
23   belt.
24   Q    What does a taser test involve?
25   A    Actually, just that way we can know what it
```

1  does to you or what -- the capability in case you

2  use it in the field, you can testify in court.

3  **Q    Do you get tased as part of that test?**

4  A    Yeah.  We actually get tased.

5  **Q    Did you have any other tests like that as**

6  **part of the City of Cleveland only portion of**

7  **your early training?**

8  A    Just that one.

9  **Q    You didn't have a similar test for pepper**

10 **spray, for example?**

11 A    We did pepper spray, but it was at the State

12 Highway Patrol.

13 **Q    Okay.  I see.  Did you have any training**

14 **during that one-month City of Cleveland training**

15 **about the use of deadly force?**

16 A    We went over it at the State Highway Patrol

17 when we were doing the OPOTA.

18 **Q    Did you have any additional or different**

19 **training on the use of deadly force during the**

20 **Cleveland specific month after OPOTA?**

21 A    No.

22 **Q    After that OPOTA training and then the**

23 **one-month Cleveland training, have you ever had**

24 **any additional training as a Cleveland police**

25 **officer?**

1    A    No.

2    Q    Okay.  After that training that you had, then

3    you started your job as a police officer; is that

4    right?

5    A    Yes.

6    Q    What district and what division of the police

7    did you start your job in?

8    A    I started in the 5th District.

9    Q    What was your job title when you first

10   started in the 5th District?

11   A    So I was -- when we first got on the road, we

12   have a field training officer, which was FTO, and

13   I was in there for six weeks.

14   Q    In the 5th District for six weeks with your

15   field training officer?

16   A    Yes.

17   Q    Did that six weeks overlap with the one-month

18   Cleveland training you discussed or was that

19   afterwards?

20   A    Afterwards.

21   Q    So you're in the 5th District with a field

22   training officer.  Who was that person in your

23   case?

24   A    Victor Claudio.  Officer Victor Claudio.

25   Q    And that was the same field training officer

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   you had the whole six weeks?

2   A    No.  I was there for six weeks and then

3   everybody gets changed to another district, which

4   was -- I end up in the 2nd District.

5   Q    So you were with Officer Claudio for six

6   weeks in the 5th, right?

7   A    Yes.

8   Q    And then you got transferred to the 2nd?

9   A    Yes.  The whole academy.  So we were there

10  for -- so we got shipped out to our first

11  district, and then after six weeks we get to

12  change to another district, which is -- I ended

13  up in the 2nd District.

14  Q    Do you know why you ended up in the 2nd

15  District?

16  A    That's how they've always done it, rotate

17  everybody.  That way you can get familiar with

18  both sides of the city.

19  Q    When you say "everybody," was that everybody

20  in that year's incoming class of officers?

21  A    Yes.  Everybody in my academy.

22  Q    How many people were in your academy

23  approximately?

24  A    I think we graduated about 45, 48 officers at

25  that time.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q    So all 45 or 48 start in the 5th?

2  A    No.  So everybody got shipped out different

3  districts -- we've got five districts.  So

4  everybody got shipped out to different districts.

5  Maybe five goes to the 4th District, 10 goes to

6  2nd District, three goes to the 5th, and some --

7  Q    Got it.  How many people got shipped out to

8  the 5th District with you in that first instance?

9  A    I don't know the exact number, but there was

10 quite a few of us.

11 Q    Do you remember any of the names of those

12 people?

13 A    No, I can't remember.

14 Q    Do you still keep in touch with any of those

15 people?

16 A    No, I do not.

17 Q    So they were with you in your first six weeks

18 when you were a Cleveland police officer, right?

19 A    Different -- and we're all on different

20 shifts.  There's morning, second shift, and third

21 shift.

22 Q    I see.  And then all those same people got

23 transferred with you to the 2nd District --

24 A    Not necessarily.

25 Q    -- or that's not how it works?

Case: 1:22-cv-00061-DAP  Doc #: 44-4  Filed: 01/31/24  33 of 239.  PageID #: 400

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A    It's random pick, I guess.

2   Q    I see.  When you first started during that

3   first six weeks in the 5th, did you have a

4   partner or were you only together with that field

5   training officer?

6   A    Field training officer.

7   Q    What about when you got moved to the 2nd

8   District, did you have a partner, were you with a

9   different training officer?

10  A    Different field training officer.

11  Q    Who was that person?

12  A    It was Smith.

13  Q    Do you remember a first name?

14  A    I do not remember his first name.

15  Q    How long were you with that field training

16  officer?

17  A    I was there with him eight weeks, I believe

18  so.

19  Q    And then after that did you stay in the 2nd

20  District?

21  A    Yes.  I had another field training officer on

22  different -- with Smith I was on first shift,

23  then I went -- the next phase it was with PO

24  Quintana, which was second shift.

25  Q    How long was that phase?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1    A    Another eight weeks.

2    Q    Is PO Quintana the whole last name or is that

3    a first and last name?

4    A    Last name.  Quintana.

5    Q    Quintana is the last name?

6    A    Yes.

7    Q    Oh, okay.  So I have Claudio in the 5th

8    District, then Smith in the 2nd District first

9    shift, then Quintana in the 2nd District second

10   shift.

11   A    Correct.

12   Q    Then what?

13   A    Then my last phase, I had PO Tracy as my last

14   phase.

15   Q    Was that third shift?

16   A    No.  Second shift I remember.

17   Q    Stayed on second shift?

18   A    Yes.  I wasn't lucky enough to stay on first

19   shift.

20   Q    That's a good shift.

21   A    Yeah.  I mean, I don't like night shift.

22   Q    Why not?

23   A    I mean, we're meant to sleep during the

24   night, right?  So...

25   Q    After Officer Tracy did you get paired up
```

1   with anybody else?

2   A   After we completed -- so it's six months

3   on-the-road probation.  So after I completed my

4   six-month probation, I was in general duty, so

5   they placed me in the office lobby, so I was

6   there taking reports, any crash report or

7   accident, whatever the client came in to make a

8   report for.

9   Q   So you go through the State Highway Patrol

10  training, you come up to Cleveland, get another

11  month of training, and then you spend how long

12  total in field training?  And did you call it

13  probation?

14  A   Probation, yeah.

15  Q   How long total?

16  A   Another six months.

17  Q   Does every new police officer do that?

18  A   Yes.  We do the academy, and then six months

19  on the road of probation with a field training

20  officer.

21  Q   General duty in the office lobby, that's in

22  the 2nd District building; is that right?

23  A   Yeah.  It's called general, like you're not

24  in an assigned car.  They put you in whatever --

25  you pretty much fill into whatever is open.  If

1  they need someone in the lobby, you go there;

2  tomorrow you could be on the road.  You fill out

3  whatever they need on that car to fill out.

4  **Q    I see.  So your first job by yourself was**

5  **called general duty --**

6  A    Yes.

7  **Q    -- is that right?**

8  A    Yes.

9  **Q    And what that meant was you just do whatever**

10  **people need when you show up that day at work.**

11  A    Yes.

12  **Q    So it's not necessarily true that you're**

13  **always in the lobby taking reports.  That was**

14  **just an example.**

15  A    When you're in the lobby, you handle anything

16  that comes to the lobby.  Any clients that come

17  to the lobby, wants to make a police report or

18  they have any questions, you assist them.  Answer

19  the phone also.

20  **Q    So if you're on general duty, you could**

21  **possibly be assigned to stay in the lobby and**

22  **take reports, right?**

23  A    If they need someone in the lobby, yes.

24  **Q    But that's not all you do as a general duty**

25  **officer.  You could also, for example, be**

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    assigned to go out in a patrol car?  Am I getting
2    that right?
3    A    Not that the day.  If you're assigned to the
4    lobby, you're assigned to the lobby for that day.
5    Q    Okay.  What about a different day?
6    A    A different day, let's say they need an
7    officer in a one-man car, which was a solo car,
8    they'll put you there and you just handle all the
9    priority calls.
10   Q    Got it.  Who gave you that general duty
11   assignment?
12   A    Supervisors.
13   Q    Do you know why you were assigned as general
14   duty officer?
15   A    All the other cars were filled in with
16   partners, so how can I go jump into a car
17   immediately and have a partner?
18   Q    Did other people from your academy group get
19   assigned to a car immediately?
20   A    No.  We were all in general duties.
21   Q    You were all assigned to general duty.
22   A    After we were completed, yes.
23   Q    How long were you assigned to general duty?
24   A    A couple months.
25   Q    Did there come a time when you then became a

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  patrol officer?

2  A    I mean, general duty you do -- you can be in

3  the lobby one day, another day you can be on the

4  road, so I was back and forth.  Whatever they

5  needed me, I fill in.

6  **Q    Sure.  Did there come a day after your time**

7  **as a general duty officer when you got assigned**

8  **to your own car?**

9  A    After people started going to other different

10  units, cars started opening up, I was in a car.

11  **Q    That was after a couple of months?**

12  A    Yes.

13  **Q    What car?**

14  A    Two-man car.  Two-man car is responsible for

15  everything pretty much, any violent crime.

16  **Q    That was still second shift 2nd District?**

17  A    Yes.

18  **Q    Did you have a partner?**

19  A    I had a partner.

20  **Q    Who was that?**

21  A    PO Majid.

22  **Q    Can you spell that?**

23  A    M-A-J-I-D.

24  **Q    Do you have a first name?**

25  A    Not right now, no.  His badge is 777.

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    What was your badge number?

2    A    2168.

3    Q    Has that always been your badge number in the

4    Cleveland Police Department?

5    A    Yes, ma'am.

6    Q    So if any document that I were to look at

7    from the Cleveland Police Department refers to

8    badge number 2168, that would also be referring

9    to you?

10   A    Yes.  From the time I started.

11                MS. BOOP:    Thank you.

12   Q    Thank you.

13        How long were you partnered with Officer

14   Majid?

15   A    I would say about three, four years, I would

16   say.  Yeah.  Two, three.

17   Q    Did the car have a number?

18   A    We were 2 Adam 24.

19   Q    Did you choose to get partnered with Officer

20   Majid?

21   A    I mean, we liked each other so we can get

22   along.  So, yeah, we matched up, and we got in a

23   car together.

24   Q    Explain to me how that works when you match

25   up with somebody.

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    As far as -- I mean, it's good to work with
 2   somebody you can get along with working 10-hour
 3   shifts.  So we liked each other and we seen we
 4   can get along with each other, and we just asked
 5   our boss to see if he can put us together in a
 6   car, and then our boss made it happen.
```

 7   **Q    Who was your boss?**

 8   A    He's Lieutenant Farnsworth.

 9   **Q    When you got assigned to that car with**
10   **Officer Majid, what was the -- what were the**
11   **times of day that second shift lasted, from when**
12   **until when?**

13   A    We started at 2:00 p.m. and our shift ended
14   at midnight.

15   **Q    When did you first meet Dalia Lopez?**

16   A    I can't say exactly what year, but when she
17   first got on and came to the 2nd District.

18   **Q    She wasn't in your same police academy group?**

19   A    No.

20   **Q    You first met her when she came to the 2nd**
21   **District and you were already there; is that**
22   **right?**

23   A    Yes.

24   **Q    About how long had you been there?**

25   A    I've been on the 2nd District since 2016.

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    When you first met Officer Lopez, were you

2    already partnered up and assigned to that patrol

3    car with Officer Majid?

4    A    No.  I had a different partner at that time.

5    Q    Who was that?

6    A    I would say PO Laird.

7    Q    Can you spell that for me?

8    A    L-A-I-R-D.

9    Q    That was before you partnered up with Officer

10    Majid?

11    A    No.  That's after.  Because PO Majid went to

12    -- took -- went to another unit, and so I was

13    open on that car, so I got another partner.

14    Q    Officer Majid was your first partner, right?

15    A    Yes.

16    Q    Tell me again how long you guys were

17    partners.

18    A    About two, three years.

19    Q    About two or three years.

20    A    Yes.

21    Q    Okay.  Then you became partners with Officer

22    Laird after that, right?

23    A    Laird.  Yes.

24    Q    What's his badge number, if you know?

25    A    Her badge number --

1  Q    Her badge number.

2  A    -- I do not know off the top of my head.

3  Q    Were you assigned to the same patrol car?

4  A    Yes.

5  Q    How long were you partners with her?

6  A    Probably like two years, I would say.

7  Q    So that takes you up to about 2020; is that

8  right?

9  A    Around there probably.

10  Q    After that, can you take me through who your

11  partners were?

12  A    Then my last partner I had, it was Officer

13  Domnori.  That was my last partner.

14  Q    Are they your current partner?

15  A    No.  He's not -- he's in another unit so

16  we're no longer a partner.

17  Q    Do you have a partner right now?

18  A    No.

19  Q    Are you still in the 2nd District?

20  A    Yes.  I'm in the 2nd District.

21  Q    Second shift?

22  A    Second shift.

23  Q    Same job?

24  A    Patrol, yes.

25  Q    You just don't have a partner.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    I work by myself.

2    **Q    Can you spell the name of your most recent**

3    **partner for me?**

4    A    Domnori, D-O-M-N-O-R-I.

5    **Q    How long about were you partners with him?**

6    A    About a year and a half, close to two years.

7    **Q    And then more recently you've been working**

8    **alone.**

9    A    Yes.

10   **Q    Did all three of your former partners just**

11   **move to different locations?**

12   A    Majid went to like a major crime unit, PO

13   Laird, she went to the academy, and PO Domnori

14   went to CSU community engagement.

15   **Q    Do you keep in touch with any of them?**

16   A    I see Domnori and Majid at the district.

17   **Q    What about Officer Laird?**

18   A    I haven't seen her.  I mean, whenever -- if

19   we get any yearly training, if I have to go to

20   the academy, I've seen her there.

21   **Q    Do you take annual training?**

22   A    Excuse me?

23   **Q    Do you take annual training?**

24   A    Every year we go through training.  Every

25   officer goes every year through training.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q    Can you explain to me what training that is?

2  A    Just like how to -- we can deal with people

3  that are going through crisis, and people that is

4  going through depression, and stuff like --

5  pretty much how to manage people or deal with

6  people that are going through a psych episode.

7  Q    Like crisis intervention training?

8  A    Crisis, yes.

9  Q    Do you have that every year?

10 A    Yeah.  We go through it.

11 Q    Where at?

12 A    At the academy.

13 Q    Do you go through any other annual training?

14 A    We re-qualify for shooting -- our shooting.

15 Q    Where is that conducted and by whom?

16 A    It's conducted at the shooting range.

17 Q    Where?

18 A    The range is off of 62nd and Denison.

19 Q    So that's something the Cleveland Police

20 Department conducts or a different agency?

21 A    No.  Cleveland.

22 Q    That's on an annual basis?

23 A    Yes.

24 Q    Is there any other training that you receive

25 annually besides re-qualifying for your firearm

1    and taking crisis intervention training at the

2    academy?

3    A    No.

4    Q    Have you done those two trainings annually

5    since you very first started as an officer with

6    the Cleveland police?

7    A    Yes.

8    Q    Is there any other training that you received

9    after the police academy that we haven't

10   discussed yet?

11   A    No.

12   Q    You might see your former partner, Officer

13   Laird, at these annual trainings, but otherwise

14   you don't keep in touch with her, right?

15   A    No.

16   Q    But your two other former partners, you do

17   keep in touch with socially?

18   A    I see them at the district.

19   Q    Do you ever text with them?

20   A    Outside?

21   Q    Yeah.

22   A    No, unless it's something involved with work.

23   I mean, I don't text with them.  I mean, I don't

24   talk to -- the people that I work with I don't --

25   I don't have an outside like with them so -- it's

1   just work, work.  That's it.  I go home.

2   Q    You don't have an outside work relationship

3   with anybody at all at the Cleveland Police

4   Department?

5   A    No.  Nothing.

6   Q    You don't do anything socially with any of

7   your colleagues?

8   A    No.

9   Q    Have you ever?

10  A    I've done in the past, but it's just not my

11  environment.

12  Q    What do you mean?

13  A    Just I'm more to myself and just rather stay

14  and spend more time with my family.

15  Q    Is there anybody that you talk to on the

16  phone or text with socially that's a colleague?

17  A    No.

18  Q    Has there ever been while you were a

19  Cleveland police officer?

20  A    What do you mean?

21  Q    Has there ever been a colleague that you talk

22  to on the phone or text with socially outside of

23  work?

24  A    In the past I did, just casual, hi, how are

25  you doing.

1  Q    Who are those people?

2  A    My partners.

3  Q    Anybody else?

4  A    No.

5  Q    All three partners?

6  A    Yes.

7  Q    In the past, but not now.

8  A    Not now.

9  Q    Have you ever talked or texted with Officer

10 Lopez, Dalia Lopez, socially?

11 A    I have just casual conversation.

12 Q    Have you and Officer Lopez ever hung out in a

13 social environment outside of work?

14 A    No.

15 Q    You've just talked on the phone or texted

16 casually?

17 A    Just call or text.

18 Q    Besides Officer Lopez and your former

19 partners, is there any other Cleveland police

20 officer that you have ever talked to or spent

21 time with socially?

22             MS. BOOP:    Objection; asked

23        and answered.

24             Go ahead.

25 A    No.

1  Q    It sounds like in the past you have attended

2  some kind of social engagements with colleagues,

3  but you just don't do that anymore; is that

4  right?

5                    MS. BOOP:    Asked and

6            answered.

7                    Go ahead.

8  A    Yes.

9  Q    Can you tell me what those social engagements

10  were and when they occurred?

11  A    I can't exactly tell you what the time, but

12  it was -- before I was -- I mean, that was more

13  towards like when I first started the job.  We

14  went to the bar afterward, after work, had a

15  couple beers, but that's it.  I don't drink

16  anymore so that's why I cut out those -- hanging

17  out because they always want to drink, so I don't

18  drink anymore so...

19  Q    Oh.  Congratulations.

20        Previously when you did go to social

21  gatherings maybe at a bar after work, how often

22  would that be?

23  A    Maybe once a week.

24  Q    With your colleagues?

25  A    A few of them, yeah.

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   Q    Who would attend?

 2   A    It was just my partner.

 3   Q    Which partner was that?

 4   A    Majid.

 5   Q    Anybody else?

 6   A    No, not that I can recall.  No.

 7   Q    About what year did you stop going to those

 8   events?

 9   A    Probably in like '19, 2019.

10   Q    Did you keep seeing Mr. Villafuerte socially?

11   A    No.  I haven't seen him in a couple years.

12   Q    When was the last time you saw or talked to

13   him?

14   A    I mean, he has his own family, got a baby,

15   got his own thing going, so I would say maybe two

16   years ago.

17                MS. BONHAM:    I want to get

18           into the facts of this case a

19           little bit, and I want to see if

20           my colleagues are going to join on

21           Zoom, so let's take two minutes,

22           if that's okay.

23                MR. CABRAL:    Okay.

24                (Recess had.)

25   BY MS. BONHAM:
```

1   Q    Okay.  So I want to talk about the day of the

2   shooting of Desmond Franklin which is the case

3   we're here about.  Do you understand that?

4   A    Yes, ma'am.

5   Q    Okay.  And unless I tell you otherwise, all

6   of my questions from this point forward are going

7   to be about that day and that period of time.  Do

8   you understand that?

9   A    Yes, ma'am.

10  Q    So I'll specify if that's not the case.

11  Okay?

12  A    Yes, ma'am.

13  Q    I want to ask you at that time -- I don't

14  need to know your address, but can you tell me

15  what neighborhood you were living in?

16  A    Old Brooklyn.

17  Q    In Old Brooklyn.  How would you usually get

18  to work?

19  A    I drive through Denison, then go through 22nd

20  Place, and then go through Forestdale, and --

21  where I'll be coming to the intersection of

22  Pearl.

23  Q    Where's the 2nd District at?

24  A    Fulton Road.  348 -- 3481 West -- I mean

25  Fulton Road.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    That's where you would report to each day for

2    work at that time, right?

3    A    Yes.

4    Q    You're working at that time second shift in

5    the 2nd District, right?

6    A    Yes.

7    Q    You were assigned to patrol car 2A24 at that

8    time?

9    A    Yes.

10   Q    And who was your partner at that time?

11   A    PO Domnori.

12   Q    I'm sorry?

13   A    Domnori.  PO Domnori.

14   Q    To get from home to the 2nd District to start

15   your shift, to start second shift, you would have

16   to drive north on 25th, right?

17   A    North on 25th.

18   Q    North on 25th.  Okay.  And that was your

19   typical route you would drive?

20   A    Normally, yes.

21   Q    Tell me the make and model of your car at

22   that time.

23   A    Honda Accord.

24   Q    What color?

25   A    Silver.

1  Q    Was that a stick shift?

2  A    Yes.

3  Q    You were the owner of that vehicle, right?

4  A    Yes.

5  Q    It was in your name?

6  A    Yes, ma'am.

7  Q    Was there anything wrong with the car at that

8  time?

9  A    No, ma'am.

10  Q    The windows worked?

11  A    Yes.

12  Q    Did they roll up and down with an electric

13  button or was it a crank?

14  A    Electric.

15  Q    And the stick shift on that model of car, was

16  it a more modern stick shift or was it a stick in

17  the floor?

18  A    What do you mean by that?

19  Q    You know how like newer model cars have --

20  you just put your hand on the gear shift, right?

21  Do you know what I'm talking about?

22  A    No, I do not.

23  Q    Explain to me what the gear shift in the car

24  looked like.

25  A    I mean, just a normal typical stick shift

1    car.

2    Q    Okay.

3    A    You have to put your hands on to move -- to

4    switch the gear.

5    Q    Okay.  You use your right hand to do that

6    while you drove that car?

7    A    Yes.

8    Q    Are you right-handed or left-handed?

9    A    I'm a right-hander.

10   Q    Right-handed.  And it had a clutch and a gas

11   and a brake pedal; is that right?

12   A    Yes, ma'am.

13   Q    Did you use your left hand for the clutch or

14   did you -- sorry -- left foot for the clutch or

15   do you use your right for all three?

16   A    Left.  Left leg for the clutch.

17   Q    And right leg for the gas and brake?

18   A    Yes.

19   Q    And right hand for the gear shift?

20   A    Yes.

21   Q    And left or right or both hands on the wheel?

22   A    Yes.

23   Q    Nothing was different on that car than in the

24   typical model.  You hadn't modified it, in other

25   words.

Deposition of Officer Jose Garcia                Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    No.  It was completely stock.

2    Q    **And nothing was broken?**

3    A    No.

4    Q    **What year was that car?  Do you remember?**

5    A    I believe it was an '06.

6    Q    **So that's the car that you would drive to**

7    **work, from your house to the 2nd District,**

8    **including by driving north on Pearl Road; is that**

9    **right?**

10   A    Yes, ma'am.

11   Q    **The day that Desmond Franklin died, take me**

12   **through what you did from when you first woke up**

13   **that morning until you got in the car to go to**

14   **work.**

15   A    That day I ate breakfast, went to the gym,

16   came home, showered, got ready for work,

17   proceeding to -- heading out to work.  And that's

18   when I was -- I drove on Denison, went on 22nd

19   Place, then got on Forestdale.  As I was

20   approaching Forestdale, there was a box truck

21   was -- that was unloading merchandise, and that's

22   when I observed that car going behind the box

23   truck and saw a passenger exiting the vehicle and

24   grabbing the merchandise out of the back of the

25   truck and placing it inside the car.

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q    I want to ask you more about that, but first

2   I want to ask you a little bit more about what

3   you did that morning.  Okay?

4        Your shift was going to start at 2:00 p.m.;

5   is that right?

6   A    Correct.

7   Q    Were you planning to get to the office right

8   at 2:00?

9   A    Probably like 10 to 15 minutes before my

10  shift ended -- started.

11  Q    How long about does it take you to get from

12  your house to work?

13  A    Probably like ten minutes, five minutes.

14  Depends on traffic.

15  Q    So about when did you leave your house that

16  day?

17  A    Probably like 1:35, I believe so.  Something

18  like that.

19  Q    Were you living with anybody else at that

20  time?

21  A    No.

22  Q    Just by yourself?

23  A    Yes.

24  Q    Were you spending time with anyone prior to

25  when you left for work that day?

1   A    No.

2   Q    You woke up, had your breakfast, went to the

3   gym, and came home, right?

4   A    Yes, ma'am.

5   Q    Did you at any point spend time with anybody

6   else --

7   A    No, ma'am.

8   Q    -- before you left for work?

9   A    No.

10  Q    Did you talk to anyone else or call anyone on

11  the phone?

12  A    No, ma'am.

13  Q    Do you remember if you texted with anybody?

14  A    Not that I can recall at this moment.

15  Q    Did you talk to your partner at all before

16  you showed up for work that day?

17  A    No.

18  Q    Did you talk to Officer Lopez at all before

19  you showed up for work that day?

20  A    No.

21             MR. CABRAL:    Did you mean

22        before the incident?

23             MS. BONHAM:    Yes.

24  Q    I'm sorry.  Before you left your house for

25  work that day, did you talk to Officer Lopez at

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   all?

2   A    No, I did not.

3   Q    Did you talk to your partner at all before

4   you left your house for work?

5   A    No.

6   Q    And you were going to go right from your

7   house straight to work; is that right?

8   A    Yes, ma'am.

9   Q    Planning to show up just a little bit early

10  for your shift?

11  A    Yes.

12  Q    And was it typical that you would drive your

13  personal car to work and then get in your patrol

14  car at the district?

15  A    Yes.

16  Q    What police-issued equipment, if any, did you

17  have at home with you that day before you left

18  your house?

19  A    My issued weapon by the city.

20  Q    Anything else?

21  A    That's it.

22  Q    Did you have any part of your uniform?

23  A    I didn't have -- I was in plainclothes.

24  Q    Did you have any part of your uniform in like

25  a bag or something, even if you weren't wearing

1  it?

2  A    No.  I leave my uniform at the locker.

3  Q    That was your habit, to leave your whole

4  uniform in the locker?

5  A    Yes.

6  Q    What about your badge, did you have that?

7  A    I carry my badge, yes.

8  Q    Did you always carry your badge?

9  A    Typically and normally, yes.

10 Q    And you had your badge with you that day at

11 home, right?

12 A    Yes.  I had it at home.

13 Q    Where would you keep your badge?  Would you

14 keep it with you at all times?

15 A    Depends on -- I keep it in my pocket or put

16 it on my belt line area.

17 Q    When you were off duty that's where you kept

18 it?

19 A    Yes.

20 Q    So when you were off duty, it would vary at

21 that time where you kept your badge.  Sometimes

22 on your belt.  Sometimes in your pocket.  Is that

23 right so far?

24 A    Yes.

25 Q    Anywhere else?

1  A    No.

2  Q    Do you remember where you had your badge that

3  day as you were leaving your house for work?

4  A    Not quite exactly.  I can't recall that.

5  Q    You had it with you?

6  A    Yes.

7  Q    But you don't know exactly where you were

8  wearing it?

9  A    If I can say, I would have it in my pocket

10  that day.

11  Q    Besides your badge and your gun, did you have

12  any other police-issued equipment with you at

13  home before you left for work?

14  A    No.

15  Q    Did you have any clothes that bore the

16  insignia of the police department or the City of

17  Cleveland on them even if they weren't issued by

18  the department?

19  A    No.

20              MS. BOOP:    You mean like

21         was he wearing it or did he just

22         have it in his possession?  I'm

23         sorry.

24  Q    Either one.  Were you wearing anything like

25  that?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1    A    No.
2    Q    Did you have anything like that in your
3    possession whether in a bag or in the car?
4    A    No, ma'am.
5    Q    Did you have your police radio with you?
6    A    No, ma'am.
7    Q    Was it your habit to keep that with you or
8    keep it at work or somewhere else?
9    A    Leave it at work in my locker.
10                        - - - - -
11        (Sarah Gelsomino, Esq. enters proceedings.)
12                        - - - - -
13                MR. RUSSELL:    Did
14           Ms. Gelsomino enter?
15                MS. BONHAM:    Sarah
16           Gelsomino just entered the
17           conference remotely.
18                MS. BOOP:    It's showing
19           three participants at the bottom,
20           so who would that be?
21                MS. BONHAM:    I have it
22           here --
23                MS. BOOP:    Us, Matt, and
24           then Sarah.
25                MS. BONHAM:    And then
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1              Sarah.
2                   MS. BOOP:    Okay.  Got it.
3              Can Sarah just confirm that nobody
4              else is in the office with her?
5                   MS. BONHAM:    Sarah, can you
6              hear me?
7                   MS. BOOP:    Maybe she can
8              text you and you can just state it
9              on the record.  I just want to
10             make sure.
11                  MS. BONHAM:    Just a minute.
12             I'm just going to pause this and
13             screw around with the tech.
14                  MS. BOOP:    Sure.
15                  (Recess had.)
16                  MS. BONHAM:    Back on the
17             record.
18   BY MS. BONHAM:
19   Q   You didn't have your police radio with you
20   that day, right?
21   A   No, ma'am.
22   Q   Because it was your habit to keep it in your
23   locker with your uniform and not bring it home;
24   is that right?
25   A   Yes, ma'am.
```

1   Q    Did you have any other police equipment
2   besides your gun and your badge with you?
3   A    That's all I had, ma'am.
4   Q    Was it your habit to only take your gun and
5   your badge with you and no other equipment when
6   you left work?
7   A    Yes, ma'am.
8   Q    How did you carry the gun at that -- that day
9   how did you carry it, if at all?
10  A    I carry it on my waistband.
11  Q    Is that what you typically did when you were
12  off duty with your gun?
13  A    Yes, ma'am.
14  Q    Did you use a holster for it when you were
15  off duty that the department issued you?
16  A    Personal off-duty holster.
17  Q    Can you describe the off-duty holster that
18  you were using on the date that we're talking
19  about?
20  A    The holster is specifically made for the type
21  of weapon that I have.  It has one retention,
22  which is a button on the inside, and one side --
23  it has one retention on the holster.
24  Q    Did you buy that for yourself?
25  A    Yes.

1  Q    How long had you had it before the day that

2  we're talking about?

3  A    I believe since I got on the job -- I mean,

4  after I got on the job I bought it.

5  Q    You bought it for the purpose of carrying

6  your gun while you were off duty?

7  A    Yes.

8  Q    Your police-issued gun.

9  A    Or whenever I have to go to court -- that I

10 have to go to court, I don't have to carry the

11 belt, the police duty belt.  I would just carry

12 the holster.

13 Q    When you're on duty, you carry your weapon in

14 the duty belt holster, right?

15 A    Yes.

16 Q    When you're off duty, you always carried it

17 in this holster that you purchased that we're

18 talking about?

19 A    Yes.

20 Q    Where did you purchase it at?

21 A    Through the city allowance.  There's a -- so

22 the city issues funds to buy stuff that you need

23 for the job or whatever they -- a supplier, so

24 the supplier has that as a selection of a

25 holster, and I purchased it through that, through

1  there.

2  Q    Did you make that purchase through someone at

3  work or independently?

4  A    So each officer has an individual allowance,

5  so I did it through my allowance.

6  Q    How exactly did you make that purchase?

7  A    Through a computer.

8  Q    At work?

9  A    At work, yeah.

10  Q    So there's a selection of holsters that you

11  can get with your allowance through the supplier

12  that the city uses?  Am I getting it right?

13  A    Not a selection.  It's just what they have

14  there in the online store that the city works

15  with, furnish it with the supplier.

16  Q    Who's the supplier?

17  A    I can't recall their name.

18  Q    Does the holster that you were using have a

19  name or a serial number, any kind of identifying

20  information where I could look it up?

21  A    I haven't -- I haven't looked at those

22  details.

23  Q    Do you still have that same holster?

24  A    Yes.

25  Q    Do you have any other holsters or is that the

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   only one?

2   A    The only one.

3   Q    For an off-duty holster.

4   A    Yes.

5   Q    On the date that we're talking about, before

6   you left your house for work, had you put on that

7   holster and put your gun in it?

8   A    Yes.  My gun was in that holster.

9   Q    Your duty weapon.

10  A    Yeah.

11  Q    Explain to me how you put the holster on and

12  how you get the gun in there.

13  A    So the holster has like a piece that goes --

14  that will go on the pants -- I would say --

15  what's the word?

16              MR. CABRAL:    Waistband.

17  A    Waistband.  And it like kind of clicks there.

18  It holds -- the holster holds itself.

19  Q    Okay.  It clips onto the waistband of your

20  pants?

21  A    Yes.

22  Q    And how do you put the gun into it?

23  A    Straight in.

24  Q    Do you clip anything over top of the gun or

25  is the handle of the gun just sticking out into

1  the air?

2  A   So once you insert the gun inside the

3  holster, it makes a click and let's you know that

4  it's secured, that it won't be falling out.

5  **Q   So you hear a clicking noise.**

6  A   So it has a retention.

7  **Q   And then you have to hit that retention**

8  **button in order to release it back out?**

9  A   Yes.

10  **Q   Can you show me how exactly -- if you were**

11  **reaching into that off-duty holster and trying to**

12  **release the gun, how would do that?**

13  A   Just with my right hand go down and just --

14  it will be out.  It's for -- it's for the purpose

15  of quick draw.

16  **Q   It's for the purpose of quick draw.**

17  A   Yes.

18  **Q   How would you hit the release button in that**

19  **motion that you just showed me?**

20  A   So as my hand's going down, my thumb just hit

21  it and just exit immediately.

22  **Q   You're right-handed, right?**

23  A   Yes.

24  **Q   And you wear the holster on your right side.**

25  A   Yes.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    So if you're reaching for the gun, you reach
2    down to your right side, press the button with
3    your right hand to release it.  Right so far?
4    A    It's all in one sequence.  So I could -- you
5    do -- you do it in one sequence.  So it's not
6    like you press and then exit.  It just release at
7    once.
8    Q    Is the button for that on the inside of your
9    waistband?
10   A    Inside next to it.  Next to the gun.
11   Q    Is there anything else you have to do to get
12   that gun out of the holster once it's clicked in
13   there besides hit that button and pull it out?
14   A    That's it.
15   Q    Are there other types of off-duty holsters
16   that don't enable that kind of quick draw?
17   A    I mean, there's multiple selections, I
18   believe, I mean, out there, but I never looked --
19   I just used the one that was there that -- my
20   personal is the one that -- it was on the
21   supplier.  So, I mean, there could be other
22   options possibly.
23   Q    Why did you pick that one?
24   A    Just because it was on the supplier website
25   that we're able to use our funds.

1  Q    That was the only one available on that

2  website?

3  A    For my type of gun, yes.

4  Q    What type of gun do you have?

5  A    I got a Glock 17.

6  Q    That's the type of gun you had at the time

7  we're talking about?

8  A    Yes, ma'am.

9  Q    Have you always kept that same gun?

10  A    Yes, ma'am.

11  Q    Do you get to pick what type of gun you get

12  issued by the department?

13  A    You can choose the 19 or the 17.

14  Q    What's the difference?

15  A    One is smaller.  The other one is a bigger

16  one.

17  Q    Which one is smaller?

18  A    The 19.

19  Q    So you chose the bigger one.

20  A    Because of my hands, yes.

21  Q    Because your hands are bigger.

22  A    Yes.

23  Q    Did you ever make any modifications to that

24  gun at all?

25  A    No, ma'am.

1  Q    The gun that you were originally issued by

2  the department, that's the same gun that you

3  still have and that you've always used?

4  A    The one that I have currently is not the same

5  one from the incident, no.

6  Q    Just the same model.

7  A    Same model.  Yes, ma'am.

8  Q    You were issued a new -- different gun after

9  the shooting, right?

10  A    Yes, ma'am.

11  Q    Are those two guns, the one you originally

12  got and the one that you were issued later, the

13  only guns you've ever been issued by the

14  department?

15  A    Yes, ma'am.

16  Q    And it's the same model.  Just two different

17  guns.

18  A    Yes, ma'am.

19  Q    Walk me through what you did that day after

20  you left your house.  You routinely drove on

21  Forestdale; is that right?

22  A    Yes.

23  Q    To get out to 25th?

24  A    Yes.

25  Q    I'm going to pull out a Google map.  It's

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    **kind of a bad image, I'm sorry, and I'm going to**

2    **ask you to make some notes on it, okay, so I can**

3    **get a picture.**

4              MS. BONHAM:     You guys, I

5         don't have -- I only have three

6         copies.

7              MS. BOOP:    That's fine.

8              MS. BONHAM:    You can also

9         just search Forestdale Avenue

10        online if you want to look at what

11        I'm showing him.

12             MR. CABRAL:    I can make

13        some copies real quick if you're

14        going to mark it.

15             MS. BONHAM:    Okay.  That

16        would be awesome.

17             MR. CABRAL:    Won't take me

18        long.  The copier's right here.

19             MS. BONHAM:    Okay.  Thanks.

20        All right.  Just a second.

21             (Recess had.)

22             MS. BONHAM:    Tom has

23        courteously made us some extra

24        maps.

25                  - - - - -

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                    (Plaintiff's Exhibit 1 was
 2               marked for identification.)
 3                    - - - - -
 4   BY MS. BONHAM:
 5   Q    I'm handing you what I just marked as
 6   Plaintiff's Exhibit 1.
 7             (Discussion had off the record.)
 8               MS. BOOP:     I can't see
 9          anything.
10               MS. BONHAM:     If it's too
11          small, I can just pull it up on
12          Google maps and everybody has a
13          copy of what it generally is.
14               MS. BOOP:     I can't see.  I
15          need my readers.
16               MR. CABRAL:     Got you
17          covered.
18               MS. BOOP:     Do you have
19          readers?
20               MR. CABRAL:     No.  But I can
21          read.
22               MS. BOOP:     I see Pearl
23          Road.
24               MR. CABRAL:     I've got one
25          of those little rulers with the
```

```
 1              magnifying glass.
 2                   MS. BOOP:     Please.
 3                   MR. CABRAL:     Seriously?
 4                   MS. BOOP:     Seriously.  You
 5        don't -- can we just keep going?
 6                   MR. CABRAL:     Yeah.  Keep
 7        going.
 8                   MS. BOOP:     Thank you.
 9   BY MS. BONHAM:
10   Q   All right.  In case you're having trouble,
11   I'm going to show you -- I'm going to unplug this
12   and show you on my screen right here.  Okay.
13       I'm showing you the same exact thing as I
14   printed out, but it's bigger and it's in color on
15   my screen.  I'm going to remove that.  Just a
16   minute.  And I'm going to come over here.  Okay.
17       So what I'm showing you on my screen is the
18   top of what you have on the printout.  Okay.  I'm
19   going to grab you a pen, and I'm going to ask you
20   to make some markings on that printed version
21   which is the exhibit.
22       Can you draw me starting on Denison how you
23   were coming from your house to work that day?
24                   MS. BOOP:     Do you need the
25              magnifying ruler?
```

```
 1                    THE WITNESS:       That will
 2             help.
 3    A    All the way to work?
 4    Q    No.  To where you stopped.  I'm sorry.  And I
 5    have more copies.
 6         Okay.  So you just drew for me starting with
 7    Denison your route you were taking to work and
 8    you stopped when you got to Pearl.
 9    A    Um-hmm.
10    Q    Is that right?
11    A    Yes, ma'am.
12    Q    Can you answer verbally?  Thank you.
13         So that route includes and would typically
14    include Forestdale Avenue to Pearl, right?
15    A    Yes, ma'am.
16    Q    So you would cut up 22nd.
17    A    22nd Place, yes.
18    Q    Okay.  Thank you.
19         At the corner of Forestdale and Pearl -- I'm
20    going to zoom in on the --
21                    MS. BONHAM:       You guys want
22             to come back here.
23    Q    I'm going to zoom in a little bit on the
24    screen copy, okay, since we're all having trouble
25    with the piece of paper.
```

1    So on the northeast corner of Forestdale and

2    Pearl there's a Wendy's, right?

3    A    Yes, ma'am.

4    Q    And on the other side of Forestdale there's a

5    Convenient Food Mart, right?

6    A    Yes, ma'am.

7    Q    Okay.  And is that -- when you were driving

8    on Forestdale towards Pearl, is that the first

9    time you ever encountered Desmond Franklin on

10   that day?

11   A    Yes.

12   Q    I'm going to take my computer back.  I'm just

13   going to leave this paper in front of you so you

14   can refer to it if it's necessary.

15       Had you ever seen Desmond Franklin before

16   that day?

17   A    No.

18   Q    Had you ever seen Devin Badley before that

19   day?

20   A    No, ma'am.

21   Q    Tell me exactly what happened when you pulled

22   up to the corner of Forestdale and Pearl that

23   day.

24   A    When I was approaching the intersection,

25   there was -- like I mentioned earlier, there was

1  a box truck unloading merchandise at the

2  Convenient.  I saw a car pulling up behind it.

3  There was no one in the back.  I saw the

4  passenger exit out of the vehicle, grab the

5  merchandise that was on the back of the truck,

6  and placing it in the car.

7      When I saw that, I was like -- I lowered my

8  window halfway, and the person that I made

9  contact with, it was the driver, and that's when

10 I tell him, "Hey, that's not nice, put it back."

11     And his answer when he -- towards me was --

12 after I told him "That's not nice, put it back,"

13 he was like "Shut the fuck up.  You want your

14 shit shot up."

15 **Q   When you first pulled up to the corner of**

16 **Forestdale and Pearl, is there a stop sign right**

17 **there?**

18 A   Yeah.  There's a stop sign.

19 **Q   On Forestdale before you turn onto Pearl?**

20 A   Yes.

21 **Q   And on a typical workday you would have been**

22 **getting ready to make a right-hand turn onto**

23 **Pearl; is that right?**

24 A   Yes.

25 **Q   To complete your journey to work.**

1   A    Yes.

2   Q    On that day were you driving the car -- your

3   car that you already described to me?

4   A    Yes.

5   Q    Were you wearing your gun on your right side

6   in the holster as you've already just described

7   to me?

8   A    Yes.

9   Q    As you sit here, you can't remember where

10  your badge was, but you know you had it and it

11  might have been in your pocket.  Is that your

12  testimony?

13  A    Yes.

14  Q    And you weren't wearing any other police

15  equipment -- right --

16  A    No, ma'am.

17  Q    -- at that time when you were pulling up to

18  Forestdale and Pearl?

19  A    Yes.

20  Q    When you were pulling up, were there cars in

21  front of you --

22  A    Yes.

23  Q    -- at the stop sign?

24  A    Yes.

25  Q    How many cars were in front of you at the

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   stop sign?
 2   A    I would say -- if I can recall, just one.
 3   Q    Were there any cars behind you, coming up
 4   behind you?
 5   A    Not that I can recall.
 6   Q    When you first pulled up?
 7   A    Yes.
 8   Q    When you first pulled up to Forestdale and
 9   Pearl, did you have your -- all your windows
10   rolled up?
11   A    No.  Just the driver's side, mine.
12   Q    It was closed.
13   A    It was -- I mean, the one that was only open,
14   it was my window.  The rest of windows was
15   closed, if I'm answering your question.
16   Q    When you first pulled up on Forestdale,
17   you're heading towards the stop sign at
18   Forestdale and Pearl, before you stopped and
19   talked to the young men that you referred to,
20   were your windows all the way up?
21   A    Yes.
22   Q    All your windows were all the way up?
23   A    Yes.
24   Q    On that car is it four windows or two windows
25   that you can roll up and down?
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A    Four windows.

2   **Q    Were you listening to music?**

3   A    I cannot recall if I was listening to it or

4   not.

5   **Q    Was the air conditioning on?**

6   A    I can't recall.

7   **Q    Was the heat on?**

8   A    It was between -- between cooling -- hot and

9   cold, like medium.

10  **Q    In the car or that was the temperature that**

11  **day outside?**

12  A    In my car.

13  **Q    Were you talking on the phone?**

14  A    No.

15  **Q    Did the car have tinted windows?**

16  A    No.

17  **Q    None of them were tinted?**

18  A    No.

19  **Q    Including the windshield?**

20  A    No tinted windows.

21              MR. CABRAL:    You mean

22         beyond stock.

23  **Q    Beyond whatever was stock for that car.**

24  A    It was stock.

25  **Q    Did you have sunglasses on?**

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1   A    No.

2   Q    You have glasses on today, right?

3   A    Yes.

4   Q    Are they prescription?

5   A    Yes.

6   Q    Were you wearing those at the time?

7   A    I might have wore my contacts that day.

8   Q    Are you nearsighted or farsighted?

9   A    Farsighted.

10  Q    Do you think you were wearing your contacts

11  that day?

12  A    Yes.

13  Q    As you were pulling up to the stop sign at

14  Forestdale and Pearl, at what point did you first

15  notice the box truck?

16  A    So as I was pulling to -- as I was driving

17  westbound on Forestdale, right before getting to

18  the intersection there was -- that box truck was

19  there already, so it was impeding me to see the

20  flow of traffic coming from south to north, so

21  that's why I noticed that the box truck was

22  there.

23  Q    When was the first time that you noticed

24  either Desmond Franklin or Devin Badley?

25  A    So there was like -- there was a car in front
```

1    of me so I wasn't able to get to the stop sign

2    and make a right immediately.  So as I was

3    sitting behind, that's when I observed the car

4    pulling up real quick behind the box truck.

5    **Q    Okay.  So you first saw the box truck and**

6    **then you saw Desmond Franklin's car pull in; is**

7    **that right?**

8    A    Yes.

9    **Q    Did you recognize the car at all?**

10   A    What do you mean?

11   **Q    Had you ever seen it before?  Do you think --**

12   A    No.

13   **Q    -- you had ever seen it before?**

14   A    No, ma'am.

15   **Q    So you saw the car pull in.**

16   A    Yes.

17   **Q    At that time did you suspect that anything**

18   **wrong or illegal was going on?**

19   A    No.  When they first pulled in, no, not until

20   the time the passenger exited the vehicle and

21   went towards the box truck and grabbed the

22   merchandise.

23   **Q    When you first saw Mr. Franklin's car pulling**

24   **in, why were you looking over there?  Did you**

25   **just happen to look?**

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    Well --
 2                  MS. BOOP:     Objection; asked
 3          and answered.
 4                  Go ahead.
 5   A    The reason I was looking towards that
 6   direction, like I mentioned, I was looking for
 7   the flow of traffic that was coming from south to
 8   northbound.
 9   Q    Okay.  So you see the box truck impeding that
10   and then Mr. Franklin's car pulled in and you saw
11   it.
12   A    Yes.
13   Q    At that point you saw the passenger -- who
14   I'm calling Devin Badley.  Do you understand who
15   that is as you sit here now?
16   A    Yes.
17   Q    At that point after you had looked over at
18   the box truck, seen Mr. Franklin's car pulled up,
19   then you saw Mr. Badley get out of the passenger
20   side of the car; is that right?
21   A    Yes.
22   Q    And then you saw what you described.  He
23   was -- he went and took merchandise from the box
24   truck.
25   A    Yes.
```

1  Q   At any point did you start to believe that

2  there was illegal conduct going on?

3  A   I mean, the box truck was unattended, and

4  they pulled up behind it and taking it, that's

5  when I -- that's what got me to roll my window

6  halfway down and say something.

7  Q   At what point did you first start to suspect

8  that there might be illegal conduct going on?

9  A   I mean, it happened so quick, so just -- it

10  was a reaction.

11  Q   Tell me, if you can, exactly what triggered

12  that in your mind.

13              MS. BOOP:    Objection; asked

14         and answered.

15              Go ahead.

16  A   Just by the way they just -- the passenger

17  jumped out and started grabbing the stuff and put

18  it into -- putting it into the car.

19  Q   Do you remember what Devin was grabbing from

20  the box truck?

21  A   It was some boxes.

22  Q   Did you see at the time clearly what he was

23  grabbing?

24  A   The boxes.

25  Q   Did you see anything else about them?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    No.

 2   Q    Did you know what they were?

 3   A    I didn't know what they were, but they were

 4   sitting on the back of the truck, so that was

 5   merchandise.

 6   Q    So Devin taking these from an unattended

 7   truck made you believe that there was illegal

 8   activity going on; is that right?

 9   A    Well, they were stealing it.

10   Q    You thought they were stealing it?

11   A    Yes.

12   Q    You thought Devin was stealing those two

13   boxes from the unattended truck?

14   A    Yes.

15   Q    But you didn't know what the boxes were.

16   A    No.

17   Q    Had you ever been to that Convenient store

18   before?

19   A    No.  For work related, yes, but not just

20   personally, no.

21                MS. BOOP:    When you say

22         "before," before the incident?

23   Q    Before the incident.  At any time before the

24   incident.

25   A    Before the incident, no.
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    Whether work related or not.

2    A    For work related, it was an alarm.

3    Q    Okay.  You had responded there for work to

4    that Convenient store because an alarm went off?

5    A    Yes.  When it was closed.

6    Q    How many times?

7    A    I think once I've been there.

8    Q    Did you know the owner or any of the

9    employees?

10   A    No.

11   Q    That store is in the 2nd District, right?

12   A    Yes.

13   Q    Did you have any impressions about that

14   Convenient store at all --

15   A    No.

16              MS. BOOP:     Objection.

17   Q    -- at that time?

18              MS. BOOP:    Go ahead.

19   Q    Did you think it was a high crime location?

20   A    I wouldn't consider that.  I mean, crimes

21   happen anywhere, everywhere around the city.

22   Q    So you observed Devin taking what, from your

23   perspective at the time, was two unknown boxes

24   from this unattended box truck, and you roll your

25   window halfway down, your driver's side window;

1  is that correct?

2  A    Yes, ma'am.

3  Q    Is Devin still out of the car when you roll

4  your window down like that?

5  A    Yes.

6  Q    What's he doing at that time?

7  A    He was grabbing the boxes.

8  Q    Was he in the truck?

9  A    Not in the truck.  Just -- the boxes was

10  sitting at the end of the truck bed.

11  Q    Oh, they weren't all the way in the truck.

12  They were sitting sort of at the --

13  A    Visible.

14  Q    Visible to you.

15  A    Yes.

16  Q    So Devin's got his hands on the boxes when

17  you roll your window down?

18  A    Well, when he grabbed them, that's when I

19  lowered my window halfway.

20  Q    So you can see Devin grabbing the two boxes

21  from the end of the back of the box truck, right?

22  A    Yes, ma'am.

23  Q    At that moment you roll your window down?

24  A    Yes.

25  Q    And you make eye contact with Desmond

1  Franklin, the driver?

2  A    The driver.

3  Q    When you said you made contact with him, were

4  you referring to eye contact?

5  A    Just talked to him.  When I talked to him.

6  Q    I see.  Can you explain to me in detail how

7  that happened?

8              MS. BOOP:    Objection; asked

9         and answered.

10              Go ahead.

11  A    So -- so I was waiting for the car next to

12  move forward.  I was looking to my left.  I saw

13  what's -- what's going on.  When I noticed that

14  the passenger was unloading the boxes to the car,

15  that's when I lowered my window, and I said --

16  that's when the driver saw me, and I said,

17  "That's not nice, put it back," and that's when

18  he responded back.

19  Q    When you rolled down your window, you're

20  saying the driver of the car looked at you?

21  A    Yeah.  He looked towards my direction.  Yeah.

22  Q    Did you make any noise to signal him to look

23  at you prior to when you spoke to him?

24              MS. BOOP:    Objection;

25         mischaracterizes prior testimony.

```
 1                    Go ahead.
 2   A    No.
 3   Q    You didn't honk?
 4   A    No.
 5   Q    Did you pull or angle your car towards him at
 6   that point or did you just roll down the window?
 7   A    Just rolled down the window.
 8   Q    Did you turn the wheel to angle the wheels of
 9   your car towards him?
10   A    No.
11   Q    You didn't do anything with the car besides
12   roll the window halfway down at that time?
13   A    Just that.
14   Q    After you rolled down your window and the
15   driver -- who I'm referring to Desmond -- as
16   Desmond Franklin.  Do you understand who that is
17   as you sit here?
18   A    Yes.
19   Q    And we agree that that's the driver of the
20   car?
21   A    Yes, ma'am.
22   Q    And that Devin Badley is the passenger of the
23   car --
24   A    Yes, ma'am.
25   Q    -- at the time.
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1        So when Desmond Franklin looks at you at that
 2   point, your window's halfway down, did he say
 3   anything to you first?
 4   A    No, he did not.
 5   Q    The first part of any verbal exchange that
 6   the two of you had was what you said to him; is
 7   that right?
 8   A    Right.
 9   Q    Did you ever say anything to Devin Badley?
10   A    No.  I never made contact -- talked to
11   Badley.
12   Q    At that time, right?
13   A    Right.
14   Q    Why did you decide to roll your window down
15   and say anything to Mr. Franklin?
16   A    Because I noticed something was going on that
17   is not right, and just because I was in the area
18   and I saw what was going on, I wanted to say
19   something that was not correct, what they were
20   doing.
21   Q    Did you have any intention of arresting them?
22   A    I did not.
23   Q    Did you have any intention of further
24   investigating the suspected misconduct they were
25   engaged in?
```

1  A    No.  I was just trying -- just basically warn

2  them, "Hey, that's not nice, put it back," and I

3  was just trying to continue my day to work.

4  **Q    Did you receive any training prior to the**

5  **event we're talking about regarding what you do**

6  **if you suspect that you see a crime in progress**

7  **while you're off duty?**

8  A    Well, if it's a high violent crime where

9  there's life and death of a threat to someone, I

10  can intervene as long as it's safe for me.

11  **Q    That's what you're trained in?**

12  A    Yes.

13  **Q    Did you receive any other training besides**

14  **what you just described to me regarding what**

15  **you're supposed to do if you think you see a**

16  **crime in progress while you're off duty?**

17  A    No.

18  **Q    Were you supposed to call the police if you**

19  **saw a crime in progress when you were off duty?**

20  A    Like I said, it depends on the high violent

21  -- if it's a high violent crime, yes, you can

22  call it in immediately.

23  **Q    Do you have an obligation to call a crime in**

24  **progress or suspected crime in progress in while**

25  **you're off duty if it's not a violent crime?**

```
 1              MS. BOOP:      Objection to
 2          form of the question; the term
 3          "obligation."
 4              You can answer.
 5  A   It depends on the discretion of the
 6  situation.
 7  Q   It's discretionary.  You can if you want.
 8  A   Yes.
 9  Q   So it's your judgement call.
10  A   Yes.
11  Q   Did anything about Mr. Badley's or
12  Mr. Franklin's conduct in the Convenient store
13  parking lot when you first encountered them
14  suggest that there was a violent crime in
15  progress?
16  A   No.
17  Q   Did you have any suspicion that that was or
18  going to become a violent crime?
19  A   No.
20  Q   So because you didn't suspect there to be a
21  violent crime, it was within your discretion to
22  decide whether to intercede.  Is that what you're
23  testifying to?
24  A   Yes.
25  Q   And you chose to intercede.
```

1    MR. CABRAL:    Objection.

2    MS. BOOP:    Objection.

3  A   Can you rephrase that?

4  **Q   It was within your discretion to intercede or**

5  **not in what you suspected to be a non-violent**

6  **crime at that moment, right?**

7  A   Right.

8  **Q   And you did choose to intercede; is that**

9  **right?**

10    MS. BOOP:    Objection.  That

11    mischaracterizes his testimony.

12  **Q   You can go ahead.**

13  A   I didn't stop -- I didn't stop them from what

14  they were doing.  I continued to proceed my day,

15  moving forward to go to work.

16  **Q   Okay.  So you didn't stop them from what they**

17  **were doing, but you rolled down your window to**

18  **issue them a warning; is that right?**

19    MR. CABRAL:    Objection.

20    MS. BOOP:    Objection.

21    Again, mischaracterizes.

22    You can answer.

23  A   Pretty much, yes.  Just warning.

24  **Q   What was the purpose of doing that?**

25  A   Like I said, I live in Old Brooklyn.  I

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1   protect the community.  You know, like if there's
2   a crime going on, I mean, what do you -- just --
3   if you see something someone's doing wrong, you
4   at least -- as long as it's not a violent crime.
5   At that point I just wanted to warn them.
6   Q    You described to me what you said to
7   Mr. Franklin and what Mr. Franklin said back to
8   you when you had your window rolled halfway down.
9   Was there anything else that anyone said -- you,
10  Devin, or Desmond -- at that time in the
11  Convenient store parking lot on Forestdale?
12  A    No.
13                  MS. BONHAM:    I'm going to
14          let Terry Gilbert into the meeting
15          remotely.
16                  - - - - -
17     (Terry Gilbert, Esq. enters proceedings.)
18                  - - - - -
19                  MS. BOOP:    Again, can we
20          confirm Mr. Gilbert is the only
21          one in his office participating by
22          video Zoom?
23                  MS. BONHAM:    Hey, Terry,
24          can you hear us?
25                  MR. CABRAL:    Not
```

1               responding.

2                    MS. BOOP:     Maybe we can go

3               off the record and just give him a

4               quick call.

5                    MS. BONHAM:     Yeah.  Just a

6               second.

7                    MS. BOOP:    Thank you.

8                    (Recess had.)

9    BY MS. BONHAM:

10   **Q    When you were on the corner of Forestdale and**

11   **Pearl interacting with Mr. Franklin and**

12   **Mr. Badley, was your police-issued firearm in the**

13   **holster the whole time?**

14   A    Yes, ma'am.

15   **Q    Was it clicked in there so that you would**

16   **have to hit the release button to release it as**

17   **you described to me before?**

18   A    Yes, ma'am.

19   **Q    Did you ever take it out of the holster while**

20   **you were interacting with those young men at the**

21   **corner of Forestdale and Pearl?**

22   A    No, ma'am.

23   **Q    After you and Mr. Franklin had the verbal**

24   **exchange that you described to me, exactly what**

25   **happened next?**

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A    I left.  I made a right turn onto Pearl.

2   Q    **During the verbal exchange you had with**

3   **Mr. Franklin, the whole time you were talking to**

4   **him, Devin was still at the back of the box truck**

5   **with those two boxes, right?**

6   A    If I can recall, yes.

7   Q    **You didn't see him come back and get back in**

8   **the car?**

9   A    I can't recall that.

10  Q    **You don't know whether you saw him come back**

11  **and get back in the car?**

12  A    I didn't see -- I mean, it happened so quick,

13  so I just left right away afterward.  So I didn't

14  see -- I didn't see him inside the car at the

15  time that I left.

16  Q    **Did you see anything else Devin did after you**

17  **saw him put his hands on the boxes on the back of**

18  **the box truck?**

19  A    No.

20  Q    **After you had that verbal exchange with**

21  **Mr. Franklin, did you roll your window back up**

22  **before you proceeded on your way?**

23  A    No.  I left it the same way.

24  Q    **It was halfway down the whole time?**

25  A    Yes, ma'am.

1  Q    Did you ever overhear Desmond say anything

2  else after the verbal exchange you already

3  described?

4  A    I left, so -- yeah.

5  Q    So you didn't hear him say anything to Devin

6  after the verbal exchange that you just described

7  to me that you had with him?

8  A    What are you referring?

9  Q    Anything at all.

10  A    Not that I can recall at this time.

11  Q    Did you see if Mr. Franklin was armed at that

12  time?

13  A    No, ma'am.

14  Q    You didn't see whether or not he was armed?

15  A    No, ma'am.

16  Q    Did it ever occur to you for any reason that

17  he might be armed at that time?

18  A    I didn't think he was armed.  I mean, no.

19  Q    If you thought there was an non-violent crime

20  in process when you pulled over -- I'm sorry.

21  Strike "pulled over."

22       If you thought that there was a non-violent

23  crime in process when you were waiting at the

24  stop sign on Forestdale, what crime, if any,

25  would that be?

1  A    You're asking me like what kind of crime they

2  were doing?

3  **Q    Yeah.**

4  A    It would be pretty much a petty theft.

5  **Q    Petty theft.  When you left, your window was**

6  **still halfway down, you didn't hear anything**

7  **else.  Is that right so far?**

8  A    Right.

9  **Q    Did you then pull up to the stop sign or was**

10  **there still a car in front of you?**

11  A    No.  I made a right turn.

12  **Q    Did you pull up to the stop sign first before**

13  **you made a right turn?**

14  A    There was no one in front me.  I made it to

15  the stop sign.  I just -- I had the clear.  I

16  didn't see a car coming so I just made a right

17  and proceeded north.

18  **Q    After the verbal exchange with Mr. Franklin**

19  **that you described to me, did you look away from**

20  **him and back at Pearl Road?**

21  A    What do you mean?

22  **Q    After you got done talking to Mr. Franklin,**

23  **did you turn and look away from him or were you**

24  **still watching him for any period of time before**

25  **you left?**

1  A   Right after I make the right, I looked over,

2  the car was still there, and then I just

3  proceeded moving forward to where I stopped at

4  Willowdale light.

5  Q   Let me ask you a little bit more about that.

6  When you had the verbal exchange with

7  Mr. Franklin that you described to me, the two of

8  you were looking at each other in the eyes,

9  right?

10  A   Excuse me?

11  Q   When you had the verbal exchange with

12  Mr. Franklin that you just described to me, the

13  two of you were looking each other in the eyes;

14  is that right?

15  A   I wouldn't -- I can't recall if it was eye

16  contact, but we know each other, we were looking

17  at -- towards the same direction.

18  Q   So your car was still pointing towards the

19  stop sign on Forestdale and Pearl, right?

20  A   Yes.

21  Q   So you had to turn to look out the driver's

22  side window to look at Desmond; is that right?

23  A   When I made contact with Desmond, I was still

24  not at the stop sign.  There was a car in front

25  of me so it was kind of like right here.

1    Q    Okay.

2    A    But he was facing on an angle towards like

3    northeast, I would say.

4    Q    Because he had pulled into the Convenient

5    store parking lot.

6    A    Behind the truck, yes.

7    Q    So he was kind of facing towards you.

8    A    Yes.

9    Q    Were you looking at him out the driver's side

10   window?

11   A    Can you repeat that?

12   Q    Were you -- were your eyes pointing towards

13   him through the driver's side window of your car?

14   A    I was looking through my window.

15   Q    You weren't looking at him through your dash?

16   A    No.

17   Q    You were looking at him through your

18   passenger window, right?

19   A    Correct.

20   Q    And that window was rolled part way down

21   right?

22   A    Halfway down.

23   Q    And you were speaking to him out that window,

24   right?

25   A    Yes.

1  Q   And he had rolled the passenger side window
2  of his car down to talk to you; is that right?
3              MS. BOOP:    Objection.
4  A   I can't recall if he put it down or it was
5  already down so...
6  Q   But when the two of you had that verbal
7  exchange, his passenger window was down.
8  A   Correct.
9  Q   But you don't remember if he rolled it down
10 or if it was already down.
11 A   Correct.
12 Q   Do you remember if any of his other windows
13 were down in his car?
14 A   No.  I can't recall.
15 Q   You don't know one way or the other?
16 A   No.
17 Q   But all the other windows on your car were
18 up?
19 A   Yes.
20 Q   So when you talked to him, you were looking
21 at him out your driver's side window --
22 A   Correct.
23 Q   -- through his passenger window -- which was
24 down, right?
25 A   Correct.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1    Q    -- and he was in the driver's seat.
2    A    Correct.
3    Q    And then after you had that interaction, when
4    you left to proceed on your way towards Pearl,
5    did you turn away from him and look back out the
6    dash to drive?
7    A    Yes.
8    Q    At that point you got up to the stop sign,
9    right?
10   A    Excuse me?
11   Q    At that point you got up to the stop sign on
12   the corner, right?
13   A    Yeah.  I got up to the stop sign and made a
14   right.
15   Q    So after your verbal interaction with
16   Mr. Franklin, you turned away to look back out
17   your dash so you could drive, right?
18   A    Correct.
19   Q    Did you turn back and look at him again
20   before you turned onto Pearl?
21   A    I didn't look at him.
22   Q    Did you see anything else that he or Devin
23   were doing after you turned away from him?
24   A    No.
25   Q    So you just had this verbal interaction and
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    then you left.

2    A    Yeah.  Which I thought it was done there.

3    Q    **Tell me exactly what you did then.**

4    A    So I stayed -- I remained in the curb lane.

5    I was at the stop -- the light, at the Willowdale

6    light, and there was a car behind me.  I noticed

7    there was a car behind me and the outside lane

8    was open.

9         And I was -- like it happened so fast.  Just

10   all of a sudden I saw the car I remember that I

11   made contact with, and he was coming really fast

12   on the outside lane, and right before he pulled

13   up next to me, the light turns green, and I just

14   started heading out, like moving forward as far

15   as -- as fast as I can just trying to stay away

16   from that car.

17   Q    **And the car you were referring to --**

18   A    Desmond.

19   Q    **-- did you at that time recognize it as the**

20   **same car from the Convenient store?**

21   A    Yes, ma'am.

22   Q    **So that was Desmond Franklin's car that**

23   **you're describing.**

24   A    Yes.

25   Q    **Why were you trying to get away from it?**

1  A    I just didn't want to deal with him anymore.

2  I mean, I wasn't trying to get in a confrontation

3  any farther than what it needed to be.

4  **Q    Why did you get concerned that there could be**

5  **a confrontation?**

6  A    I mean, he already mentioned back, he said,

7  "You want your shit shot up."  So I was like,

8  man, I don't know if this guy meant what he said

9  or what is he trying to do, what is his -- what

10  is he trying to do.  So I was just trying to get

11  away from him.

12  **Q    How were you feeling at that moment?**

13  A    Really scared and nervous.

14  **Q    You were scared.  What was making you nervous**

15  **and scared?**

16  A    Because the way that he was approaching

17  towards me, like trying to catch up with my --

18  with me.

19  **Q    What signaled to you that he was trying to**

20  **catch up with you?**

21  A    Because the way he was -- when I was at the

22  light, how fast he was going.  It's kind of

23  aggressive.

24  **Q    Did you notice that through the rear-view**

25  **mirror in your car?**

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    I saw it on the side, side mirror.  The
2    driver's side mirror.
3    **Q    Say more about how you noticed and formed the**
4    **opinion that he was speeding up to you.**
5    A    I mean, you can tell when a car is speeding
6    up approaching you, so that's what -- what my
7    instinct told me and that's what I felt at that
8    moment.
9    **Q    So you saw his car in your driver's side**
10   **rear-view mirror, right?**
11   A    Driver's side mirror.
12   **Q    Driver's side rear-view mirror?**
13   A    Is it the rear or the side?  Side.
14              MR. CABRAL:    Rear would be
15         to your -- you mean the side
16         mirror on the side of the car.
17              MS. BONHAM:    Oh, yeah.  You
18         know what?  I always call them
19         rear-view mirrors, like all three
20         of them.
21   BY MS. BONHAM:
22   **Q    So you're talking about the driver's side of**
23   **the car, but there's like a mirror sticking out**
24   **the side of the car.**
25   A    The side mirror.

1  Q    And that's how you saw him.

2  A    Yes.

3  Q    Okay.  And that's the only way that you saw

4  him.

5  A    Yes.

6  Q    And your instinct told you he was speeding up

7  to you.

8  A    He was approaching towards my direction.  He

9  was getting -- pulling right -- pulling up next

10  to me.

11  Q    You first formed that opinion and noticed

12  that at the light at Willowdale?

13  A    Yes.

14  Q    Then exactly what happened?

15  A    So I was -- like I said, I wasn't trying to

16  have any other further contact with him so I was

17  just trying -- I put -- my car was in first gear

18  already, so I released the clutch, I was

19  accelerating, and then he's trying -- managed to

20  get parallel with me.

21  Q    When you pulled up to the light at

22  Willowdale, you stopped at the light, right?

23  A    Correct.

24  Q    It was a red light?

25  A    Correct.

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q   Did you take the car -- you put the car in
2  neutral?
3  A   No.  I kept it in first gear.
4  Q   You kept it in first gear the whole time you
5  were at the light?
6  A   With the clutch down, yes.
7  Q   Okay.  So it was already in first gear.
8  A   Yes.
9  Q   After you leave -- the light turns green and
10 after you leave the light at Willowdale, then
11 Desmond's car got parallel towards you -- or
12 almost parallel towards yours?
13 A   He didn't get parallel on the light.  I
14 just -- right when he was about to pull up, I
15 proceeded forward, moving forward.
16 Q   What exactly happened then?
17 A   As I was trying to proceed -- I was
18 proceeding forward, he managed to get parallel
19 with me, and that's when I looked to my left and
20 I saw the barrel of the gun pointing towards my
21 direction.
22 Q   Up until this point you had only seen him in
23 your driver's side side mirror, right?
24 A   Correct.
25 Q   And when you --

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1            MS. BOOP:    I'm sorry.
 2            Which point?
 3   Q   Up until this point when you're driving on
 4   Pearl.
 5   A   At the light.
 6   Q   Okay.
 7   A   Before he approached to the light, that's
 8   when.
 9   Q   Okay.  So in between the time -- you pulled
10   off Forestdale, you're on Pearl.  In between that
11   time and the light at Willowdale, you had only
12   seen Mr. Franklin's car when you described it
13   coming up and you looked at it in your side-view
14   mirror, right?
15   A   Yes.
16   Q   You didn't look behind you and see him, for
17   example.
18   A   No.
19   Q   Okay.  Then when he -- his car became
20   parallel to yours, you saw him out your driver's
21   side window?
22   A   When I looked over to my left, I only saw the
23   driver of that vehicle, and there was a barrel of
24   the gun pointing towards my direction.
25   Q   And you observed that not through your
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    rear-view mirror or a side-view mirror, but

2    directly with your eyes through your driver's

3    side window, right?

4    A    When he was parallel with me, yes.

5    Q    At that time was your window still partially

6    lowered down?

7    A    Halfway down.

8    Q    It wasn't all the way down.

9    A    Halfway.

10   Q    Okay.  It was lowered halfway down to where

11   it could go.  In other words, it wasn't fully

12   inside the car.

13   A    Correct.

14   Q    It was halfway down.

15   A    Yes.

16   Q    Was the passenger side window of Desmond's

17   car up or down?

18   A    I can't recall if it was up or down.

19   Q    Did you see the passenger in the car?

20   A    I did not see the passenger.

21   Q    You didn't see whether there was a passenger?

22   A    When I looked over, it happened so fast, I

23   just saw the barrel of the gun, and I saw the

24   driver.

25   Q    What did you see the driver doing exactly at

1  that moment?

2  A    Pointing a gun towards my direction.

3  Q    **Was he pointing it with his right hand or his**

4  **left hand?**

5  A    I can't recall exactly what hand he was

6  using, but I just saw the barrel of the gun

7  pointed towards my direction.

8  Q    **Were any of his hands on the steering wheel?**

9  A    It happened so fast.  I just saw -- focused

10  on the barrel of the gun pointed towards my

11  direction.

12  Q    **Where in his car did you see the barrel of**

13  **the gun?**

14  A    In the front side, like towards my direction.

15  Q    **Did you see his arm pointing at you?**

16  A    Like I said, I just focused on that barrel of

17  the gun, and that's what I saw and -- coming.

18  That's what I can remember.

19  Q    **Did you see a hand on the gun?**

20                  MS. BOOP:    Objection; asked

21            and answered.

22                  You can answer again.

23  A    I saw the barrel of the gun pointed towards

24  me.  That's all I can remember.

25  Q    **Okay.  So you don't remember seeing anything**

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  else at all except the gun's barrel; is that

2  right?

3  A    Pointing towards me.

4  Q    Did you form an opinion about who was

5  pointing the gun at you?

6                    MS. BOOP:    Objection to

7            opinion.

8                    You can answer.

9  A    I didn't have the time to process that.  I

10  just reacted and -- I mean, someone's pointing a

11  gun towards me.

12  Q    You didn't know who it was?

13  A    It was coming from that car.

14  Q    Was it coming from the driver or the

15  passenger?

16  A    The driver.

17  Q    How did you know that?

18  A    Because he was the only person I saw in the

19  -- in the front.

20  Q    So you did see the driver.

21  A    I mean, he's the only car -- person that was

22  in the front and saw the barrel of the gun at

23  that time.

24  Q    You saw the driver.  You believed that was

25  the only person in the car or you just don't

1   remember whether anyone else was in the car?

2                   MS. BOOP:    Objection; asked

3           and answered.

4                   You can answer again.

5   A   When I looked to my left, I saw the barrel of

6   the gun and the driver.

7   Q   What else did you see about the driver?

8   A   Nothing else that I can recall, whatever.  I

9   mean, just everything happened so fast.

10  Q   Was the barrel of the gun touching the window

11  of the passenger side of the car?

12  A   I can't --

13                  MS. BOOP:    Objection.

14                  Go ahead answer.

15  A   I can't recall if it was touching the window

16  or not.  I mean, I don't know.

17  Q   Could it have been sticking out of the

18  window?

19                  MS. BOOP:    Objection; calls

20          for speculation.

21                  MS. BONHAM:    Okay.  Strike

22          that.

23  Q   Was it sticking out of the window?

24  A   I can't recall.

25  Q   You don't know if the window was up or down

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   so you can't tell where the barrel was with
 2   respect to the window.
 3   A    Correct.
 4   Q    The orientation of your car vis-a-vis
 5   Desmond's car was that you were in the curb lane
 6   in the driver's side and he was to your car's
 7   left in the other lane also in the driver's side,
 8   right?
 9   A    Correct.
10   Q    So in order to shoot you from his car, he
11   would have to shoot across the passenger side,
12   out through the passenger side window, right?
13                   MS. BOOP:    Objection.
14                   You can answer.
15   A    Correct.
16   Q    Did you -- when you observed the barrel of
17   the gun pointing at you, did you hear anything?
18   A    It happened so fast.  It just -- I mean, I
19   can't tell.  I mean, it's -- just instantly
20   reaction, you know.
21   Q    At that moment did you have music playing in
22   the car?
23   A    I don't recall playing music.
24   Q    At that moment did you have your heating or
25   air on in the car?
```

1    A    Probably medium air/heat.

2                    MR. CABRAL:    Don't guess.

3    A    No.  I mean, I had the heater probably --

4    yeah.  I had the heater on.  Just not because --

5    I had it on.

6    Q    How close to you was the barrel of the gun

7    when you noticed it pointing at you?

8    A    You know, I would say a car length of me.  I

9    mean, he was on the -- right next to me parallel.

10   Q    But how close was the actual barrel of the

11   gun that you observed to you?

12                   MS. BOOP:    Objection; calls

13           for speculation.

14                   You can answer.

15   A    I can't tell you exactly how far the measure

16   of it.  I know it was just pointed towards my

17   direction.

18   Q    How close to Mr. Franklin's chest was the

19   barrel of the gun when you noticed it pointing at

20   you?

21                   MS. BOOP:    Objection.

22   A    I didn't pay attention to that.

23   Q    You couldn't tell whether he was extending

24   his arm when he was pointing the gun at you?

25                   MS. BOOP:    Objection.

1   A    I mean, in order for me to clearly see the

2   barrel of the gun, he has to extend his arm.  I

3   mean, otherwise, I would have never seen it.

4   **Q    Describe what the barrel of the gun looked**

5   **like to you at that time.**

6   A    I saw a gun.  I saw a barrel pointing towards

7   my direction.

8   **Q    What color was it?**

9   A    I did not look at the color.  I just saw the

10  barrel of the gun.

11  **Q    How big was it?**

12  A    Enough to see it.

13  **Q    Was it pointing at your face?**

14  A    I would say yes.

15  **Q    Did it -- the whole time that you were**

16  **observing it, was it steadily pointing in the**

17  **same direction?**

18              MS. BOOP:    Objection; calls

19          for speculation.  He's already

20          testified it was a matter of

21          seconds.

22  A    So it happened so quick.  I can't -- I mean,

23  it was steady enough to alert me that it was

24  towards my direction.

25  **Q    When you first looked through your driver's**

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   side window and observed the barrel of the gun,

2   was it already pointing at you?

3   A    It was pointing -- when I looked to my left,

4   it was already pointed towards my direction.

5   Q    So you didn't see anybody raise a gun.  You

6   saw a gun raised already.

7   A    Correct.

8   Q    Did you notice anything else about the gun?

9   A    What do you mean?

10  Q    Did you notice anything else at all about the

11  gun that you haven't explained to me yet?

12  A    My gun?

13  Q    The gun that you say was pointing at you.

14  A    I mean, I just saw the barrel of the gun.

15  That's -- that's what I saw at the time.

16  Q    How long was the barrel part of the gun?

17  A    I can't really tell you that.  I don't know.

18  I didn't take a measurement.

19  Q    Did you notice what type of gun it was?

20  A    No.  I just saw that it was a gun.  I

21  immediately identified it right away.

22  Q    How did you immediately identify it right

23  away?

24  A    Because I saw the barrel.

25  Q    What did the barrel look like?

1          MS. BOOP:    Objection; asked

2          and answered.

3   A    A barrel of a gun.  I mean, you can tell when

4   it's a gun just by looking at it.

5   **Q    Well, you can tell it wasn't a shotgun,**

6   **right?**

7   A    Correct.

8   **Q    How could you tell it wasn't a shotgun?**

9   A    The size is different.

10  **Q    So explain to me what the identifying factors**

11  **were that led you to believe it was a barrel of a**

12  **gun and recognize it.**

13  A    The shape.

14  **Q    Anything else?**

15  A    Just I know -- I mean, I recognized it was a

16  barrel of a gun.

17  **Q    At that moment when you recognized the barrel**

18  **of the gun, did you hear anyone from that car say**

19  **anything?**

20          MS. BOOP:    Objection; asked

21          and answered.

22  A    Everything happened so fast that I just

23  reacted, so I can't tell.

24  **Q    You can't remember as you sit here -- is that**

25  **your testimony? -- whether you heard anything at**

1  all from that car?

2  A   I mean, I didn't hear anything so...from that

3  car.

4  Q   You know you didn't hear anything or you

5  can't remember either way?

6  A   I didn't hear anything.

7            MR. CABRAL:   We're still

8        talking about when the gun was

9        pointed at him and they were on

10        Pearl?

11            MS. BONHAM:   At this

12        moment.

13            MR. CABRAL:   Right.  Okay.

14        That just wasn't super clear.

15        Thanks.

16  BY MS. BONHAM:

17  Q   When you noticed the gun pointing at you

18  initially, was your foot on the gas in your car?

19  A   Yes.  I was trying to get away.

20  Q   Was the car -- was your car in motion?

21  A   Yes.

22  Q   Was Mr. Franklin's car in motion?

23  A   Yes.

24  Q   And you were past the light at Willowdale,

25  right?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A    Yes, ma'am.

2   Q    **About how long had transpired between when**

3   **you left the light at Willowdale until when you**

4   **first noticed the barrel of this gun pointing at**

5   **you?**

6              MS. BOOP:    Objection; calls

7         for speculation.

8   A    I mean, a couple seconds, I would say.

9   Q    **Could you see if the safety was on on the gun**

10  **that was pointing at you?**

11  A    I wasn't able to see detail like that.

12  Q    **You couldn't see details of the gun at all?**

13  A    I mean, like to see a safety?  No.

14  Q    **Could you see the trigger of the gun?**

15  A    I just saw the barrel of the gun, ma'am.

16  Q    **Could you see whether the person holding the**

17  **gun's finger was on the trigger?**

18  A    I saw the barrel.  Just the barrel of the

19  gun.

20  Q    **You couldn't see anything else that you can**

21  **tell me about that I haven't asked you about at**

22  **that moment while you're seeing the barrel of the**

23  **gun?**

24              MS. BOOP:    Objection;

25         asked and answered.

1          Go ahead.

2    A    No, ma'am.

3    **Q    At the time that you first observed the**

4    **barrel of the gun in the other car, was your gun**

5    **still in its holster on your right hip?**

6    A    What was your question again?

7    **Q    At the time that you first observed the**

8    **barrel of the gun in the other car, was your gun**

9    **still in its holster on your right hip?**

10   A    You're asking me when I saw the barrel of

11   that gun if my gun was in my holster?

12   **Q    Yes.**

13   A    When I saw the barrel of that gun, I reacted

14   it.  That's when I defended myself.

15   **Q    At that time when you first saw the barrel of**

16   **the other gun, so far was your gun still in its**

17   **holster?**

18   A    Like I said, when I saw the barrel of that

19   gun pointing towards my direction, that's when I

20   reacted.

21   **Q    What exactly did you do?**

22               MR. CABRAL:    Just listen to

23          the question.  She's asking you if

24          your gun was still in its holster

25          when you looked over and first saw

1        the barrel.

2   A    Yes.   It was --

3              MR. CABRAL:    Just listen to

4        the question that she's asking

5        you.

6              THE WITNESS:     Okay.

7   Q    All right.  At the time that you first

8   observed the barrel of the gun in the other car

9   on Pearl Road after the light at Willowdale, was

10  your gun still in its holster?

11  A    Yes.

12  Q    Was it still clipped in there with the -- I'm

13  sorry.  I'm forgetting what's it's called.

14  What's that button that you release it with?

15  A    The retention.

16  Q    Was it still clipped in there such that you

17  would have to hit the retention button to release

18  it?

19  A    Yes, ma'am.  It was fully holstered.

20  Q    At any point prior to when you reached the

21  light at Willowdale had you unholstered your gun?

22  A    No.

23  Q    So in between -- I'm sorry.  When you're in

24  the Convenient store -- looking at these men in

25  the Convenient store parking lot, your gun is

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    still in its holster, right?

2    A    Yes, ma'am.

3    Q    When you turned onto Pearl, your gun is still

4    in its holster, right?

5    A    Yes, ma'am.

6    Q    And at no point between when you're on

7    Forestdale until you get to the light at

8    Willowdale does your gun leave its holster,

9    right?

10   A    No, ma'am.

11   Q    So you never --

12           MS. BOOP:    I'm sorry.

13        There's a right and a no, but then

14        there was a negative question.

15        Can we clarify?

16           MS. BONHAM:    Let me do it

17        again.

18           MS. BOOP:    You said right,

19        he said no, so I think he was

20        agreeing with you.  Anyways, can

21        we just clarify that?

22           MS. BONHAM:    Yeah.  Let's

23        do it again.

24           MS. BOOP:    There's a double

25        negative in there.

1              MR. CABRAL:      Tricky.

2    BY MS. BONHAM:

3    Q    Between when you left Forestdale, turned onto

4    Pearl Road, and got to the light at Willowdale,

5    your gun was in its holster the whole time; is

6    that correct?

7    A    Yes.

8    Q    Your gun never left the holster during that

9    time; is that correct?

10   A    Correct.

11   Q    You never took your gun out and pointed it

12   out the window during that time; is that correct?

13   A    Never did.

14   Q    So after the light at Willowdale, you see

15   Desmond's car coming parallel to you in your

16   rear-view mirror, and when it gets parallel to

17   you, you for the first time look at him through

18   your driver's side window.  Is that right so far?

19   A    When I saw him in my side mirror was when we

20   were -- I was still at the light, not afterwards.

21   Not after the light.

22   Q    Okay.  So you see him in your side mirror

23   coming up to the light.  Then after the light,

24   his car reaches yours parallel, and then for the

25   first time on Pearl you look out your driver's

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    side window and see him, right?

2    A    A few seconds later after I took off, yes.

3    Q    That's when you noticed the barrel of the

4    gun, right?

5    A    Yes.

6    Q    Can you demonstrate for me how exactly the

7    gun is being pointed at you?

8              MS. BOOP:     I'd object to a

9         demonstration.

10             But go ahead.

11             MR. CABRAL:    To the extent

12        you're able and you remember.

13             MS. BOOP:    To extent you

14        can remember.

15   A    So when I look to my left, I just saw the

16   driver pointing the gun towards my direction.

17   (Demonstrating.)

18   Q    Okay.  The driver -- and you're sticking your

19   right arm out straight -- right? -- and making a

20   gun sign?

21   A    Simulating a gun, yes.

22   Q    Okay.  So your arm is held straight out --

23   right? -- when you're simulating that?

24   A    Yes.

25   Q    But you didn't see Desmond raise the gun.

1  You just saw it when it was already pointed at

2  you is your testimony.

3  A    At this level right here.  (Demonstrating.)

4  Q    At that level.  Okay.  So that's about --

5  like you're pointing your arm straight out from

6  your shoulder, right?

7  A    Yes.

8  Q    Your elbow's not bent, right?  It's straight.

9  A    Bent.  Straight.  (Demonstrating.)

10 Q    Okay.  So now it's straight, and that's what

11 you saw, right?

12 A    That's when I saw the gun, yeah.

13 Q    Okay.  So you didn't notice anything else

14 about what Desmond was doing, whether his hand

15 was on the wheel, for example, right?

16 A    No.  My focus and my -- my vision focused on

17 that gun and the barrel.

18 Q    Okay.  And this hasn't refreshed your

19 recollection as to what else he was doing

20 obviously, right?

21 A    No.

22 Q    But the gun was -- his arm and the gun was

23 pointed straight out it sounds like -- is that

24 right? -- at you?

25                    MS. BOOP:    Objection.

1          You can answer again.

2  A   I mean, I saw -- like I've been saying, I

3  just -- I saw the barrel of the gun pointing

4  towards my direction.  I don't know how he

5  managed to make it to be at that level.  I don't

6  know if he extended his arm.  I couldn't say.  I

7  just saw the gun, the barrel of the gun.

8  **Q   Which was already raised up towards you,**

9  **right?**

10  A   Yes.  I never seen him doing this.  I just

11  saw this.  (Demonstrating.)

12  **Q   His arm straight -- extended straight out at**

13  **his shoulder.**

14  A   The gun -- the gun towards me.

15  **Q   The gun towards you at the end of an extended**

16  **arm.**

17              MS. BOOP:    Objection;

18          mischaracterizes prior testimony.

19              MR. CABRAL:    You can

20          answer.

21  A   The gun was pointed towards my direction,

22  yes.

23              MS. BOOP:    Elizabeth, I've

24          got to leave at 3:00.  I got a

25          hard -- which I've got a capable

```
 1              team here --
 2                   MS. BONHAM:    Okay.
 3                   MS. BOOP:      -- but if we
 4              could, you know, at some point --
 5                   MR. CABRAL:    Just break at
 6              3:00.
 7                   MS. BOOP:    Yeah.
 8                   MR. CABRAL:    Okay.
 9                   MS. BONHAM:    No.  We can't
10              break at 3:00 and get it
11              rescheduled.
12                   MR. CABRAL:    No, no, no.
13                   MS. BOOP:    Oh, no, no.
14              We're not saying that.
15                   MR. CABRAL:    Just so she
16              can leave and we'll switch chairs.
17                   MS. BONHAM:    No problem.
18              No problem.  Because I don't have
19              that much longer.
20                   MR. CABRAL:    No.  We're not
21              suggesting that.
22                   MS. BOOP:    We're not
23              stopping.  We're breaking.
24                   MS. BONHAM:    Okay.  No
25              problem.  Okay.  It's nine minutes
```

1  until 3:00.

2  BY MS. BONHAM:

3  Q   At the time you saw the barrel of the gun

4  pointed towards you, were there any other cars

5  that you observed on the road besides yours and

6  his that you can remember?

7  A   It happened so fast.  It's just -- I mean, I

8  wasn't really -- I just saw -- the car was next

9  to me, and I saw the barrel of the gun, and my

10  focus was just on that at that time and moment.

11  That's all I can tell you.  That I can recall.

12  Q   After you saw the barrel of the gun pointing

13  at you, what exactly did you do then?

14  A   I instantly -- I mean, I reacted it.  I mean,

15  I reached for my gun, city-issued weapon, and I

16  defended myself.

17  Q   Can you describe in detail what exactly you

18  did?

19  A   Unholstered my weapon, angled it towards that

20  -- towards the suspect, and fired rounds.

21  Q   When you call him a suspect, are you

22  referring to Desmond Franklin?

23  A   I mean, I'm referring to the driver.  Yes.

24  Q   Do you now know that that person is Desmond

25  Franklin?

1    A    Yes, I know now.

2    Q    At that time you didn't know who it was?

3    A    I did not know.

4    Q    But you just recognized him as the same man

5    from the Convenient store -- right? --

6    A    Yes.

7    Q    -- that you had engaged with?

8         So when you call him a suspect as you sit

9    here today, what does that mean?

10   A    I'm referring to Desmond Franklin.

11   Q    Why are you referring to him as a suspect at

12   this point?

13   A    I mean, what would -- what else do you want

14   to refer as him to?

15   Q    What does that word mean when you use it in

16   this context?

17   A    I mean, I prefer not use his name and I just

18   refer to him as that.

19   Q    At the moment when you saw the gun pointing

20   towards you and you reach for your weapon, you're

21   saying you pointed at the suspect, Desmond

22   Franklin.

23   A    I --

24                   MS. BOOP:    Objection.

25                   Go ahead.

Deposition of Officer Jose Garcia                 Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    I reacted and defended myself towards the

2    person that was -- that was holding a gun towards

3    my direction.

4    Q    **When you call him a suspect, what, if**

5    **anything, did you suspect him of at that moment?**

6    A    I mean, he's holding a gun towards me.  He's

7    not -- that's why I call him a suspect.

8    Q    **Did you think that that was a crime that he**

9    **was committing?**

10   A    Pointing a gun?

11   Q    **Yeah.**

12   A    Yes, it's a crime.

13   Q    **So you suspected him of committing a crime.**

14   A    I mean at --

15              MS.BOOP:     Objection;

16         mischaracterizing his prior

17         testimony.

18   Q    **Okay.  Go ahead.**

19              MS. BOOP:     You can answer

20         again.

21   A    At that time I -- I reacted and defended

22   myself.  I didn't -- like the word you said

23   previously like -- I mean, like I said, I just

24   defended myself.

25   Q    **Okay.  Did you suspect Desmond Franklin of**

Tackla Court Reporting, LLC              PH:  216.241.3918                Page: 127

1    **committing a crime at the moment you were about**

2    **to defend yourself?**

3                    MS. BOOP:    Objection.

4    A   He was pointing a gun towards me.  I defended

5    myself.

6    **Q   I don't want to seem tedious.  I just want**

7    **you to answer the same question that I'm asking.**

8    **So I hear what you're saying, and we'll explore**

9    **that.**

10    **Let me ask you this question.  Okay?  At the**

11    **time that you were about to defend yourself, did**

12    **you suspect Desmond Franklin of committing a**

13    **crime?**

14                    MS. BOOP:    Same objection.

15            He's provided exhaustive testimony

16            as to how quick it went.

17            But go ahead.

18    A   Everything happened so fast that I just

19    reacted it and defended myself.

20    **Q   I hear you on that, but I just want you to**

21    **listen to the question that I'm asking --**

22                    MS. BOOP:    You just want

23            him to agree.

24    **Q   -- and your lawyer's making an objection.**

25                    MS. BOOP:    You want him to

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1          agree with you.

2                  MS. BONHAM:     He can say no

3          or he can say yes.

4                  MS. BOOP:    He said he

5          didn't have time to process

6          anything and he reacted, and you

7          keep wanting to put words in his

8          mouth --

9                  MS. BONHAM:    He didn't say

10         anything about processing --

11                 MS. BOOP:    -- and he's not

12         going to do it.

13                 MS. BONHAM:    -- so, you

14         know, I don't know who's putting

15         words in his mouth.

16                 MS. BOOP:    That's what

17         he -- that's what he testified to,

18         that he didn't have enough time to

19         process.

20                 MS. BONHAM:    I didn't hear

21         the word "processing" except out

22         of your mouth.

23                 MS. BOOP:    We can read the

24         transcript.

25                 MS. BONHAM:    All right.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  BY MS. BONHAM:

2  Q   I hear your testimony and I understand what

3  you're saying.  Okay.  My job is to try and drill

4  down on the details so we can all get a clean

5  transcript.  Okay?  So I just want you to pay

6  attention to the question I'm asking, and if you

7  can't answer it because you don't remember, you

8  can tell me that.  Okay?  So if it's a yes or no

9  question, try to say yes or no or I don't

10  remember, I can't answer you.  Okay?  Is that

11  fair?

12  A   Fair enough, ma'am.

13  Q   Okay.  At the moment that you saw Desmond

14  Franklin pointing a gun at you, did you suspect

15  him of committing any crimes?

16                 MS. BOOP:    Objection.

17  Q   Go ahead.

18  A   I don't know, ma'am.

19  Q   You don't know; is that right?

20  A   Yes.

21  Q   You don't know because you don't remember

22  what you were thinking?

23  A   Everything happened with a reaction.  There

24  was no process of thinking whether he's

25  committing a crime or not.  It just was a

1  reaction.  Someone was pointing a gun towards me

2  and I reacted it.

3  Q   So at that moment you had to unholster your

4  weapon, which involves using a clip -- I'm

5  sorry -- a button to release it; is that right?

6  A   A retention.

7  Q   Retention.  Demonstrate for me exactly what

8  you did to unholster your weapon and, as you put

9  it, defend yourself.

10         MS. BOOP:    Objection to the

11         demonstration.

12  Q   Go ahead.

13         MS. BOOP:    Do the best you

14         can.

15  A   I used my right hand, reached down,

16  unholstered my weapon, came across my -- my

17  chest, and that's when I fired.  (Demonstrating.)

18  Q   Did you fire your weapon through your

19  driver's side window?

20         MR. CABRAL:    You mean the

21         glass or the window opening?

22  Q   Let's try this.  Show me again how you

23  pointed your weapon.

24         MS. BOOP:    Same objection

25         to the demonstration.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1              MS. BONHAM:    Sure.

2   A   I reached down for my gun, unholstered, came

3   here.  (Demonstrating.)

4   Q   So you unholstered it and then you pointed it

5   with your right hand across your body; is that

6   correct?

7   A   Yes.

8   Q   And did you point it out the top part of the

9   window that was rolled down?

10  A   Just right here.  I didn't measure.  I didn't

11  just point out.  I didn't calculate where I have

12  to put it.  I just reacted it and sent -- I mean,

13  fired my weapon.  (Demonstrating.)

14              MR. CABRAL:    For the

15              record, he's holding his hand

16              across the lower portion of his

17              face by his jaw.

18              MS. BONHAM:    That's fine.

19  Q   Did you point the gun at the window glass or

20  did you point the gun above the window glass at

21  the air?

22              MS. BOOP:    Objection.

23              You can answer.

24  A   What do you mean, ma'am?

25  Q   Your window was rolled halfway up, right?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    Right.

2    Q    And I saw you, as Tom articulated, holding

3    your gun sort of near face level, right?  A

4    little bit lower than your face level?

5    A    Right.

6    Q    Across your body, right?

7    A    Right.

8    Q    Do you remember if you were pointing the

9    barrel of your gun at the glass part of the

10   window or at the part of the window where the

11   glass was rolled down --

12                MS. BOOP:    Objection.

13   Q    -- so it was open?

14                MS. BOOP:    You can answer.

15   A    It was above that glass that was halfway

16   down.

17                MS. BOOP:    Is this a good

18          time?  It's three o'clock.

19                MS. BONHAM:    Yeah.  That's

20          fine.

21                MS. BOOP:    Thank you.

22                  (Recess had.)

23   BY MS. BONHAM:

24   Q    When you raised your firearm and pointed it

25   at Desmond Franklin on Pearl, did you stick the

1  barrel of your gun out of the window?

2  A    I don't recall sticking it out of the car

3  window.

4  Q    You were pointing it with your right hand

5  across your chest and at the driver's side

6  window, right?

7  A    What was that again?

8  Q    You were pointing your gun with your right

9  hand across your chest and at the driver's side

10  window, right?

11  A    Correct.

12  Q    And you think it was pointing in the air

13  space rather than at the space where there was

14  still glass in the window pane, right?

15  A    Correct.

16  Q    But you don't -- you didn't stick it out of

17  the window, right?

18  A    No.

19  Q    You're pointing the gun at Desmond

20  Franklin -- did you point it at the car or right

21  at him?

22                    MR. RUSSELL:    Objection.

23                    Go ahead.

24  A    Answering your question, just towards that

25  direction.

1  Q    Just in the general direction of his car?

2  A    Towards him.  Towards the vehicle.

3  Q    When you were pointing your gun, did you see

4  Desmond Franklin at that point?

5  A    No.  When I -- when I had the -- my weapon

6  towards that direction, I had my hand on the

7  steering wheel, and I looked forward to keep my

8  car in the lane because we were still moving.

9  Q    Okay.  So when your gun was -- when you first

10  raised your gun with your right hand, you had

11  your left hand on the steering wheel?

12  A    Yes.

13  Q    What were your feet doing?

14  A    They were on the pedals.

15  Q    Was your left foot on the clutch?

16  A    I can't recall that.  I mean, I -- I can't

17  recall exactly if it was on the clutch.

18  Q    Was your right foot on the gas?

19  A    It was on the right, yes.

20  Q    And the car was moving forward, right?

21  A    Yes.

22  Q    Were you accelerating or was the car rolling

23  forward?

24  A    I think -- I mean, everything happened so

25  fast.  I was trying -- I was -- everything was in

Deposition of Officer Jose Garcia                     Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    motion moving forward.

2    Q    Do you remember if you were depressing the

3    gas pedal at the time that you were pointing your

4    gun?

5    A    I can't recall if I was.

6    Q    You were still in first gear, right?

7    A    Correct.

8    Q    Because you had one hand on the gun and one

9    hand on the wheel, your hands weren't touching

10   the gear shift, right?

11   A    Correct.

12   Q    When you were pointing your gun, did you ever

13   look over at Desmond or were your eyes forward on

14   the road the whole time?

15   A    On the road.

16   Q    So you kept your eyes on the road.

17   A    Yes.

18   Q    The whole time you were pointing the gun?

19   A    When I -- yes, I kept my eyes on the road.

20   Q    At what point did you shoot the gun?

21   A    When I -- when I was here at this level.

22   Q    You're gesturing right below your face --

23   right? -- across your body?

24   A    Across my body.

25   Q    You unholstered your gun and did you shoot it

1  **immediately after unholstering it?**

2  A    Once I got here to this level.

3  (Demonstrating.)

4  **Q    So you unholstered your gun, you raised it up**

5  **so it was across your body and near your chin,**

6  **and then you shot it; is that right?**

7  A    My more towards my chest area.

8  **Q    Okay.  Can you just verbally describe to me**

9  **from when you unholstered it to when you shot it,**

10  **what course did the gun and your body take?**

11  A    I unholstered my weapon with my right hand,

12  came across my chest and pointed towards the car

13  direction, and I was still looking at the road,

14  and then I fired my weapon.

15  **Q    When you fired your weapon, the barrel of**

16  **your gun still was not sticking outside of the**

17  **window pane; is that right?**

18  A    Correct.

19  **Q    So your weapon was still inside your car,**

20  **including its barrel, right?**

21  A    Correct.

22  **Q    You were pointing it at the general direction**

23  **of Desmond's car.  Am I getting that right?**

24  A    Towards the direction where I saw the gun

25  coming out.

Deposition of Officer Jose Garcia Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1 Q How many times did you shoot?

2 A What I can recall that day, three times.

3 Q Was it three shots all in a row or was there

4 some period of time that passed in between the

5 shots?

6 A It happened so quick so -- I didn't pause.

7 It just happened so quick.

8 Q Did you make three shots right in a row,

9 immediately one after the other?

10 A Like I said, it happened so quick.  It

11 just -- I never took a pause.  Just reaction.  I

12 fired.

13 Q When you say that, do you mean that you

14 didn't pause between the shots?

15 A What was your question?

16 Q Did you -- did you pause in between the three

17 shots that you took?

18 A No.

19 Q You made at least three shots right in a row;

20 is that right?

21 A Yes.

22 Q During those three shots, you were looking

23 out your dash rather than in the direction that

24 you were shooting; is that right?

25 A I knew the car was next to me because we were

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    parallel, and I pointed the gun; and, yes, I was

2    looking straightforward, and that's when I fired

3    towards that direction -- towards the car.

4    **Q    After those shots that you made in**

5    **succession, did you take any additional shots**

6    **later?**

7    A    No.  I stopped immediately.

8    **Q    You pulled your gun out, you fired it off a**

9    **number of times right in a row, and then you**

10   **stopped and didn't make any additional shots; is**

11   **that correct?**

12   A    I didn't make any additional shots.

13   **Q    Every shot you made was in a different**

14   **direction than the direction you were looking; is**

15   **that correct?**

16   A    What was that?

17   **Q    Every shot you made was in a different**

18   **direction than the direction you were looking in;**

19   **is that correct?**

20   A    I was pointing -- my weapon was facing

21   towards the car direction.

22   **Q    And your eyes were facing a different**

23   **direction towards the dash.**

24   A    I took a quick look to my -- to the front to

25   keep my car straight because I was driving still.

1  We were moving forward.

2  Q   So the whole time you were shooting you were

3  looking forward, but you were shooting to your

4  left; is that correct?

5  A   What was that?

6  Q   The whole time you were shooting, you were

7  looking forward with your eyes, but you were

8  shooting towards your left; is that true?

9  A   Everything happened so fast.  So I draw my

10 weapon as soon as -- when I saw the barrel of the

11 gun, I saw the gun -- the barrel of the gun, I

12 draw my weapon, pointed it towards -- towards the

13 car, and I fired as I was looking forward.

14 Q   After you stopped shooting, what exactly

15 happened then?

16 A   I came at a complete stop.  I put my car in

17 neutral, pulled out my phone, dialed 911, and

18 communicated with the dispatcher.

19 Q   Before you started shooting, when you

20 unholstered your gun did you turn your body in

21 the direction of Mr. Franklin's car?

22 A   No.

23              MR. RUSSELL:    Objection.

24 A   No.

25 Q   You kept your body straight pointing towards

1    the dash and your steering wheel; is that right?

2                    MR. RUSSELL:     Objection.

3                    Go ahead.

4    A    Yes.

5    Q    So it was only your arm that was holding your

6    weapon that pointed towards Mr. Franklin's car;

7    is that right?

8    A    Yes.

9    Q    No other part of your body pointed towards

10   his car at that time.

11   A    No.  Because we -- I was still moving

12   forward.  My car was not at a complete stop.

13   Q    After you stopped shooting, did you then look

14   over towards Mr. Franklin's car?

15   A    The car sped off.

16   Q    So you didn't turn to look at that car after

17   you stopped shooting?

18   A    After I shooted, I completely came to a stop,

19   saw the car speeding off, and I just pulled out

20   my phone and called 911 to report the incident.

21   Q    Were you still looking straight ahead?

22   A    I was looking at the car where it was going

23   to go.

24   Q    So Desmond's car passed you and sped off; is

25   that right?

1   A    After the shots.

2   Q    After the shots.  You came to a stop, his car

3   passes you and speeds off.

4   A    Yes.

5   Q    Did you see him in the car at that time?

6   A    No.

7   Q    Did you see the passenger?

8   A    No.

9   Q    Did you see whether you had hit Mr. Franklin

10  with any of the bullets at that time?

11  A    No.

12  Q    Did you think you had?

13  A    I didn't know.

14  Q    You didn't think you had or you don't know?

15  A    I didn't -- at the moment, I didn't know

16  that -- if he was hit with one of the rounds that

17  I fired.

18  Q    Up until this point, did you believe that

19  there was a passenger in the car at all?

20  A    What do you mean?

21  Q    Up until this point, between when you left

22  Forestdale and Pearl, through the point where you

23  shot at the car and it sped away, did you believe

24  that there was a passenger in the car?

25  A    I mean, it was the same car that I had

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    initial contact with, and there was two people in

2    it, but I didn't see the passenger.  I only saw

3    the driver -- the driver.  And then I noticed

4    that the passenger was still in the car when the

5    car crashed into the cemetery fence and then he

6    exited out of the vehicle.

7    Q    So at the time that you shot at the car, did

8    you think that there was a passenger in there?

9    A    I didn't see the passenger.

10   Q    You didn't see the passenger.

11   A    Correct.

12   Q    Did you think he was in there?

13   A    I didn't know at the time.  I just didn't see

14   him.

15   Q    You didn't know one way or the other?

16   A    I didn't know that he was there.

17   Q    Back at the Convenient store before the

18   shooting, did you know that Devin Badley was a

19   passenger in Mr. Franklin's car?

20                   MR. RUSSELL:    Objection.

21                   Go ahead.

22   A    I saw him exiting the vehicle when he was

23   grabbing those boxes, but, like I said, when I

24   turned, I didn't see him.  I didn't know if he

25   was jumping in the car or not.

1  Q    When you shot at Mr. Franklin's car, did you
2  see or hear glass break?
3  A    What was that again?
4  Q    When you shot at Mr. Franklin's car, did you
5  see or hear glass break?
6  A    From my side mirror I did.
7  Q    You saw some glass break on your side mirror?
8  A    Yes.
9  Q    Did you understand how that happened?
10  A    At that -- at that moment, no.
11  Q    As you sit here now do you know how that
12  happened?
13  A    Yes.
14  Q    How did it happen?
15  A    I mean, from grand jury when they explained
16  it, they said that it was one of my rounds that
17  hit the side mirror.
18  Q    One of your rounds hit your own side mirror?
19  A    Yes.
20  Q    Did you hear glass break on the other car?
21  A    I can't recall.
22  Q    Before you shot into the other car, you
23  couldn't tell whether the passenger side window
24  of that car was open or closed; is that right?
25  A    That's correct.  I can't recall that.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q    Did anybody from Desmond Franklin's car ever
2   shoot a bullet at you?
3   A    When in the moment, I thought they shot
4   towards me because the side mirror was the one
5   that was -- had a bullet hole, so I thought they
6   took a shot towards me.
7   Q    At what point did you conclude that someone
8   had taken a shot at you?
9   A    I mean, in the event that was going on.  I
10  mean, it happened so fast.
11  Q    At what exact point did you conclude that
12  someone had taken a shot at you?
13  A    Like when the -- I don't have a specific time
14  frame.
15  Q    You testified that you pulled your gun out of
16  its holster because you saw the barrel of a gun
17  pointing at you, right?
18  A    Correct.
19  Q    At that time did anyone shoot at you?
20  A    It happened so fast.  I just reacted it.
21  Q    Did you ever see the barrel of the gun that
22  you described shoot a bullet at you?
23  A    I mean, I'm not -- I can't -- it's impossible
24  to see a bullet coming out of the barrel, I mean.
25  Q    You saw the barrel of the gun, right?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    I saw the barrel of the gun, yes.

 2   Q    Did you ever see someone shoot at you?

 3   A    Like I said --

 4                  MR. RUSSELL:    Objection.

 5   A    -- I reacted when the gun was pointed towards

 6   my direction.

 7   Q    So you didn't have that reaction based upon

 8   someone shooting at you.  You had that reaction

 9   based upon seeing the barrel of the gun.  Is that

10   your testimony?

11   A    The gun was pointed towards my direction and

12   I reacted it.  That's my training.

13   Q    You reacted because you saw the gun pointed

14   at you, but not because someone was shooting at

15   you.  Is that your testimony?

16   A    I'm saying I reacted it when the gun was

17   pointed towards my direction.

18   Q    And at that point when you had that reaction,

19   you didn't believe that anyone had shot a bullet

20   at you, right?

21   A    What was that again?

22   Q    At that point when you had that reaction that

23   you described, you didn't believe that anyone had

24   shot a bullet at you; is that right?

25                  MR. RUSSELL:    Objection.
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1   A   I can't say that I didn't know.  I mean,
2   the -- my side mirror at that time, when I -- it
3   exploded, so I believed that they sent a round
4   towards my direction.
5   Q   Well, your side mirror only exploded after
6   you shot at it, right?
7   A   I didn't know at the time.  It happened so
8   fast.  I can't just stop and look at what's going
9   on.  So it happened so fast.
10  Q   As you sit here today, do you know whether
11  anyone ever shot at you?
12  A   In the grand jury I think they said they
13  didn't make a shot.
14  Q   Say that again.
15  A   In the grand jury -- when I was at the grand
16  jury, they went over the scenario and everything,
17  I believe they said that there was no rounds sent
18  towards my direction, that the gun wasn't shot or
19  fired.
20  Q   So the -- when your side-view mirror
21  exploded, was that the first moment at which you
22  thought someone might be shooting at you?
23               MR. RUSSELL:   Objection.
24               Go ahead, if you can.
25  A   That's when I believe that someone took a
```

1  shot towards me, yes.

2  Q   That's when you first believed that someone

3  took a shot towards you.

4  A   Yes.

5  Q   And you later found out that it was your

6  bullet that had hit your side-view mirror, right?

7              MR. RUSSELL:    Objection.

8  A   Months later, yes.  Not on scene.

9  Q   Did you believe that you had been injured at

10  any point before you stopped your car and put it

11  into neutral and saw Desmond's car speed away?

12  A   At that time I thought I was hit, but I

13  verified myself.  I didn't see no bleeding or

14  anything was hurt at the time.  So I think I

15  mentioned it to the dispatcher, if I'm not

16  mistaken.

17  Q   At some point you thought you were hit, but

18  then you realized you were not?  Is that what I'm

19  hearing you?

20  A   I checked on myself afterwards, yes.  I

21  checked on myself.

22  Q   At what point did you initially believe that

23  you had been hit by a bullet?

24  A   When the side mirror exploded.

25  Q   So at the moment the side mirror was hit by

1   **your bullet and exploded, you believed that you**

2   **were hit by a bullet?**

3   A   I didn't know that it was my bullet that hit

4   that side mirror, like I mentioned before.   I

5   didn't know at the time.   It happened so fast.   I

6   can't realize that.   So, I mean, that's what I

7   was -- I've been telling you in the past.   I

8   couldn't -- at that time I couldn't say it was

9   mine, it was from me, that the original bullet --

10   I mean the side mirror exploded.

11   **Q   But the explosion of that side mirror was the**

12   **thing that caused you to believe that you were**

13   **being shot at and that you were hit.   Am I**

14   **getting that right?**

15   A   Yes.

16   **Q   At the moment that you fired your gun, you**

17   **were looking straight ahead so you couldn't see**

18   **the barrel of the other gun; is that correct?**

19           MR. RUSSELL:    Objection.

20   A   What do you mean the other barrel?

21   **Q   You testified that you saw Desmond Franklin**

22   **point a gun at you, right?**

23   A   Correct.

24   **Q   And you saw the barrel of the gun pointing at**

25   **you, right?**

1   A    Correct.

2   Q    In fact, you were so focused on the barrel

3   that you couldn't see much else; is that right?

4   A    I saw the barrel of the gun, that's when I

5   reacted it, but I was also concerned about my --

6   keeping my car in the lane moving forward because

7   we were going forward.  We're not at a complete

8   stop.

9   Q    So at the moment you shot your gun, you were

10  no longer looking at the barrel of that other

11  gun, right?

12  A    It happened so fast.  So that's -- the only

13  thing I can tell you, I saw the barrel of the

14  gun, reacted it, pointed my gun towards the

15  direction, and fired my weapon.

16  Q    And when you did that, you weren't looking at

17  the barrel of his gun, you were looking out the

18  dash, right?

19  A    I was making sure I keep my car in a straight

20  lane.

21  Q    So you were looking forward.

22  A    Making sure my car was staying in a straight

23  lane.

24  Q    And you couldn't see him anymore.

25  A    What do you mean?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q   At that moment, because you were looking

2  forward, you couldn't see Mr. Franklin.

3  A   I know he was parallel with me and pointing

4  the gun towards me and that's when I reacted it.

5  Q   You knew that he was there because of what

6  you had previously seen, not because you were

7  still looking at him, right?

8  A   Within -- it happened within seconds so

9  it's...

10  Q   But is that your testimony?

11  A   What was -- what I'm saying, when I saw the

12  barrel of the gun, I reacted it by pointing my

13  gun towards the direction of the -- towards the

14  car.

15  Q   And then before you shot that gun, you looked

16  away from his car, right?

17  A   I was looking straight to keep my car

18  straight because we were both moving straight

19  ahead.

20  Q   After you put your car into neutral,

21  Desmond's car sped away, and you checked yourself

22  for injuries, is that when you concluded that you

23  had not been shot by a bullet?

24  A   First thing I did after I stopped, put the

25  car in neutral, I pulled out my phone.  I wasn't

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   even -- I just wanted to immediately notify

2   dispatcher of the incident while -- I believe

3   while I was on the phone that's when I checked

4   myself because she asked me if I was hit.  So

5   that's when I did check for myself and make sure

6   that I wasn't hit.  I didn't -- that's after I

7   was with dispatcher on the phone.

8   **Q   And you called 911.  Was that immediately**

9   **after you stopped your car?**

10  A   Yes.  I dialed 911 from my personal phone,

11  yes.

12  **Q   Did you pull over at that point or did you**

13  **just put your car in neutral right there in the**

14  **road?**

15  A   I stopped in the -- in the road.

16  **Q   You called 911, and on the call you check**

17  **yourself and conclude that you don't have any**

18  **injuries.**

19  A   I was like, yeah, I'm not shot.  I believe

20  I'm not shot.

21  **Q   At that time, even though you had concluded**

22  **that you hadn't been hit by a bullet, did you**

23  **still believe that you may have been shot at?**

24  A   What do you mean?

25  **Q   Did you still believe that someone shot at**

1  you?

2  A   I mean, yeah, because the side mirror was

3  exploded.  Yeah.

4  Q   When did you first become aware that nobody

5  shot at you?

6  A   After months they told me about -- about it.

7  Q   It wasn't until the grand jury months later?

8  A   Yes.

9  Q   So until your -- you testified at the grand

10  jury?

11  A   Yes.

12  Q   Until your grand jury testimony, you

13  believed, based upon your side mirror exploding,

14  that someone had fired shots at you?

15  A   Correct.

16  Q   You thought Desmond had fired shots at you.

17  A   Correct.

18  Q   Did you think he shot first or do you think

19  that -- did you think that you started shooting

20  first?

21  A   I don't know.  I can't recall that.

22  Q   But you unholstered your weapon and started

23  shooting right after you saw the barrel of his

24  gun, right?

25  A   Correct.

1  Q   And you don't remember hearing any gunshots

2  before you started shooting, right?

3  A   I can't recall of that.  I just -- like I

4  said, I reacted it and defended myself.  I mean,

5  that's all I -- my -- I was concerned about my

6  safety.

7              MR. CABRAL:    I think she's

8          just asking you whether you heard

9          anything.

10 A   No.

11 Q   No, you didn't hear anything?

12 A   No.

13 Q   Is that a busy time of day on Pearl Road?

14 A   Moderate.

15 Q   That's a route you take every day to work at

16 that time, right?

17 A   Yes.

18 Q   Moderately busy?

19 A   It depends on the hour.  It's moderate, not

20 crazy -- crazy traffic.  I would say light

21 traffic.

22 Q   Before you started shooting your gun, did

23 you -- you had your foot on the gas pedal, right?

24 A   Correct.

25 Q   Did you try to accelerate to get away?

1  A   That's -- before seeing the gun, that's what

2  my intention was; just accelerate, get away from

3  them, move forward.

4  **Q  But once you saw the gun, did you try to**

5  **accelerate and get away?**

6                  MR. RUSSELL:   Objection.

7                  Go ahead.

8  A   I already was in the process of trying to get

9  away, so he managed to get parallel with my car.

10  **Q  How fast were you going?**

11  A   I would say 25, 30.  Something like that.

12  **Q  You were still in first gear?**

13  A   First gear.

14  **Q  Why didn't you just try and floor it and get**

15  **out of there?**

16  A   What was that?

17  **Q  Why didn't you just try to floor and get out**

18  **of there?**

19                   MR. RUSSELL:   Objection.

20                  Go ahead.

21  A   I was still in first gear.  I was trying --

22  that's exactly what I was doing.  I was trying to

23  get away.

24  **Q  So -- but it sounds like instead of shifting**

25  **up and getting out of there, you took your gun**

Deposition of Officer Jose Garcia                 Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   out and shot someone.

2                   MR. RUSSELL:    Objection.

3                   MR. STADLER:    Objection.

4   A   I mean, the severity and this time frame, it

5   just happened so fast that I had no chance to put

6   it in second gear.

7   Q   Did you try to put it in second gear?

8   A   There was no chance.

9   Q   Did you try and steer your car away from

10  Desmond's car?

11  A   There's a curb, there's a sidewalk, there's a

12  cemetery next to me, and I have no room to turn

13  right.

14  Q   So instead of shifting up and putting your

15  foot on the gas, you pulled your gun out --

16                  MR. RUSSELL:    Objection.

17  Q   -- is that right?

18  A   There was a gun pointed towards me.  I

19  defended myself.

20  Q   When you saw the gun pointed towards you, you

21  didn't put your hand on the gear shift, you put

22  it on your gun, right?

23                  MR. RUSSELL:    Objection.

24               Look, you've asked the same

25               question now 20 times.

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1              MS. BONHAM:    Here's --
2       here's the thing --
3              MR. RUSSELL:    You don't
4       like the answers that you're
5       getting so you keep asking the
6       question over and over again.
7              MS. BONHAM:    You guys keep
8       giving speaking objections when
9       you don't like where something's
10      going.  So let's just try and get
11      a good record.  Here's what I want
12      to do --
13             MR. RUSSELL:    Then stop
14      asking the same question 20 times
15      now.
16             MS. BONHAM:    There's an --
17      there's an asked and answered
18      objection.  It has to be asked and
19      also answered.  So I just need to
20      get answers to the questions.
21      Okay.  I'm not --
22             MR. RUSSELL:    The same
23      questions.  You want the same ones
24      again for the next hour.
25             MS. BONHAM:    I'm not making
```

1              anything difficult.  You don't

2              make anything difficult.  We'll

3              get this done.

4    BY MS. BONHAM:

5    Q   You've got to just give me an answer unless

6    your lawyer tells you not to.  That's what we've

7    got to do.  Okay?  Let's try it.

8        Before Desmond, you say, pointed a gun at

9    you, you were trying to get out of there, right?

10   A   Correct.

11   Q   Okay.  After you saw the gun pointed at you,

12   you had a choice point, right?  You could

13   accelerate or you could shoot at him.  Were those

14   choices both available to you?

15              MR. CABRAL:    Objection.

16              MR. RUSSELL:    Objection.

17   A   No.  There was no choice there because my car

18   is a stick shift.  I would have to throw it in

19   gear.  I'm taking the chance of someone taking a

20   shot at me when a gun is pointed towards me.

21   Q   While you're trying to get it into gear --

22   A   Yeah.

23   Q   -- and get away.  Okay.  So that's why you

24   got your gun out instead.

25   A   Correct.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  Q    Okay.  What about ducking to try to get out

2  of the way?  Did you try to duck?

3  A    Where can I duck?

4  Q    Like putting your head down.  That's what I

5  mean by ducking.  Did you try to do that?

6  A    Would I lose control of my car when I'm

7  moving?

8              MR. CABRAL:    Just yes or

9          no.  Did you try to duck?

10 A    I mean, yes -- no.  I wasn't able to duck.

11 No.

12 Q    Did you try to?

13 A    No.

14 Q    So you stop your car in the road.  You call

15 911.  You checked yourself for injuries.  What

16 exactly happened then?

17 A    After that, I observed the car speeding off,

18 jerked to the right, and then go over the curb,

19 crash into the fence of the cemetery, and then

20 hit a tree.

21 Q    You are sitting in your car on the phone with

22 911 at this point, right?

23 A    Correct.

24 Q    And you can see out your dash --

25 A    My windshield.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    -- your windshield the trajectory of

2    Mr. Franklin's car?

3    A    Yes.

4    Q    And the trajectory of his car that you

5    observed was as you just described, right?

6    A    Correct.

7    Q    What did you do then?

8    A    I remained on line with the dispatcher.  I

9    was -- a few seconds later, I observed the

10   passenger jumping out and crossing Pearl Road to

11   the tire shop.  That's when I began moving

12   forward to keep eyes on him because I believed he

13   was going -- I believed that he would have ran

14   with the gun, try to run with the gun.  So that's

15   why I kept eyes on him.

16        I don't know what happened in the tire shop.

17   He left the tire shop, went back to the car where

18   it crashed.  That's when I went back -- I went --

19   I was inside -- at that point I was in the

20   parking lot.  Then I exited the parking lot,

21   parked my car by the cemetery entrance, and I was

22   still in the car looking towards where he was at,

23   the passenger was at.  I was still on with

24   dispatcher at that point.

25   Q    Everything that you just described to me

1    about what the car did and what the passenger

2    did, you could -- you could see that all

3    happening?  You watched that?

4    A    Through my windshield, yes.

5    Q    So none of what you just described is

6    something that you later learned or saw on a

7    video.  What you just described you saw with your

8    own eyes.

9    A    Correct.

10   Q    Okay.  When you saw the passenger exit

11   Desmond's car, did you recognize him as the same

12   young man that you had seen at the Convenient

13   store?

14   A    Correct.

15   Q    At that point were you aware that he had been

16   in the car the whole time?

17   A    Correct.

18   Q    Were you surprised by that?

19   A    Yes.

20   Q    Why?

21   A    Because I didn't see him when we were

22   parallel.

23   Q    After you saw him get out of the car, I think

24   you said that you were concerned that he was --

25   he was going to run off with the gun; is that

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   right?   Am I getting that right?

2   A    Correct.

3   Q    **Why were you concerned about that?**

4   A    Because I saw the gun and I wanted to make

5   sure I didn't lose sight of that gun.

6   Q    **Why was that?**

7   A    What do you mean?

8   Q    **Why did you want to make sure that you didn't**

9   **lose sight of that gun?**

10  A    Because there were -- I shot at that car, and

11  there was a reason why I shot that car, and that

12  was because I saw a gun.

13  Q    **You shot at the car because you saw a gun.**

14  A    Yes.

15  Q    **Did you -- at the point when you saw Devin**

16  **Badley exit the car, you were concerned that he**

17  **was going to run off with the gun.  Did you**

18  **suspect him or Desmond of being involved in the**

19  **commission of a crime?**

20  A    What do you mean?

21  Q    **At that moment when you saw Devin get out of**

22  **the car, did you suspect that he or Desmond**

23  **Franklin were involved in committing a crime?**

24  A    Well, that was the part that I was involved

25  in, in that shooting, so I had to make sure

1   that -- that evidence would have been the gun.

2   It wouldn't never leave out of my vision.

3   **Q    So you were concerned with keeping track of**

4   **evidence in a crime.  Is that -- am I getting**

5   **that right?**

6   A    Yes.

7   **Q    Did you believe at that time that the**

8   **shooting that you believed had occurred had**

9   **anything to do with what you observed at the**

10  **Convenient store previously?**

11  A    No.

12  **Q    So you saw Devin getting out of the car.  You**

13  **wanted to make sure that you were keeping track**

14  **of evidence that was involved in a potential**

15  **crime.  Right so far?**

16  A    Correct.

17  **Q    Explain to me exactly where you went after**

18  **you saw Devin get out of the car.**

19  A    I proceeded forward northbound on Pearl.

20  Then I went to the parking lot of that tire shop.

21  That's where Desmond -- the passenger was at, ran

22  to.  A few seconds later, he ran back towards the

23  car, and that's when I exited the parking lot and

24  parked my car by the cemetery entrance.

25  **Q    Okay.  So you're on the phone -- you stay on**

1   the phone with dispatch this whole time, right?

2   A    Correct.

3   Q    You see Devin run to the tire shop so you

4   follow him there in your car; is that right?

5   A    Correct.

6   Q    Do you interact with him at all at that

7   point?

8   A    No.

9   Q    Do you see him do anything specifically at

10  that point when you -- in your car at the tire

11  shop?

12  A    What do you mean?

13  Q    What, if anything, do you see Devin do when

14  you are at the tire shop?

15  A    He was talking to the staff of that tire

16  shop.

17  Q    Did you hear anything he said?

18  A    No.

19  Q    Did you see anything else he did besides talk

20  to the staff?

21  A    Running back to the car.

22  Q    Did you see whether he had a gun?

23  A    No, I did not see a gun on him, at least

24  holding it in his hand.

25  Q    Did you still think that he had a gun at that

Deposition of Officer Jose Garcia       Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  time?

2  A   I was just being precautious.  I was making

3  sure that we had -- if he leaved the scene, I

4  have -- I was able to communicate with dispatcher

5  where he was going to.

6  **Q   Were you still scared of the gun?**

7  A   What do you mean?

8  **Q   When you followed Devin to the tire shop to**

9  **make sure he wasn't running off with the gun,**

10  **were you still scared of the gun?**

11  A   Yes, I was scared.

12  **Q   Why did you follow a person who was -- you**

13  **thought had that same gun?**

14  A   I followed him at a distance.

15  **Q   Did you observe anything else about Devin at**

16  **that time in the tire shop?**

17  A   No.

18  **Q   Could you tell whether he had blood on him?**

19  A   I couldn't tell.

20  **Q   Could you tell whether he was upset?**

21  A   I couldn't tell.

22  **Q   Could you tell anything about his demeanor?**

23  A   I was far enough that -- I was not so close

24  to him, so I can't pick up that.

25  **Q   After you -- after you pulled up to the tire**

1  shop, you witnessed Devin talking to the staff,

2  and then you witnessed him run back towards the

3  car crash at the cemetery, right?

4  A    Correct.

5  Q    What did you do after you saw Devin leave the

6  tire shop?

7  A    I parked my car by the cemetery entrance.

8  Q    So you drove your car around from the tire

9  shop and had to come around to the cemetery

10  entrance, right?

11  A    The main entrance to the parking lot of the

12  tire shop, and then exited the tire shop parking

13  lot, crossed over Pearl, and parked myself by the

14  entrance.

15  Q    Of Riverside Cemetery.

16  A    Yes.

17  Q    And the whole time you're on this same call

18  with dispatch, right?

19  A    Correct.

20  Q    You didn't hang up and call back, right?

21  A    Negative.

22  Q    You didn't talk to anyone else besides the

23  dispatcher at this time, correct?

24  A    Correct.

25  Q    When you pulled your car up and stopped it in

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  the cemetery parking, what exactly happened next?

2  A    I was still on the Pearl street and I was by

3  the entrance, so I was in the lane still.

4  Q    Okay.  So you pulled up there.

5  A    Yes.  At a -- at a distance just because

6  safety, you know.  Just there was -- I just

7  parked there.

8  Q    Then what happened?

9  A    After that, a few seconds later, I saw

10  Officer Lopez exiting her vehicle -- I mean,

11  after she exited her vehicle.  She was trying to

12  put some gloves on, and she was running towards

13  the car's direction.  That's when I immediately

14  exited my vehicle.  I was still on with dispatch

15  and running towards her, and I was telling Lopez,

16  "Hey, Lopez, there's a gun, there's a gun

17  involved."

18  Q    When you saw Officer Lopez, that's when you

19  first exited your vehicle at Riverside Cemetery,

20  right?

21  A    Correct.

22  Q    You stay on the phone with dispatch because

23  you're on a cell phone, right?

24  A    Correct.

25  Q    At that point is your gun still drawn?

1   A    No, it was in my holster.

2   Q    **When had you reholstered your gun?**

3   A    After I stopped the car.

4   Q    **After you stopped the car back on Pearl after**

5   **the first shots?**

6   A    After the shots, yeah.

7   Q    **After that point did you ever take your gun**

8   **out of the holster again that day?**

9   A    Not that I can recall.

10  Q    **When you get out of your car at Riverside and**

11  **you see Officer Lopez, you stay on the phone with**

12  **dispatch, right?**

13  A    Correct.

14  Q    **You go towards Officer Lopez, right?**

15  A    Correct.

16  Q    **That's also putting you towards Desmond's car**

17  **and Devin Badley at that point, right?**

18  A    Correct.

19  Q    **So now you're approaching Devin Badley and**

20  **Desmond Franklin and the car where you think**

21  **there's a gun, right?**

22  A    Correct.

23  Q    **Why do you now approach them?**

24  A    Because I was concerned about her safety.

25  Q    **About Officer Lopez's safety?**

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    A    Yes.

2    Q    **Why is that?**

3    A    Because, I mean, she's running to something

4    that she doesn't know -- she's not aware there's

5    a gun in that car.

6    Q    **So when you're going towards her, your gun is**

7    **still holstered, right?**

8    A    Yes.

9    Q    **You don't know the location of the gun that**

10   **you thought Desmond had, though, right?**

11   A    I didn't know where was it at, no.

12   Q    **Did you still think Devin might have it?**

13   A    I was -- I didn't -- I didn't process that.

14   I didn't think of it like that.

15   Q    **Were you thinking about where it might be?**

16   A    I was just making sure she didn't get near

17   that car, and that was my concern at the time,

18   and then after I told her, yeah.

19   Q    **After you told her what?**

20   A    I told her that there was a gun involved,

21   that's when she's beginning to approach the car.

22   Q    **She didn't approach the car?**

23   A    I mean, I stopped her from going over there

24   so...

25   Q    **Did you stop Officer Lopez from going towards**

1  **Desmond's car by giving her a verbal warning?**

2  A    I barely told her, "Hey, there's a gun,

3  there's a gun in that car."

4  **Q    Then what did she do?**

5  A    Then that's when she realized that I was the

6  one -- I told her that I was involved, so she

7  stopped, and then I can't recall what she did

8  next.

9  **Q    What else did you tell her besides that you**

10  **were involved?**

11  A    To call -- communicate with dispatcher to get

12  more officers, to get officers assist to help.

13  **Q    You had her call for more officers.**

14  A    Yes.

15  **Q    When you explained to her that you were**

16  **involved, what exactly did you tell her?**

17  A    I can't recall.

18  **Q    You don't remember anything at all?**

19  A    I just told her, "There's a gun, there's a

20  gun involved."

21  **Q    At that time did you interact further with**

22  **Devin Badley?**

23  A    Then after I -- after I told her to get --

24  after that, I approached the car, and that's when

25  I saw Desmond -- the passenger on the driver's

1  side.

2  Q    **What did you see him doing, the passenger?**

3  A    Trying to -- I saw him like reaching towards

4  the driver's side.

5  Q    **So you saw Devin Badley.  He was on the**

6  **outside of the car --**

7  A    Yes.

8  Q    **-- at that time?**

9  A    Yes.

10  Q    **And he was reaching towards the driver's side**

11  **of the car?**

12  A    Towards the driver.

13  Q    **He was reaching towards the driver --**

14  A    Correct.

15  Q    **-- from the outside of the car.**

16  A    Correct.

17  Q    **Through the driver's side or through the**

18  **passenger's side?**

19  A    Through the driver's side.

20  Q    **What was he doing?**

21  A    He was -- as far as I can remember, he was

22  just holding -- like holding the driver, the

23  driver.

24  Q    **He was holding the driver?**

25  A    Yes.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    Like where and how?

2    A    In the area of the head.

3    Q    So Devin was reaching in the car and holding

4    Desmond's head?

5    A    Yes.

6    Q    What else, if anything, did you notice about

7    Devin and Desmond at that moment when you

8    approached them?

9    A    When I approached them, I was like, "Where's

10   the gun?  Where's the gun?  Where's the

11   motherfucking gun?"  That's when he pointed with

12   his face expression like right there and that's

13   when I saw the gun.

14   Q    Okay.  So you addressed Devin verbally and

15   you asked him where's the gun?

16   A    Yes.

17   Q    While he was holding Desmond's head?

18   A    While he was in that area -- in the area of

19   that side of that car, yes.

20   Q    And the car was crashed -- right? --

21   A    Correct.

22   Q    -- and stopped at this time?

23   A    Correct.

24   Q    Devin then gestured with his chin at where

25   the gun was?

1    A    Yes.

2    **Q    Where was the gun?**

3    A    On the floor of the driver's side.

4    **Q    The floor of the driver's side.**

5    A    Yes.

6    **Q    Was it by Desmond's -- I'm sorry.  Was**

7    **Desmond still in the driver's side of the car?**

8    A    Yes.

9    **Q    Was the gun by his feet?**

10    A    It was by his feet, yes.

11    **Q    Did you move the gun?**

12    A    No.

13    **Q    Did you see anybody else move the gun?**

14    A    Once I confirmed the gun was there, I put my

15    focus to the passenger.  I told him get on the

16    ground.  That's when Lopez came and the other

17    officer came and took it from there.  I just

18    moved to the side with all the officers.

19    **Q    Did you ever see Devin touch the gun?**

20    A    No.  Like I said, when I approached him, he

21    was holding onto the driver.

22    **Q    When you saw Devin holding onto Desmond's**

23    **head, was the driver's side door open or closed?**

24    A    I can't recall, to be honest.

25    **Q    Do you know if Devin was reaching in the**

Deposition of Officer Jose Garcia                     Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  **window or reaching in the door to hold Desmond's**

2  **head?**

3                          MR. RUSSELL:      Objection.

4  A    I can't recall if it was through the window

5  or the door open.

6  **Q    So you didn't see Devin or anybody else move**

7  **or touch the gun, right?**

8  A    Correct.

9  **Q    You found it near Desmond's feet in the car.**

10  A    Right there, yes.

11  **Q    And you didn't touch it either.**

12  A    No.

13  **Q    Did you notice anything about the passenger**

14  **side of the car?**

15  A    The seat was reclined.

16  **Q    Anything else?**

17  A    That's it.

18  **Q    Did you see bullet holes in the car?**

19  A    I didn't -- I didn't inspect the car.  I

20  just -- everyone that was on scene moved me to

21  the side.  That's it.  That's what I can

22  remember.

23  **Q    When you first interacted with Devin at the**

24  **scene of the crash and after he gestured to you**

25  **to show you where the gun was, you told him to**

1  get on the ground; is that right?

2  A    Yeah.   To stay away from the car, get on the

3  ground.

4  Q    Stay away from the car and get on the ground.

5  Did you tell him anything else?

6  A    That I can recall right now, no.

7  Q    When you came to the scene with Officer Lopez

8  and started telling Devin to do or not do things,

9  were you giving him orders as a police officer?

10  A    Yes.

11  Q    When you become involved in an incident where

12  there's potentially criminal activity but you're

13  off duty, are you still acting as a police

14  officer?

15              MR. RUSSELL:    Objection.

16  A    I mean, you're -- I'm a police officer 24/7.

17  Q    So once you arrived to that -- the scene of

18  that car crash, even though you're off duty,

19  you're acting as a police officer, right?

20  A    Yes.  I identified myself.

21  Q    Besides identifying yourself as an officer,

22  did you do anything -- did you say anything else

23  to Devin or Desmond?

24  A    No.

25  Q    Did you notice -- when you first approached

1  the car and talked to Devin, did you notice

2  anything about Desmond?

3  A   I really -- not specifically detailed, no.  I

4  know he was on the driver's side.  I can tell you

5  like I wasn't aware that he was shot in the head

6  or anything, so I thought -- I didn't know

7  anything specifically.

8  Q   You didn't know if he was shot in the head?

9  A   No.

10 Q   Did you know if he was dead?

11 A   No.

12 Q   Did you see any blood?

13 A   Not that I can recall.

14 Q   Did you call for an ambulance?

15 A   I was with dispatcher the whole time on the

16 phone, and I asked for EMS too, to send EMS over

17 here to the scene.

18 Q   When you asked Officer Lopez to call for more

19 officers, did you ask her to call for medical

20 care?

21 A   I just told her to call dispatcher for more

22 help.  I mean, that's what I can recall.

23 Q   When you first approached Desmond's car after

24 it crashed, did you see whether the passenger

25 side window had shattered?

1  A   I didn't pay attention to that.  There was so

2  much going on at that moment.  I was not looking

3  for shattered windows or anything like that.

4  **Q   Did you see whether Devin had any blood on**

5  **him at that point?**

6  A   I did not pay attention to that.

7  **Q   Could you tell anything about his demeanor at**

8  **that time?**

9  A   He was just scared, I guess, I mean.

10 **Q   Did you put Devin in handcuffs?**

11 A   No.  Just -- I just told him to get on the

12 ground and then -- I did not put him in

13 handcuffs.

14 **Q   You had him get on the ground and stay there.**

15 A   Yes.

16 **Q   Did you give him any other commands?**

17 A   No.

18 **Q   Did you interact with him further at all?**

19 A   No.

20 **Q   Did you interact with the car or the gun**

21 **further at all after that point?**

22 A   No.

23 **Q   Did you interact with Desmond Franklin or his**

24 **body further at all after that point?**

25 A   No.

1  Q   About how many minutes passed between the

2  time you first ran up to Officer Lopez at

3  Riverside Cemetery and additional officers showed

4  up?

5  A   It happened fast so I can't take a guess.  It

6  just happened fast.

7  Q   Was it seconds or minutes?

8  A   I can't really tell you.

9  Q   Was it a couple of minutes or 30 minutes?

10  A   No.  It was just a few.  Probably a few

11  minutes.

12  Q   Few minutes.  When other officers besides you

13  and Officer Lopez first arrived, do you remember

14  who those people were?

15  A   I only recall an officer was Essen, Officer

16  Essen.  That's all I can remember.

17  Q   Did you ever talk to any eyewitnesses at the

18  scene besides police officers and Devin Badley?

19  A   No, I did not.

20  Q   You didn't talk to anybody that was there on

21  the street?

22  A   No.

23  Q   Did you recognize anybody that was there on

24  the street besides officers?

25  A   No.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    When other officers arrived, did anybody tell

2    you to do or not do anything?

3    A    No.  Just to remain silent until I got my

4    union representative.

5    Q    Who told you that?

6    A    I can't recall exactly.  There was so many

7    officers I can't keep track of it.

8                    MS. BONHAM:    Let me take a

9              two-minute break.  Okay?

10                        (Recess had.)

11   BY MS. BONHAM:

12   Q    At the scene after the -- after Desmond's car

13   had crashed, you responded right after Officer

14   Lopez and the two of you took control of the

15   scene; is that right?

16   A    Yes.

17   Q    Then back-up officers came and at some point

18   somebody told you to remain silent and talk to a

19   union rep, right?

20   A    Correct.

21   Q    Did you call a lawyer at that point?

22   A    No.

23   Q    Did you call anybody from your union?

24   A    Officers that were on scene, they did --

25   called -- bosses were on scene, so they did that.

1   Q    They did it for you?

2   A    Yes.

3   Q    Do you know who they called?

4   A    I can't -- I mean, everybody showed up on

5   scene so I can't specifically say who called who,

6   but they were there, internal affair, the union.

7   Q    So at some point you're still at the scene

8   and internal affairs and people from the union

9   both came to the scene.

10  A    Yes.

11  Q    Did anybody tell you to stop talking to Devin

12  Badley?

13  A    What do you mean?

14  Q    Once the other officers arrived, did anybody

15  tell you to stop talking to Devin Badley?

16  A    I was not -- once everybody got there, they

17  secured the man.  I was -- I didn't talk to him

18  afterward.

19  Q    Did anybody tell you to get away from him and

20  get away from the car?

21  A    I mean, we went to another side of the scene

22  that was not near the car.

23  Q    Did someone direct you to do that?

24  A    I can't recall.

25  Q    But you somehow left where you were by Devin

1　and the car and went to another location but

2　still at the cemetery.

3　A　Yes.

4　Q　Who else -- besides that first person that

5　told you to remain silent and talk to the union,

6　who else did you talk to?

7　A　Nobody else that I can recall.

8　Q　Did you talk to Officer Lopez again?

9　A　I seen her on scene, but I didn't talk to

10　her.

11　Q　Did you talk to any other officers while you

12　were still at the scene?

13　A　No.

14　Q　What did you do?

15　A　Just stood there and waited for the union and

16　internal affair.

17　Q　So the next people that you talked to --

18　after the first officers showed up and told you

19　to remain silent and talk to the union, the very

20　next people you talked to were from IA and the

21　union; is that right?

22　A　Correct.

23　Q　Who were those people?

24　A　The internal affair and all that?  I don't

25　know their names, no.

1   Q   You don't know the people from the union's

2   names either?

3   A   I mean, the president I talked to, James

4   Follmer.

5   Q   Who's that?

6   A   Follmer.

7   Q   Oh.  Anybody else?

8   A   From the internal affair, no, I can't.  I

9   mean, there was a lot of people.  I can't keep

10  track of their names so...

11  Q   What did you and James Follmer talk about?

12  A   I mean, I didn't talk -- he just told me to

13  wait until internal affair gets there.

14  Q   That's it?  That's all you guys talked about?

15  A   Yes.

16  Q   Nothing else was said?

17  A   Correct.

18  Q   And then you didn't talk to anybody else

19  until internal affairs arrived?

20  A   Correct.

21  Q   Who did you talk to from internal affairs?

22  A   I talked to some officers that's on the

23  internal affair unit.

24  Q   But you don't know who they are?

25  A   I don't know their name.

Deposition of Officer Jose Garcia          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    What did you talk about with them?

2    A    I told them about the incident that happened.

3    Q    What did you tell them?

4    A    That I was involved in a shooting.

5    Q    What else did you tell them exactly?

6    A    About how -- the first encounter I made with

7    Desmond Franklin, and then what it led up to, and

8    then after what got into the shooting.

9    Q    What else did you tell them?

10   A    That's it.

11   Q    And were they with the Cleveland Police

12   Department or were they with the county?

13   A    Cleveland internal affair.

14   Q    Did you talk to anyone who was an officer

15   with the county at that time?

16   A    I can't recall the -- I know the sheriff I

17   did talk to, but I don't know if it was the same

18   day or a different day.

19   Q    You talked to the actual county sheriff or

20   officers from the sheriff's department?

21   A    From their investigating unit.

22   Q    Okay.  And you don't know if it was on the

23   scene or a different day?

24   A    Correct.

25   Q    Did you talk to a Detective Goudy?

1   A    It's two years ago so I can't really

2   recollect the names.

3   Q    Okay.  Were you involved at all with the

4   processing of the scene after you were made to

5   walk away from Devin Badley and the car?

6   A    No.

7   Q    Did you ever handle any evidence?

8   A    No.

9   Q    Did you ever touch Desmond's gun?

10  A    Negative.

11  Q    Did you ever touch Desmond's car after it

12  crashed?

13  A    No.

14  Q    Did you ever talk to Devin Badley again that

15  day?

16  A    No.

17  Q    Did you ever talk to Officer Lopez again that

18  day at the scene?

19  A    No.

20  Q    Besides the FOP and internal affairs and

21  maybe people from the county, did you talk to

22  anyone else at the scene that day?

23                  MR. RUSSELL:    Objection.

24                  Go ahead.

25  A    No.

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    And I say "maybe people from the county"

2    because your testimony is that you did talk to

3    them, you just aren't sure if it's that day; is

4    that correct?

5    A    I know I talked to their investigating unit,

6    but it was not -- it was a different day.

7    Q    When was the first time that you talked to a

8    lawyer about your involvement in this shooting?

9                    MR. CABRAL:    Just be

10                careful not to discuss what you

11                talked about.  She's not asking

12                that.  She just wants to know

13                when.

14   A    Within the same week, I believe so.

15   Q    Okay.  That week?

16   A    Yes.

17   Q    Do you remember who the lawyer was that you

18   first spoke to?

19   A    I don't want to guess on his name, but I

20   think I know, but I just -- he works with our

21   union.

22   Q    Was it Henry Hilow?

23   A    Hilow, yes.

24   Q    The first time you talked to him was the same

25   week that the shooting occurred?

1   A   Correct.

2   Q   **At the scene did anyone make you give over**

3   **your weapon?**

4   A   Give up -- yes.  I gave it to homicide.

5   Q   **Who did you give it to?**

6   A   To the sergeant.

7   Q   **Do you remember what sergeant?**

8   A   He's from the homicide unit.

9   Q   **Is that the use of deadly force unit?**

10  A   What is it?

11  Q   **Is that the use of deadly force investigation**

12  **team?**

13  A   That's the homicide unit.

14  Q   **That's in the homicide unit.**

15  A   Yes.

16  Q   **Okay.  So you gave your gun to someone from**

17  **that unit?**

18  A   Correct.

19  Q   **Did you give a written statement -- did you**

20  **make a written statement that day?**

21  A   No.

22  Q   **Did you ever make a written statement about**

23  **the events of that day yourself?**

24  A   No.

25  Q   **Did you have any period of suspension from**

Deposition of Officer Jose Garcia           Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1 **duty as a result of the events of that day?**

2          MR. CABRAL:  Objection.

3          You can answer.

4 A  I was on -- not suspension, but restricted

5 duty.

6 **Q  What does that mean?**

7 A  I was not able to patrol on the road.

8 **Q  You were still at work and still being paid,**

9 **right?**

10 A  Correct.

11 **Q  But you weren't able to patrol on the road.**

12 **Is there anything else that you weren't able to**

13 **do?**

14 A  Make contact with the public.

15 **Q  How long did that last for?**

16 A  About a year and a half.

17 **Q  During that time were you still entitled to**

18 **carry a duty weapon?**

19 A  Excuse me?

20 **Q  During that time were you still entitled to**

21 **carry a duty weapon?**

22 A  Correct.

23 **Q  You were?**

24 A  Yes.

25 **Q  Did you ever receive back the gun that you**

1   used to shoot Desmond Franklin?

2   A   No.

3   Q   When were you issued a new weapon?

4   A   On scene.

5   Q   On scene?

6   A   Yes.

7   Q   Someone took away the gun that you used to

8   shoot him and then gave you a new gun?

9   A   Yes.

10   Q   Who was that?

11   A   From the homicide unit.

12   Q   And is the gun that you were issued on scene

13   the one that you still have?

14   A   What was that?

15   Q   Is the gun that you were issued on scene the

16   same one that you still have?

17   A   Yes.

18   Q   Is it the same make and model as you used

19   before?

20   A   Yes.  Well, actually, they gave me a

21   temporary one, and then I had to go back to the

22   shooting range and get one that will be under my

23   portfolio.

24   Q   Okay.  So they gave you a temporary gun on

25   scene.

1   A    Yes.

2   Q    And you -- what did you do with it?

3   A    I secured it.

4   Q    In your holster?

5   A    Yes.

6   Q    Right away?

7   A    Yes.

8   Q    And then you got recertified at the shooting

9   range at some point and they gave you your new

10  permanent duty weapon?

11  A    Yes.

12  Q    How long after the incident was that?

13  A    They gave me time to debrief myself and --

14  because I was going through -- I mean, still

15  going through a lot.  Just mentally prepare --

16  whenever I was able to mentally go there to do

17  the re-qualify, that's when I went.

18  Q    How long was it after the shooting until you

19  re-qualified?

20  A    After a year, I believe so.

21  Q    So you had your temporary weapon for a year?

22  A    No, not the temporary.  The temporary -- it

23  was into -- they gave me the temporary on scene,

24  but then I gave -- went to get the new one that

25  was assigned to me -- I don't know exactly the

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    amount of time, but re-qualified, and then they

2    gave me the new issue weapon.

3    Q    But how long was it until you re-qualified to

4    get the new weapon?  Was it a year?

5    A    Close to a year maybe or less than that.  I

6    can't really say exactly the time frame.

7    Q    Before you re-qualified and got your new

8    weapon, were you allowed to use the temporary

9    weapon that they issued you?

10   A    I mean, there was no -- I mean, the only

11   reason I needed to re-qualify is because it was

12   due at the time, but it was more re-qualifying

13   just for -- just to -- the yearly re-qualify --

14   re-qualification.

15   Q    So why did you need time to decompress?

16   A    Because I was in a stressful situation.

17   Q    What, if anything, did that have to do with

18   the time it took you to get your new service

19   weapon?

20   A    I just needed time for myself.

21   Q    So while you were taking that time for

22   yourself, were you allowed to use your gun?

23   A    I was still -- I mean, I'm still capable of

24   using it.  I was not losing my mind.  Just needed

25   it for my protection.

1   Q    So did the city put you on -- I'm sorry.

2        Did the police department put you on any

3   restriction with respect to using your duty

4   weapon during that time period?

5   A    No, they didn't put no restriction on my --

6   on my weapon.

7   Q    After you left the scene that day, did you go

8   to work?

9   A    No.

10  Q    Where did you go?

11  A    Home.

12  Q    Did you talk to anyone about what had

13  happened?

14  A    I didn't talk about it.

15  Q    To anyone at all --

16  A    No.

17  Q    -- after you left the scene?

18  A    No.

19  Q    You didn't call your dad?

20  A    I saw my dad, I saw my family and spent time

21  with my family, but I didn't talk about it.

22  Q    You didn't talk about this at all?

23  A    No.

24  Q    Did you talk to any other police officers

25  about this after you left the scene that day?

1    A    No.

2    Q    Did you talk to Officer Lopez about it ever

3    again?

4    A    No.

5    Q    You didn't text with her, call her on the

6    phone?

7    A    No.

8    Q    Did you talk to your former partner about

9    this ever?

10   A    No.

11   Q    Did you talk to your current partner about

12   this?

13   A    No.

14   Q    You didn't ever at any time talk to your

15   partner at the time about any of the events the

16   day of the shooting of Desmond Franklin?

17   A    That's correct.  Never talked about it.

18   Q    Did you ever talk to Officer Villafuerte

19   about anything involved -- involving the shooting

20   of Desmond Franklin?

21   A    No.

22   Q    Did you ever talk to any Cleveland police

23   officer at all besides the internal affairs and

24   homicide detectives that you mentioned about the

25   events of the day in question?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   A    No.

2              MR. CABRAL:    Excluding

3         union or including union in that

4         question?

5              MS. BONHAM:    I'm including

6         union members.

7   Q    I guess except for the FOP head that you

8   talked to at the scene.

9   A    Just the lawyer.

10  Q    Okay.  In between the -- I'm sorry.

11       Subsequent to the shooting, there were

12  multiple investigations of the event at which you

13  were interviewed; is that right?

14  A    Correct.

15  Q    After the day of the shooting, when was the

16  first time that you participated in an interview

17  about the shooting?

18  A    The first interview?

19  Q    Yeah.

20  A    After internal affair.

21  Q    Was the first interview from internal

22  affairs?

23  A    I believe the first ones are internal affair.

24  Q    How long after the shooting did that take

25  place?

1    A    A few days.

2    Q    **Were you represented by counsel during that**

3    **interview?**

4    A    By the union lawyer.

5    Q    **Mr. Hilow?**

6    A    Yes.  Hilow.

7    Q    **Had you talked to Mr. Hilow in between the**

8    **day of the shooting and the first internal**

9    **affairs interview?**

10   A    No.

11   Q    **Was the first time you talked to Mr. Hilow**

12   **before that internal affairs interview?**

13   A    Yes.

14   Q    **Was that a video recorded interview?**

15   A    I believe I gave like several interviews and

16   they were recorded.

17   Q    **I'm just talking about the very first time**

18   **you were interviewed by internal affairs.**

19   A    Oh, no.  No.

20   Q    **After that meeting with internal affairs a**

21   **few days after the shooting where you were**

22   **represented by Mr. Hilow, when was the next time**

23   **after that that you were interviewed in the**

24   **course of the investigation about this day?**

25   A    I did it twice with internal affairs and then

1  the sheriff.

2  Q    At both of the internal affairs meetings were

3  you represented by Mr. Hilow?

4  A    Yes.

5  Q    Did you talk to him about these events any

6  other time up until that second internal affairs

7  meeting besides at the two meetings?

8  A    No.

9  Q    After those two internal affairs meetings,

10  what was the next interview you were involved in

11  with respect to your conduct on the date in

12  question?

13  A    The sheriff.

14  Q    The county sheriff.

15  A    Yes.

16  Q    And about how much time had passed between

17  the day of the shooting and that first time you

18  were interviewed with the sheriff's department?

19  A    Another a few days, I believe.

20  Q    Another few days?

21  A    Yes.

22  Q    Were you represented by Mr. Hilow at that

23  meeting?

24  A    Correct.

25  Q    After that, what was the next interview that

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1   you participated in and with what agency about

2   the conduct in question?

3   A    I can't recall after.

4   Q    Did you ever up until this point talk to any

5   other lawyers besides Mr. Hilow?

6   A    Just the counsel that's here.

7   Q    Let me rephrase that.  That was sloppy.

8        In the course of the investigation, before

9   this litigation was filed, did you talk to any

10  lawyer besides Mr. Hilow?

11  A    No.

12  Q    So you participated in two internal affairs

13  investigations and an interview with the county

14  sheriff's department, right?

15  A    Correct.

16  Q    After that did you participate in any other

17  investigations with any other agencies?

18  A    No.

19  Q    Okay.  More recently you participated in an

20  investigation with the Office of Professional

21  Standards, right?

22  A    Yes.

23  Q    Were you represented during that

24  investigation?

25  A    Yes.
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q    Was that also by Mr. Hilow?

2   A    Hilow and the president union.

3   Q    And the union president?

4   A    Yeah.

5   Q    Did you talk to Mr. Hilow and the union

6   president in advance of any meeting with OPS?

7   A    No.

8   Q    You just talked to them at the interview,

9   right?

10  A    Correct.

11  Q    And you also gave testimony to the grand

12  jury; is that right?

13  A    Correct.

14  Q    Were you represented by counsel in the course

15  of giving that testimony?

16  A    Yes.

17  Q    Who represented you there?

18  A    Hilow.

19  Q    How many times total have you talked to Henry

20  Hilow about this, the events at issue in this

21  case?

22  A    Grand jury and my interviews.

23  Q    That's it?

24  A    Yes.

25  Q    You didn't talk to Mr. Hilow about anything

Deposition of Officer Jose Garcia                     Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1  having to do with the litigation that we're here

 2  about?

 3  A    No.

 4  Q    And I understand the city's also representing

 5  you in an insurance dispute having to do with

 6  this litigation; is that right?

 7  A    Correct.

 8  Q    Is there anyone else representing you besides

 9  the lawyers that are here, and the city in an

10  insurance dispute, and Mr. Hilow in the past with

11  regard to any part of your conduct on that day?

12  A    No.

13  Q    Besides the OPS investigation, internal

14  affairs, the county, and the grand jury

15  proceedings, and the litigation that we're here

16  about today, are there any other times that

17  you've been asked by anybody to give a statement

18  about or an interview about your conduct on the

19  day in question?

20  A    No.

21  Q    Are you aware of whether there's any

22  investigation still ongoing about your conduct on

23  the day in question?

24  A    I'm sure there is.

25  Q    You're sure there is?
```

1   A    I mean, yes.

2   **Q    Besides the litigation that --**

3   A    Oh, no.

4   **Q    Okay.**

5                   MR. CABRAL:    Yeah.  Don't

6           guess.

7   **Q    That's fine.**

8       **When you get recertified on your firearm, do**

9   **you get any firearms training as part of your**

10  **certification?**

11  A    Just a re-qualification.

12  **Q    Can you explain to me what the**

13  **re-qualification entails?**

14  A    There's a target they make us shoot from a

15  certain distance.  Once you hit the target on all

16  the distance, you pass the qualification.

17  **Q    That's all that's required to pass the**

18  **qualification is the shooting test?**

19  A    Yes.

20  **Q    Regarding use of your firearm, the only**

21  **training that you've had on that would have been**

22  **the OPOTA training and then the one-month City of**

23  **Cleveland training that you received when you**

24  **first became a police officer; is that correct?**

25  A    Correct.

1    Q   In the course of that training, do you learn

2    when it's appropriate to use deadly force?

3    A   Correct.

4    Q   You do?

5    A   Correct.

6    Q   Does the training that you receive as a

7    police officer apply whether or not you're on

8    duty?

9    A   What was that?

10    Q   Does the training that you receive as a

11    police officer apply to you whether or not you're

12    on duty?

13    A   Yes.

14    Q   It does?

15    A   Yes.

16    Q   Are you ever trained about whether or not you

17    should shoot into a moving car?

18    A   That we're trained?

19    Q   Yeah.

20    A   No.

21    Q   So you're not trained about whether or not

22    you should shoot into a moving car?

23    A   Correct.

24    Q   Are you -- did you ever receive training

25    about whether or not you should shoot at someone

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   from a moving car?

 2   A    Never received that training.

 3   Q    As part of your training on the use of your

 4   firearm, did you receive any training on whether

 5   you should be looking at someone when you try to

 6   shoot at them?

 7   A    Yes.

 8   Q    What training do you receive having to do

 9   with that?

10   A    I mean, you look -- you look at the target.

11   Q    Why is that?

12   A    To make sure you're shooting at the target.

13   Q    Why is that important?

14   A    It's important, that way you know where

15   your rounds are going.

16   Q    Why do you want to know where your rounds are

17   going?

18   A    For others safety.

19   Q    For the safety of others that are nearby?

20   A    Correct.

21   Q    In your training on the use of deadly force,

22   should using deadly force be your last option?

23                   MR. RUSSELL:    Objection.

24                   MR. CABRAL:    Objection.

25   A    It depends on the circumstances you're in.
```

1  Q    In what circumstances should using deadly

2  force not be your last option?

3                    MR. RUSSELL:    Objection.

4                    Go ahead.

5  A    When there's a weapon that can physically

6  cause you harm.

7  Q    When you're confronted with a weapon that can

8  physically cause you harm, you can use deadly

9  force even if you have other options?

10  A    It all depends on the circumstances.

11  Q    Okay.  That's -- that's what your training

12  says?

13  A    I mean, that's -- as far as that you're

14  physical to obtain and you can -- in the sequence

15  of events you can justify what -- the tools that

16  you're using.

17  Q    How would you -- how would you justify the

18  use of the tools that you're using?

19  A    I mean, there's a weapon pointed towards me,

20  and the only tool I had available at that time,

21  because I was off duty, it was my city issue

22  weapon.

23  Q    Pursuant to your training, if you are in

24  danger and you're able to get away, are you

25  supposed to try and get away?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1                    MR. RUSSELL:    Objection.

2                    MR. CABRAL:    Objection.

3   A    What do you mean by that?

4   Q    If you feel like you're in danger, but you

5   can get yourself out of danger, are you supposed

6   to try to do that?

7                    MR. CABRAL:    Objection.

8   A    It all depends on the circumstances you're

9   in.

10  Q    If you think that somebody possesses a gun

11  and is committing a crime, do those two things

12  together entitle you to use deadly force against

13  a person?

14                   MR. RUSSELL:    Objection.

15                   MR. CABRAL:    Objection.

16  A    I can't assume someone has a weapon unless I

17  see it.

18  Q    If you see that someone has a weapon and that

19  person's committing a crime, is that enough to

20  justify the use of deadly force pursuant to your

21  training?

22                   MR. RUSSELL:    Objection.

23                   MR. CABRAL:    Objection.

24  A    It just depends on the circumstances of the

25  reaction of that person.
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   Q    Do you receive training on whether or when to

2   use your service weapon in a public place?

3   A    What do you mean?

4   Q    Do you receive training on whether or when to

5   fire your service weapon if other people are

6   around, members of the public are around you?

7   A    I mean, it all depends on the scenario you're

8   in.  I mean, if there's a crowd, you obviously

9   have to be super careful.

10  Q    Do you receive training on that subject?

11  A    We all receive training when's the proper --

12  or just watch your back -- the backstop, what's

13  on the back to be precautionary.

14  Q    And what does that mean?

15  A    To know where your bullet -- your rounds can

16  travel to if it missed the target.

17  Q    If you're not looking at the target that

18  you're shooting at, is it possible that your

19  rounds could hit a bystander?

20            MR. CABRAL:    Objection.

21  A    What do you mean?

22  Q    If you're shooting without looking where

23  you're shooting, is it possible that you could

24  shoot something other than the target you're

25  aiming at?

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                    MR. CABRAL:     Objection.
 2   A    I don't know.
 3   Q    You don't know?  You're not trained on that?
 4   A    What was -- can you repeat that again?
 5   Q    Yeah.  If you're shooting your weapon but
 6   you're not looking at what you're shooting at, do
 7   you receive training that tells you that your
 8   shots could hit something other than your target
 9   like a bystander?
10                    MR. CABRAL:     Objection.
11                    MR. RUSSELL:     Objection.
12   A    Our training is to focus on the target.
13   Q    So is that a no?
14   A    To focus on the target.
15   Q    So it sounds like you don't receive training
16   on whether you could cause a danger to a
17   bystander or a member of the public if you're not
18   looking where you're shooting.
19                    MR. RUSSELL:     Objection.
20   A    I mean, there's a chance -- there could be
21   chances of that, but, I mean, once you -- it
22   depends on the circumstances you're in, what's
23   the surroundings that you're in.
24   Q    Have you ever been disciplined, whether
25   formally or informally, for any of your conduct
```

1  that occurred on the day of the shooting of

2  Desmond Franklin?

3               MR. RUSSELL:    Objection.

4  A   No.

5  Q   You never received any discipline for any of

6  your conduct that day; is that right?

7               MR. RUSSELL:    Objection.

8  A   No.

9  Q   Am I correct when I say that?

10  A   You're correct.

11  Q   Did you ever receive any informal or verbal

12  warning about any of your conduct on that day?

13  A   No.

14  Q   Do you know what the results were of the

15  internal affairs investigation of the conduct?

16               MR. RUSSELL:    Objection.

17               Go ahead.

18  A   I can't recall.

19  Q   Were you ever informed of the results?

20  A   I really didn't ask.

21  Q   And no one ever informed you?

22  A   Not that I can recall.

23  Q   Were you ever informed of the results of the

24  sheriff's department investigation of your

25  conduct?

```
1    A    What was that again?

2    Q    Were you ever informed of the results of the

3    sheriff's department investigation of your

4    conduct?

5    A    No, I didn't ask for it.

6    Q    And no one ever told you.

7    A    No.

8    Q    Were you ever informed of the results of the

9    OPS investigation of your conduct?

10                    MR. RUSSELL:    Objection.

11                    Go ahead.

12   A    No.

13   Q    Are you still being represented by counsel

14   with respect to an OPS or police review board

15   determination about your conduct on the day in

16   question?

17   A    What was that again?

18   Q    Are you still being represented by counsel

19   with respect to an OPS or police review board

20   decision about your conduct on the day in

21   question?

22   A    I haven't talked to anybody about that yet.

23   Q    Anybody at all?

24   A    The union hasn't contacted me so I'm just --

25   it's on their behalf to contact me.
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                        - - - - -
 2              (Plaintiff's Exhibit 2 was
 3               marked for identification.)
 4                        - - - - -
 5   BY MS. BONHAM:
 6   Q    I'm handing you what I'm marking as
 7   Plaintiff's Exhibit 2.  This is a two-page
 8   exhibit.  Do you recognize it?
 9   A    That's a Glock 19.
10   Q    Is that the --
11              MR. CABRAL:    You said 19?
12              THE WITNESS:    That's a 19.
13         Yeah.  That's the weapon that I
14         had.
15   Q    That's the weapon that you had that you shot
16   Desmond Franklin with.
17   A    Yes.
18                        - - - - -
19              (Plaintiff's Exhibit 3 was
20               marked for identification.)
21                        - - - - -
22   BY MS. BONHAM:
23   Q    I'm going to hand what you I'm marking as
24   Plaintiff's 3.  That's a two-page exhibit.  Do
25   you recognize that?
```

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   A    Yes.
 2   Q    What's that?
 3   A    The gun.
 4   Q    I'm sorry?
 5   A    The gun.
 6   Q    Whose gun?
 7   A    Desmond Franklin.
 8   Q    Before the day of the shooting, had you ever
 9   seen a gun like that before?
10   A    No.
11   Q    You had never seen a gun resembling that
12   before?
13   A    What do you mean?
14   Q    Had you ever seen this model gun before?
15   A    I don't know what model is that gun.
16   Q    You can't recognize as you sit here today
17   what model the gun is?
18   A    No.
19   Q    It's not a machine gun, right?
20   A    It's a handgun.
21   Q    It's a handgun.  Do you remember what color
22   it was?
23   A    I can't recall.
24   Q    When you look at this exhibit, is this the
25   gun that you remember seeing on that day?
```

1  A   When I saw it the first time, I just saw the

2  barrel.  And when I secondly saw it, when I

3  confirmed that the gun was still in the car,

4  that's -- I just saw the top part.

5  Q   And when you say that you saw the barrel --

6  you were describing that to us earlier -- can you

7  take that blue pen and mark on the exhibit

8  exactly what part you saw?  Can you put a little

9  A by that circle that you made?

10    And when you saw the gun later in the car, on

11  the floor of the car, can you circle what part of

12  the gun you saw?  And can you put a little B?

13  Thank you.

14    Was anything obscuring that -- the rest of

15  the gun when you saw it on the car floor?

16  A   Excuse me?

17  Q   Was anything obscuring the rest of the gun

18  when you saw it on the car floor?

19  A   What do you mean?

20  Q   I mean is there a reason you could only see

21  that part?  Was anything covering the rest of it?

22  A   It was on -- like by his feet.

23  Q   Okay.  Were his feet on the floor in the foot

24  well?

25  A   On the floor of the car.

1    Q    Were both his feet there?

2    A    Yes.

3    Q    Were they planted so the bottom of the foot

4    was sitting flush on the floor of the car?

5    A    I can't recall.

6    Q    And from your viewpoint, his feet were kind

7    of hiding part of the gun so you could only see

8    that where you circled B?

9    A    Yes.

10   Q    Do you remember how the gun was laying on the

11   floor when you saw it?

12   A    No.

13                      - - - - -

14              (Plaintiff's Exhibit 4 was

15              marked for identification.)

16                      - - - - -

17   BY MS. BONHAM:

18   Q    I'm handing you what I'm marking as

19   Plaintiff's 4.  This is a screen capture that I

20   took from a bodycam video that was produced by

21   the City of Cleveland.

22       Is that you in the foreground of the photo?

23   A    Yes.  That's me.

24   Q    Does that accurately depict what you were

25   wearing on the day of the shooting?

1    A    Yes.

2    Q    It looks like you're walking away from

3    Officer Lopez handcuffing Devin Badley in this

4    photo; is that right?

5    A    Correct.

6    Q    At this point when you're first -- does this

7    depict when you're first walking away from Devin

8    when other officers first arrive at the scene?

9    A    Yes.  When everybody arrived, that's when I

10   left.

11   Q    Because after that you didn't go back near

12   Devin, right?

13   A    Correct.

14   Q    So does this photo depict your gun in your

15   holster before you were issued a different gun?

16   A    No.  This is the same weapon that I -- was

17   used.

18   Q    Okay.  This is the same -- this photo depicts

19   the same gun that you had shot Desmond with.

20   A    Correct.

21   Q    And it's in the same holster that you

22   described to us earlier.

23   A    Correct.

24               MS. BONHAM:    Okay.  I need

25          a two-minute break, and I think

Case: 1:22-cv-00061-DAP  Doc #: 44-4  Filed:  01/31/24  214 of 239.  PageID #: 581

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1              we're going to be done in just a

2              second.  I just need to check on

3              something.  Let me go off the

4              record.

5                      (Recess had.)

6    BY MS. BONHAM:

7    Q    After the shooting involving Desmond

8    Franklin, besides the investigative interviews

9    that we've discussed, did you talk to any other

10   police officers or officers of the county

11   sheriff's department about the shooting?

12   A    Just the investigator unit.

13   Q    Did you talk to any officers for the purpose

14   of putting together an affidavit to execute a

15   search warrant of Desmond Franklin's car after

16   the shooting?

17   A    No.

18   Q    Did anyone ever ask you about the shooting

19   for the purpose of putting together an affidavit

20   in support of a search warrant?

21   A    No.

22   Q    And you never made any written statement or

23   written record describing the details of the

24   shooting, right?

25   A    No.

1    Q   Did you tell the county investigators that

2    Desmond shot at you?

3    A   I can't recall if I told them that.

4    Q   You told the 911 dispatcher that, right?

5    A   I believe so.

6                MR. CABRAL:    Objection.

7    Q   Did you tell the internal affairs officers

8    that Desmond shot at you?

9    A   As far as my knowledge, I can't recall right

10   now.

11   Q   After the shooting did you retain possession

12   of your own car?

13   A   No, they -- they took it on scene.

14   Q   They took it on scene.  How did you leave the

15   scene?

16   A   Might have one of the union members drove me

17   to my house.  I believe so.

18   Q   Did the county take your car?

19   A   I don't know.  I can't recall.

20   Q   How long was it before you got your car back?

21   A   I would say a couple of days later, something

22   like that.

23   Q   Did you consent to a search of your car?

24   A   Yes.

25   Q   Who asked you to do that?

1   A    I believe one of the investigators.

2   **Q    From the county?**

3   A    I can't recall who exactly it was, but they

4   asked me on scene.

5   **Q    And you got your car back a couple of days**

6   **later?**

7   A    Yes.

8   **Q    Did you go and pick it up or did someone**

9   **bring it to you?**

10  A    I believe I picked it up.

11  **Q    Do you remember where you picked it up at?**

12  A    Lot 2.

13  **Q    Had anything been changed about your car at**

14  **that time that you could see?**

15  A    No.

16  **Q    Were you ever told that anything about your**

17  **car was changed at that time when you picked it**

18  **up?**

19  A    No.

20  **Q    At some time after that did you get rid of**

21  **that car?**

22  A    Yes, I did.

23  **Q    When was that?**

24  A    Probably like a week later.

25  **Q    Why -- why did you get rid of it?**

1  A   Because just the trauma -- I was traumatized.

2  I just didn't -- every time I see that car, it

3  just brings so much memory.

4  Q   **What did you do with it?**

5  A   I traded it in.

6  Q   **Where?**

7  A   At a dealership.

8  Q   **What dealership?**

9  A   It's located on Denison.

10  Q   **Do you know what it's called?**

11  A   Sam's Motorsport, I believe.

12  Q   **That was within just a little over a week of**

13  **the shooting; is that right?**

14  A   Yes.  I believe so.

15  Q   **Did you tell anybody that you got rid of it?**

16  A   No.

17  Q   **Nobody at the county or the city or the**

18  **state?**

19  A   No.

20  Q   **Did anybody tell you not to get rid of it**

21  **before you got rid of it?**

22  A   No.

23  Q   **Did anybody later ask where it was or want to**

24  **see it again from the county, the city, or the**

25  **state?**

```
1   A    No.

2   Q    Is English your first language?

3   A    No.

4   Q    What's your first language?

5   A    Spanish.

6   Q    When did you first learn English?

7   A    Over the years.

8   Q    When did you first start learning English?

9   A    I came in 2002.  I was back and forth,

10  traveling back and forth, back home.  Then I

11  just -- I remained here.  I progressed through

12  the years.  I don't have a specific year.  I just

13  progressed through the years.

14  Q    Was English ever spoken in your house when

15  you were a little kid?

16  A    No.

17  Q    Was English ever spoken in your community

18  when you were a little kid?

19  A    What do you mean by "community"?

20  Q    Did you ever hear English spoken at school or

21  in your neighborhood?

22  A    School, yes.

23  Q    So there was English at school when you were

24  a little kid?

25  A    Yes.
```

1   Q    Even in the DR or just when you got to

2   Scranton?

3   A    No.  Scranton.

4   Q    Scranton only.

5   A    Yes.

6   Q    And you got there when you were 9?

7   A    10 years old.

8   Q    Oh, 10 you got to Scranton?

9   A    Yes.

10  Q    Was Scranton only English speaking at that

11  time?

12  A    No.  It's bilingual.

13  Q    The whole school is bilingual?

14  A    I had -- there's a section where there's

15  bilingual teachers and they have bilingual

16  groups.

17  Q    Did your -- did you take your lessons in both

18  English and Spanish at Scranton?

19  A    Yes.

20  Q    Did you take classes that were only English

21  at Scranton?

22  A    Pretty much we just have a few teachers and

23  they were bilingual.

24  Q    So none of your classes were both in English

25  and Spanish or some of them were?

Deposition of Officer Jose Garcia                          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1    A    They're both -- they gave them in both
2    language.
3    Q    And Lincoln West is totally English speaking
4    or is it also bilingual?
5    A    Bilingual.  International.
6    Q    Lincoln West High School was bilingual when
7    you went there?
8    A    Yes.
9    Q    Every class?
10   A    Not every class, but we had some like --
11   there was teachers that only spoke English and
12   there was instructors that were there to assist
13   with the students that didn't speak the language.
14   Q    So at Lincoln West High School the courses
15   were taught in English, right?
16   A    Yes.
17   Q    And you graduated from there, right?
18   A    Correct.
19   Q    And we're speaking English during this
20   deposition, right?
21   A    Correct.
22   Q    And like we said at the beginning, you would
23   have asked me if you had a problem understanding
24   anything I was saying, right?
25   A    Correct.
```

Deposition of Officer Jose Garcia                 Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    Q    At the time you started the police academy,

2    were you a fluent English speaker?

3    A    Yes.

4                    MS. BONHAM:    That's all I

5          have.   Thank you.

6                    MR. RUSSELL:    He's going to

7          review the transcript.

8                    - - - - -

9          (Deposition concluded at 4:12 p.m.)

10              (Signature not waived.)

11                   - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE
 2            I, Rebecca L. Fumich, Notary Public
 3     within and for the State of Ohio, do hereby
 4     certify that the within named witness, OFFICER
 5     JOSE GARCIA, was first duly sworn to testify to
 6     the truth and nothing but the truth in the cause
 7     aforesaid; that the testimony was by me reduced
 8     to stenotype in the presence of said witness;
 9     afterwards transcribed, and that the foregoing is
10     a true and correct transcription of the testimony
11     so given by the above referenced witness.  I
12     further certify that this deposition was taken at
13     the time and place in the foregoing caption
14     specified.  I do further certify that I am not a
15     relative, counsel or attorney for either party,
16     or otherwised interested in the event of this
17     action.
18            IN WITNESS WHEREOF, I have hereunto set my
19     hand and affixed by seal of office at Cleveland,
20     Ohio this 13th day of March, 2023.
21
22     Rebecca L. Fumich
23     Rebecca L. Fumich, Notary Public,
24     within and for the State of Ohio.
25     My Commission expires:  6-5-2025.
```

Case: 1:22-cv-00061-DAP   Doc #: 44-4   Filed: 01/31/24   223 of 239.   PageID #: 590

Deposition of Officer Jose Garcia                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**WORD INDEX**

**< 0 >**
**06**  53:5

**< 1 >**
**1**  4:3  70:1, 6
**1:22-CV-00061**  1:9
**1:35**  54:17
**10**  4:3  19:13  31:5  54:9
  218:7, 8
**106**  2:12
**107**  4:25
**108**  5:1
**109**  5:2, 3, 4
**10-hour**  39:2
**11**  20:10
**110**  5:5
**111**  5:6, 7, 8
**112**  5:9
**114**  5:10, 11
**116**  5:12, 13
**117th**  21:5
**12:17**  1:22
**121**  5:14
**1215**  1:20  3:3
**122**  5:15
**123**  5:16
**126**  5:17
**127**  5:18
**128**  5:19, 20
**130**  5:21
**131**  5:22, 23
**132**  5:24
**133**  5:25
**134**  6:1
**13th**  221:20
**14**  18:15  24:17, 19, 21
**140**  6:2
**141**  6:3
**143**  6:4
**146**  6:5, 6
**147**  6:7
**148**  6:8
**149**  6:9
**15**  21:1, 13  24:20  54:9
**155**  6:10, 11
**156**  6:12, 13, 14, 15
**158**  6:16, 17
**1621**  3:10
**17**  21:1, 13  67:5, 13
**174**  6:18
**175**  6:19
**184**  6:20
**187**  6:21
**19**  48:9  67:13, 18  208:9,
  11, 12
**1900**  2:7

**< 2 >**

**2**  4:3  38:18  208:2, 7
  215:12
**2:00**  39:13  54:4, 8
**20**  156:25  157:14
**2002**  217:9
**201**  6:22, 23
**2014**  24:3
**2015**  18:15  21:11  24:5,
  15
**2016**  39:25
**2017**  21:11
**2019**  48:9
**202**  6:24
**2020**  41:7
**2023**  1:22  221:20
**203**  6:25  7:1, 2, 3, 4
**204**  7:5
**205**  7:6, 7, 8, 9
**206**  7:10, 11, 12
**207**  7:13
**208**  4:3
**211**  4:3
**214**  7:14
**216-241-1430**  2:9
**216-241-5310**  3:5
**216-664-2767**  2:12
**216-722-3112**  3:12
**2168**  38:2, 8
**22**  1:22
**22nd**  49:19  53:18  72:16,
  17
**24**  38:18
**24/7**  175:16
**25**  155:11
**25th**  50:16, 17, 18  68:23
**2A24**  50:7
**2nd**  30:4, 8, 13, 14  31:6,
  23  32:7, 19  33:8, 9  34:22
  37:16  39:17, 20, 25  41:19,
  20  49:23  50:5, 14  53:7
  83:11

**< 3 >**
**3**  4:3  208:19, 24
**3:00**  123:24  124:6, 10
  125:1
**30**  155:11  178:9
**300**  3:10
**348**  49:24
**3481**  49:24

**< 4 >**
**4**  4:3  211:14, 19
**4:12**  220:9
**44113**  2:8  3:11
**44114**  1:21  2:12  3:4
**45**  30:24  31:1
**46**  4:12
**47**  4:13

**48**  30:24  31:1
**4th**  31:5

**< 5 >**
**50**  2:7
**5th**  29:8, 10, 14, 21  30:6
  31:1, 6, 8  32:3  33:7

**< 6 >**
**601**  2:12
**62nd**  43:18
**6-5-2025**  221:25

**< 7 >**
**70**  4:3
**777**  37:25
**7th**  1:21  3:3

**< 8 >**
**80**  4:14
**81**  4:15
**83**  4:16
**85**  4:17, 18

**< 9 >**
**9**  19:12  218:6
**90**  4:19, 20, 21, 22, 23
**911**  140:17  141:20  152:8,
  10, 16  159:15, 22  214:4
**98**  4:24

**< A >**
**able**  21:24  66:25  79:1
  116:11  121:12  159:10
  165:4  187:7, 11, 12
  189:16  202:24
**academy**  18:17  22:14
  23:6, 21  24:13, 16, 25
  25:9, 10, 16, 20  27:8  30:9,
  21, 22  34:18  36:18  39:18
  42:13, 20  43:12  44:2, 9
  220:1
**accelerate**  154:25  155:2,
  5  158:13
**accelerating**  103:19
  135:22
**accident**  34:7
**Accord**  50:23
**accurately**  13:2  211:24
**acting**  175:13, 19
**action**  221:17
**activity**  82:8  175:12
**actual**  111:10  183:19
**ADAM**  1:4  9:6  22:20
  38:18
**additional**  28:18, 24
  139:5, 10, 12  178:3
**address**  49:14
**addressed**  172:14

**Administrator**  1:6
**advance**  197:6
**affair**  180:6  181:16, 24
  182:8, 13, 23  183:13
  193:20, 23
**affairs**  180:8  182:19, 21
  184:20  192:23  193:22
  194:9, 12, 18, 20, 25  195:2,
  6, 9  196:12  198:14
  206:15  214:7
**AFFAN**  2:12  13:25
**affidavit**  213:14, 19
**affixed**  221:19
**aforesaid**  221:7
**afternoon**  8:17  13:3
**afterward**  47:14  93:13
  180:18
**agencies**  196:17
**agency**  43:20  196:1
**ages**  21:13
**aggressive**  101:23
**ago**  48:16  184:1
**agree**  86:19  128:23
  129:1
**agreeing**  119:20
**agreement**  9:1
**ahead**  12:20  46:24  47:7
  80:4  81:15  83:18  85:10
  86:1  90:12  109:14  117:1
  121:10  126:25  127:18
  128:17  130:17  131:12
  134:23  141:3, 21  143:21
  147:24  149:17  151:19
  155:7, 20  184:24  202:4
  206:17  207:11
**aiming**  204:25
**air**  65:1  77:5  110:25
  132:21  134:12
**air/heat**  111:1
**alarm**  83:2, 4
**alert**  112:23
**ALI**  2:12  13:23, 24, 25
**allowance**  62:21  63:4, 5,
  11
**allowed**  190:8, 22
**ambulance**  176:14
**amount**  190:1
**and/or**  8:19
**angle**  86:5, 8  97:2
**angled**  125:19
**Ankuda**  3:9
**annual**  42:21, 23  43:13,
  22  44:13
**annually**  43:25  44:4
**answer**  11:22, 25  12:11,
  22  35:18  72:12  74:11
  89:4  90:22  107:22  108:8
  109:4, 14  110:14  111:14
  123:1, 20  127:19  128:7

Case: 1:22-cv-00061-DAP  Doc #: 44-4  Filed:  01/31/24  224 of 239.  PageID #: 591
Deposition of Officer Jose Garcia
Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

130:7, *10*  132:23  133:*14*
158:5  187:*3*
**answered**  46:*23*  47:6
80:*3*  81:*14*  85:9  107:*21*
109:*3*  114:2, *21*  116:25
157:*17, 19*
**answering**  76:*15*  134:24
**answers**  157:4, *20*
**anybody**  17:*4*  18:6  22:*1*
26:*16*  34:*1*  45:*3, 15*  46:*3*
48:5  54:*19*  55:5, *13*
113:5  145:*1*  173:*13*
174:6  178:20, *23*  179:*1,
23*  180:*11, 14, 19*  182:*7,
18*  198:*17*  207:22, *23*
216:*15, 20, 23*
**anymore**  47:*3, 16, 18*
101:*1*  150:*24*
**Anyways**  119:*20*
**APPEARANCES**  2:*1*
**application**  23:*20*
**applied**  22:2  23:*19*
**apply**  200:*7, 11*
**approach**  168:*23*  169:*21,
22*
**approached**  105:7  170:*24*
172:8, *9*  173:*20*  175:25
176:*23*
**approaching**  53:*20*  73:24
101:*16*  102:6  103:8
168:*19*
**appropriate**  200:2
**approximately**  30:*23*
**area**  57:*16*  87:*17*  137:7
172:2, *18*
**arm**  107:*15*  111:*24*
112:2  121:*19, 22*  122:5,
22  123:*6, 12, 16*  141:5
**armed**  94:*11, 14, 17, 18*
**arresting**  87:*21*
**arrive**  212:8
**arrived**  175:*17*  178:*13*
179:*1*  180:*14*  182:*19*
212:9
**articulated**  133:2
**asked**  39:*4*  46:22  47:5
80:2  81:*13*  85:8  107:*20*
109:2  114:*1, 20*  116:*21,
25*  152:*4*  156:24  157:*17,
18*  172:*15*  176:*16, 18*
198:*17*  214:25  215:*4*
219:23
**asking**  95:*1*  117:*10, 23*
118:*4*  128:7, *21*  130:6
154:*8*  157:5, *14*  185:*11*
**assigned**  34:*24*  35:*21*
36:*1, 3, 4, 13, 19, 21, 23*
37:7  39:*9*  40:2  41:*3*
50:7  189:*25*
**assignment**  36:*11*

**assist**  35:*18*  170:*12*
219:*12*
**assume**  12:*1*  203:*16*
**ate**  53:*15*
**attend**  20:20  48:*1*
**attended**  47:*1*
**attention**  15:20  111:22
130:6  177:*1, 6*
**attorney**  9:6  17:5  221:*15*
**attorneys**  16:9
**available**  67:*1*  158:*14*
202:*20*
**Avenue**  1:*21*  2:*12*  3:*3,
10*  4:3  69:9  72:*14*
**aware**  153:*4*  161:*15*
169:*4*  176:5  198:*21*
**awesome**  69:*16*

**< B >**
**baby**  48:*14*
**back**  24:5  25:*19, 22*  27:2
37:*4*  53:24  60:*16*  65:8
72:22  73:*12*  74:*3, 5, 10,
12*  82:*4*  84:*21*  85:*17, 18*
88:2  91:7  93:*4, 7, 10, 11,
17, 21*  95:20  99:5, *16, 19*
101:6  143:*17*  160:*17, 18*
163:22  164:*21*  166:*2, 20*
168:*4*  187:25  188:*21*
204:*12, 13*  212:*11*  214:20
215:5  217:9, *10*
**background**  18:*17*
**backstop**  204:*12*
**back-up**  179:*17*
**bad**  69:*1*
**badge**  37:*25*  38:*1, 3, 8*
40:*24, 25*  41:*1*  57:6, *7, 8,
10, 13, 21*  58:2, *11*  61:2, *5*
75:*10*
**Badley**  73:*18*  78:*24*
80:*14, 19*  86:22  87:9, *11*
92:*12*  143:*18*  162:*16*
168:*17, 19*  170:22  171:5
178:*18*  180:*12, 15*  184:*5,
14*  212:*3*
**Badley's**  89:*11*
**bag**  56:25  59:*3*
**bar**  47:*14, 21*
**barely**  170:2
**barrel**  104:*20*  105:23
106:*23*  107:6, *10, 12, 16,
23*  108:*1, 22*  109:5, *10*
110:*1, 16*  111:6, *10, 19*
112:*2, 4, 6, 10*  113:*1, 14,
16, 24, 25*  114:*3, 11, 16, 17*
116:*4, 15, 18, 22*  117:*4, 8,
10, 13, 15, 18*  118:*1, 8*
121:*3*  122:*17*  123:*3, 7*
125:*3, 9, 12*  133:9  134:*1*
137:*15, 20*  140:*10, 11*

**145**:*16, 21, 24, 25*  146:*1, 9*
149:*18, 20, 24*  150:2, *4, 10,
13, 17*  151:*12*  153:23
210:2, *5*
**based**  146:7, *9*  153:*13*
**basically**  88:*1*
**basis**  43:22
**bed**  84:*10*
**beers**  47:*15*
**began**  160:*11*
**beginning**  169:*21*  219:22
**behalf**  2:2, *12*  207:25
**believe**  15:*16*  32:*17*  53:5
54:*17*  62:3  66:*18*  81:*1*
82:7  114:*11*  142:*18, 23*
146:*19, 23*  147:*17, 25*
148:9, 22  149:*12*  152:2,
*19, 23, 25*  163:7  185:*14*
189:20  193:*23*  194:*15*
195:*19*  214:5, *17*  215:*1,
10*  216:*11, 14*
**believed**  108:24  147:*3*
148:2  149:*1*  153:*13*
160:*12, 13*  163:8
**belt**  27:23  57:*16, 22*
62:*11, 14*
**bent**  122:8, *9*
**best**  131:*13*
**beyond**  77:22, *23*
**big**  112:*11*
**bigger**  67:*15, 19, 21*  71:*14*
**bilingual**  218:*12, 13, 15,
23*  219:*4, 5, 6*
**bit**  48:*19*  54:2  56:9
72:23  96:5  133:*4*
**bleeding**  148:*13*
**blood**  165:*18*  176:*12*
177:*4*
**blue**  210:7
**board**  207:*14, 19*
**body**  132:5  133:6
136:*23, 24*  137:5, *10*
140:*20, 25*  141:9  177:24
**bodycam**  211:*20*
**BONHAM**  2:3  4:3  8:8,
*14, 15*  9:12, *15, 19, 22*
10:2, *7*  16:18  26:24  27:2,
*4*  48:*17, 25*  55:23  59:*15,
21, 25*  60:5, *11, 16, 18*
69:*4, 8, 15, 19, 22*  70:*4, 10*
71:9  72:21  91:*13, 23*
92:5, *9*  102:*17, 21*  109:21
115:*11, 16*  119:*20, 21, 22*
120:2  124:2, *9, 17, 24*
125:2  129:2, *9, 13, 20, 25*
130:*1*  132:*1, 18*  133:*19,
23*  157:*1, 7, 16, 25*  158:*4*
179:8, *11*  193:5  208:5, *22*
211:*17*  212:24  213:6
220:*4*

**BOOP**  2:*12*  4:*12, 13, 14,
15, 16, 17, 18, 20, 21, 23, 24,
25*  5:*1, 2, 3, 4, 5, 6, 7, 8, 9,
10, 11, 12, 13, 14, 15, 16, 17,
18, 19, 20, 21, 22, 23, 24, 25*
8:6, *10, 23*  9:*11, 14, 18, 21*
13:20, 25  16:*16, 19*  38:*11*
46:22  47:5  58:20  59:*18,
23*  60:2, *7, 14*  69:7  70:8,
*14, 18, 22*  71:2, *4, 8, 24*
80:2  81:*13*  82:21  83:*16,
18*  85:8, *24*  89:*1*  90:2, *10,
20*  91:*19*  92:2, *7*  98:*3*
105:*1*  107:20  108:6
109:*2, 13, 19*  110:*13*
111:*12, 21, 25*  112:*18*
114:*1, 20*  116:6, *24*
119:*12, 18, 24*  121:8, *13*
122:25  123:*17, 23*  124:*3,
7, 13, 22*  126:24  127:*19*
128:*3, 14, 22, 25*  129:*4, 11,
16, 23*  130:*16*  131:*10, 13,
24*  132:22  133:*12, 14, 17,
21*
**bore**  58:*15*
**born**  19:2, *4, 5, 7, 10*
**boss**  39:*5, 6, 7*
**bosses**  179:25
**bottom**  59:*19*  211:*3*
**bought**  62:*4, 5*
**box**  53:20, *22*  74:*1*  78:*15,
18, 21*  79:*4, 5, 21*  80:*9, 18,
23*  81:*3, 20*  83:24  84:*21*
93:*4, 18*
**boxes**  81:*21, 24*  82:*13, 15*
83:23  84:*7, 9, 16, 20*
85:*14*  93:5, *17*  143:*23*
**brake**  52:*11, 17*
**break**  12:*4, 5, 7, 12*  26:25
124:5, *10*  144:2, *5, 7, 20*
179:*9*  212:25
**breakfast**  53:*15*  55:2
**breaking**  124:*23*
**bring**  16:*3, 6*  60:*23*
215:9
**brings**  216:*3*
**broken**  53:2
**Brooklyn**  49:*16, 17*  90:25
**building**  34:22
**buildings**  26:2
**bullet**  145:2, *5, 22, 24*
146:*19, 24*  148:*6, 23*
149:*1, 2, 3, 9*  151:*23*
152:22  174:*18*  204:*15*
**bullets**  142:*10*
**busy**  154:*13, 18*
**button**  51:*13*  61:22  65:8,
*18*  66:2, *8, 13*  92:*16*
118:*14, 17*  131:5
**buy**  61:*24*  62:22

Case: 1:22-cv-00061-DAP Doc #: 44-4 Filed: 01/31/24 225 of 239. PageID #: 592
Deposition of Officer Jose Garcia
Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

bystander 204:*19* 205:*9, 17*

< C >
**CABRAL** 3:*1* 4:*19, 22* 6:*16, 21, 23* 7:*1, 4, 5, 6, 7, 14* 9:*9* 13:*6, 20* 48:*23* 55:*21* 64:*16* 69:*12, 17* 70:*16, 20, 24* 71:*3, 6* 77:*21* 90:*1, 19* 91:*25* 102:*14* 111:*2* 115:*7, 13* 117:*22* 118:*3* 120:*1* 121:*11* 123:*19* 124:*5, 8, 12, 15, 20* 131:*20* 132:*14* 154:*7* 158:*15* 159:*8* 185:*9* 187:*2* 193:*2* 199:*5* 201:*24* 203:*2, 7, 15, 23* 204:*20* 205:*1, 10* 208:*11* 214:*6*
**calculate** 132:*11*
**call** 17:*23* 34:*12* 46:*17* 55:*10* 88:*18, 22, 23* 89:*9* 92:*4* 102:*18* 125:*21* 126:*8* 127:*4, 7* 152:*16* 159:*14* 166:*17, 20* 170:*11, 13* 176:*14, 18, 19, 21* 179:*21, 23* 191:*19* 192:*5*
**called** 1:*15* 20:*2* 34:*23* 35:*5* 118:*13* 141:*20* 152:*8, 16* 179:*25* 180:*3, 5* 216:*10*
**calling** 80:*14*
**calls** 36:*9* 109:*19* 111:*12* 112:*18* 116:*6*
**candidates** 24:*2*
**capability** 28:*1*
**capable** 123:*25* 190:*23*
**caption** 221:*13*
**capture** 4:*3* 211:*19*
**car** 15:*11, 18* 34:*24* 35:*3* 36:*1, 7, 16, 19* 37:*8, 10, 13, 14* 38:*17, 23* 39:*6, 9* 40:*3, 13* 41:*3* 50:*7, 21* 51:*7, 15, 23* 52:*1, 6, 23* 53:*4, 6, 13, 22, 25* 56:*13, 14* 59:*3* 74:*2, 6* 75:*2, 3* 76:*24* 77:*10, 12, 15, 23* 78:*25* 79:*3, 6, 9, 15, 23* 80:*10, 18, 20* 81:*18* 84:*3* 85:*11, 14, 20* 86:*5, 9, 11, 20, 23* 93:*8, 11, 14* 95:*10, 16* 96:*2, 18, 24* 97:*13* 98:*2, 13, 17* 100:*6, 7, 10, 16, 17, 20, 22* 101:*25* 102:*5, 9, 16, 23, 24* 103:*17* 104:*1, 11* 105:*12, 19* 106:*12, 17, 19* 107:*12* 108:*13, 21, 25* 109:*1, 11* 110:*4, 5, 10, 22, 25* 111:*8* 114:*18* 115:*1, 3, 18, 20, 22* 117:*4, 8* 118:*8* 120:*15, 24*

125:*8* 134:*2, 20* 135:*1, 8, 20, 22* 137:*12, 19, 23* 138:*25* 139:*3, 21, 25* 140:*13, 16, 21* 141:*6, 10, 12, 14, 15, 16, 19, 22, 24* 142:*2, 5, 19, 23, 24, 25* 143:*4, 5, 7, 19, 25* 144:*1, 4, 20, 22, 24* 145:*1* 148:*10, 11* 150:*6, 19, 22* 151:*14, 16, 17, 20, 21, 25* 152:*9, 13* 155:*9* 156:*9, 10* 158:*17* 159:*6, 14, 17, 21* 160:*2, 4, 17, 21, 22* 161:*1, 11, 16, 23* 162:*10, 11, 13, 16, 22* 163:*12, 18, 23, 24* 164:*4, 10, 21* 166:*3, 7, 8, 25* 168:*3, 4, 10, 16, 20* 169:*5, 17, 21, 22* 170:*1, 3, 24* 171:*6, 11, 15* 172:*3, 19, 20* 173:*7* 174:*9, 14, 18, 19* 175:*2, 4, 18* 176:*1, 23* 177:*20* 179:*12* 180:*20, 22* 181:*1* 184:*5, 11* 200:*17, 22* 201:*1* 210:*3, 10, 11, 15, 18, 25* 211:*4* 213:*15* 214:*12, 18, 20, 23* 215:*5, 13, 17, 21* 216:*2*
**care** 176:*20*
**careful** 185:*10* 204:*9*
**carried** 62:*16*
**carry** 57:*7, 8* 61:*8, 9, 10* 62:*10, 11, 13* 187:*18, 21*
**carrying** 62:*5*
**cars** 15:*15* 36:*15* 37:*10* 51:*19* 75:*20, 25* 76:*3* 125:*4*
**car's** 110:*6* 167:*13*
**Case** 1:*8* 9:*5* 16:*22* 17:*1* 28:*1* 29:*23* 48:*18* 49:*2, 10* 71:*10* 197:*21*
**casual** 45:*24* 46:*11*
**casually** 46:*16*
**catch** 101:*17, 20*
**cause** 202:*6, 8* 205:*16* 221:*6*
**caused** 149:*12*
**caveat** 12:*10*
**cell** 167:*23*
**cemetery** 143:*5* 156:*12* 159:*19* 160:*21* 163:*24* 166:*3, 7, 9, 15* 167:*1, 19* 178:*3* 181:*2*
**centers** 21:*1, 2*
**certain** 20:*3* 199:*15*
**CERTIFICATE** 221:*1*
**certification** 25:*19, 23* 199:*10*
**certifications** 19:*23*
**certified** 8:*3* 25:*1, 9, 10*

certify 221:*4, 12, 14*
**chairs** 124:*16*
**chance** 156:*5, 8* 158:*19* 205:*20*
**chances** 205:*21*
**change** 30:*12*
**changed** 30:*3* 215:*13, 17*
**check** 152:*5, 16* 213:*2*
**checked** 148:*20, 21* 151:*21* 152:*3* 159:*15*
**chest** 111:*18* 131:*17* 134:*5, 9* 137:*7, 12*
**chin** 137:*5* 172:*24*
**choice** 158:*12, 17*
**choices** 158:*14*
**choose** 38:*19* 67:*13* 90:*8*
**chose** 20:*6* 67:*19* 89:*25*
**Christmas** 15:*14*
**circle** 210:*9, 11*
**circled** 211:*8*
**circumstances** 201:*25* 202:*1, 10* 203:*8, 24* 205:*22*
**citizens** 26:*1*
**City** 2:*12* 20:*17, 25* 23:*25* 27:*9* 28:*6, 14* 30:*18* 56:*19* 58:*16* 62:*21, 22* 63:*12, 14* 83:*21* 191:*1* 198:*9* 199:*22* 202:*21* 211:*21* 216:*17, 24*
**city-issued** 125:*15*
**city's** 198:*4*
**Civil** 1:*17* 23:*24*
**clarification** 11:*22, 23*
**clarify** 119:*15, 21*
**class** 30:*20* 219:*9, 10*
**classes** 218:*20, 24*
**Claudio** 29:*24* 30:*5* 33:*7*
**clean** 10:*20* 11:*6* 21:*9* 130:*4*
**clear** 95:*15* 115:*14*
**clearly** 81:*22* 112:*1*
**Cleveland** 1:*21* 2:*8, 12* 3:*4, 11* 18:*11, 13, 25* 19:*14* 20:*17* 21:*3, 25* 23:*22* 25:*4, 17, 19, 23, 25* 26:*5, 14, 15, 22* 27:*7, 9, 13* 28:*6, 14, 20, 23, 24* 29:*18* 31:*18* 34:*10* 38:*4, 7* 43:*19, 21* 44:*6* 45:*3, 19* 46:*19* 58:*17* 183:*11, 13* 192:*22* 199:*23* 211:*21* 221:*19*
**click** 65:*3*
**clicked** 66:*12* 92:*15*
**clicking** 65:*5*
**clicks** 64:*17*
**client** 34:*7*
**clients** 35:*16*

clip 64:*24* 131:*4*
**clipped** 118:*12, 16*
**clips** 64:*19*
**close** 42:*6* 111:*6, 10, 18* 165:*23* 190:*5*
**closed** 76:*12, 15* 83:*5* 144:*24* 173:*23*
**clothes** 58:*15*
**clutch** 52:*10, 13, 14, 16* 103:*18* 104:*6* 135:*15, 17*
**cold** 77:*9*
**colleague** 45:*16, 21*
**colleagues** 8:*18* 17:*11* 45:*7* 47:*2, 24* 48:*20*
**college** 20:*7, 20*
**color** 50:*24* 71:*14* 112:*8, 9* 209:*21*
**Columbus** 24:*18*
**come** 34:*10* 35:*16* 36:*25* 37:*6* 71:*16* 72:*22* 93:*7, 10* 166:*9*
**comes** 35:*16*
**coming** 49:*21* 71:*23* 76:*3* 78:*20* 80:*7* 95:*16* 100:*11* 105:*13* 107:*17* 108:*13, 14* 120:*15, 23* 137:*25* 145:*24*
**commands** 177:*16*
**commencing** 1:*22*
**commission** 162:*19* 221:*25*
**committing** 127:*9, 13* 128:*1, 12* 130:*15, 25* 162:*23* 203:*11, 19*
**communicate** 165:*4* 170:*11*
**communicated** 140:*18*
**community** 21:*23, 25* 42:*14* 91:*1* 217:*17, 19*
**complete** 74:*25* 140:*16* 141:*12* 150:*7*
**completed** 25:*18, 20* 34:*2, 3* 36:*22*
**completely** 53:*1* 141:*18*
**computer** 63:*7* 73:*12*
**concern** 169:*17*
**concerned** 101:*4* 150:*5* 154:*5* 161:*24* 162:*3, 16* 163:*3* 168:*24*
**conclude** 145:*7, 11* 152:*17*
**concluded** 151:*22* 152:*21* 220:*9*
**conditioning** 77:*5*
**conduct** 81:*2, 8* 89:*12* 195:*11* 196:*2* 198:*11, 18, 22* 205:*25* 206:*6, 12, 15, 25* 207:*4, 9, 15, 20*
**conducted** 27:*11* 43:*15, 16*

Case: 1:22-cv-00061-DAP  Doc #: 44-4  Filed:  01/31/24  226 of 239.  PageID #: 593

Deposition of Officer Jose Garcia                                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**conducts**  43:2*0*
**conference**  59:*17*
**confirm**  60:*3*  91:*20*
**confirmed**  173:*14*  210:*3*
**confrontation**  101:2, *5*
**confronted**  202:*7*
**Congratulations**  47:*19*
**consent**  214:*23*
**consider**  83:*20*
**contact**  74:9  84:25  85:*3*,
  *4*  87:*10*  96:*16*, *23*  100:*11*
  103:*16*  143:*1*  187:*14*
  207:*25*
**contacted**  207:*24*
**contacts**  78:*7*, *10*
**context**  126:*16*
**continue**  88:*3*
**continued**  90:*14*
**control**  159:6  179:*14*
**Convenient**  73:5  74:2
  82:*17*  83:*4*, *14*  89:*12*
  91:*11*  97:*4*  100:*20*
  118:*24*, *25*  126:5  143:*17*
  161:*12*  163:*10*
**conversation**  11:9  46:*11*
**cooling**  77:8
**copier's**  69:*18*
**copies**  69:*6*, *13*  72:5
**copy**  70:*13*  72:*24*
**corner**  72:*19*  73:*1*, *22*
  74:*15*  92:*10*, *21*  99:*12*
**Correct**  33:*11*  54:6  84:*1*
  87:*19*  97:*19*  98:8, *11*, *22*,
  *25*  99:*2*, *18*  103:*23*, *25*
  104:*24*  106:*13*  110:*3*, *9*,
  *15*  113:7  114:7  120:*6*, *9*,
  *10*, *12*  132:6  134:*11*, *15*
  136:*7*, *11*  137:*18*, *21*
  139:*11*, *15*, *19*  140:*4*
  143:*11*  144:*25*  145:*18*
  149:*18*, *23*  150:*1*  153:*15*,
  *17*, *25*  154:*24*  158:*10*, *25*
  159:*23*  160:6  161:9, *14*,
  *17*  162:2  163:*16*  164:2, *5*
  166:*4*, *19*, *23*, *24*  167:*21*,
  *24*  168:*13*, *15*, *18*, *22*
  171:*14*, *16*  172:*21*, *23*
  174:8  179:*20*  181:*22*
  182:*17*, *20*  183:*24*  185:*4*
  186:*1*, *18*  187:*10*, *22*
  192:*17*  193:*14*  195:*24*
  196:*15*  197:*10*, *13*  198:*7*
  199:*24*, *25*  200:*3*, *5*, *23*
  201:*20*  206:*9*, *10*  212:*5*,
  *13*, *20*, *23*  219:*18*, *21*, *25*
  221:*10*
  **counsel**  9:*20*  10:*11*
  14:*10*  16:*11*, *22*  17:*1*
  194:2  196:6  197:*14*

**207**:*13*, *18*  221:*15*
**counselors**  13:*12*
**county**  183:*12*, *15*, *19*
  184:*21*  185:*1*  195:*14*
  196:*13*  198:*14*  213:*10*
  214:*1*, *18*  215:2  216:*17*,
  *24*
**couple**  36:24  37:*11*
  47:*15*  48:*11*  116:8  178:9
  214:*21*  215:5
**course**  137:*10*  194:*24*
  196:*8*  197:*14*  200:*1*
**courses**  219:*14*
**COURT**  1:2  10:24  28:2
  62:9, *10*
**courteously**  69:*23*
**covered**  70:*17*
**covering**  210:*21*
**crank**  51:*13*
**crash**  34:6  159:*19*  166:*3*
  174:*24*  175:*18*
**crashed**  143:5  160:*18*
  172:*20*  176:*24*  179:*13*
  184:*12*
**crazy**  154:*20*
**crime**  37:*15*  42:*12*  83:*19*
  88:6, *8*, *16*, *19*, *21*, *23*, *24*,
  *25*  89:*14*, *18*, *21*  90:6
  91:2, *4*  94:*19*, *23*, *24*  95:*1*
  127:8, *12*, *13*  128:*1*, *13*
  130:*25*  162:*19*, *23*  163:*4*,
  *15*  203:*11*, *19*
**crimes**  83:*20*  130:*15*
**criminal**  175:*12*
**crisis**  43:*3*, *7*, *8*  44:*1*
**crossed**  166:*13*
**crossing**  160:*10*
**crowd**  204:*8*
**CSU**  42:*14*
**curb**  100:*4*  110:5  156:*11*
  159:*18*
**current**  41:*14*  192:*11*
**currently**  24:*11*  68:*4*
**curriculum**  26:*8*
**cut**  47:*16*  72:*16*

**< D >**
**dad**  17:*15*, *18*, *21*  18:*4*
  191:*19*, *20*
**Dalia**  39:*15*  46:*10*
**danger**  202:*24*  203:*4*, *5*
  205:*16*
**dash**  97:*15*  99:*6*, *17*
  138:*23*  139:*23*  141:*1*
  150:*18*  159:*24*
**date**  61:*18*  64:5  195:*11*
**Dave**  13:*21*, *22*
**DAVID**  3:*8*
**day**  24:*12*  26:*12*  35:*10*
  36:*3*, *4*, *5*, *6*  37:*3*, *6*  39:*11*

**49**:*1*, *7*  50:*1*  53:*11*, *15*
  54:*16*, *25*  55:*16*, *19*, *25*
  56:*17*  57:*10*  58:*3*, *10*
  60:*20*  61:*8*  62:*1*  68:*19*
  71:*23*  73:*10*, *16*, *19*, *23*
  75:2  77:*11*  78:*7*, *11*  88:*3*
  90:*14*  138:2  154:*13*, *15*
  168:8  183:*18*, *23*  184:*15*,
  *18*, *22*  185:*3*, *6*  186:*20*, *23*
  187:*1*  191:*7*, *25*  192:*16*,
  *25*  193:*15*  194:*8*, *24*
  195:*17*  198:*11*, *19*, *23*
  206:*1*, *6*, *12*  207:*15*, *20*
  209:*8*, *25*  211:*25*  221:*20*
**days**  14:2, *3*, *6*, *8*, *11*
  194:*1*, *21*  195:*19*, *20*
  214:*21*  215:5
**dead**  176:*10*
**deadly**  28:*15*, *19*  186:9,
  *11*  200:2  201:*21*, *22*
  202:*1*, *8*  203:*12*, *20*
**deal**  25:*25*  43:2, *5*  101:*1*
**dealership**  216:*7*, *8*
**death**  88:9
**debrief**  189:*13*
**December**  18:*15*  24:*15*,
  *17*, *19*
**decide**  87:*14*  89:*22*
**decided**  23:5
**decision**  207:*20*
**decompress**  190:*15*
**defend**  128:2, *11*  131:9
**Defendant**  1:*11*, *15*  2:*12*
**defended**  117:*14*  125:*16*
  127:*1*, *21*, *24*  128:*4*, *19*
  154:*4*  156:*19*
**delivered**  26:*16*
**demeanor**  165:22  177:*7*
**demonstrate**  121:6  131:*7*
**Demonstrating**  121:*17*
  122:*3*, *9*  123:*11*  131:*17*
  132:*3*, *13*  137:*3*
**demonstration**  121:9
  131:*11*, *25*
**Denison**  43:*18*  49:*19*
  53:*18*  71:*22*  72:*7*  216:9
**Department**  2:*12*  18:*11*,
  *14*  20:*18*, *23*  21:*17*  22:*2*
  27:*13*  38:*4*, *7*  43:*20*  45:*4*
  58:*16*, *18*  61:*15*  67:*12*
  68:*2*, *14*  183:*12*, *20*  191:*2*
  195:*18*  196:*14*  206:*24*
  207:*3*  213:*11*
**Depends**  54:*14*  57:*15*
  88:*20*  89:*5*  154:*19*
  201:*25*  202:*10*  203:*8*, *24*
  204:*7*  205:*22*
**depict**  211:*24*  212:*7*, *14*
**depicts**  212:*18*
**deposed**  10:*13*

**deposition**  1:*14*  9:*17*
  10:*15*  13:*10*  14:*17*  16:*12*,
  *17*, *23*  17:5, *14*  18:2, *7*
  219:*20*  220:9  221:*12*
**depressing**  136:2
**depression**  43:*4*
**describe**  15:7  61:*17*
  112:*4*  125:*17*  137:8
**described**  75:*3*, *6*  80:*22*
  88:*14*  91:6  92:*17*, *24*
  94:*3*, *6*  95:*19*  96:*7*, *12*
  105:*12*  145:*22*  146:*23*
  160:*5*, *25*  161:*5*, *7*  212:*22*
**describing**  100:*23*  210:*6*
  213:*23*
**DESMOND**  1:*7*  49:*2*
  53:*11*  73:9, *15*  78:*24*
  79:6  84:*25*  86:*15*, *16*
  87:*1*  91:*10*  94:*1*  96:*22*,
  *23*  100:*18*, *22*  121:*25*
  122:*14*  125:*22*, *24*  126:*10*,
  *21*  127:*25*  128:*12*  130:*13*
  133:*25*  134:*19*  135:*4*
  136:*13*  145:*1*  149:*21*
  153:*16*  158:8  162:*18*, *22*
  163:*21*  168:*20*  169:*10*
  170:*25*  172:*7*  173:*7*
  175:*23*  176:2  177:*23*
  183:*7*  188:*1*  192:*16*, *20*
  206:2  208:*16*  209:*7*
  212:*19*  213:*7*, *15*  214:2, *8*
**Desmond's**  104:*11*
  106:*16*  110:5  120:*15*
  137:*23*  141:*24*  148:*11*
  151:*21*  156:*10*  161:*11*
  168:*16*  170:*1*  172:*4*, *17*
  173:*6*, *22*  174:*1*, *9*  176:*23*
  179:*12*  184:9, *11*
**detail**  15:*7*, *20*  17:*17*
  85:*6*  116:*11*  125:*17*
**detailed**  176:*3*
**details**  63:22  116:*12*
  130:*4*  213:*23*
**Detective**  183:*25*
**detectives**  192:*24*
**determination**  207:*15*
**Devin**  73:*18*  78:*24*  80:*14*
  81:*19*  82:6, *12*  83:*22*
  84:*3*, *20*  86:*22*  87:9
  91:*10*  93:*4*, *16*  94:5
  99:*22*  143:*18*  162:*15*, *21*
  163:*12*, *18*  164:*3*, *13*
  165:*8*, *15*  166:*1*, *5*  168:*17*,
  *19*  169:*12*  170:*22*  171:*5*
  172:*3*, *7*, *14*, *24*  173:*19*, *22*,
  *25*  174:*6*, *23*  175:*8*, *23*
  176:*1*  177:*4*, *10*  178:*18*
  180:*11*, *15*, *25*  184:*5*, *14*
  212:*3*, *7*, *12*

**Devin's** 84:*16*
**dialed** 140:*17* 152:*10*
**died** 53:*11*
**difference** 67:*14*
**different** 14:6 28:*18*
31:*2, 4, 19* 32:*9, 10, 22*
36:*5, 6* 37:*9* 40:*4* 42:*11*
43:*20* 52:*23* 68:*8, 16*
114:*9* 139:*13, 17, 22*
183:*18, 23* 185:*6* 212:*15*
**difficult** 158:*1, 2*
**diploma** 18:*24* 19:*20*
**direct** 12:*23* 22:5 180:*23*
**direction** 80:6 85:*21*
96:*17* 103:*8* 104:*21*
105:*24* 107:*2, 7, 11, 14*
111:*17* 112:*7, 17, 24*
113:*4* 117:*19* 121:*16*
123:*4, 21* 127:*3* 134:*25*
135:*1, 6* 137:*13, 22, 24*
138:*23* 139:*3, 14, 18, 21,*
*23* 140:*21* 146:*6, 11, 17*
147:*4, 18* 150:*15* 151:*13*
167:*13*
**directly** 106:2
**discipline** 206:*5*
**disciplined** 205:*24*
**discretion** 89:*5, 21* 90:4
**discretionary** 89:7
**discuss** 185:*10*
**discussed** 29:*18* 44:*10*
213:*9*
**Discussion** 70:7
**dispatch** 164:*1* 166:*18*
167:*14, 22* 168:*12*
**dispatcher** 140:*18* 148:*15*
152:*2, 7* 160:*8, 24* 165:*4*
166:*23* 170:*11* 176:*15, 21*
214:*4*
**dispute** 198:*5, 10*
**distance** 165:*14* 167:*5*
199:*15, 16*
**DISTRICT** 1:*2, 3* 29:6, *8,*
*10, 14, 21* 30:*3, 4, 11, 12,*
*13, 15* 31:*5, 6, 8, 23* 32:*8,*
*20* 33:*8, 9* 34:*22* 37:*16*
39:*17, 21, 25* 41:*19, 20*
42:*16* 44:*18* 49:*23* 50:*5,*
*14* 53:7 56:*14* 83:*11*
**districts** 31:*3, 4*
**DIVISION** 1:*4* 29:6
**document** 15:*1* 38:6
**documents** 14:22, *24*
16:*1, 3*
**doing** 26:*12* 28:*17* 45:*25*
84:6 87:*20* 90:*14, 17, 24*
91:*3* 95:*2* 99:*23* 106:*25*
122:*14, 19* 123:*10* 135:*13*
155:*22* 171:*2, 20*

**domestic** 26:*3*
**Dominican** 19:*6, 11*
**Domnori** 41:*13* 42:*4, 13,*
*16* 50:*11, 13*
**D-O-M-N-O-R-I** 42:*4*
**door** 173:*23* 174:*1, 5*
**double** 119:*24*
**DR** 19:*8* 218:*1*
**draw** 65:*15, 16* 66:*16*
71:*22* 140:*9, 12*
**drawn** 167:*25*
**drew** 72:6
**drill** 130:*3*
**drink** 47:*15, 17, 18*
**drive** 49:*19* 50:*16, 19*
53:6 56:*12* 99:*6, 17*
**driver** 74:9 85:*1, 2, 16,*
*20* 86:*15, 19* 105:*23*
106:*24, 25* 108:*14, 16, 20,*
*24* 109:*6, 7* 121:*16, 18*
125:*23* 143:*3* 171:*12, 13,*
*22, 23, 24* 173:*21*
**driver's** 76:*11* 83:*25*
96:*21* 97:*9, 13* 98:*21*
99:*1* 102:*2, 9, 11, 12, 22*
104:*23* 105:*20* 106:*2*
110:*6, 7* 112:*25* 120:*18,*
*25* 131:*19* 134:*5, 9*
170:*25* 171:*4, 10, 17, 19*
173:*3, 4, 7, 23* 176:*4*
**driving** 53:*8* 73:*7* 75:2
78:*16* 105:*3* 139:*25*
**drove** 52:6 53:*18* 68:*20*
166:*8* 214:*16*
**dstadler@law-asm.com**
3:*13*
**duck** 159:*2, 3, 9, 10*
**ducking** 159:*1, 5*
**due** 20:*3* 190:*12*
**duly** 8:*2* 221:*5*
**duties** 36:*20*
**duty** 34:*4, 21* 35:*5, 20, 24*
36:*10, 14, 21, 23* 37:*2, 7*
57:*17, 20* 61:*12, 15* 62:*6,*
*11, 13, 14, 16* 64:*9* 88:*7,*
*16, 19, 25* 175:*13, 18*
187:*1, 5, 18, 21* 189:*10*
191:*3* 200:*8, 12* 202:*21*

**< E >**
**earlier** 73:*25* 210:*6*
212:*22*
**early** 28:*7* 56:*9*
**EASTERN** 1:*4*
**eboop@clevelandohio.gov**
2:*12*
**education** 18:*19* 19:*18, 22*
**educational** 18:*16*
**Edward** 22:*21, 22*
**eight** 32:*17* 33:*1*

**either** 21:*21* 58:*24* 78:*24*
115:*5* 174:*11* 182:*2*
221:*15*
**elbow's** 122:*8*
**electric** 51:*12, 14*
**electrical** 27:*21*
**Elementary** 18:*23* 19:*15*
**ELENA** 2:*12* 13:*20*
**ELIZABETH** 2:*3* 8:*15*
123:*23*
**elizabeth@fggfirm.com**
2:*10*
**employees** 83:*9*
**EMS** 176:*16*
**enable** 66:*16*
**encounter** 183:*6*
**encountered** 73:*9* 89:*13*
**ended** 30:*12, 14* 39:*13*
54:*10*
**engaged** 87:*25* 126:*7*
**engagement** 42:*14*
**engagements** 47:*2, 9*
**English** 217:*2, 6, 8, 14, 17,*
*20, 23* 218:*10, 18, 20, 24*
219:*3, 11, 15, 19* 220:*2*
**entails** 199:*13*
**enter** 59:*14*
**entered** 22:*3* 59:*16*
**enters** 59:*11* 91:*17*
**entitle** 203:*12*
**entitled** 12:*17* 187:*17, 20*
**entrance** 160:*21* 163:*24*
166:*7, 10, 11, 14* 167:*3*
**environment** 45:*11* 46:*13*
**episode** 43:*6*
**equipment** 56:*16* 58:*12*
61:*1, 5* 75:*15*
**ESQ** 2:*3, 4, 5, 12* 3:*1, 8*
59:*11* 91:*17*
**Essen** 178:*15, 16*
**Estate** 1:6 9:*8*
**Euclid** 3:*10*
**event** 88:*5* 145:*9* 193:*12*
221:*16*
**events** 48:*8* 186:*23*
187:*1* 192:*15, 25* 195:*5*
197:*20* 202:*15*
**Evergreen** 20:*2*
**everybody** 8:*11* 10:*8*
30:*3, 17, 19, 21* 31:*2, 4*
70:*12* 180:*4, 16* 212:*9*
**everything's** 21:*10*
**evidence** 163:*1, 4, 14*
184:*7*
**exact** 31:*9* 71:*13* 145:*11*
**exactly** 39:*16* 47:*11* 58:*4,*
*7* 63:*6* 65:*10* 73:*21*
81:*11* 92:*24* 100:*3*
103:*14* 104:*16* 106:*25*
107:*5* 111:*15* 117:*21*

**either** 121:6 125:*13, 17* 131:7
135:*17* 140:*14* 155:*22*
159:*16* 163:*17* 167:*1*
170:*16* 179:6 183:*5*
189:*25* 190:6 210:*8*
215:*3*
**exam** 24:*3*
**examination** 1:*16* 4:*1*
10:*1*
**examined** 8:*3*
**example** 28:*10* 35:*14, 25*
105:*17* 122:*15*
**examples** 26:*2*
**exams** 27:*17*
**exchange** 87:*5* 92:*24*
93:*2, 20* 94:*2, 6* 95:*18*
96:*6, 11* 98:*7*
**Excluding** 193:*2*
**Excuse** 10:*14* 24:*12*
42:*22* 96:*10* 99:*10*
187:*19* 210:*16*
**execute** 213:*14*
**executor** 9:*7*
**exhaustive** 128:*15*
**EXHIBIT** 4:*3* 70:*1, 6*
71:*21* 208:*2, 7, 8, 19, 24*
209:*24* 210:*7* 211:*14*
**exit** 65:*21* 66:6 74:*4*
161:*10* 162:*16*
**exited** 79:*20* 143:6
160:*20* 163:*23* 166:*12*
167:*11, 14, 19*
**exiting** 53:*23* 143:*22*
167:*10*
**experience** 25:*8*
**expires** 221:*25*
**Explain** 38:*24* 43:*1*
51:*23* 64:*11* 85:6 114:*10*
163:*17* 199:*12*
**explained** 113:*11* 144:*15*
170:*15*
**exploded** 147:*3, 5, 21*
148:*24* 149:*1, 10* 153:*3*
**exploding** 153:*13*
**explore** 128:*8*
**explosion** 149:*11*
**expression** 172:*12*
**extend** 112:*2*
**extended** 123:*6, 12, 15*
**extending** 111:*23*
**extent** 121:*11, 13*
**extra** 69:*23*
**eye** 84:*25* 85:*4* 96:*15*
**eyes** 96:*8, 13* 97:*12*
106:*2* 136:*13, 16, 19*
139:*22* 140:*7* 160:*12, 15*
161:*8*
**eyewitnesses** 178:*17*

**< F >**

**face** 112:*13* 132:*17*
133:*3, 4* 136:22 172:*12*
**facing** 97:2, 7 139:*20, 22*
**fact** 150:2
**factors** 114:*10*
**factory** 20:2, *12, 24* 21:*17*
**facts** 48:*18*
**fair** 11:*18* 12:2 130:*11,
12*
**fall** 21:8
**falling** 65:4
**familiar** 30:*17*
**family** 17:8 20:4, 5
45:*14* 48:*14* 191:*20, 21*
**far** 27:*14* 39:*1* 57:23
66:3 95:7 100:*14* 111:*15*
117:*16* 120:*18* 163:*15*
165:*23* 171:*21* 202:*13*
214:9
**Farnsworth** 39:8
**farsighted** 78:8, 9
**farther** 101:3
**fast** 100:9, *11, 15* 101:22
106:22 107:9 109:9
110:*18* 114:22 125:7
128:*18* 135:*25* 140:9
145:*10, 20* 147:8, 9 149:5
150:*12* 155:*10* 156:5
178:5, 6
**February** 1:22
**Federal** 1:*17*
**feel** 11:8 203:4
**feeling** 101:*12*
**feet** 135:*13* 173:9, *10*
174:9 210:22, *23* 211:*1, 6*
**felt** 102:7
**fence** 143:5 159:*19*
**field** 28:2 29:*12, 15, 21,
25* 32:4, 6, *10, 15, 21*
34:*12, 19*
**filed** 196:9
**fill** 34:25 35:2, *3* 37:5
**filled** 36:*15*
**fine** 69:7 132:*18* 133:*20*
199:7
**finger** 116:*17*
**finished** 22:*24*
**fire** 21:*21* 131:*18* 204:5
**firearm** 43:25 92:*12*
133:*24* 199:8, *20* 201:4
**firearms** 199:9
**fired** 125:*20* 131:*17*
132:*13* 137:*14, 15* 138:*12*
139:2, 8 140:*13* 142:*17*
147:*19* 149:*16* 150:*15*
153:*14, 16*
**first** 8:2 10:5 23:*19*
25:*16* 27:6 29:9, *11*
30:*10* 31:8, *17* 32:2, *3, 13,
14, 22* 33:3, 8, *18* 35:4

37:24 39:*15, 17, 20* 40:*1,
14* 44:5 47:*13* 53:*12*
54:*1* 73:8 74:*15* 76:6, 8,
*16* 78:*14, 23* 79:5, *19, 23*
81:7 87:3, 5 89:*13* 95:*12*
103:*11, 17* 104:3, 4, 7
112:*25* 116:4 117:3, 7, *15,
25* 118:7 120:*17, 25*
135:9 136:6 147:*21*
148:2 151:*24* 153:4, *18,
20* 155:*12, 13, 21* 167:*19*
168:5 174:*23* 175:*25*
176:*23* 178:2, *13* 181:*4,
18* 183:6 185:7, *18, 24*
193:*16, 18, 21, 23* 194:8,
*11, 17* 195:*17* 199:*24*
210:*1* 212:6, 7, 8 217:2, 4,
6, 8 221:5
**five** 31:*3, 5* 54:*13*
**Floor** 1:*21* 3:*3* 51:*17*
155:*14, 17* 173:*3, 4*
210:*11, 15, 18, 23, 25*
211:4, *11*
**flow** 78:20 80:7
**fluent** 220:2
**flush** 211:4
**focus** 122:*16* 125:*10*
173:*15* 205:*12, 14*
**focused** 107:9, *16* 122:*16*
150:2
**Follmer** 182:4, 6, *11*
**follow** 164:4 165:*12*
**followed** 165:8, *14*
**follows** 8:4
**Food** 73:5
**foot** 52:*14* 115:*18*
135:*15, 18* 154:23 156:*15*
210:*23* 211:3
**FOP** 184:20 193:7
**force** 23:*1, 17* 26:*19*
28:*15, 19* 186:9, *11* 200:2
201:*21, 22* 202:2, 9
203:*12, 20*
**foregoing** 221:9, *13*
**foreground** 211:22
**Forestdale** 4:3 49:*20*
53:*19, 20* 68:*21* 69:9
72:*14, 19* 73:*1, 4, 8, 22*
74:*16, 19* 75:*18* 76:8, *16,
18* 78:*14, 17* 91:*11* 92:*10,
21* 94:*24* 96:*19* 105:*10*
119:7 120:*3* 142:*22*
**forgetting** 118:*13*
**form** 10:*24* 89:2 108:*4*
**formally** 205:*25*
**formed** 102:*3* 103:*11*
**former** 42:*10* 44:*12, 16*
46:*18* 192:8
**forth** 37:*4* 217:9, *10*

**forward** 15:*11* 49:6
85:*12* 90:*15* 96:3 100:*14*
104:*15, 18* 135:7, *20, 23*
136:*1, 13* 140:*1, 3, 7, 13*
141:*12* 150:6, 7, *21* 151:2
155:*3* 160:*12* 163:*19*
**found** 148:5 174:9
**four** 20:*15* 38:*15* 76:24
77:*1*
**frame** 145:*14* 156:4
190:6
**Frank** 22:20
**FRANKLIN** 1:7 49:2
53:*11* 73:9, *15* 78:24
85:*1* 86:*16* 87:*1, 15* 91:7
92:*11, 23* 93:3, *21* 94:*11*
95:*18, 22* 96:7, *12* 99:*16*
125:*22, 25* 126:*10, 22*
127:*25* 128:*12* 130:*14*
133:*25* 134:20 135:4
142:9 149:*21* 151:2
162:*23* 168:20 177:*23*
183:7 188:*1* 192:*16, 20*
206:2 208:*16* 209:7
213:8
**Franklin's** 79:6, *23* 80:*10,
18* 89:*12* 100:22 105:*12*
111:*18* 115:22 140:*21*
141:6, *14* 143:*19* 144:*1, 4*
145:*1* 160:2 213:*15*
**FRIED** 1:*4* 9:6
**Friedman** 2:6
**friends** 23:*15, 16*
**front** 15:*14* 73:*13* 75:*21,
25* 78:25 95:*10, 14* 96:24
107:*14* 108:*19, 22* 139:24
**FTO** 29:*12*
**fuck** 74:*13*
**fully** 106:*11* 118:*19*
**Fulton** 49:*24, 25*
**Fumich** 1:*18* 221:2, *23*
**funds** 62:22 66:25
**furnish** 63:*15*
**further** 19:*18* 87:*23*
103:*16* 170:*21* 177:*18, 21,
24* 221:*12, 14*

**< G >**
**Gallagher** 1:*20* 3:2
**GARCIA** 1:*10, 15* 4:2
8:*1* 9:2 10:6, *11* 221:5
**G-A-R-C-I-A** 10:6
**gas** 52:*10, 17* 115:*18*
135:*18* 136:3 154:*23*
156:*15*
**gatherings** 47:*21*
**gear** 51:*20, 23* 52:4, *19*
103:*17* 104:*3, 4, 7* 136:6,
*10* 155:*12, 13, 21* 156:6, 7,
21* 158:*19, 21*

**GELSOMINO** 2:*4* 8:*20*
59:*11, 14, 16*
**general** 34:4, *21, 23* 35:5,
*20, 24* 36:*10, 13, 20, 21, 23*
37:2, 7 135:*1* 137:22
**generally** 70:*13*
**gentleman** 13:22
**Gerhardstein** 2:6
**gestured** 172:*24* 174:*24*
**gestures** 11:*10*
**gesturing** 136:22
**getting** 14:*11* 18:7 27:*13*
36:*1* 63:*12* 74:22 78:*17*
103:9 137:*23* 149:*14*
155:*25* 157:5 162:*1*
163:*4, 12*
**GILBERT** 2:5, 6 8:*19*
91:*14, 17, 20*
**give** 11:*17, 22* 12:*21*
26:2 92:3 158:5 177:*16*
186:2, 4, 5, *19* 198:*17*
**given** 12:*17* 221:*11*
**giving** 157:8 170:*1*
175:9 197:*15*
**glass** 71:*1* 131:*21* 132:*19,
20* 133:9, *11, 15* 134:*14*
144:2, 5, 7, 20
**glasses** 78:2
**Glock** 67:5 208:9
**gloves** 167:*12*
**go** 10:*18* 12:20 20:6
23:6 25:5, 8 27:*11* 34:9
35:*1* 36:*1, 16* 42:*19, 24*
43:*10, 13* 45:*1* 46:24
47:7, *20* 49:*19, 20* 53:*13*
56:6 62:9, *10* 64:*14*
65:*13* 80:4 81:*15* 83:*18*
85:*10* 86:*1* 90:*12, 15*
92:2 106:*11* 109:*14*
117:*1* 121:*10* 126:25
127:*18* 128:*17* 130:*17*
131:*12* 134:23 141:*3, 23*
143:*21* 147:*24* 155:7, *20*
159:*18* 168:*14* 184:24
188:*21* 189:*16* 191:7, *10*
202:*4* 206:*17* 207:*11*
212:*11* 213:3 215:8
**goes** 31:5, *6* 42:25 64:*13*
**going** 10:*19, 23, 25* 11:7
12:*16* 17:5, *14* 24:*13*
25:*16, 17, 24* 37:9 43:3, 4,
6* 48:7, *15, 20* 49:6 53:22
54:*4* 56:6 60:*12* 65:20
68:25 69:*1, 14* 71:5, 7, *11,
15, 16, 19* 72:*20, 23* 73:*12,
13* 79:*18* 81:2, 8 82:8
85:*13* 87:*16, 18* 89:*18*
91:2, *13* 101:22 129:*12*
141:22 145:9 147:8
150:7 155:*10* 157:*10*

Deposition of Officer Jose Garcia                                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

160:13  161:25  162:17
165:5  169:6, 23, 25  177:2
189:14, 15  201:15, 17
208:23  213:1  220:6
**Good**  8:17  10:20  11:6
33:20  39:1  133:17
157:17
**Google**  4:3  68:25  70:12
**Goudy**  183:25
**grab**  71:19  74:4
**grabbed**  79:21  84:18
**grabbing**  53:24  81:17, 19,
23  84:7, 20  143:23
**graduated**  18:20, 23
19:17  20:8  21:16  30:24
219:17
**grand**  144:15  147:12, 15
153:7, 9, 12  197:11, 22
198:14
**grandma**  17:25  18:1
**green**  100:13  104:9
**grew**  21:25
**ground**  10:18  173:16
175:1, 3, 4  177:12, 14
**group**  36:18  39:18
**groups**  218:16
**guess**  32:1  111:2  177:9
178:5  185:19  193:7
199:6
**gun**  58:11  61:2, 4, 8, 12
62:6, 8  64:7, 8, 12, 22, 24,
25  65:2, 12  66:1, 10, 12
67:3, 4, 6, 9, 11, 24  68:1, 2,
8  75:5  104:20  105:24
106:23  107:2, 6, 10, 13, 17,
19, 23  108:5, 11, 22  109:6,
10  110:17  111:6, 11, 19,
24  112:2, 4, 6, 10  113:1, 5,
6, 8, 11, 12, 13, 14, 16, 19,
20  114:3, 4, 12, 16, 18
115:8, 17  116:4, 9, 12, 14,
15, 19, 23  117:4, 8, 11, 13,
16, 19, 24  118:8, 10, 21, 25
119:3, 8  120:5, 8, 11
121:4, 7, 16, 20, 21, 25
122:12, 17, 22  123:3, 7, 14,
15, 21  125:3, 9, 12, 15
126:19  127:2, 6, 10  128:4
130:14  131:1  132:2, 19,
20  133:3, 9  134:1, 8, 19
135:3, 9, 10  136:4, 8, 12,
18, 20, 25  137:4, 10, 16, 24
139:1, 8  140:11, 20
145:15, 16, 21, 25  146:1, 5,
9, 11, 13, 16  147:18
149:16, 18, 22, 24  150:4, 9,
11, 14, 17  151:4, 12, 13, 15
153:24  154:22  155:1, 4,
25  156:15, 18, 20, 22
158:8, 11, 20, 24  160:14

161:25  162:4, 5, 9, 12, 13,
17  163:1  164:22, 23, 25
165:6, 9, 10, 13  167:16, 25
168:2, 7, 21  169:5, 6, 9, 20
170:2, 3, 19, 20  172:10, 11,
13, 15, 25  173:2, 9, 11, 13,
14, 19  174:7, 25  177:20
184:9  186:16  187:25
188:7, 8, 12, 15, 24  190:22
203:10  209:3, 5, 6, 9, 11,
14, 15, 17, 19, 25  210:3, 10,
12, 15, 17  211:7, 10
212:14, 15, 19
**guns**  68:11, 13, 17
**gun's**  108:1  116:17
**gunshots**  154:1
**guy**  101:8
**guys**  23:13  40:16  69:4
72:21  157:7  182:14
**gym**  53:15  55:3

< H >
**habit**  57:3  59:7  60:22
61:4
**half**  42:6  187:16
**halfway**  74:8  81:6  83:25
84:19  86:12  87:2  91:8
93:24  95:6  97:22  106:7,
9, 10, 14  132:25  133:15
**Halloran**  21:5
**hand**  11:10  51:20  52:5,
13, 19  65:13  66:3  107:3,
4, 5, 19  122:14  131:15
132:5, 15  134:4, 9  135:6,
10, 11  136:8, 9  137:11
156:21  164:24  208:23
221:19
**handcuffing**  212:3
**handcuffs**  177:10, 13
**handgun**  209:20, 21
**handing**  70:5  208:6
211:18
**handle**  35:15  36:8  64:25
184:7
**hands**  52:3, 21  67:20, 21
84:16  93:17  107:8  136:9
**hand's**  65:20
**hang**  166:20
**hanging**  15:14  47:16
**happen**  10:19  39:6
79:25  83:21  144:14
**happened**  24:9  25:15
73:21  81:9  85:7  92:25
93:12  100:9  103:14
104:16  106:22  107:9
109:9  110:18  112:22
114:22  125:7  128:18
130:23  135:24  138:6, 7,
10  140:9, 15  144:9, 12
145:10, 20  147:7, 9  149:5

150:12  151:8  156:5
159:16  160:16  167:1, 8
178:5, 6  183:2  191:13
**happening**  20:4  161:3
**hard**  123:25
**harm**  202:6, 8
**head**  41:2  159:4  172:2, 4,
17  173:23  174:2  176:5, 8
193:7
**heading**  53:17  76:17
100:14
**hear**  13:15  23:25  60:6
65:5  91:24  94:5  95:6
110:17  114:18  115:2, 4, 6
128:8, 20  129:20  130:2
144:2, 5, 20  154:11
164:17  217:20
**heard**  24:5  114:25  154:8
**hearing**  148:19  154:1
**heat**  77:7
**heater**  111:3, 4
**heating**  110:24
**held**  1:20  121:22
**help**  21:7, 22, 24  72:2
170:12  176:22
**helped**  21:8
**helping**  20:5
**Henry**  185:22  197:19
**hereinafter**  8:3
**hereunto**  221:18
**Hey**  74:10  88:2  91:23
167:16  170:2
**hi**  45:24
**hiding**  211:7
**High**  18:20, 24  19:20
20:1, 8, 22  21:12, 16
22:24  83:19  88:8, 20, 21
219:6, 14
**highlights**  15:18, 19
**Highway**  24:18, 25  25:17
28:12, 16  34:9
**Hilow**  185:22, 23  194:5, 6,
7, 11, 22  195:3, 22  196:5,
10  197:1, 2, 5, 18, 20, 25
198:10
**hip**  117:5, 9
**hired**  18:15  20:16
**hiring**  23:22
**hit**  65:7, 18, 20  66:13
92:16  118:17  142:9, 16
144:17, 18  148:6, 12, 17,
23, 25  149:2, 3, 13  152:4,
6, 22  159:20  199:15
204:19  205:8
**hold**  174:1
**holding**  116:16  127:2, 6
132:15  133:2  141:5
164:24  171:22, 24  172:3,
17  173:21, 22

**holds**  64:18
**hole**  145:5
**holes**  174:18
**holster**  61:14, 16, 17, 20,
23  62:12, 14, 17, 25  63:18,
23  64:3, 7, 8, 11, 13, 18
65:3, 11, 24  66:12  75:6
92:13, 19  117:5, 9, 11, 17,
24  118:10  119:1, 4, 8
120:5, 8  145:16  168:1, 8
189:4  212:15, 21
**holstered**  118:19  169:7
**holsters**  63:10, 25  66:15
**home**  45:1  50:14  53:16
55:3  56:17  57:11, 12
58:13  60:23  191:11
217:10
**homicide**  186:4, 8, 13, 14
188:11  192:24
**Honda**  50:23
**honest**  173:24
**honk**  86:3
**hot**  77:8
**hour**  14:21  154:19
157:24
**house**  53:7  54:12, 15
55:24  56:4, 7, 18  58:3
64:6  68:20  71:23  214:17
217:14
**housekeeping**  8:7
**hung**  46:12
**hurt**  148:14

< I >
**IA**  181:20
**ice**  21:6, 7, 8
**Ida**  22:19
**identification**  70:2  208:3,
20  211:15
**identified**  113:21  175:20
**identify**  8:12  113:22
**identifying**  63:19  114:10
175:21
**illegal**  79:18  81:2, 8  82:7
**image**  69:1
**images**  9:2
**immediately**  36:17, 19
65:21  79:2  88:22  113:21,
22  137:1  138:9  139:7
152:1, 8  167:13
**impeding**  78:19  80:9
**important**  201:13, 14
**impossible**  145:23
**impressions**  83:13
**incident**  55:22  68:5
82:22, 23, 24, 25  141:20
152:2  175:11  183:2
189:12
**include**  72:14
**includes**  72:13

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

including 53:8 77:19
137:20 193:3, 5
incoming 30:20
independently 63:3
INDEX 4:1, 3, 11
individual 63:4
informal 206:11
informally 205:25
information 63:20
informed 206:19, 21, 23
207:2, 8
initial 143:1
initially 115:18 148:22
injured 148:9
injuries 151:22 152:18
159:15
insert 65:2
inside 53:25 61:22 65:2
66:8, 10 93:14 106:12
137:19 160:19
insignia 58:16
inspect 174:19
instance 31:8
instantly 110:19 125:14
instinct 102:7 103:6
instructors 219:12
insurance 198:5, 10
intention 87:21, 23 155:2
interact 164:6 170:21
177:18, 20, 23
interacted 174:23
interacting 92:11, 20
interaction 99:3, 15, 25
intercede 89:22, 25 90:4,
8
interested 221:16
internal 180:6, 8 181:16,
24 182:8, 13, 19, 21, 23
183:13 184:20 192:23
193:20, 21, 23 194:8, 12,
18, 20, 25 195:2, 6, 9
196:12 198:13 206:15
214:7
International 219:5
intersection 49:21 73:24
78:18
intervene 88:10
intervention 43:7 44:1
interview 193:16, 18, 21
194:3, 9, 12, 14 195:10, 25
196:13 197:8 198:18
interviewed 193:13
194:18, 23 195:18
interviews 194:15 197:22
213:8
investigating 87:24
183:21 185:5
investigation 186:11
194:24 196:8, 20, 24

198:13, 22 206:15, 24
207:3, 9
investigations 193:12
196:13, 17
investigative 213:8
investigator 213:12
investigators 214:1 215:1
involve 27:24
involved 44:22 162:18,
23, 24 163:14 167:17
169:20 170:6, 10, 16, 20
175:11 183:4 184:3
192:19 195:10
involvement 185:8
involves 131:4
involving 192:19 213:7
issue 90:18 190:2 197:20
202:21
issued 56:19 58:17
61:15 67:12 68:1, 8, 12,
13 188:3, 12, 15 190:9
212:15
issues 62:22
its 117:5, 9, 16, 24 118:10
119:1, 4, 8 120:5 137:20
145:16

< J >
J.R 2:12 13:20
James 182:3, 11
jaw 132:17
jerked 159:18
job 20:1, 14 22:3, 8
24:10 29:3, 7, 9 35:4
41:23 47:13 62:3, 4, 23
130:3
jobs 20:22 21:15
join 8:22 48:20
JOSE 1:10, 14 4:2 8:1
10:5 121:5
J-O-S-E 10:5
journey 74:25
jrussell2@clevelandohio.go
v 2:12
judgement 89:9
jump 36:16
jumped 81:17
jumping 143:25 160:10
jury 144:15 147:12, 15,
16 153:7, 10, 12 197:12,
22 198:14
justify 202:15, 17 203:20

< K >
keep 13:6 31:14 42:15
44:14, 17 48:10 57:13, 14,
15 59:7, 8 60:22 71:5, 6
129:7 135:7 139:25
150:19 151:17 157:5, 7

160:12 179:7 182:9
keeping 150:6 163:3, 13
kept 57:17, 21 67:9
104:3, 4 136:16, 19
140:25 160:15
kid 217:15, 18, 24
kind 19:22 47:2 63:19
64:17 66:16 69:1 95:1
96:25 97:7 101:22 211:6
knew 138:25 151:5
know 8:13 10:19 12:7
13:17 22:1, 4, 11, 12
27:25 30:14 31:9 36:13
40:24 41:2 49:14 51:19,
21 58:7 65:3 75:10 82:2,
3, 15 83:8 91:1 93:10
96:16 98:15 101:8
102:18 108:12, 17 109:16,
25 110:20 111:8, 16
113:17 114:15 115:4
123:4, 6 124:4 125:24
126:1, 2, 3 129:14 130:18,
19, 21 142:13, 14, 15
143:13, 15, 16, 18, 24
144:11 147:1, 7, 10 149:3,
5 151:3 153:21 160:16
167:6 169:4, 9, 11 173:25
176:4, 6, 8, 10 180:3
181:25 182:1, 24, 25
183:16, 17, 22 185:5, 12,
20 189:25 201:14, 16
204:15 205:2, 3 206:14
209:15 214:19 216:10
knowledge 214:9

< L >
Laird 40:6, 22, 23 42:13,
17 44:13
L-A-I-R-D 40:8
Lakeside 2:12
lane 100:4, 7, 12 110:5, 7
135:8 150:6, 20, 23 167:3
language 217:2, 4 219:2,
13
lasted 39:11
Law 2:12
lawyer 158:6 179:21
185:8, 17 193:9 194:4
196:10
lawyers 12:14 16:21, 25
196:5 198:9
lawyer's 128:24
laying 211:10
learn 200:1 217:6
learned 161:6
learning 217:8
leave 54:15 57:2, 3 59:9
73:13 104:9, 10 119:8
123:24 124:16 163:2

166:5 214:14
leaved 165:3
leaving 58:3
led 114:11 183:7
left 52:13, 14, 16, 21
54:25 55:8, 24 56:4, 17
58:13 61:6 64:6 68:20
85:12 93:1, 13, 15, 23
94:4 95:5, 25 99:4 100:1
104:19 105:22 107:4
109:5 110:7 113:3 116:3
120:3, 8 121:15 135:11,
15 140:4, 8 142:21
160:17 180:25 191:7, 17,
25 212:10
left-handed 52:8
leg 52:16, 17
length 111:8
lessons 218:17
letter 24:1
level 122:3, 4 123:5
133:3, 4 136:21 137:2
Lieutenant 39:8
life 88:9
light 15:6, 9 96:4 100:5,
6, 13 101:22 103:12, 21,
22, 24 104:5, 9, 10, 13
105:5, 7, 11 115:24 116:3
118:9, 21 119:7 120:4, 14,
20, 21, 23 154:20
lights 15:14
liked 38:21 39:3
Lincoln 18:20 19:17
22:19, 20 193:3, 6, 14
line 57:16 160:8
listen 117:22 118:3
128:21
listening 77:2, 3
litigation 196:9 198:1, 6,
15 199:2
little 15:7, 14 48:19 54:2
56:9 70:25 72:23 96:5
133:4 210:8, 12 216:12
217:15, 18, 24
live 23:8, 10 90:25
lived 18:25
living 22:23 49:15 54:19
lobby 34:5, 21 35:1, 13,
15, 16, 17, 21, 23 36:4
37:3
located 21:5 216:9
location 83:19 169:9
181:1
locations 42:11
locker 57:2, 4 59:9 60:23
long 13:17 14:19, 20
20:14 23:10 25:2 26:4
32:15, 25 34:11, 15 36:23
38:13 39:24 40:16 41:5
42:5 54:11 62:1 69:18

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

88:*10* 91:*4* 113:*16* 116:*2*
187:*15* 189:*12*, *18* 190:*3*
193:*24* 214:*20*
**longer** 22:*8* 41:*16*
124:*19* 150:*10*
**look** 14:22, *25* 15:*3*, *18*,
*24* 16:*1* 38:6 63:*20*
69:*10* 79:*25* 85:22 95:*19*,
*23* 96:*21*, *22* 99:*5*, *16*, *19*,
*21* 105:*16* 112:9 113:*25*
120:*17*, *25* 121:*15* 136:*13*
139:*24* 141:*13*, *16* 147:8
156:*24* 201:*10* 209:*24*
**looked** 51:*24* 63:*21*
66:*18* 80:*17* 85:20, *21*
96:*1* 104:*19* 105:*13*, *22*
106:*22* 109:*5* 112:*4*, *25*
113:*3* 117:*25* 135:*7*
151:*15*
**looking** 21:*21* 79:*24*
80:*5*, *6* 85:*12* 96:*8*, *13*, *16*
97:*9*, *14*, *15*, *17* 98:*20*
114:*4* 118:*24* 137:*13*
138:*22* 139:*2*, *14*, *18*
140:*3*, *7*, *13* 141:*21*, *22*
149:*17* 150:*10*, *16*, *17*, *21*
151:*1*, *7*, *17* 160:*22* 177:*2*
201:*5* 204:*17*, *22* 205:*6*,
*18*
**looks** 87:*1* 212:*2*
**Lopez** 39:*15* 40:*1* 46:*10*,
*12*, *18* 55:*18*, *25* 167:*10*,
*15*, *16*, *18* 168:*11*, *14*
169:*25* 173:*16* 175:*7*
176:*18* 178:*2*, *13* 179:*14*
181:*8* 184:*17* 192:*2*
212:*3*
**Lopez's** 168:*25*
**lose** 159:*6* 162:*5*, *9*
**losing** 190:*24*
**lot** 12:*14* 89:*13* 91:*11*
97:*5* 118:*25* 160:*20*
163:*20*, *23* 166:*11*, *13*
182:*9* 189:*15* 215:*12*
**lower** 132:*16* 133:*4*
**lowered** 74:*7* 84:*19*
85:*15* 106:6, *10*
**lucky** 33:*18*

< M >

**ma'am** 11:2, *15*, *19*, *24*
12:*3*, *9*, *13*, *19*, *25* 18:*12*
19:25 25:*12* 27:*15* 38:*5*
49:*4*, *9*, *12* 51:6, *9* 52:*12*
53:*10* 55:*4*, *7*, *12* 56:8
59:*4*, *6* 60:*21*, *25* 61:*3*, *7*,
*13* 67:*8*, *10*, *25* 68:*7*, *10*,
*15*, *18* 72:*11*, *15* 73:*3*, *6*,
*20* 75:*16* 79:*14* 84:2, *22*
86:*21*, *24* 92:*14*, *18*, *22*

93:25 94:*13*, *15* 100:*21*
116:*1*, *15* 117:2 118:*19*
119:*2*, *5*, *10* 130:*12*, *18*
132:*24*
**machine** 209:*19*
**magnifying** 71:*1*, *25*
**main** 166:*11*
**Majid** 37:*21* 38:*14*, *20*
39:*10* 40:*3*, *10*, *11*, *14*
42:*12*, *16* 48:*4*
**M-A-J-I-D** 37:*23*
**major** 42:*12*
**making** 10:*22* 11:*3*
12:*16* 101:*14* 121:*19*
128:*24* 150:*19*, *22* 157:*25*
165:*2* 169:*16*
**man** 101:*8* 126:*4* 161:*12*
180:*17*
**manage** 43:*5*
**managed** 103:*19* 104:*18*
123:*5* 155:*9*
**Map** 4:*3* 68:*25*
**maps** 69:*24* 70:*12*
**March** 221:*20*
**mark** 69:*14* 210:*7*
**Marked** 4:*3* 70:2, *5*
208:*3*, *20* 211:*15*
**marking** 208:*6*, *23* 211:*18*
**markings** 71:*20*
**Mart** 73:*5*
**match** 38:*24*
**matched** 38:*22*
**Matt** 59:*23*
**matter** 17:*1* 112:*20*
**mean** 16:*16* 26:*10* 33:*21*,
*23* 37:2 38:*21* 39:*1*
42:*18* 44:*23* 45:*12*, *20*
47:*12* 48:*14* 49:*24* 51:*18*,
*25* 55:*21* 58:*20* 62:*3*
66:*17*, *18*, *21* 76:*13* 77:*21*
79:*10* 81:*3*, *9* 83:*20* 91:*2*
93:*12* 94:*18* 95:*21* 101:*2*,
*6* 102:*5*, *15* 108:*10*, *21*
109:*9*, *16* 110:*18*, *19*
111:*3*, *9* 112:*1*, *3*, *22*
113:*9*, *14* 114:*3*, *15* 115:*2*
116:*8*, *13* 123:*2* 125:*7*, *14*,
*23* 126:*9*, *13*, *15*, *17* 127:*6*,
*14*, *23* 131:*20* 132:*12*, *24*
135:*16*, *24* 138:*13* 142:*20*,
*25* 144:*15* 145:*9*, *10*, *23*,
*24* 147:*1* 149:*6*, *10*, *20*
150:*25* 152:*24* 153:*2*
154:*4* 156:*4* 159:*5*, *10*
162:*7*, *20* 164:*12* 165:*7*
167:*10* 169:*3*, *23* 175:*16*
176:*22* 177:*9* 180:*4*, *13*,
*21* 182:*3*, *9*, *12* 187:6
189:*14* 190:*10*, *23* 199:*1*
201:*10* 202:*13*, *19* 203:*3*

204:*3*, *7*, *8*, *14*, *21* 205:*20*,
*21* 209:*13* 210:*19*, *20*
217:*19*
**meant** 33:*23* 35:9 101:8
**measure** 111:*15* 132:*10*
**measurement** 113:*18*
**medical** 176:*19*
**medium** 77:9 111:*1*
**meet** 13:*19* 14:*14* 16:*21*
39:*15*
**meeting** 91:*14* 194:*20*
195:*7*, *23* 197:6
**meetings** 13:*18* 14:*19*, *23*
16:8 195:2, *7*, *9*
**member** 17:9 26:*18*
205:*17*
**members** 27:*12* 193:6
204:6 214:*16*
**memory** 216:*3*
**men** 76:*19* 92:*20* 118:*24*
**mentally** 189:*15*, *16*
**mentioned** 73:*25* 80:6
101:6 148:*15* 149:*4*
192:*24*
**merchandise** 53:*21*, *24*
74:*1*, *5* 79:22 80:*23* 82:*5*
**met** 13:*20* 14:*10*, *16*
39:*20* 40:*1*
**meter** 12:6
**midnight** 39:*14*
**mind** 81:*12* 190:*24*
**mine** 76:*11* 149:*9*
**minute** 12:*21* 60:*11*
71:*16*
**minutes** 48:*21* 54:9, *13*
124:*25* 178:*1*, *7*, *9*, *11*, *12*
**mirror** 102:*5* 102:*1*, *2*,
*10*, *11*, *12*, *16*, *23*, *25*
104:*23* 105:*14* 106:*1*
120:*16*, *19*, *22* 144:6, *7*, *17*,
*18* 145:*4* 147:2, *5*, *20*
148:6, *24*, *25* 149:*4*, *10*, *11*
153:*2*, *13*
**mirrors** 102:*19*
**mischaracterizes** 85:*25*
90:*11*, *21* 123:*18*
**mischaracterizing** 127:*16*
**misconduct** 87:*24*
**missed** 204:*16*
**mistaken** 148:*16*
**model** 50:*21* 51:*15*, *19*
52:*24* 68:*6*, *7*, *16* 188:*18*
209:*14*, *15*, *17*
**Moderate** 154:*14*, *19*
**Moderately** 154:*18*
**modern** 51:*16*
**modifications** 67:*23*
**modified** 52:*24*
**Moeller** 3:*9*
**mom** 18:*22*

**moment** 55:*14* 84:*23*
90:*6* 101:*12* 102:*8* 107:*1*
110:*21*, *24* 114:*17* 115:*12*
116:*22* 125:*10* 126:*19*
127:*5* 128:*1* 130:*13*
131:*3* 142:*15* 144:*10*
145:*3* 147:*21* 148:*25*
149:*16* 150:*9* 151:*1*
162:*21* 172:*7* 177:*2*
**month** 26:6 27:*9*, *16*, *18*
28:*20* 34:*11*
**months** 19:*11* 25:*3* 34:*2*,
*16*, *18* 36:*24* 37:*11* 148:*8*
153:*6*, *7*
**morning** 31:*20* 53:*13*
54:*3*
**motherfucking** 172:*11*
**motion** 65:*19* 115:*20*, *22*
136:*1*
**Motorsport** 216:*11*
**mouth** 129:*8*, *15*, *22*
**move** 19:*8*, *9* 20:*7* 42:*11*
52:*3* 85:*12* 155:*3* 173:*11*,
*13* 174:*6*
**moved** 19:*14* 32:*7*
173:*18* 174:*20*
**moving** 15:*10* 21:*17*
90:*15* 96:*3* 100:*14*
104:*15* 135:*8*, *20* 136:*1*
140:*1* 141:*11* 150:*6*
151:*18* 159:*7* 160:*11*
200:*17*, *22* 201:*1*
**MS.BOOP** 127:*15*
**multiple** 66:*17* 193:*12*
**music** 77:2 110:*21*, *23*

< N >

**name** 10:*4*, *5*, *6* 22:*10*, *16*,
*17* 32:*13*, *14* 33:*2*, *3*, *4*, *5*
37:*24* 42:2 51:*5* 63:*17*,
*19* 126:*17* 182:*25* 185:*19*
**named** 9:*4* 221:*4*
**names** 10:8 31:*11*
181:*25* 182:*2*, *10* 184:*2*
**near** 133:*3* 137:*5* 169:*16*
174:*9* 180:*22* 212:*11*
**nearby** 201:*19*
**nearsighted** 78:8
**necessarily** 31:*24* 35:*12*
**necessary** 73:*14*
**need** 11:*12* 12:*4*, *5*, *7*
35:*1*, *3*, *10*, *23* 36:6 49:*14*
62:*22* 70:*15* 71:*24*
157:*19* 190:*15* 212:*24*
213:*2*
**needed** 37:*5* 101:*3*
190:*11*, *20*, *24*
**Negative** 16:*15* 119:*14*,
*25* 166:*21* 184:*10*

Case: 1:22-cv-00061-DAP   Doc #: 44-4   Filed: 01/31/24   232 of 239.   PageID #: 599
Deposition of Officer Jose Garcia
Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

neighborhood 49:*15*
217:*21*
nervous 101:*13, 14*
neutral 104:2 140:*17*
148:*11* 151:20, *25* 152:*13*
never 66:*18* 87:*10* 112:*3*
119:*11* 120:8, *11, 13*
123:*10* 138:*11* 163:2
192:*17* 201:2 206:5
209:*17* 213:22
new 25:4 34:*17* 68:8
188:*3, 8* 189:9, *24* 190:2,
*4, 7, 18*
newer 51:*19*
nice 74:*10, 12* 85:*17* 88:2
night 33:*21, 24*
nine 19:*11* 124:25
noise 65:5 85:22
non-violent 90:5 94:*19, 22*
normal 24:*10* 25:*13*
51:*25*
Normally 50:*20* 57:9
north 50:*16, 17, 18* 53:8
78:*20* 95:*17*
northbound 80:8 163:*19*
northeast 73:*1* 97:*3*
NORTHERN 1:*3*
Notary 1:*19* 221:2, *23*
notes 16:6, *8* 69:2
notice 78:*15* 101:*24*
113:*8, 10, 19* 122:*13*
172:6 174:*13* 175:25
176:*1*
noticed 78:2*1, 23* 85:*13*
87:*16* 100:6 102:*3*
103:*11* 111:7, *19* 115:*17*
116:*4* 121:*3* 143:*3*
notify 152:*1*
number 31:9 38:*1, 3, 8,
17* 40:24, *25* 41:*1* 63:*19*
139:9

< O >
oath 11:*4*
object 121:8
OBJECTION 4:*11* 12:20
46:22 80:2 81:*13* 83:*16*
85:8, *24* 89:*1* 90:*1, 2, 10,
19, 20* 98:3 107:20 108:6
109:2, *13, 19* 110:*13*
111:*12, 21, 25* 112:*18*
114:*1, 20* 116:6, *24*
122:25 123:*17* 126:24
127:*15* 128:*3, 14, 24*
130:*16* 131:*10, 24* 132:22
133:*12* 134:22 140:*23*
141:2 143:20 146:4, *25*
147:23 148:7 149:*19*
155:6, *19* 156:2, *3, 16, 23*
157:*18* 158:*15, 16* 174:*3*

175:*15* 184:*23* 187:2
201:*23, 24* 202:*3* 203:*1, 2,
7, 14, 15, 22, 23* 204:20
205:*1, 10, 11, 19* 206:*3, 7,
16* 207:*10* 214:6
objections 12:*16* 157:8
obligation 88:*23* 89:*3*
obscuring 210:*14, 17*
observe 165:*15*
observed 53:22 79:*3*
83:22 105:*25* 110:*16*
111:*11* 113:*1* 117:*3, 7*
118:8 125:5 159:*17*
160:5, 9 163:9
observing 112:*16*
obtain 202:*14*
obviously 122:20 204:8
occasion 16:*12*
occasions 14:*16* 16:*13*
occur 94:*16*
occurred 47:*10* 163:8
185:*25* 206:*1*
o'clock 133:*18*
off-duty 61:*16, 17* 64:3
65:*11* 66:*15*
office 34:5, *21* 54:7 60:4
91:*21* 196:20 221:*19*
OFFICER 1:*14* 4:2 8:*1*
9:2 18:*10* 21:20 23:*3, 20*
27:7 28:25 29:*3, 12, 15,
22, 24, 25* 30:5 31:*18*
32:5, 6, 9, 10, 16, 21* 33:25
34:*17, 20* 35:25 36:7, *14*
37:*1, 7* 38:*13, 19* 39:*10*
40:*1, 3, 9, 14, 21* 41:*12*
42:*17, 25* 44:5, *12* 45:*19*
46:9, *12, 18, 20* 55:*18, 25*
63:*4* 167:*10, 18* 168:*11,
14, 25* 169:25 173:*17*
175:*7, 9, 14, 16, 19, 21*
176:*18* 178:2, *13, 15*
179:*13* 181:8 183:*14*
184:*17* 192:2, *18, 23*
199:*24* 200:*7, 11* 212:*3*
221:*4*
officers 25:5 26:*15*
30:20, *24* 170:*12, 13*
173:*18* 176:*19* 178:*3, 12,
18, 24* 179:*1, 7, 17, 24*
180:*14* 181:*11, 18* 182:22
183:20 191:*24* 212:8
213:*10, 13* 214:*7*
OH 2:8, *12* 3:4, *11* 21:*13*
22:*16* 33:7 47:*19* 84:*11*
102:*17* 124:*13* 182:*7*
194:*19* 199:*3* 218:8
OHIO 1:*3, 20, 21* 221:*3,
20, 24*
Okay 10:*11, 18, 21* 12:8,
*12* 13:5, *18* 14:*3, 6* 15:22

16:*19* 17:*16* 21:*15* 24:22
28:*13* 29:2 33:7 36:5
40:*21* 48:22, *23* 49:*1, 5,
11* 50:*18* 52:2, 5 54:*3*
60:2 64:*19* 69:2, *15, 19*
71:*12, 16, 18* 72:6, *18, 24*
73:7 79:5 80:9 83:*3*
90:*16* 97:*1* 103:*3* 104:7
105:6, 9, *19* 106:*10*
107:25 109:*21* 115:*13*
118:6 120:22 121:*18, 22*
122:*4, 10, 13, 18* 124:2, 8,
24, 25* 127:*18, 25* 128:*10*
130:*3, 5, 8, 10, 13* 135:9
137:8 157:*21* 158:7, *11,
23* 159:*1* 161:*10* 163:25
167:4 172:*14* 179:9
183:22 184:*3* 185:*15*
186:*16* 188:24 193:*10*
196:*19* 199:*4* 202:*11*
210:23 212:*18, 24*
old 19:*11, 12* 49:*16, 17*
90:25 218:7
once 24:*11* 25:*18* 47:23
65:2 66:7, *12* 83:7 137:2
155:*4* 173:*14* 175:*17*
180:*14, 16* 199:*15* 205:*21*
one-man 36:7
one-month 26:*14, 17, 22*
28:*14, 23* 29:*17* 199:22
ones 157:*23* 193:*23*
ongoing 198:22
online 63:*14* 69:*10*
on-the-road 34:*3*
open 34:25 40:*13* 76:*13*
100:8 133:*13* 144:24
173:*23* 174:5
opening 37:*10* 131:*21*
opinion 102:4 103:*11*
108:4, 7
OPOTA 24:24 25:*1, 9, 18,
23* 27:8 28:*17, 20, 22*
199:22
OPS 197:6 198:*13* 207:9,
14, 19
option 201:22 202:2
options 66:22 202:9
order 16:22 65:8 110:*10*
112:*1*
orders 175:9
orientation 110:*4*
original 149:9
originally 68:*1, 11*
otherwised 221:*16*
outside 9:*19* 44:20, *25*
45:2, 22 46:*13* 77:*11*
100:7, *12* 137:*16* 171:6,
15
overhear 94:*1*

overlap 29:*17*
owner 51:*3* 83:8

< P >
p.m 1:*23* 39:*13* 54:*4*
220:9
Packaging 20:*3*
paid 187:8
paired 33:25
pane 134:*14* 137:*17*
pants 64:*14, 20*
paper 11:*13* 26:*12* 72:25
73:*13*
parallel 103:20 104:*11,
12, 13, 18* 105:20 106:4
111:9 120:*15, 16, 24*
139:*1* 151:*3* 155:9
161:22
Park 21:5
parked 160:*21* 163:24
166:7, *13* 167:7
parking 12:6 89:*13*
91:*11* 97:5 118:25
160:20 163:20, *23* 166:*11,
12* 167:*1*
part 25:20 26:*13, 17, 21*
28:3, 6 56:22, *24* 87:5
97:20 113:*16* 132:8
133:9, *10* 141:9 162:*24*
198:*11* 199:9 201:*3*
210:*4, 8, 11, 21* 211:7
partially 106:5
participants 59:*19*
participate 8:20 196:*16*
participated 193:*16*
196:*1, 12, 19*
participating 8:*11, 13*
10:9 91:*21*
parties 9:2
partner 32:4, 8 36:*17*
37:*18, 19* 40:4, *13, 14*
41:*12, 13, 14, 16, 17, 25*
42:3 44:*12* 48:2, *3* 50:*10*
55:*15* 56:*3* 192:8, *11, 15*
partnered 38:*13, 19* 40:2,
9
partners 36:*16* 40:*17, 21*
41:5, *11* 42:5, *10* 44:*16*
46:2, 5, 19
party 221:*15*
pass 199:*16, 17*
passed 138:*4* 141:24
178:*1* 195:*16*
passenger 53:23 74:*4*
79:20 80:*13, 19* 81:*16*
85:*14* 86:22 97:*18* 98:*1,
7, 23* 106:*16, 19, 20, 21*
108:*15* 109:*11* 110:*11, 12*
142:7, *19, 24* 143:2, *4, 8, 9,
10, 19* 144:23 160:*10, 23*

161:*1*, *10*  163:*21*  170:*25*
171:*2*  173:*15*  174:*13*
176:*24*
**passenger's**  171:*18*
**passes**  142:*3*
**Patrol**  24:*18*, *25*  25:*17*
28:*12*, *16*  34:*9*  36:*1*  37:*1*
40:*2*  41:*3*, *24*  50:*7*  56:*13*
187:*7*, *11*
**pause**  60:*12*  138:*6*, *11*, *14*,
*16*
**pay**  12:*5*  15:*20*  111:*22*
130:*5*  177:*1*, *6*
**Pearl**  49:*22*  53:*8*  70:*22*
72:*8*, *14*, *19*  73:*2*, *8*, *22*
74:*16*, *19*, *23*  75:*18*  76:*9*,
*18*  78:*14*  92:*11*, *21*  93:*1*
95:*20*  96:*19*  99:*4*, *20*
105:*4*, *10*  115:*10*  118:*9*
119:*3*  120:*4*, *25*  133:*25*
142:*22*  154:*13*  160:*10*
163:*19*  166:*13*  167:*2*
168:*4*
**pedal**  52:*11*  136:*3*
154:*23*
**pedals**  135:*14*
**pen**  71:*19*  210:*7*
**pending**  12:*11*
**people**  21:*7*  30:*22*  31:*7*,
*12*, *15*, *22*  35:*10*  36:*18*
37:*9*  43:*2*, *3*, *5*, *6*  44:*24*
46:*1*  143:*1*  178:*14*  180:*8*
181:*17*, *20*, *23*  182:*1*, *9*
184:*21*  185:*1*  204:*5*
**pepper**  28:*9*, *11*
**period**  25:*13*  49:*7*  95:*24*
138:*4*  186:*25*  191:*4*
**permanent**  189:*10*
**person**  29:*22*  32:*11*  74:*8*
108:*18*, *21*, *25*  116:*16*
125:*24*  127:*2*  165:*12*
181:*4*  203:*13*, *25*
**personal**  56:*13*  61:*16*
66:*20*  152:*10*
**personally**  82:*20*
**person's**  203:*19*
**perspective**  83:*23*
**petty**  95:*4*, *5*
**phase**  32:*23*, *25*  33:*13*, *14*
**phone**  35:*19*  45:*16*, *22*
46:*15*  55:*11*  77:*13*
140:*17*  141:*20*  151:*25*
152:*3*, *7*, *10*  159:*21*
163:*25*  164:*1*  167:*22*, *23*
168:*11*  176:*16*  192:*6*
**photo**  15:*3*  211:*22*  212:*4*,
*14*, *18*
**Photograph**  4:*3*
**photos**  15:*24*  16:*4*

**physical**  202:*14*
**physically**  202:*5*, *8*
**pick**  32:*1*  66:*23*  67:*11*
165:*24*  215:*8*
**picked**  215:*10*, *11*, *17*
**picture**  69:*3*
**piece**  64:*13*  72:*25*
**Place**  49:*20*  53:*19*  72:*17*
193:*25*  204:*2*  221:*13*
**placed**  34:*5*
**placing**  53:*25*  74:*6*
**plainclothes**  56:*23*
**Plaintiff**  1:*8*, *16*  2:*2*  8:*16*
9:*4*
**Plaintiff's**  4:*3*  70:*1*, *6*
208:*2*, *7*, *19*, *24*  211:*14*, *19*
**planning**  54:*7*  56:*9*
**planted**  211:*3*
**playing**  110:*21*, *23*
**please**  11:*21*  71:*2*
**PO**  32:*23*  33:*2*, *13*  37:*21*
40:*6*, *11*  42:*12*, *13*  50:*11*,
*13*
**pocket**  57:*15*, *22*  58:*9*
75:*11*
**point**  12:*17*  49:*6*  55:*5*
78:*14*  80:*13*, *17*  81:*1*, *7*
86:*6*  87:*2*  91:*5*  99:*8*, *11*
104:*22*  105:*2*, *3*  118:*20*
119:*6*  124:*4*  126:*12*
132:*8*, *11*, *19*, *20*  134:*20*
135:*4*  136:*20*  142:*18*, *21*,
*22*  145:*7*, *11*  146:*18*, *22*
148:*10*, *17*, *22*  149:*22*
152:*12*  158:*12*  159:*22*
160:*19*, *24*  161:*15*  162:*15*
164:*7*, *10*  167:*25*  168:*7*,
*17*  177:*5*, *21*, *24*  179:*17*,
*21*  180:*7*  189:*9*  196:*4*
212:*6*
**pointed**  107:*7*, *10*, *23*
111:*16*  113:*4*  115:*9*
120:*11*  121:*7*  122:*1*, *23*
123:*21*  125:*4*  126:*21*
131:*23*  132:*4*  133:*24*
137:*12*  139:*1*  140:*12*
141:*6*, *9*  146:*5*, *11*, *13*, *17*
150:*14*  156:*18*, *20*  158:*8*,
*11*, *20*  172:*11*  202:*19*
**pointing**  96:*18*  97:*12*
104:*20*  105:*24*  107:*2*, *3*,
*15*  108:*3*, *5*, *10*  110:*17*
111:*7*, *19*, *24*  112:*6*, *13*, *16*
113:*2*, *3*, *13*  115:*17*  116:*4*,
*10*  117:*19*  121:*16*  122:*5*
123:*3*  125:*12*  126:*19*
127:*10*  128:*4*  130:*14*
131:*1*  133:*8*  134:*4*, *8*, *12*,
*19*  135:*3*  136:*3*, *12*, *18*

137:*22*  139:*20*  140:*25*
145:*17*  149:*24*  151:*3*, *12*
**police**  18:*10*, *11*, *14*, *17*
20:*18*, *23*  21:*17*, *19*, *22*
22:*2*, *14*  23:*1*, *6*, *17*, *20*, *21*
25:*5*, *7*  26:*18*  27:*7*, *13*
28:*24*  29:*3*, *6*  31:*18*
34:*17*  35:*17*  38:*4*, *7*
39:*18*  43:*19*  44:*6*, *9*  45:*3*,
*19*  46:*19*  58:*16*  59:*5*
60:*19*  61:*1*  62:*11*  75:*14*
88:*18*  175:*9*, *13*, *16*, *19*
178:*18*  183:*11*  191:*2*, *24*
192:*22*  199:*24*  200:*7*, *11*
207:*14*, *19*  213:*10*  220:*1*
**police-issued**  56:*16*  58:*12*
62:*8*  92:*12*
**policy**  25:*24*
**portfolio**  188:*23*
**portion**  28:*6*  132:*16*
**possesses**  203:*10*
**possession**  58:*22*  59:*3*
214:*11*
**possible**  204:*18*, *23*
**possibly**  35:*21*  66:*22*
**potential**  175:*12*
**potentially**  175:*12*
**precautionary**  204:*13*
**precautious**  165:*2*
**preclass**  23:*23*
**prefer**  126:*17*
**prepare**  13:*9*  16:*17*, *22*
23:*23*  189:*15*
**prescription**  78:*4*
**presence**  221:*8*
**present**  13:*12*
**president**  182:*3*  197:*2*, *3*,
*6*
**press**  66:*2*, *6*
**pretty**  16:*21*  34:*25*
37:*15*  43:*5*  90:*23*  95:*4*
218:*22*
**previously**  25:*6*  47:*20*
127:*23*  151:*6*  163:*10*
**printed**  14:*25*  71:*14*, *20*
**printout**  71:*18*
**Prior**  9:*9*, *11*  13:*14*  25:*7*
54:*24*  85:*23*, *25*  88:*4*
118:*20*  123:*18*  127:*16*
**priority**  36:*9*
**Probably**  14:*20*  41:*6*, *9*
48:*9*  54:*9*, *13*, *17*  111:*1*, *3*
178:*10*  215:*24*
**probation**  34:*3*, *4*, *13*, *14*,
*19*
**problem**  124:*17*, *18*, *25*
219:*23*
**Procedure**  1:*17*
**proceed**  90:*14*  99:*4*
104:*17*

**proceeded**  15:*10*  93:*22*
95:*17*  96:*3*  104:*15*
163:*19*
**proceeding**  53:*17*  104:*18*
**proceedings**  59:*11*  91:*17*
198:*15*
**process**  23:*21*  94:*20*, *23*
108:*9*  129:*5*, *19*  130:*24*
155:*8*  169:*13*
**processing**  129:*10*, *21*
184:*4*
**produced**  211:*20*
**Professional**  1:*18*  196:*20*
**progress**  88:*6*, *16*, *19*, *24*
89:*15*
**progressed**  217:*11*, *13*
**proper**  204:*11*
**protect**  91:*1*
**protection**  190:*25*
**provide**  21:*24*
**provided**  128:*15*
**psych**  43:*6*
**Public**  1:*19*  2:*7*  187:*14*
204:*2*, *6*  205:*17*  221:*2*, *23*
**Puerto**  19:*5*, *10*
**pull**  66:*13*  68:*25*  70:*11*
79:*6*, *15*  86:*5*  95:*9*, *12*
104:*14*  152:*12*
**pulled**  73:*21*  74:*15*  76:*6*,
*8*, *16*  79:*19*  80:*10*, *18*
81:*4*  94:*20*, *21*  97:*4*
100:*12*  103:*21*  105:*9*
139:*8*  140:*17*  141:*19*
145:*15*  151:*25*  156:*15*
165:*25*  166:*25*  167:*4*
**pulling**  15:*9*, *11*  74:*2*
75:*17*, *20*  78:*13*, *16*  79:*4*,
*23*  103:*9*
**purchase**  62:*20*  63:*2*, *6*
**purchased**  62:*17*, *25*
**purpose**  62:*5*  65:*14*, *16*
90:*24*  213:*13*, *19*
**pursuant**  1:*16*  202:*23*
203:*20*
**put**  8:*21*  34:*24*  36:*8*
39:*5*  51:*20*  52:*3*  57:*15*
64:*6*, *7*, *11*, *22*  74:*10*, *12*
81:*17*  85:*17*  88:*2*  93:*17*
98:*4*  103:*17*  104:*1*  129:*7*
131:*8*  132:*12*  140:*16*
148:*10*  151:*20*, *24*  152:*13*
156:*5*, *7*, *21*  167:*12*
173:*14*  177:*10*, *12*  191:*1*,
*2*, *5*  210:*8*, *12*
**putting**  81:*18*  129:*14*
156:*14*  159:*4*  168:*16*
213:*14*, *19*

**< Q >**
**qualification**  199:*16*, *18*

**question** 11:20 12:1, 11, 22 76:15 89:2 117:6, 23 118:4 119:14 128:7, 10, 21 130:6, 9 134:24 138:15 156:25 157:6, 14 192:25 193:4 195:12 196:2 198:19, 23 207:16, 21
**questions** 12:16 35:18 49:6 157:20, 23
**quick** 65:15, 16 66:16 69:13 79:4 81:9 92:4 93:12 112:22 128:16 138:6, 7, 10 139:24
**Quintana** 32:24 33:2, 4, 5, 9
**quite** 31:10 58:4

**< R >**
**radio** 59:5 60:19
**raise** 113:5 121:25
**raised** 19:5, 11 113:6 123:8 133:24 135:10 137:4
**ran** 160:13 163:21, 22 178:2
**random** 32:1
**range** 43:16, 18 188:22 189:9
**reach** 66:1 126:20
**reached** 118:20 125:15 131:15 132:2
**reaches** 120:24
**reaching** 65:11 66:1 171:3, 10, 13 172:3 173:25 174:1
**reacted** 108:10 114:23 117:13, 20 125:14 127:1, 21 128:19 129:6 131:2 132:12 145:20 146:5, 12, 13, 16 150:5, 14 151:4, 12 154:4
**reaction** 81:10 110:20 130:23 131:1 138:11 146:7, 8, 18, 22 203:25
**read** 70:21 129:23
**readers** 70:15, 19
**ready** 14:17 24:13 53:16 74:22
**real** 69:13 79:4
**realize** 149:6
**realized** 148:18 170:5
**really** 100:11 101:13 113:17 125:8 176:3 178:8 184:1 190:6 206:20
**rear** 102:13, 14
**rear-view** 101:24 102:10, 12, 19 106:1 120:16

**reason** 13:1, 4 20:6 80:5 94:16 162:11 190:11 210:20
**Rebecca** 1:18 221:2, 23
**rec** 21:2
**recall** 14:9 26:7 48:6 55:14 58:4 63:17 76:2, 5 77:3, 6 93:6, 9 94:10 96:15 98:4, 14 106:18 107:5 109:8, 15, 24 110:23 125:11 134:2 135:16, 17 136:5 138:2 144:21, 25 153:21 154:3 168:9 170:7, 17 173:24 174:4 175:6 176:13, 22 178:15 179:6 180:24 181:7 183:16 196:3 206:18, 22 209:23 211:5 214:3, 9, 19 215:3
**receive** 19:20 26:9 43:24 88:4, 13 187:25 200:6, 10, 24 201:4, 8 204:1, 4, 10, 11 205:7, 15 206:11
**received** 26:4 44:8 199:23 201:2 206:5
**recertified** 189:8 199:8
**Recess** 27:1 48:24 60:15 69:21 92:8 133:22 179:10 213:5
**reclined** 174:15
**recognize** 79:9 100:19 114:12 161:11 178:23 208:8, 25 209:16
**recognized** 114:15, 17 126:4
**recollect** 184:2
**recollection** 122:19
**record** 8:21 10:4, 23 11:6 26:25 27:3 60:9, 17 70:7 92:3 132:15 157:11 213:4, 23
**recorded** 10:25 194:14, 16
**recording** 9:1
**recreation** 20:25 21:5
**red** 103:24
**reduced** 221:7
**refer** 73:14 126:14, 18
**referenced** 221:11
**referred** 76:19
**referring** 14:24 38:8 85:4 86:15 94:8 100:17 125:22, 23 126:10, 11
**refers** 38:7
**refreshed** 122:18
**regard** 198:11
**regarding** 88:5, 14 199:20
**Registered** 1:18
**reholstered** 168:2
**related** 82:19 83:1, 2

**relation** 22:6
**relationship** 45:2
**relative** 221:15
**release** 65:8, 12, 18 66:3, 6 92:16 118:14, 17 131:5
**released** 103:18
**remain** 179:3, 18 181:5, 19
**remained** 100:4 160:8 217:11
**remember** 14:8 31:11, 13 32:13, 14 33:16 53:4 55:13 58:2 75:9 81:19 98:9, 12 100:10 107:18, 24, 25 109:1 114:24 115:5 121:12, 14 125:6 130:7, 10, 21 133:8 136:2 154:1 170:18 171:21 174:22 178:13, 16 185:17 186:7 209:21, 25 211:10 215:11
**remotely** 59:17 91:15
**remove** 71:15
**rep** 179:19
**repeat** 97:11 205:4
**rephrase** 90:3 196:7
**report** 34:6, 8 35:17 50:1 141:20
**Reporter** 1:19 10:10, 24
**reports** 34:6 35:13, 22
**representative** 179:4
**represented** 194:2, 22 195:3, 22 196:23 197:14, 17 207:13, 18
**representing** 198:4, 8
**Republic** 19:6, 12
**re-qualification** 190:14 199:11, 13
**re-qualified** 189:19 190:1, 3, 7
**re-qualify** 43:14 189:17 190:11, 13
**re-qualifying** 43:25 190:12
**required** 199:17
**rescheduled** 124:11
**resembling** 209:11
**respect** 110:2 191:3 195:11 207:14, 19
**responded** 83:3 85:18 179:13
**responding** 92:1
**responses** 11:7
**responsible** 37:14
**rest** 76:14 210:14, 17, 21
**restricted** 187:4
**restriction** 191:3, 5
**result** 187:1
**results** 206:14, 19, 23

207:2, 8
**retain** 214:11
**retention** 61:21, 23 65:6, 7 118:15, 17 131:6, 7
**review** 207:14, 19 220:7
**rhythm** 11:9
**Rico** 19:5, 10
**rid** 215:20, 25 216:15, 20, 21
**right** 10:9 14:12, 17 19:14, 18 22:24 24:3, 7 25:11 27:14, 18 29:4 30:6 31:18 33:24 34:20 35:7, 22 36:2 37:25 39:22 40:14, 22 41:8, 17 44:14 47:4 50:2, 5, 16 51:3, 20 52:5, 11, 15, 17, 19, 21 53:9 54:5, 7 55:3 56:6, 7 57:11, 23 60:20, 24 62:14 63:12 65:13, 22, 24 66:2, 3 68:9, 21 69:18, 20 71:10, 12 72:10, 14 73:2, 5 74:16, 23 75:5, 15 78:2, 17 79:2, 7 80:20 82:8 83:11 84:21 87:7, 8, 12, 13, 17 90:6, 7, 9, 18 93:1, 5, 13 95:7, 8, 11, 13, 16 96:1, 9, 14, 19, 22, 25 97:18, 21, 24 98:2, 24 99:9, 12, 14, 17 100:12 102:10 103:9, 22 104:14, 23 105:14 106:3 107:3 108:2 110:8, 12 111:9 113:21, 22 114:6 115:13, 25 117:5, 9 118:7 119:1, 4, 9, 13, 18 120:18 121:1, 4, 19, 23 122:3, 6, 8, 11, 15, 20, 24 123:9 126:5 129:25 130:19 131:5, 15 132:5, 10, 25 133:1, 3, 5, 6 134:4, 6, 8, 10, 14, 17, 20 135:10, 18, 19, 20 136:6, 10, 22, 23 137:6, 11, 17, 20, 23 138:8, 19, 20, 24 139:9 141:1, 7, 25 144:24 145:17, 25 146:20, 24 147:6 148:6 149:14, 22, 25 150:3, 11, 18 151:7, 16 152:13 153:23, 24 154:2, 16, 23 156:13, 17, 22 158:9, 12 159:18, 22 160:5 162:1 163:5, 15 164:1, 4 166:3, 10, 18, 20 167:20, 23 168:12, 14, 17, 21 169:7, 10 172:12, 20 174:7, 10 175:1, 6, 19 179:13, 15, 19 181:21 187:9 189:6 193:13 196:14, 21 197:9, 12 198:6 206:6 209:19

*212:4, 12* 213:*24* 214:*4, 9*
216:*13* 219:*15, 17, 20, 24*
**right-hand** 74:*22*
**right-handed** 52:*8, 10*
65:*22*
**right-hander** 52:*9*
**rink** 21:*6*
**Riverside** 166:*15* 167:*19*
168:*10* 178:*3*
**road** 29:*11* 34:*19* 35:*2*
37:*4* 49:*24, 25* 53:*8*
70:*23* 95:*20* 118:*9* 120:*4*
125:*5* 136:*14, 15, 16, 19*
137:*13* 152:*14, 15* 154:*13*
159:*14* 160:*10* 187:*7, 11*
**Robert** 22:*21*
**roll** 51:*12* 76:*25* 81:*5*
83:*24* 84:*3, 17, 23* 86:*6,
12* 87:*14* 93:*21*
**rolled** 76:*10* 85:*19* 86:*7,
14* 90:*17* 91:*8* 97:*20*
98:*1, 9* 132:*9, 25* 133:*11*
**rolling** 135:*22*
**Room** 2:*12* 10:*9, 12*
12:*15* 156:*12*
**roommate** 22:*13*
**roommates** 23:*13*
**roommate's** 22:*16*
**rotate** 30:*16*
**round** 147:*3*
**rounds** 125:*20* 142:*16*
144:*16, 18* 147:*17* 201:*15,
16* 204:*15, 19*
**route** 50:*19* 72:*7, 13*
154:*15*
**routinely** 68:*20*
**row** 138:*3, 8, 19* 139:*9*
**ruler** 71:*25*
**rulers** 70:*25*
**Rules** 1:*17* 10:*19*
**run** 160:*14* 161:*25*
162:*17* 164:*3* 166:*2*
**Running** 164:*21* 165:*9*
167:*12, 15* 169:*3*
**RUSSELL** 2:*12* 6:*1, 2, 3,
4, 5, 6, 7, 8, 9, 10, 11, 12, 14,
15, 17, 18, 19, 20, 22, 24, 25*
7:*2, 3, 8, 9, 10, 11, 12, 13*
13:*23* 59:*13* 134:*22*
140:*23* 141:*2* 143:*20*
146:*4, 25* 147:*23* 148:*7*
149:*19* 155:*6, 19* 156:*2,
16, 23* 157:*3, 11, 22*
158:*16* 174:*3* 175:*15*
184:*23* 201:*23* 202:*3*
203:*1, 14, 22* 205:*11, 19*
206:*3, 7, 16* 207:*10* 220:*6*

**< S >**
**safe** 88:*10*

**safety** 116:*9, 13* 154:*6*
167:*6* 168:*24, 25* 201:*18,
19*
**Sam's** 216:*11*
**SARAH** 2:*4* 8:*19* 59:*11,
15, 24* 60:*1, 3, 5*
**sarah@fggfirm.com** 2:*11*
**saw** 13:*14, 17* 23:*22*
48:*12* 53:*23* 74:*2, 3, 7*
79:*5, 6, 15, 23* 80:*10, 13,
19, 22* 85:*12, 16* 87:*18*
88:*19* 93:*10, 17* 100:*10*
102:*1, 9* 103:*1, 3* 104:*20*
105:*20, 22* 106:*23* 107:*6,
9, 17, 23* 108:*18, 22, 24*
109:*5* 112:*6, 9* 113:*6, 14,
15, 20, 24* 116:*15, 18*
117:*10, 13, 15, 18, 25*
120:*19* 121:*15* 122:*1, 11,
12* 123:*2, 3, 7, 11* 125:*3, 8,
9, 12* 126:*19* 130:*13*
133:*2* 137:*24* 140:*10, 11*
141:*19* 143:*2, 22* 144:*7*
145:*16, 25* 146:*1, 13*
148:*11* 149:*21, 24* 150:*4,
13* 151:*11* 153:*23* 155:*4*
156:*20* 158:*11* 161:*6, 7,
10, 23* 162:*4, 12, 13, 15, 21*
163:*12, 18* 166:*5* 167:*9,
18* 170:*25* 171:*3, 5*
172:*13* 173:*22* 191:*20*
210:*1, 2, 4, 5, 8, 10, 12, 15,
18* 211:*11*
**saying** 85:*20* 123:*2*
124:*14* 126:*21* 128:*8*
130:*3* 146:*16* 151:*11*
219:*24*
**says** 202:*12*
**scared** 101:*13, 14, 15*
165:*6, 10, 11* 177:*9*
**scenario** 147:*16* 204:*7*
**scenarios** 26:*1*
**scene** 148:*8* 165:*3*
174:*20, 24* 175:*7, 17*
176:*17* 178:*18* 179:*12, 15,
24, 25* 180:*5, 7, 9, 21*
181:*9, 12* 183:*23* 184:*4,
18, 22* 186:*2* 188:*4, 5, 12,
15, 25* 189:*23* 191:*7, 17,
25* 193:*8* 212:*8* 214:*13,
14, 15* 215:*4*
**schedule** 26:*11* 27:*10*
**School** 18:*20, 24* 19:*20*
20:*1, 6, 9, 23* 21:*12, 16*
22:*25* 217:*20, 22, 23*
218:*13* 219:*6, 14*
**Scranton** 18:*23* 19:*15*
218:*2, 3, 4, 8, 10, 18, 21*
**Screen** 4:*3* 71:*12, 15, 17*

72:*24* 211:*19*
**screw** 60:*13*
**seal** 221:*19*
**search** 26:*2* 69:*9* 213:*15,
20* 214:*23*
**seat** 99:*1* 174:*15*
**seated** 14:*10* 16:*11*
**second** 31:*20* 32:*24* 33:*9,
16, 17* 37:*16* 39:*11* 41:*21,
22* 50:*4, 15* 69:*20* 92:*6*
156:*6, 7* 195:*6* 213:*2*
**secondary** 27:*22*
**secondly** 210:*2*
**seconds** 112:*21* 116:*8*
121:*2* 151:*8* 160:*9*
163:*22* 167:*9* 178:*7*
**section** 218:*14*
**secured** 65:*4* 180:*17*
189:*3*
**see** 13:*15* 15:*15* 17:*23*
28:*13* 31:*22* 32:*2* 35:*4*
39:*5* 42:*16* 44:*12, 18*
48:*19* 70:*8, 14, 22* 78:*19*
80:*9* 81:*22, 25* 84:*20*
85:*6* 88:*6, 15* 91:*3* 93:*7,
12, 14, 16* 94:*11, 14* 95:*9*
99:*22* 105:*16* 106:*19, 20,
21, 25* 107:*12, 15, 19*
108:*20* 109:*7* 112:*1, 12*
113:*5* 116:*9, 11, 12, 13, 14,
16, 20* 120:*14, 22* 121:*1,
25* 135:*3* 142:*5, 7, 9*
143:*2, 9, 10, 13, 24* 144:*2,
5* 145:*21, 24* 146:*2*
148:*13* 149:*17* 150:*3, 24*
151:*2* 159:*24* 161:*2, 21*
164:*3, 9, 13, 19, 22, 23*
168:*11* 171:*2* 173:*13, 19*
174:*6, 18* 176:*12, 24*
177:*4* 203:*17, 18* 210:*20*
211:*7* 215:*14* 216:*2, 24*
**seeing** 48:*10* 107:*25*
116:*22* 146:*9* 155:*1*
209:*25*
**seen** 39:*3* 42:*18, 20*
48:*11* 73:*15, 18* 79:*11, 13*
80:*18* 104:*22* 105:*12*
112:*3* 123:*10* 151:*6*
161:*12* 181:*9* 209:*9, 11,
14*
**selected** 24:*2*
**selection** 62:*24* 63:*10, 13*
**selections** 66:*17*
**send** 24:*17* 176:*16*
**sense** 12:*24*
**sent** 24:*24* 132:*12* 147:*3,
17*
**sequence** 66:*4, 5* 202:*14*
**sergeant** 186:*6, 7*

**serial** 63:*19*
**Seriously** 71:*3, 4*
**service** 190:*18* 204:*2, 5*
**set** 221:*18*
**severity** 156:*4*
**shape** 114:*13*
**share** 9:*16*
**shared** 9:*3* 11:*12*
**Sharp** 1:*20* 3:*2*
**shattered** 176:*25* 177:*3*
**sheriff** 183:*16, 19* 195:*1,
13, 14*
**sheriff's** 183:*20* 195:*18*
196:*14* 206:*24* 207:*3*
213:*11*
**shift** 31:*20, 21* 32:*22, 24*
33:*9, 10, 15, 16, 17, 19, 20,
21* 37:*16* 39:*11, 13* 41:*21,
22* 50:*4, 15* 51:*1, 15, 16,
20, 23, 25* 52:*19* 54:*4, 10*
56:*10* 136:*10* 156:*21*
158:*18*
**shifting** 155:*24* 156:*14*
**shifts** 31:*20* 39:*3*
**shipped** 30:*10* 31:*2, 4, 7*
**shit** 74:*14* 101:*7*
**shoot** 110:*10, 11* 136:*20,
25* 138:*1* 145:*2, 19, 22*
146:*2* 158:*13* 188:*1, 8*
199:*14* 200:*17, 22, 25*
201:*6* 204:*24*
**shooted** 141:*18*
**shooting** 43:*14, 16* 49:*2*
68:*9* 138:*24* 140:*2, 3, 6, 8,
14, 19* 141:*13, 17* 143:*18*
146:*8, 14* 147:*22* 153:*19,
23* 154:*2, 22* 162:*25*
163:*8* 183:*4, 8* 185:*8, 25*
188:*22* 189:*8, 18* 192:*16,
19* 193:*11, 15, 17, 24*
194:*8, 21* 195:*17* 199:*18*
201:*12* 204:*18, 22, 23*
205:*5, 6, 18* 206:*1* 209:*8*
211:*25* 213:*7, 11, 16, 18,
24* 214:*11* 216:*13*
**shop** 160:*11, 16, 17*
163:*20* 164:*3, 11, 14, 16*
165:*8, 16* 166:*1, 6, 9, 12*
**shot** 74:*14* 101:*7* 137:*6,
9* 139:*13, 17* 142:*23*
143:*7* 144:*1, 4, 22* 145:*3,
6, 8, 12* 146:*19, 24* 147:*6,
11, 13, 18* 148:*1, 3* 149:*13*
150:*9* 151:*15, 23* 152:*19,
20, 23, 25* 153:*5, 18* 156:*1*
158:*20* 162:*10, 11, 13*
176:*5, 8* 208:*15* 212:*19*
214:*2, 8*
**shotgun** 114:*5, 8*

Case: 1:22-cv-00061-DAP  Doc #: 44-4  Filed: 01/31/24  236 of 239.  PageID #: 603

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**shots**  138:3, 5, 8, 14, 17, 19, 22  139:4, 5, 10, 12  142:1, 2  153:14, 16  168:5, 6  205:8
**shoulder**  122:6  123:13
**show**  11:12  35:10  56:9  65:10  71:11, 12  131:22  174:25
**showed**  55:16, 19  65:19  178:3  180:4  181:18
**showered**  53:16
**showing**  59:18  69:11  71:13, 17
**shows**  15:9, 10
**Shut**  74:13
**side**  12:15  61:22  65:24  66:2  73:4  75:5  76:11  80:20  83:25  96:22  97:9, 13  98:1, 21  102:1, 2, 9, 11, 12, 13, 15, 16, 22, 24, 25  104:23  105:21  106:3, 16  107:14  109:11  110:6, 7, 11, 12  113:1  120:18, 19, 22  121:1  131:19  134:5, 9  144:6, 7, 17, 18, 23  145:4  147:2, 5  148:24, 25  149:4, 10, 11  153:2, 13  171:1, 4, 10, 17, 18, 19  172:19  173:3, 4, 7, 18, 23  174:14, 21  176:4, 25  180:21
**sides**  30:18
**side-view**  105:13  106:1  147:20  148:6
**sidewalk**  156:11
**sight**  162:5, 9
**sign**  74:16, 18  75:23  76:1, 17  78:13  79:1  94:24  95:9, 12, 15  96:19, 24  99:8, 11, 13  121:20
**signal**  85:22
**signaled**  101:19
**Signature**  220:10
**signed**  23:23
**silent**  179:3, 18  181:5, 19
**Silver**  50:25
**similar**  28:9
**Similarly**  12:14
**Simulating**  121:21, 23
**sit**  17:14  75:9  80:15  86:17  114:24  126:8  144:11  147:10  209:16
**sitting**  79:3  82:4  84:10, 12  159:21  211:4
**situation**  89:6  190:16
**Six**  25:3  29:13, 14, 17  30:1, 2, 5, 11  31:17  32:3  34:2, 16, 18
**six-month**  25:13  34:4
**size**  114:9

**skates**  21:9
**skating**  21:6, 8
**sleep**  33:23
**slip**  11:9
**sloppy**  196:7
**small**  70:11
**smaller**  67:15, 17
**Smith**  32:12, 22  33:8
**so...from**  115:2
**social**  46:13  47:2, 9, 20
**socially**  44:17  45:6, 16, 22  46:10, 21  48:10
**solely**  27:12
**solo**  36:7
**somebody**  12:20  38:25  39:2  179:18  203:10
**someone's**  91:3  108:10
**something's**  157:9
**soon**  140:10
**Sorry**  24:19  50:12  52:14  55:24  58:23  69:1  72:4  94:20  105:1  118:13, 23  119:12  131:5  173:6  191:1  193:10  209:4
**sort**  84:12  133:3
**sounds**  27:7, 10  47:1  122:23  155:24  205:15
**south**  78:20  80:7
**space**  134:13
**Spanish**  217:5  218:18, 25
**speak**  219:13
**speaker**  220:2
**speaking**  97:23  157:8  218:10  219:3, 19
**specific**  26:22  28:20  145:13  217:12
**specifically**  12:23  61:20  164:9  176:3, 7  180:5
**specified**  221:14
**specify**  49:10
**speculation**  109:20  111:13  112:19  116:7
**sped**  141:15, 24  142:23  151:21
**speed**  148:11
**speeding**  102:4, 5  103:6  141:19  159:17
**speeds**  142:3
**spell**  10:3  22:18  37:22  40:7  42:2
**spelled**  10:5, 6
**spend**  34:11  45:14  55:5
**spending**  54:24
**spent**  46:20  191:20
**spoke**  85:23  185:18  219:11
**spoken**  217:14, 17, 20
**spouse**  17:8
**spray**  28:10, 11

**Square**  2:7
**squared**  21:10
**STADLER**  3:8, 9  6:13  13:21  156:3
**staff**  164:15, 20  166:1
**Standards**  196:21
**start**  8:7  13:19  18:13  22:23  24:13  29:7  31:1  50:14, 15  54:4  81:1, 7  217:8
**Started**  20:3, 11  24:15  29:3, 8, 10  32:2  37:9, 10  38:10  39:13  44:5  47:13  54:10  81:17  100:14  140:19  153:19, 22  154:2, 22  175:8  220:1
**starting**  20:23  71:22  72:6
**State**  1:19  10:3  24:17, 25  25:17  28:11, 16  34:9  60:8  216:18, 25  221:3, 24
**statement**  10:22  11:4  186:19, 20, 22  198:17  213:22
**STATES**  1:2
**stay**  20:14  32:19  33:18  35:21  45:13  100:15  163:25  167:22  168:11  175:2, 4  177:14
**Stayed**  33:17  100:4
**staying**  150:22
**steadily**  112:16
**steady**  112:23
**stealing**  82:9, 10, 12
**steer**  156:9
**steering**  107:8  135:7, 11  141:1
**stenotype**  221:8
**stick**  51:1, 15, 16, 25  133:25  134:16  158:18
**sticking**  64:25  102:23  109:17, 23  121:18  134:2  137:16
**stills**  9:16
**stock**  53:1  77:22, 23, 24
**stood**  181:15
**stop**  48:7  74:16, 18  75:23  76:1, 17  78:13  79:1  90:13, 16  94:24  95:9, 12, 15  96:19, 24  99:8, 11, 13  100:5  140:16  141:12, 18  142:2  147:8  150:8  157:13  159:14  169:25  180:11, 15
**stopped**  72:4, 8  76:18  96:3  103:22  139:7, 10  140:14  141:13, 17  148:10  151:24  152:9, 15  166:25  168:3, 4  169:23  170:7

**172**:22
**stopping**  124:23
**store**  63:14  82:17  83:4, 11, 14  89:12  91:11  97:5  100:20  118:24, 25  126:5  143:17  161:13  163:10
**straight**  56:7  64:23  121:19, 22  122:5, 8, 9, 10, 23  123:12  139:25  140:25  141:21  149:17  150:19, 22  151:17, 18
**straightforward**  139:2
**street**  167:2  178:21, 24
**stressful**  190:16
**Strike**  94:21  109:21
**students**  219:13
**stuff**  21:9  26:1, 3  43:4  62:22  81:17
**subject**  204:10
**Subsequent**  193:11
**succession**  139:5
**sudden**  100:10
**suggest**  89:14
**suggesting**  124:21
**Suite**  2:7  3:10
**sunglasses**  77:25
**super**  115:14  204:9
**Superior**  1:20  3:3
**Supervisors**  36:12
**supplier**  62:23, 24  63:11, 15, 16  66:21, 24
**support**  213:20
**supposed**  88:15, 18  202:25  203:5
**sure**  11:16  21:10  37:6  60:10, 14  132:1  150:19, 22  152:5  162:5, 8, 25  163:13  165:3, 9  169:16  185:3  198:24, 25  201:12
**surprised**  161:18
**surroundings**  205:23
**suspect**  79:17  81:7  88:6  89:20  125:20, 21  126:8, 11, 21  127:4, 5, 7, 25  128:12  130:14  162:18, 22
**suspected**  87:24  88:24  90:5  127:13
**suspension**  186:25  187:4
**suspicion**  89:17
**switch**  52:4  124:16
**sworn**  8:2  10:22  221:5

**< T >**
**table**  12:15
**take**  12:4, 5  17:6  18:16  23:19, 24  26:21, 24  35:22  41:10  42:21, 23  48:21  53:11  54:11  61:4  69:17  73:12  92:19  104:1  113:18  137:10  139:5

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

154:*15* 168:*7* 178:*5*
179:*8* 193:*24* 210:*7*
214:*18* 218:*17, 20*
**taken** 1:*17* 10:*15* 18:8
145:8, *12* 221:*12*
**takes** 41:*7*
**talk** 11:*7, 11, 16* 17:4, *8,
11, 21* 44:*24* 45:*15, 21*
49:*1* 55:*10, 15, 18, 25*
56:*3* 98:2 164:*19* 166:22
178:*17, 20* 179:*18* 180:*17*
181:*5, 6, 8, 9, 11, 19*
182:*11, 12, 18, 21* 183:*1,
14, 17, 25* 184:*14, 17, 21*
185:2 191:*12, 14, 21, 22,
24* 192:2, *8, 11, 14, 18, 22*
195:*5* 196:4, *9* 197:*5, 25*
213:9, *13*
**talked** 13:*11, 16* 16:*11,
25* 46:*9, 15, 20* 48:*12*
76:*19* 85:*5* 87:*10* 98:*20*
176:*1* 181:*17, 20* 182:*3,
14, 22* 183:*19* 185:*5, 7, 11,
24* 192:*17* 193:*8* 194:*7,
11* 197:*8, 19* 207:*22*
**talking** 15:*13, 17* 51:*21*
61:*18* 62:*2, 18* 64:*5* 67:*7*
77:*13* 88:*5* 93:*3* 95:*22*
102:*22* 115:*8* 164:*15*
166:*1* 180:*11, 15* 194:*17*
**target** 199:*14, 15* 201:*10,
12* 204:*16, 17, 24* 205:*8,
12, 14*
**tased** 28:*3, 4*
**taser** 27:*19, 21, 24*
**taught** 219:*15*
**tcabral@gallaghersharp.co
m** 3:*6*
**teachers** 218:*15, 22*
219:*11*
**team** 124:*1* 186:*12*
**tech** 60:*13*
**tedious** 128:*6*
**tell** 17:*13, 18* 18:*1* 19:*7*
25:*21* 40:*16* 47:*9, 11*
49:*5, 14* 50:*21* 73:*21*
74:*10* 81:*11* 100:*3* 102:*5*
110:*1, 19* 111:*15, 23*
113:*17* 114:*3, 5, 8, 23*
116:*21* 125:*11* 130:*8*
144:*23* 150:*3* 168:*15, 19,
20, 21, 22* 170:*9, 16* 175:*5*
176:*4* 177:*7* 178:*8* 179:*1*
180:*11, 15, 19* 183:*3, 5, 9*
214:*1, 7* 216:*15, 20*
**telling** 27:*5* 149:*7*
167:*15* 175:*8*
**tells** 158:6 205:*7*
**temperature** 77:*10*

**temporary** 188:*21, 24*
189:*21, 22, 23* 190:*8*
**ten** 54:*13*
**term** 89:*2*
**terms** 25:*22*
**TERRY** 2:*5* 8:*19* 91:*14,
17, 23*
**terry@fggfirm.com** 2:*12*
**test** 23:*24, 25* 27:*19, 24*
28:*3, 9* 199:*18*
**testified** 8:*3* 112:*20*
129:*17* 145:*15* 149:*21*
153:*9*
**testify** 13:2 28:*2* 221:*5*
**testifying** 89:*23*
**testimony** 75:*12* 85:*25*
90:*11* 114:*25* 122:*2*
123:*18* 127:*17* 128:*15*
130:*2* 146:*10, 15* 151:*10*
153:*12* 185:*2* 197:*11, 15*
221:*7, 10*
**tests** 26:*21* 27:*17* 28:*5*
**text** 17:*23* 44:*19, 23*
45:*16, 22* 46:*17* 60:*8*
192:*5*
**texted** 46:*9, 15* 55:*13*
**Thank** 8:*23, 24* 9:*18, 21*
16:*19* 38:*11, 12* 71:*8*
72:*12, 18* 92:*7* 133:*21*
210:*13* 220:*5*
**Thanks** 69:*19* 115:*15*
**theft** 95:*4, 5*
**thing** 48:*15* 71:*13*
149:*12* 150:*13* 151:*24*
157:*2*
**things** 20:*4* 175:*8* 203:*11*
**think** 11:*11* 18:*6* 22:*24*
23:*12* 30:*24* 78:*10* 79:*11*
83:*7, 19* 88:*15* 94:*18*
119:*19* 127:*8* 134:*12*
135:*24* 142:*12, 14* 143:*8,
12* 147:*12* 148:*14* 153:*18,
19* 154:*7* 161:*23* 164:*25*
168:*20* 169:*12, 14* 185:*20*
203:*10* 212:*25*
**thinking** 130:*22, 24*
169:*15*
**third** 31:*20* 33:*15*
**THOMAS** 3:*1*
**thought** 82:*10, 12* 94:*19,
22* 100:*2* 145:*3, 5* 147:*22*
148:*12, 17* 153:*16* 165:*13*
169:*10* 176:6
**threat** 88:*9*
**three** 14:*16* 16:*13* 23:*11*
31:6 38:*15, 16* 40:*18, 19*
42:*10* 46:*5* 52:*15* 59:*19*
69:*5* 102:*19* 133:*18*
138:2, *3, 8, 16, 19, 22*

**throw** 158:*18*
**thumb** 65:*20*
**time** 11:*8, 17* 20:*5* 22:*2,
13* 24:*11* 30:*25* 36:*25*
37:6 38:*10* 40:*4* 45:*14*
46:*21* 47:*11* 48:*12* 49:*7,
13* 50:*2, 4, 8, 10, 22* 51:*8*
54:*20, 24* 55:*5* 57:*21*
67:6 73:*9* 75:*17* 78:*6, 23*
79:*17, 20* 81:*22* 82:*23*
83:*17, 23* 84:6 86:*12, 25*
87:*12* 91:*10* 92:*13* 93:*3,
15, 24* 94:*10, 12, 17* 95:*24*
100:*19* 104:*4* 105:*9, 11*
106:*5* 108:*9, 23* 112:*5, 15*
113:*15* 117:*3, 7, 15* 118:*7*
120:*5, 9, 12, 17, 25* 125:*3,
10* 126:*2* 127:*21* 128:*11*
129:*5, 18* 133:*18* 136:*3,
14, 18* 138:*4* 140:*2, 6*
141:*10* 142:*5, 10* 143:*7,
13* 145:*13, 19* 147:*2, 7*
148:*12, 14* 149:*5, 8*
152:*21* 154:*13, 16* 156:*4*
161:*16* 163:*7* 164:*1*
165:*1, 16* 166:*17, 23*
169:*17* 170:*21* 171:*8*
172:*22* 176:*15* 177:*8*
178:*2* 183:*15* 185:*7, 24*
187:*17, 20* 189:*13* 190:*1,
6, 12, 15, 18, 20, 21* 191:*4,
20* 192:*14, 15* 193:*16*
194:*11, 17, 22* 195:*6, 16,
17* 202:*20* 210:*1* 215:*14,
17, 20* 216:2 218:*11*
220:*1* 221:*13*
**times** 39:*11* 57:*14* 83:6
138:*1, 2* 139:*9* 156:*25*
157:*14* 197:*19* 198:*16*
**tinted** 77:*15, 17, 20*
**tire** 160:*11, 16, 17* 163:*20*
164:*3, 10, 14, 15* 165:*8, 16,
25* 166:*6, 8, 12*
**title** 99:*9*
**today** 10:*20* 12:*7* 13:*10,
11, 13* 14:*1, 14, 15* 16:*4*
17:*2, 6, 14, 17* 18:*8* 78:*2*
126:*9* 147:*10* 198:*16*
209:*16*
**told** 16:*13* 17:*15* 18:*7*
74:*12* 102:*7* 103:*6* 153:*6*
169:*18, 19, 20* 170:*2, 6, 19,
23* 173:*15* 174:*25* 176:*21*
177:*11* 179:*5, 18* 181:*5,
18* 182:*12* 183:*2* 207:*6*
214:*3, 4* 215:*16*
**Tom** 13:*20* 22:*22* 69:*22*
133:*2*
**tomorrow** 35:*2*

**tool** 27:*21, 22* 202:*20*
**tools** 202:*15, 18*
**top** 41:*2* 64:*24* 71:*18*
132:*8* 210:*4*
**Torres** 22:*10* 23:*3*
**total** 34:*12, 15* 197:*19*
**totally** 219:*3*
**touch** 31:*14* 42:*15* 44:*14,
17* 173:*19* 174:*7, 11*
184:*9, 11*
**touching** 109:*10, 15* 136:*9*
**track** 163:*3, 13* 179:*7*
182:*10*
**Tracy** 33:*13, 25*
**traded** 216:*5*
**traffic** 54:*14* 78:*20* 80:*7*
154:*20, 21*
**trained** 26:*13* 88:*11*
200:*16, 18, 21* 205:*3*
**training** 19:*23* 25:*2, 4, 6,
22* 26:*4, 8, 14, 17, 18, 22*
27:*5, 11* 28:*7, 13, 14, 19,
22, 23, 24* 29:*2, 12, 15, 18,
22, 25* 32:*5, 6, 9, 10, 15, 21*
34:*10, 11, 12, 19* 42:*19, 21,
23, 24, 25* 43:*1, 7, 13, 24*
44:*1, 8* 88:*4, 13* 146:*12*
199:*9, 21, 22, 23* 200:*1, 6,
10, 24* 201:*2, 3, 4, 8, 21*
202:*11, 23* 203:*21* 204:*1,
4, 10, 11* 205:*7, 12, 15*
**trainings** 44:*4, 13*
**trajectory** 160:*1, 4*
**transcribed** 10:*23* 221:*9*
**Transcript** 1:*14* 10:*20*
129:*24* 130:*5* 220:*7*
**transcription** 221:*10*
**transferred** 30:*8* 31:*23*
**transpired** 116:*2*
**trauma** 216:*1*
**traumatized** 216:*1*
**travel** 204:*16*
**traveling** 217:*10*
**tree** 159:*20*
**trial** 9:*10, 11, 13, 14*
**Tricky** 120:*1*
**trigger** 116:*14, 17*
**triggered** 81:*11*
**trouble** 71:*10* 72:*24*
**truck** 53:*20, 23, 25* 74:*1,
5* 78:*15, 18, 21* 79:*4, 5, 21*
80:*9, 18, 24* 81:*3, 20* 82:*4,
7, 13* 83:*24* 84:*8, 9, 10, 11,
21* 93:*4, 18* 95:*2*
**true** 35:*12* 140:*8* 221:*10*
**truth** 221:6
**truthfully** 13:*2*
**try** 11:*7* 12:6 13:6
130:*3, 9* 131:*22* 154:*25*
155:*4, 14, 17* 156:*7, 9*

Deposition of Officer Jose Garcia

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

157:10  158:7  159:1, 2, 5,
9, 12  160:14  201:5
202:25  203:6
**trying**  11:10  65:11  88:1,
3  100:15, 25  101:2, 9, 10,
17, 19  103:15, 17, 19
104:17  115:19  135:25
155:8, 21, 22  158:9, 21
167:11  171:3
**turn**  74:19, 22  86:8  93:1
95:11, 13, 23  96:21  99:5,
19  140:20  141:16  156:12
**turned**  99:16, 20, 23
119:3  120:3  143:24
**turns**  100:13  104:9
**twice**  13:14  194:25
**Two**  14:6, 11  23:11
38:16  40:18, 19  41:6
42:6  44:4, 16  48:15, 21
68:11, 16  76:24  82:12
83:23  84:20  87:6  93:5
96:7, 13  98:6  143:1
179:14  184:1  195:7, 9
196:12  203:11
**Two-man**  37:14
**two-minute**  179:9  212:25
**two-page**  208:7, 24
**type**  61:20  67:3, 4, 6, 11
113:19
**types**  66:15
**typical**  50:19  51:25
52:24  56:12  74:21
**Typically**  57:9  61:11
72:13

< U >
**Um-hmm**  72:9
**unable**  13:1
**unattended**  81:3  82:6, 13
83:24
**uncle**  22:15  23:1
**understand**  11:1, 3, 14, 21
12:1, 2, 18  49:3, 8  80:14
86:16  130:2  144:9  198:4
**understanding**  11:12
219:23
**unholster**  131:3, 8
**unholstered**  118:21
125:19  131:16  132:2, 4
136:25  137:4, 9, 11
140:20  153:22
**unholstering**  137:1
**uniform**  56:22, 24  57:2, 4
60:23
**union**  22:21  179:4, 19, 23
180:6, 8  181:5, 15, 19, 21
185:21  193:3, 6  194:4
197:2, 3, 5  207:24  214:16
**union's**  182:1

**unit**  40:12  41:15  42:12
182:23  183:21  185:5
186:8, 9, 13, 14, 17  188:11
213:12
**UNITED**  1:2
**units**  37:10
**unknown**  83:23
**unloading**  53:21  74:1
85:14
**unplug**  71:11
**upset**  165:20
**use**  27:22  28:2, 15, 19
52:5, 13, 15  61:14  66:25
126:15, 17  186:9, 11
190:8, 22  199:20  200:2
201:3, 21  202:8, 18
203:12, 20  204:2
**uses**  63:12
**usually**  49:17

< V >
**vary**  57:20
**vehicle**  51:3  53:23  74:4
79:20  105:23  135:2
143:6, 22  167:10, 11, 14,
19
**verbal**  11:17  87:5  92:23
93:2, 20  94:2, 6  95:18
96:6, 11  98:6  99:15, 25
170:1  206:11
**verbally**  72:12  137:8
172:14
**verified**  148:13
**version**  71:20
**Victor**  22:19  29:24
**video**  4:3  9:1, 16  10:25
15:3, 4, 5, 13, 17  91:22
161:7  194:14  211:20
**videos**  15:22  16:3
**view**  15:15
**viewpoint**  211:6
**Villafuerte**  22:17  23:5
48:10  192:18
**violence**  26:3
**violent**  37:15  88:8, 20, 21,
25  89:14, 18, 21  91:4
**vis-a-vis**  110:4
**Visible**  84:13, 14
**vision**  122:16  163:2
**visit**  17:25
**vocational**  19:23
**voice**  13:7
**vs**  1:9

< W >
**waistband**  61:10  64:16,
17, 19  66:9
**wait**  182:13
**waited**  181:15

**waiting**  85:11  94:23
**waived**  220:10
**Walk**  68:19  184:5
**walking**  212:2, 7
**want**  10:18  11:16  13:15,
16  21:19  47:17  48:17, 19
49:1, 13  54:1, 2  60:9
69:10  72:21  74:13  89:7
101:1, 7  126:13  128:6, 20,
22, 25  130:5  157:11, 23
162:8  185:19  201:16
216:23
**wanted**  21:22  87:18
91:5  152:1  162:4  163:13
**wanting**  129:7
**wants**  35:17  185:12
**warn**  88:1  91:5
**warning**  90:18, 23  170:1
206:12
**warrant**  213:15, 20
**watch**  15:4, 22  204:12
**watched**  161:3
**watching**  95:24
**way**  21:22  27:25  30:17
72:3  76:20, 22  81:16
84:11  93:22, 23  97:20
98:15  99:4  101:16, 21
103:3  106:8  115:5
143:15  159:2  201:14
**ways**  21:23
**weapon**  56:19  61:21
62:13  64:9  125:15, 19
126:20  131:4, 8, 16, 18, 23
132:13  135:5  137:11, 14,
15, 19  139:20  140:10, 12
141:6  150:15  153:22
186:3  187:18, 21  188:3
189:10, 21  190:2, 4, 8, 9,
19  191:4, 6  202:5, 7, 19,
22  203:16, 18  204:2, 5
205:5  208:13, 15  212:16
**wear**  65:24
**wearing**  56:25  58:8, 21,
24  75:5, 14  78:6, 10
211:25
**website**  66:24  67:2
**Wednesday**  1:22
**week**  14:5, 6, 11  47:23
185:14, 15, 25  215:24
216:12
**weeks**  29:13, 14, 17  30:1,
2, 6, 11  31:17  32:3, 17
33:1
**Well**  80:1  82:9  84:18
88:8  114:5  147:5  162:24
188:20  210:24
**Wendy's**  73:2
**went**  18:17, 20, 22, 23
19:14  22:13  27:6  28:16
32:23  40:11, 12  42:12, 13,

14  47:14  53:15, 18  55:2
79:21  80:23  83:4  128:16
147:16  160:17, 18  163:17,
20  180:21  181:1  189:17,
24  219:7
**we're**  11:10  17:2, 5
23:16  25:16  31:19  33:23
41:16  49:3  61:18  62:2,
17  64:5  66:25  67:7
72:24  88:5  115:7  124:14,
20, 22, 23  150:7  198:1, 15
200:18  213:1  219:19
**West**  18:20  19:17  49:24
219:3, 6, 14
**westbound**  78:17
**we've**  31:3  158:6  213:9
**wheel**  52:21  86:8  107:8
122:15  135:7, 11  136:9
141:1
**wheels**  86:8
**when's**  204:11
**WHEREOF**  221:18
**Willowdale**  96:4  100:5
103:12, 22  104:10  105:11
115:24  116:3  118:9, 21
119:8  120:4, 14
**window**  74:8  76:14  81:5
83:25  84:4, 17, 19, 23
85:15, 19  86:6, 7, 12, 14
87:14  90:17  91:8  93:21
95:5  96:22  97:10, 13, 14,
18, 20, 23  98:1, 7, 21, 23
105:21  106:3, 5, 16
109:10, 15, 18, 23, 25
110:2, 12  113:1  120:12,
18  121:1  131:19, 21
132:9, 19, 20, 25  133:10
134:1, 3, 6, 10, 14, 17
137:17  144:23  174:1, 4
176:25
**windows**  51:10  76:9, 14,
20, 22, 24  77:1, 15, 20
98:12, 17  177:3
**window's**  87:2
**windshield**  77:19  159:25
160:1  161:4
**WITNESS**  13:8  72:1
118:6  208:12  221:4, 8, 11,
18
**witnessed**  166:1, 2
**woke**  53:12  55:2
**word**  64:15  126:15
127:22  129:21
**words**  52:25  106:11
129:7, 15
**wore**  78:7
**work**  20:6  35:10  39:1
42:1  44:22, 24  45:1, 2, 23
46:13  47:14, 21  49:18
50:2  53:7, 14, 16, 17

54:*12, 25*  55:*8, 16, 19, 25*
56:*4, 7, 13*  58:*3, 13*  59:*8,*
*9*  61:*6*  63:*3, 8, 9*  64:*6*
71:*23*  72:*3, 7*  74:*25*
82:*19*  83:*1, 2, 3*  88:*3*
90:*15*  154:*15*  187:*8*
191:*8*
**workday**  74:*21*
**Worked**  20:*2, 15, 16, 25*
21:*4*  22:*1*  51:*10*
**working**  18:*13*  20:*3, 12*
21:*16*  24:*10, 11*  39:*2*
42:*7*  50:*4*
**works**  25:*21*  31:*25*
38:*24*  63:*14*  185:*20*
**written**  10:*24*  14:*25*
26:*8*  27:*10*  186:*19, 20, 22*
213:*22, 23*
**wrong**  51:*7*  79:*18*  91:*3*

**< Y >**
**Yeah**  8:*8*  9:*22*  16:*18*
23:*16*  26:*6*  28:*4*  33:*21*
34:*14, 23*  38:*16, 22*  43:*10*
44:*21*  47:*25*  63:*9*  64:*10*
71:*6*  74:*18*  85:*21*  92:*5*
94:*4*  95:*3*  99:*13*  100:*2*
102:*17*  111:*4*  119:*22*
122:*12*  124:*7*  127:*11*
133:*19*  152:*19*  153:*2, 3*
158:*22*  168:*6*  169:*18*
175:*2*  193:*19*  197:*4*
199:*5*  200:*19*  205:*5*
208:*13*
**year**  20:*8, 11*  23:*25*
39:*16*  42:*6, 24, 25*  43:*9*
48:*7*  53:*4*  187:*16*  189:*20,*
*21*  190:*4, 5*  217:*12*
**yearly**  42:*19*  190:*13*
**years**  19:*12*  20:*15*  23:*11*
38:*15*  40:*18, 19*  41:*6*
42:*6*  48:*11, 16*  184:*1*
217:*7, 12, 13*  218:*7*
**year's**  30:*20*
**Yesterday**  17:*22*
**young**  76:*19*  92:*20*
161:*12*

**< Z >**
**Zoom**  2:*4, 5*  8:*12, 20*
48:*21*  72:*20, 23*  91:*22*