Adam Fried, Administrator
Estate of Desmond Franklin,

vs.

Jose Garcia,

In the United States District Court
Northern District of Ohio
Eastern Divison
Case No. 1:22-cv-00061

**Matthew Noedel**
Thursday, December 7, 2023

Reporter Lauren Shammo

DEFENDANT'S
EXHIBIT

**J**





Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918  fax: 216-241-3935

1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland, OH 44114



www.table8litigationsolutions.com

Case: 1:22-cv-00061-DAP  Doc #: 44-10  Filed: 01/31/24  2 of 167.  PageID #: 814

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3    ADAM FRIED, Administrator,   )
      Estate of DESMOND FRANKLIN,  )
 4                                 )
                     Plaintiff,    )
 5                                 )
            vs.                    )   No. 1:22-CV-00061
 6                                 )
      JOSE GARCIA,                 )   Judge Dan Aaron Polster
 7                                 )
                     Defendant.    )
 8

 9                          -  -  -

10

11            REMOTE ZOOM DEPOSITION OF MATTHEW NOEDEL

12         DATE:      December 7, 2023 at 10:00 a.m.

13         PLACE:     All parties appearing via Remote Zoom

14         REPORTER:  Lauren Shammo, RPR, CRR
                      Notary Public
15

16                          -  -  -

17

18                                        DEFENDANT'S
                                          EXHIBIT
19
                                             J
20                                        _____

21

22

23

24

25
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   APPEARANCES:

 2          On behalf of the Plaintiff:

 3                  FRIEDMAN, GILBERT & GERHARDSTEIN:

 4                  Elizabeth Bonham, Esq.

 5                  Terry H. Gilbert, Esq.

 6                  50 Public Square, Suite 1900

 7                  Cleveland, Ohio 44113

 8                  (216) 241-1430

 9

10          On behalf of the Defendant:

11                  CITY OF CLEVELAND LAW:

12                  J.R. Russell, Esq.

13                  Dylan Ford, Esq.

14                  601 Lakeside Avenue East, Suite 106

15                  Cleveland, Ohio 44114

16                  (216) 664-2800

17                  GALLAGHER SHARP, LLP:

18                  Thomas Cabral, Esq.

19                  1215 Superior Avenue, Seventh Floor

20                  Cleveland, Ohio 44114

21                  (216) 241-5310

22                          - - -

23

24

25
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1                    I N D E X

2                      EXHIBITS

3    Exhibit      Page      Line       Description

4    PX A          7         5         Notice of Deposition

5    PX B          7         5         Curriculum Vitae

6    PX C          7         5         Expert Report

7    PX D          7         5         Rebuttal Report

8                             - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                          THOMAS NOEDEL,

 2     a Witness herein, called by the Plaintiff as if upon

 3     Examination, was by me first duly sworn, as hereinafter

 4     certified, and deposed and said as follows:

 5                          EXAMINATION

 6     BY MS. BONHAM:

 7          Q.    Good morning, everyone.  Good morning,

 8     Mr. Noedel, I am Elizabeth Bonham, I'm counsel for the

 9     plaintiff in this matter.  Could you state and spell your

10     name for the record?

11          A.    My name is Matthew Noedel, M-a-t-t-h-e-w,

12     N-o-e-d-e-l.

13          Q.    Nice to meet you, Mr. Noedel.

14          A.    Same here.

15          Q.    For the record, we are conducting the

16     deposition by Zoom but it is only being recorded

17     stenographically and the witness is here pursuant to

18     notice.  Mr. Noedel, I know this isn't your first

19     deposition, correct?

20          A.    That's right.

21          Q.    How many depositions do you think you've given

22     in your career?

23          A.    If I refer to my -- my CV, I've got about 38

24     depositions in the last 18 years or so since I've been a

25     private consultant.
```

```
 1          Q.     Okay.  So this is not your first rodeo, so I

 2   won't belabor the basics, I just want to let you know we're

 3   going to -- we won't be here all day, I expect to be here

 4   for a few hours.  If you do need a break, just let me know

 5   anytime, okay?

 6          A.     Okay.

 7          Q.     I just ask that we don't take a break while a

 8   question is pending, is that fair?

 9          A.     Sure, yes.

10          Q.     And if I ask you a question I will assume, if

11   you answer, that you've understood it, is that fair?

12          A.     Yes.

13          Q.     Otherwise, if you feel that any question is

14   unclear or if you need further clarification, just ask me

15   anytime and I'll be happy to clarify, okay?

16          A.     Sure.  That's fine.

17          Q.     Okay.  Are you experiencing any circumstances

18   that would prevent you from testifying truthfully or

19   accurately this morning?

20          A.     No.

21          Q.     Okay.  I know it's earlier where you are than

22   it is here, isn't it?

23          A.     That's correct.  It's just after 7:00 a.m.

24          Q.     Okay.  Well, I wouldn't be prepared to testify

25   at that time in the morning, but I appreciate you being
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1   here.  Okay.  So let's get into it.  So I have sent your

 2   counsel four marked exhibits that I want to use during the

 3   deposition.  Were they able to get those over to you?  I

 4   just sent them.

 5        A.   I -- I believe I have them.  I have the CV and

 6   my two reports, I'm not sure what the fourth exhibit is.

 7        Q.   The only other exhibit I want to use is the

 8   notice of deposition.  Did your counsel send that over to

 9   you?

10        A.   Yes, they did.

11        Q.   Okay.  So what I would like to do, unless

12   anyone objects, because the screen share on Zoom gets a

13   little unwieldily for me, I would just like to enter into

14   the record the way I've marked those and then if you have

15   them with you, can you just refer to your copy rather than

16   a screen share?

17        A.   That's absolutely fine.  Yes.

18             MS. BONHAM:  Okay.  Is that fine with

19        you, J.R.?

20             MR. RUSSELL:  Yes.  If we get in a

21        pinch though, let me know and I can -- I think

22        I can pull them up, so, but he has everything.

23             MS. BONHAM:  Okay.  Great.

24        Q.   So I'm going to enter, the notice of

25   deposition is going to be Exhibit A to the deposition.

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   Matthew Noedel's CV is going to be Exhibit B.  The
 2   preliminary report of Matthew Noedel is going to be Exhibit
 3   C.  And then the rebuttal report of Matthew Noedel is going
 4   to be Exhibit D.
 5                       (At this time Plaintiff's Exhibits A,
 6               B, C and D were marked for identification
 7               purposes.)
 8        Q.    So when I refer to those exhibits or vice
 9   versa, when I refer to the title, can we all -- do you
10   understand what I'm going to be referring to, Mr. Noedel?
11        A.    Yes, I do.
12        Q.    Okay.  Great.  And you have those available to
13   you at the moment?
14        A.    I do.
15        Q.    Okay.  Fantastic.  So let's take a look at
16   Exhibit A, the notice of deposition, briefly to start with.
17   I have a -- do you have that in front of you?
18        A.    I do.
19        Q.    Okay.  I have appended a request for
20   production of documents to this notice and I had previously
21   propounded a request for production of documents early in
22   the case on your counsel with respect to some of these.  I
23   understand, you know, I didn't ask that you produce these
24   things today, but I'm going to ask that some of them be
25   produced, you know, eventually in the expert discovery
```

1    period.  So I just want to run down these, and they start

2    in the middle of the first page and they're numbered at 1.

3    Do you see where I'm looking?

4         A.    Yes.

5         Q.    Okay.  The first is a complete copy of your

6    file in this case.  Do you -- did you keep a file in this

7    case?

8         A.    Yes, I did.

9         Q.    Can you give me a summary of what's included

10   in that file?

11        A.    So I -- what I typically do not reproduce all

12   of the data that's provided, I work from the original data

13   that's -- that's provided.  So in my case file are

14   handwritten notes where I extract information from the --

15   the data that's provided, diagrams, various -- various

16   notations and things that I use or refer to later on, notes

17   about the physical evidence examinations I conducted, so I

18   have those kinds of written notes.  I also have some

19   extracts of key areas of some of the data from statements,

20   for example, of players in this event.  So that's what's in

21   my -- in my bench notes.  I also have -- those are my

22   handwritten notes essentially.  I also keep track of a lot

23   of data and sort photographs using PowerPoint, but not as a

24   traditional venue to present a show but simply to organize

25   concepts and photographs, and when I find physical evidence

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   and data that supports a particular concept I can
 2   accumulate that in a PowerPoint.  So I have the PowerPoint
 3   organization of data, which is similar to my bench notes.
 4   And then I do have, I did do some 3D scanning of a replica
 5   surrogate vehicle, I have the computer files of that 3D
 6   data in my -- in my notes or my folder.  That's basically
 7   what -- what I have maintained in there.  My agreement
 8   letter from counsel, what I have is called a client contact
 9   sheet that records when I was contacted and then billing --
10   billing records.  That's essentially everything that I have
11   in my -- in my file, along with my reports.
12        Q.    Thank you.  Do you keep that file
13   electronically?
14        A.    It's a combination of both.  There is an
15   electronic file and then there are, the handwritten objects
16   are in a manila type folder that I scan, when requested to
17   provide I'll scan those into the -- into a computer data
18   and then I can Dropbox or provide all of that data at once.
19   So I have both computer files and handwritten physical
20   notes.
21        Q.    Do you keep billing records as a part of that
22   file in this case?
23        A.    Yes.
24        Q.    Do you keep correspondence with counsel who
25   hired you as a part of the file in this case?
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1          A.    I -- I typically keep a lot of e-mails that

 2     are correspondence between myself and the client that's

 3     hired me, yes.

 4          Q.    Who did retain you in this case?

 5          A.    My recollection was that I was originally

 6     contacted by Elena Boop as counsel for the City of

 7     Cleveland or representing an insurance agency, but I think

 8     that's the actual attorney who -- who made initial contact

 9     and then I wound up meeting with other members of that

10     team, some of whom are on this call.

11          Q.    At what time did Ms. Boop first contact you,

12     if you know?

13          A.    It was, I was retained on May 13th of 2022.

14     Typically that's not the first contact, so I'm not sure

15     when she may have reached out.  Usually I receive an e-mail

16     or a phone call describing the case, am I available, do I

17     have time to work on a particular case.  Sometimes those go

18     forward, sometimes they disappear, so I usually don't track

19     the initial contact, it's more along the lines of when I'm

20     retained on a case that I begin tracking that, and that was

21     May 13th of 2022.

22          Q.    Are there any other data that you reviewed in

23     coming to your opinions in this case that are not contained

24     in the present copy of your file?

25          A.    Not that I can think of, no, I'm not aware of
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    any -- any additional data that's not in the file.
 2          Q.    The CV that we have from you in this case has
 3    on the bottom of it, and that's Exhibit B, if you have
 4    that.
 5          A.    Yes.
 6          Q.    Has on the bottom of it -- each page the words
 7    revision 2023 July 14.
 8          A.    Yes.
 9          Q.    Is that copy of the CV that we have still
10    current?
11          A.    It is, it is a couple of months behind, there
12    are some additional testimonies and activities that are not
13    yet recorded on that CV, but that is the current one that's
14    been -- that's been updated as -- as of today.
15          Q.    Can I ask that you provide an updated copy
16    through counsel?
17          A.    Sure, yeah, I can -- I can get -- get the CV
18    updated when I have time and glad to provide the most
19    current copy when it's available.
20          Q.    Sure thing.  As you sit there, do you know
21    which testimonies in which cases would be not yet listed in
22    the copy that we have of the CV?
23          A.    I suspect, I don't know specifically, but I
24    know I've had a couple of more depositions, I believe, that
25    will be reflected on that between, I think you mentioned
```

```
 1   July and November, I would have to go back through my

 2   calendar, but I would anticipate two or three more

 3   depositions and/or testimonies.  And I don't think there's

 4   any new -- I'm trying to think of, I don't think there's

 5   any new training updates or presentations or publications

 6   in that time frame.  So I think it would be primarily

 7   updating the last couple of months' worth of depositions or

 8   testimonies is all I can think of right now.

 9        Q.   Are any of the testimonies that you would be

10   updating arising out of cases in Ohio, whether in state or

11   federal court?

12        A.   No.

13        Q.   Have you ever been hired as an expert witness

14   by the City of Cleveland before?

15        A.   No.

16        Q.   Have you been hired as an expert witness by a

17   government or municipality in the state of Ohio before?

18        A.   Yes, I have.

19        Q.   Can you tell me about the instances where

20   you've been hired by a government in the state of Ohio?

21        A.   Yes, I can -- I can think of three, I think

22   there are three cases that -- that I've been retained on

23   and worked on in the past in Ohio.  Testified in Columbus,

24   Ohio in federal court, I think there were two different,

25   there maybe was only two, two different officer involved
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    shooting incidents where I was retained by the attorneys

2    representing the defendants in those cases.  And there's --

3    there's two that I can -- that I can recall and there might

4    be a third, I would have to -- I would have to check my --

5    some of those cases drug on for quite a long time.

6        Q.    Can you tell me about the two cases that

7    you're presently recalling?

8        A.    Yeah, sure.  One of them was in Columbus,

9    involved a police officer who shot a young man after an

10   armed robbery, there was a pursuit, the suspect was running

11   across a parking lot and produced a firearm and a police

12   officer shot and killed the suspect.  That was one of them.

13   Another was in Columbus, again in Columbus, Ohio, police

14   officers on patrol in a community observed a man brandish a

15   firearm, confronted the man and a shootout between the

16   officers and the man with the firearm ensued and that

17   resulted in that man's death.  Both of those were

18   fatalities that were caused by law enforcement in Columbus.

19       Q.    In both of those cases, was it the City of

20   Columbus Law Department that hired you?

21       A.    I don't recall if it was the City, I think in

22   one instance, in the first instance I think it was the City

23   that retained me.  And the other one may have been an

24   insurance company that was associated with the law

25   enforcement agency, something like that, without digging

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1  out the actual contracts, I'm not sure.

 2       Q.    Fair enough.  In the first case that you just

 3  described, do you recall the name of that case?

 4       A.    No, but if I refer to my -- it might be on my

 5  CV even -- even the one you have.  Would you want me to see

 6  if I can --

 7       Q.    Sure, we can, yeah, take a quick look at the

 8  CV, Exhibit B.  Testimonies begin on page 19 of 36 of that

 9  document.

10       A.    So one of them is -- was called Adrienne Hood

11  versus City of Columbus, that's how I've recorded it.

12       Q.    And the Hood case was the second case that you

13  just described, is that correct?

14       A.    It could be, I would have to look up all the

15  names and the data connected to them.  The other one, I

16  don't recall the name of that case and I'm not sure I ever

17  -- I may have been deposed but not testified, I don't see

18  it referenced here.  I want to say maybe King, an officer

19  involved shooting that involved the name King, but I'm not

20  sure, I would have to check.  If you want, I can look up

21  what those cases were.

22       Q.    That would be great, but we don't need to do

23  that right now as we sit here, but I would appreciate that.

24  And I do want to ask about the testimony that you provided

25  in those cases, so if maybe later on a break if you want to

1    refresh your memory it would be a more appropriate time to

2    do that.

3          A.    Okay.

4          Q.    Would that work?  Okay.  We'll come back to

5    that.  The CV that we do have, Exhibit B to the deposition,

6    also lists your publications and presentations.  Is that a

7    complete list to date?

8          A.    Yeah, as I sit here right now I don't recall

9    any new presentations or publications coming out in --

10   since July.  So I think that the listing there is up to

11   date.

12         Q.    Are there any publications that are listed

13   there that you specifically relied upon to arrive at any of

14   your opinions in this case?

15         A.    Not -- not specifically for this case, no.

16         Q.    Are there any other publications not produced

17   by you that you specifically relied upon as references to

18   produce your opinions in this case?

19         A.    Well, I may have referred to textbooks on

20   shooting incident reconstruction, for example, the book by

21   Lucien Haag, H-a-a-g, shooting reconstruction textbooks,

22   shooting scene reconstruction textbooks, I may have

23   referenced those in looking up some of the data.  But other

24   than -- other than the general knowledge that might be in

25   those, I didn't rely on any of those or any published

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    material to specifically evaluate this case.

 2         Q.    Understood.  Do you consider Haag -- never

 3    mind, let's move on.  So I'm going to put away for now

 4    Exhibits A and B, the notice of deposition and the CV and,

 5    like I said, we can come back later to discuss those two

 6    Ohio cases that you recall, if you end up recalling whether

 7    there was a third or whether there are any others, will you

 8    just let me know?

 9         A.    Sure.

10         Q.    Okay.  Thank you.  So what I would like to do

11    now, I have, like I said, marked your preliminary report

12    Exhibit C and the rebuttal report that you produced Exhibit

13    D and I'm really just going to march through those and talk

14    with you about them.

15         A.    Okay.

16         Q.    So if you want to -- if you're able to pull up

17    Exhibit C first.

18         A.    Yes, I have a hard copy in front of me.

19         Q.    Okay.  Great.  Looking first at the page 1 of

20    17 of this report, there are a couple of paragraphs of text

21    before the subsections start with subsection background.

22    Do you see where I'm looking, those initial paragraphs of

23    text?

24         A.    Yes.

25         Q.    Okay.  Does the second paragraph there express
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    your methodology?

2         A.    In -- in a very minor way I would say it

3    describes the methodology by using the phrase commonly

4    accepted forensic methods, so that, again, ties back to the

5    various education and training and background that I have,

6    so I'm using those methods as long -- as well as the

7    scientific method to evaluate the various aspects of this

8    event.

9         Q.    Can you explain in a little more detail what

10   the particular methodology that you used here was?

11        A.    Sure.  So in approaching a shooting incident

12   reconstruction I try to break down the events into

13   basically questions that may be useful in evaluating the

14   event.  In the scientific form the questions would be

15   considered a hypothesis, so make a statement and then find

16   data to support or refute that statement, and in going

17   through that process, that's where I begin to organize

18   things in a PowerPoint.  I can find -- I look for and see

19   if I can find data to substantiate the hypothesis or reject

20   the hypothesis or is the result inconclusive or does the

21   process, does the question need to be reworked.  And so

22   basically that's the methodology in going through, so I

23   start by reviewing what's being said about an event, I

24   catalog what kind of evidence, what pieces we have, I

25   sometimes call them landmarks that have to be met in order

Deposition of Matthew Noedel                                        Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    for the entire event to play out, so those are the physical
 2    aspects of a -- of a scene.  And so in going through that
 3    process I then begin to test various scenarios as -- as are
 4    posed in either interviews or statements or anything that
 5    claims a witness statement or, for example, Officer
 6    Garcia's interview information, and test what's being said
 7    and that forms the basis of what I -- what I ultimately can
 8    report on and how I generate the report.  So that's --
 9    that's the method I follow in doing a shooting incident
10    reconstruction and generally follows the scientific method
11    for discovery.
12         Q.   Is what you've done to express your opinions
13    in this case what you're referring to as a shooting
14    reconstruction, shooting scene reconstruction?
15         A.   Yes.
16         Q.   Okay.  Is that what you were asked to do by
17    counsel that retained you in this case?
18         A.   Yes, the question was, what -- can I do an
19    incident reconstruction or scene reconstruction or, in this
20    case, it's a shooting, so a shooting scene reconstruction,
21    yes.
22         Q.   What does a shooting scene reconstruction
23    typically involve?
24         A.   Guns.  So part of my process, part of my
25    methodology is looking for some of these key things that
```

```
 1   are common to all shooting incident reconstructions.  If
 2   it's a shooting incident such as this, there's gun, a gun
 3   or guns involved, so one of the things I start to look for
 4   is cataloging what the year -- the make and model of
 5   firearms that are present, how they're loaded, how they
 6   function, I may not have to physically write down things
 7   like how a Glock pistol functions, but I want to know what
 8   brands of guns, what types of ammunition are employed in
 9   this, and so I begin to catalog those types of things.  My
10   method then goes from, once I know what kind of guns and
11   ammunition are involved, can I track a discharge of a gun
12   from the time the trigger is pulled through the end point
13   of that single discharge, so that's going to involve
14   pulling a trigger to cause the gun -- the round, the
15   cartridge to fire, the bullet goes down the barrel on its
16   way and just after that, in semiautomatic pistols, such are
17   represented here, the cartridge case is expelled.  So I'm
18   looking at each one of those elements and everything that
19   occurs to cause those elements to see what, if anything, I
20   can figure out from that.  So for each cartridge case there
21   should be an expelled bullet and the path that the bullet
22   traveled, and so that's what I try to research and find out
23   in my methodology, can I track a particular shot, and if
24   there's multiple shots, can I do that for each shot that is
25   known to have been delivered or that I have evidence of.
```

Deposition of Matthew Noedel                                          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1    And in doing that, once I catalog the -- which firearms are

 2    available, the performance of each firearm and what the

 3    physical, again, I call them landmarks are in the scene,

 4    then I can begin to use that data to test various

 5    statements or theories about the case.  And so that's --

 6    that's kind of how I -- how I proceed in a shooting

 7    reconstruction by defining those landmarks, figuring out

 8    what I can from that data and then further testing any

 9    questions that may come up in the statements or witness

10    information.

11           Q.    That kind of shooting scene reconstruction

12    that you just described, about how many times have you

13    performed such a reconstruction in your career?

14           A.    I would estimate about 4 or 500 times, I work

15    about -- I work about 40 or 50 cases a year, I've been an

16    independent consultant for 18 years and I was with the

17    state patrol for 15 years prior to that.  The state patrol

18    was fewer reconstructions, now as a private consultant I do

19    more reconstructions, so ballpark it, that's 4 or 500 I

20    would say easily in going through that process and trying

21    to track the performance of bullets and firearms and

22    ballistic components in a scene.  And of course every --

23    not every case I work winds up going to court or being

24    deposed, and so many cases are resolved prior to that, so

25    I've worked a lot of cases, somewhere in the order of that

```
 1   I think is reasonable, 4 or 500 certainly in my career.
 2        Q.    In your career outside of law enforcement,
 3   since you've been a contractor, that's been since, is it
 4   2009?
 5        A.    2000 and, wait a second here, 2005.
 6        Q.    That's right, 2005.
 7        A.    Yeah.
 8        Q.    Has that been all you've done professionally
 9   since 2005?
10        A.    That's correct, the only -- the only
11   profession and the only -- the only career that I have been
12   working as.
13        Q.    So in the course of that career, since 2005,
14   you've done hundreds of these shooting scene
15   reconstructions, right?
16        A.    Yes.
17        Q.    Okay.  Is the shooting scene reconstruction
18   the main thing that you do as a consultant?
19        A.    Yes, I would say that's my primary specialty,
20   and I still maintain expertise in the mechanical
21   examination of bullets, cartridge cases and firearms
22   through my professional organizations, but the mechanical
23   second opinion, for example, through the microscope
24   comparison is a lesser part of my business, although I
25   still provide that.  And the other big area that I maintain
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   expertise in is in blood stain pattern analysis, and that's

2   because most of the shootings that I get involved with

3   reconstructing also have a component of blood letting or

4   blood stains, and so I consider those my two strongest,

5   most requested areas is shooting incident and blood stain

6   pattern analysis.

7          Q.    Okay.  Shooting incident, blood stain pattern

8   analysis are the two key areas that you provide

9   consultation on, and then mechanical analysis is the third?

10         A.    Yes, lab, I would call, I'm sorry to

11  interrupt, I apologize, I would call it laboratory

12  ballistics, you know, the physical microscopic comparison

13  of bullets, cartridge cases and the evaluation of those

14  components.  I also do a fair amount of teaching various

15  topics in shooting incident reconstruction, primarily

16  shooting incident reconstruction.

17         Q.    Are there any other areas besides laboratory

18  ballistics, shooting reconstruction and blood stain

19  patterns in which you are qualified in your view to provide

20  expert testimony?

21         A.    I do some work in general crime scene

22  reconstruction, for example, a stabbing that might have a

23  component of blood stain pattern analysis might be

24  something I get involved with, but that's relatively rare,

25  I do a couple of non-shooting events a year maybe, two or

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    three scene reconstructions that do not involve the

2    discharge of a firearm, so that's a relatively minor

3    component, but I will -- I will provide opinion about other

4    -- other scenes to the extent that I can provide

5    reconstruction value to them.

6         Q.    Understood.   Anything else that we've missed,

7    any other type of expertise or consultation that you

8    supply?

9         A.    No, I think we've mentioned everything that I

10   do in my business.

11        Q.    Between that laboratory ballistics, scene

12   reconstruction and blood stain patterns sort of fields,

13   which of these have you applied in this case?

14        A.    I would say this case has components of all of

15   those elements, the main component is the shooting incident

16   reconstruction, but in this case there is also a component

17   of blood stain pattern assessment and there's also a

18   component of ballistics, looking at the performance

19   projectiles and documenting how projectiles performed in

20   this environment.   So it -- it basically encompasses three

21   of the four, if I take out general scene reconstruction, I

22   didn't really consider it in terms of a -- of a general

23   scene, I considered it in terms of a shooting scene that

24   also had elements of blood stain pattern, and in my

25   shooting scenes I often like to evaluate the projectiles

```
 1    and the physical evidence to look at the performance of

 2    projectiles, not only that they've been fired, but what did

 3    they hit, what is the interpretation of how the bullets

 4    performed, interpretation of how the cartridge cases

 5    landed, so this has components of those three topics.

 6           Q.    In terms of how -- how the mechanics of how

 7    the bullets, you say, performed bear upon your opinions for

 8    the shooting scene reconstruction, generally speaking, not

 9    just with respect to this case?

10           A.    So bullet performance is, in my view, a very

11    underdeveloped, underutilized, it's not underdeveloped, but

12    it's certainly underutilized component of accident

13    reconstruction, and by examining how a bullet performs on

14    impact can tell you quite a bit about what that bullet's

15    history was.  So, for example, a bullet that goes through

16    glass often retains glass embedded into the surface,

17    sometimes you'll have a hollow point bullet designed to

18    expand on impact that does not expand, so then that leads

19    to more investigative questions, why did this not expand,

20    was this a ricochet, was the bullet under powdered with not

21    enough gunpowder or something along those lines.  So by

22    examining the bullets it informs something about the

23    history of that bullet and then that can be applied, as the

24    reconstruction builds you can apply the performance of a

25    bullet with bullet paths that you know exist and then try
```

```
 1    to organize that data among others.  Sometimes a bullet

 2    examination, just the performance of a bullet will allow

 3    you to eliminate it as causing some other event, for

 4    example, a bullet, I'll use this case as an example, a

 5    bullet that strikes but does not exit cannot go on and hit

 6    another object, so if you have objects that are struck you

 7    can take the bullet that is -- that cannot go any further

 8    because it's embedded in a surface or in a person and take

 9    that out of the -- out of the equation, and then you have

10    the other bullets to consider, which ones performed to

11    create these holes.  Bullets often retain angles and

12    dimensions and shapes that are commensurate with what they

13    struck and how they hit a surface, so that's what I mean by

14    bullet performance, did it collect trace evidence, did it

15    perform as designed, is it a complete bullet or a partial

16    bullet.  Oftentimes if we're looking at a portion of a

17    bullet the obvious question becomes where did the rest of

18    it go and so that's part of the -- the triage process in

19    reconstruction, understanding how the projectiles perform

20    to be able to backtrack them through the gun and then

21    evaluate ultimately the entire path that that bullet

22    traveled.

23         Q.   What about blood stain pattern evidence, how

24    does that generally bear upon or help you evaluate a

25    shooting scene reconstruction?
```

```
 1          A.   So using the commonly accepted nomenclature

 2   and processes in evaluating blood stains, you can catalog

 3   different shapes and patterns of blood stains and that can

 4   assist, along with the other information, the

 5   reconstruction efforts, for example, there is a category of

 6   blood that is connected to high energy spatter, small

 7   collection of multiple blood droplets, depending on where

 8   that spatter is located might inform you if a person was

 9   standing when a gunshot arrived or lowered when a gunshot

10   arrived.  There's a form of blood stains called drip

11   trails, so, for example, if a person is injured and then

12   they continue to travel, you may be able to track the drip

13   trail.  So it becomes another component that's often

14   connected to a wound, it's caused by a wound of some sort

15   and we know that ballistic events, firearm related events

16   often create blood producing wounds, and so it becomes a

17   result of a bullet path that may inform additional

18   information about the circumstances of the case.

19          Q.   Looking back to your report, Exhibit C, also

20   in those first couple of paragraphs here you say that the

21   evidence -- I'm sorry, the opinions are provided to a

22   reasonable degree of scientific certainty, correct?

23          A.   Yes.

24          Q.   So this is scientific expertise that you are

25   -- scientific opinions that you're expressing in this case?
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1          A.    Yes.

 2          Q.    Looking down to where the subsections begin at

 3   the bolded text background, the two paragraphs under

 4   background looks like contain the factual assumptions that

 5   you're using for the -- as the bases for the report, am I

 6   correct?

 7          A.    Yes, what I try to include in the background

 8   is uncontested information just to set the table of what

 9   the reconstruction is going to involve, it identifies

10   things like the names of people, that a car is involved or

11   multiple cars, in this case two cars are involved, and that

12   it's a -- it provides the context for the setting in which

13   this occurs, so.  I try to keep -- I try not to include any

14   kind of opinion or interpretation of it, just physically

15   what is undisputed and is known to have occurred.

16          Q.    Okay.  In your view the background section is

17   based only upon undisputed facts?

18          A.    Yes.

19          Q.    What is the source material that you use to

20   base that section upon?

21          A.    So typically this information comes from the

22   initial police reports and things like the event case

23   number, the date that it occurred, some of the mechanical

24   situations are presented in police reports, summaries of

25   the initial event, and then typically it's supplemented
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   with photographs, someone reports that there's a red Ford
 2   and then sure enough there's photographs to support that
 3   that's a red Ford in this event, so reports and photographs
 4   are the primary source of obtaining the background
 5   information.
 6           Q.    And that's what you used in this case as well?
 7           A.    Yes.
 8           Q.    Is everything that you referred to as source
 9   material for the report listed on page, beginning on page
10   15 of the report?
11           A.    Yes.
12           Q.    Is there anything else, as you look at this
13   from page 15 to 17, that you consulted but that is omitted
14   from this list?
15           A.    No, that's a comprehensive list from the
16   information that I relied upon.
17           Q.    Looking now to the subsection entitled in bold
18   examination and results beginning on page 1 and coming over
19   to page 2, you, it looks like, viewed what you call
20   replicas of the two vehicles at issue in this case, is that
21   right?
22           A.    One of the vehicles, the --
23           Q.    One, I'm sorry.
24           A.    I found a surrogate or a replica, same year,
25   make and model of the Ford that had the bullet -- the
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    bullet impacts documented to it, on October 8th I located a

2    replica car and then I made a 3D model of that car by using

3    a terrestrial laser scanner and capturing all the

4    dimensions of that.  By using that surrogate car of the

5    same year, make, and model, it gives me some of the

6    dimensional aspects of that vehicle which typically are

7    useful in reconstruction to have something to scale that

8    represents the actual vehicle.

9         Q.    So you looked at and created this

10   approximation of a replica car of my client's car, right,

11   Desmond Franklin's car in the case?

12        A.    Correct, just the Ford Taurus is the only car

13   that I -- that I scanned, that I documented.

14        Q.    Why didn't you create a replica or document

15   the other car, the car that the officer was driving?

16        A.    Because it only had one bullet defect in it.

17   I could have tried to do that but I wanted to try to model

18   the Ford that received the bullet impacts and then I can

19   always find a model to represent -- the dimensions of the

20   -- of Garcia's vehicle are less important to me in the

21   reconstruction then the car receiving them, the Ford, from

22   Franklin's Ford because we know the shots originated from

23   the Garcia vehicle and went to the Ford vehicle, so whether

24   the replica car was a little higher, little lower is not

25   going to matter, I'm more interested in what was impacted

1    by Garcia's bullets, so that's why, that's why I did the

2    Ford and not -- didn't create a 3D model of the Garcia

3    Honda.

4          Q.    And you had to do the modeling because neither

5    vehicle was available to you for actual inspection,

6    correct?

7          A.    That's correct.

8          Q.    Would you rather have had the vehicles

9    available to you for inspection?

10         A.    Yes, I would -- I would always prefer the

11   actual exhibit than a surrogate replica.

12         Q.    Did you understand when you were evaluating

13   this case what happened to the actual vehicles in the case?

14         A.    It's my understanding that they were -- were

15   released or destroyed, I don't know which, or released then

16   destroyed, I only recall being told that they were not

17   available for further examination.

18         Q.    Did you do anything to try to replicate or

19   evaluate the bullet strike that did go through the mirror

20   of Garcia's car?

21         A.    Yes.

22         Q.    Can you tell me about that?

23         A.    So once I have the Ford modeled and I can

24   evaluate the bullet strikes that were documented in the

25   photographs and the reports from the original processing

1    that was done, I can extend those bullet tracks and then

2    put a surrogate Honda adjacent to those and evaluate how

3    those two line up such that a projectile can travel from

4    the Garcia model into the Franklin model vehicles.  And so

5    in doing that process, I can align the angle that was

6    photographed through Garcia's mirror with the continuation

7    of bullet tracks that I know struck the Ford, and so then I

8    can move the cars forward and backwards in the 3D

9    environment on the computer until I find a position that

10   approximates where the angle through the mirror also

11   matches the angle represented in the car door, so that was

12   one of the exercises that I did using 3D data.

13        **Q.    And, sorry, it's obvious I'm not a scientist,**

14   **how did you get the Honda model then if you didn't go and**

15   **take the replica, how did you --**

16        A.    I simply incorporated -- fair question, I

17   incorporated the dimensions of the Honda and then took a

18   generic sedan from the 3D -- from the 3D tools that are

19   available, there's all kinds of drop-downs, you can add

20   another car, I just found a model and I scaled it to the

21   proper size of a Honda Accord or, I've forgotten if this is

22   -- Accord, scaled it so that the length and width are

23   appropriate for that -- for that model and then move that

24   alongside the 3D scan to scale that I took and aligned them

25   that way.  So it was a surrogate model of a Honda, it was

1   just not the same -- it may not have been the same year,

2   make and model, but in the 3D environment I can scale it to

3   the right length of the same year, make and model.

4        **Q.    And you used those approximations of those**

5   **vehicles in the -- when you say 3D environment, that's**

6   **inside a computer program that you use, is that correct?**

7        A.    That's correct.  It's within the 3D

8   environment I can do that from my office so that -- that is

9   work that I can do without having to actually be on scene

10  and troubleshoot the various angles and bullet paths that

11  are represented.

12       **Q.    Is there a name for that program?**

13       A.    The program I use is called Scene, S-c-e-n-e,

14  and it's a proprietary program that comes with the 3D

15  scanner that I use, and so I work -- I work within the

16  program.  So the scan data is acquired by the instrument

17  and Scene is the software that runs the 3D modeling.

18       **Q.    What kind of instrument is that, does that**

19  **have a manufacturer?**

20       A.    Yeah, Faro, F-a-r-o, X330, and generically

21  it's considered a terrestrial scanner, so it's a 3D laser

22  scanner called Faro, F-a-r-o.

23       **Q.    Cool.**

24       A.    Yeah, it is very cool.

25       **Q.    As part of that analysis, did you scan the**

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   exterior of the surrogate for Desmond's car, or, I'm sorry,

2   the interior of the surrogate for Desmond's car?

3        A.    Yes.

4        Q.    Did you approximate the dimensions for the

5   interior of the surrogate you made for Garcia's car?

6        A.    Not -- not for the interior, no.  The model --

7   the model that I used for the Honda I simply made the

8   length, width, and height the appropriate size for a Honda

9   of that year, but I didn't -- it's an opaque model so I

10  can't even see inside the Honda model, it's simply a shape

11  of a vehicle that has the dimensions of the Garcia vehicle.

12       Q.    So in looking at the model of the Garcia

13  vehicle surrogate, you didn't evaluate, for example, where

14  the driver's seat is with respect to the other items inside

15  the car?

16       A.    Correct, that -- I didn't make an effort to

17  try to replicate the position of the seat or the position

18  of the steering wheel or anything like that in the Garcia

19  vehicle.

20       Q.    Did you consider whether that vehicle was a

21  manual shift vehicle?

22       A.    I don't recall thinking or considering

23  anything about that.

24       Q.    For the model that you used to approximate

25  Desmond's car, what, if anything, was relevant to you about

1  the dimensions of the inside of the vehicle?

2       A.    Nothing in particular.  Nothing -- nothing

3  stood out, it was a typical Ford -- a Ford interior

4  vehicle.

5       Q.    So you just -- you got the data for the inside

6  of the vehicle just because you were there, it wasn't

7  necessarily because it was --

8       A.    Correct, I had one opportunity at the

9  surrogate vehicle so I scanned the entire exterior and then

10  I also took scans of the interior to try to fill in, in

11  part so that it looks like a complete vehicle without blank

12  spots, if I don't scan the interior then you can see right

13  through the floor and into the ground underneath and it's a

14  distracting view, so I document the interior as well so

15  that we know the alignment of the steering wheel, what the

16  dash looks like.  But I didn't -- I didn't do any

17  measurements or anything specifically to try to figure out

18  how far it is from the -- for example, I could measure from

19  the center console to the side door, all of those

20  measurements would be -- are captured in the 3D data, so

21  that's one of the values of the surrogate model is I don't

22  know if those values are going to come into play and be

23  used by me, and in this case generally they were not,

24  physical measurements were not important in my assessment,

25  but when I had an opportunity to capture those measurements

1  and dimensions, I grabbed them.

2      Q.    For your purposes in making your report, what

3  was the point of creating these approximations of these two

4  vehicles?

5      A.    So one of the things that I like to include in

6  my reports, I like to include visuals, some of the physical

7  descriptions of ballistic events and bullet trajectories

8  and horizontal and vertical angles are hard to follow when

9  it's just a written report, so if I have a model that I can

10  overlay bullet paths, a model that I can cut the roof off

11  of or something like that, now I can discuss the properties

12  of the bullet paths or the bullet performance and show the

13  model to scale of what that looks like, where that would be

14  and so I'm preparing that in the event that I may need to

15  describe this or, of course, I assume, which is why I keep

16  a case file, I assume every case I work is going to

17  ultimately wind up in court somewhere and so that's --

18  that's part of this, I prepare those kinds of models and

19  diagrams so that they are ready if they're ever needed.

20      Q.    Okay.  So these models that you created of

21  these vehicles, you did that to create a visual aid?

22      A.    Correct, correct, yeah.  They were not used,

23  for example, to measure an angle, the angles were derived

24  from other data and then applied to the model, the model

25  was not -- it wasn't the reverse where I used the model and

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    said, therefore the angle must be this or that.  But where

2    the model is useful, for example, on the Ford that has

3    multiple bullet strikes, I can position, based on the

4    photographs and the physical measurements that were

5    captured, I can reposition those bullet holes in the model

6    and then I know that those are accurate to where a Ford

7    Taurus Limited, where the door seams are and how the

8    pillars are built and the dimensions of a window, for

9    example, I've captured all that data to scale so that I can

10   track the bullets into it and that's -- that's part of --

11   part of it too, so it's to document demonstratives in the

12   future and to be able to visualize this, when I put the

13   bullet paths all together and I can move the model all

14   around in different orientations, what does it show me,

15   what do I see, what interpretation and value does that

16   have, that's kind of my end game in conducting that kind of

17   a modeling and that kind of an assessment.  I don't 3D scan

18   every scene, but I use it quite frequently and most --

19   nowadays a lot of law enforcement uses that, it's really

20   gained popularity in the last four or five years, 3D

21   modeling of a scene.

22          Q.   **Had you had access to the actual vehicles in**

23   **this case, you could have evaluated the bullet trajectories**

24   **in person using those vehicles?**

25          A.   That's true.

1      **Q.    Here the modeling that you used is not the**

2    **basis for the opinions you reached, correct?**

3      A.    No, the basis of the opinion is generated

4    first based on the documentation and the photographs that

5    are recorded about the actual vehicle, then that

6    information is translated on to my surrogate vehicle so

7    that I can observe it, so the process is identify the

8    bullet tracks first and then apply them on the model so

9    that I can look at that in different orientation.

10      **Q.    You also, turning back to page 2 of 17 of the**

11    **report at the top, viewed the scene of the shooting,**

12    **correct?**

13      A.    Yes.

14      **Q.    What, if anything, did that do for you to form**

15    **a basis for your opinions?**

16      A.    So what I like about visiting the actual scene

17    is it gives me a realtime, a real spatial dimensions of how

18    far things are apart and how busy, for example, the road

19    is, things that are not necessarily captured in a static

20    map.  And so, for example, in this event, of course when I

21    was there the fence had been repaired, but you could find

22    some of these landmarks, the signs that were still there

23    when I visited that are also captured in the original scene

24    photographs, and so it gives me an idea of the scale and

25    dimension, just the environment, the traffic that's around,

1    certainly distances, I walked from the convenience store

2    almost not quite to the highway but found the place where

3    the fence was repaired and it just enables me to see the

4    environment.  Photographs and maps often don't capture the

5    scale or perspective that a scene has, sometimes it's a lot

6    bigger than it seems or smaller than it seems.  I don't

7    recall my impression of this, but when I had the

8    opportunity as I was in Cleveland I just wanted to be able

9    to say I had seen the location where the shooting occurred.

10         Q.    So you came to look at the evidence in the

11   case and you also went and looked at the scene?

12         A.    Correct.

13         Q.    It gave you some context?

14         A.    Absolutely, yes.

15         Q.    Do you remember what time of day you went and

16   looked at the scene on Pearl Road?

17         A.    My recollection was it was prior to my

18   appointment to view the physical evidence, so I'm

19   estimating that I was on that scene maybe at 9:00 or

20   10:00 a.m.

21         Q.    A different time of day than the shooting, but

22   still a daytime?

23         A.    Yes, it was daylight, it was daytime, and,

24   again, it was not to measure the width of the road or

25   anything like that, it was just to visualize the actual

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1  environment.

2       Q.   Do you remember the traffic on Pearl Road?

3       A.   A little bit, sure.

4       Q.   What kind of traffic was it, if you recall?

5       A.   It was -- I would -- I would estimate it as

6  very average, there were no real backups, you know, at the

7  stoplights in the area, cars would stack two or three deep

8  maybe before they would get the light and move on, so I

9  don't consider that heavy, I consider that normal traffic

10 flow, so it was not rush hour or there was not any kind of

11 backup that I was aware of.  I recall it being a four lane

12 road, so as a four lane road there's -- it's prepared to

13 handle some volume, so, but it was very average.

14      Q.   There's construction right now so there's a

15 huge jam up right there on Pearl Road, it's really

16 horrible.  But it wasn't like that that day, it was normal?

17      A.   I don't recall any construction anywhere

18 between the convenience store and the highway, there might

19 have been something on the on ramp, starting on the

20 highway, but it was not backed up when I was there that I

21 recall.

22      Q.   So we're still in this section under

23 examination/results, that's the subheading where it starts

24 on page 1 and goes through page 2 of the report, and is

25 that, you know, when you say examination/results as the

Deposition of Matthew Noedel                Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   subheading, what is contained in this portion of the
 2   report?
 3        A.   So the reason that's a dual heading is because
 4   with the evaluation of -- I find that with the evaluation
 5   of ballistic events and shooting reconstruction events,
 6   disengaging the result from the -- from the examination is
 7   sometimes more confusing then including them together.  So,
 8   for example, a gun that was loaded in a particular way,
 9   well, the result is how it was loaded, the exam is there's
10   a -- a Glock pistol, and so rather than separating that I
11   combine the whole heading and then I try to use subheadings
12   to describe each of the -- each of the, again, I'll use the
13   word landmarks or elements that I want to establish so that
14   I can then do, troubleshoot the scene further.  So I
15   combine those two to make the report -- I think makes the
16   report clear by including some of the results of the
17   observations or documentations, for example, about a gun,
18   about a car or something like that.
19        Q.   And when you say results in this context, what
20   does that mean for you?
21        A.   Well, a result could be the position of fired
22   cartridge cases, that a collection of cartridge cases, for
23   example in this case, five fired cartridge cases were found
24   inside the Garcia's vehicle.  That's an observation, that's
25   an examination observation, but the result is that the gun
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    was discharged in and around -- in or around that vehicle,

2    which, of course, fits with the rest of the reconstruction.

3    So a result is that the physical evidence supports being --

4    the gun being discharged from a position near the driver's

5    seat.  The exam is that there are five cartridge cases in

6    there.  So marrying those two together, an exam and a

7    result, allows me to digest, just as cartridge cases, those

8    make sense for what's being claimed in this event.

9         Q.    I see.  And in this section you express those

10   two things, the examination and the result, as to each

11   landmark or important element that you, you know, view as

12   important for the scene reconstruction, is that fair?

13        A.    Correct, yes.  I'm trying to establish

14   landmarks that I may or may not draw, you know, be able to

15   draw information from later to support or refute a

16   particular concept.

17        Q.    Understood.  So we spoke about the vehicle

18   reconstruction and the scene viewing.  Now we're moving on

19   to the subheading in italics, Officer Garcia data.  What is

20   the basis that you use as source material for the findings

21   under Officer Garcia data?

22        A.    Police reports and photographs.

23        Q.    Okay.  So under the first bullet point here,

24   there are two bullet points, first bullet point you say,

25   this supports or you make a finding that Officer Garcia

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    fired five times.  That's not really in dispute, right?

 2            A.    Correct, I don't believe that's in dispute.

 3            Q.    Right under that, the second bullet point, you

 4    say, "This supports all five of his fired cartridge cases

 5    ejected into the interior of the vehicle he was driving."

 6    Can you tell me the specific basis for that conclusion?

 7            A.    Yeah, so I mentioned earlier that in part of

 8    my -- my method, my process is to try to track the

 9    performance from the time a trigger is pulled all the way

10    through the entire performance of that particular shot

11    cycle.  In a semiautomatic pistol, like what Officer Garcia

12    had, some of the energy of each individual shot extracts

13    and ejects the cartridge case, and ejection pattern

14    analysis is one subdiscipline within shooting

15    reconstruction that I study and consider in this event.  So

16    that all the cartridge cases ejected into the car where

17    they were ultimately recovered, according to police reports

18    and scene photographs, tells me that the ejection port of

19    his pistol is in a location or a position such that the

20    cartridge cases can come back into the car, that is,

21    they're not going over the top of his car as if the gun was

22    extended out of the window a long way at the time it was

23    fired, it's they're being ejected back into the car, and so

24    that is one aspect, and I can marry the ejection pattern

25    with the path the bullet takes and kind of trap that gun in
```

 1   various positions between ejecting into the car.  Now

 2   ejection patterns into vehicles are difficult because they

 3   will almost certainly be intercepted by the roof and the

 4   dashboard and the chairs, they can fall off of chairs, they

 5   can bounce off of a seat on to a floor, they can

 6   subsequently roll under, so inside a vehicle you can't

 7   really position things on the -- from the ejection pattern

 8   itself, but certainly all five of his cartridge cases wound

 9   up inside his vehicle, so he has a shooting profile that

10   enables that ejection, that type of ejection from his gun.

11        **Q.    Assuming that, that all five car triages are**

12   **found inside of the vehicle, what exactly does that tell**

13   **you about the position of the gun when he was shooting it,**

14   **if anything?**

15        A.    It's that it was near -- that it was inside or

16   near the vehicle, near an opening to the vehicle for them

17   to be inside the vehicle means that they were either

18   discharged within the confines of the vehicle or the gun

19   was close enough to the exterior of the vehicle that the

20   cartridge cases flew back inside the vehicle.  So it gives

21   me some limitation as to that he was, in fact, shooting

22   from -- from the driving position, as was claimed, and it's

23   -- that is, I would say that concept is supported by the

24   physical evidence, because the ejection pattern is

25   predictably to back toward the position of the shooter, and

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    of course, I -- I'm also marrying, it's not that

 2    observation alone that I consider, I'm marrying that to the

 3    path that the bullets took.  So I'm evaluating the position

 4    of the gun based on bullets going one direction and cases

 5    going the other, and it's that process that enables me to

 6    localize the gun in a particular area.

 7         Q.    Based upon the ejection pattern and the bullet

 8    paths, you believe that Officer Garcia was, in fact, in the

 9    driver's seat driving the car when he was shooting,

10    correct?

11         A.    That's correct.

12         Q.    And you believe that the gun, as it was being

13    shot, was either inside or somewhere close to the vehicle,

14    correct?

15         A.    Correct, and to further combine that with him

16    operating the vehicle in the driver's seat, we can still

17    limit his -- the position that he can achieve, his arm's

18    length and, of course I don't -- I don't know his arm's

19    length, but if he's an anatomically normal human, it's just

20    within a couple of feet of the side of the door, so that is

21    an area that he could eject from.  So they're -- not that

22    there were any claims that he got out and shot outside of

23    the car or anything like that, but that supports that

24    aspect of the shooting, that the ejected cartridge cases

25    and the angles of the shots into the Ford are consistent
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   with him operating the vehicle while he's shooting.
 2        Q.   Based upon this data, the gun could have been
 3   sticking some way out of the window or out of the car,
 4   right?
 5        A.   Yes, yes, ejection -- ejection from a
 6   semiautomatic pistol, such as a Glock that he's carrying,
 7   tries to eject to the right and rear, so if he's extending
 8   his arm out of the -- out of the driver's window and
 9   pointing it in the direction where his bullets struck, I
10   expect the cartridge cases to eject back toward him, so the
11   gun can physically be out of the window and still eject
12   back into the car.
13        Q.   Okay.  So the gun could be partially outside
14   or all the way outside of the car, just not very far away
15   as though he ran out of the car, correct?
16        A.   Correct.
17        Q.   In this case did you see any police reports
18   indicating that only four cartridges were found inside of
19   his car?
20        A.   Yes.
21        Q.   Can you tell me what you made of that, if
22   anything?
23        A.   So in the -- in the initial scene when the car
24   was still physically on the road and the road was blocked
25   off, of course, the initial investigator located four of
```

```
 1   the fired cartridge cases.  Ultimately the car was towed to

 2   the garage in a controlled environment, that's when the

 3   examiner found the fifth one.  So initial reports they only

 4   found the four and then when they secured the vehicle and

 5   put it in a confined garage is when they found the fifth.

 6   So that's all I make of that accounting.

 7        Q.    Moving forward to the area under Desmond, the

 8   italicized subheading, Desmond Franklin data.  In the first

 9   sort of subsection you find that the -- the pistol in

10   Desmond's car was recovered at the feet of Mr. Franklin

11   Ford of the driver's seat, is that correct?

12        A.    Yes.

13        Q.    Okay.  So you don't have any disputes with

14   where that gun was recovered?

15        A.    No, that, I think, is well supported by the

16   body camera video of the first person who actually

17   recovered or reported recovering the gun is in that area

18   near his feet.

19        Q.    Okay.  Moving down to the bullet points below

20   that, you find that the pistol had the safety lever on the

21   left side in the on safe position, correct?

22        A.    Correct.

23        Q.    So you don't have any disputes with that, you

24   find that the safety was on that firearm?

25        A.    Again, I'm making an assumption there that the
```

1  photographs that captured this gun were not altered in any

2  way, that they simply recovered the gun and then, when time

3  permitted, photographed it as is.  So it was documented

4  with the safety in a position that would be on safe when

5  they photographed it.

6      Q.    Okay.  And what does it mean for that pistol

7  to be in the on safe position as you've put it?

8      A.    So there's an external safety lever, it's

9  called an ambidextrous because the lever is actually on the

10  left and the right side, when you move that lever downward,

11  so it's pointing downward, that's the on safe position, and

12  what that does is it locks out the ability for a pull of

13  the trigger to cock the hammer and fire the gun or to be

14  able to discharge the gun, the gun is mechanically locked

15  and unable to discharge when the safety is applied as it

16  was photographed.

17      Q.    If you are holding that pistol -- have you

18  physically held a pistol like this one?

19      A.    I've held this pistol, yes.

20      Q.    Yeah, this particular pistol, if you're

21  holding that particular pistol and the safety is on or on

22  safe as you've just described, how does the trigger feel,

23  can you --

24      A.    That I don't recall, I would have to -- I

25  would have to check if -- if it has a disconnect.

1   Sometimes when the safety is on safe the trigger flops and

2   sometimes the trigger is physically blocked.  I think this

3   trigger simply just doesn't pick up, which I think you

4   would meet very little resistance in pulling the trigger,

5   but for a deposition I would want to check the mechanics of

6   that specifically.  So I'm going from memory, I think the

7   trigger simply just can move but it doesn't have any

8   tension, any real tension on it.

9        Q.    Fair enough.  In either case, if you're

10  holding that gun, you know how to use that gun and you put

11  your finger on the trigger when it's in the on safe

12  position, would you know that you can't fire the gun and

13  shoot a bullet out of it?

14       A.    Only once you pull the trigger, you would have

15  to complete the action of pulling the trigger to the rear

16  and then you might recognize that you have this slack and

17  that the trigger is not engaging properly, but it would

18  require you to pull the trigger to the rear, you wouldn't

19  -- you wouldn't recognize it just by touching the trigger,

20  it would require you to be pulling the trigger.

21       Q.    Then what about visually, if you look at that

22  pistol and the safety is in the on safe position, can you

23  visually tell that it's -- that it's on safe?

24       A.    If you know the gun the answer would be yes,

25  if you know how the gun functions, you could either

1    recognize that the lever is not parallel to the frame but

2    it's pointed downward, that would be one visual.  And then

3    when it's on fire there's a little dot that is exposed, a

4    little red dot, red means hot, fire, and you might be able

5    to see that dot when the lever is in fire.  So it's

6    conditional if you know the gun and know the

7    characteristics of the gun, but it has a visible downward

8    tilt to the safety lever and when it's on safe it covers up

9    that red dot.

10           **Q.    And with this pistol, how -- how physically do**

11   **you put the gun into on safe or off safe?**

12           A.    Either side lever, you simply, typically you

13   would use your thumb to push the lever upward, it rotates

14   maybe a quarter-inch from on safe to ready to fire.

15           **Q.    The third bullet point under the subparagraph**

16   **saying Desmond Franklin data, you talk about pulverized**

17   **glass and blood on the surface of Desmond's pistol, is that**

18   **right?**

19           A.    Yes.

20           **Q.    I want to ask you about the pulverized glass,**

21   **you viewed that physically when you looked at that gun, is**

22   **that correct?**

23           A.    The glass?

24           **Q.    Yes.  The pulverized glass on the pistol.**

25           A.    No, when I -- when I did my direct viewing of

```
 1   the physical evidence in this case the gun had changed its

 2   appearance quite a bit, the blood had degraded, the blood

 3   that was on the surface had degraded and created some rusty

 4   areas, and because I think the gun had been test fired and

 5   examined by other examiners prior to me, there was not

 6   nearly as much glass contained on the surface of the gun.

 7   I would have to zoom in on the pictures I took at that

 8   time, but I deferred to the original scene photographs

 9   because I think they captured the appearance as it was

10   right after collection, and in my opinion the trace

11   evidence like this blood and glass had changed by the time

12   I did direct viewing.

13          Q.    Okay.  So the meaningful photographs of the

14   glass for you were the ones taken at the scene, is that --

15   am I getting that right?

16          A.    Correct, yes, in the original photographs when

17   they first put the gun in a package, a storage box they

18   took photos of both sides of the gun.

19          Q.    That's what you're using here on page 3 of

20   your report as figure 1?

21          A.    That's correct.

22          Q.    What, if anything, does that glass, and I see

23   the arrows you put in pointing to it on figure 1, what, if

24   anything, does that tell about you this crime scene?

25          A.    So one of the things I know about this event
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    is that a fired bullet perforated, went through and through
 2    the passenger side window glass, and that's a type of glass
 3    called tempered glass, causes the entire window to shatter
 4    when it's struck by a projectile.  With the high energy of
 5    a projectile it creates a lot of very tiny shards, what
 6    I've called the pulverized glass, and so this gun, what
 7    this tells me forensically about this reconstruction is
 8    that this gun in some capacity was exposed to this
 9    pulverized glass, whether it arrived at the exact time that
10    the glass was pulverized or that pulverized glass landed on
11    the gun, I can't say for sure, but it was definitely not
12    hidden or protected from pulverized glass arriving to it,
13    so that's the -- that's the gist of the observation that I
14    included here, because I know I have pulverized glass, one
15    source of pulverized glass that combines with the rest of
16    the reconstruction.
17         Q.    Was the shattered passenger side window from
18    the bullet the only source of pulverized glass that could
19    have resulted in these glass drops?
20         A.    Yes.
21         Q.    The windshield crashing against the fence
22    could not have done it in your view?
23         A.    No, a couple reasons, the windshield glass is
24    a different design, it's called laminated glass, and so it
25    doesn't pulverize and then, albeit a significant impact,
```

Deposition of Matthew Noedel                                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    it's still considerably less energy then the focused bullet

2    perforating the glass.  So the windshield cracking and

3    being hit with the head or the -- or a body part or

4    something is not going to create the kind of pulverized

5    glass that we see here, it requires the higher energy

6    connected to something like the discharge of a firearm.

7         Q.    In your view the pulverized glass then that

8    went on to this gun shattered at the moment that Garcia's

9    bullet hit it, correct so far?

10        A.    The glass did, the glass shattered, and if we

11   look at high speed video of tempered glass being fired with

12   handgun rounds, you see an enormous plume of pulverized

13   glass, it's everything from little shards like what we see

14   here to almost dust-like fragments of glass, and that

15   pulverized glass is propelled forward along the path of the

16   bullet, the bullet is kind of hidden inside that plume of

17   pulverized glass, the glass is relatively small so it falls

18   out and the bullet keeps going, and that's what I recognize

19   happening here.

20        Q.    Here after that glass shattered, that was from

21   what you expect to be the -- either first or second bullet

22   that was fired, correct?

23        A.    Yes.

24        Q.    Okay.  And we'll talk about that in a minute.

25        A.    Sure.

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    **Q.    So the glass shattered from either the first**

2    **or second bullet and then went all over the inside of the**

3    **car?**

4         A.    Yeah, there's -- there is a lot of, both

5    photographically and then practically my knowledge about

6    glass breaks, there's a lot of pulverized glass in and

7    around the front seat areas across in the car.  So, yeah,

8    that pulverized glass is blasted into the -- into the car

9    and can land on all the -- on any surfaces inside the car.

10        **Q.    And then from the point that the glass**

11   **shatters in this case all the way up to the point where the**

12   **car crashes and comes to a resting position, that glass is**

13   **still going all over the inside of the car, is that**

14   **correct?**

15        A.    I wouldn't say that, I think the -- the

16   pulverized glass dissipates pretty quickly, it doesn't

17   float like chalk dust or something like that, at least not

18   the shards that are as large as what I've identified in

19   this photograph, those will settle fairly quickly, so I

20   don't expect those shards to be flying around the car, but

21   they would be on surfaces.  I think by the time the car

22   crashes, that pulverized glass would have landed and been

23   sitting on whatever surface it landed on.

24        **Q.    Okay.  So that -- that pulverized glass, even**

25   **though there's a plume, it doesn't remain in the air**

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   really?

2          A.   Correct, for particles the size that are

3   represented in this image, I expect them to fall out of the

4   air pretty quickly.  I don't have a quantitative time

5   frame, I've never considered that, but they are physical

6   entities, they have mass, and so they will settle under

7   gravity pretty quickly in the environment of this shot

8   being delivered.

9          Q.   Okay.  So the glass shards fall pretty quickly

10  and then after they fall, as the car is in motion, that

11  matter is shifting around until the car comes to --

12         A.   It can, correct, glass shards, fragmentation

13  patterns that are inside the car settle down and they can

14  be dislodged, they're not necessarily stuck to the surface

15  that they land on.

16         Q.   And similarly, they could, you know, if

17  there's glass that has fallen onto the seat, for example,

18  then it could be smushed up against another object or come

19  into contact with another object with the car as it moves?

20         A.   Correct, we would call that a secondary

21  transfer, and, yeah, that would be glass that has already

22  shattered and landed and then secondarily transferred onto

23  another object.

24         Q.   If you had had access to the actual vehicle in

25  this case, could you better tell the extent and location of

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   the glass in that car?

 2        A.    Possibly, it's -- I would -- I would generally

 3   lean towards that it wouldn't be valuable because that

 4   plume of glass, that high energy dissipation of glass

 5   doesn't necessarily land in a predictable cone shape thing

 6   that I could then trace back and say, oh, this traveled

 7   this far or whatever, but there's always value in observing

 8   the direct piece of physical evidence, in this case the

 9   car.  So I stopped short of saying it would have no value,

10   I don't know that it would have no value, but it would be

11   something that could be considered if we had had the car

12   and look for transfers of glass in other conspicuous areas

13   in the car.

14        Q.    Can you tell here whether the glass fell onto

15   the gun or struck the gun from a particular direction or

16   how it got there?

17        A.    No, I -- I stopped short of trying to figure

18   out how the glass actually arrived to the surfaces on this

19   gun because of what we've discussed, we know that glass, a

20   lot of small shards were generated, so the best that I can

21   do with the reconstructive aspect is to say that the gun

22   was not protected from glass arriving to it.  When the

23   glass actually arrived to it, I can't say.

24        Q.    Okay.  And when you say the gun was not

25   protected, in this case that means the gun wasn't wholly
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    shut away somewhere?

2          A.    Correct, it wasn't -- it wasn't protected.

3    The glass will only go in to spaces that it can fly into.

4    So if -- if the gun were protected, say, between two seats

5    or in a pocket or something like that, it would be

6    physically blocked from the glass arriving to it.  So

7    that's not indicated in this -- in this event, so somehow

8    the gun is exposed enough to be able to intercept the

9    glass, whether it's from the primary bullet strike or

10   secondarily being set into preexisting pulverized glass, I

11   can't tell the difference between those two.

12         Q.    I see.  Now, at -- going back to the bottom of

13   page 2 of the report, the final paragraph, unbulleted

14   paragraph, the autopsy report shows a single gunshot entry

15   wound to Mr. Franklin's right temple with no associated

16   exit and that the bullet entry is irregular in shape, which

17   supports that the bullet struck an intervening object prior

18   to arriving to Mr. Franklin.  Can you explain to me the

19   significance of those two findings?

20         A.    So, again, in tracking a bullet path, trying

21   to complete the track, I have a bullet that left Garcia's

22   gun, impacted and pulverized glass, and my question then

23   becomes is that the bullet that also crossed the interior

24   of the Ford and struck Franklin in the head.  So one of the

25   things I'm going to look at is the wound pathology or the

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    wound ballistics that are associated with the autopsy, I'm
 2    not a pathologist, I'll admit, but I study wound impacts
 3    and bullet impacts into bodies in virtually every case I
 4    examine, so looking for cues, if the bullet were stable and
 5    stationary, that is if the glass had already broken and a
 6    bullet comes through open space, I expect the entry wound
 7    to be symmetrical and reasonably round or oval because the
 8    bullet that's causing it would be round or oval.  But when
 9    a bullet strikes an intervening object, like the glass in
10    this event, the bullet begins to tumble, it becomes
11    irregular in shape and it changes from its normal, straight
12    on profile to a tumbling and wobbling bullet, so the bullet
13    is both physically damaged by hitting a hard surface, such
14    as the glass, and it's unstable.  When that -- when a
15    bullet is performing in that manner and it hits soft
16    tissue, hits a human being, it doesn't leave a nice round
17    hole, it leaves an irregular hole, and in this case the
18    entry wound described at autopsy and photographed is more
19    triangular than oval, and so it suggests that the bullet
20    that arrived to him was destabilized or not -- not stable,
21    not whole nose first type of bullet.  Then when I examined
22    the actual bullet in Cleveland I could see microscopically
23    that there are shards of glass embedded in the nose of that
24    bullet.  So now I have a bullet in his body, irregular
25    entry with shards of glass, backtracking those observations
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    allows me to complete essentially that bullet track, which

2    is what I then use for one of my five tasks, that basically

3    completes one bullet path analysis and I move on to the

4    next one.

5         Q.    So based upon, if I'm getting this right, the

6    glass shards, which you would expect to be and observed in

7    the bullet and the position and shape of how the bullet

8    went into the temple, you conclude that the same bullet

9    that killed Mr. Franklin in his head was the same bullet

10   that came through that and shattered that glass window?

11        A.    That, I agree, that's my opinion based on the

12   collection of evidence that we've talked about so far.

13        Q.    And we'll speak about this more later, and I

14   know you get to it, but it's also your conclusion that that

15   was probably the first or maybe the first or second bullet

16   fired?

17        A.    Yes, yes, it's one of the first two, and then

18   we begin to rely on some of the data from the video

19   documentation as well, so it's not simply the performance

20   of the bullet but the angles and the reconstruction in

21   totality helps me identify that that has to be one of the

22   first two projectiles delivered.

23        Q.    There was no exit wound, so that bullet was

24   available to you because it was recovered at autopsy,

25   correct?

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1            A.    That's right.
 2            Q.    And looking at page 4 of 17 of the report,
 3    there are, you find two fired bullets which were never
 4    recovered?
 5            A.    Correct.
 6            Q.    Okay.  Do you have any -- does that do
 7    anything to your opinions in the case or your ability to
 8    evaluate the reconstruction?
 9            A.    It -- it does to the extent that, as I've been
10    describing, I like to track everything from the time it
11    leaves the gun until it comes to rest, so if we don't have
12    the final end point of a bullet because it's lost in the
13    environment, that I would like to see those two missing
14    bullets, look at the performance, look at the shape, look
15    at the damage that they encountered, did they pick up trace
16    paint or metal or something like that.  However, I do have
17    the bullet holes that were caused by those, so I can track
18    those to the point where they impacted the vehicle, created
19    the damage that was documented, but then of course I don't
20    know where they go.  So would I like to know where those
21    two are, sure, I don't consider them essential to
22    reconstructing the tracks of the bullet, the paths that the
23    bullets took.
24            Q.    And when you say you do have the bullet holes,
25    you're relying on photographs, right?
```

 1          A.    Correct, the photographs, body worn camera,

 2   the documentation of the vehicle from the time it was first

 3   approached by law enforcement was the only one recording

 4   the dynamic, so body camera and then the physical

 5   examinations that they did on the -- on the vehicle.

 6          **Q.    So when you say in the report, and I'm looking**

 7   **at page 4 of 17, the second full paragraph, no specific**

 8   **horizontal or vertical bullet path details were defined in**

 9   **the data so approximations were made, can you explain that**

10   **to me?**

11          A.    Yes.  So in the process of evaluating a bullet

12   path, every bullet path is comprised of two values,

13   horizontal, that's like the left/right or the compass

14   bearing north, south, east or west is measured on the flat

15   plane, so that's, horizontal is one aspect, and then the

16   vertical is the up and down, and you can, in some

17   instances, use techniques to determine those horizontal and

18   vertical angles, and so in the report here I noted in my

19   data, well, of course we know I don't have the car and the

20   data did not record specific horizontal and vertical

21   angles, so, again, that would be information that would

22   have been useful to further plot, again, when I go all the

23   way forward to my 3D diagrams, I would love to be able to

24   put a physical number to each of these bullet tracks, but I

25   have to estimate that number because I don't have those

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    horizontal/vertical measurements.

2          Q.    Would you typically expect to have those

3    horizontal/vertical measurements from the people who

4    process the crime scene or processed it?

5          A.    That's typically where it comes from when it's

6    done.  When processing a scene not everyone knows those

7    techniques of how to measure those and not every bullet

8    path is easy to determine those, for example, in this case

9    where we have very short bullet strikes through the door

10   and to the A frame, some people are uncomfortable trying to

11   marry those two positions and backtrack that as a

12   horizontal and vertical value.  So why they didn't do it

13   here, I don't know, but they didn't -- they didn't attempt

14   to put numeric values to those angles.  And then, of

15   course, in the condition of the window glass, we know where

16   the bullet went through the glass, but Mr. Franklin would

17   have mobility in the vehicle, so you don't have a fixed

18   second point and that can affect, of course, the horizontal

19   and vertical angles, how Mr. Franklin was oriented while in

20   the car is -- is a variable rather than a fixed point, so

21   it may be with the variables that they were faced with they

22   decided not to try to use physical hard measurements, or

23   they simply just didn't -- didn't think to do that for this

24   particular event.

25         Q.    Desmond's position in the car would only be a

Deposition of Matthew Noedel          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1   **variable as to the bullet path that struck him, right?**

2        A.    Desmond, yes, yes, yeah, his orientation is, I

3   often talk about it as, I've been calling them landmarks,

4   but a snapshot.  So the bullet arrives to him, that is a

5   one one-thousandth of a second impact time, so that's his

6   position that's documented for that one one-thousandth of a

7   second, but it doesn't necessarily inform me how he was a

8   thousand milliseconds ahead of that or a thousand

9   milliseconds after that, he has just the one impact, at the

10  time of that impact we can lock him into position because

11  we can connect wherever he was in the driver's seat, we can

12  limit that range and then backtrack, has to come through

13  the glass and then if we continue that approximate wedge

14  that ultimately comes to where Garcia would have been

15  located, that's how we backtrack those trajectories.

16        Q.    Okay.

17        A.    So the limit is on Mr. Franklin because we

18  know he's in the driver's seat.

19        **Q.    And as to the bullet that struck him, another**

20  **data point for your findings about that bullet's trajectory**

21  **would be the piece of glass still sticking out of the**

22  **passenger side window with the circle around it pictured in**

23  **figure 2 of your report, is that correct?**

24        A.    Yeah, yeah, that small corner, the way that

25  that glass breaks points back to the position where the

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   bullet went through.  And so we know where the bullet
 2   entered that lower window and then it goes, continues, of
 3   course, across toward the driver's position and strikes
 4   Franklin in the -- in the side of the head.  Whether
 5   Franklin was leaning more towards the steering wheel or
 6   pushing back against the back of the seat, that we don't
 7   know, that's the variable that we don't know, but we know
 8   that he is operating the vehicle and so that puts him in
 9   that localized area, so we connect that area through that
10   bullet hole and continue that backtracking across to where
11   Garcia would have been to deliver that shot.
12         Q.   And that also -- is the location at which the
13   bullet entered Desmond's right temple also an important
14   data point for that path?
15         A.   Yes, yes, that is the point that you connect,
16   because he is not fixed in space like a pillar or a window,
17   he can be leaning forward or back, but he can only lean so
18   far forward and back as the confines of the driver's
19   compartment dictate.  So when we backtrack that path from
20   head through the glass back toward Garcia, we get a limit,
21   we get a range of where that -- where that bullet path was
22   traveling, and that's how we -- that's also how I applied
23   sequencing in this event determining that to be the first
24   or -- first or possibly the second shot delivered.
25         Q.   Okay.  And that data puts Desmond for sure in
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    the driver's seat, right?

2         A.    Yes, well, that and the other physical

3    evidence that he's physically strapped in the seat, so we

4    know he's in the driver's seat and that part of his body

5    has to be facing the arrival of the bullet, that being the

6    right side of his head, he's -- he can't be in the back

7    seat and he can't be in the passenger seat, so that leaves,

8    that leaves him in the driver's seat, and connecting that

9    general area back through that bullet hole is how I

10   established the approximation of that bullet track.

11        Q.    And, in fact, all that evidence also means

12   that at the moment that the bullet entered Desmond's head

13   he was looking forward and the bullet entered through the

14   glass window to the temple?

15        A.    Correct, the right side of his face is facing

16   the gun, so it actually, the track through his -- through

17   his skull through his head actually goes rearward a little

18   bit, which would indicate a little bit of rightward turn,

19   but the right side of his head has to be exposed to the gun

20   and since this came through the forward portion, this

21   bullet came through the forward portion of the car he's

22   generally facing forward, his head is generally facing

23   forward, the track of the bullet indicates he may have been

24   slightly turned to the right because it doesn't go straight

25   across his head, it lands -- it ends a little bit behind,

1    and to accommodate that along this straight line path would

2    be a little, slight turn of the head.  But I also consider

3    in that exercise that there's variables of the bullet

4    tumbling, the glass pulverizing, so at the end of the day,

5    yes, the -- his head is facing generally forward to expose

6    the right side of his head to the gunshot, the position of

7    the firearm.

8            Q.    The tumbling of the bullet and it being

9    interrupted by going through the glass affect its angle

10   into the head, is that what you're saying?

11           A.    Yes, it can.  The irregular shape of the

12   bullet as well as now the bullet is decelerating, slowing

13   down, slowing down to the point that it does not exit the

14   other side of his head, so it loses all the rest of its

15   energy in traveling across his head.  So the slower the

16   bullet is, it's more susceptible to deviation from a

17   straight line.  So that's why I consider him an area, this

18   part of his face where the -- head where the entry is has

19   to be facing the gun wherever it was, so it's not going to

20   be a mathematically linear line that you can draw, it's

21   going to be more conical or a cone-shaped path to describe

22   an area that would accommodate the glass, the entry wound

23   to the head and backtracking to where Garcia would be.

24           Q.    And the -- you're also surmising that his head

25   could have been tilted to some angle, can you conclude what

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    angle, how much?

2          A.    No, it's not going to be a quantitative

3    analysis, it's not going to be possible with that, how much

4    angle head tilt, head twist because of those variables, the

5    deformation of the bullet and the deceleration of the

6    bullet.  The range that he could achieve is within the

7    range that we know the error that that bullet can deviate

8    from a straight line, so those -- the movement of his head

9    is basically offset by the predictable error in that

10   slowing down bullet, so that's why we can't say he was

11   turned 4 degrees to the right or 8 degrees to the right,

12   the variables of the performance of the bullet don't allow

13   that level of discrimination.

14         Q.    And so you're not making a biomechanical

15   analysis of his head angle, correct?

16         A.    No, no.

17         Q.    Okay.

18         A.    Other than -- other than the bullet has to

19   arrive, which means it has to be pointed toward the

20   position of the gun at that instant.

21         Q.    The temple has to be pointed towards --

22         A.    Yeah, the right side of his temple, yeah.

23         Q.    Got it.  Also based upon the data about this

24   bullet path, where can you place Garcia's car with respect

25   to Desmond Franklin's car?

```
 1          A.   So for this bullet path he doesn't hit the
 2   pillars behind the passenger door or the frame below the
 3   passenger door, so there's a physical limit with where the
 4   car seats are.  He doesn't go through the car seats either
 5   to achieve this, he goes through the glass and through open
 6   space, so that -- that wedge of going through the glass and
 7   then ending, I'm indicating with my hand an expanding
 8   wedge, it starts at the hole through the glass and then the
 9   range expands.  And so I may have lost the question, but
10   that's -- that's what dictates why I think it's one of the
11   first shots because it occurs when they're -- when they're
12   parallel, cars side by side that is, I'm sorry, when the
13   cars are side by side, because once the Ford accelerates
14   past Garcia, that shot no longer -- the shot to the glass
15   and head no longer becomes possible, the bullet would have
16   hit either the back window, the pillars, which were struck,
17   but it would hit -- it would have hit somewhere else and
18   there's no bullet path that could accommodate that.  So it
19   has to occur when Garcia and his -- when his gun is forward
20   of the, what we call the B pillar or the back of the
21   passenger door, it's got to be forward of that, and it has
22   to continue across the cab to strike a position in the
23   driver's area.  So that only occurs when the cars are side
24   by side, nearly window to window essentially at that level
25   or somewhere in that range, so that's what I'm using to
```

```
 1    determine that that's one of the first shots.  The video

 2    data never shows a cat and mouse where one car accelerates

 3    and another car passes it and one car slows down, it's a

 4    continuous action of the Ford passing Garcia's vehicle and

 5    Garcia never again goes -- goes forward of the Ford, so the

 6    progression of gunshots he delivers fit with the

 7    acceleration of the Ford, maybe the deceleration of Garcia

 8    or some combination of both to accommodate a shot that goes

 9    across and by then the Ford moves forward and the remaining

10    shots are diagonal into the side of the car and the back

11    doors.

12         Q.    Okay.  So at -- so let's break that down a

13    little bit.  At all times during this interaction Desmond

14    Franklin's car is going past Garcia's car?

15         A.    Correct, they -- well, it comes from behind

16    him first and then during the shooting event when what I

17    believe is the first shot, but possibly the second shot,

18    the glass shot, which is the fatal, the cars are almost

19    side by side where the fronts of the cars are essentially

20    in the same relative position.  In that orientation a shot

21    through the glass can continue across and hit an object

22    somewhere in the driver's seat between the steering wheel

23    and the back of the driver's seat, which is where Franklin

24    was occupying.  The remaining shots all have a little bit

25    of back -- a little bit to a lot of back to front, so to
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   achieve a back to front either Garcia is slowing down

 2   creating a greater angle, so now the cars are not nose, you

 3   know, front plane to front plane, one car, the Ford,

 4   Franklin is ahead of Garcia and the shot is delivered in

 5   that manner.  Those bullet tracks are diagonal and then as

 6   the -- as the shooting continues additional shots are even

 7   more diagonal.  So the cars are not moving at the same rate

 8   when all five shots are delivered, it starts when they're

 9   essentially side by side and continues as the Ford passes

10   forward of the Honda, of Garcia's car.

11        Q.   After that first shot, which you believe is

12   the fatal shot, Desmond Franklin's car speeds up and

13   continues to move forward?

14        A.   I don't know if it speeds up, but it does

15   continue to move forward.

16        Q.   And that first shot, which you believe is the

17   fatal shot, it -- the position that's circled on figure 2

18   on page 4 of your report where you can see the piece of

19   window glass still sticking out of the passenger side

20   window?

21        A.   Yes.

22        Q.   So it's all the way to the rear of that

23   passenger side window, that's the place at which the bullet

24   struck that window?

25        A.   Yes, and if I can refer you to figure 3 on
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   page 5, I've incorporated one of the original photos and

 2   there's a close-up of the shattered glass and you can see

 3   where the -- where the glass is -- comes to kind of a

 4   circular point or a cone shaped point, that's where the

 5   bullet perforated that glass.  So on figure 2 you can see

 6   the overall profile of the car with the forward circle

 7   incorporating that glass and figure 3 is a closer up view

 8   of that.

 9        Q.    Okay.  And so between figures 2 and 3 you can

10   see that bullet strike and its position is all the way to

11   the rear of that passenger side window, correct?

12        A.    That's correct, yes.

13        Q.    So there are no shots fired anywhere to the --

14   that struck anywhere to the front of Desmond's car from

15   that point?

16        A.    That's correct.  By front you mean like the

17   hood or headlights?

18        Q.    Yeah.

19        A.    No evidence documented in that, this is the

20   farthest forward impact that I'm aware of on Franklin's

21   vehicle.

22        Q.    And based upon this and the other data that

23   you've discussed, is your conclusion that the cars had to

24   be exactly parallel --

25        A.    No.
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1          Q.     -- at the time the shooting happened?
 2          A.     No, and I'll -- I'll include that when you ask
 3   a scientist exactly parallel would mean that I could put a
 4   -- a level across the fronts of the car and I don't know
 5   that it's that.  They are approximately parallel to where
 6   Garcia can deliver a shot that's more side to side from his
 7   driver's side into the passenger side at toward the rear
 8   side of this window and have it continue across to strike
 9   Franklin in the head.  And it's not quantitative, that is,
10   I don't have a number of how many inches forward or
11   rearward of the window he was, but I have a qualitative
12   kind of an area that can be delivered that has to meet
13   these landmarks, and that's why in the totality of this
14   event I think that this is the first or possibly the first
15   or second shot.  The next one described is just behind this
16   one and it does not exhibit a lot of angle to it either, so
17   these two have very similar profiles, the one through the
18   glass and the one immediately behind the glass, so that's
19   why I can't say if they are exactly one or two.  By the
20   time we get to three, four and five we've increased the
21   angle so much that they can't be side by side as in shots
22   one and two, they have to be forward forward of Garcia by a
23   certain amount.
24          Q.     For shots one and two, could Garcia's car have
25   been somewhat behind Desmond Franklin's car when the
```

Deposition of Matthew Noedel                           Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   bullets were fired?

 2         A.    Yes, his window, the front part, for example,

 3   the front part of Garcia's Honda's window could be aligned

 4   with the rear part of Franklin's so they are not exactly

 5   bumper to bumper dead parallel, but where the Garcia

 6   vehicle is slightly behind the front plane of Franklin's

 7   vehicle.  He is limited by if he gets too far behind

 8   adjacent he can't deliver this shot, he would hit the

 9   pillar, which is what happened later on.  So for this first

10   shot and then first and -- I'll group the first and second

11   shots together, they have to be close, now, it can be the

12   front part of Garcia's window aligning with the back part

13   of Franklin's window, I think that's the orientation you're

14   questioning me about, that is a possibility, they do not

15   have to be back window to back window, front window to

16   front window, they can be offset a little bit up to the

17   point where the shot becomes impossible.

18         Q.    You also conclude that the passenger side

19   window in Desmond's car was fully closed when Garcia's

20   bullet struck it, correct?

21         A.    Yes.

22         Q.    Can you explain the basis for that finding?

23         A.    So, again, it gets back to the performance of

24   tempered glass, which is his side window, when a

25   projectile, a high energy to tempered glass shatters that
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   entire window from that single impact where the impact
 2   goes, hits, the fractures radiate outward, that's why when
 3   some glass remains we can backtrack those fractures and
 4   figure out where the bullet came through.  Part of that is
 5   a lot of glass fell in ultimately, probably from the
 6   collision, because once the glass shatters from this bullet
 7   impact it's very weak and it can fall in.  So when it falls
 8   in though there is weather-stripping all the way around the
 9   edge of the window to keep it sealed up, when it falls in,
10   glass that's trapped in the weather-stripping doesn't
11   always fall in because it's physically compressed in the
12   weather-stripping.  This car, Franklin's car had small
13   particles, small fragments of glass still in the upper
14   weather-stripping, which means glass had to be in that
15   position, glass will never fly up into that
16   weather-stripping, so that's how I know his was up for the
17   shot that perforated that window.
18        Q.    Moving forward to page 5, I guess we've been
19   looking at figure 3, but page 5 at the top above figure 3
20   in your report, you have a finding that Devin Badley was
21   not in line with the bullet trajectory, but it's -- it
22   sounds like you conclude that he was very near the bullet
23   trajectory, is that fair?
24        A.    Yes, I think that's true.
25        Q.    Can you explain that finding -- those findings
```

1    to me?

2          A.    So it's back to the pulverized glass and the,

3    I guess I'll call it an assumption that Badley was in the

4    passenger seat during this, during the shooting event.  So

5    first he cannot be in the path of this bullet because he

6    doesn't have a gunshot wound, so he either has to be ahead

7    of, below, or behind the track that connects the glass to

8    Franklin's gunshot wound.  When I examined his outer jacket

9    that was recovered from this event, he has pulverized glass

10   collected on his right shoulder and across his back, that

11   would tend to support, for me, that I think he's more

12   likely leaning forward, maybe chest against the knees, and

13   if you look at how low that perforation is to the glass, he

14   has to essentially be below the plane of the window or he

15   would have been struck by the bullet, so I think the best

16   orientation is with him leaning forward and below the plane

17   having the bullet cross over him, pulverized glass is

18   shattered into his shoulder and back.  I cannot eliminate

19   that he's leaning back, and that leaning back and maybe

20   twisted such that he exposes his shoulder and back to the

21   pulverized glass that snags his outer jacket and is still

22   embedded into the fabric that he was wearing.  So he does

23   not have a passage of a bullet, he is not struck by the

24   bullet so he has to be ahead of it or behind it, and so he

25   received the pulverized glass as well.  But his exact

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1   orientation, whether he was below the plane of the window

 2   or pressed back, he can achieve either one of those

 3   positions and still get glass, but not get a bullet.

 4        Q.    Did you consider any blood drop evidence with

 5   respect to Devin Badley's position or his clothing or his

 6   orientation?

 7        A.    No, he was -- he was much too complicated,

 8   from what I could see and what I was able to do in the --

 9   in the exam room.  The type of blood and the secondary

10   transfer and movement of the jacket didn't really reveal an

11   analysis where it was something that was diagnostic from a

12   blood stain perspective on him or on his seat.  I looked at

13   the photographs of where he had been seated, of the objects

14   in and around his feet, you know, he had the soda cartons

15   were toward his feet, they intercepted some blood, but to

16   me that -- none of the patterns that I observed on any of

17   those were diagnostic of a particular location or event of

18   how he got the blood to those positions.

19        Q.    Okay.  So he had blood on his clothes and on

20   his seat, but it didn't really tell you anything

21   meaningful, am I getting that right?

22        A.    Correct, for blood stain patterns to have

23   meaning they need to be able to be cataloged and

24   categorized, and these were very irregular, random types of

25   stains, some were secondarily disturbed from movement

1    through them, so they weren't diagnostic of any particular

2    type of pattern or specific event, and certainly no --

3    nothing diagnostic enough to position his body or his

4    jacket in the -- in the environment of that confines of the

5    car.

6         Q.    Okay.  But based upon the photos and the glass

7    in the jacket that you viewed, you put him, at the time of

8    the shooting, either ducking down forward or potentially

9    twisted back, but in the passenger seat, is that correct?

10        A.    Yes.

11                  MS. BONHAM:  Okay.  Guys, can we take a

12                  five-minute break, get a cup of coffee and

13                  come back just really quick?

14                  THE WITNESS:  That's fine.

15                  MR. CABRAL:  Yeah, that would be great.

16                  (Brief recess was had.)

17        Q.    Looking again at pages 3 through 5 of the

18   report, are there any other conclusions that you made that

19   aren't captured here about that first bullet strike,

20   besides what we've discussed?

21        A.    No, I think we've -- I think we've covered all

22   the aspects of that, of that bullet path.

23        Q.    Okay.  I think we'll go through the others a

24   little bit more quickly.  Turning to page 6 of 17, under

25   the subheading bullet path B, now, sequentially you say

1  this shot is indicated to be one of the first two shots but

2  you believe it to be the second, am I getting that right?

3        A.    Yeah, I think it better fits with the second,

4  but I tend to try to be conservative in reporting that.

5  It's so close to the perforation of the glass that I didn't

6  want to commit to it being second, but it is physically

7  behind the first one and it is -- it impacted the pillar

8  underneath the forward edge of the door.  So it's based

9  primarily on its location that I think it's second, again,

10  because I have better data on the other impacts that show

11  there's a progression from the side that continues angular

12  to where the shots become diagonal, and so when I continue

13  that progression, this fits best with a second impact.

14        Q.    So based upon all the data that you're looking

15  at, it seems to you like if you look at Desmond's car, the

16  bullet strikes on Desmond's car, they go sequentially from

17  front to back, one, two, three, four, five?

18        A.    Yes, generally speaking I think that's true.

19  And, again, there's, one and two are close together,

20  there's not a big separation, and then three, four, and

21  five are similar angles but in different positions, so

22  combining all of that, I think the best explanation is a

23  sequence front to back, but I can't -- I can't conclusively

24  prove that based on the data that I have.

25        Q.    Based upon looking at that sequence of bullet

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    strikes in Desmond Franklin's car, can you make any

2    conclusions about how long between shots, you know, if

3    there was any space in time between the sequence of shots?

4            A.    No, I can't make that determination looking at

5    the -- at the bullet holes.  The best I can consider with

6    that is data that describes how -- the fastest that people

7    can deliver shots from a semiautomatic pistol.  The process

8    could be slower, it's not likely dramatically slower

9    because there is limits of distance of travel and a limited

10   amount of time when the cars are juxtaposed to allow the

11   paths, but physically documentation would show that a

12   shooter of a semiautomatic pistol can usually deliver three

13   or four shots in a second, so that makes this between, you

14   know, a second and a quarter if he's shooting as fast as he

15   can, to maybe 1.75 seconds if there's a slower cadence to

16   it.  Ultimately, again, it's not a quantitative assessment

17   but a visual assessment, the cars do not continue side by

18   side, Garcia stops before the Ford continues going and

19   crashing, so the shots have to fit in that little window,

20   and shooting as fast as he can would encompass that timing,

21   but independently looking just at the bullet strikes and

22   the distance between them, I can't assess velocity of the

23   cars or velocity of the separate shots.

24           Q.    Is there anything to suggest that some shots

25   had more time in between them than others or that there was

1  any kind of pause between the series of shots?

2        A.   No, I don't think so, I don't think they're

3  far enough apart to really generate that kind of an

4  assessment.  Again, variables that I have to consider in

5  trying to assess that include the velocity of the cars and

6  we don't know, I don't know, sorry, I don't know if the

7  cars were both accelerating, one accelerating, one

8  decelerating, both decelerating, I don't know in that

9  course of the delivery of the five shots the absolute ratio

10  of velocities, so that precludes me from saying there was

11  two and a pause and then three, or that there was three

12  that hit near the B pillar and then two that hit farther to

13  the rear, they're still too close together given those

14  variables of car velocity for me to differentiate.

15        Q.   On the bottom of page 6 in your report in

16  figure 4 you talk about your bullet path B, that you

17  identify as B, being identified by the original police

18  processing as impact number 3, is there any significance

19  for you to that original police processing numbering

20  system?

21        A.   No, it appeared to me that they simply

22  numbered them one through five by using that yellow chalk

23  or yellow crayon on the side.  If they meant them to be

24  some form of a sequential, I didn't take it like that, I

25  just considered it the nomenclature the way that they

Deposition of Matthew Noedel          Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   described them, so the -- their nomenclature is of no

 2   reconstructive value to me.

 3        Q.    And you didn't take the police processing

 4   numbering system to mean that they had drawn conclusions

 5   about the sequence of the bullets?

 6        A.    Correct, I did not see any data that they

 7   recorded that they thought that this was the order, and in

 8   my experience typically that's not something that would be

 9   numbered in a manner like this against a car because you

10   have to name them something, they get these names and

11   numbers, which may or may not reflect the actual sequence.

12        Q.    So moving forward, we talked a lot about what

13   you called bullet path A and then B, C, D and E on the

14   subsequent pages of your report, your report fully captures

15   your opinions about those bullet trajectories, am I getting

16   that right?

17        A.    Yeah, that would be correct based on the

18   assessments in totality, those are the complete

19   descriptions of the path as much as I could reconstruct.

20        Q.    Under bullet path C on page 7 when you're

21   discussing that, you say, the angle indicated by this

22   bullet strike supports that the Ford had moved ahead of the

23   driver's position of Garcia's Honda at the time of this

24   shot.  So by the time you get to the third, fourth and

25   fifth bullet strikes to Desmond's car, your conclusion is
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1    that Desmond's car is already moving ahead of Garcia's, is

2    that correct?

3         A.    Yes, and, again, I try to be careful, either

4    -- either Desmond is accelerating ahead or Garcia is

5    slowing down, but the relative position between the two

6    cars, an angle is being introduced where Desmond's car is

7    ahead of, for three, four and five, ahead of the driver's

8    position of Garcia's vehicle, so the angles are beginning

9    to increase and get steeper as documented in the impacts to

10   the car.

11        Q.    And part of the data that you reviewed for the

12   basis of your report includes data showing that ultimately

13   Desmond's car continued down the street and crashed into

14   the gate, right?

15        A.    Yes.

16        Q.    So can you conclude that while Desmond's car

17   is still being shot at it is moving forward?

18        A.    I'm not sure I can say that conclusively, I --

19   I don't have any data to suggest that the car was -- was

20   shot, for example, after the crash or I know where Garcia's

21   vehicle stopped and did not advance, so there are limits to

22   where the shots can be delivered, but, I mean, you could

23   deliver the shots when the car was stopped but then the

24   rest of the scene doesn't work, the ejected cartridge

25   cases, the movement of people through the scene, so, yeah,
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    I may have lost the question in there.

2          Q.    That's okay.  I was asking, can you conclude

3    that Desmond's car is moving forward the whole time it's

4    being shot at?

5          A.    I believe that to be true based on the video

6    record and the other characteristics of where cars ended, I

7    think that's true, I'll say it this way, in my opinion,

8    that is true.

9          Q.    Okay.  So the later shots, what you label as

10   paths C, D, and E, those did not have a human target, those

11   are just striking the back of a car?

12         A.    I don't know what the target was, but that's

13   where they're hitting, they're hitting the frame and the

14   back door of the car and they're on a diagonal line that if

15   we continue -- they didn't continue into the driver's

16   position but they're on a diagonal that if you were to

17   continue, if they could have got through the door they

18   would continue generally toward the driver's seat, and by

19   the time you get to D and E, David and Edward, you would

20   probably be hitting the back of the driver's seat if it

21   were to get through and go that far.

22         Q.    I see.  Okay.  Looking at page 8 of 17 of the

23   report where you're discussing bullet path D, this is the

24   bullet that you conclude may have struck Officer Garcia's

25   side mirror on the way out, is that correct?

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1              A.    Yes.

 2              Q.    Can you explain to me the basis for that

 3    conclusion?

 4              A.    Yes.  So, again, evaluating the appearance of

 5    the impact site and the side of the car, this damage is

 6    pointed at one end and oval and irregular and it's

 7    diagonally pointing downward, which to me suggests it's a

 8    bullet that's destabilized, one of these tumbling bullets,

 9    and for a bullet to destabilize it has to hit something

10    first, otherwise it's a perfect cylinder arriving to the

11    side of the car.  So when we look at the other impacts to

12    the car they have a cylindrical appearance, noting that the

13    side mirror of Garcia's car was stuck and and looking at

14    the profile of this bullet hole I think best fits with the

15    continuation of that strike to his mirror, it's -- I

16    believe it's occurring at a time when the bullet is

17    traveling generally diagonally forward but it's a

18    destabilized bullet tumbling and it's giving us this

19    irregular slice in the side of the car rather than this

20    nice cylindrical profile.

21              Q.    Did you do anything to evaluate the bullet

22    strike through the mirror, the side mirror?

23              A.    I -- no, I -- you mean physically?

24              Q.    Yeah.

25              A.    I didn't, yeah, I didn't, I never touched that
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    car and I didn't -- I didn't, for example, examine a
 2    surrogate car for that, I used the documentation that was
 3    included.  They did, in the original documentation, insert
 4    a trajectory rod, which gives you a visual representation
 5    of the track the bullet took through the mirror, and so I
 6    evaluated that bullet path, it shows a diagonal profile,
 7    and then if we continue that diagonal profile into position
 8    D, that is how I began to further support that the two cars
 9    are changing their position relative to each other and the
10    shots are coming in more and more angled.
11          Q.   Looking at figure 7 on your report, that -- is
12    that the trajectory rod through that side-view mirror
13    picture that you're referring to?
14          A.   Yes, I've added a dotted line that's a yellow
15    arrow if you're in color, I added the arrow, but next to
16    the arrow is the rod that they positioned through the
17    mirror surface and they took some additional photos.  So
18    when you look at the appearance of that photo you can see
19    that the rod is not going straight front to back or side to
20    side, it's going diagonally through that mirror, and so
21    that bullet would be available, came out of the mirror and
22    it would be available to impact the side of the car, can't
23    be one of the front shots because the bullet will not make
24    a left hand turn in midair, so it has to be a bullet strike
25    that shares a similar angle into the side of the car, and I
```

1  think that's bullet path D, David, that best fits, this

2  would be a bullet that's destabilized and impacts at an

3  angled bullet path.

4      Q.    That trajectory rod that's pictured that was

5  placed by the original investigators, do you have

6  confidence of the placement of that rod being accurate to

7  where the bullet path was?

8      A.    Yes, I think it's accurate, that process of

9  connecting an entry and an exit is not a tricky one or a

10 difficult one and there are other images that support the

11 damage to the front side of the mirror and show other views

12 of this.  So I'm confident that that's where it went

13 through and the track that the bullet took at that point.

14     Q.    What, if anything, does that trajectory tell

15 you about where Garcia's gun was at the time he shot that

16 bullet?

17     A.    So it is certainly somewhere, I'll say

18 rearward or behind, sort of the back of the mirror surface

19 on the external side mirror, and if we continue that yellow

20 on the rod back into his car, his gun is on that rod,

21 essentially somewhere straight back onto that rod, so

22 somewhere between the about steering wheel position but out

23 toward the side window and diagonal.  So the limits of him,

24 of course he occupies physical space, so this -- we can't

25 extend this rod all the way through the back of his seat

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1    because he's physically there, so, but he can have the gun

 2    positioned anywhere in front of his body but behind the

 3    mirror along that line and we can basically hang his gun

 4    somewhere in that area, and that's the best we would be

 5    able to do with that, with that track, forward of his body

 6    and diagonal, including through the window to the back of

 7    the -- of the mirror to the mirror surface of the mirror.

 8         Q.    And do you know, in forming this opinion, did

 9    you know whether Garcia is right or left-handed?

10         A.    I don't know.

11         Q.    Did you know whether he was holding the gun in

12    the right or left hand?

13         A.    I know his holster is on his right -- on his

14    right hip, which indicates to me he's a right-handed

15    shooter, so I never really considered past that, I assumed

16    that he was shooting right-handed, but I don't know that

17    for sure.

18         Q.    Did you consider, as part of forming this

19    opinion, where his seat was or how the seat was oriented in

20    the car?

21         A.    No, I did not.

22         Q.    And so his -- the position of that gun has to

23    be somewhere along that line and you can't say precisely

24    where?

25         A.    Correct, I don't know how forward --

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1        Q.    Within the range?

2        A.    Yeah, it's going to be a range that points

3   generally back to the driver's position of the Honda and

4   adjacent to the driver's door of the Honda somewhere along

5   the continuation of that line.

6        Q.    And on the bottom of page 8 in the report when

7   you were discussing this, you conclude that the adjacent

8   window had to have been lower than the elevation of that

9   bullet path, correct?

10       A.    Yes.

11       Q.    Can you explain what that means?

12       A.    So Garcia's driver's window was not shattered

13  and if it had been struck by a bullet it would have

14  absolutely had shattered, but it was not shattered which

15  means that it was not in the way of this bullet, of this

16  particular bullet path, which means it has to be lowered.

17  The -- the bullet cannot do a turn after it's been

18  delivered and this shot is generally a level -- a level

19  type of a shot, so when we backtrack this, if we hang the

20  gun on -- if we track this yellow rod into the vehicle and

21  hang his gun on it, the muzzle end of his gun has to be

22  above the level of the window, so the window has to be

23  lowered enough to let this bullet and/or the gun go by, I'm

24  sorry, must be below -- the window must be lowered to the

25  level of the gun or to the level that he can reach and not
```

1    hit his own window.  So it has to be lowered, he didn't

2    shoot through his own glass window, and it has to be low

3    enough to let this bullet come through when he delivers

4    this particular shot.

5         Q.    For this particular shot, how -- how low does

6    the window on this particular car have to be?

7         A.    I would estimate, I don't know inches wise

8    without -- I would have to measure a replica car, but

9    qualitative, just in general, I would say that the window

10   has to be down to -- the edge of the window is about at the

11   same level as the top of the mirror, if you lower the

12   window to the point where the top edge of the glass matches

13   the top edge of the mirror, I think you could deliver this

14   shot.  So qualitatively speaking I would say maybe

15   three-quarters of the way down from completely submerged or

16   lower, of course it can be lower than that, but it can't be

17   much higher than that, so somewhere from three-quarters of

18   the way down or farther at the time of this shot.

19        Q.    And then looking to page 9 of the report, back

20   to page 9 at figure 7, right above that figure, the

21   location and angle fired by this bullet you say supports

22   that it was one of the last two shots fired.  So you're

23   labeling this shot D, but, again, this is one of the last

24   two, am I getting that right?

25        A.    Correct, similar to A and B that are a similar

```
 1    profile, D and E have very similar angles indicated by the

 2    damage that was photographed, and so a very slight

 3    adjustment of the gun position can mean you hit under the

 4    handle or forward of the handle, it's a very minor

 5    adjustment.  I can't tell those two apart with the data

 6    that I have, so one consideration is the progression goes

 7    straight from front to back, but physically with the angles

 8    indicated by D and E they could be reversed, they don't

 9    necessarily have to be four and five, they could be five

10    and four because the angles are so similar.

11         Q.    Understood.  Looking at the very bottom of

12    page 9 of 17 of the report when you're discussing what you

13    label bullet path E and you're talking about that bullet

14    path, you say, "This fired bullet path," and then on the

15    next page, "has the general properties that can produce a

16    fired bullet as seen in item 23."  Can you just explain to

17    me what that means?

18         A.    Yes, so three of the five shots the projectile

19    was actually recovered or a substantial portion of it, one

20    was the one we discussed in his head.  One of the

21    projectiles that was recovered was smashed, I'll say

22    symmetrically, so that is with the nose being pushed

23    straight back and equally on all sides, generally speaking,

24    that's a bullet that hits more straight on, and so the

25    bullet that I'm talking about here in E is not smashed
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   straight back, it's smashed back, it's smashed, but it's
 2   smashed at an angle.  And so given my, the very qualitative
 3   points of is it a bullet, is bullet at an angle or is it
 4   straight on, I have the bullet in the head we've resolved,
 5   the other two bullets, one indicates an angle and one
 6   indicates a straight on.  So I have bullets that account
 7   for that angle, so D and E are angled and so this
 8   projectile fits better with shot D or E, and because of its
 9   angled profile the bullet that's flattened nose first fits
10   better with position B, very similar to something straight
11   into the side of the car.  So that's a function of where
12   the examination of the projectile can help resolve
13   something about the path the bullet took, the performance
14   of that bullet and the angular nature that it didn't hit
15   straight on, this bullet, it hit at an angle.  So that's
16   what I'm trying to incorporate by that description of what
17   they called item 23, which is one of the recovered bullets.
18        Q.    So you're -- here you're matching the
19   recovered bullets to the bullet entries, am I getting that
20   right?
21        A.    Correct, the bullet path indicates an angle on
22   D and E, a pretty steep back to front angle diagonal and
23   one of the bullets I have came from somewhere in the car,
24   came from the back seat, but the bullet from the car, if I
25   try to match it with the other impacts, it best fits with
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    an angular shot.  There's another bullet that's found in
 2    the front seat area and that bullet is smashed almost
 3    straight on, but it doesn't show me that angle.  So it's
 4    hard -- it does not fit with the reconstruction for the
 5    smashed straight bullet to be from an angled shot, it's
 6    more from a straight shot.  My position B fits well with a
 7    shot straight into the car metal that cause it to smash and
 8    then get trapped in the door where it was -- where it was
 9    ultimately documented.
10         Q.    Does it have any impact on your conclusions to
11    match which bullet matches which bullet strike?
12         A.    It can.  It depends on how you -- how you
13    consider it, bullet E -- bullet path E actually made it
14    into the interior of the back seat and so that bullet is at
15    an angle that I would have to consider, could it have come
16    through the glass or through the opening created by the
17    open glass when the glass fell in, so that's just part of
18    the reconstruction.  Again, it doesn't -- it doesn't inform
19    me a whole lot about this, it doesn't really matter a whole
20    lot what projectile caused it, but it did -- it does fill
21    in what the appearance of that bullet is and it resolves
22    other questions that, you know, so what bullets are we
23    missing, we're missing probably bullet C and D or E, one of
24    those two, those are the two that we're missing.  So it
25    just goes to my process of bullet accounting, bullet
```

```
 1    tracking, can I track a bullet from the time it leaves the
 2    gun until the time it comes to rest, so that's more of the
 3    exercise there.  And, again, you don't always know in
 4    reconstruction what the questions are going to become, so
 5    that's -- that's part of why this process is documented in
 6    the way I do it, the way I did it.
 7         Q.    So this is more a matter of complete -- a
 8    complete data set?
 9         A.    Yes, I call it bullet accounting, I try to
10    account for every projectile that was delivered in this
11    event, of course here we only have three recovered and I've
12    accounted for one, it doesn't -- it doesn't change the fact
13    or the angles that were delivered, it doesn't create a big
14    aha moment, which I like, because if it did create an uh-oh
15    moment or an aha moment, that might affect the
16    reconstruction, it's like, this bullet doesn't fit with
17    this track, how did this bullet come to this, but it fits
18    with the rest of the reconstruction, so it's a completeness
19    thing in how I approach the methods of reconstructing.
20         Q.    And there's no question here that all five
21    bullets were fired from Garcia's gun and hit somewhere in
22    Desmond or his car?
23         A.    That's correct, the bullet profiles that I did
24    see are consistent with Glocks, although I wasn't -- I
25    would have to do more additional work to see if I could
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1    identify his specific gun, the fired cartridge cases are

 2    all Glock style cartridge cases, so that would be

 3    microscopy work that could be done.  But in the confines of

 4    this, they're certainly not from Franklin's 45-caliber gun,

 5    the only other gun known to be in this limited universe is

 6    the 9-millimeter from Garcia, so I'm willing to make that

 7    assumption in the universe of this scene.

 8         **Q.    Sure.  Moving now on page 11 of 17 of your**

 9    **report under the subheading reconstruction, we've spoken**

10    **about the bullet trajectories, now it looks like you're**

11    **speaking about the videos, the video evidence, correct?**

12         A.    Yes.  So in the reconstruction is the section

13    where I'm attempting to use my landmarks, my previously

14    documented physical evidence and apply that to the

15    interpretation of the event, the actual reconstruction or

16    what does this all mean that bullets struck here and struck

17    there, so, yeah, a lot of that relies on the video

18    documentation and does it fit with the physical angles and

19    measurements and views that I've already documented or is

20    it -- is it different, do I need to revisit my hypothesis,

21    change, reject my original ideas and accept new ones or

22    not.  So that's what this reconstruction is about and

23    that's why it relies on the video record showing where the

24    cars were in relation to each other.

25         **Q.    And in this case did you find that the**

1   physical evidence that you looked at fit with the video

2   evidence that you looked at?

3        A.    Yeah, I think it all -- it all agrees, I

4   didn't find any conflicts that could not be explained by

5   the landmarks and the physical results that I found with

6   the bullets, the bullet tracks and the performance of the

7   projectiles.

8        Q.    There are a number of videos and photos in the

9   record in this case.  Which videos in particular did you

10  rely upon for this section of the report?

11       A.    Boy, I might have to -- I might have to

12  research that if I didn't mention it specifically here.  I

13  called it kind of generically on the top of page 11 video

14  data captured from the Midnight Smoke Shop, and I think

15  there was more than one camera angle on the Midnight Smoke

16  Shop, so which specific angle, obviously this is the one

17  that can see the intersection and the area just to the left

18  of the intersection, but I don't know the official name of

19  that without looking up the name in the discovery.

20       Q.    Do you know if you viewed more than one

21  different video angle or if you just used one video to

22  arrive at this -- these conclusions?

23       A.    Ultimately I used just this video from this

24  single camera, but I did view other -- other camera angles

25  and in doing so I'm looking for other -- other data that

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1   might be -- that might support or refute something that I

 2   can say about the shooting aspect of this.  So I look for

 3   that other -- look through that other data and information,

 4   but I found this to be the most useful in describing how

 5   the shooting went down and the relative positions of the

 6   vehicles and how the -- how do I get these angular shots in

 7   this dynamic action.  So I viewed other videos, there were

 8   definitely other videos provided, but I found that this one

 9   view best identified the conclusions that I found about

10   this event.

11         **Q.   Do you remember whether this video that you**

12   **primarily relied upon was sort of a mash-up video where**

13   **there were spotlights, you know, pointed at the cars at**

14   **certain places?  There was a video like that that was made**

15   **and I'm just trying to figure out if that's the one you**

16   **used.**

17         A.    No, the video I used, my recollection is that

18   it was essentially a raw video, it was -- there was a lot

19   of -- a lot of video prior to the cars even arriving into

20   view of this camera, so nobody had edited parts of this out

21   or I don't recall anyone highlighting.  I recall seeing

22   that video that somebody did an analysis of highlighting

23   various positions of it, but that, I used the raw -- my

24   recollection is I used the raw video because I had to -- I

25   had to eliminate the front, you know, 20 minutes of that

1  video in order to get to just one section that shows the

2  positions of the cars.

3  **Q.    Understood.  Thank you.  If there's a way that**

4  **you can look and identify for me the actual file name or**

5  **some identifier for the video that you did use at some**

6  **point, I would appreciate getting that information.**

7       A.    All right.  I jotted it down with the other

8  Ohio cases and so I'll be able to provide that.  I'll

9  probably provide it to the attorneys and they can provide

10 it to you.

11      **Q.    Great.  Thank you.  When you viewed this video**

12 **in the course of arriving at these opinions, did you do**

13 **anything to magnify or otherwise alter the video when you**

14 **were looking at it?**

15      A.    Yes to magnification.  The format of the video

16 that I was working with here wasn't a common file format

17 and my recollection was I had to use the proprietary

18 software that captured the video, in other words, I

19 couldn't just bring it into any MP4, it wasn't an MP4 in

20 that I could just manipulate.  In that proprietary program,

21 which I don't remember what the name of it was, it had zoom

22 capabilities and slow down and speed up capabilities.  And

23 so in capturing these frames I was using both, in some

24 cases the zoom to try to see if I could see anything more

25 in it as well as stepping frame by frame forward and

1   backward to move through and look at the relative positions

2   of cars and then try to marry that to my -- to my

3   reconstructed angles and such.  So I did use the zoom, the

4   onboard tools that are with the viewer that came with that

5   video.

6        **Q.    Did you run this video through any other kind**

7   **of software or specialized program in order to come to**

8   **these conclusions?**

9        A.    No, I didn't export it or enhance it or alter

10  the colors or anything like that, I didn't have the

11  capability for that.  So it was simply using the -- the

12  onboard tools to -- which had a zoom feature and it had a

13  frame by frame feature and that's -- that's the only

14  manipulation I did to the video.

15       **Q.    You used the same tools, in other words, that**

16  **would be available to any person using this software to**

17  **view this video?**

18       A.    Correct, it was provided with the video itself

19  and my impression was it was proprietary to the camera type

20  that recorded it, so it was not a common file format so I

21  had to use their viewer.

22       **Q.    Do you have any particular expertise in video**

23  **analysis that you're bringing to the analysis of the video**

24  **here?**

25       A.    I would say not to technical video assessment,

1  that is timing and frame rates and how video fills in and

2  connects rolling movement.  I do use the video, as I've

3  identified in some of these diagrams, to isolate

4  observations, in this case to try to figure out where the

5  car was in relation to the roadway, one of my diagrams here

6  points out three bushes that are still there, and so in

7  combining those it's like, okay, so now I know where -- I

8  can then go and view where those bushes are and say, okay,

9  the cars had advanced to this point.  So using it

10  analytically like that I do -- I used in this case and do

11  that frequently for assessment, but enhancing, determining

12  the timing and the properties of the -- of the exposures

13  and frame rates, I don't do any kind of analysis in that

14  regard.

15      Q.    Okay.  So you're viewing the video as any

16  layperson would, but your analysis is in service of your

17  expertise in reconstruction, is that fair?

18      A.    I think that's accurate, yes.

19      Q.    Looking down below this subheading

20  reconstruction at some of the assumptions that you're

21  making from viewing the video, in the second subbullet

22  point you find that the -- the first shots from Officer

23  Garcia could generally align with the fatal shot and the

24  shot you've labeled B, that's -- that's correct?

25      A.    Yes.

1          Q.     So this fits with what we discussed earlier,

2     that this substantiates your conclusion that these were the

3     first two shots and one of them was the fatal shot?

4          A.     Yes, that's true.

5          Q.     Looking down below that, the third main bullet

6     point, you find as the progression continues the Ford

7     passes the Honda, the perspective shows Officer Garcia

8     possibly with the firearm pointed at a forward angle

9     towards the Ford?

10         A.     Yes.

11         Q.     What is the basis for that conclusion, the

12    possibly with the firearm pointed?

13         A.     When you look at, and I've isolated that as my

14    figure 11, page 13, when you look at that view there is a,

15    I'll call it a bright spot that shows up in those -- in

16    that frame, the one I isolated in my report, and the frames

17    around it, and that appears, and I think I've seen other

18    images that were enhanced by somebody, that appears that

19    that may be a firearm that is positioned adjacent to the

20    mirror there.  Now, it's not so clear that I can physically

21    make out the firearm, but knowing that these shots are

22    occurring at this angle and that I have a shot that goes

23    through the mirror, for example, would fit with this

24    alignment and the appearance of this -- of this frame

25    capture in the video that's rolling from the Smoke Shop, so

```
 1   that's why I say I'm not certain it's a gun, I've seen a

 2   lot of videos that there's -- there can be tricks of the

 3   light, somebody's watch can reflect at a particular time

 4   and it's -- it's not -- it's not a muzzle flash or it's not

 5   a bullet impact impacting and sparking, so I try to be

 6   careful and conservative with what that is.  But I

 7   certainly could see the alignment, the position and the

 8   object appearing in those frames certainly could be a

 9   position when the two cars are aligned and fits with the

10   latter shots, D and E, could be -- could be approximately

11   the time one of those two shots was delivered.

12        Q.   Is this why you qualify that finding with the

13   word possibly?

14        A.   Yes.

15        Q.   You can't say for sure that that's what's

16   pictured?

17        A.   Correct, correct.

18        Q.   Moving down, right below that you say,

19   "Collectively these videos indicate the following," and

20   under the first subpoint there, "The Ford had to catch up

21   to Garcia's Honda and both were moving forward as they

22   crossed through the intersection."  What do you mean when

23   you say catch up to?

24        A.   The documentation in the videos, including

25   other views, show that the -- the Ford was behind, it came
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    from a position behind Garcia's Honda, and so the Ford,

2    none of these shots were from front to back, they were all

3    sideways or diagonally forward, so for those shots to be

4    even available the Ford has to catch up and at some point

5    become parallel to the Honda.  Some of the statements

6    offered, particularly by Badley, indicate that they were

7    stopped side by side at the stoplight and they started

8    shooting, and so I don't think that's supported by the

9    physical evidence and the appearance of these videos, it

10   clearly shows movement and no gunshots, the cars are not

11   aligned in a position where a gunshot could be delivered

12   until they begin to move through the -- the intersection.

13   So that's the -- the purpose of that kind of statement,

14   it's testing a witness statement, Badley's statement, the

15   shooting began as the car pulled up side by side.  I say

16   catch up, the Honda had to catch up because it was

17   physically behind, it came from behind the Garcia vehicle

18   and then came up alongside of it, so it -- it had to catch

19   up to Garcia.

20        Q.    Okay.  So the video, first of all, the video

21   that you viewed you believe matches with your conclusions

22   that we've already discussed, that when Garcia started

23   shooting the cars were approximately parallel and then

24   continued shooting and Desmond's car continued moving

25   forward, that's right?

1      A.    Correct, yes.

2      Q.    So the cars, you believe, were not fully

3  stationary at the moment of the shooting, in other words?

4      A.    Correct, I -- that is not consistent with the

5  physical evidence.

6      Q.    And when you say catch up, is what you mean is

7  Desmond's car started from behind Garcia's car and ended up

8  in front of Garcia's car?

9      A.    Yes.

10      Q.    And as you say, later the cars are generally

11  aligned side by side when the shooting begins?

12      A.    Yes.

13      Q.    Moving to the next page, page 12, the second

14  bullet point on that page, when you say the Ford had pulled

15  ahead of the Honda just north of Riverside Cemetery, what

16  do you mean when you say pulled ahead?

17      A.    So the relative position between the Ford and

18  Garcia's vehicle, by the time they arrived to the cemetery

19  sign, which was a sign that was -- that was still there, I

20  think it's still there now, the video documentation shows

21  that the Ford is physically ahead of the Honda, and so what

22  I'm trying to describe there is that the, again, whether

23  it's both cars were moving forward, so whether it's one car

24  slowing while the other continues, one car accelerating, or

25  a combination of both, I can't say, but by the time

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    Garcia's car is aligned with that cemetery sign in that
 2    figure 11, page 13, clearly the Ford, Franklin's car, is
 3    ahead of his vehicle and the two vehicles -- there's no
 4    evidence that would suggest the two vehicles ever caught up
 5    to each other past that point because Garcia stops shortly
 6    after this sign.  So this figure 11, page 13 kind of
 7    represents the end of a shooting sequence.  So I have an
 8    image of the start of the shooting sequences when they're
 9    generally side by side, I depicted that in figure 10, and
10    then the cars' relative positions change to where the Ford
11    is ahead of the Honda and that's by figure 11, those
12    landmarks, the bushes and the cemetery sign give me a
13    distance, a position.  Now, I don't know how fast these
14    cars were actually moving, but it does give me a limit as
15    to the location where the gunshots are occurring -- had
16    occurred, and then of course there are some photos that I
17    didn't rely heavily on of physical evidence in the street,
18    the broken pieces of mirror and so forth that also helped
19    define some of the elements of this.  So in using this part
20    of the reconstruction I'm trying to define where the
21    shooting occurs and then using that to consider what
22    primarily Badley and Garcia are saying about the event.
23         Q.   So when you say, in this section, caught up
24    and pulled ahead, all you're referring to is the position
25    of the cars relative to one another?
```

```
 1        A.    Correct, yes.  I -- I do not have any

 2   independent data or any analytical data that would talk

 3   about the velocity of each car or if one was slowing while

 4   the other was accelerating, all I know is that the -- the

 5   Ford advanced faster than the Honda, that's the only way in

 6   this scene to get the diagonal, both the side shots and the

 7   diagonal shots, and that passing event occurred between the

 8   bushes and the cemetery sign.

 9        Q.    Then you do say right above figure 9 on page

10   12, "A reasonable average time to deliver five shots

11   without delay between shots is between 1.25 and

12   1.65 seconds."  And what was your basis for that?

13        A.    There is a -- there is some published

14   literature on that, I've also conducted a series of

15   personal experiments, I've been tracking how fast different

16   people, different age groups and different abilities can

17   shoot, and so personal knowledge as well as some of the

18   published literature, and that value that I cited earlier,

19   somewhere between four -- three or four shots per second is

20   a very common average for a semiautomatic pistol, for

21   discharging a semiautomatic pistol.  So it represents a

22   minimum time, but, of course, given the distance between

23   the three bushes and the sign, all the shots have to occur

24   in that zone because then the cars are out of position and

25   so five shots have to be delivered in that time frame, and
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   watching the progression of the video would indicate that

 2   it's probably on the order of what I've cited here,

 3   somewhere between one-and-a-quarter up to, I'll say

 4   two seconds to deliver those five.

 5        Q.    I'm going to flip to page 14 of 17 of the

 6   report which lists what you call your conclusions.

 7        A.    Yes.

 8        Q.    Before we discuss those, is there anything --

 9   anything else, any other findings that haven't been

10   captured here, that we haven't already discussed that you

11   used to inform these conclusions?

12        A.    No, no, that's the totality of the -- of the

13   data analysis I conducted, and this is meant to be a

14   summary of the findings earlier in the report.

15        Q.    The conclusion section is meant to be a

16   summary of the earlier findings?

17        A.    Yeah, they're -- I try, maybe you'll correct

18   me, I try not to introduce any new concepts in the

19   conclusions, so they are a summary where I may have taken a

20   couple of photographs and paragraphs to discuss them in the

21   results section, these are meant to just summarize very

22   quickly and reference you back to those -- the body of the

23   report.

24        Q.    I see.  So these are not necessarily

25   independent opinions, rather, these are summaries of your
```

1    prior findings?

2        A.    Correct, these should all be supported by the

3    data that's in the rest of the report in the earlier

4    portion of the report.

5        Q.    Okay.  So the first three subparagraphs under

6    conclusions, these have to do with what happened prior to

7    the shooting, correct?

8        A.    Correct.

9        Q.    And what is the basis for those, that you

10   discussed earlier in the report?

11       A.    So of course the -- the record described by

12   Badley and Garcia talk about this -- this confrontation

13   that occurred in the theft of the convenience store, I

14   include that here, not because I have an independent test

15   that I conducted, but because it sets -- it sets up that

16   they did have an encounter, there is some connection

17   between these two prior to shots ever being established, so

18   that's why I add those descriptors.  I also want to

19   describe for the reader of this how did these guys even

20   come to be on the same road at the same time.  So this

21   first three are a progression of how we get to the meat of

22   the physical evidence that I evaluated.

23       Q.    Okay.  And these -- these sort of three

24   photographs about the background, these are based upon what

25   you consider to be undisputed facts?

```
1        A.    Yes, these are common to all the descriptions

2   that I was aware of.

3        Q.    These are not based upon evaluating the

4   credibility of any statement?

5        A.    No, no, they don't speak to the credibility of

6   any statements and they're statements that I feel are

7   supported by the totality of the evidence, whether it's the

8   video evidence showing the progression of vehicles, and

9   there is some evidence that shows the arrival of Garcia in

10  the area of the convenience store, so starting way back

11  there, there's a connection between these two people or

12  these two cars starting back from there.  Of course

13  evidence by there are two cases of soda in the vehicle,

14  Garcia claimed that he witnessed the theft of those two

15  objects which caused him to utter a statement or something

16  like that.  So that makes sense that that interaction

17  occurred back by the convenience store and that put these

18  guys on this path that resulted with the rest of the

19  analysis.

20       Q.    And the significance of these facts for your

21  purposes is to set the background context for the reader?

22       A.    Correct, how did these cars even come to be

23  adjacent to each other for the gunshots to be delivered.

24       Q.    Then moving down to the fourth subparagraph,

25  we've already discussed your finding that the two cars when
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    the shooting began were aligned generally side by side, but

 2    you can't say exactly the assignment, correct?

 3            A.    Correct.

 4            Q.    Next you say, "Officer Garcia reported seeing

 5    a firearm pointed at him which caused him to acquire and

 6    shoot his firearm."  What is the significance to you of

 7    including that?

 8            A.    Because something -- because Officer Garcia is

 9    not -- does not -- there's no evidence that he's randomly

10    shooting in this environment, so something caused Garcia to

11    go from driving to driving and shooting, and so what Garcia

12    says is that he saw a firearm and when he saw the firearm

13    he drew his firearm and fired at the, what he perceived as

14    a threat.  So I include that because that's what he's -- he

15    said he saw, that's why he started shooting.  That is -- so

16    in evaluating that -- that statement, there is a firearm in

17    the Ford, so if a firearm, he could have seen that firearm,

18    and that's why I include it here that that's what he

19    reports causing him to initiate the gunshots that he

20    delivered, so that's -- that's all that's meant by that

21    statement.

22            Q.    Are you crediting or discrediting that

23    statement by Garcia one way or another in coming to any of

24    your opinions?

25            A.    I think that there is evidence to support that
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   he did see a firearm, I think I speak to it more in the
 2   rebuttal report, but he, after the car -- after the Ford
 3   crashes and he advanced and he's on 911 he does make the
 4   utterance about where's -- where's the gun, so somehow he
 5   knows there's a gun involved in this, in this event, so if
 6   he didn't see it, it's conceivable that he's just guessing
 7   there's a gun, I mean, that's a possibility, but that there
 8   is a physical gun in the Ford would suggest to me that he
 9   did, in fact, see a gun and knew that there was a gun in
10   the Ford.
11           Q.    Okay.  So that -- the 911 call that he made
12   and the presence, the ultimate presence of the gun in the
13   Ford, those two things suggest to you that Officer Garcia
14   did, in fact, see a gun before he -- before he acquired and
15   shot his gun?
16           A.    Yes.
17           Q.    Okay.  Do those things suggest to you that he
18   saw a gun in the car at some point before he reported
19   seeing the gun pointed at him?
20           A.    That I don't know.  I don't know when he --
21   other than when he described seeing the gun, and of course
22   Badley describes providing the gun to Franklin, so at what
23   point if he saw during that transaction the gun being
24   handed over, I don't know.  Garcia only recalls seeing the
25   gun pointed in his direction and he claims that's the
```

1    stimulus that caused the reaction of him firing.  Whether

2    that was the actual stimulus that caused him to fire or he

3    just began firing, I don't think I can say the difference,

4    I don't think I would be able to determine the difference

5    based on the bullet paths.

6         Q.    So what is the significance of including this

7    fact, Officer Garcia's report about seeing the firearm, to

8    your conclusions about the shooting reconstruction?

9         A.    Because some stimulus, in my opinion, some

10   stimulus caused Garcia to shoot his gun and it caused him

11   to shoot his gun at a point in time when the two cars were

12   parallel to each other, he did not shoot at the convenience

13   store and he didn't shoot rearward at the vehicle, it was

14   at a time when the gunshots, the physical paths of the

15   initial gunshots are at a time when the two cars were side

16   by side.  So it fits with the physical evidence in my view,

17   and the reason I include this -- this statement is because

18   I feel that there has to be some stimulus for Garcia to

19   start shooting at the point in time when they were both

20   cars aligned by the three bushes, not at the stop sign, not

21   forward of the stop sign, and no shots were delivered

22   before or after this, that sequence.  So what I guess the

23   investigative question, the hypothesis, the hypothesis is

24   Garcia saw a gun and reacted by shooting, and then the

25   examination would be is that supported or refuted by the

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   physical evidence, well, there is a gun, if he didn't see a
 2   gun then he's just shooting into -- into a car adjacent to
 3   him, I'm not aware of him shooting any other cars adjacent
 4   to him, so that statement of Garcia seeing a gun is
 5   supported by some of the physical evidence, the presence of
 6   a gun, Badley providing a gun to Franklin for reasons
 7   unknown, so that's why -- that's why that's included, I'm
 8   looking for position as to why would Garcia start shooting
 9   at that time on that highway and he says it's because he
10   saw a firearm.
11        Q.   So you believe, based upon your own expertise,
12   that there had to have been a stimulus at that moment that
13   would cause Garcia to shoot his gun?
14        A.   Yes.
15        Q.   And you don't know what that stimulus was
16   independently based on the evidence?
17        A.   That's correct, that's correct.
18        Q.   So if you assume Officer Garcia's report as
19   true, you can make some assumptions about what that
20   stimulus was?
21        A.   Yes, yes, you -- well, you have to test
22   Garcia.
23        Q.   Uh-huh.
24        A.   Garcia's statement is not -- is not -- is
25   never accepted on face value, Garcia's statement has to be
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   accepted or refuted based on physical evidence, so he says
 2   he saw a gun, first question for my data section of my
 3   scientific method, is there a gun to be seen, the answer is
 4   yes, there is a gun to be seen.  Did he fire at any other
 5   point in time other than when the cars were generally
 6   aligned side by side and then continuing while the cars
 7   advance, no, there's no evidence of him firing randomly at
 8   other cars or in another situation.  So in testing Garcia's
 9   statement you would say -- I would say that there are
10   physical evidence elements of the scene that supported
11   Officer Garcia's statement, so that's why it's included
12   here.  Badley, I can test Badley, Badley says, I never saw
13   a gun pointed, okay, so you didn't see a gun pointed, let's
14   test that, where were you looking, were you bent over
15   forward or leaning significantly backward, were you looking
16   over at Garcia, I don't know any of that, all I know is
17   that you provided a gun to Mr. Franklin at his request and
18   then gunshots came into your car, you recall them happening
19   at the stop sign, that's not supported by the physical
20   evidence, and so collectively I begin to go through that
21   process.  The statements that are provided I try to test
22   against the physical evidence, and so Officer Garcia says
23   he saw a firearm, he described a firearm being in the car
24   before it was discovered, so he either guessed that there
25   was a gun in the car or he actually had seen a gun in the
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1    car.  If he -- I can't eliminate that he just simply

2    guessed that there's a gun in the car, so maybe that's --

3    maybe that's an aspect of the -- of the test that's not

4    clear in that statement.

5         Q.   Did you test any of Badley's statements in

6    coming to any of your opinions that are captured in this

7    report?

8         A.   Yes, I considered some of what Badley said, I

9    don't know that they all -- that they -- sometimes they

10   have to have some bearing in the -- in the report.

11   Typically when people don't see something it's not a test,

12   you can't test that, somebody says, I didn't see a gun,

13   well, I can't test what somebody saw or didn't see or what

14   somebody remembers or heard, but I can test some of the

15   elements of what Badley says.  Badley says he provided a

16   firearm, there is a firearm.  Badley says that the shooting

17   started when they were at the stop sign, the stop line, the

18   stoplight, but that's not supported by the physical

19   evidence, but I don't know that it's all that relevant in

20   assessing him.  And I want to be clear that in doing this

21   I'm not trying to say that Garcia is right about everything

22   he said and Badley is wrong, it's simply the elements that

23   I can test I try to put some significance to in the report.

24   So that's the purpose of the conclusion points as they're

25   outlined here.
```

1        Q.    Can you test whether Desmond was pointing his

2   gun at Garcia at the time that Desmond was shot?

3        A.    No.

4        Q.    Looking down on page 14 of 17 to your report,

5   the conclusion section, in the sixth paragraph down you

6   say, "Officer Garcia accessed and fired his weapon."  When

7   you say accessed, can you explain what that means and

8   whether you have any -- drew any conclusions based upon

9   that?

10       A.    It's simply meant to be a descriptive term,

11  the gun was, I'll say it this way, the gun was accessible

12  to him, so he accessed the gun and he had to -- he had to

13  acquire the gun is all I really mean by that.  So I don't

14  know if he drew it or had it sitting out or kept it on the

15  seat adjacent, I don't know any of that, but however he got

16  it in his hand, he accessed it, because he can't deliver

17  those shots without pulling the trigger, and so that's all

18  I meant by accessed his firearm, and I'm not trying to

19  indicate where the gun was or in what capacity he stored

20  the gun.

21       Q.    Okay.  So you didn't, in your evaluation of

22  the crime scene, you didn't form any opinions about where

23  his gun was before he started shooting it?

24       A.    No, like Franklin's gun, a gun in open space

25  or in a position prior to the discharge of it or the

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    revelation of it can't be determined, so where it was
 2    before Garcia accessed it, I don't know, and I'm not -- I'm
 3    not trying to evaluate that.
 4         Q.    Moving down to the final three paragraphs
 5    under conclusions, you believe that the best fitting bullet
 6    for the one that killed Desmond Franklin was the first
 7    bullet that Garcia shot, is that correct?
 8         A.    Yes, that's true.
 9         Q.    You believe that Devin Badley was right there
10    in the passenger seat but did not interfere with that
11    bullet path when the fatal shot came?
12         A.    That's correct, he was not in line with that
13    shot.
14         Q.    And you conclude that the gun that was in
15    Desmond Franklin's car was found at his feet on the
16    driver's side of the car, correct?
17         A.    Yes.
18         Q.    And that's the only position that you can
19    place the gun in at any point based on the physical
20    evidence?
21         A.    Correct, correct.  The end position of the gun
22    is all we can deduce with any certainty.
23         Q.    Outside of the rebuttal opinions, which we'll
24    get to, do you have any other opinions to express in this
25    case that were not covered in this report or in our
```

1    discussion of it just now?

2        A.    I can't -- I can't think of any other topics

3    or areas that I would introduce beyond what we've

4    discussed.

5                  MS. BONHAM:  Okay.  Can you guys give

6            me another two-minute break, we'll go through

7            the rebuttal report and then I won't have too

8            much left for you today.

9                  THE WITNESS:  Okay.  That's fine.

10                 (Brief recess was had.)

11       Q.    I'm looking now at what I marked for the

12   deposition as Exhibit D, the rebuttal report that you dated

13   9/14/2023.  Do you have that pulled up?

14       A.    Yes, I have a hard copy in front of me.

15       Q.    Okay.  Were you asked to provide the rebuttal

16   report as to the opinions of both of plaintiff's experts in

17   the case?

18       A.    Yes, I was provided their -- the two expert

19   reports and asked if there was anything that I would rebut

20   by the attorney that hired me.

21       Q.    And this is a consolidated rebuttal as to both

22   of those reports?

23       A.    Yes, just in formatting them, because there

24   was some overlap between the two reports, I found it easier

25   to just combine them where there was an opinion that I

```
 1   wanted to express.

 2          Q.    And is this rebuttal report based upon the

 3   same methodology that you described using for your

 4   preliminary report?

 5          A.    Yes, the statements here are basically

 6   opinions offered and I use that as the basis of my test or

 7   the hypothesis and then I consider and test whether or not

 8   those are supported or refuted by the physical evidence in

 9   the event.  So same process as the mechanical

10   reconstruction, the original reconstruction.

11          Q.    Your rebuttal opinions are also based on the

12   scope of your expertise in, as a scientist in forensic and

13   shooting event reconstruction, is that correct?

14          A.    Yes, and in this event, since blood stain

15   pattern analysis was also opined, I do rely on my

16   experience in blood stain patterns as well.

17          Q.    I want to look briefly through these

18   rebuttals, and these are numbered, is that correct, 1

19   through, I believe, 7?

20          A.    That's correct.

21          Q.    And this is the totality of your rebuttal

22   opinions in the case, correct?

23          A.    Yes, based on -- based on my review of the

24   experts, these are the key points that I felt I needed to

25   address.
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1          Q.    Looking at number 1 on page 1 of 7 of the

 2    rebuttal report, you rebut that you call the implication

 3    that Desmond Franklin cannot be looking forward and

 4    pointing a gun at Garcia at the same time, correct?

 5          A.    Yes.

 6          Q.    So as we've already discussed, you -- you

 7    yourself conclude that Desmond Franklin, when he was shot,

 8    he was shot in the right temple, correct?

 9          A.    Yes.

10          Q.    And that that means that, based upon your

11    expertise, the right temple had to be facing the gun that

12    shot him at the moment he was shot?

13          A.    That's true.

14          Q.    So you have no dispute with that, that's not

15    in dispute among the experts in the case?

16          A.    No, that -- that has to be accepted that the

17    head -- the head position as you just described has to be

18    the approximate position for that bullet to arrive and hit

19    the way it did.

20          Q.    Your issue is with an inference that someone

21    has to be looking at the target when they shoot, am I

22    getting that right?

23          A.    Yes, my interpretation of multiple positions

24    in the Balash and Tucker reports, and I've italicized them

25    as quotes from their report, they talk about he could not
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    have been pointing a gun in the direction of Garcia causing

2    that, what I called a stimulus earlier, because he was

3    looking forward, and from an analytical perspective those

4    are mutually, what we call mutually exclusive events, you

5    can point your arm to the right and continue to look

6    forward and it also, it can speak to the instant the bullet

7    arrives he's looking forward, but of course there might be

8    seconds before the decision to shoot and the first bullet

9    is actually delivered where he was looking right and then

10   had adjusted his head back to forward again.  So the

11   concept that they both seem to embrace that he couldn't

12   have shot, he couldn't have pointed a gun because he was

13   looking forward is a fallacy in my view.

14        **Q.   Your only conclusion as to where Desmond**

15   **Franklin was looking is based upon the bullet entrance to**

16   **his head, is that correct?**

17        A.   Correct, and I don't know what he was looking

18   at, but I know his head position has to have the right side

19   of his head facing the gun, the source gun, Garcia's gun.

20   So that, the right side of his head has to be generally

21   facing forward, his head has to be facing forward

22   approximately for the bullet to cross the interior and

23   strike him in the side of the head.

24        **Q.   So in this situation that means his forehead**

25   **had to be pointed across the steering wheel towards the**

1  road, looking out at the road?

2       A.    Correct, his head position is generally in

3  that orientation.

4       Q.    So your position is if he's looking towards

5  the road he could still be pointing his arms in any

6  direction?

7       A.    Of course, that captures my criticism of those

8  statements.

9       Q.    And that's a conclusion that you are drawing

10 based upon analytical sense, that's your basis for that

11 conclusion?

12      A.    Correct, the hypothesis they proposed was that

13 you could not point a gun while looking forward, and when I

14 test that with my common sense to include 35 years of

15 driving experience, knowing how to operate a car, and

16 informs me that that is not a true statement, that

17 hypothesis that they both presented is not supported by the

18 evidence.

19      Q.    You, based upon the physical evidence and your

20 expertise, you can't put Desmond's hands in any particular

21 position at the moment he was shot, is that correct?

22      A.    That's correct.

23      Q.    We spoke before about -- a little bit about

24 the angle of the head and you indicated that you don't have

25 biomechanical expertise that would allow you to express the

1   angle that Desmond's head would have been at when it was

2   shot, correct?

3        A.    Correct.

4        Q.    So the figure 1 to the rebuttal report, which

5   shows some computer rendered drawings of a person, what do

6   these purport to express?

7        A.    So these are computer models that I generated

8   to simply show what was described in the written portion of

9   the rebuttal on page 1, and so the diagrams are used,

10  again, I find that I do better with a visual support, a

11  demonstrative exhibit in conjunction with the words and

12  descriptions, and so this is my attempt to model a

13  mannequin and show how the head can be facing forward or

14  even slightly twisted toward the right, which is what the

15  autopsy indicates, and still have your arm pointed in a

16  direction that would be visible to a viewer from an

17  adjacent car, so that's what these models are meant to

18  show.  The opposition experts said you can't do this, that

19  this is not possible and I would argue that these images

20  show that it is possible.

21       Q.    These images don't purport to express the

22  actual angle of Desmond's head, right?

23       A.    Correct, I can't determine his actual angle

24  other than his right side of his head was facing the gun.

25       Q.    These images don't purport to express anything

Deposition of Matthew Noedel                        Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    about Desmond's actual physical position actually, right?

2         A.    Correct, these were -- these were only

3    generated to demonstrate that the opinions by Balash and

4    Tucker are not supported.  That these are normal,

5    reasonable anatomical positions that could be achieved by a

6    reasonably -- an anatomically reasonable human being would

7    have the ability to make -- to render these, to achieve

8    these positions.  So it is merely meant to show that the

9    Tucker and Balash opinion that you have to be looking in

10   the direction you're pointing is not supported by the

11   physical evidence.  Whether he was actually holding a gun

12   at this angle at that moment before the bullet arrived,

13   that I don't know.

14        Q.    Okay.  These renderings, in other words, just

15   express that a person can do one thing with his head and a

16   different thing with his arms?

17        A.    Correct, correct, I wanted to demonstrate

18   visually why that is a reasonable opinion.

19        Q.    Looking at rebuttal opinion number 2, what did

20   you evaluate in order to reach this rebuttal opinion, what

21   data did you look at?

22        A.    So on page 3 I included a figure, again, the

23   opinion that Balash stated was that he opined that he could

24   determine how Garcia wore his jacket while seated in his

25   vehicle and as I -- as I review the data I don't see any

1    data to support that, there's no in-car cameras that would

2    support that.  To demonstrate then, similar to the last

3    figure, to demonstrate how -- certainly how the jacket

4    could have been considered or positioned I used a screen

5    capture from a body camera video of Garcia as he was

6    captured by somebody else's video and show that, in fact,

7    in that position he's got the jacket tucked behind the gun

8    and holster.  Again, when an expert reports in their expert

9    report that something is not possible or not likely, there

10   needs to be data to support that, so I think that even this

11   image that's included with the text proves that we don't

12   know how Garcia carried or wore or sat in his car with his

13   jacket position, so it's certainly a reflection on what

14   Balash, how he may sit in his car, but it has nothing to do

15   with Garcia.

16       Q.    This photo of -- screen grab of the jacket

17   position you took comes from after, you know, the shooting,

18   after Garcia is on scene and he's wearing this in this

19   position, correct?

20       A.    Correct, yeah, this is after the crash when,

21   at some point after when arriving police officers come and

22   have activated body cameras, so this is a frame grab from

23   one of the body cams that captured Garcia walking through

24   the scene that happens to also show his jacket position.

25       Q.    So this shows the jacket position from after

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    the shooting.  Is there any other basis that you use for

2    the rebuttal opinion, number 2?

3          A.    No.

4          Q.    Is there a scientific basis for the rebuttal

5    opinion number 2?

6          A.    A scientific basis, it is not the result of

7    any test, so I would say there was no test performed as to

8    the position of Garcia's jacket prior to the shooting, so

9    the answer would be no, there is no scientific test, it's

10   simply a statement offered by Balash that is not supported

11   by physical evidence, and so I wanted to rebut that rather

12   than let it go.

13         Q.    With respect to rebuttal opinion number 3,

14   this talks about the end location of the firearm, correct?

15         A.    Yes.

16         Q.    What exactly is your basis for this rebuttal

17   opinion number 3?

18         A.    So for an expert report I need to see the

19   data, the underlying data that would support that opinion,

20   and so knowing the physical evidence that was provided to

21   me and knowing that I could not find any physical evidence,

22   I was looking in their report for what physical evidence

23   are they relying on to say that the end position of the gun

24   represents that it couldn't have been pointed earlier, and

25   I couldn't find any data that would support that, so while

1    they're certainly entitled to write anything they want in

2    their expert report, but in an expert report you need the

3    data or the experience or something to demonstrate that

4    your statement is true, I could not find any data to

5    support what they're saying that where the gun ended

6    identifies where it was when the shots began, that's simply

7    not supported by physical evidence.  So, again, in the

8    rebuttal that's part of -- part of what -- what I'm trying

9    to do, I'm trying to point out things that I don't feel are

10   supported by any evidence or anything more than pure

11   speculation on their part.

12       **Q.    Based upon your experience in shooting scene**

13   **reconstruction, can you make any conclusions about where**

14   **the gun was in Desmond Franklin's car prior to its -- where**

15   **it was finally discovered?**

16       A.    No, no, I can't position that gun in three

17   dimensional space in the moments before and through the

18   shooting, how it may have moved during the course of the

19   delivery of shots or its potential movement after the

20   collision and car wreck at the end.  So I can't position

21   Franklin's pistol in space prior to where it ended up at

22   his feet.

23       **Q.    Based upon your experience in shooting scene**

24   **reconstruction, can you exclude any possibilities about**

25   **where that gun would have been in the car prior to when the**

1    car crashed?

2          A.    Yes, it has to be -- it has to enable -- be

3    able to have access to blood arriving on both sides of the

4    -- of the firearm and it has to be able to intercept

5    shattered glass which means to me it can't be protected, it

6    can't be under somebody sitting on it or in a pocket, those

7    would protect those areas from receiving the type of -- of

8    appearance, the glass and blood that's on the gun itself,

9    so that's -- that's what I would eliminate from this scene,

10   protected areas that the gun could not have accessed or did

11   not access because it was exposed to glass and blood.  And

12   so the actual exact mechanism of how it was exposed to

13   glass and blood, I can't say the specific mechanism,

14   there's insufficient data for that.

15         Q.    You can't say how the gun was exposed to glass

16   or blood, that's what you're saying?

17         A.    Correct, yes, I don't know the orientation of

18   the gun based on those deposits or the timing of exactly

19   when all those -- when those pieces of evidence arrived to

20   the gun, but it can't arrive if the gun's protected, so the

21   gun has to be exposed enough to receive those pieces of

22   evidence.

23         Q.    And the gun has to be exposed enough to

24   receive blood and glass at some point before it was

25   discovered, correct?

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1        A.    Correct, after -- after the initial shot

 2   shattering the glass and before it's recovered at his -- at

 3   the footwell of his driver's seat.

 4        Q.    But you don't believe you can say when or

 5   where that gun got blood on it?

 6        A.    No, there was bleeding secondary to the crash

 7   as Franklin was positioned in the seat and so depending on,

 8   now, there is blood on both sides of the gun, which would

 9   indicate that the gun had moved and, but I don't know at

10   what point it moved to expose one side as well as the other

11   side.  In other words, it can't just be against the ground

12   or blood would just be coming from above from Franklin's

13   bleeding wounds, so the gun position moved at some point, I

14   expect that in the type of collision that was experienced,

15   it appears to be a significant collision, enough to cause

16   the airbags to go and the front end to crush.  So how it

17   actually moved and where it was in the moments before it

18   ended at his feet, I can't speak to.

19        Q.    You can't say whether or when the gun got

20   glass on it?

21        A.    Correct, I can't -- I cannot tell you the

22   orientation or position of the gun when glass arrived.

23        Q.    You can exclude the possibility that the

24   entire time the gun was put away because otherwise it

25   wouldn't have blood or glass on it, right?
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1          A.    Correct.

 2          Q.    **Are there any other possibilities about the**

 3    **location of the gun that you can exclude based upon the**

 4    **physical evidence?**

 5          A.    Well, I mean, it does not appear to me that

 6    the gun was in the back seat, I don't expect it to end at

 7    his feet, I mean, it does not appear to have been in the

 8    glove compartment, doesn't appear to have been in a pocket,

 9    does not appear to have been in the center console or

10    tucked between, for example, between two seats there's a

11    space where the french fries fall, I would consider that a

12    protected area of the car, and if the gun were stuffed in

13    there I would not expect it to have the appearance, so I

14    think it has to be exposed enough, whether it was

15    physically pointed in the moments before the car wreck or

16    pointed upwards, brandished, I don't know, but it

17    ultimately was not hidden, but I can't tell you where the

18    gun was in open space prior to the gunshots.

19          Q.    **Why would you not expect it to be in the back**

20    **seat?**

21          A.    Because of where it was, there's a lot of

22    restriction under the seats and if the gun were placed in

23    the back seat and the collision occurs to the front of the

24    car, which means things from the back can lurch forward,

25    but it would have had to have lurched under the seat,

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1    there's a lot of restrictions under the car seats, humps

 2    and levers that control the seat mechanism, so I don't

 3    expect it to lurch forward and get around those barriers to

 4    end up at his feet.  So I think it's -- I think it's

 5    something that's landed at his feet in the commotion of the

 6    collision after the collision.

 7         Q.    And what is that conclusion based upon, what

 8    experience that you have is that conclusion based upon?

 9         A.    Gravity, in part, the gun will try to fall to

10    its lowest stable point based just on gravity.  Inertia and

11    momentum, which are two ballistic principles, but they

12    would also apply to the mass of a firearm in that if you

13    give forward momentum to an object, it will try to carry

14    that momentum forward as well.  Reaction to gunshots, I've

15    seen people pull their hands in after receiving a gunshot,

16    those are the kinds of events that I would draw on to say

17    that I think the gun fell from some area around the front,

18    around the front seat to his feet ultimately.  It's, again,

19    not a quantitative thing, I can't measure velocity of the

20    car based on where the gun ended, it's a qualitative

21    observation based on the presence of a gun at his feet.

22         Q.    And you think the gun fell from gravity to his

23    feet?

24         A.    Yes, I think ultimately wherever it was it

25    ultimately got displaced by gravity to reach that low point

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1    on the floor.

 2         Q.    And you've held that gun that Desmond had in

 3    the car yourself, right?

 4         A.    Yes.

 5         Q.    So that's a heavy object, it's not like a

 6    feather or a piece of paper, right?

 7         A.    Correct, it's approximately two to

 8    two-and-a-half pounds the way it was loaded, so the gun

 9    magazine and I think there were three or four cartridges

10    with the gun, so collectively that represents about

11    2 pounds, 2-pound, two-and-a-half pound weight.

12         Q.    So, for example, if it was in the -- in the

13    back of the car it couldn't be, you know -- you wouldn't

14    expect it to be knocked so far that it fell up to Desmond's

15    feet, it's a heavy object, it would encounter a barrier?

16         A.    That's correct, that's my expectation,

17    although I've never tested that specific property.

18         Q.    And you didn't perform any tests independently

19    to evaluate where the firearm may have been at any point

20    inside the car?

21         A.    No, I did not.

22         Q.    Looking down to rebuttal opinion 4, you do say

23    that some of the pistol received more blood than other

24    parts of the pistol, is that correct?

25         A.    Yes.

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
1          Q.    The one in Desmond's car?

2          A.    Yes.

3          Q.    So your conclusion is that it couldn't -- the

4    pistol couldn't have been wholly put away because it got

5    some blood and glass on it, right?

6          A.    Correct, yes.

7          Q.    Okay.  But the blood and glass wasn't

8    completely all over it?

9          A.    No, there was more blood on the top and sides

10   of what's called the slide area of the gun, which is the

11   top, the top and the upper left and right side.  There was

12   some blood on the grip area but less blood on the grip area

13   and less glass on the grip area then on the top of the gun.

14   So there is, based on the original photographs,

15   preferential depositions of blood in those particular areas

16   on the tops and sides, same with the glass, preferentially

17   deposited on the right side of the upper slide, but, again,

18   those are difficult to interpret why those specific areas

19   were saturated or deposited on in preference to other areas

20   and why some others receive less blood, so it's not a

21   uniform event.  And, again, these are aspects that I didn't

22   address in my initial report because I think they were too

23   complicated to address, but when the opposing experts begin

24   to opine about blood stain patterns then I'm compelled to

25   rebut that in my opinion and identify what the limits are
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   and where they've overstated the limits to the best of my

 2   ability.  In this rebuttal opinion the descriptions

 3   provided are not common blood stain pattern terms, I

 4   included some terms at the end, so I had to try to

 5   understand first, what was -- what were they trying to say

 6   about the blood deposits, because they're not following

 7   normal descriptions and nomenclature, so propelled blood, I

 8   knew that Badley described a fountain of blood, or a warm

 9   liquid, which I presume to be blood emanating from the --

10   what has to be the entry wound of Franklin, and so blood, I

11   expect blood to squirt out of that entry wound and Badley

12   described that, I would say that's a supported observation,

13   and if there was a gun in the -- in the interim space it

14   could receive that back spatter of blood from the entry

15   wound, it got to Badley, so blood is being propelled

16   through the cabin of the car.

17        Q.    And when you say interim space, you mean the

18   space between Desmond and Devin?

19        A.    Correct, yes.

20        Q.    Then your ultimate conclusion, looking at page

21   4 on this, is that you can't identify where, quote, "Where

22   the gun was pointed in the moments before Garcia delivered

23   the gunshots"?

24        A.    Correct, the blood will not inform that.

25        Q.    If it was pointed anywhere, I mean, that's --
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1          A.    Correct, that's --
 2          Q.    You don't have an assumption that it was?
 3          A.    Yes, I agree, the position of the firearm in
 4    the instant or the moments before the first shot arrived
 5    into the vehicle, into the Ford can't be determined, we
 6    don't have data to identify that.
 7          Q.    Okay.  Looking at rebuttal opinion 5, can you
 8    explain to me what is the significance of this -- of this
 9    rebuttal opinion, what does it mean?
10          A.    So in the -- in the Balash report he included
11    a fairly lengthy description about, I think he was speaking
12    to the lack of collection of the holster and he implied
13    that the presence of the holster could have had significant
14    bearing on his interpretation, but then he goes on to say
15    that he has enough data to provide his interpretation, so
16    to me I wanted to point that out in a rebuttal, because you
17    either are limited by that or you have enough.  If your
18    opinion is, I don't have the holster so I can't evaluate
19    it, that's fine, but to say that I don't have the holster
20    but I can evaluate it anyway is -- there's no point to that
21    other than to try to diminish what was collected in this
22    event.  So, again, in a rebuttal report such as this I have
23    to decide, do I want to address a particular issue or
24    something that I see is, in this case, I would say
25    frivolous, or leave it alone.  And so I thought it was
```

```
1   important enough to mention that the implications in his
2   report that without the holster he can't do anything are
3   not true, he did all kinds of evaluation with the holster
4   and ultimately opined that the type of holster that Garcia
5   had would perform in a particular way, I don't claim to be
6   a use of force or a holster expert so I don't know the
7   mechanical advantage or disadvantage of Garcia's holster,
8   but if he doesn't have sufficient to opine then he
9   shouldn't opine.  That was the point of my rebuttal number
10  5.
11       Q.    So on number 5 you're not disagreeing on a
12  scientific basis or a scientific finding with Balash,
13  you're -- correct?
14       A.    Correct, I don't -- I don't have an opinion
15  about the holster's -- Garcia's holster role in the overall
16  event, I don't have any -- any opinion whatsoever.  I do
17  look for, in expert reports, some of -- the last term I
18  mentioned here where I quote him, Balash opines that the
19  investigators were not concerned or interested in an aspect
20  of this, well, I don't know if that's true or not, I don't
21  know if they cared or not, and he doesn't know if they
22  cared or not, his interpretation might be that they don't
23  care but you can't say that somebody else didn't care about
24  this crime scene because they didn't collect a holster for
25  you, it's an inappropriate statement because it can't be
```

1  substantiated with any physical evidence or facts or data,

2  it's just his opinion, he wishes -- he felt that the

3  examiners were not concerned or interested in processing

4  this scene, well, they did what they did and that's what we

5  can evaluate, so that's part of that substance 5 as well.

6      Q.   All right.  So you don't have a scientific

7  basis to differ from him with respect to number 5, it's a

8  -- you don't like his analysis basically or his style on

9  this one?

10      A.   Yes, he's -- as in the other points, he's made

11  statements that are not supported by any data, they're

12  simply criticisms of what he sees in this report.

13      Q.   Moving to rebuttal opinion 6, this has to do

14  with the trigger disconnect or the safety on the gun that

15  was in Desmond Franklin's car.  I think you started

16  explaining this to me before, but can you explain the

17  significance of how you know -- how a user of that gun

18  knows that the gun is in the on safe position?

19      A.   So visually if you -- if you have time and you

20  inspect the position of the lever itself, that would be one

21  thing, if you know the gun and you know the arrangement of

22  the gun, you know what the angle lever is in the on safe

23  position, so that would be the first thing.  What Balash

24  implies here is that Franklin would have known right away

25  that he was in an on safe condition because the trigger of

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1   the trigger disconnect, and that is what I referred to
 2   earlier as the slack in the trigger, but to know that you
 3   have to pull the trigger, so if it is Balash's opinion that
 4   Franklin would have known that he was on safe, then that
 5   means Franklin pulled the trigger by his description of the
 6   -- of the trigger disconnect.  So if Franklin is pulling
 7   the trigger of a loaded gun inside of his vehicle, I assume
 8   he's intending to fire but did not fire because his safety
 9   was on, but the only way he can know from the trigger
10   disconnect is to fully pull the trigger to the rear and
11   realizes it's not firing the gun.  So Balash has opined
12   that he would have known because of the trigger disconnect,
13   I rebut that by saying he would have had to pull the
14   trigger to know and if he's pulling the trigger then he's
15   intending -- you don't pull the trigger of a gun that you
16   don't intend to shoot, so he's intending to try to -- if
17   he's pulling the -- if he's pulling the trigger then he's
18   trying to discharge the gun, there is no process in this
19   environment where you would pull the trigger and hope that
20   your gun doesn't fire, that doesn't make any sense.  And he
21   would if he knows the gun, recognize, after he's pulled the
22   trigger, this trigger has slack, it's on safe, and I think
23   if that occurred, if that thought process occurred to
24   Franklin, I think that he was then subsequently shot before
25   he could flip the switch and make the gun work properly, if
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1    -- if he recognizes what Balash has -- has given him credit
 2    for.
 3         Q.    The hypothetical that you just posed is based
 4    upon an assumption that Desmond's playing with the trigger
 5    at the same moment he's trying to shoot a gun, right?
 6         A.    Not playing with the trigger, you would have
 7    to pull the trigger.
 8         Q.    Pulling the trigger at the same moment he's
 9    going to shoot the gun, the hypothetical that you just
10    posed is based upon that assumption, also hypothetical?
11         A.    Correct, in my experience people do not pull
12    the trigger of a gun until they're trying to initiate a
13    gunshot.  It's not a reasonable way to check whether your
14    safety is on or off by pulling the trigger, because if it's
15    off, his gun was loaded with a round in the chamber, if the
16    gun was off, wherever it was pointed, a bullet would have
17    come out at 900 feet per second and hit whatever was in
18    front of it, so it is not an effective way to check whether
19    a safety is on or off.  But if he, as Balash -- Balash
20    proposed that's what he did or that's what he would have
21    done in his quote there, if that's what he did then he was
22    trying to discharge the firearm by pulling the trigger, in
23    my opinion.
24         Q.    Okay.  You conclude, just to make sure I get
25    this right, your opinion is that if Desmond had pulled the
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    on safe trigger of his gun while in the car, the only thing

2    he could be doing is trying to shoot someone?

3          A.     That is my opinion, yes.  Well, I don't know

4    if he's trying to shoot someone, he's trying to discharge

5    his gun.

6          Q.     Okay.  The only thing he could be doing is

7    trying to discharge the gun?

8          A.     Correct, because it is not an appropriate way

9    to check if you're on safe or not on a pistol that is

10   loaded with a round in the chamber, because if it's off

11   safe you just fired the gun.

12         Q.     If the gun -- this particular gun is on safe

13   you can visually tell, someone can visually tell, as you've

14   described to me before, that it's on safe, correct?

15         A.     Yes, there are the external levers, what I

16   referred to earlier, ambidextrous safety, a lever on each

17   side of the back of the gun, so if you visually inspect the

18   gun and you know the properties of the gun, you could

19   recognize that, hey, this gun, the safety is angled

20   downward, which means it's on safe, you can see that

21   visually if you inspect the position of the gun.

22         Q.     And you're familiar with this type of gun, not

23   even just this particular gun, right?

24         A.     Yes, yes.

25         Q.     Is that -- that safety feature that you can

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

1    visually see, is that commonly used for gun users to make

2    sure the safety is on or off?

3         A.   Yes, the safety is -- the purpose of the

4    safety is so that you can carry the gun and not have an

5    inadvertent pull of the trigger, so if somebody does access

6    your trigger or if you accidentally access your trigger the

7    gun won't discharge, and the visual safety, if you learn

8    what the safety, because some guns up is fire, or, I'm

9    sorry, up is safe, down is fire, this gun down is safe, up

10   is fire.  So if you know your gun you might be able to

11   visually check simply by looking at it and say, it's on

12   safe, okay, no problems here, so there -- you can visually,

13   if you know the gun, you can visually assess the position

14   of that lever and determine whether or not the safety is on

15   or off.

16        Q.   Okay.  So if you use this gun that was in

17   Desmond's car you can tell visually, okay, my gun's on safe

18   and then you can have it safely?

19        A.   Yes, if you know the gun, I mean, if you know

20   what the operations are on the gun.  It has an external

21   lever that's a physical piece of metal that flips up or

22   down and so you can feel and see that lever, so it is a

23   visual -- there is a visual -- a potential to visually

24   assess whether your gun is on safe or off safe.

25        Q.   Visual and you can feel it?

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1        A.    Then if you pull the trigger that would be,
 2   independent of the visual, you would feel slack trigger and
 3   you would -- you would realize that, hey, the gun is not
 4   discharging, so it's loaded, so if it's not discharging
 5   that must mean it's on safe or mechanically flawed, which I
 6   don't think is an element here, but --
 7        Q.    So that safety lever that you can visually see
 8   and feel and the slack trigger, those are both indicia of
 9   the gun being on safe on this gun?
10        A.    Yes, visually with the lever and by pulling
11   the trigger on what's called a disconnect.
12        Q.    Moving to rebuttal opinion 7, explain to me
13   the significance for you of the 911 call here.
14        A.    So this is something that I -- I began to
15   address in the initial report and it's in context to
16   testing whether or not Garcia saw a gun prior to this
17   event.  And so we have the very obvious things, there is a
18   gun in the car that's revealed, but this is an utterance
19   made before he's done any -- before there's been any time
20   to do an inspection of the car, and he's referencing that,
21   he's asking where's the gun, you know, some gun, so this
22   implies to me that he knows there's a gun in this car.  He
23   could be guessing and hopefully guess correctly or it could
24   be that he's seen the gun or seen a gun in the car and be
25   reacting to that.  The reason I included it in the rebuttal
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

 1    here is because they imply that him saying this means he
 2    didn't see a gun and that he has to ask Badley where is a
 3    gun, where is the gun, what did you do with the gun, so
 4    they, I guess there's two interpretations of the same data,
 5    they interpreted it as he doesn't know that there's a gun
 6    and he has to, I guess, I assume guess that there's a gun
 7    in this car by asking Badley where's the gun or he already
 8    knows.  My position is he already knows there's a gun in
 9    the car but Badley is running around, he needs to know,
10    Officer Garcia wants to know where is the gun, and to my
11    interpretation he -- he's aware of a gun in the car.  One
12    reason that he's aware -- that he could be aware of the gun
13    in the car is that he saw it pointed at him before he
14    discharged it or he could guess and say, a car in this
15    neighborhood probably has a gun in it and I hope that it's
16    something that's not in the trunk, or he -- he's more along
17    the lines of what Tucker reports, which is that he doesn't
18    know there's any gun, he's unaware of any gun and he's
19    trying to fabricate it in making these utterances captured
20    on the 911 call.  So I wanted to just point out that the
21    interpretation that this means that Garcia did not -- was
22    not aware of any gun at the time after the car wreck and
23    after he ran up to the scene I don't think is supported by
24    the evidence.  I think he -- I think the evidence supports
25    that there was a gun and he could have seen it or he could

1   be guessing that there's a gun.

2        **Q.    Rebuttal opinion 7 then, this is your --**

3   **you're rebutting your interpretation of Tucker's**

4   **interpretation of the 911 call?**

5                    MR. CABRAL:  Objection.

6        A.    I'm going to read the paragraph real quick.

7        **Q.    Yeah.**

8        A.    Yeah, so generally speaking my interpretation

9   of what he says is that Garcia was not aware of a gun in

10  the car until he saw it at Franklin's feet, and I interpret

11  the utterance another way, a different way in that he

12  uttered that because he knew there was a gun in the car,

13  not because he didn't know there was a gun in the car.  So,

14  again, a test as to what Garcia meant by uttering that in

15  the 911 car, I'm not aware of a test that was done to

16  evaluate or refute which of those interpretations are best

17  or correct.

18       **Q.    Then what is the -- what is the scientific**

19  **basis for your interpretation of what Garcia's utterance**

20  **was?**

21       A.    So the test is Garcia makes a statement,

22  proposed a hypothesis that he saw a gun pointed at him

23  inside the car, that provides a testable -- a situation

24  that we want to try to test, and then we look for the

25  evidence of that.  There was, in fact, a gun in the car and

```
 1   he, in my interpretation of his utterance, knew there was a
 2   gun in the car, and he could only know that there was a gun
 3   in the car for his utterance if he had seen it earlier in
 4   the -- in the event.  So that's -- that's the information
 5   that I combined to test Garcia's statement, that he saw a
 6   gun in the car or, I'm sorry, that he saw a gun pointed at
 7   him earlier in the incident.  He was aware of a gun in the
 8   car that if -- that if the gun was put away at all times he
 9   could not have seen it, he would never have known that
10   there's a gun in the car and he would have to be guessing
11   that there's a gun in the car.
12        Q.    That's your evaluation of Garcia's statement?
13        A.    Correct.
14        Q.    Did you read Garcia's deposition testimony --
15        A.    Yes.
16        Q.    -- in order to prepare?  Besides these
17   rebuttal opinions 1 through 7, do you have any other
18   rebuttal opinions that you want to express with either the
19   Balash or the Tucker report?
20        A.    No, nothing that comes to mind.
21        Q.    Have you had your expert witness testimony
22   excluded in whole or in part based upon a Daubert challenge
23   in any police involved shooting case that you are aware of?
24        A.    I'm not aware of any Daubert restrictions or
25   restrictions of my testimony.
```

1    Q.    That's all I have.   If you could just follow

2  up on those few things that we discussed, the two prior

3  cases and identifying the video that you had used, as well

4  as I'll follow up with your counsel on getting those

5  document productions that I had propounded to the extent we

6  don't already have those materials.

7    A.    Okay.   Yeah, I'll follow up on that.   Believe

8  it or not, I have another trial going this afternoon so I

9  want to get back and land in my office.   I'll organize that

10  and get it to counsel.

11                    MR. CABRAL:   Mr. Noedel, I presume you

12              want to read the transcript in the event that

13              it's transcribed.

14                    THE WITNESS:   That's correct, read and

15              sign, please.

16                    (Deposition concluded at 2:15 p.m.)

17                    (Signature reserved.)

18

19

20

21

22

23

24

25

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                        SIGNATURE PAGE

 2    Date of Deposition:    December 7, 2023

 3    Correction page(s) enclosed?  Yes _____     No _____

 4    How many correction pages?  _____

 5

 6          _____

 7                   MATTHEW NOEDEL       Date

 8                         - - -

 9

10

11

12

13

14

15

16

17        Please return this signed signature page along

18              with correction page(s) to:

19

20              TACKLA COURT REPORTING
                1020 Ohio Savings Plaza
21              1801 East Ninth Street
                Cleveland, Ohio 44114
22                 (216) 241-3918

23

24

25
```

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

```
 1                  C E R T I F I C A T E

 2

 3            I, Lauren Shammo, a Notary Public in and for

 4   the State of Ohio, duly commissioned and qualified, do

 5   hereby certify that the within-named witness was by me

 6   first duly sworn to tell the truth, the whole truth and

 7   nothing but the truth in the cause aforesaid; that the

 8   testimony then given was by me reduced to stenotype in the

 9   presence of said witness and afterwards transcribed; that

10   the foregoing is a true and correct transcription of the

11   testimony so given as aforesaid.

12            I do further certify that this deposition was

13   taken at the time and place in the foregoing caption

14   specified.

15            I do further certify that I am not a relative,

16   employee of or attorney for any of the parties in this

17   action; that I am not a relative or employee of an attorney

18   of any of the parties in this action; that I am not

19   financially interested in this action, nor am I or the

20   court reporting firm with which I am affiliated under a

21   contract as defined in the applicable civil rule.

22

23

24

25
```

1              IN WITNESS WHEREOF, I have hereunto set my hand

2     and affixed my seal of office at Cleveland, Ohio on this

3     21st day of December, 2023.

4

5                                    _Lauren Shammo_

6                             LAUREN SHAMMO, RPR, CRR
                                  Notary Public
7                         in and for the State of Ohio

8     My Commission expires December 5, 2025.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

## WORD INDEX

**< 1 >**
**1** 8:2 16:*19* 28:*18* 39:*24*
50:*20, 23* 117:*18* 118:*1*
121:*4, 9* 143:*17*
**1.25** 104:*11*
**1.65** 104:*12*
**1.75** 78:*15*
**1:22-CV-00061** 1:*5*
**10** 103:*9*
**10:00** 1:*12* 38:*20*
**1020** 145:*20*
**106** 2:*8*
**11** 93:*8* 94:*13* 99:*14*
103:*2, 6, 11*
**12** 102:*13* 104:*10*
**1215** 2:*8*
**13** 99:*14* 103:*2, 6*
**13th** 10:*13, 21*
**14** 11:*7* 105:*5* 114:*4*
**15** 20:*17* 28:*10, 13*
**17** 16:*20* 28:*13* 37:*10*
59:*2* 60:*7* 76:*24* 82:*22*
89:*12* 93:*8* 105:*5* 114:*4*
**18** 4:*24* 20:*16*
**1801** 145:*21*
**19** 14:*8*
**1900** 2:*6*

**< 2 >**
**2** 28:*19* 37:*10* 39:*24*
56:*13* 62:*23* 69:*17* 70:*5,
9* 122:*19* 124:*2, 5* 130:*11*
**2:15** 144:*16*
**20** 95:*25*
**2000** 21:*5*
**2005** 21:*5, 6, 9, 13*
**2009** 21:*4*
**2022** 10:*13, 21*
**2023** 1:*12* 11:*7* 145:*2*
147:*3*
**2025** 147:*8*
**216** 2:*8* 145:*22*
**21st** 147:*3*
**23** 89:*16* 90:*17*
**241-1430** 2:*8*
**241-3918** 145:*22*
**241-5310** 2:*8*
**2-pound** 130:*11*

**< 3 >**
**3** 50:*19* 69:*25* 70:*7, 9*
73:*19* 76:*17* 79:*18*
122:*22* 124:*13, 17*
**35** 120:*14*
**36** 14:*8*
**38** 4:*23*
**3D** 9:*4, 5* 29:*2* 30:*2*
31:*8, 12, 18, 24* 32:*2, 5, 7,*

*14, 17, 21* 34:*20* 36:*17, 20*
60:*23*

**< 4 >**
**4** 20:*14, 19* 21:*1* 59:*2*
60:*7* 66:*11* 69:*18* 79:*16*
130:*22* 132:*21*
**40** 20:*15*
**44113** 2:*7*
**44114** 2:*8* 145:*21*
**45-caliber** 93:*4*

**< 5 >**
**5** 3:*4, 5, 6, 7* 70:*1* 73:*18,
19* 76:*17* 133:*7* 134:*10,
11* 135:*5, 7* 147:*8*
**50** 2:*6* 20:*15*
**500** 20:*14, 19* 21:*1*

**< 6 >**
**6** 76:*24* 79:*15* 135:*13*
**601** 2:*8*
**664-2800** 2:*8*

**< 7 >**
**7** 1:*12* 3:*4, 5, 6, 7* 80:*20*
84:*11* 88:*20* 117:*19*
118:*1* 140:*12* 142:*2*
143:*17* 145:*2*
**7:00** 5:*23*

**< 8 >**
**8** 66:*11* 82:*22* 87:*6*
**8th** 29:*1*

**< 9 >**
**9** 88:*19, 20* 89:*12* 104:*9*
**9/14/2023** 116:*13*
**9:00** 38:*19*
**900** 137:*17*
**911** 109:*3, 11* 140:*13*
141:*20* 142:*4, 15*
**9-millimeter** 93:*6*

**< A >**
**a.m** 1:*12* 5:*23* 38:*20*
**Aaron** 1:*6*
**abilities** 104:*16*
**ability** 47:*12* 59:*7* 122:*7*
132:*2*
**able** 6:*3* 16:*16* 25:*20*
26:*12* 36:*12* 38:*8* 41:*14*
47:*14* 49:*4* 56:*8* 60:*23*
75:*8, 23* 86:*5* 96:*8* 110:*4*
126:*3, 4* 139:*10*
**absolute** 79:*9*
**absolutely** 6:*17* 38:*14*
87:*14*
**accelerates** 67:*13* 68:*2*

**accelerating** 79:*7* 81:*4*
102:*24* 104:*4*
**acceleration** 68:*7*
**accept** 93:*21*
**accepted** 17:*4* 26:*1*
111:*25* 112:*1* 118:*16*
**access** 36:*22* 54:*24*
126:*3, 11* 139:*5, 6*
**accessed** 114:*6, 7, 12, 16,
18* 115:*2* 126:*10*
**accessible** 114:*11*
**accident** 24:*12*
**accidentally** 139:*6*
**accommodate** 65:*1, 22*
67:*18* 68:*8*
**Accord** 31:*21, 22*
**account** 90:*6* 92:*10*
**accounted** 92:*12*
**accounting** 46:*6* 91:*25*
92:*9*
**accumulate** 9:*2*
**accurate** 36:*6* 85:*6, 8*
98:*18*
**accurately** 5:*19*
**achieve** 44:*17* 66:*6* 67:*5*
69:*1* 75:*2* 122:*7*
**achieved** 122:*5*
**acquire** 108:*5* 114:*13*
**acquired** 32:*16* 109:*14*
**action** 48:*15* 68:*4* 95:*7*
146:*17, 18, 19*
**activated** 123:*22*
**activities** 11:*12*
**actual** 10:*8* 14:*1* 29:*8*
30:*5, 11, 13* 36:*22* 37:*5,
16* 38:*25* 54:*24* 57:*22*
80:*11* 93:*15* 96:*4* 110:*2*
121:*22, 23* 122:*1* 126:*12*
**ADAM** 1:*3*
**add** 31:*19* 106:*18*
**added** 84:*14, 15*
**additional** 11:*1, 12* 26:*17*
69:*6* 84:*17* 92:*25*
**address** 117:*25* 131:*22,
23* 133:*23* 140:*15*
**adjacent** 31:*2* 72:*8* 87:*4,
7* 99:*19* 107:*23* 111:*2, 3*
114:*15* 121:*17*
**adjusted** 119:*10*
**adjustment** 89:*3, 5*
**Administrator** 1:*3*
**admit** 57:*2*
**Adrienne** 14:*10*
**advance** 81:*21* 112:*7*
**advanced** 98:*9* 104:*5*
109:*3*
**advantage** 134:*7*
**affect** 61:*18* 65:*9* 92:*15*
**affiliated** 146:*20*

**affixed** 147:*2*
**aforesaid** 146:*7, 11*
**afternoon** 144:*8*
**age** 104:*16*
**agency** 10:*7* 13:*25*
**agree** 58:*11* 133:*3*
**agreement** 9:*7*
**agrees** 94:*3*
**aha** 92:*14, 15*
**ahead** 62:*8* 69:*4* 74:*6, 24*
80:*22* 81:*1, 4, 7* 102:*15,
16, 21* 103:*3, 11, 24*
**aid** 35:*21*
**air** 53:*25* 54:*4*
**airbags** 127:*16*
**albeit** 51:*25*
**align** 31:*5* 98:*23*
**aligned** 31:*24* 72:*3*
100:*9* 101:*11* 102:*11*
103:*1* 108:*1* 110:*20*
112:*6*
**aligning** 72:*12*
**alignment** 34:*15* 99:*24*
100:*7*
**allow** 25:*2* 66:*12* 78:*10*
120:*25*
**allows** 41:*7* 58:*1*
**alongside** 31:*24* 101:*18*
**alter** 96:*13* 97:*9*
**altered** 47:*1*
**ambidextrous** 47:*9*
138:*16*
**ammunition** 19:*8, 11*
**amount** 22:*14* 71:*23*
78:*10*
**analysis** 22:*1, 6, 8, 9, 23*
32:*25* 42:*14* 58:*3* 66:*3,
15* 75:*11* 95:*22* 97:*23*
98:*13, 16* 105:*13* 107:*19*
117:*15* 135:*8*
**analytical** 104:*2* 119:*3*
120:*10*
**analytically** 98:*10*
**anatomical** 122:*5*
**anatomically** 44:*19* 122:*6*
**and/or** 12:*3* 87:*23*
**angle** 31:*5, 10, 11* 35:*23*
36:*1* 65:*9, 25* 66:*1, 4, 15*
69:*2* 71:*16, 21* 80:*21*
81:*6* 84:*25* 88:*21* 90:*2, 3,
5, 7, 15, 21, 22* 91:*3, 15*
94:*15, 16, 21* 99:*8, 22*
120:*24* 121:*1, 22, 23*
122:*12* 135:*22*
**angled** 84:*10* 85:*3* 90:*7,
9* 91:*5* 118:*19*
**angles** 25:*11* 32:*10* 35:*8,
23* 44:*25* 58:*20* 60:*18, 21*
61:*14, 19* 77:*21* 81:*8*

Case: 1:22-cv-00061-DAP  Doc #: 44-10  Filed: 01/31/24  150 of 167.  PageID #: 962
Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

89:*1*, 7, 10  92:*13*  93:*18*
94:*24*  97:*3*
**angular**  77:*11*  90:*14*
91:*1*  95:*6*
**answer**  5:*11*  48:*24*  112:*3*
124:*9*
**anticipate**  12:2
**anytime**  5:*5*, *15*
**anyway**  133:*20*
**apart**  37:*18*  79:*3*  89:*5*
**apologize**  22:*11*
**appear**  128:*5*, 7, 8, 9
**appearance**  50:*2*, *9*  83:*4*,
*12*  84:*18*  91:*21*  99:*24*
101:*9*  126:*8*  128:*13*
**APPEARANCES**  2:*1*
**appeared**  79:*21*
**appearing**  1:*13*  100:*8*
**appears**  99:*17*, *18*  127:*15*
**appended**  7:*19*
**applicable**  146:*21*
**applied**  23:*13*  24:*23*
35:*24*  47:*15*  63:*22*
**apply**  24:*24*  37:*8*  93:*14*
129:*12*
**appointment**  38:*18*
**appreciate**  5:*25*  14:*23*
96:*6*
**approach**  92:*19*
**approached**  60:*3*
**approaching**  17:*11*
**appropriate**  15:*1*  31:*23*
33:*8*  138:*8*
**approximate**  33:*4*, *24*
62:*13*  118:*18*
**approximately**  71:*5*
100:*10*  101:*23*  119:*22*
130:*7*
**approximates**  31:*10*
**approximation**  29:*10*
64:*10*
**approximations**  32:*4*
35:*3*  60:*9*
**area**  21:*25*  39:*7*  44:*6*, *21*
46:*7*, *17*  63:*9*  64:*9*  65:*17*,
*22*  67:*23*  71:*12*  86:*4*
91:*2*  94:*17*  107:*10*
128:*12*  129:*17*  131:*10*, *12*,
*13*
**areas**  8:*19*  22:*5*, 8, *17*
50:*4*  53:*7*  55:*12*  116:*3*
126:*7*, *10*  131:*15*, *18*, *19*
**argue**  121:*19*
**arising**  12:*10*
**arm**  45:*8*  119:*5*  121:*15*
**armed**  13:*10*
**arms**  120:*5*  122:*16*
**arm's**  44:*17*, *18*
**arrangement**  135:*21*
**arrival**  64:*5*  107:*9*

**arrive**  15:*13*  66:*19*
94:*22*  118:*18*  126:*20*
**arrived**  26:*9*, *10*  51:*9*
55:*18*, *23*  57:*20*  102:*18*
122:*12*  126:*19*  127:*22*
133:*4*
**arrives**  62:*4*  119:*7*
**arriving**  51:*12*  55:*22*
56:*6*, *18*  83:*10*  95:*19*
96:*12*  123:*21*  126:*3*
**arrow**  84:*15*, *16*
**arrows**  50:*23*
**asked**  18:*16*  116:*15*, *19*
**asking**  82:*2*  140:*21*  141:*7*
**aspect**  42:*24*  44:*24*
55:*21*  60:*15*  95:*2*  113:*3*
134:*19*
**aspects**  17:*7*  18:*2*  29:*6*
76:*22*  131:*21*
**assess**  78:*22*  79:*5*  139:*13*,
*24*
**assessing**  113:*20*
**assessment**  23:*17*  34:*24*
36:*17*  78:*16*, *17*  79:*4*
97:*25*  98:*11*
**assessments**  80:*18*
**assignment**  108:*2*
**assist**  26:*4*
**associated**  13:*24*  56:*15*
57:*1*
**assume**  5:*10*  35:*15*, *16*
111:*18*  136:*7*  141:*6*
**assumed**  86:*15*
**Assuming**  43:*11*
**assumption**  46:*25*  74:*3*
93:*7*  133:*2*  137:*4*, *10*
**assumptions**  27:*4*  98:*20*
111:*19*
**attempt**  61:*13*  121:*12*
**attempting**  93:*13*
**attorney**  10:*8*  116:*20*
146:*16*, *17*
**attorneys**  13:*1*  96:*9*
**autopsy**  56:*14*  57:*1*, *18*
58:*24*  121:*15*
**available**  7:*12*  10:*16*
11:*19*  20:*2*  30:*5*, *9*, *17*
31:*19*  58:*24*  84:*21*, *22*
97:*16*  101:*4*
**Avenue**  2:*8*
**average**  39:*6*, *13*  104:*10*,
*20*
**aware**  10:*25*  39:*11*
70:*20*  107:*2*  111:*3*
141:*11*, *12*, *22*  142:*9*, *15*
143:*7*, *23*, *24*

**< B >**
**back**  12:*1*  15:*4*  16:*5*
17:*4*  26:*19*  37:*10*  42:*20*,

23  43:*20*, *25*  45:*10*, *12*
55:*6*  56:*12*  62:*25*  63:*6*,
*17*, *18*, *20*  64:*6*, *9*  67:*16*,
*20*  68:*10*, *23*, *25*  69:*1*
72:*12*, *15*, *23*  74:*2*, *10*, *18*,
*19*, *20*  75:*2*  76:*9*, *13*
77:*17*, *23*  82:*11*, *14*, *20*
84:*19*  85:*18*, *20*, *21*, *25*
86:*6*  87:*3*  88:*19*  89:*7*, *23*
90:*1*, *22*, *24*  91:*14*  101:*2*
105:*22*  107:*10*, *12*, *17*
119:*10*  128:*6*, *19*, *23*, *24*
130:*13*  132:*14*  138:*17*
144:*9*
**backed**  39:*20*
**background**  16:*21*  17:*5*
27:*3*, *4*, 7, *16*  28:*4*  106:*24*
107:*21*
**backtrack**  25:*20*  61:*11*
62:*12*, *15*  63:*19*  73:*3*
87:*19*
**backtracking**  57:*25*
63:*10*  65:*23*
**backup**  39:*11*
**backups**  39:*6*
**backward**  97:*1*  112:*15*
**backwards**  31:*8*
**Badley**  73:*20*  74:*3*  101:*6*
103:*22*  106:*12*  109:*22*
111:*6*  112:*12*  113:*8*, *15*,
*16*, *22*  115:*9*  132:*8*, *11*, *15*
141:*2*, 7, *9*
**Badley's**  75:*5*  101:*14*
113:*5*
**Balash**  118:*24*  122:*3*, *9*,
*23*  123:*14*  124:*10*  133:*10*
134:*12*, *18*  135:*23*  136:*11*
137:*1*, *19*  143:*19*
**Balash's**  136:*3*
**ballistic**  20:*22*  26:*15*
35:*7*  40:*5*  129:*11*
**ballistics**  22:*12*, *18*  23:*11*,
*18*  57:*1*
**ballpark**  20:*19*
**barrel**  19:*15*
**barrier**  130:*15*
**barriers**  129:*3*
**base**  27:*20*
**based**  27:*17*  36:*3*  37:*4*
44:*4*, 7  45:*2*  58:*5*, *11*
66:*23*  70:*22*  76:*6*  77:*8*,
*14*, *24*, *25*  80:*17*  82:*5*
106:*24*  107:*3*  110:*5*
111:*11*, *16*  112:*1*  114:*8*
115:*19*  117:*2*, *11*, *23*
118:*10*  119:*15*  120:*10*, *19*
125:*12*, *23*  126:*18*  128:*3*
129:*7*, *8*, *10*, *20*, *21*  131:*14*
137:*3*, *10*  143:*22*
**bases**  27:*5*

**basically**  9:*6*  17:*13*, *22*
23:*20*  58:*2*  66:*9*  86:*3*
117:*5*  135:*8*
**basics**  5:*2*
**basis**  18:*7*  37:*2*, *3*, *15*
41:*20*  42:*6*  72:*22*  81:*12*
83:*2*  99:*11*  104:*12*  106:*9*
117:*6*  120:*10*  124:*1*, *4*, *6*,
*16*  134:*12*  135:*7*  142:*19*
**bear**  24:*7*  25:*24*
**bearing**  60:*14*  113:*10*
133:*14*
**began**  84:*8*  101:*15*  108:*1*
110:*3*  125:*6*  140:*14*
**beginning**  28:*9*, *18*  81:*8*
**begins**  57:*10*  102:*11*
**behalf**  2:*2*, *8*
**belabor**  7:*19*
**believe**  6:*5*  11:*24*  42:*2*
44:*8*, *12*  68:*17*  69:*11*, *16*
77:*2*  82:*5*  83:*16*  101:*21*
102:*2*  111:*11*  115:*5*, *9*
117:*19*  127:*4*  144:*7*
**bench**  8:*21*  9:*3*
**bent**  112:*14*
**best**  55:*20*  74:*15*  77:*13*,
*22*  78:*5*  83:*14*  85:*1*  86:*4*
90:*25*  95:*9*  115:*5*  132:*1*
142:*16*
**better**  54:*25*  77:*3*, *10*
90:*8*, *10*  121:*10*
**beyond**  116:*3*
**big**  21:*25*  77:*20*  92:*13*
**bigger**  38:*6*
**billing**  9:*9*, *10*, *21*
**biomechanical**  66:*14*
120:*25*
**bit**  24:*14*  39:*3*  50:*2*
64:*18*, *25*  68:*13*, *24*, *25*
72:*16*  76:*24*  120:*23*
**blank**  34:*11*
**blasted**  53:*8*
**bleeding**  127:*6*, *13*
**blocked**  45:*24*  48:*2*  56:*6*
**blood**  22:*1*, *3*, *4*, *5*, 7, *18*,
*23*  23:*12*, *17*, *24*  25:*23*
26:*2*, *3*, 6, 7, *10*, *16*  49:*17*
50:*2*, *11*  75:*4*, *9*, *12*, *15*, *18*,
*19*, *22*  117:*14*, *16*  126:*3*, *8*,
*11*, *13*, *16*, *24*  127:*5*, *8*, *12*,
*25*  130:*23*  131:*5*, 7, *9*, *12*,
*15*, *20*, *24*  132:*3*, *6*, 7, *8*, *9*,
*10*, *11*, *14*, *15*, *24*
**bodies**  57:*3*
**body**  46:*16*  52:*3*  57:*24*
60:*1*, 4  64:*4*  76:*3*  86:*2*, *5*
105:*22*  123:*5*, *22*, *23*
**bold**  28:*17*
**bolded**  27:*3*

Deposition of Matthew Noedel                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**Bonham** 2:*4* 4:*6*, *8* 6:*18*, *23* 76:*11* 116:*5*
**book** 15:*20*
**Boop** 10:*6*, *11*
**bottom** 11:*3*, *6* 56:*12* 79:*15* 87:*6* 89:*11*
**bounce** 43:*5*
**box** 50:*17*
**Boy** 94:*11*
**brandish** 13:*14*
**brandished** 128:*16*
**brands** 19:*8*
**break** 5:*4*, *7* 14:*25* 17:*12* 68:*12* 76:*12* 116:*6*
**breaks** 53:*6* 62:*25*
**Brief** 76:*16* 116:*10*
**briefly** 7:*16* 117:*17*
**bright** 99:*15*
**bring** 96:*19*
**bringing** 97:*23*
**broken** 57:*5* 103:*18*
**builds** 24:*24*
**built** 36:*8*
**bullet** 19:*15*, *21* 24:*10*, *13*, *15*, *17*, *20*, *23*, *25* 25:*1*, *2*, *4*, *5*, *7*, *14*, *15*, *16*, *17*, *21* 26:*17* 28:*25* 29:*1*, *16*, *18* 30:*19*, *24* 31:*1*, *7* 32:*10* 35:*7*, *10*, *12* 36:*3*, *5*, *13*, *23* 37:*8* 41:*23*, *24* 42:*3*, *25* 44:*7* 46:*19* 48:*13* 49:*15* 51:*1*, *18* 52:*1*, *9*, *16*, *18*, *21* 53:*2* 56:*9*, *16*, *17*, *20*, *21*, *23* 57:*3*, *4*, *6*, *8*, *9*, *10*, *12*, *15*, *19*, *21*, *22*, *24* 58:*1*, *3*, *7*, *8*, *9*, *15*, *20*, *23* 59:*12*, *17*, *22*, *24* 60:*8*, *11*, *12*, *24* 61:*7*, *9*, *16* 62:*1*, *4*, *19* 63:*1*, *10*, *13*, *21* 64:*5*, *9*, *10*, *12*, *13*, *21*, *23* 65:*3*, *8*, *12*, *16* 66:*5*, *6*, *7*, *10*, *12*, *18*, *24* 67:*1*, *15*, *18* 69:*5*, *23* 70:*5*, *10* 72:*20* 73:*4*, *6*, *21*, *22* 74:*5*, *15*, *17*, *23*, *24* 75:*3* 76:*19*, *22*, *25* 77:*16*, *25* 78:*5*, *21* 79:*16* 80:*13*, *15*, *20*, *22*, *25* 82:*23*, *24* 83:*8*, *9*, *14*, *16*, *18*, *21* 84:*5*, *6*, *21*, *23*, *24* 85:*1*, *2*, *3*, *7*, *13*, *16* 87:*9*, *13*, *15*, *16*, *17*, *23* 88:*3*, *21* 89:*13*, *14*, *16*, *24*, *25* 90:*3*, *4*, *9*, *13*, *14*, *15*, *19*, *21*, *24* 91:*1*, *2*, *5*, *13*, *14*, *21*, *23*, *25* 92:*1*, *9*, *16*, *17*, *23* 93:*10* 94:*6* 99:*5* 100:*5* 102:*14* 110:*5* 115:*5*, *7*, *11* 118:*18* 119:*6*, *8*, *15*, *22* 122:*12* 137:*16*
**bullets** 20:*21* 21:*21* 22:*13* 24:*3*, *7*, *22* 25:*10*,

*11* 30:*1* 36:*10* 44:*3*, *4* 45:*9* 59:*3*, *14*, *23* 72:*1* 80:*5* 83:*8* 90:*5*, *6*, *17*, *19*, *21* 91:*22* 92:*21* 93:*16* 94:*6*
**bullet's** 24:*14* 62:*20*
**bumper** 72:*5*
**bushes** 98:*6*, *8* 103:*12* 104:*8*, *23* 110:*20*
**business** 21:*24* 23:*10*
**busy** 37:*18*

**< C >**
**cab** 67:*22*
**cabin** 132:*16*
**Cabral** 2:*8* 76:*15* 142:*5* 144:*11*
**cadence** 78:*15*
**calendar** 12:*2*
**call** 10:*10*, *16* 17:*25* 20:*3* 22:*10*, *11* 28:*19* 54:*20* 67:*20* 74:*3* 92:*9* 99:*15* 105:*6* 109:*11* 118:*2* 119:*4* 140:*13* 141:*20* 142:*4*
**called** 4:*2* 9:*8* 14:*10* 26:*10* 32:*13*, *22* 47:*9* 51:*3*, *6*, *24* 80:*13* 90:*17* 94:*13* 119:*2* 131:*10* 140:*11*
**calling** 62:*3*
**camera** 46:*16* 60:*1*, *4* 94:*15*, *24* 95:*20* 97:*19* 123:*5*
**cameras** 123:*1*, *22*
**cams** 123:*23*
**capabilities** 96:*22*
**capability** 97:*11*
**capacity** 51:*8* 114:*19*
**caption** 146:*13*
**capture** 34:*25* 38:*4* 99:*25* 123:*5*
**captured** 34:*20* 36:*5*, *9* 37:*19*, *23* 47:*1* 50:*9* 76:*19* 94:*14* 96:*18* 105:*10* 113:*6* 123:*6*, *23* 141:*19*
**captures** 80:*14* 120:*7*
**capturing** 29:*3* 96:*23*
**car** 27:*10* 29:*2*, *4*, *10*, *11*, *12*, *15*, *21*, *24* 30:*20* 31:*11*, *20* 33:*1*, *2*, *5*, *15*, *25* 40:*18* 42:*16*, *20*, *21*, *24* 43:*1*, *11* 44:*9*, *23* 45:*3*, *12*, *14*, *15*, *19*, *23* 46:*1*, *10* 53:*3*, *7*, *8*, *9*, *12*, *13*, *20*, *21* 54:*10*, *11*, *13*, *19* 55:*1*, *9*, *11*, *13* 60:*19* 61:*20*, *25* 64:*21* 66:*24*, *25* 67:*4* 68:*2*, *3*, *10*, *14* 69:*3*, *10*, *12* 70:*6*, *14*

71:*4*, *24*, *25* 72:*19* 73:*12* 76:*5* 77:*15*, *16* 78:*1* 79:*14* 80:*9*, *25* 81:*1*, *6*, *10*, *13*, *16*, *19*, *23* 82:*3*, *11*, *14* 83:*5*, *11*, *12*, *13*, *19* 84:*1*, *2*, *22*, *25* 85:*20* 86:*20* 88:*6*, *8* 90:*11*, *23*, *24* 91:*7* 92:*22* 98:*5* 101:*15*, *24* 102:*7*, *8*, *23*, *24* 103:*1*, *2* 104:*3* 109:*2*, *18* 111:*2* 112:*18*, *23*, *25* 113:*1*, *2* 115:*15*, *16* 120:*15* 121:*17* 123:*12*, *14* 125:*14*, *20*, *25* 126:*1* 128:*12*, *15*, *24* 129:*1*, *20* 130:*3*, *13*, *20* 131:*1* 132:*16* 135:*15* 138:*1* 139:*17* 140:*18*, *20*, *22*, *24* 141:*7*, *9*, *11*, *13*, *14*, *22* 142:*10*, *12*, *13*, *15*, *23*, *25* 143:*2*, *3*, *6*, *8*, *10*, *11*
**care** 134:*23*
**cared** 134:*21*, *22*
**career** 4:*22* 20:*13* 21:*1*, *2*, *11*, *13*
**careful** 81:*3* 100:*6*
**carried** 123:*12*
**carry** 129:*13* 139:*4*
**carrying** 45:*6*
**cars** 27:*11* 31:*8* 39:*7* 67:*12*, *13*, *23* 68:*18*, *19* 69:*2*, *7* 70:*23* 78:*10*, *17*, *23* 79:*5*, *7* 81:*6* 82:*6* 84:*8* 93:*24* 95:*13*, *19* 96:*2* 97:*2* 98:*9* 100:*9* 101:*10*, *23* 102:*2*, *10*, *23* 103:*10*, *14*, *25* 104:*24* 107:*12*, *22*, *25* 110:*11*, *15*, *20* 111:*3* 112:*5*, *6*, *8*
**cartons** 75:*14*
**cartridge** 19:*15*, *17*, *20* 21:*21* 22:*13* 24:*4* 40:*22*, *23* 41:*5*, *7* 42:*4*, *13*, *16*, *20* 43:*8*, *20* 44:*24* 45:*10* 46:*1* 81:*24* 93:*1*, *2*
**cartridges** 45:*18* 130:*9*
**case** 7:*22* 8:*6*, *7*, *13* 9:*22*, *25* 10:*4*, *16*, *17*, *20*, *23* 11:*2* 14:*2*, *3*, *12*, *16* 15:*14*, *15*, *18* 16:*1* 18:*13*, *17*, *20* 19:*17*, *20* 20:*5*, *23* 23:*13*, *14*, *16* 24:*9* 25:*4* 26:*18*, *25* 27:*11*, *22* 28:*6*, *20* 29:*11* 30:*13* 34:*23* 35:*16* 36:*23* 38:*11* 40:*23* 42:*13* 45:*17* 48:*9* 50:*1* 53:*11* 54:*25* 55:*8*, *25* 57:*3*, *17* 59:*7* 61:*8* 93:*25* 94:*9* 98:*4*, *10* 115:*25* 116:*17* 117:*22* 118:*15* 133:*24* 143:*23*

**cases** 11:*21* 12:*10*, *22* 13:*2*, *5*, *6*, *19* 14:*21*, *25* 16:*6* 20:*15*, *24*, *25* 21:*21* 22:*13* 24:*4* 40:*22*, *23* 41:*5*, *7* 42:*4*, *16*, *20* 43:*8*, *20* 44:*4*, *24* 45:*10* 46:*1* 81:*25* 93:*1*, *2* 96:*8*, *24* 107:*13* 144:*3*
**cat** 68:*2*
**catalog** 17:*24* 19:*9* 20:*1* 26:*2*
**cataloged** 75:*23*
**cataloging** 19:*4*
**catch** 100:*20*, *23* 101:*4*, *16*, *18* 102:*6*
**categorized** 75:*24*
**category** 26:*5*
**caught** 103:*4*, *23*
**cause** 19:*14*, *19* 91:*7* 111:*13* 127:*15* 146:*7*
**caused** 13:*18* 26:*14* 59:*17* 91:*20* 107:*15* 108:*5*, *10* 110:*1*, *2*, *10*
**causes** 51:*3*
**causing** 25:*3* 57:*8* 108:*19* 119:*1*
**Cemetery** 102:*15*, *18* 103:*1*, *12* 104:*8*
**center** 34:*19* 128:*9* 100:*1*
**certainly** 21:*1* 24:*12* 38:*1* 43:*3*, *8* 76:*2* 85:*17* 93:*4* 100:*7*, *8* 123:*3*, *13* 125:*1*
**certainty** 26:*22* 115:*22*
**certified** 4:*4*
**certify** 146:*5*, *12*, *15*
**chairs** 43:*4*
**chalk** 53:*17* 79:*22*
**challenge** 143:*22*
**chamber** 137:*15* 138:*10*
**change** 92:*12* 93:*21* 103:*10*
**changed** 50:*1*, *11*
**changes** 57:*11*
**changing** 84:*9*
**characteristics** 49:*7* 82:*6*
**check** 13:*4* 14:*20* 47:*25* 48:*5* 137:*13*, *18* 138:*9* 139:*11*
**chest** 74:*12*
**circle** 62:*22* 70:*6*
**circled** 69:*17*
**circular** 70:*4*
**circumstances** 5:*17* 26:*18*
**cited** 104:*18* 105:*2*
**CITY** 2:*8* 10:*6* 12:*14* 13:*19*, *21*, *22* 14:*11*

Case: 1:22-cv-00061-DAP  Doc #: 44-10  Filed: 01/31/24  152 of 167.  PageID #: 964

Deposition of Matthew Noedel                                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**civil** 146:*21*
**claim** 134:*5*
**claimed** 41:*8* 43:*22*
107:*14*
**claims** 18:*5* 44:*22* 109:*25*
**clarification** 5:*14*
**clarify** 5:*15*
**clear** 40:*16* 99:*20* 113:*4,*
*20*
**clearly** 101:*10* 103:*2*
**Cleveland** 2:*7, 8* 10:*7*
12:*14* 38:*8* 57:*22* 145:*21*
147:*2*
**client** 9:*8* 10:*2*
**client's** 29:*10*
**close** 43:*19* 44:*13* 72:*11*
77:*5, 19* 79:*13*
**closed** 72:*19*
**closer** 70:*7*
**close-up** 70:*2*
**clothes** 75:*19*
**clothing** 75:*5*
**cock** 47:*13*
**coffee** 76:*12*
**collect** 25:*14* 134:*24*
**collected** 74:*10* 133:*21*
**collection** 26:*7* 40:*22*
50:*10* 58:*12* 133:*12*
**Collectively** 100:*19*
112:*20* 130:*10*
**collision** 73:*6* 125:*20*
127:*14, 15* 128:*23* 129:*6*
**color** 84:*15*
**colors** 97:*10*
**Columbus** 12:*23* 13:*8, 13,*
*18, 20* 14:*11*
**combination** 9:*14* 68:*8*
102:*25*
**combine** 40:*11, 15* 44:*15*
116:*25*
**combined** 143:*5*
**combines** 51:*15*
**combining** 77:*22* 98:*7*
**come** 15:*4* 16:*5* 20:*9*
34:*22* 42:*20* 54:*18* 62:*12*
76:*13* 88:*3* 91:*15* 92:*17*
97:*7* 106:*20* 107:*22*
123:*21* 137:*17*
**comes** 27:*21* 32:*14*
53:*12* 54:*11* 57:*6* 59:*11*
61:*5* 62:*14* 68:*15* 70:*3*
92:*2* 123:*17* 143:*20*
**coming** 10:*23* 15:*9*
28:*18* 84:*10* 108:*23*
113:*6* 127:*12*
**commensurate** 25:*12*
**Commission** 147:*8*
**commissioned** 146:*4*
**commit** 77:*6*

**common** 19:*1* 96:*16*
97:*20* 104:*20* 107:*1*
120:*14* 132:*3*
**commonly** 17:*3* 26:*1*
139:*1*
**commotion** 129:*5*
**community** 13:*14*
**company** 13:*24*
**comparison** 21:*24* 22:*12*
**compartment** 63:*19* 128:*8*
**compass** 60:*13*
**compelled** 131:*24*
**complete** 8:*5* 15:*7* 25:*15*
34:*11* 48:*15* 56:*21* 58:*1*
80:*18* 92:*7, 8*
**completely** 88:*15* 131:*8*
**completeness** 92:*18*
**completes** 58:*3*
**complicated** 75:*7* 131:*23*
**component** 22:*3, 23* 23:*3,*
*15, 16, 18* 24:*12* 26:*13*
**components** 20:*22* 22:*14*
23:*14* 24:*5*
**comprehensive** 28:*15*
**compressed** 73:*11*
**comprised** 60:*12*
**computer** 9:*5, 17, 19*
31:*9* 32:*6* 121:*5, 7*
**conceivable** 109:*6*
**concept** 9:*1* 41:*16* 43:*23*
119:*11*
**concepts** 8:*25* 105:*18*
**concerned** 134:*19* 135:*3*
**conclude** 58:*8* 65:*25*
72:*18* 73:*22* 81:*16* 82:*2,*
*24* 87:*7* 115:*14* 118:*7*
137:*24*
**concluded** 144:*16*
**conclusion** 42:*6* 58:*14*
70:*23* 80:*25* 83:*3* 99:*2,*
*11* 105:*15* 113:*24* 114:*5*
119:*14* 120:*9, 11* 129:*7, 8*
131:*3* 132:*20*
**conclusions** 76:*18* 78:*2*
80:*4* 91:*10* 94:*22* 95:*9*
97:*8* 101:*21* 105:*6, 11, 19*
106:*6* 110:*8* 114:*8* 115:*5*
125:*13*
**conclusively** 77:*23* 81:*18*
**condition** 61:*15* 135:*25*
**conditional** 49:*6*
**conducted** 8:*17* 104:*14*
105:*13* 106:*15*
**conducting** 4:*15* 36:*16*
**cone** 55:*5* 70:*4*
**cone-shaped** 65:*21*
**confidence** 85:*6*
**confident** 85:*12*
**confined** 46:*5*

**confines** 43:*18* 63:*18*
76:*4* 93:*3*
**conflicts** 94:*4*
**confrontation** 106:*12*
**confronted** 13:*15*
**confusing** 40:*7*
**conical** 65:*21*
**conjunction** 121:*11*
**connect** 62:*11* 63:*9, 15*
**connected** 14:*15* 26:*6, 14*
52:*6*
**connecting** 64:*8* 85:*9*
**connection** 106:*16* 107:*11*
**connects** 74:*7* 98:*2*
**conservative** 77:*4* 100:*6*
**consider** 16:*2* 22:*17*
23:*22* 25:*10* 33:*20* 39:*9*
42:*15* 44:*2* 59:*21* 65:*2,*
*17* 75:*4* 78:*5* 79:*4* 86:*18*
91:*13, 15* 103:*21* 106:*25*
117:*7* 128:*11*
**considerably** 52:*1*
**consideration** 89:*6*
**considered** 17:*15* 23:*23*
32:*21* 54:*5* 55:*11* 79:*25*
86:*15* 113:*8* 123:*4*
**considering** 33:*22*
**consistent** 44:*25* 92:*24*
102:*4*
**console** 34:*19* 128:*9*
**consolidated** 116:*21*
**conspicuous** 55:*12*
**construction** 39:*14, 17*
**consultant** 4:*25* 20:*16, 18*
21:*18*
**consultation** 22:*9* 23:*7*
**consulted** 28:*13*
**contact** 9:*8* 10:*8, 11, 14,*
*19* 54:*19*
**contacted** 9:*9* 10:*6*
**contain** 27:*4*
**contained** 10:*23* 40:*1*
50:*6*
**context** 27:*12* 38:*13*
40:*19* 107:*21* 140:*15*
**continuation** 31:*6* 83:*15*
87:*5*
**continue** 26:*12* 62:*13*
63:*10* 67:*22* 68:*21* 69:*15*
71:*8* 77:*12* 78:*17* 82:*15,*
*17, 18* 84:*7* 85:*19* 119:*5*
**continued** 81:*13* 101:*24*
**continues** 63:*2* 69:*6, 9, 13*
77:*11* 78:*18* 99:*6* 102:*24*
**continuing** 112:*6*
**continuous** 68:*4*
**contract** 146:*21*
**contractor** 21:*3*
**contracts** 14:*1*

**control** 129:*2*
**controlled** 46:*2*
**convenience** 38:*1* 39:*18*
106:*13* 107:*10, 17* 110:*12*
**Cool** 32:*23, 24*
**copy** 6:*15* 8:*5* 10:*24*
11:*9, 15, 19, 22* 16:*18*
116:*14*
**corner** 62:*24*
**correct** 4:*19* 5:*23* 14:*13*
21:*10* 26:*22* 27:*6* 29:*12*
30:*6, 7* 32:*6, 7* 33:*16*
34:*8* 35:*22* 37:*2, 12*
38:*12* 41:*13* 42:*2* 44:*10,*
*11, 14, 15* 45:*15, 16* 46:*11,*
*21, 22* 49:*22* 50:*16, 21*
52:*9, 22* 53:*14* 54:*2, 12,*
*20* 56:*2* 58:*25* 59:*5* 60:*1*
62:*23* 64:*15* 66:*15* 68:*15*
70:*11, 12, 16* 72:*20* 75:*22*
76:*9* 80:*6, 17* 81:*2* 82:*25*
86:*25* 87:*9* 88:*25* 90:*21*
92:*23* 93:*11* 97:*18* 98:*24*
100:*17* 102:*1, 4* 104:*1*
105:*17* 106:*2, 7, 8* 107:*22*
108:*2, 3* 111:*17* 115:*7, 12,*
*16, 21* 117:*13, 18, 20, 22*
118:*4, 8* 119:*16, 17* 120:*2,*
*12, 21, 22* 121:*2, 3, 23*
122:*2, 17* 123:*19, 20*
124:*14* 126:*17, 25* 127:*1,*
*21* 128:*1* 130:*7, 16, 24*
131:*6* 132:*19, 24* 133:*1*
134:*13, 14* 137:*11* 138:*8,*
*14* 142:*17* 143:*13* 144:*14*
146:*10*
**Correction** 145:*3, 4, 18*
**correctly** 140:*23*
**correspondence** 9:*24* 10:*2*
**counsel** 4:*8* 6:*2, 8* 7:*22*
9:*8, 24* 10:*6* 11:*16* 18:*17*
144:*4, 10*
**couple** 11:*11, 24* 12:*7*
16:*20* 22:*25* 26:*20* 44:*20*
51:*23* 105:*20*
**course** 20:*22* 21:*13*
35:*15* 37:*20* 41:*2* 44:*1,*
*18* 45:*25* 59:*19* 60:*19*
61:*15, 18* 63:*3* 79:*9*
85:*24* 88:*16* 92:*11* 96:*12*
103:*16* 104:*22* 106:*11*
107:*12* 109:*21* 119:*7*
120:*7* 125:*18*
**COURT** 1:*1* 12:*11, 24*
20:*23* 35:*17* 145:*20*
146:*20*
**covered** 76:*21* 115:*25*
**covers** 49:*8*
**cracking** 52:*2*

Case: 1:22-cv-00061-DAP Doc #: 44-10 Filed: 01/31/24 153 of 167. PageID #: 965

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**crash** 81:20 123:20 127:6
**crashed** 81:13 126:1
**crashes** 53:12, 22 109:3
**crashing** 51:21 78:19
**crayon** 79:23
**create** 25:11 26:16 29:14 30:2 35:21 52:4 92:13, 14
**created** 29:9 35:20 50:3 59:18 91:16
**creates** 51:5
**creating** 35:3 69:2
**credibility** 107:4, 5
**credit** 137:1
**crediting** 108:22
**crime** 22:21 50:24 61:4 114:22 134:24
**criticism** 120:7
**criticisms** 135:12
**cross** 74:17 119:22
**crossed** 56:23 100:22
**CRR** 1:14 147:6
**crush** 127:16
**cues** 57:4
**cup** 76:12
**current** 11:10, 13, 19
**Curriculum** 3:5
**cut** 35:10
**CV** 4:23 6:5 7:1 11:2, 9, 13, 17, 22 14:5, 8 15:5 16:4
**cycle** 42:11
**cylinder** 83:10
**cylindrical** 83:12, 20

**< D >**
**damage** 59:15, 19 83:5 85:11 89:2
**damaged** 57:13
**Dan** 1:6
**dash** 34:16
**dashboard** 43:4
**data** 8:12, 15, 19, 23 9:1, 3, 6, 17, 18 10:22 11:1 14:15 15:23 17:16, 19 20:4, 8 25:1 31:12 32:16 34:5, 20 35:24 36:9 41:19, 21 45:2 46:8 49:16 58:18 60:9, 19, 20 62:20 63:14, 25 66:23 68:2 70:22 77:10, 14, 24 78:6 80:6 81:11, 12, 19 89:5 92:8 94:14, 25 95:3 104:2 105:13 106:3 112:2 122:21, 25 123:1, 10 124:19, 25 125:3, 4 126:14 133:6, 15 135:1, 11 141:4

**DATE** 1:12 15:7, 11 27:23 145:2, 7
**dated** 116:12
**Daubert** 143:22, 24
**David** 82:19 85:1
**day** 5:3 38:15, 21 39:16 65:4 147:3
**daylight** 38:23
**daytime** 38:22, 23
**dead** 72:5
**death** 13:17
**decelerating** 65:12 79:8
**deceleration** 66:5 68:7
**December** 1:12 145:2 147:3, 8
**decide** 133:23
**decided** 61:22
**decision** 119:8
**deduce** 115:22
**deep** 39:7
**defect** 29:16
**Defendant** 1:7 2:8
**defendants** 13:2
**deferred** 50:8
**define** 103:19, 20
**defined** 60:8 146:21
**defining** 20:7
**definitely** 51:11 95:8
**deformation** 66:5
**degraded** 50:2, 3
**degree** 26:22
**degrees** 66:11
**delay** 104:11
**deliver** 63:11 71:6 72:8 78:7, 12 81:23 88:13 104:10 105:4 114:16
**delivered** 19:25 54:8 58:22 63:24 69:4, 8 71:12 81:22 87:18 92:10, 13 100:11 101:11 104:25 107:23 108:20 110:21 119:9 132:22
**delivers** 68:6 88:3
**delivery** 79:9 125:19
**demonstrate** 122:3, 17 123:2, 3 125:3
**demonstrative** 121:11
**demonstratives** 36:11
**Department** 13:20
**depending** 26:7 127:7
**depends** 91:12
**depicted** 103:9
**deposed** 4:4 14:17 20:24
**deposited** 131:17, 19
**DEPOSITION** 1:9 3:4 4:16, 19 6:3, 8, 25 7:16 15:5 16:4 48:5 116:12 143:14 144:16 145:2 146:12

**depositions** 4:21, 24 11:24 12:3, 7 131:15
**deposits** 126:18 132:6
**derived** 35:23
**describe** 35:15 40:12 65:21 102:22 106:19
**described** 14:3, 13 20:12 47:22 57:18 71:15 80:1 106:11 109:21 112:23 117:3 118:17 121:8 132:8, 12 138:14
**describes** 17:3 78:6 109:22
**describing** 10:16 59:10 95:4
**Description** 3:3 90:16 133:11 136:5
**descriptions** 35:7 80:19 107:1 121:12 132:2, 7
**descriptive** 114:10
**descriptors** 106:18
**design** 51:24
**designed** 24:17 25:15
**DESMOND** 1:3 29:11 46:7, 8 49:16 62:2 63:25 66:25 68:13 69:12 71:25 78:1 81:4 92:22 114:1, 2 115:6, 15 118:3, 7 119:14 125:14 130:2 132:18 135:15 137:25
**Desmond's** 33:1, 2, 25 46:10 49:17 61:25 63:13 64:12 70:14 72:19 77:15, 16 80:25 81:1, 6, 13, 16 82:3 101:24 102:7 120:20 121:1, 22 122:1 130:14 131:1 137:4 139:17
**destabilize** 83:9
**destabilized** 57:20 83:8, 18 85:2
**destroyed** 30:15, 16
**detail** 17:9
**details** 60:8
**determination** 78:4
**determine** 60:17 61:8 68:1 110:4 121:23 122:24 139:14
**determined** 115:1 133:5
**determining** 63:23 98:11
**deviate** 66:7
**deviation** 65:16
**Devin** 73:20 75:5 115:9 132:18
**diagnostic** 75:11, 17 76:1, 3
**diagonal** 68:10 69:5, 7 77:12 82:14, 16 84:6, 7 85:23 86:6 90:22 104:6, 7

**diagonally** 83:7, 17 84:20 101:3
**diagrams** 8:15 35:19 60:23 98:3, 5 121:9
**dictate** 63:19
**dictates** 67:10
**differ** 135:7
**difference** 56:11 110:3, 4
**different** 12:24, 25 26:3 36:14 37:9 38:21 51:24 77:21 93:20 94:21 104:15, 16 122:16 142:11
**differentiate** 79:14
**difficult** 43:2 85:10 131:18
**digest** 41:7
**digging** 13:25
**dimension** 37:25
**dimensional** 29:6 125:17
**dimensions** 25:12 29:4, 19 31:17 33:4, 11 34:1 35:1 36:8 37:17
**diminish** 133:21
**direct** 49:25 50:12 55:8
**direction** 44:4 45:9 55:15 109:25 119:1 120:6 121:16 122:10
**disadvantage** 134:7
**disagreeing** 134:11
**disappear** 10:18
**discharge** 19:11, 13 23:2 47:14, 15 52:6 114:25 136:18 137:22 138:4, 7 139:7
**discharged** 41:1, 4 43:18 141:14
**discharging** 104:21 140:4
**disconnect** 47:25 135:14 136:1, 6, 10, 12 140:11
**discovered** 112:24 125:15 126:25
**discovery** 7:25 18:11 94:19
**discrediting** 108:22
**discrimination** 66:13
**discuss** 16:5 35:11 105:8, 20
**discussed** 55:19 70:23 76:20 89:20 99:1 101:22 105:10 106:10 107:25 116:4 118:6 144:2
**discussing** 80:21 82:23 87:7 89:12
**discussion** 116:1
**disengaging** 40:6
**dislodged** 54:14
**displaced** 129:25
**dispute** 42:1, 2 118:14, 15
**disputes** 46:13, 23

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

dissipates 53:*16*
dissipation 55:*4*
distance 78:*9, 22* 103:*13*
104:*22*
distances 38:*1*
distracting 34:*14*
DISTRICT 1:*1*
disturbed 75:*25*
DIVISION 1:*2*
document 14:*9* 29:*14*
34:*14* 36:*11* 144:*5*
documentation 37:*4*
58:*19* 60:*2* 78:*11* 84:*2, 3*
93:*18* 100:*24* 102:*20*
documentations 40:*17*
documented 29:*1, 13*
30:*24* 47:*3* 59:*19* 62:*6*
70:*19* 81:*9* 91:*9* 92:*5*
93:*14, 19*
documenting 23:*19*
documents 7:*20, 21*
doing 18:*9* 20:*1* 31:*5*
94:*25* 113:*20* 138:*2, 6*
door 31:*11* 34:*19* 36:*7*
44:*20* 61:*9* 67:*2, 3, 21*
77:*8* 82:*14, 17* 87:*4* 91:*8*
doors 68:*11*
dot 49:*3, 4, 5, 9*
dotted 84:*14*
downward 47:*10, 11* 49:*2,
7* 83:*7* 138:*20*
dramatically 78:*8*
draw 41:*14, 15* 65:*20*
129:*16*
drawing 120:*9*
drawings 121:*5*
drawn 80:*4*
drew 108:*13* 114:*8, 14*
drip 26:*10, 12*
driver's 33:*14* 41:*4* 44:*9,
16* 45:*8* 46:*11* 62:*11, 18*
63:*3, 18* 64:*1, 4, 8* 67:*23*
68:*22, 23* 71:*7* 80:*23*
81:*7* 82:*15, 18, 20* 87:*3, 4,
12* 115:*16* 127:*3*
driving 29:*15* 42:*5*
43:*22* 44:*9* 108:*11*
120:*15*
drop 75:*4*
Dropbox 9:*18*
drop-downs 31:*19*
droplets 26:*7*
drops 51:*19*
drug 13:*5*
dual 40:*3*
ducking 76:*8*
duly 4:*3* 146:*4, 6*
dust 53:*17*
dust-like 52:*14*

Dylan 2:*8*
dynamic 60:*4* 95:*7*

< E >
earlier 5:*21* 42:*7* 99:*1*
104:*18* 105:*14, 16* 106:*3,
10* 119:*2* 124:*24* 136:*2*
138:*16* 143:*3, 7*
early 7:*21*
easier 116:*24*
easily 20:*20*
East 2:*8* 60:*14* 145:*21*
EASTERN 1:*2*
easy 61:*8*
edge 73:*9* 77:*8* 88:*10, 12,
13*
edited 95:*20*
education 17:*5*
Edward 82:*19*
effective 137:*18*
effort 33:*16*
efforts 26:*5*
either 18:*4* 43:*17* 44:*13*
48:*9, 25* 49:*12* 52:*21*
53:*1* 67:*4, 16* 69:*1* 71:*16*
74:*6* 75:*2* 76:*8* 81:*3, 4*
112:*24* 133:*17* 143:*18*
eject 44:*21* 45:*7, 10, 11*
ejected 42:*5, 16, 23* 44:*24*
81:*24*
ejecting 43:*1*
ejection 42:*13, 18, 24*
43:*2, 7, 10, 24* 44:*7* 45:*5*
ejects 42:*13*
electronic 9:*15*
electronically 9:*13*
element 41:*11* 140:*6*
elements 19:*18, 19* 23:*15,
24* 40:*13* 103:*19* 112:*10*
113:*15, 22*
Elena 10:*6*
elevation 87:*8*
eliminate 25:*3* 74:*18*
95:*25* 113:*1* 126:*9*
Elizabeth 2:*4* 4:*8*
else's 123:*6*
e-mail 10:*15*
e-mails 10:*1*
emanating 132:*9*
embedded 24:*16* 25:*8*
57:*23* 74:*22*
embrace 119:*11*
employed 19:*8*
employee 146:*16, 17*
enable 126:*2*
enables 38:*3* 43:*10* 44:*5*
enclosed 145:*3*
encompass 78:*20*
encompasses 23:*20*

encounter 106:*16* 130:*15*
encountered 59:*15*
ended 82:*6* 102:*7* 125:*5,
21* 127:*18* 129:*20*
ends 64:*25*
energy 26:*6* 42:*12* 51:*4*
52:*1, 5* 55:*4* 65:*15* 72:*25*
enforcement 13:*18, 25*
21:*2* 36:*19* 60:*3*
engaging 48:*17*
enhance 97:*9*
enhanced 99:*18*
enhancing 98:*11*
enormous 52:*12*
ensued 13:*16*
enter 6:*13, 24*
entered 63:*2, 13* 64:*12, 13*
entire 18:*1* 25:*21* 34:*9*
42:*10* 51:*3* 73:*1* 127:*24*
entities 54:*6*
entitled 28:*17* 125:*1*
entrance 119:*15*
entries 90:*19*
entry 56:*14, 16* 57:*6, 18,
25* 65:*18, 22* 85:*9* 132:*10,
11, 14*
environment 23:*20* 31:*9*
32:*2, 5, 8* 37:*25* 38:*4*
39:*1* 46:*2* 54:*7* 59:*13*
76:*4* 108:*10* 136:*19*
equally 89:*23*
equation 25:*9*
error 66:*7, 9*
Esq 2:*4, 5, 8*
essential 59:*21*
essentially 8:*22* 9:*10*
58:*1* 67:*24* 68:*19* 69:*9*
74:*14* 85:*21* 95:*18*
establish 40:*13* 41:*13*
established 64:*10* 106:*17*
Estate 1:*3*
estimate 20:*14* 39:*5*
60:*25* 88:*7*
estimating 38:*19*
evaluate 16:*1* 17:*7* 23:*25*
25:*21, 24* 30:*19, 24* 31:*2*
33:*13* 59:*8* 83:*21* 115:*3*
122:*20* 130:*19* 133:*18, 20*
135:*5* 142:*16*
evaluated 36:*23* 84:*6*
106:*22*
evaluating 17:*13* 26:*2*
30:*12* 44:*3* 60:*11* 83:*4*
107:*3* 108:*16*
evaluation 22:*13* 40:*4*
114:*21* 134:*3* 143:*12*
event 8:*20* 17:*8, 14, 23*
18:*1* 25:*3* 27:*22, 25* 28:*3*
35:*14* 37:*20* 41:*8* 42:*15*
50:*25* 56:*7* 57:*10* 61:*24*

63:*23* 68:*16* 71:*14* 74:*4,
9* 75:*17* 76:*2* 92:*11*
93:*15* 95:*10* 103:*22*
104:*7* 109:*5* 117:*9, 13, 14*
131:*21* 133:*22* 134:*16*
140:*17* 143:*4* 144:*12*
events 17:*12* 22:*25*
26:*15* 35:*7* 40:*5* 119:*4*
129:*16*
eventually 7:*25*
evidence 8:*17, 25* 17:*24*
19:*25* 24:*1* 25:*14, 23*
26:*21* 38:*10, 18* 41:*3*
43:*24* 50:*1, 11* 55:*8*
58:*12* 64:*3, 11* 70:*19*
75:*4* 93:*11, 14* 94:*1, 2*
101:*9* 102:*5* 103:*4, 17*
106:*22* 107:*7, 8, 9, 13*
108:*9, 25* 110:*16* 111:*1, 5,
16* 112:*1, 7, 10, 20, 22*
113:*19* 115:*20* 117:*8*
120:*18, 19* 122:*11* 124:*11,
20, 21, 22* 125:*7, 10*
126:*19, 22* 128:*4* 135:*1*
141:*24* 142:*25*
exact 51:*9* 74:*25* 126:*12*
exactly 43:*12* 70:*24* 71:*3,
19* 72:*4* 108:*2* 124:*16*
126:*18*
exam 40:*9* 41:*5, 6* 75:*9*
Examination 4:*3, 5* 21:*21*
25:*2* 28:*18* 30:*17* 40:*6,
25* 41:*10* 90:*12* 110:*25*
examination/results 39:*23,
25*
examinations 8:*17* 60:*5*
examine 57:*4* 84:*1*
examined 50:*5* 57:*21*
74:*8*
examiner 46:*3*
examiners 50:*5* 135:*3*
examining 24:*13, 22*
example 8:*20* 15:*20* 18:*5*
21:*23* 22:*22* 24:*15* 25:*4*
26:*5, 11* 33:*13* 34:*18*
35:*23* 36:*2, 9* 37:*18, 20*
40:*8, 17, 23* 54:*17* 61:*8*
72:*2* 81:*20* 84:*1* 99:*23*
128:*10* 130:*12*
exclude 125:*24* 127:*23*
128:*3*
excluded 143:*22*
exclusive 119:*4*
exercise 65:*3* 92:*3*
exercises 31:*12*
Exhibit 3:*3* 6:*6, 7, 25*
7:*1, 2, 4, 16* 11:*3* 14:*8*
15:*5* 16:*12, 17* 26:*19*
30:*11* 71:*16* 116:*12*
121:*11*

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**EXHIBITS** 3:2  6:2  7:5,
*8*  16:4

**exist** 24:25

**exit** 25:5  56:16  58:23
65:13  85:9

**expand** 24:18, *19*

**expanding** 67:7

**expands** 67:9

**expect** 5:3  45:10  52:21
53:20  54:3  57:6  58:6
61:2  127:14  128:6, *13, 19*
129:3  130:14  132:11

**expectation** 130:16

**expelled** 19:17, 21

**experience** 80:8  117:16
120:15  125:3, *12, 23*
129:8  137:11

**experienced** 127:14

**experiencing** 5:17

**experiments** 104:15

**Expert** 3:6  7:25  12:13,
*16*  22:20  116:18  123:8
124:18  125:2  134:6, *17*
143:21

**expertise** 21:20  22:1
23:7  26:24  97:22  98:17
111:11  117:12  118:11
120:20, 25

**experts** 116:16  117:24
118:15  121:18  131:23

**expires** 147:8

**explain** 17:9  56:18  60:9
72:22  73:25  83:2  87:11
89:16  114:7  133:8
135:16  140:12

**explained** 94:4

**explaining** 135:16

**explanation** 77:22

**export** 97:9

**expose** 65:5  127:10

**exposed** 49:3  51:8  56:8
64:19  126:11, *12, 15, 21,
23*  128:14

**exposes** 74:20

**exposures** 98:12

**express** 16:25  18:12
41:9  115:24  117:1
120:25  121:6, *21, 25*
122:15  143:18

**expressing** 26:25

**extend** 31:1  85:25

**extended** 42:22

**extending** 45:7

**extent** 23:4  54:25  59:9
144:5

**exterior** 33:1  34:9  43:19

**external** 47:8  85:19
138:15  139:20

**extract** 8:14

**extracts** 8:19  42:12

**< F >**

**fabric** 74:22

**fabricate** 141:19

**face** 64:15  65:18  111:25

**faced** 61:21

**facing** 64:5, *15, 22*  65:5,
*19*  118:11  119:19, 21
121:13, 24

**fact** 43:21  44:8  64:11
92:12  109:9, *14*  110:7
123:6  142:25

**facts** 27:17  106:25
107:20  135:1

**factual** 27:4

**fair** 5:8, *11*  14:2  22:14
31:16  41:12  48:9  73:23
98:17

**fairly** 53:19  133:11

**fall** 43:4  54:3, *9, 10*  73:7,
*11*  128:11  129:9

**fallacy** 119:13

**fallen** 54:17

**falls** 52:17  73:7, 9

**familiar** 138:22

**Fantastic** 7:15

**far** 34:18  37:18  45:14
52:9  55:7  58:12  63:18
72:7  79:3  82:21  130:14

**Faro** 32:20, 22

**F-a-r-o** 32:20, 22

**farther** 79:12  88:18

**farthest** 70:20

**fast** 78:14, *20*  103:13
104:15

**faster** 104:5

**fastest** 78:6

**fatal** 68:18  69:12, 17
98:23  99:3  115:11

**fatalities** 13:18

**feather** 130:6

**feature** 97:12, *13*  138:25

**federal** 12:11, 24

**feel** 5:13  47:22  107:6
110:18  125:9  139:22, 25
140:2, 8

**feet** 44:20  46:10, 18
75:14, 15  115:15  125:22
127:18  128:7  129:4, *5, 18,
21, 23*  130:15  137:17
142:10

**fell** 55:14  73:5  91:17
129:17, 22  130:14

**felt** 117:24  135:2

**fence** 37:21  38:3  51:21

**fewer** 20:18

**fields** 23:12

**fifth** 46:3, 5  80:25

**figure** 19:20  34:17  50:20,
*23*  55:17  62:23  69:17, 25
70:5, 7  73:4, *19*  79:16
84:11  88:20  95:15  98:4
99:14  103:2, 6, 9, *11*
104:9  121:4  122:22
123:3

**figures** 70:9

**figuring** 20:7

**file** 8:6, *10, 13*  9:11, *12,
15, 22, 25*  10:24  11:1
35:16  96:4, *16*  97:20

**files** 9:5, *19*

**fill** 34:10  91:20

**fills** 98:1

**final** 56:13  59:12  115:4

**finally** 125:15

**financially** 146:19

**find** 8:25  17:15, *18, 19*
19:22  29:19  31:9  37:21
40:4  46:9, *20, 24*  59:3
93:25  94:4  98:22  99:6
121:10  124:21, *25*  125:4

**finding** 41:25  72:22
73:20, *25*  100:12  107:25
134:12

**findings** 41:20  56:19
62:20  73:25  105:9, *14, 16*
106:1

**fine** 5:16  6:17, *18*  76:14
116:9  133:19

**finger** 48:11

**fire** 19:15  47:13  48:12
49:3, 4, *5, 14*  110:2  112:4
136:8, *20*  139:8, *9, 10*

**firearm** 13:11, *15, 16*
20:2  23:2  26:15  46:24
52:6  65:7  99:8, *12, 19, 21*
108:5, *6, 12, 13, 16, 17*
109:1  110:7  111:10
112:23  113:16  114:18
124:14  126:4  129:12
130:19  133:3  137:22

**firearms** 19:5  20:1, 21
21:21

**fired** 24:2  40:21, *23*  42:1,
*4, 23*  46:1  50:4  51:1
52:11, *22*  58:16  59:3
70:13  72:1  88:21, *22*
89:14, *16*  92:21  93:1
108:13  114:6  133:13

**firing** 110:1, *3*  112:7
136:11

**firm** 146:20

**first** 4:3, *18*  5:1  8:2, 5
10:11, *14*  13:22  14:2
16:17, *19*  26:20  37:4, 8
41:23, *24*  46:8, *16*  50:17
52:21  53:1  57:21  58:15,
*17, 22*  60:2  63:23, 24

**fit** 68:6  78:19  91:4
92:16  93:18  94:1  99:23

**fits** 41:2  77:3, *13*  83:14
85:1  90:8, 9, *25*  91:6
92:17  99:1  100:9  110:16

**fitting** 115:5

**five** 36:20  40:23  41:5
42:1, *4*  43:8, *11*  58:2
69:8  71:20  77:17, 21
79:9, *22*  81:7  89:9, *18*
92:20  104:10, *25*  105:4

**five-minute** 76:12

**fixed** 61:17, *20*  63:16

**flash** 100:4

**flat** 60:14

**flattened** 90:9

**flawed** 140:5

**flew** 43:20

**flip** 105:5  136:25

**flips** 139:21

**float** 53:17

**Floor** 2:8  34:13  43:5
130:1

**flops** 48:1

**flow** 39:10

**fly** 56:3  73:15

**flying** 53:20

**focused** 52:1

**folder** 9:6, *16*

**follow** 18:9  35:8  144:1,
*4, 7*

**following** 100:19  132:6

**follows** 4:4  18:10

**footwell** 127:3

**force** 134:6

**Ford** 2:8  28:1, *3, 25*
29:12, *18, 21, 22, 23*  30:2,
*23*  31:7  34:3  36:2, 6
44:25  46:11  56:24  67:13
68:4, *5, 7, 9*  69:3, *9*  78:18
80:22  99:6, 9  100:20, 25
101:1, *4*  102:14, *17, 21*
103:2, *10*  104:5  108:17
109:2, 8, *10, 13*  133:5

**foregoing** 146:10, *13*

**forehead** 119:24

**forensic** 17:4  117:12

**forensically** 51:7

**forgotten** 31:21

**form** 17:14  26:10  37:14
79:24  114:22

**format** 96:15, *16*  97:20

formatting 116:*23*
forming 86:8, *18*
forms 18:7
forth 103:*18*
forward 10:*18* 31:8 46:7
  52:*15* 60:*23* 63:*17*, *18*
  64:*13*, *20*, *21*, *22*, *23* 65:5
  67:*19*, *21* 68:5, 9 69:*10*,
  *13*, *15* 70:6, 20 71:*10*, 22
  73:*18* 74:*12*, *16* 76:8
  77:8 80:*12* 81:*17* 82:*3*
  83:*17* 86:5, *25* 89:*4*
  96:*25* 99:8 100:*21* 101:*3*,
  *25* 102:*23* 110:*21* 112:*15*
  118:*3* 119:*3*, *6*, *7*, *10*, *13*,
  *21* 120:*13* 121:*13* 128:*24*
  129:*3*, *13*, *14*
found 28:*24* 31:*20* 38:2
  40:*23* 43:*12* 45:*18* 46:*3*,
  *4*, *5* 91:*1* 94:5 95:*4*, 8, 9
  115:*15* 116:*24*
fountain 132:8
four 6:2 25:*21* 36:*20*
  39:*11*, *12* 45:*18*, *25* 46:*4*
  71:*20* 77:*17*, *20* 78:*13*
  81:7 89:9, *10* 104:*19*
  130:9
fourth 6:6 80:*24* 107:*24*
fractures 73:2, *3*
fragmentation 54:*12*
fragments 52:*14* 73:*13*
frame 12:6 49:*1* 54:5
  61:*10* 67:2 82:*13* 96:*25*
  97:*13* 98:*1*, *13* 99:*16*, *24*
  104:*25* 123:*22*
frames 96:*23* 99:*16*
  100:8
FRANKLIN 1:*3* 31:*4*
  46:8, *10* 49:*16* 56:*18*, *24*
  58:9 61:*16*, *19* 62:*17*
  63:*4*, *5* 68:*23* 69:*4* 71:9
  109:*22* 111:6 112:*17*
  115:6 118:*3*, *7* 119:*15*
  127:7 132:*10* 135:*24*
  136:*4*, *5*, *6*, *24*
Franklin's 29:*11*, *22*
  56:*15* 66:*25* 68:*14* 69:*12*
  70:*20* 71:*25* 72:*4*, *6*, *13*
  73:*12* 74:*8* 78:*1* 93:*4*
  103:2 114:*24* 115:*15*
  125:*14*, *21* 127:*12* 135:*15*
  142:*10*
french 128:*11*
frequently 36:*18* 98:*11*
FRIED 1:*3*
FRIEDMAN 2:*3*
fries 128:*11*
frivolous 133:*25*
front 7:*17* 16:*18* 53:7
  68:*25* 69:*1*, *3* 70:*14*, *16*

72:*2*, *3*, *6*, *12*, *15*, *16* 77:*17*,
  *23* 84:*19*, *23* 85:*11* 86:2
  89:7 90:*22* 91:2 95:*25*
  101:2 102:*8* 116:*14*
  127:*16* 128:*23* 129:*17*, *18*
  137:*18*
fronts 68:*19* 71:*4*
full 60:7
fully 72:*19* 80:*14* 102:2
  136:*10*
function 19:6 90:*11*
functions 19:7 48:*25*
further 5:*14* 20:8 25:7
  30:*17* 40:*14* 44:*15* 60:*22*
  84:*8* 146:*12*, *15*
future 36:*12*

< G >
gained 36:*20*
GALLAGHER 2:8
game 36:*16*
garage 46:2, *5*
GARCIA 1:6 29:*23* 30:2
  31:*4* 33:*11*, *12*, *18* 41:*19*,
  *21*, *25* 42:*11* 44:8 62:*14*
  63:*11*, *20* 65:*23* 67:*14*, *19*
  68:5, 7 69:*1*, *4* 71:6, *22*
  72:5 78:*18* 81:*4* 86:9
  93:6 98:*23* 99:7 101:*17*,
  *19*, *22* 103:5, *22* 106:*12*
  107:9, *14* 108:*4*, 8, *10*, *11*,
  *23* 109:*13*, *24* 110:*10*, *18*,
  *24* 111:*4*, *8*, *13*, *22* 112:*16*,
  *22* 113:*21* 114:*2*, *6* 115:*2*,
  *7* 118:*4* 119:*1* 122:*24*
  123:*5*, *12*, *15*, *18*, *23*
  132:*22* 134:*4* 140:*16*
  141:*10*, *21* 142:*9*, *14*, *21*
Garcia's 18:6 29:*20*
  30:*1*, *20* 31:6 33:5 40:*24*
  52:8 56:*21* 66:*24* 68:*4*,
  *14* 69:*10* 71:*24* 72:*3*, *12*,
  *19* 80:*23* 81:*1*, *8*, *20*
  82:*24* 83:*13* 85:*15* 87:*12*
  92:*21* 100:*21* 101:*1*
  102:*7*, *8*, *18* 103:*1* 110:7
  111:*18*, *24*, *25* 112:*8*, *11*
  119:*19* 124:*8* 134:*7*, *15*
  142:*19* 143:*5*, *12*, *14*
gate 81:*14*
general 15:*24* 22:*21*
  23:*21*, *22* 64:9 88:9
  89:*15*
generally 18:*10* 24:8
  25:*24* 34:*23* 55:2 64:*22*
  65:5 77:*18* 82:*18* 83:*17*
  87:*3*, *18* 89:*23* 98:*23*
  102:*10* 103:9 108:*1*
  112:*5* 119:*20* 120:2

142:8
generate 18:8 79:*3*
generated 37:*3* 55:*20*
  121:7 122:*3*
generic 31:*18*
generically 32:*20* 94:*13*
GERHARDSTEIN 2:*3*
getting 50:*15* 58:5 75:*21*
  77:2 80:*15* 88:*24* 90:*19*
  96:6 118:*22* 144:*4*
GILBERT 2:*3*, 5
gist 51:*13*
give 8:9 103:*12*, *14*
  116:5 129:*13*
given 4:*21* 79:*13* 90:2
  104:*22* 137:*1* 146:8, *11*
gives 29:5 37:*17*, *24*
  43:*20* 84:*4*
giving 83:*18*
glad 11:*18*
glass 24:*16* 49:*17*, *20*, *23*,
  *24* 50:6, *11*, *14*, *22* 51:2, *3*,
  *6*, *9*, *10*, *12*, *14*, *15*, *18*, *19*,
  *23*, *24* 52:2, 5, 7, *10*, *11*, *13*,
  *14*, *15*, *17*, *20* 53:*1*, 6, 8, *10*,
  *12*, *16*, *22*, *24* 54:9, *12*, *17*,
  *21* 55:*1*, *4*, *12*, *14*, *18*, *19*,
  *22*, *23* 56:*3*, *6*, 9, *10*, *22*
  57:5, 9, *14*, *23*, *25* 58:6, *10*
  61:*15*, *16* 62:*13*, *21*, *25*
  63:*20* 64:*14* 65:*4*, 9, *22*
  67:5, *6*, 8, *14* 68:*18*, *21*
  69:*19* 70:2, *3*, 5, 7 71:*18*
  72:*24*, *25* 73:*3*, 5, *6*, *10*, *13*,
  *14*, *15* 74:2, 7, 9, *13*, *17*, *21*,
  *25* 75:*3* 76:6 77:5 88:2,
  *12* 91:*16*, *17* 126:5, 8, *11*,
  *13*, *15*, *24* 127:2, *20*, *22*, *25*
  131:5, 7, *13*, *16*
Glock 19:7 40:*10* 45:6
  93:2
Glocks 92:*24*
glove 128:8
go 10:*17* 12:*1* 25:5, 7, *18*
  30:*19* 31:*14* 56:*3* 59:*20*
  60:*22* 64:*24* 67:*4* 76:*23*
  77:*16* 82:*21* 87:*23* 98:8
  108:*11* 112:*20* 116:6
  124:*12* 127:*16*
goes 19:*10*, *15* 24:*15*
  39:*24* 63:2 64:*17* 67:5
  68:5, 8 73:2 89:6 91:*25*
  99:*22* 133:*14*
going 5:*3* 6:*24*, *25* 7:*1*, *2*,
  *3*, *10*, *24* 16:*3*, *13* 17:*16*,
  *22* 18:2 19:*13* 20:*20*, *23*
  27:9 29:*25* 34:*22* 35:*16*
  42:*21* 44:*4*, 5 48:6 52:*4*,
  *18* 53:*13* 56:*12*, *25* 65:9,
  *19*, *21* 66:*2*, *3* 67:6 68:*14*

78:*18* 84:*19*, *20* 87:2
  92:*4* 105:5 137:9 142:6
  144:8
Good 4:7
government 12:*17*, *20*
grab 123:*16*, *22*
grabbed 35:*1*
gravity 54:7 129:9, *10*, *22*,
  *25*
Great 6:*23* 7:*12* 14:*22*
  16:*19* 76:*15* 96:*11*
greater 69:2
grip 131:*12*, *13*
ground 34:*13* 127:*11*
group 72:*10*
groups 104:*16*
guess 73:*18* 74:*3* 110:*22*
  140:*23* 141:*4*, *6*, *14*
guessed 112:*24* 113:2
guessing 109:6 140:*23*
  142:*1* 143:*10*
gun 19:2, *11*, *14* 25:*20*
  40:8, *17*, *25* 41:*4* 42:*21*,
  *25* 43:*10*, *13*, *18* 44:*4*, *6*,
  *12* 45:2, *11*, *13* 46:*14*, *17*
  47:*1*, 2, *13*, *14* 48:*10*, *12*,
  *24*, *25* 49:6, *7*, *11*, *21* 50:*1*,
  *4*, *6*, *17*, *18* 51:6, 8, *11*
  52:8 55:*15*, *19*, *21*, *24*, *25*
  56:*4*, 8, *22* 59:*11* 64:*16*,
  *19* 65:*19* 66:*20* 67:*19*
  85:*15*, *20* 86:*1*, *3*, *11*, *22*
  87:*20*, *21*, *23*, *25* 89:*3*
  92:*2*, *21* 93:*1*, *4*, 5 100:*1*
  109:*4*, *5*, 7, 8, 9, *12*, *14*, *15*,
  *18*, *19*, *21*, *22*, *23*, *25*
  110:*10*, *11*, *24* 111:*1*, *2*, *4*,
  *6*, *13* 112:*2*, *3*, *4*, *13*, *17*, *25*
  113:*2*, *12* 114:*2*, *11*, *12*, *13*,
  *19*, *20*, *23*, *24* 115:*14*, *19*,
  *21* 118:*4*, *11* 119:*1*, *12*, *19*
  120:*13* 121:*24* 122:*11*
  123:7 124:*23* 125:5, *14*,
  *16*, *25* 126:8, *10*, *15*, *18*, *20*,
  *21*, *23* 127:5, 8, 9, *13*, *19*,
  *22*, *24* 128:3, *6*, *12*, *18*, *22*
  129:9, *17*, *20*, *21*, *22* 130:2,
  *8*, *10* 131:*10*, *13* 132:*13*,
  *22* 135:*14*, *17*, *18*, *21*, *22*
  136:7, *11*, *15*, *18*, *20*, *21*, *25*
  137:5, 9, *12*, *15*, *16* 138:*1*,
  5, 7, *11*, *12*, *17*, *18*, *19*, *21*,
  *22*, *23* 139:*1*, *4*, *7*, 9, *10*, *13*,
  *16*, *19*, *20*, *24* 140:3, 9, *16*,
  *18*, *21*, *22*, *24* 141:2, *3*, 5, *6*,
  *7*, 8, *10*, *11*, *12*, *15*, *18*, *22*,
  *25* 142:*1*, 9, *12*, *13*, *22*, *25*
  143:2, 6, 7, 8, *10*, *11*
gunpowder 24:*21*

Guns  18:24  19:3, 8, 10
139:8
gun's  126:20  139:17
gunshot  26:9  56:14  65:6
74:6, 8  101:11  129:15
137:13
gunshots  68:6  101:10
103:15  107:23  108:19
110:14, 15  112:18  128:18
129:14  132:23
Guys  76:11  106:19
107:18  116:5

< H >
Haag  15:21  16:2
H-a-a-g  15:21
hammer  47:13
hand  67:7  84:24  86:12
114:16  147:1
handed  109:24
handgun  52:12
handle  39:13  89:4
hands  120:20  129:15
handwritten  8:14, 22
9:15, 19
hang  86:3  87:19, 21
happened  30:13  71:1
72:9  106:6
happening  52:19  112:18
happens  123:24
happy  5:15
hard  16:18  35:8  57:13
61:22  91:4  116:14
head  52:3  56:24  58:9
63:4, 20  64:6, 12, 17, 19,
22, 25  65:2, 5, 6, 10, 14, 15,
18, 23, 24  66:4, 8, 15
67:15  71:9  89:20  90:4
118:17  119:10, 16, 18, 19,
20, 21, 23  120:2, 24  121:1,
13, 22, 24  122:15
heading  40:3, 11
headlights  70:17
heard  113:14
heavily  103:17
heavy  39:9  130:5, 15
height  33:8
held  47:18, 19  130:2
help  25:24  90:12
helped  103:18
helps  58:21
hereinafter  4:3
hereunto  147:1
hey  138:19  140:3
hidden  51:12  52:16
128:17
high  26:6  51:4  52:11
55:4  72:25
higher  29:24  52:5  88:17
highlighting  95:21, 22

highway  38:2  39:18, 20
111:9
hip  86:14
hired  9:25  10:3  12:13,
16, 20  13:20  116:20
history  24:15, 23
hit  24:3  25:5, 13  52:3, 9
67:1, 16, 17  68:21  72:8
79:12  83:9  88:1  89:3
90:14, 15  92:21  118:18
137:17
hits  57:15, 16  73:2  89:24
hitting  57:13  82:13, 20
holding  47:17, 21  48:10
86:11  122:11
hole  57:17  63:10  64:9
67:8  83:14
holes  25:11  36:5  59:17,
24  78:5
hollow  24:17
holster  86:13  123:8
133:12, 13, 18, 19  134:2, 3,
4, 6, 7, 15, 24
holster's  134:15
Honda  30:3  31:2, 14, 17,
21, 25  33:7, 8, 10  69:10
80:23  87:3, 4  99:7
100:21  101:1, 5, 16
102:15, 21  103:11  104:5
Honda's  72:3
Hood  14:10, 12  70:17
hope  136:19  141:15
hopefully  140:23
horizontal  35:8  60:8, 13,
15, 17, 20  61:12, 18
horizontal/vertical  61:1, 3
horrible  39:16
hot  49:4
hour  39:10
hours  5:4
huge  39:15
human  44:19  57:16
82:10  122:6
humps  129:1
hundreds  21:14
hypothesis  17:15, 19, 20
93:20  110:23  117:7
120:12, 17  142:22
hypothetical  137:3, 9, 10

< I >
idea  37:24
ideas  93:21
identification  7:6
identified  53:18  79:17
95:9  98:3
identifier  96:5
identifies  27:9  125:6

identify  37:7  58:21
79:17  93:1  96:4  131:25
132:21  133:6
identifying  144:3
image  54:3  103:8  123:11
images  85:10  99:18
121:19, 21, 25
immediately  71:18
impact  24:14, 18  51:25
62:5, 9, 10  70:20  73:1, 7
77:13  79:18  83:5  84:22
91:10  100:5
impacted  29:25  56:22
59:18  77:7
impacting  100:5
impacts  29:1, 18  57:2, 3
77:10  81:9  83:11  85:2
90:25
implication  118:2
implications  134:1
implied  133:12
implies  135:24  140:22
imply  141:1
important  29:20  34:24
41:11, 12  63:13  134:1
impossible  72:17
impression  38:7  97:19
inadvertent  139:5
inappropriate  134:25
in-car  123:1
inches  71:10  88:7
incident  15:20  17:11
18:9, 19  19:1, 2  22:5, 7,
15, 16  23:15  143:7
incidents  13:1
include  27:7, 13  35:5, 6
71:2  79:5  106:14  108:14,
18  110:17  120:14
included  8:9  51:14  84:3
111:7  112:11  122:22
123:11  132:4  133:10
140:25
includes  81:12
including  40:7, 16  86:6
100:24  108:7  110:6
inconclusive  17:20
incorporate  90:16
incorporated  31:16, 17
70:1
incorporating  70:7
increase  81:9
increased  71:20
independent  20:16  104:2
105:25  106:14  140:2
independently  78:21
111:16  130:18
indicate  64:18  100:19
101:6  105:1  114:19
127:9

indicated  56:7  77:1
80:21  89:1, 8  120:24
indicates  64:23  86:14
90:5, 6, 21  121:15
indicating  45:18  67:7
indicia  140:8
individual  42:12
Inertia  129:10
inference  118:20
inform  26:8, 17  62:7
91:18  105:11  132:24
information  8:14  18:6
20:10  26:4, 18  27:8, 21
28:5, 16  37:6  41:15
60:21  95:3  96:6  143:4
informs  24:22  120:16
initial  10:8, 19  16:22
27:22, 25  45:23, 25  46:3
110:15  127:1  131:22
140:15
initiate  108:19  137:12
injured  26:11
insert  84:3
inside  32:6  33:10, 14
34:1, 5  40:24  43:6, 9, 12,
15, 17, 20  44:13  45:18
52:16  53:2, 9, 13  54:13
130:20  136:7  142:23
inspect  135:20  138:17, 21
inspection  30:5, 9  140:20
instance  13:22
instances  12:19  60:17
instant  66:20  119:6
133:4
instrument  32:16, 18
insufficient  126:14
insurance  10:7  13:24
intend  136:10
intending  136:8, 15, 16
interaction  68:13  107:16
intercept  56:8  126:4
intercepted  43:3  75:15
interested  29:25  134:19
135:3  146:19
interfere  115:10
interim  132:13, 17
interior  33:2, 5, 6  34:3,
10, 12, 14  42:5  56:23
91:14  119:22
interpret  131:18  142:10
interpretation  24:3, 4
27:14  36:15  93:15
118:23  133:14, 15  134:22
141:11, 21  142:3, 4, 8, 19
143:1
interpretations  141:4
142:16
interpreted  141:5
interrupt  22:11
interrupted  65:9

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

intersection  94:*17, 18*
100:22  101:*12*
intervening  56:*17*  57:*9*
interview  18:*6*
interviews  18:*4*
introduce  105:*18*  116:*3*
introduced  81:*6*
investigative  24:*19*  110:*23*
investigator  45:*25*
investigators  85:*5*  134:*19*
involve  18:*23*  19:*13*  23:*1*
27:*9*
involved  12:*25*  13:*9*
14:*19*  19:*3, 11*  22:*2, 24*
27:*10, 11*  109:*5*  143:*23*
irregular  56:*16*  57:*11, 17,*
*24*  65:*11*  75:*24*  83:*6, 19*
isolate  98:*3*
isolated  99:*13, 16*
issue  28:*20*  118:*20*
133:*23*
italicized  46:*8*  118:*24*
italics  41:*19*
item  89:*16*  90:*17*
items  33:*14*
its  19:*15*  50:*1*  57:*11*
65:*9, 14*  70:*10*  77:*9*  90:*8*
125:*14, 19*  129:*10*

< J >
J.R  2:*8*  6:*19*
jacket  74:*8, 21*  75:*10*
76:*4, 7*  122:*24*  123:*3, 7,*
*13, 16, 24, 25*  124:*8*
jam  39:*15*
JOSE  1:*6*
jotted  96:*7*
Judge  1:*4*
July  11:*7*  12:*1*  15:*10*
juxtaposed  78:*10*

< K >
keep  8:*6, 22*  9:*12, 21, 24*
10:*1*  27:*13*  35:*15*  73:*9*
keeps  52:*18*
kept  114:*14*
key  8:*19*  18:*25*  22:*8*
117:*24*
killed  13:*12*  58:*9*  115:*6*
kind  17:*24*  19:*10*  20:*6,*
*11*  27:*14*  32:*18*  36:*16, 17*
39:*4, 10*  42:*25*  52:*4, 16*
70:*3*  71:*12*  79:*1, 3*  94:*13*
97:*6*  98:*13*  101:*13*  103:*6*
kinds  8:*18*  31:*19*  35:*18*
129:*16*  134:*3*
King  14:*18, 19*
knees  74:*12*
knew  109:*9*  132:*8*

142:*12*  143:*1*
knocked  130:*14*
know  4:*18*  5:*2, 4, 21*
6:*21*  7:*23, 25*  10:*12*
11:*20, 23, 24*  16:*8*  19:*7,*
*10*  22:*12*  24:*25*  26:*15*
29:*22*  30:*15*  31:*7*  34:*15,*
*22*  36:*6*  39:*6, 25*  41:*11,*
*14*  44:*18*  48:*10, 12, 24, 25*
49:*6*  50:*25*  51:*14*  54:*16*
55:*10, 19*  58:*14*  59:*20*
60:*19*  61:*13, 15*  62:*18*
63:*1, 7*  64:*4*  66:*7*  69:*3,*
*14*  71:*4*  73:*16*  75:*14*
78:*2, 14*  79:*6, 8*  81:*20*
82:*12*  86:*8, 9, 10, 11, 13,*
*16, 25*  88:*7*  91:*22*  92:*3*
94:*18, 20*  95:*13, 25*  98:*7*
103:*13*  104:*4*  109:*20, 24*
111:*15*  112:*16*  113:*9, 19*
114:*14, 15*  115:*2*  119:*17,*
*18*  122:*13*  123:*12, 17*
126:*17*  127:*9*  128:*16*
130:*13*  134:*6, 20, 21*
135:*17, 21, 22*  136:*2, 9, 14*
138:*3, 18*  139:*10, 13, 19*
140:*21*  141:*5, 9, 10, 18*
142:*13*  143:*2*
knowing  99:*21*  120:*15*
124:*20, 21*
knowledge  15:*24*  53:*5*
104:*17*
known  19:*25*  27:*15*  93:*5*
135:*24*  136:*4, 12*  143:*9*
knows  61:*6*  109:*5*
135:*18*  136:*21*  140:*22*
141:*8*

< L >
lab  22:*10*
label  82:*9*  89:*13*
labeled  98:*24*
labeling  88:*23*
laboratory  22:*11, 17*
23:*11*
lack  133:*12*
Lakeside  2:*8*
laminated  51:*24*
land  53:*9*  54:*15*  55:*5*
144:*9*
landed  24:*5*  51:*10*  53:*22,*
*23*  54:*22*  129:*5*
landmark  41:*11*
landmarks  17:*25*  20:*3, 7*
37:*22*  40:*13*  41:*14*  62:*3*
71:*13*  93:*13*  94:*5*  103:*12*
lands  64:*25*
lane  39:*11, 12*
large  53:*18*

laser  29:*3*  32:*21*
Lauren  1:*14*  146:*3*  147:*6*
LAW  2:*8*  13:*18, 20, 24*
21:*2*  36:*19*  60:*3*
layperson  98:*16*
leads  24:*18*
lean  55:*3*  63:*17*
leaning  63:*5, 17*  74:*12,*
*16, 19*  112:*15*
learn  139:*7*
leave  57:*16*  133:*25*
leaves  57:*17*  59:*11*  64:*7,*
*8*  92:*1*
left  46:*21*  47:*10*  56:*21*
84:*24*  86:*12*  94:*17*  116:*8*
131:*11*
left/right  60:*13*
left-handed  86:*9*
length  31:*22*  32:*3*  33:*8*
44:*18, 19*
lengthy  133:*11*
lesser  21:*24*
letter  9:*8*
letting  22:*3*
level  66:*13*  67:*24*  71:*4*
87:*18, 22, 25*  88:*11*
lever  46:*20*  47:*8, 9, 10*
49:*1, 5, 8, 12, 13*  135:*20,*
*22*  138:*16*  139:*14, 21, 22*
140:*7, 10*
levers  129:*2*  138:*15*
light  39:*8*  100:*3*
limit  44:*17*  62:*12, 17*
63:*20*  67:*3*  103:*14*
limitation  43:*21*
Limited  36:*7*  72:*7*  78:*9*
93:*5*  133:*17*
limits  78:*9*  81:*21*  85:*23*
131:*25*  132:*1*
Line  3:*3*  31:*3*  65:*1, 17,*
*20*  66:*8*  73:*21*  82:*14*
84:*14*  86:*3, 23*  87:*5*
113:*17*  115:*12*
linear  65:*20*
lines  10:*19*  24:*21*  141:*17*
liquid  132:*9*
list  15:*7*  28:*14, 15*
listed  11:*21*  15:*12*  28:*9*
listing  15:*10*
lists  15:*6*  105:*6*
literature  104:*14, 18*
little  6:*13*  17:*9*  29:*24*
39:*3*  48:*4*  49:*3, 4*  52:*13*
64:*17, 18, 25*  65:*2*  68:*13,*
*24, 25*  72:*16*  76:*24*  78:*19*
120:*23*
LLP  2:*8*
loaded  19:*5*  40:*8, 9*
130:*8*  136:*7*  137:*15*

138:*10*  140:*4*
localize  44:*6*
localized  63:*9*
located  26:*8*  29:*1*  45:*25*
62:*15*
location  38:*9*  42:*19*
54:*25*  63:*12*  75:*17*  77:*9*
88:*21*  103:*15*  124:*14*
128:*3*
lock  62:*10*
locked  47:*14*
locks  47:*12*
long  13:*5*  17:*6*  42:*22*
78:*2*
longer  67:*14, 15*
look  7:*15*  14:*7, 14, 20*
17:*18*  19:*3*  24:*1*  28:*12*
37:*9*  38:*10*  48:*21*  52:*11*
55:*12*  56:*25*  59:*14*  74:*13*
77:*15*  83:*11*  84:*18*  95:*2,*
*3*  96:*4*  97:*1*  99:*13, 14*
117:*17*  119:*5*  122:*21*
134:*17*  142:*24*
looked  29:*9*  38:*11, 16*
49:*21*  75:*12*  94:*1, 2*
looking  8:*3*  15:*23*  16:*19,*
*22*  18:*25*  19:*18*  23:*18*
25:*16*  26:*19*  27:*2*  28:*17*
33:*12*  57:*4*  59:*2*  60:*6*
64:*13*  73:*19*  76:*17*  77:*14,*
*25*  78:*4, 21*  82:*22*  83:*13*
84:*11*  88:*19*  89:*11*  94:*19,*
*25*  96:*14*  98:*19*  99:*5*
111:*8*  112:*14, 15*  114:*4*
116:*11*  118:*1, 3, 21*  119:*3,*
*7, 9, 13, 15, 17*  120:*1, 4, 13*
122:*9, 19*  124:*22*  130:*22*
132:*20*  133:*7*  139:*11*
looks  27:*4*  28:*19*  34:*11,*
*16*  35:*13*  93:*10*
loses  65:*14*
lost  59:*12*  67:*9*  82:*1*
lot  8:*22*  10:*1*  13:*11*
20:*25*  36:*19*  38:*5*  51:*5*
53:*4, 6*  55:*20*  68:*25*
71:*16*  73:*5*  80:*12*  91:*19,*
*20*  93:*17*  95:*18, 19*  100:*2*
128:*21*  129:*1*
love  60:*23*
low  74:*13*  88:*2, 5*  129:*25*
lower  29:*24*  63:*2*  87:*8*
88:*11, 16*
lowered  26:*9*  87:*16, 23,*
*24*  88:*1*
lowest  129:*10*
Lucien  15:*2*
lurch  128:*24*  129:*3*
lurched  128:*25*

Case: 1:22-cv-00061-DAP Doc #: 44-10 Filed: 01/31/24 159 of 167. PageID #: 971
Deposition of Matthew Noedel
Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

< M >

magazine 130:9
magnification 96:15
magnify 96:13
main 21:18 23:15 99:5
maintain 21:20, 25
maintained 9:7
making 35:2 46:25
66:14 98:21 141:19
man 13:9, 14, 15, 16
manila 9:16
manipulate 96:20
manipulation 97:14
mannequin 121:13
manner 57:15 69:5 80:9
man's 13:17
manual 33:21
manufacturer 32:19
map 37:20
maps 38:4
march 16:13
marked 6:2, 14 7:6
16:11 116:11
marry 42:24 61:11 97:2
marrying 41:6 44:1, 2
mash-up 95:12
mass 54:6 129:12
match 90:25 91:11
matches 31:11 88:12
91:11 101:21
matching 90:18
material 16:1 27:19
28:9 41:20
materials 144:6
mathematically 65:20
matter 4:9 29:25 54:11
91:19 92:7
MATTHEW 1:9 4:11
7:1, 2, 3 145:7
M-a-t-t-h-e-w 4:11
mean 25:13 40:20 47:6
70:16 71:3 80:4 81:22
83:23 89:3 93:16 100:22
102:6, 16 109:7 114:13
128:5, 7 132:17, 25 133:9
139:19 140:5
meaning 75:23
meaningful 50:13 75:21
means 43:17 49:4 55:25
64:11 66:19 73:14 87:11,
15, 16 89:17 114:7
118:10 119:24 126:5
128:24 136:5 138:20
141:1, 21
meant 79:23 105:13, 15,
21 108:20 114:10, 18
121:17 122:8 142:14
measure 34:18 35:23
38:24 61:7 88:8 129:19
measured 60:14

measurements 34:17, 20,
24, 25 36:4 61:1, 3, 22
93:19
meat 106:21
mechanical 21:20, 22
22:9 27:23 117:9 134:7
mechanically 47:14 140:5
mechanics 24:6 48:5
mechanism 126:12, 13
129:2
meet 4:13 48:4 71:12
meeting 10:9
members 10:9
memory 15:1 48:6
mention 94:12 134:1
mentioned 11:25 23:9
42:7 134:18
merely 122:8
met 17:25
metal 59:16 91:7 139:21
method 17:7 18:9, 10
19:10 42:8 112:3
methodology 17:1, 3, 10,
22 18:25 19:23 117:3
methods 17:4, 6 92:19
microscope 21:23
microscopic 22:12
microscopically 57:22
microscopy 93:3
midair 84:24
middle 8:2
Midnight 94:14, 15
milliseconds 62:8, 9
mind 16:3 143:20
minimum 104:22
minor 17:2 23:2 89:4
minute 52:24
minutes 95:25
mirror 30:19 31:6, 10
82:25 83:13, 15, 22 84:5,
12, 17, 20, 21 85:11, 18, 19
86:3, 7 88:11, 13 99:20,
23 103:18
missed 23:6
missing 59:13 91:23, 24
mobility 61:17
model 19:4 28:25 29:2,
5, 17, 19 30:2 31:4, 14, 20,
23, 25 32:2, 3 33:6, 7, 9,
10, 12, 24 34:21 35:9, 10,
13, 24, 25 36:2, 5, 13 37:8
121:12
modeled 30:23
modeling 30:4 32:17
36:17, 21 37:1
models 35:18, 20 121:7,
17
moment 7:13 52:8 64:12
92:14, 15 102:3 111:12

118:12 120:21 122:12
137:5, 8
moments 125:17 127:17
128:15 132:22 133:4
momentum 129:11, 13, 14
months 11:11 12:7
morning 4:7 5:19, 25
motion 54:10
mouse 68:2
move 16:3 31:8, 23
36:13 39:8 47:10 48:7
58:3 69:13, 15 97:1
101:12
moved 80:22 125:18
127:9, 10, 13, 17
movement 66:8 75:10, 25
81:25 98:2 101:10
125:19
moves 54:19 68:9
moving 41:8 46:7, 19
69:7 73:18 80:12 81:1,
17 82:3 93:8 100:18, 21
101:24 102:13, 23 103:14
107:24 115:4 135:13
140:12
MP4 96:19
multiple 19:24 26:7
27:11 36:3 118:23
municipality 12:17
mutually 119:4
muzzle 87:21 100:4

< N >

name 4:10, 11 14:3, 16,
19 32:12 80:10 94:18, 19
96:4, 21
names 14:15 27:10 80:10
nature 90:14
near 41:4 43:15, 16
46:18 73:2 79:12
nearly 50:6 67:24
necessarily 34:7 37:19
54:14 55:5 62:7 89:9
105:24
need 5:4, 14 14:22 17:21
35:14 75:23 93:20
124:18 125:2
needed 35:19 117:24
needs 123:10 141:9
neighborhood 141:15
neither 30:4
never 16:2 54:5 59:3
68:2, 5 73:15 83:25
86:15 111:25 112:12
130:17 143:9
new 12:4, 5 15:9 93:21
105:18
Nice 4:13 57:16 83:20
Ninth 145:21

NOEDEL 1:9 4:1, 8, 11,
13, 18 7:2, 3, 10 144:11
145:7
N-o-e-d-e-l 4:12
Noedel's 7:1
nomenclature 26:1 79:25
80:1 132:7
non-shooting 22:25
normal 39:9, 16 44:19
57:11 122:4 132:7
north 60:14 102:15
NORTHERN 1:1
nose 57:21, 23 69:2
89:22 90:9
Notary 1:14 146:3 147:6
notations 8:16
noted 60:18
notes 8:14, 16, 18, 21, 22
9:3, 6, 20
Notice 3:4 4:18 6:8, 24
7:16, 20 16:4
noting 83:12
November 12:1
nowadays 36:19
number 27:23 60:24, 25
71:10 79:18 94:8 118:1
122:19 124:2, 5, 13, 17
134:9, 11 135:7
numbered 8:2 79:22
80:9 117:18
numbering 79:19 80:4
numbers 80:11
numeric 61:14

< O >

object 25:6 54:18, 19, 23
56:17 57:9 68:21 100:8
129:13 130:5, 15
Objection 142:5
objects 6:12 9:15 25:6
75:13 107:15
observation 40:24, 25
44:2 51:13 129:21
132:12
observations 40:17 57:25
98:4
observe 37:7
observed 13:14 58:6
75:16
observing 55:7
obtaining 28:4
obvious 25:17 31:13
140:17
obviously 94:16
occupies 85:24
occupying 68:24
occur 67:19 104:23
occurred 27:15, 23 38:9
103:16 104:7 106:13
107:17 136:23

Case: 1:22-cv-00061-DAP  Doc #: 44-10  Filed: 01/31/24  160 of 167.  PageID #: 972
Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

occurring 83:16 99:22 103:15
occurs 19:19 27:13 67:11, 23 103:21 128:23
October 29:1
offered 101:6 117:6 124:10
office 32:8 144:9 147:2
officer 12:25 13:9, 12 14:18 18:5 29:15 41:19, 21, 25 42:11 44:8 82:24 98:22 99:7 108:4, 8 109:13 110:7 111:18 112:11, 22 114:6 141:10
officers 13:14, 16 123:21
official 94:18
offset 66:9 72:16
Oftentimes 25:16
oh 55:6
OHIO 1:1 2:7, 8 12:10, 17, 20, 23, 24 13:13 16:6 96:8 145:20, 21 146:4 147:2, 7
Okay 5:1, 5, 6, 15, 17, 21, 24 6:1, 11, 18, 23 7:12, 15, 19 8:5 15:3, 4 16:10, 15, 19, 25 18:16 21:17 22:7 27:16 35:20 41:23 45:13 46:13, 19 47:6 50:13 52:24 53:24 54:9 55:24 59:6 62:16 63:25 66:17 68:12 70:9 75:19 76:6, 11, 23 82:2, 9, 22 98:7, 8, 15 101:20 106:5, 23 109:11, 17 112:13 114:21 116:5, 9, 15 122:14 131:7 133:7 137:24 138:6 139:12, 16, 17 144:7
omitted 28:13
onboard 97:4, 12
once 9:18 19:10 20:1 30:23 48:14 67:13 73:6
one-and-a-quarter 105:3
ones 25:10 50:14 93:21
one-thousandth 62:5, 6
opaque 33:9
open 57:6 67:5 91:17 114:24 128:18
opening 43:16 91:16
operate 120:15
operating 44:16 45:1 63:8
operations 139:20
opine 131:24 134:8, 9
opined 117:15 122:23 134:4 136:11
opines 134:18
opinion 21:23 23:3 27:14 37:3 50:10 58:11 82:7 86:8, 19 110:9

116:25 122:9, 18, 19, 20, 23 124:2, 5, 13, 17, 19 130:22 131:25 132:2 133:7, 9, 18 134:14, 16 135:2, 13 136:3 137:23, 25 138:3 140:12 142:2
opinions 10:23 15:14, 18 18:12 24:7 26:21, 25 37:2, 15 59:7 80:15 96:12 105:25 108:24 113:6 114:22 115:23, 24 116:16 117:6, 11, 22 122:3 143:17, 18
opportunity 34:8, 25 38:8
opposing 131:23
opposition 121:18
order 17:25 20:25 80:7 96:1 97:7 105:2 122:20 143:16
organization 9:3
organizations 21:22
organize 8:24 17:17 25:1 144:9
orientation 37:9 62:2 68:20 72:13 74:16 75:1, 6 120:3 126:17 127:22
orientations 36:14
oriented 61:19 86:19
original 8:12 30:25 37:23 50:8, 16 70:1 79:17, 19 84:3 85:5 93:21 117:10 131:14
originally 10:5
originated 29:22
outer 74:8, 21
outlined 113:25
outside 21:2 44:22 45:13, 14 115:23
outward 73:2
oval 57:7, 8, 19 83:6
overall 70:6 134:15
overlap 116:24
overlay 35:10
overstated 132:1

< P >
p.m 144:16
package 50:17
Page 3:3 8:2 11:6 14:8 16:19 28:9, 13, 18, 19 37:10 39:24 50:19 56:13 59:2 60:7 69:18 70:1 73:18, 19 76:24 79:15 80:20 82:22 87:6 88:19, 20 89:12, 15 93:8 94:13 99:14 102:13, 14 103:2, 6 104:9 105:5 114:4 118:1 121:9 122:22 132:20 145:1, 17

page(s 145:3, 18
pages 76:17 80:14 145:4
paint 59:16
paper 130:6
paragraph 16:25 56:13, 14 60:7 114:5 142:6
paragraphs 16:20, 22 26:20 27:3 105:20 115:4
parallel 49:1 67:12 70:24 71:3, 5 72:5 101:5, 23 110:12
parking 13:11
part 9:21, 25 18:24 21:24 25:18 32:25 34:11 35:18 36:10, 11 42:7 52:3 64:4 65:18 72:2, 3, 4, 12 73:4 81:11 86:18 91:17 92:5 103:19 125:8, 11 129:9 135:5 143:22
partial 25:15
partially 45:13
particles 54:2 73:13
particular 9:1 10:17 17:10 19:23 34:2 40:8 41:16 42:10 44:6 47:20, 21 55:15 61:24 75:17 76:1 87:16 88:4, 5, 6 94:9 97:22 100:3 120:20 131:15 133:23 134:5 138:12, 23
particularly 101:6
parties 1:13 146:16, 18
parts 95:20 130:24
passage 74:2
passenger 51:2, 17 62:22 64:7 67:2, 3, 21 69:19, 23 70:11 71:7 72:18 74:4 76:9 115:10
passes 68:3 69:9 99:7
passing 68:4 104:7
path 19:21 25:21 26:17 42:25 44:3 52:15 56:20 58:3 60:8, 12 61:8 62:1 63:14, 19, 21 65:1, 21 66:24 67:1, 18 74:5 76:22, 25 79:16 80:13, 19, 20 82:23 84:6 85:1, 3, 7 87:9, 16 89:13, 14 90:13, 21 91:13 107:18 115:11
pathologist 57:2
pathology 56:25
paths 24:25 32:10 35:10, 12 36:13 44:8 59:22 78:11 82:10 110:5, 14
patrol 13:14 20:17
pattern 22:1, 6, 7, 23 23:17, 24 25:23 42:13, 24 43:7, 24 44:7 76:2 117:15 132:3

patterns 22:19 23:12 26:3 43:2 54:13 75:16, 22 117:16 131:24
pause 79:1, 11
Pearl 38:16 39:2, 15
pending 5:8
people 27:10 61:3, 10 78:6 81:25 104:16 107:11 113:11 129:15 137:11
perceived 108:13
perfect 83:10
perforated 51:1 70:5 73:17
perforating 52:2
perforation 74:13 77:5
perform 25:15, 19 130:18 134:5
performance 20:2, 21 23:18 24:1, 10, 24 25:2, 14 35:12 42:9, 10 58:19 59:14 66:12 72:23 90:13 94:6
performed 20:13 23:19 24:4, 7 25:10 124:7
performing 57:15
performs 24:13
period 8:1
permitted 47:3
person 25:8 26:8, 11 36:24 46:16 97:16 121:5 122:15
personal 104:15, 17
perspective 38:5 75:12 99:7 119:3
phone 10:16
photo 84:18 123:16
photograph 53:19
photographed 31:6 47:3, 5, 16 57:18 89:2
photographically 53:5
photographs 8:23, 25 28:1, 2, 3 30:25 36:4 37:4, 24 38:4 41:22 42:18 47:1 50:8, 13, 16 59:25 60:1 75:13 105:20 106:24 131:14
photos 50:18 70:1 76:6 84:17 94:8 103:16
phrase 17:3
physical 8:17, 25 9:19 18:1 20:3 22:12 24:1 34:24 35:6 36:4 38:18 41:3 43:24 50:1 54:5 55:8 60:4, 24 61:22 64:2 67:3 85:24 93:14, 18 94:1, 5 101:9 102:5 103:17 106:22 109:8 110:14, 16 111:1, 5 112:1, 10, 19, 22 113:18 115:19

Deposition of Matthew Noedel                                    Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

117:8  120:19  122:1, 11
124:11, 20, 21, 22  125:7
128:4  135:1  139:21
**physically** 19:6  27:14
45:11, 24  47:18  48:2
49:10, 21  56:6  57:13
64:3  73:11  77:6  78:11
83:23  86:1  89:7  99:20
101:17  102:21  128:15
**pick** 48:3  59:15
**picture** 84:13
**pictured** 62:22  85:4
100:16
**pictures** 50:7
**piece** 55:8  62:21  69:18
130:6  139:21
**pieces** 17:24  103:18
126:19, 21
**pillar** 63:16  67:20  72:9
77:7  79:12
**pillars** 36:8  67:2, 16
**pinch** 6:21
**pistol** 19:7  40:10  42:11,
19  45:6  46:9, 20  47:6, 17,
18, 19, 20, 21  48:22  49:10,
17, 24  78:7, 12  104:20, 21
125:21  130:23, 24  131:4
138:9
**pistols** 19:16
**PLACE** 1:13  38:2  66:24
69:23  115:19  146:13
**placed** 85:5  128:22
**placement** 85:6
**places** 95:14
**Plaintiff** 1:4  2:2  4:2, 9
**Plaintiff's** 7:5  116:16
**plane** 60:15  69:3  72:6
74:14, 16  75:1
**play** 18:1  34:22
**players** 8:20
**playing** 137:4, 6
**Plaza** 145:20
**please** 144:15  145:17
**plot** 60:22
**plume** 52:12, 16  53:25
55:4
**pocket** 56:5  126:6  128:8
**point** 19:12  24:17  35:3
41:23, 24  42:3  49:15
53:10, 11  59:12, 18  61:18,
20  62:20  63:14, 15  65:13
70:4, 15  72:17  85:13
88:12  96:6  98:9, 22  99:6
101:4  102:14  103:5
109:18, 23  110:11, 19
112:5  115:19  119:5
120:13  123:21  125:9
126:24  127:10, 13  129:10,
25  130:19  133:16, 20
134:9  141:20

**pointed** 49:2  66:19, 21
83:6  95:13  99:8, 12
108:5  109:19, 25  112:13
119:12, 25  121:15  124:24
128:15, 16  132:22, 25
137:16  141:13  142:22
143:6
**pointing** 45:9  47:11
50:23  83:7  114:1  118:4
119:1  120:5  122:10
**points** 41:24  46:19
62:25  87:2  90:3  98:6
113:24  117:24  135:10
**police** 13:9, 11, 13  27:22,
24  41:22  42:17  45:17
79:17, 19  80:3  123:21
143:23
**Polster** 1:6
**popularity** 36:20
**port** 42:18
**portion** 25:16  40:1
64:20, 21  89:19  106:4
121:8
**posed** 18:4  137:3, 10
**position** 31:9  33:17  36:3
40:21  41:4  42:19  43:7,
13, 22, 25  44:3, 17  46:21
47:4, 7, 11  48:12, 22
53:12  58:7  61:25  62:6,
10, 25  63:3  65:6  66:20
67:22  68:20  69:17  70:10
73:15  75:5  76:3  80:23
81:5, 8  82:16  84:7, 9
85:22  86:22  87:3  89:3
90:10  91:6  100:7, 9
101:1, 11  102:17  103:13,
24  104:24  111:8  114:25
115:18, 21  118:17, 18
119:18  120:2, 4, 21  122:1
123:7, 13, 17, 19, 24, 25
124:8, 23  125:16, 20
127:13, 22  133:3  135:18,
20, 23  138:21  139:13
141:8
**positioned** 84:16  86:2
99:19  123:4  127:7
**positions** 43:1  61:11
75:3, 18  77:21  95:5, 23
96:2  97:1  103:10  118:23
122:5, 8
**possibilities** 125:24  128:2
**possibility** 72:14  109:7
127:23
**possible** 66:3  67:15
121:19, 20  123:9
**Possibly** 55:2  63:24
68:17  71:14  99:8, 12
100:13
**potential** 125:19  139:23

**potentially** 76:8
**pound** 130:11
**pounds** 130:8, 11
**powdered** 24:20
**PowerPoint** 8:23  9:2
17:18
**practically** 53:5
**precisely** 86:23
**precludes** 79:10
**predictable** 55:5  66:9
**predictably** 43:25
**preexisting** 56:10
**prefer** 30:10
**preference** 131:19
**preferential** 131:15
**preferentially** 131:16
**preliminary** 7:2  16:11
117:4
**prepare** 35:18  143:16
**prepared** 5:24  39:12
**preparing** 35:14
**presence** 109:12  111:5
129:21  133:13  146:9
**present** 8:24  10:24  19:5
**presentations** 12:5  15:6, 9
**presented** 27:24  120:17
**presently** 13:7
**pressed** 75:2
**presume** 132:9  144:11
**pretty** 53:16  54:4, 7, 9
90:22
**prevent** 5:18
**previously** 7:20  93:13
**primarily** 12:6  22:15
77:9  95:12  103:22
**primary** 21:19  28:4  56:9
**principles** 129:11
**prior** 20:17, 24  38:17
50:5  56:17  95:19  106:1,
6, 17  114:25  124:8
125:14, 21, 25  128:18
140:16  144:2
**private** 4:25  20:18
**probably** 58:15  73:5
82:20  91:23  96:9  105:2
141:15
**problems** 139:12
**proceed** 20:6
**process** 17:17, 21  18:3,
24  20:20  25:18  31:5
37:7  42:8  44:5  60:11
61:4  78:7  85:8  91:25
92:5  112:21  117:9
136:18, 23
**processed** 61:4
**processes** 26:2
**processing** 30:25  61:6
79:18, 19  80:3  135:3
**produce** 7:23  15:18
89:15

**produced** 7:25  13:11
15:16  16:12
**producing** 26:16
**production** 7:20, 21
**productions** 144:5
**profession** 21:11
**professional** 21:22
**professionally** 21:8
**profile** 43:9  57:12  70:6
83:14, 20  84:6, 7  89:1
90:9
**profiles** 71:17  92:23
**program** 32:6, 12, 13, 14,
16  96:20  97:7
**progression** 68:6  77:11,
13  89:6  99:6  105:1
106:21  107:8
**projectile** 31:3  51:4, 5
72:25  89:18  90:8, 12
91:20  92:10
**projectiles** 23:19, 25  24:2
25:19  58:22  89:21  94:7
**propelled** 52:15  132:7, 15
**proper** 31:21
**properly** 48:17  136:25
**properties** 35:11  89:15
98:12  138:18
**property** 130:17
**proposed** 120:12  137:20
142:22
**propounded** 7:21  144:5
**proprietary** 32:14  96:17,
20  97:19
**protect** 126:7
**protected** 51:12  55:22, 25
56:2, 4  126:5, 10, 20
128:12
**prove** 77:24
**proves** 123:11
**provide** 9:17, 18  11:15,
18  21:25  22:8, 19  23:3, 4
96:8, 9  116:15  133:15
**provided** 8:12, 13, 15
14:24  26:21  95:8  97:18
112:17, 21  113:15  116:18
124:20  132:3
**provides** 27:12  142:23
**providing** 109:22  111:6
**Public** 1:14  2:6  146:3
147:6
**publications** 12:5  15:6, 9,
12, 16
**published** 15:25  104:13,
18
**pull** 6:22  16:16  47:12
48:14, 18  129:15  136:3,
10, 13, 15, 19  137:7, 11
139:5  140:1

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

**pulled** 19:*12* 42:9
101:*15* 102:*14, 16* 103:*24*
116:*13* 136:5, *21* 137:*25*
**pulling** 19:*14* 48:*4, 15, 20*
114:*17* 136:6, *14, 17*
137:*8, 14, 22* 140:*10*
**pulverize** 51:*25*
**pulverized** 49:*16, 20, 24*
51:6, 9, *10, 12, 14, 15, 18*
52:4, *7, 12, 15, 17* 53:6, *8,
16, 22, 24* 56:*10, 22* 74:*2,
9, 17, 21, 25*
**pulverizing** 65:*4*
**pure** 125:*10*
**purport** 121:6, *21, 25*
**purpose** 101:*13* 113:*24*
139:*3*
**purposes** 7:7 35:*2*
107:*21*
**pursuant** 4:*17*
**pursuit** 13:*10*
**push** 49:*13*
**pushed** 89:*22*
**pushing** 63:6
**put** 16:*3* 31:*2* 36:*12*
46:5 47:*7* 48:*10* 49:*11*
50:*17, 23* 60:*24* 61:*14*
71:*3* 76:*7* 107:*17* 113:*23*
120:*20* 127:*24* 131:*4*
143:*8*
**puts** 63:*8, 25*
**PX** 3:*4, 5, 6, 7*

**< Q >**
**qualified** 22:*19* 146:*4*
**qualify** 100:*12*
**qualitative** 71:*11* 88:*9*
90:*2* 129:*20*
**qualitatively** 88:*14*
**quantitative** 54:*4* 66:*2*
71:9 78:*16* 129:*19*
**quarter** 78:*14*
**quarter-inch** 49:*14*
**question** 5:*8, 10, 13*
17:*21* 18:*18* 25:*17* 31:*16*
56:*22* 67:*9* 82:*1* 92:*20*
110:*23* 112:*2*
**questioning** 72:*14*
**questions** 17:*13, 14* 20:9
24:*19* 91:*22* 92:*4*
**quick** 14:*7* 76:*13* 142:*6*
**quickly** 53:*16, 19* 54:*4, 7,
9* 76:*24* 105:*22*
**quite** 13:*5* 24:*14* 36:*18*
38:*2* 50:*2*
**quote** 132:*21* 134:*18*
137:*21*
**quotes** 118:*25*

**< R >**
**radiate** 73:*2*
**ramp** 39:*19*
**ran** 45:*15* 141:*23*
**random** 75:*24*
**randomly** 108:*9* 112:*7*
**range** 62:*12* 63:*21* 66:*6,
7* 67:*9, 25* 87:*1, 2*
**rare** 22:*24*
**rate** 69:*7*
**rates** 98:*1, 13*
**ratio** 79:*9*
**raw** 95:*18, 23, 24*
**reach** 87:*25* 122:*20*
129:*25*
**reached** 10:*15* 37:*2*
**reacted** 110:*24*
**reacting** 140:*25*
**reaction** 110:*1* 129:*14*
**read** 142:6 143:*14*
144:*12, 14*
**reader** 106:*19* 107:*21*
**ready** 35:*19* 49:*14*
**real** 37:*17* 39:6 48:*8*
142:*6*
**realize** 140:*3*
**realizes** 136:*11*
**really** 16:*13* 23:*22* 36:*19*
39:*15* 42:*1* 43:*7* 54:*1*
75:*10, 20* 76:*13* 79:*3*
86:*15* 91:*19* 114:*13*
**realtime** 37:*17*
**rear** 45:*7* 48:*15, 18*
69:*22* 70:*11* 71:*7* 72:*4*
79:*13* 136:*10*
**rearward** 64:*17* 71:*11*
85:*18* 110:*13*
**reason** 40:*3* 110:*17*
140:*25* 141:*12*
**reasonable** 21:*1* 26:*22*
104:*10* 122:*5, 6, 18*
137:*13*
**reasonably** 57:*7* 122:*6*
**reasons** 51:*23* 111:*6*
**rebut** 116:*19* 118:*2*
124:*11* 131:*25* 136:*13*
**Rebuttal** 3:*7* 7:*3* 16:*12*
109:*2* 115:*23* 116:*7, 12,
15, 21* 117:*2, 11, 21* 118:*2*
121:*4, 9* 122:*19, 20* 124:*2,
4, 13, 16* 125:*8* 130:*22*
132:*2* 133:*7, 9, 16, 22*
134:*9* 135:*13* 140:*12, 25*
142:*2* 143:*17, 18*
**rebuttals** 117:*18*
**rebutting** 142:*3*
**recall** 13:*3, 21* 14:*3, 16*
15:*8* 16:*6* 30:*16* 33:*22*
38:*7* 39:*4, 11, 17, 21*

47:*24* 95:*21* 112:*18*
**recalling** 13:*7* 16:*6*
**recalls** 109:*24*
**receive** 10:*15* 126:*21, 24*
131:*20* 132:*14*
**received** 29:*18* 74:*25*
130:*23*
**receiving** 29:*21* 126:*7*
129:*15*
**recess** 76:*16* 116:*10*
**recognize** 48:*16, 19* 49:*1*
52:*18* 136:*21* 138:*19*
**recognizes** 137:*1*
**recollection** 10:5 38:*17*
95:*17, 24* 96:*17*
**reconstruct** 80:*19*
**reconstructed** 97:*3*
**reconstructing** 22:*3*
59:*22* 92:*19*
**reconstruction** 15:*20, 21,
22* 17:*12* 18:*10, 14, 19, 20,
22* 20:*7, 11, 13* 21:*17*
22:*15, 16, 18, 22* 23:*5, 12,
16, 21* 24:*8, 13, 24* 25:*19,
25* 26:*5* 27:9 29:*7, 21*
40:*5* 41:*2, 12, 18* 42:*15*
51:*7, 16* 58:*20* 59:*8* 91:*4,
18* 92:*4, 16, 18* 93:*9, 12,
15, 22* 98:*17, 20* 103:*20*
110:*8* 117:*10, 13* 125:*13,
24*
**reconstructions** 19:*1*
20:*18, 19* 21:*15* 23:*1*
**reconstructive** 55:*21* 80:*2*
**record** 4:*10, 15* 6:*14*
60:*20* 82:6 93:*23* 94:9
106:*11*
**recorded** 4:*16* 11:*13*
14:*11* 37:5 80:*7* 97:*20*
**recording** 60:*3*
**records** 9:9, *10, 21*
**recovered** 42:*17* 46:*10,
14, 17* 47:2 58:*24* 59:*4*
74:9 89:*19, 21* 90:*17, 19*
92:*11* 127:*2*
**recovering** 46:*17*
**red** 28:*1, 3* 49:*4, 9*
**reduced** 146:*8*
**refer** 4:*23* 6:*15* 7:*8, 9*
8:*16* 14:*4* 69:*25*
**reference** 105:*22*
**referenced** 14:*18* 15:*23*
**references** 15:*17*
**referencing** 140:*20*
**referred** 15:*19* 28:*8*
136:*1* 138:*16*
**referring** 7:*10* 18:*13*
84:*13* 103:*24*
**reflect** 80:*11* 100:*3*

**reflected** 11:*25*
**reflection** 123:*13*
**refresh** 15:*1*
**refute** 17:*16* 41:*15* 95:*1*
142:*16*
**refuted** 110:*25* 112:*1*
117:*8*
**regard** 98:*14*
**reject** 17:*19* 93:*21*
**related** 26:*15*
**relation** 93:*24* 98:*5*
**relative** 68:*20* 81:*5* 84:*9*
95:*5* 97:*1* 102:*17* 103:*10,
25* 146:*15, 17*
**relatively** 22:*24* 23:*2*
52:*17*
**released** 30:*15*
**relevant** 33:*25* 113:*19*
**relied** 15:*13, 17* 28:*16*
95:*12*
**relies** 93:*17, 23*
**rely** 15:*25* 58:*18* 94:*10*
103:*17* 117:*15*
**relying** 59:*25* 124:*23*
**remain** 53:*25*
**remaining** 68:9, *24*
**remains** 73:*3*
**remember** 38:*15* 39:*2*
95:*11* 96:*21*
**remembers** 113:*14*
**REMOTE** 1:*9, 13*
**render** 122:*7*
**rendered** 121:*5*
**renderings** 122:*14*
**repaired** 37:*21* 38:*3*
**replica** 9:*4* 28:*24* 29:*2,
10, 14, 24* 30:*11* 31:*15*
88:*8*
**replicas** 28:*20*
**replicate** 30:*18* 33:*17*
**Report** 3:6, *7* 7:*2, 3*
16:*11, 12, 20* 18:*8* 26:*19*
27:*5* 28:*9, 10* 35:*2, 9*
37:*11* 39:*24* 40:*2, 15, 16*
50:*20* 56:*13, 14* 59:*2*
60:*6, 18* 62:*23* 69:*18*
73:*20* 76:*18* 79:*15* 80:*14*
81:*12* 82:*23* 84:*11* 87:6
88:*19* 89:*12* 93:9 94:*10*
99:*16* 105:6, *14, 23* 106:*3,
4, 10* 109:*2* 110:*7* 111:*18*
113:*7, 10, 23* 114:*4*
115:*25* 116:*7, 12, 16*
117:*2, 4* 118:*2, 25* 121:*4*
123:*9* 124:*18, 22* 125:*2*
131:*22* 133:*10, 22* 134:*2*
135:*12* 140:*15* 143:*19*
**reported** 46:*17* 108:*4*
109:*18*
**REPORTER** 1:*14*

Case: 1:22-cv-00061-DAP  Doc #: 44-10  Filed: 01/31/24  163 of 167.  PageID #: 975

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

reporting 77:4 145:20 146:20
reports 6:6 9:11 27:22, 24 28:1, 3 30:25 35:6 41:22 42:17 45:17 46:3 108:19 116:19, 22, 24 118:24 123:8 134:17 141:17
reposition 36:5
represent 29:19
representation 84:4
represented 19:17 31:11 32:11 54:3
representing 10:7 13:2
represents 29:8 103:7 104:21 124:24 130:10
reproduce 8:11
request 7:19, 21 112:17
requested 9:16 22:5
require 48:18, 20
requires 52:5
research 19:22 94:12
reserved 144:17
resistance 48:4
resolve 90:12
resolved 20:24 90:4
resolves 91:21
respect 7:22 24:9 33:14 66:24 75:5 124:13 135:7
rest 25:17 41:2 51:15 59:11 65:14 81:24 92:2, 18 106:3 107:18
resting 53:12
restriction 128:22
restrictions 129:1 143:24, 25
result 17:20 26:17 40:6, 9, 21, 25 41:3, 7, 10 124:6
resulted 13:17 51:19 107:18
results 28:18 40:16, 19 94:5 105:21
retain 10:4 25:11
retained 10:13, 20 12:22 13:1, 23 18:17
retains 24:16
return 145:17
reveal 75:10
revealed 140:18
revelation 115:1
reverse 35:25
reversed 89:8
review 117:23 122:25
reviewed 10:22 81:11
reviewing 17:23
revision 11:7
revisit 93:20
reworked 17:21
ricochet 24:20

right 4:20 12:8 14:23 15:8 21:6, 15 28:21 29:10 32:3 34:12 39:14, 15 42:1, 3 45:4, 7 47:10 49:18 50:10, 15 56:15 58:5 59:1, 25 62:1 63:13 64:1, 6, 15, 19, 24 65:6 66:11, 22 74:10 75:21 77:2 80:16 81:14 86:9, 12, 13, 14 88:20, 24 90:20 96:7 100:18 101:25 104:9 113:21 115:9 118:8, 11, 12 119:5, 9, 18, 20 121:14, 22, 24 122:1 127:25 130:3, 6 131:5, 11, 17 135:6, 24 137:5, 25 138:23
right-handed 86:14, 16
rightward 64:18
Riverside 102:15
road 37:18 38:16, 24 39:2, 12, 15 45:24 106:20 120:1, 5
roadway 98:5
robbery 13:10
rod 84:4, 12, 16, 19 85:4, 6, 20, 21, 25 87:20
rodeo 5:1
role 134:15
roll 43:6
rolling 98:2 99:25
roof 35:10 43:3
room 75:9
rotates 49:13
round 19:14 57:7, 8, 16 137:15 138:10
rounds 52:12
RPR 1:14 147:6
rule 146:21
run 8:1 97:6
running 13:10 141:9
runs 32:17
rush 39:10
Russell 2:8 6:20
rusty 50:3

< S >
safe 46:21 47:4, 7, 11, 22 48:1, 11, 22, 23 49:8, 11, 14 135:18, 22, 25 136:4, 22 138:1, 9, 11, 12, 14, 20 139:9, 12, 17, 24 140:5, 9
safely 139:18
safety 46:20, 24 47:4, 8, 15, 21 48:1, 22 49:8 135:14 136:8 137:14, 19 138:16, 19, 25 139:2, 3, 4, 7, 8, 14 140:7
sat 123:12

saturated 131:19
Savings 145:20
saw 108:12, 15 109:18, 23 110:24 111:10 112:2, 12, 23 113:13 140:16 141:13 142:10, 22 143:5, 6
saying 49:16 55:9 65:10 79:10 103:22 125:5 126:16 136:13 141:1
says 108:12 111:9 112:1, 12, 22 113:12, 15, 16 142:9
scale 29:7 31:24 32:2 35:13 36:9 37:24 38:5
scaled 31:20, 22
scan 9:16, 17 31:24 32:16, 25 34:12 36:17
scanned 29:13 34:9
scanner 29:3 32:15, 21, 22
scanning 9:4
scans 34:10
scenarios 18:3
scene 15:22 18:2, 14, 19, 20, 22 20:3, 11, 22 21:14, 17 22:21 23:1, 11, 21, 23 24:8 25:25 32:9, 13, 17 36:18, 21 37:11, 16, 23 38:5, 11, 16, 19 40:14 41:12, 18 42:18 45:23 50:8, 14, 24 61:4, 6 81:24, 25 93:7 104:6 112:10 114:22 123:18, 24 125:12, 23 126:9 134:24 135:4 141:23
S-c-e-n-e 32:13
scenes 23:4, 25
scientific 17:7, 14 18:10 26:22, 24, 25 112:3 124:4, 6, 9 134:12 135:6 142:18
scientist 31:13 71:3 117:12
scope 117:12
screen 6:12, 16 123:4, 16
seal 147:2
sealed 73:9
seams 36:7
seat 33:14, 17 41:5 43:5 44:9, 16 46:11 53:7 54:17 62:11, 18 63:6 64:1, 3, 4, 7, 8 68:22, 23 74:4 75:12, 20 76:9 82:18, 20 85:25 86:19 90:24 91:2, 14 114:15 115:10 127:3, 7 128:6, 20, 23, 25 129:2, 18
seated 75:13 122:24
seats 56:4 67:4 128:10, 22 129:1

second 14:12 16:25 21:5, 23 42:3 52:21 53:2 58:15 60:7 61:18 62:5, 7 63:24 68:17 71:15 72:10 77:2, 3, 6, 9, 13 78:13, 14 98:21 102:13 104:19 137:17
secondarily 54:22 56:10 75:25
secondary 54:20 75:9 127:6
seconds 78:15 104:12 105:4 119:8
section 27:16, 20 39:22 41:9 93:12 94:10 96:1 103:23 105:15, 21 112:2 114:5
secured 46:4
sedan 31:18
see 8:3 14:5, 17 16:22 17:18 19:19 33:10 34:12 36:15 38:3 41:9 45:17 49:5 50:22 52:5, 12, 13 56:12 57:22 59:13 69:18 70:2, 5, 10 75:8 80:6 82:22 84:18 92:24, 25 94:17 96:24 100:7 105:24 109:1, 6, 9, 14 111:1 112:13 113:11, 12, 13 122:25 124:18 133:24 138:20 139:1, 22 140:7 141:2
seeing 95:21 108:4 109:19, 21, 24 110:7 111:4
seen 38:9 89:16 99:17 100:1 108:17 112:3, 4, 25 129:15 140:24 141:25 143:3, 9
sees 135:12
semiautomatic 19:16 42:11 45:6 78:7, 12 104:20, 21
send 6:8
sense 41:8 107:16 120:10, 14 136:20
sent 6:1, 4
separate 78:23
separating 40:10
separation 77:20
sequence 77:23, 25 78:3 80:5, 11 103:7 110:22
sequences 103:8
sequencing 63:23
sequential 79:24
sequentially 76:25 77:16
series 79:1 104:14
service 98:16
set 27:8 56:10 92:8

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

107:*21*  147:*1*
**sets**  106:*15*
**setting**  27:*12*
**settle**  53:*19*  54:6, *13*
**Seventh**  2:*8*
**Shammo**  1:*14*  146:*3*
  147:*6*
**shape**  33:*10*  55:5  56:16
  57:*11*  58:7  59:*14*  65:*11*
**shaped**  70:*4*
**shapes**  25:*12*  26:*3*
**shards**  51:5  52:*13*  53:*18,
  20*  54:*9, 12*  55:*20*  57:*23,
  25*  58:6
**share**  6:*12, 16*
**shares**  84:*25*
**SHARP**  2:*8*
**shatter**  51:*3*
**shattered**  51:*17*  52:8, *10,
  20*  53:*1*  54:*22*  58:*10*
  70:*2*  74:*18*  87:*12, 14*
  126:*5*
**shattering**  127:*2*
**shatters**  53:*11*  72:*25*
  73:*6*
**sheet**  9:*9*
**shift**  33:*21*
**shifting**  54:*11*
**shoot**  48:*13*  88:2  104:*17*
  108:6  110:*10, 11, 12, 13*
  111:*13*  118:*21*  119:*8*
  136:*16*  137:5, *9*  138:2, *4*
**shooter**  43:*25*  78:*12*
  86:*15*
**shooting**  13:*1*  14:*19*
  15:*20, 21, 22*  17:*11*  18:*9,
  13, 14, 20, 22*  19:*1, 2*  20:6,
  11*  21:*14, 17*  22:5, *7, 15,
  16, 18*  23:*15, 23, 25*  24:*8*
  25:*25*  37:*11*  38:*9, 21*
  40:5  42:*14*  43:*9, 13, 21*
  44:*9, 24*  45:*1*  68:*16*  69:6
  71:*1*  74:*4*  76:*8*  78:*14, 20*
  86:*16*  95:2, *5*  101:8, *15,
  23, 24*  102:*3, 11*  103:7, *8,
  21*  106:*7*  108:*1, 10, 11, 15*
  110:8, *19, 24*  111:2, *3, 8*
  113:*16*  114:*23*  117:*13*
  123:*17*  124:*1, 8*  125:*12,
  18, 23*  143:*23*
**shootings**  22:*2*
**shootout**  13:*15*
**Shop**  94:*14, 16*  99:*25*
**short**  55:*9, 17*  61:*9*
**shortly**  103:*5*
**shot**  13:*9, 12*  19:*23, 24*
  42:*10, 12*  44:*13, 22*  54:*7*
  63:*11, 24*  67:*14*  68:*8, 17,
  18, 20*  69:*4, 11, 12, 16, 17*
  71:6, *15*  72:8, *10, 17*

73:*17*  77:*1*  80:*24*  81:*17,
  20*  82:*4*  85:*15*  87:*18, 19*
  88:*4, 5, 14, 18, 23*  90:8
  91:*1, 5, 6, 7*  98:*23, 24*
  99:*3, 22*  109:*15*  114:*2*
  115:*7, 11, 13*  118:*7, 8, 12*
  119:*12*  120:*21*  121:*2*
  127:*1*  133:*4*  136:*24*
**shots**  19:*24*  29:*22*  44:*25*
  67:*11*  68:*1, 10, 24*  69:6, *8*
  70:*13*  71:*21, 24*  72:*11*
  77:*1, 12*  78:*2, 3, 7, 13, 19,
  23, 24*  79:*1, 9*  81:*22, 23*
  82:*9*  84:*10, 23*  88:*22*
  89:*18*  95:6  98:*22*  99:*3,
  21*  100:*10, 11*  101:*2, 3*
  104:*6, 7, 10, 11, 19, 23, 25*
  106:*17*  110:*21*  114:*17*
  125:*6, 19*
**shoulder**  74:*10, 18, 20*
**show**  8:*24*  35:*12*  36:*14*
  77:*10*  78:*11*  85:*11*  91:*3*
  100:*25*  121:*8, 13, 18, 20*
  122:*8*  123:*6, 24*
**showing**  81:*12*  93:*23*
  107:*8*
**shows**  56:*14*  68:2  84:6
  96:*1*  99:*7, 15*  101:*10*
  102:*20*  107:*9*  121:*5*
  123:*25*
**shut**  56:*1*
**side**  34:*19*  44:*20*  46:*21*
  47:*10*  49:*12*  51:2, *17*
  62:*22*  63:*4*  64:*6, 15, 19*
  65:*6, 14*  66:*22*  67:*12, 13,
  23, 24*  68:*10, 19*  69:*9, 19,
  23*  70:*11*  71:6, *7, 8, 21*
  72:*18, 24*  77:*11*  78:*17, 18*
  79:*23*  82:*25*  83:*5, 11, 13,
  19, 22*  84:*19, 20, 22, 25*
  85:*11, 19, 23*  90:*11*  101:*7,
  15*  102:*11*  103:*9*  104:6
  108:*1*  110:*15, 16*  112:6
  115:*16*  119:*18, 20, 23*
  121:*24*  127:*10, 11*  131:*11,
  17*  138:*17*
**sides**  50:*18*  89:*23*  126:*3*
  127:*8*  131:*9, 16*
**side-view**  84:*12*
**sideways**  101:*3*
**sign**  102:*19*  103:*1, 6, 12*
  104:*8, 23*  110:*20, 21*
  112:*19*  113:*17*  144:*15*
**Signature**  144:*17*  145:*1,
  17*
**signed**  145:*17*
**significance**  56:*19*  79:*18*
  107:*20*  108:6  110:6
  113:*23*  133:8  135:*17*
  140:*13*

**significant**  51:*25*  127:*15*
  133:*13*
**significantly**  112:*15*
**signs**  37:*22*
**similar**  9:*3*  71:*17*  77:*21*
  84:*25*  88:*25*  89:*1, 10*
  90:*10*  123:*2*
**similarly**  54:*16*
**simply**  8:*24*  31:*16*  33:*7,
  10*  47:2  48:*3, 7*  49:*12*
  58:*19*  61:*23*  79:*21*  97:*11*
  113:*1, 22*  116:*11*  121:*8*
  124:*10*  125:6  135:*12*
  139:*11*
**single**  19:*13*  56:*14*  73:*1*
  94:*24*
**sit**  11:*20*  14:*23*  15:8
  123:*14*
**site**  83:*5*
**sitting**  53:*23*  114:*14*
  126:6
**situation**  112:8  119:*24*
  142:*23*
**situations**  27:*24*
**sixth**  114:*5*
**size**  31:*21*  33:8  54:2
**skull**  64:*17*
**slack**  48:*16*  136:2, *22*
  140:2, *8*
**slice**  83:*19*
**slide**  131:*10, 17*
**slight**  65:2  89:2
**slightly**  64:*24*  72:6
  121:*14*
**slow**  96:*22*
**slower**  65:*15*  78:8, *15*
**slowing**  65:*12, 13*  66:*10*
  69:*1*  81:5  102:*24*  104:*3*
**slows**  68:*3*
**small**  26:6  52:*17*  55:*20*
  62:*24*  73:*12, 13*
**smaller**  38:6
**smash**  91:*7*
**smashed**  89:*21, 25*  90:*1,
  2*  91:*2, 5*
**Smoke**  94:*14, 15*  99:*25*
**smushed**  54:*18*
**snags**  74:*21*
**snapshot**  62:*4*
**soda**  75:*14*  107:*13*
**soft**  57:*15*
**software**  32:*17*  96:*18*
  97:*7, 16*
**somebody**  95:*22*  99:*18*
  113:*12, 13, 14*  123:6
  126:6  134:*23*  139:5
**somebody's**  100:*3*
**somewhat**  71:*25*

**sorry**  22:*10*  26:*21*  28:*23*
  31:*13*  33:*1*  67:*12*  79:*6*
  87:*24*  139:*9*  143:6
**sort**  8:*23*  23:*12*  26:*14*
  46:*9*  85:*18*  95:*12*  106:*23*
**sounds**  73:*22*
**source**  27:*19*  28:*4, 8*
  41:*20*  51:*15, 18*  119:*19*
**south**  60:*14*
**space**  57:6  63:*16*  67:6
  78:*3*  85:*24*  114:*24*
  125:*17, 21*  128:*11, 18*
  132:*13, 17, 18*
**spaces**  56:*3*
**sparking**  100:*5*
**spatial**  37:*17*
**spatter**  36:*3, 8*  132:*14*
**speak**  58:*13*  107:5  109:*1*
  119:6  127:*18*
**speaking**  24:8  77:*18*
  88:*14*  89:*23*  93:*11*
  133:*11*  142:*8*
**specialized**  97:*7*
**specialty**  21:*19*
**specific**  42:6  60:*7, 20*
  76:2  93:*1*  94:*16*  126:*13*
  130:*17*  131:*18*
**specifically**  11:*23*  15:*13,
  15, 17*  16:*1*  34:*17*  48:6
  94:*12*
**specified**  146:*14*
**speculation**  125:*11*
**speed**  52:*11*  96:*22*
**speeds**  69:*12, 14*
**spell**  4:*9*
**spoke**  41:*17*  120:*23*
**spoken**  93:*9*
**spot**  99:*15*
**spotlights**  95:*13*
**spots**  34:*12*
**Square**  2:6
**squirt**  132:*11*
**stabbing**  22:*22*
**stable**  57:*4, 20*  129:*10*
**stack**  39:*7*
**stain**  22:*1, 5, 7, 18, 23*
  23:*12, 17, 24*  25:*23*  75:*12,
  22*  117:*14, 16*  131:*24*
  132:*3*
**stains**  22:*4*  26:*2, 3, 10*
  75:*25*
**standing**  26:*9*
**start**  7:*16*  8:*1*  16:*21*
  17:*23*  19:*3*  103:*8*  110:*19*
  111:*8*
**started**  101:*7, 22*  102:*7*
  108:*15*  113:*17*  114:*23*
  135:*15*
**starting**  39:*19*  107:*10, 12*
**starts**  39:*23*  67:*8*  69:*8*

**state** 4:9  12:10, 17, 20
20:17  146:4  147:7
**stated** 122:23
**statement** 17:15, 16  18:5
101:13, 14  107:4, 15
108:16, 21, 23  110:17
111:4, 24, 25  112:9, 11
113:4  120:16  124:10
125:4  134:25  142:21
143:5, 12
**statements** 8:19  18:4
20:5, 9  101:5  107:6
112:21  113:5  117:5
120:8  135:11
**STATES** 1:1
**static** 37:19
**stationary** 57:5  102:3
**steep** 90:22
**steeper** 81:9
**steering** 33:18  34:15
63:5  68:22  85:22  119:25
**stenographically** 4:17
**stenotype** 146:8
**stepping** 96:25
**sticking** 45:3  62:21
69:19
**stimulus** 110:1, 2, 9, 10, 18
111:12, 15, 20  119:2
**stood** 34:3
**stop** 110:20, 21  112:19
113:17
**stoplight** 101:7  113:18
**stoplights** 39:7
**stopped** 55:9, 17  81:21,
23  101:7
**stops** 78:18  103:5
**storage** 50:7
**store** 38:1  39:18  106:13
107:10, 17  110:13
**stored** 114:19
**straight** 57:11  64:24
65:1, 17  66:8  84:19
85:21  89:7, 23, 24  90:1, 4,
6, 10, 15  91:3, 5, 6, 7
**strapped** 64:3
**street** 81:13  103:17
145:21
**strike** 30:19  56:9  67:22
70:10  71:8  76:19  80:22
83:15, 22  84:24  91:11
119:23
**strikes** 25:5  30:24  36:3
57:9  61:9  63:3  77:16
78:1, 21  80:25
**striking** 82:11
**strongest** 22:4
**struck** 25:6, 13  31:7
45:9  51:4  55:15  56:17,
24  62:1, 19  67:16  69:24

**70**:14  72:20  74:15, 23
82:24  87:13  93:16
**stuck** 54:14  83:13
**study** 42:15  57:2
**stuffed** 128:12
**style** 93:2  135:8
**subbullet** 98:21
**subdiscipline** 42:14
**subheading** 39:23  40:1
41:19  46:8  76:25  93:9
98:19
**subheadings** 40:11
**submerged** 88:15
**subparagraph** 49:15
107:24
**subparagraphs** 106:5
**subpoint** 100:20
**subsection** 16:21  28:17
46:9
**subsections** 16:21  27:2
**subsequent** 80:14
**subsequently** 43:6  136:24
**substance** 135:5
**substantial** 89:19
**substantiate** 17:19
**substantiated** 135:1
**substantiates** 99:2
**sufficient** 134:8
**suggest** 78:24  81:19
103:4  109:8, 13, 17
**suggests** 57:19  83:7
**Suite** 2:6, 8
**summaries** 27:24  105:25
**summarize** 105:21
**summary** 8:9  105:14, 16,
19
**Superior** 2:8
**supplemented** 27:25
**supply** 23:8
**support** 17:16  28:2
41:15  74:11  84:8  85:10
95:1  108:25  121:10
123:1, 2, 10  124:19, 25
125:5
**supported** 43:23  46:15
101:8  106:2  107:7
110:25  111:5  112:10, 19
113:18  117:8  120:17
122:4, 10  124:10  125:7,
10  132:12  135:11  141:23
**supports** 9:1  41:3, 25
42:4  44:23  56:17  80:22
88:21  141:24
**Sure** 5:9, 16  6:6  10:14
11:17, 20  13:8  14:1, 7, 16,
20  16:9  17:11  28:2  39:3
51:11  52:25  59:21  63:25
81:18  86:17  93:8  100:15
137:24  139:2

**surface** 24:16  25:8, 13
49:17  50:3, 6  53:23
54:14  57:13  84:17  85:18
86:7
**surfaces** 53:9, 21  55:18
**surmising** 65:24
**surrogate** 9:5  28:24
29:4  30:11  31:2, 25  33:1,
2, 5, 13  34:9, 21  37:6
84:2
**susceptible** 65:16
**suspect** 11:23  13:10, 12
**switch** 136:25
**sworn** 4:3  146:6
**symmetrical** 57:7
**symmetrically** 89:22
**system** 79:20  80:4

**< T >**
**table** 27:8
**TACKLA** 145:20
**take** 5:7  7:15  14:7
23:21  25:7, 8  31:15
76:11  79:24  80:3
**taken** 50:14  105:19
146:13
**takes** 42:25
**talk** 16:13  49:16  52:24
62:3  79:16  104:2  106:12
118:25
**talked** 58:12  80:12
**talking** 89:13, 25
**talks** 124:14
**target** 82:10, 12  118:21
**tasks** 58:2
**Taurus** 29:12  36:7
**teaching** 22:14
**team** 10:10
**technical** 97:25
**techniques** 60:17  61:7
**tell** 12:19  13:6  24:14
30:22  42:6  43:12  45:21
48:23  50:24  54:25  55:14
56:11  75:20  85:14  89:5
127:21  128:17  138:13
139:17  146:6
**tells** 42:18  51:7
**tempered** 51:3  52:11
72:24, 25
**temple** 56:15  58:8  63:13
64:14  66:21, 22  118:8, 11
**tend** 74:11  77:4
**tension** 48:8
**term** 114:10  134:17
**terms** 23:22, 23  24:6
132:3, 4
**terrestrial** 29:3  32:21
**Terry** 2:5
**test** 18:3, 6  20:4  50:4
106:14  111:21  112:12, 14,

**21**  113:3, 5, 11, 12, 13, 14,
23  114:1  117:6, 7  120:14
124:7, 9  142:14, 15, 21, 24
143:5
**testable** 142:23
**tested** 130:17
**Testified** 12:23  14:17
**testify** 5:24
**testifying** 5:18
**testimonies** 11:12, 21
12:3, 8, 9  14:8
**testimony** 14:24  22:20
143:14, 21, 25  146:8, 11
**testing** 20:8  101:14
112:8  140:16
**tests** 130:10
**text** 16:20, 23  27:3
123:11
**textbooks** 15:19, 21, 22
**Thank** 9:12  16:10  96:3,
11
**theft** 106:13  107:14
**theories** 20:5
**thing** 11:20  21:18  55:5
92:19  122:15, 16  129:19
135:21, 23  138:1, 6
**things** 7:24  8:16  17:18
18:25  19:3, 6, 9  27:10, 22
35:5  37:18, 19  41:10
43:7  50:25  56:25  109:13,
17  125:9  128:24  140:17
144:2
**think** 4:21  6:21  10:7, 25
11:25  12:3, 4, 6, 8, 21, 24
13:21, 22  15:10  21:1
23:9  40:15  46:15  48:2, 3,
6  50:4, 9  53:15, 21  61:3
67:10  71:14  72:13  73:24
74:11, 15  76:21, 23  77:3,
9, 18, 22  79:2  82:7  83:14
85:1, 8  88:13  94:3, 14
98:18  99:17  101:8
102:20  108:25  109:1
110:3, 4  116:2  123:10
128:14  129:4, 17, 22, 24
130:9  131:22  133:11
135:15  136:22, 24  140:6
141:23, 24
**thinking** 33:22
**third** 13:4  16:7  22:9
49:15  80:24  99:5
**Thomas** 2:8  4:1
**thought** 80:7  133:25
136:23
**thousand** 62:8
**threat** 108:14
**three** 12:2, 21, 22  23:1,
20  24:5  39:7  71:20
77:17, 20  78:12  79:11
81:7  89:18  92:11  98:6

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

104:*19, 23*  106:*5, 21, 23*
110:*20*  115:*4*  125:*16*
130:*9*
**three-quarters**  88:*15, 17*
**thumb**  49:*13*
**ties**  17:*4*
**tilt**  49:*8*  66:*4*
**tilted**  65:*25*
**time**  5:*25*  7:*5*  10:*11, 17*
11:*18*  12:*6*  13:*5*  15:*1*
19:*12*  38:*15, 21*  42:*9, 22*
47:*2*  50:*8, 11*  51:*9*  53:*21*
54:*4*  59:*10*  60:*2*  62:*5, 10*
71:*1, 20*  76:*7*  78:*3, 10, 25*
80:*23, 24*  82:*3, 19*  83:*16*
85:*15*  88:*18*  92:*1, 2*
100:*3, 11*  102:*18, 25*
104:*10, 22, 25*  106:*20*
110:*11, 14, 15, 19*  111:*9*
112:*5*  114:*2*  118:*4*
127:*24*  135:*19*  140:*19*
141:*22*  146:*13*
**times**  20:*12, 14*  42:*1*
68:*13*  143:*8*
**timing**  78:*20*  98:*1, 12*
126:*18*
**tiny**  51:*5*
**tissue**  57:*16*
**title**  7:*9*
**today**  7:*24*  11:*14*  116:*8*
**told**  30:*16*
**tools**  31:*18*  97:*4, 12, 15*
**top**  37:*11*  42:*21*  73:*19*
88:*11, 12, 13*  94:*13*  131:*9,
11, 13*
**topics**  22:*15*  24:*5*  116:*2*
**tops**  131:*16*
**totality**  58:*21*  71:*13*
80:*18*  105:*12*  107:*7*
117:*21*
**touched**  83:*25*
**touching**  48:*19*
**towed**  46:*1*
**trace**  25:*14*  50:*10*  55:*6*
59:*15*
**track**  8:*22*  10:*18*  19:*11,
23*  20:*21*  26:*12*  36:*10*
42:*8*  56:*21*  58:*1*  59:*10,
17*  64:*10, 16, 23*  74:*7*
84:*5*  85:*13*  86:*5*  87:*20*
92:*1, 17*
**tracking**  10:*20*  56:*20*
92:*1*  104:*15*
**tracks**  31:*1, 7*  37:*8*
59:*22*  60:*24*  69:*5*  94:*6*
**traditional**  8:*24*
**traffic**  37:*25*  39:*2, 4, 9*
**trail**  26:*13*
**trails**  26:*11*
**training**  12:*5*  17:*5*

**trajectories**  35:*7*  36:*23*
62:*15*  80:*15*  93:*10*
**trajectory**  62:*20*  73:*21,
23*  84:*4, 12*  85:*4, 14*
**transaction**  109:*23*
**transcribed**  144:*13*  146:*9*
**transcript**  144:*12*
**transcription**  146:*10*
**transfer**  54:*21*  75:*10*
**transferred**  54:*22*
**transfers**  55:*12*
**translated**  37:*6*
**trap**  42:*25*
**trapped**  73:*10*  91:*8*
**travel**  26:*12*  31:*3*  78:*9*
**traveled**  19:*22*  25:*22*
55:*6*
**traveling**  63:*22*  65:*15*
83:*17*
**triage**  25:*18*
**triages**  43:*11*
**trial**  144:*8*
**triangular**  57:*19*
**tricks**  100:*2*
**tricky**  85:*9*
**tried**  29:*17*
**tries**  45:*7*
**trigger**  19:*12, 14*  42:*9*
47:*13, 22*  48:*1, 2, 3, 4, 7,
11, 14, 15, 17, 18, 19, 20*
114:*17*  135:*14, 25*  136:*1,
2, 3, 5, 6, 7, 9, 10, 12, 14, 15,
17, 19, 22*  137:*4, 6, 7, 8, 12,
14, 22*  138:*1*  139:*5, 6*
140:*1, 2, 8, 11*
**troubleshoot**  32:*10*  40:*14*
**true**  36:*25*  73:*24*  77:*18*
82:*5, 7, 8*  99:*4*  111:*19*
115:*8*  118:*13*  120:*16*
125:*4*  134:*3, 20*  146:*10*
**trunk**  141:*16*
**truth**  146:*6, 7*
**truthfully**  5:*18*
**try**  17:*12*  19:*22*  24:*25*
27:*7, 13*  29:*17*  30:*18*
33:*17*  34:*10, 17*  40:*11*
42:*8*  61:*22*  77:*4*  81:*3*
90:*25*  92:*9*  96:*24*  97:*2*
98:*4*  100:*5*  105:*17, 18*
112:*21*  113:*23*  129:*9, 13*
132:*4*  133:*21*  136:*16*
142:*24*
**trying**  12:*4*  20:*20*  41:*13*
55:*17*  56:*20*  61:*10*  79:*5*
90:*16*  95:*15*  102:*22*
103:*20*  113:*21*  114:*18*
115:*3*  125:*8, 9*  132:*5*
136:*18*  137:*5, 12, 22*
138:*2, 4, 7*  141:*19*
**tucked**  123:*7*  128:*10*

**Tucker**  118:*24*  122:*4, 9*
141:*17*  143:*19*
**Tucker's**  142:*3*
**tumble**  57:*10*
**tumbling**  57:*12*  65:*4, 8*
83:*8, 18*
**turn**  64:*18*  65:*2*  84:*24*
87:*17*
**turned**  64:*24*  66:*11*
**turning**  37:*10*  76:*24*
**twist**  66:*4*
**twisted**  74:*20*  76:*9*
121:*14*
**two**  6:*6*  12:*2, 24, 25*  13:*3,
6*  16:*5*  22:*4, 8, 25*  27:*3,
11*  28:*20*  31:*3*  35:*3*  39:*7*
40:*15*  41:*6, 10, 24*  56:*4,
11, 19*  58:*17, 22*  59:*3, 13,
21*  60:*12*  61:*11*  71:*17, 19,
22, 24*  77:*1, 17, 19*  79:*11,
12*  81:*5*  84:*8*  88:*22, 24*
89:*5*  90:*5*  91:*24*  99:*3*
100:*9, 11*  103:*3, 4*  105:*4*
106:*17*  107:*11, 12, 13, 14,
25*  109:*13*  110:*11, 15*
116:*18, 24*  128:*10*  129:*11*
130:*7*  141:*4*  144:*2*
**two-and-a-half**  130:*8, 11*
**two-minute**  116:*6*
**type**  9:*16*  23:*7*  43:*10*
51:*2*  57:*21*  75:*9*  76:*2*
87:*19*  97:*19*  126:*7*
127:*14*  134:*4*  138:*22*
**types**  19:*8, 9*  75:*24*
**typical**  34:*3*
**typically**  8:*11*  10:*1, 14*
18:*23*  27:*21, 25*  29:*6*
49:*12*  61:*2, 5*  80:*8*
113:*11*

**< U >**
**Uh-huh**  111:*23*
**uh-oh**  92:*14*
**ultimate**  109:*12*  132:*20*
**ultimately**  18:*7*  25:*21*
35:*17*  42:*17*  46:*1*  62:*14*
73:*5*  78:*16*  81:*12*  91:*9*
94:*23*  128:*17*  129:*18, 24,
25*  134:*4*
**unable**  47:*15*
**unaware**  141:*18*
**unbulleted**  56:*13*
**unclear**  5:*14*
**uncomfortable**  61:*10*
**uncontested**  27:*8*
**underdeveloped**  24:*11*
**underlying**  124:*19*
**underneath**  34:*13*  77:*8*
**understand**  7:*10, 23*
30:*12*  132:*5*

**understanding**  25:*19*
30:*14*
**understood**  5:*11*  16:*2*
23:*6*  41:*17*  89:*11*  96:*3*
**underutilized**  24:*11, 12*
**undisputed**  27:*15, 17*
106:*25*
**uniform**  131:*21*
**UNITED**  1:*1*
**universe**  93:*5, 7*
**unknown**  111:*7*
**unstable**  57:*14*
**unwieldily**  6:*13*
**updated**  11:*14, 15, 18*
**updates**  12:*5*
**updating**  12:*7, 10*
**upper**  73:*13*  131:*11, 17*
**upward**  49:*13*
**upwards**  128:*16*
**use**  6:*2, 7*  8:*16*  20:*4*
25:*4*  27:*19*  32:*6, 13, 15*
36:*18*  40:*11, 12*  41:*20*
48:*10*  49:*13*  58:*2*  60:*17*
61:*22*  93:*13*  96:*5, 17*
97:*3, 21*  98:*2*  117:*6*
124:*1*  134:*6*  139:*16*
**useful**  17:*13*  29:*7*  36:*2*
60:*22*  95:*4*
**user**  135:*17*
**users**  139:*1*
**uses**  36:*19*
**Usually**  10:*15, 18*  78:*12*
**utter**  107:*15*
**utterance**  109:*4*  140:*18*
142:*11, 19*  143:*1, 3*
**utterances**  141:*19*
**uttered**  142:*12*
**uttering**  142:*14*

**< V >**
**valuable**  55:*3*
**value**  23:*5*  36:*15*  55:*7, 9,
10*  61:*12*  80:*2*  104:*18*
111:*25*
**values**  34:*21, 22*  60:*12*
61:*14*
**variable**  61:*20*  62:*1*  63:*7*
**variables**  61:*21*  65:*3*
66:*4, 12*  79:*4, 14*
**various**  8:*15*  17:*5, 7*
18:*3*  20:*4*  22:*14*  32:*10*
43:*1*  95:*23*
**vehicle**  9:*5*  29:*6, 8, 20, 23*
30:*5*  33:*11, 13, 19, 20, 21*
34:*1, 4, 6, 9, 11*  37:*5, 6*
40:*24*  41:*1, 17*  42:*5*  43:*6,
9, 12, 16, 17, 18, 19, 20*
44:*13, 16*  45:*1*  46:*4*
54:*24*  59:*18*  60:*2, 5*
61:*17*  63:*8*  68:*4*  70:*21*

Deposition of Matthew Noedel

Adam Fried, Administrator Estate of Desmond Franklin, vs. Jose Garcia,

*72*:6, *7*   81:8, *21*   87:*20*
101:*17*   102:*18*   103:*3*
107:*13*   110:*13*   122:*25*
133:*5*   136:*7*
**vehicles**   28:*20*, *22*   30:*8*,
*13*   31:*4*   32:*5*   35:*4*, *21*
36:*22*, *24*   43:*2*   95:*6*
103:*3*, *4*   107:*8*
**velocities**   79:*10*
**velocity**   78:*22*, *23*   79:*5*,
*14*   104:*3*   129:*19*
**venue**   8:*24*
**versa**   7:*9*
**versus**   14:*11*
**vertical**   35:*8*   60:*8*, *16*, *18*,
*20*   61:*12*, *19*
**vice**   7:*8*
**video**   46:*16*   52:*11*   58:*18*
68:*1*   82:*5*   93:*11*, *17*, *23*
94:*1*, *13*, *21*, *23*   95:*11*, *12*,
*14*, *17*, *18*, *19*, *22*, *24*   96:*1*,
*5*, *11*, *13*, *15*, *18*   97:*5*, *6*, *14*,
*17*, *18*, *22*, *23*, *25*   98:*1*, *2*,
*15*, *21*   99:*25*   101:*20*
102:*20*   105:*1*   107:*8*
123:*5*, *6*   144:*3*
**videos**   93:*11*   94:*8*, *9*
95:*7*, *8*   100:*2*, *19*, *24*
101:*9*
**view**   22:*19*   24:*10*   27:*16*
34:*14*   38:*18*   41:*11*   51:*22*
52:*7*   70:*7*   94:*24*   95:*9*, *20*
97:*17*   98:*8*   99:*14*   110:*16*
119:*13*
**viewed**   28:*19*   37:*11*
49:*21*   76:*7*   94:*20*   95:*7*
96:*11*   101:*21*
**viewer**   97:*4*, *21*   121:*16*
**viewing**   41:*18*   49:*25*
50:*12*   98:*15*, *21*
**views**   85:*11*   93:*19*
100:*25*
**virtually**   57:*3*
**visible**   49:*7*   121:*16*
**visited**   37:*23*
**visiting**   37:*16*
**visual**   35:*21*   49:*2*   78:*17*
84:*4*   121:*10*   139:*7*, *23*, *25*
140:*2*
**visualize**   36:*12*   38:*25*
**visually**   48:*21*, *23*   122:*18*
135:*19*   138:*13*, *17*, *21*
139:*1*, *11*, *12*, *13*, *17*, *23*
140:*7*, *10*
**visuals**   35:*6*
**Vitae**   3:*5*
**volume**   39:*13*
**vs**   1:*5*

**< W >**
**wait**   21:*5*
**walked**   38:*1*
**walking**   123:*23*
**want**   5:*2*   6:*2*, *7*   8:*1*
14:*5*, *18*, *20*, *24*, *25*   16:*16*
19:*7*   40:*13*   48:*5*   49:*20*
77:*6*   106:*18*   113:*20*
117:*17*   125:*1*   133:*23*
142:*24*   143:*18*   144:*9*, *12*
**wanted**   29:*17*   38:*8*
117:*1*   122:*17*   124:*11*
133:*16*   141:*20*
**wants**   141:*10*
**warm**   132:*8*
**watch**   100:*3*
**watching**   105:*1*
**way**   6:*14*   17:*2*   19:*16*
31:*25*   40:*8*   42:*9*, *22*   45:*3*,
*14*   47:*2*   53:*11*   60:*23*
62:*24*   69:*22*   70:*10*   73:*8*
79:*25*   82:*7*, *25*   85:*25*
87:*15*   88:*15*, *18*   92:*6*
96:*3*   104:*5*   107:*10*
108:*23*   114:*11*   118:*19*
130:*8*   134:*5*   136:*9*
137:*13*, *18*   138:*8*   142:*11*
**weak**   73:*7*
**weapon**   114:*6*
**wearing**   74:*22*   123:*18*
**weather-stripping**   73:*8*,
*10*, *12*, *14*, *16*
**wedge**   62:*13*   67:*6*, *8*
**weight**   130:*11*
**Well**   5:*24*   15:*19*   17:*6*
28:*6*   34:*14*   40:*9*, *21*
46:*15*   58:*19*   60:*19*   64:*2*
65:*12*   68:*15*   74:*25*   91:*6*
96:*25*   104:*17*   111:*1*, *21*
113:*13*   117:*16*   127:*10*
128:*5*   129:*14*   134:*20*
135:*4*, *5*   138:*3*   144:*3*
**went**   29:*23*   38:*11*, *15*
51:*1*   52:*8*   53:*2*   58:*8*
61:*16*   63:*1*   85:*12*   95:*5*
**we're**   5:*2*   25:*16*   39:*22*
41:*18*   91:*23*, *24*
**west**   60:*14*
**we've**   23:*6*, *9*   55:*19*
58:*12*   71:*20*   73:*18*   76:*20*,
*21*   90:*4*   93:*9*   101:*22*
107:*25*   116:*3*   118:*6*
**whatsoever**   134:*16*
**wheel**   33:*18*   34:*15*   63:*5*
68:*22*   85:*22*   119:*25*
**WHEREOF**   147:*1*
**wholly**   55:*25*   131:*4*
**width**   31   31:*22*   33:*8*   38:*24*
**willing**   93:*6*
**wind**   35:*17*

**window**   36:*8*   42:*22*   45:*3*,
*8*, *11*   51:*2*, *3*, *17*   58:*10*
61:*15*   62:*22*   63:*2*, *16*
64:*14*   67:*16*, *24*   69:*19*, *20*,
*23*, *24*   70:*11*   71:*8*, *11*
72:*2*, *3*, *12*, *13*, *15*, *16*, *19*,
*24*   73:*1*, *9*, *17*   74:*14*   75:*1*
78:*19*   85:*23*   86:*6*   87:*8*,
*12*, *22*, *24*   88:*1*, *2*, *6*, *9*, *10*,
*12*
**winds**   20:*23*
**windshield**   51:*21*, *23*   52:*2*
**wise**   88:*7*
**wishes**   135:*2*
**within-named**   146:*5*
**Witness**   4:*2*, *17*   12:*13*, *16*
18:*5*   20:*9*   76:*14*   101:*14*
116:*9*   143:*21*   144:*14*
146:*5*, *9*   147:*1*
**witnessed**   107:*14*
**wobbling**   57:*12*
**word**   40:*13*   100:*13*
**words**   11:*6*   96:*18*   97:*15*
102:*3*   121:*11*   122:*14*
127:*11*
**wore**   122:*24*   123:*12*
**work**   8:*12*   10:*17*   15:*4*
20:*14*, *15*, *23*   22:*21*   32:*9*,
*15*   35:*16*   81:*24*   92:*25*
93:*3*   136:*25*
**worked**   12:*23*   20:*25*
**working**   21:*12*   96:*16*
**worn**   60:*1*
**worth**   12:*7*
**wound**   10:*9*   26:*14*   43:*8*
56:*15*, *25*   57:*1*, *2*, *6*, *18*
58:*23*   65:*22*   74:*6*, *8*
132:*10*, *11*, *15*
**wounds**   26:*16*   127:*13*
**wreck**   125:*20*   128:*15*
141:*22*
**write**   19:*6*   125:*1*
**written**   8:*18*   35:*9*   121:*8*
**wrong**   113:*22*

**< X >**
**X330**   32:*20*

**< Y >**
**yeah**   11:*17*   13:*8*   14:*7*
15:*8*   21:*7*   32:*20*, *24*
35:*22*   42:*7*   47:*20*   53:*4*, *7*
54:*21*   62:*2*, *24*   66:*22*
70:*18*   76:*15*   77:*3*   80:*17*
81:*25*   83:*24*, *25*   87:*2*
93:*17*   94:*3*   105:*17*
123:*20*   142:*7*, *8*   144:*7*
**year**   19:*4*   20:*15*   22:*25*
28:*24*   29:*5*   32:*1*, *3*   33:*9*

**years**   4:*24*   20:*16*, *17*
36:*20*   120:*14*
**yellow**   79:*22*, *23*   84:*14*
85:*19*   87:*20*
**young**   13:*9*

**< Z >**
**zone**   104:*24*
**ZOOM**   1:*9*, *13*   4:*16*
6:*12*   50:*7*   96:*21*, *24*   97:*3*,
*12*