1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3                        - - -

4   Adam Fried, Administrator  )
    of the Estate of           )
5   Desmond Franklin,          )
                               )
6                Plaintiff,    )
                               )
7        vs.                   )  Case No: 1:22-CV-00061
                               )  Judge Dan A. Polster
8   Jose Garcia,               )
                               )
9                Defendant.    )

10                       - - -

11

12          Remote deposition of David Balash, a witness

13   herein, called by the defendant for

14   cross-examination pursuant to the Federal Rules of

15   Civil Procedure, taken before Constance Versagi,

16   Notary Public in and for the State of Ohio, taken

17   via Zoom, on Tuesday, November 14, 2023 commencing

18   at 9:00 a.m.

19                       - - -

20

21

22

23

24

25

```
 1   REMOTE APPEARANCES:

 2   On behalf of the Plaintiff:

 3           Elizabeth Bonham, Esq.
             Terry Gilbert, Esq.
 4           Sarah Gelsomino, Esq.
             Friedman, Gilbert & Gerhardstein
 5           50 Public Square, Suite 1900
             Cleveland, Ohio  44113
 6           216-241-1430
             Elizabeth@fggfirm.com

 7

 8   On behalf of the Defendant:

 9           J.R. Russell, Esq.
             Dylan Ford, Esq.
10           Affan Ali, Esq.
             City of Cleveland
11           Law Department
             601 Lakeside Ave
12           Room 106
             Cleveland, OH  44114
13           216-664-2767
             Jrussell2@clevelandohio.gov
14
                 and
15
             Thomas J. Cabral, Esq.
16           Gallagher, Sharp LLP
             1215 Superior Ave, 7th Floor
17           Cleveland, Ohio 44114
             216-552-1172
18           TCabral@gallaghersharp.com

19

20                       - - -

21

22

23

24

25
```

```
1                          INDEX
2    WITNESS:                           CROSS
3    David Balash
4        By Mr. Russell                   4
5                         - - -
6
7                     E X H I B I T S
8    Exhibit:                          Referenced
9        A                                5
10       B                                14
11       C                                16
12       D                                17
13       E                                21
14                        - - -
15
16
17
18
19
20
21
22
23
24
25
```

1              DAVID BALASH

2   of lawful age, being first duly sworn, as

3   hereinafter certified, was examined and testified

4   as follows:

5              CROSS-EXAMINATION

6   BY MR. RUSSELL:

7   Q      Good morning Mr. Balash, correct?

8   A      Good morning, yes, good.

9   Q      My name is JR Russell.  I'm one of the

10         attorneys representing Jose Garcia in this

11         litigation filed by the Estate of Desmond

12         Franklin.  We're going to discuss your report

13         today and some of the analyses that you did

14         for this case this morning.

15              My understanding is that you've

16         testified in upwards of 88 depositions,

17         correct, sir?

18  A      Yes.

19  Q      So you know generally how this goes.  I'm

20         going to ask you a series of questions.

21         Because the court reporter is taking down

22         everything you say, I ask that you give an

23         audible response, fair enough?

24  A      Yes.

25  Q      Also at any time if you need me to repeat a

```
1          question, or you need some clarification,
2          please ask me to do so; do understand that,
3          sir?
4    A     Yes.
5    Q     If you respond to a question, I'm going to
6          assume you understood the question and
7          answered accordingly.  If you need to take a
8          break, let us know, we can take a break.  I
9          just ask that you answer the question that's
10         pending before you; does that make sense, sir?
11   A     Yes, it does.
12   Q     Sir, can we start out by having you state your
13         full name for the record?
14   A     David E. Balash, B-A-L-A-S-H.
15   Q     Mr. Balash, you're self-employed; is that
16         correct?
17   A     Correct.
18   Q     You're doing business as David E. Balash,
19         under a limited liability company?
20   A     Just under my name.  Not a limited liability
21         company.
22   Q     We're here for a deposition that was noticed.
23         Sir, I'm pulling up what has been marked as
24         Exhibit A for identification purposes.  Can
25         you see this document on the screen, sir?
```

1  A      Yes, I can.  There is something in the middle

2          of it.  I can't read the bottom part.  There

3          is some sort of a blockage of black material,

4          a sign, so I'm not sure what it is.  One place

5          for your meetings, I don't know if I can get

6          rid of that or -- but I have it on my side

7          computer here as well so that's -- I can read

8          it.

9  Q      You have Exhibit A pulled up, sir?

10 A      I do.

11 Q      Also with the notice there was a series of

12         requests for documents to be produced.  The

13         first one is that we had requested a copy of

14         your current curriculum vitae.  There was a

15         curriculum vitae that was produced earlier to

16         us.  Is that a current CV that you have, sir?

17 A      Yes.

18         MS. BONHAM:      Sorry, Mr. Balash.

19         Before we proceed, if you are going to discuss

20         the document request appended to the notice,

21         I'll just place an objection for the record.

22         I had sent this objection by email to all

23         defense counsel last night.

24         We object to the document request

25         appended to the notice based on timeliness as

```
 1          it was only served a couple of business days
 2          before the depo, undue burden, scope,
 3          privilege, work product, relevance and
 4          proportionality.
 5               But to the extent there are responsive
 6          and not objectionable documents, we will work
 7          to get those produced to the request.  So you
 8          can go ahead and ask him about it.  I'll put
 9          that objection for the record.  Thank you.
10   Q     So pursuant to the objection, just to confirm
11          for the record, Mr. Balash, that you did not
12          submit these documents requested to us by
13          today; is that correct, sir?
14   A     I received this yesterday.
15   Q     Miss Bonham sent this request to you
16          yesterday, correct?
17   A     Correct.
18   Q     Let's talk a little bit and as we move into
19          this, when you were retained for this matter,
20          did you open up a file for this case?
21   A     I did.
22   Q     How was that file set up, sir?
23   A     It's listed as 1046-23.
24   Q     Generally can you describe for us generally an
25          overview of what are the contents of this
```

1    file?

2  A    The contents mainly consist of emails.

3       Obviously there are documents connected with

4       the emails.  There was a flash drive that was

5       sent to me, and then I have notes, and then I

6       have printed photographs and reports from the

7       email documents and/or the flash drive that I

8       kept.  My entire file is probably no more than

9       30 pages, but that certainly would not include

10      the emails for the flash drive material.

11 Q    The flash drive materials, were those the

12      materials that you reviewed as part of your

13      preparation for a report in this matter?

14 A    Yes.

15 Q    So, in your file we talked about materials

16      that are in that.  We've also discussed item

17      1, a current curriculum vitae.  You've

18      indicated that you've supplied that to us?

19 A    I supplied it to Ms. Bonham.  Whether they

20      gave it to you, I would assume they did but I

21      don't know that.  I did not submit one to you.

22          MS. BONHAM:      I can represent for

23      the record that the materials disclosed with

24      the report are up to date.

25 Q    In your file do you have copies of any

```
 1            publications that you've authored relating to
 2            the issues in this case?
 3    A       No, I have none.
 4    Q       In the file are there copies of literature,
 5            publication studies, or authorities that you
 6            are relying on for the basis of your opinion?
 7    A       No.
 8    Q       Is there data used to form the basis of your
 9            opinion in this case contained in your file?
10    A       I'm sorry, would you explain what you are
11            asking for?
12    Q       So we will get into the basis of your opinion
13            later.  But, did you rely on data, subsets of
14            data to form your opinion?
15    A       I didn't refer to any outside data if that's
16            what you're referring to.
17    Q       Just what's contained in the report, that's
18            the data that you relied upon to form the
19            basis of your opinion?
20            MS. BONHAM:       Objection, misstates,
21            form.
22    A       What I relied on for my opinion was my
23            experience and expertise in the area, and
24            training to do these type of examinations.
25    Q       Are there any summaries that you received from
```

```
 1          any person regarding any records, deposition
 2          or other materials other than what is
 3          contained in your file that you relied on in
 4          this matter?
 5   A      No.
 6   Q      Did your file include billing statements that
 7          you submitted to Ms. Bonham and Mr. Gilbert's
 8          firm?
 9   A      I'm sorry, I did not understand your question.
10   Q      In your file that you maintain, does it
11          contain copies of billing statements, or time
12          logs that you made regarding this case that
13          you have submitted to Ms. Bonham or
14          Mr. Gilbert's firm?
15   A      I've not submitted any billing to the firm.
16   Q      Does your file contain correspondence to
17          counsel in this case as to the extent that the
18          correspondence relates to compensation that
19          you received in this matter?
20               MS. BONHAM:      Objection as to any
21          privileged portion of the response or
22          correspondence.  Go ahead.
23   A      There is no correspondence regarding
24          compensation.  To clarify for you, I have not
25          received a retainer, nor been paid anything on
```

```
 1           this particular case to this point in time.
 2   Q     Okay.  Have you received yet a check from us
 3         first off, just so I know, for your
 4         appearance?
 5   A     I was told there was going to be one, but
 6         Canton occasionally has difficulty.  For some
 7         particular reason I did not receive mail
 8         yesterday.  So it may or may not have been
 9         there.  That's the government for you.  I know
10         you work for one.  I also worked for one for a
11         period of time.  So, I suspect if you mailed
12         it, eventually it will get here.
13   Q     I appreciate you appearing today, Mr. Balash.
14         I can assure you one certainly was sent to
15         you.  Contained in your file --
16               MR. CABRAL:     JR, can I interrupt for
17         a second.  This is Tom Cabral.  I have assumed
18         responsibility for getting Mr. Balash paid.
19         The check was sent to me more than a week ago.
20         Again, our illustrious Post Office, it has not
21         yet arrived.  However, once it is in my hands,
22         I'll see that it's overnighted to Mr. Balash.
23               THE WITNESS:     It doesn't need to be
24         overnighted.  The fact that you're going to
25         mail it, feel comfortable simply to mail it
```

1    regular mail.

2              MR. CABRAL:      I'm grateful for your

3         faith in the postal system.  We will go ahead

4         and do that.

5              THE WITNESS:      It has nothing to do

6         with faith in the postal system.  There is no

7         need to spend an additional $15 to mail

8         something.

9              MR. CABRAL:      Appreciate it.

10        Thank you.

11             MR. RUSSELL:      Again, we appreciate

12        that, Mr. Balash.

13   Q    Contained in your file do you have facts or

14        data that plaintiff's counsel provided to you

15        and that you may have considered in forming

16        the basis of your opinion?

17   A    Could you state that again, please?

18   Q    Certainly.  On number item 8 that we have

19        listed in Exhibit A, my question to you is,

20        does your file contain correspondence or other

21        communications that identify facts or data

22        that plaintiff's counsel provided to you that

23        you may have considered in forming the

24        opinions expressed?

25   A    All my opinions were formulated on what I

```
 1            observed and what I read, not what counsel
 2            told me.
 3    Q       Would those be contained in your file is my
 4            question?
 5    A       They would be, yes, if there is anything in
 6            there, a letter from counsel, it would be in
 7            my file.
 8    Q       You've also, I believe, provided to us a list
 9            of cases that you've been retained as an
10            expert and those are something you provided to
11            plaintiff's counsel; is that correct?
12    A       That's not correct.
13    Q       What would be a correct statement, sir?
14    A       Correct statement is I provided them with a
15            copy of court testimony on my last period of
16            time, not on cases that I've worked on.
17    Q       Sir, did you prepare, maybe contained in your
18            file, any diagrams or charts?
19    A       No, I did not.
20    Q       Does the file contain the item number 11;
21            documents, photographs, notes, statements,
22            exhibits, inspection notes, reports, diagrams,
23            et cetera that you prepared or reviewed in
24            coming up with the basis of your opinion?
25    A       Yes.
```

```
 1                    (Coughing)  I apologize.  That may
 2           happen more often.  It's a byproduct of my
 3           surgery and I apologize for that.
 4    Q      No need to apologize.
 5                    Sir, I am pulling up now what has been
 6           previously marked as Exhibit B for
 7           identification purposes.  Sir, can you tell us
 8           what this document is?
 9    A      It's a curriculum vitae.  It's my current
10           version.
11    Q      That was provided to us that we sent to you in
12           advance, this is the current version of your
13           CV, sir?
14    A      If you go to the back page there will be a
15           date on there.  I suspect that's the last one,
16           yes.
17    Q      Dated February 16, 2023, so that's your
18           current CV?
19    A      Correct.
20    Q      Sir, you made a passing reference to this but
21           just to clarify for the record, we asked about
22           publications that you've authored relating to
23           the issues in this case.  I believe I thought
24           I heard you say that you had not published any
25           articles in the last 10 years?
```

| | | |
|---|---|---|
| 1 | A | That is correct. |
| 2 | Q | So, would you say that -- have you published |
| 3 | | any articles? |
| 4 | A | I published two or three little articles many |
| 5 | | years ago.  The last one was on frangible |
| 6 | | bullets. |
| 7 | Q | When was that, sir? |
| 8 | A | I think it's probably 15 years ago, give or |
| 9 | | take. |
| 10 | Q | Would that be the 1998 publication listed in |
| 11 | | your CV? |
| 12 | A | I guess it would be the longest, 15, yes, |
| 13 | | that's the one. |
| 14 | Q | You have AFTE, is that Association of Firearm |
| 15 | | Examiner and Tool Mark Examiners? |
| 16 | A | Correct. |
| 17 | Q | Then you also have publication in 1973, ATFE. |
| 18 | | That's also Association of Firearm Examiners |
| 19 | | and Tool Mark Examiners? |
| 20 | A | Yes. |
| 21 | Q | What was the nature of that publication in |
| 22 | | 1973? |
| 23 | A | I had come across cartridges at the state |
| 24 | | police laboratory on a case that were .25 auto |
| 25 | | caliber, and they were hollow points.  They |

```
 1        had been drilled out and made into hollow
 2        points.  At that time .25 autos did not have
 3        hollow points.  So a company called JJ Jovino
 4        as I recall were purchasing .25 auto
 5        cartridges and simply drilling a hole in the
 6        nose of the bullet and reselling those as
 7        hollow point ammunition in that particular
 8        caliber.  Seeing as how now one else had
 9        really seen that, I decided to notify fellow
10        examiners as to where they came from, if they
11        ran into them.
12    Q   So, that was the nature of what you wrote
13        about; is that correct, sir?
14    A   Correct.
15    Q   I'm also pulling up what's been previously
16        marked as Balash Exhibit C.  Can you tell us
17        what this document is, sir?
18    A   It's a testimonies document covering I believe
19        four years.
20    Q   So it's a little further back than four years.
21        Was it your intention to limit this list to
22        four years?
23    A   Yes, it was.  Intentional and for the reason
24        was when I would submit a full one, at one
25        point in time somebody decided to go back to
```

1       1994 and begin to ask me question about every

2       case I ever testified on.  Seeing as I'm

3       apparently only required to do two or three

4       years, I chose to put down about four years

5       worth, give or take.  Now this one obviously

6       has six years on it.

7  Q    So, my understanding is this right here was a

8       listing of cases in which you testified or

9       gave a deposition, correct, sir?  Not every

10      case you've worked on?

11  A    Correct.  Only testimonies in court or

12      deposition.

13  Q    Then here at the bottom you've indicated that

14      you've given approximately 88 depositions to

15      date; is that correct, sir?

16  A    Correct.

17  Q    Then what is -- you have 133 testimonies to

18      date.  Is this testimony that you gave in

19      court, or does this include affidavit

20      testimony?

21  A    No, that's court testimony.  The depositions

22      are separate, so you would add the two

23      together if you want a total.

24  Q    Now pulling up what's been previously marked

25      as Exhibit D for identification purposes.  I

```
 1          will represent to you I did a redaction at the
 2          bottom because I wasn't sure if that was your
 3          Social Security number or not.
 4    A     It is my Social Security number.
 5    Q     I redacted that from this copy here.  Can you
 6          tell us what this document is?
 7    A     It's a current fee schedule.
 8    Q     Is this the fee schedule that will apply to
 9          this case?
10    A     Correct.
11    Q     Sir, when were you retained in this matter?
12    A     I believe it was in somewhere around January
13          of this year.
14    Q     Who retained you, sir?
15    A     Ms. Bonham and I got my first communication
16          from Mr. Gilbert.
17    Q     Did counsel provide you with any facts that
18          you were to assume as true, or you had to
19          accept as true in giving this opinion?
20              MS. BONHAM:        Objection to form.
21          Go ahead.
22    A     No.
23    Q     In this case, did anyone provide you with any
24          assumptions that you had to accept as true?
25    A     No.
```

```
 1   Q      Have you been retained by Mr. Gilbert's firm
 2          in other cases?
 3   A      Yes.
 4   Q      How many times have you been retained by
 5          Mr. Gilbert's firm?
 6   A      Over the years I would say possibly three or
 7          four.  I don't really recall.  It's going back
 8          20 some years.  I think including a long drive
 9          to West Virginia once.
10   Q      In this Exhibit C, are any of these
11          testimonies and depositions you have listed
12          cases in which you were retained by
13          Mr. Gilbert's firm?
14   A      I don't believe so, no.
15   Q      So none of the prior cases in which you were
16          retained by Mr. Gilbert's firm appear on this
17          list?
18   A      Again, I didn't go through it for that
19          particular reason.  I don't recall being
20          retained by Mr. Gilbert's firm recently.
21          Again, I didn't look for it.  I don't know.  I
22          would have to go through it individually to
23          see.
24   Q      It's two pages, if you want to take a look at
25          it.
```

| | | |
|---|---|---|
| 1 | A | I'm going to do it right now. There are none |
| 2 | | that appear to be from that law firm. |
| 3 | Q | It appears most of the cases on this list are |
| 4 | | civil cases, would that be fair to say, sir? |
| 5 | A | Yes. |
| 6 | Q | So you have been retained to do work on cases |
| 7 | | and give testimony in cases that are both |
| 8 | | civil and criminal cases; is that correct? |
| 9 | A | Correct. |
| 10 | Q | But most of the cases on this list are civil? |
| 11 | A | I would agree. |
| 12 | Q | Would it be fair to say that on about a 6 to 1 |
| 13 | | ratio the cases are civil as compared to |
| 14 | | criminal? |
| 15 | A | I know I looked at it about 80 percent. |
| 16 | | Again, you are only basing that on what the |
| 17 | | testimony is. It's not on all the cases I |
| 18 | | received. So therefore I always figured it |
| 19 | | was about 80 percent. That was just an |
| 20 | | estimate. |
| 21 | Q | Are there any cases on this list right here, |
| 22 | | civil cases where you were retained by the |
| 23 | | defense? |
| 24 | A | There are some criminal cases I'm sure that |
| 25 | | would have been on the defense side. One or |

```
 1              two of them there.  I don't really recall
 2              anymore.
 3    Q         The question was as to civil, so as far as
 4              this list, you cannot identify any civil cases
 5              in which you were retained by the defense?
 6    A         No, I cannot.
 7    Q         I'm now pulling up what's been previously
 8              marked as Balash Exhibit E for identification
 9              purposes.  Sir, can you tell us what this
10              document is?
11    A         It appears to be my report.
12    Q         There on page 2 in that you indicate, one and
13              two you indicate the items that you reviewed
14              in reaching conclusions in this matter; is
15              that correct?
16    A         Correct.
17    Q         Is this a comprehensive list of everything you
18              reviewed in reaching an opinion in this
19              matter?
20    A         In reaching an opinion, yes.
21    Q         Are there any other materials that you
22              reviewed that are not included on this list?
23    A         Yes.
24    Q         What were those materials?
25    A         I believe there are defense expert reports.
```

| | | |
|---|---|---|
| 1 | Q | Did you review -- you've reviewed both of -- |
| 2 | | you reviewed two of the defendant's expert |
| 3 | | reports; is that correct, sir? |
| 4 | A | Yes. |
| 5 | Q | Did you also review the rebuttal reports? |
| 6 | A | Yes. |
| 7 | Q | Here on page 2, just for clarification, so I |
| 8 | | know you referenced the interview of Garcia. |
| 9 | | I have it pulled up at the top of the page |
| 10 | | now, it says IA interview of Garcia.  Does |
| 11 | | that mean the Internal Affairs interview of |
| 12 | | Officer Garcia? |
| 13 | A | Yes. |
| 14 | Q | So you also reviewed several different |
| 15 | | interviews of Officer Garcia; is that correct? |
| 16 | A | Yes. |
| 17 | Q | You reviewed Officer Garcia's deposition |
| 18 | | transcript? |
| 19 | A | Correct. |
| 20 | Q | You also reviewed two interviews of Devin |
| 21 | | Badley; is that correct? |
| 22 | A | Correct. |
| 23 | Q | Did you review the deposition transcript of |
| 24 | | Devin Badley? |
| 25 | A | I believe I did, yes. |

| | | |
|---|---|---|
| 1 | Q | Did you review the written statements made by |
| 2 | | Devin Badley in 2020? |
| 3 | A | Probably, yes. |
| 4 | Q | As we sit here today you can't say |
| 5 | | definitively whether you reviewed that or not? |
| 6 | A | Correct. |
| 7 | | MS. BONHAM: Objection to the |
| 8 | | extent that he already testified about the |
| 9 | | list of documents and materials reviewed. |
| 10 | Q | So if it's not listed specifically on this |
| 11 | | list, you can't say definitively whether you |
| 12 | | reviewed it, Mr. Balash? |
| 13 | A | Correct. |
| 14 | Q | Sir, did you visit the scene or do a site |
| 15 | | visit? |
| 16 | A | No. |
| 17 | Q | Would you say it's absolutely always |
| 18 | | preferable to go to the scene to get an idea |
| 19 | | of what it is? |
| 20 | | MS. BONHAM: Objection. |
| 21 | A | Absolutely, I always wish to go to a scene, if |
| 22 | | practical. |
| 23 | Q | Did you review any physical evidence in this |
| 24 | | case yourself? |
| 25 | A | I did not. I might add to that I requested it |

| 1 | | but became aware that a great amount of the |
|---|---|---|
| 2 | | physical evidence was missing. |
| 3 | Q | Did you review -- did you request or did you |
| 4 | | review any of the bullets involved at the |
| 5 | | shooting? |
| 6 | A | I've not examined any physical evidence on |
| 7 | | this case. |
| 8 | Q | Is that -- are those some of the items that |
| 9 | | you believe were missing? |
| 10 | A | I was speaking specifically missing parts |
| 11 | | being both vehicles. |
| 12 | Q | So when you say items being missing, that's |
| 13 | | what you're referring to, both vehicles? |
| 14 | A | Please repeat that, I didn't hear you. |
| 15 | Q | When you refer to items being missing that you |
| 16 | | weren't able to physically examine, you are |
| 17 | | referring to both vehicles? |
| 18 | A | Correct. |
| 19 | Q | Are there any other items that you indicated |
| 20 | | that it would be useful for you to physically |
| 21 | | view but were missing, other than those two |
| 22 | | vehicles? |
| 23 | A | Well certainly I would have liked to have |
| 24 | | examined both of the weapons, the officer's |
| 25 | | holster, all of the fired bullets and |

1     cartridge cases that were recovered, those

2     would always be something I would want to

3     examine.

4  Q    Is it your belief that those items were

5     missing?

6  A    No, I believe the firearms, at least the

7     victim of the shooting, that firearm that was

8     recovered, the .45 would be still be available

9     as well as the fired cartridge cases, and I

10    suspect the fired bullets that were recovered

11    as well.

12  Q   Sir, I'm now referring, I pulled up Balash

13    Exhibit B, your curriculum vitae.  Beginning

14    on page 3 it talks about your professional

15    training and experience.  What professional

16    training and experience do you believe helped

17    you prepare your report and reach the opinions

18    in this case?

19  A   The fact that I'm a firearms examiner, worked

20    on hundreds if not thousands of crime scenes,

21    mostly involving shootings, bombs and

22    explosives, et cetera throughout a 25-year

23    career with the Michigan State Police, and

24    have done hundreds of examinations since I

25    retired from that department along those

|   |   |
|---|---|
| 1 | lines.  I have a great deal of experience on |
| 2 | firearms trajectory analysis, blood splatter |
| 3 | analysis, and examining evidence in that |
| 4 | regard.  That would be the training that |
| 5 | involved, and it's been 50 years of |
| 6 | experience. |
| 7 | Q    Is there anything in particular that you have |
| 8 | listed in this, in your CV, that jumps out at |
| 9 | you as providing some of the training that was |
| 10 | essential in preparing your report and |
| 11 | reaching the conclusion that you reached in |
| 12 | the opinion? |
| 13 | MS. BONHAM:      Objection to form. |
| 14 | Q    I think the majority would be the experience |
| 15 | gained on examining evidence on a daily basis |
| 16 | with the Michigan State Police for a 20-plus |
| 17 | year period in the laboratory system. |
| 18 | Obviously training in examining |
| 19 | firearms  at various companies.  Attending |
| 20 | meetings and seminars, interdepartmental work |
| 21 | groups discussing various aspects of crime |
| 22 | scene investigation and firearms examination. |
| 23 | All these items and essentially the |
| 24 | cases that you are working on.  They all are |
| 25 | significant in formulating the experience that |

```
 1            I have and who I am today.
 2   Q       You've also listed in your CV teaching
 3            experience.  Does this list contain
 4            experiences and seminars and other
 5            opportunities where you were an instructor
 6            too?
 7   A       No.
 8   Q       These are just things you attended?
 9   A       No, these were, the teaching portion were the
10            ones that I would be asked to teach various
11            classes to different people.  The first one
12            under teaching I had Schoolcraft was a
13            two-week evidence technician school for the
14            collection, preservation of evidence at crime
15            scenes and the submission to laboratories.
16            That was only given to active police
17            personnel.  That was not a -- civilians were
18            not in the room.  This was only to active
19            police personnel where these classes were
20            taught.
21                 The Detroit Nuclear Edison, seven
22            classes to them on firearms, bombs and
23            explosives.
24                 Many classes with the state police and
25            local police departments.
```

```
 1                Then a guest lecturer at several

 2         universities to talk about firearms, crime

 3         scenes, bombs and explosives, et cetera.

 4    Q    It appears all of these on this page, on page

 5         7, occurred before 2002; is that fair to say?

 6    A    Yes.

 7    Q    Then as we move to page 8, you have listed

 8         Michigan Defense Attorneys Association

 9         seminar.  Is this a presentation that you made

10         in 1998, 1999?

11    A    Correct.

12    Q    Then you have listed in 2011, 2017 and 2017,

13         were these presentations that you made?

14    A    Yes.

15    Q    So you have 2011 presentation to the 36

16         district court judges.  Was that a

17         presentation that you made?

18    A    Correct.

19    Q    In 2017 you indicate I believe that is

20         International Association of Bomb Techs and

21         Investigators; is that correct?

22    A    Yes.

23    Q    Was that a presentation that you made?

24    A    No, that was a training session.  I was

25         involved in the training session.  I wasn't
```

| | | |
|---|---|---|
| 1 | | lecturing at that point. |
| 2 | Q | You attended that? |
| 3 | A | That's correct. |
| 4 | Q | What about 2017, old case review with I assume |
| 5 | | that's Michigan State Police -- |
| 6 | A | Correct. |
| 7 | Q | -- Explosive Unit? |
| 8 | A | Yes. |
| 9 | Q | Did you give that presentation? |
| 10 | A | I did.  It was to several personnel regarding |
| 11 | | cases to what happened well before their time |
| 12 | | in the department.  Showed them photographs of |
| 13 | | bombing scenes where there were two deaths |
| 14 | | involved in two separate ones.  Gave them the |
| 15 | | material.  I happened to have that material, |
| 16 | | so I gave that to them, so that they would |
| 17 | | continue to maintain it within their unit. |
| 18 | Q | So that was primarily related to IEDs, bombs, |
| 19 | | x-ray techniques of bombs, correct? |
| 20 | A | Correct. |
| 21 | Q | Sir, I'm going to stop sharing for a moment. |
| 22 | | I'm going to be referring to your report |
| 23 | | that's marked as Balash Exhibit E.  Does this |
| 24 | | report represent all the opinions that you |
| 25 | | arrived at in this case? |

| | | |
|---|---|---|
| 1 | A | I suspect if asked different questions, I may |
| 2 | | have opinions to be offered.  This right now |
| 3 | | is the summary of my opinion on this case, |
| 4 | | yes. |
| 5 | Q | Have you done all of the work that you were |
| 6 | | asked to do when you were retained? |
| 7 | A | Yes, as far as all -- this is all the work |
| 8 | | that I've done on all the information that I |
| 9 | | have.  If there were other items such as the |
| 10 | | examination of evidence that I mentioned to |
| 11 | | you, I certainly would like to be able to do |
| 12 | | that, if available.  Right now, that's all |
| 13 | | that's been done. |
| 14 | Q | So if I'm clear, is there anything that you |
| 15 | | were asked to do when you were retained that |
| 16 | | you have not done yet? |
| 17 | A | I don't think you understand what -- maybe I'm |
| 18 | | misunderstanding when you say asked.  When I'm |
| 19 | | retained, regardless of whatever case it is, |
| 20 | | people ask me if I'm willing to look at the |
| 21 | | case.  My response normally is I'll look at |
| 22 | | the case, I'll offer you opinions as to what I |
| 23 | | see.  But my opinions are my opinions.  They |
| 24 | | don't ask me to go to a specific item.  I |
| 25 | | simply look at the case, give them what I see, |

1      period.

2   Q  So, just so I'm clear then, so there's -- if

3      there are any outstanding items, or anything

4      else that you are going to do in this case,

5      will you wait for prompting before do you

6      anything else in this case?

7   A  Yes, somebody would have to ask me to do it.

8      I don't demand to do anything.

9           MS. BONHAM:        For the record,

10     Mr. Balash obviously might testify at the

11     trial of this matter.

12  Q  Do you have plans, right now, as we sit here

13     today, to do any further investigation or look

14     at additional items?

15  A  Not at this time that I'm aware of.

16  Q  My understanding is that your main business

17     address is the Echo Forest Court in Canton,

18     Michigan; is that correct?

19  A  That's correct.

20  Q  What's the scope of work that you currently

21     perform doing business as David E. Balash?

22  A  Anything that I'm qualified to look at.  In

23     other words, firearms, crime scene

24     reconstruction, bombs and explosives, tool

25     marks, blood splatter analysis.  If people ask

| | | |
|---|---|---|
| 1 | | me to look at a case that I'm qualified to |
| 2 | | look at, I accept the case.  I don't turn down |
| 3 | | any case; therefore, I don't have -- I don't |
| 4 | | accept some, turn some down.  If I'm able to |
| 5 | | do the case, I'll simply accept it, then they |
| 6 | | accept my results. |
| 7 | Q | Are your areas predominantly firearm |
| 8 | | identification and explosives? |
| 9 | A | I think it's predominantly crime scene |
| 10 | | reconstruction and firearms.  There is not a |
| 11 | | great number of explosive cases in the |
| 12 | | civilian field.  There are occasionally, but |
| 13 | | not too many of them.  Thankfully I might add. |
| 14 | Q | My understanding is that you attended Bay City |
| 15 | | St. James High School; is that correct? |
| 16 | A | Correct. |
| 17 | Q | You received your diploma, correct? |
| 18 | A | Yes. |
| 19 | Q | Then you attended Delta College for two years? |
| 20 | A | Correct. |
| 21 | Q | Then you went to Michigan State for a year; is |
| 22 | | that correct? |
| 23 | A | Yes. |
| 24 | Q | Then you weren't sure exactly what you wanted |
| 25 | | to do so you applied to the Michigan State |

```
 1        Police?
 2   A    Well, I don't think that's quite the way it
 3        went.  Yeah, I didn't go to school.  You have
 4        to notice the years.  That was, '65, '66.  I
 5        was unsure, and I did apply to the state
 6        police and was accepted.
 7   Q    Where did you start then with the -- after you
 8        were accepted with the Michigan State Police?
 9   A    Well everybody goes through recruit school.
10        My recruit school was the first of the longer
11        ones.  It was 13 weeks.  I graduated I believe
12        December 2, 1966.  Was assigned to the Niles
13        post, which is six miles north of South Bend,
14        Indiana.
15   Q    What were your duties when you were first
16        accepted to that post?
17   A    Road trooper.  Beginning as a probationary
18        road trooper.  Then once you're off probation,
19        you're a trooper.  Probation lasts essentially
20        a year from when you join the department, so
21        my probation would have been at Niles from
22        December 2nd through September 19th.
23   Q    Then what did you do after that?
24   A    Well in the state police at that time it was
25        mandatory that you were transferred at your
```

```
 1              first post.  So I knew, everyone knew that
 2              after two, two and a half years, three years,
 3              whenever your school graduated, my school
 4              graduated in December so therefore I knew that
 5              in 1969 in the Spring I would be transferred.
 6              So therefore you can put in a request for
 7              transfer.  I put in a request to go to either
 8              Bay City, Flint or Bridgeport.  They sent me
 9              to Sandusky.  P.S., Sandusy, Michigan by the
10              way, not Ohio.
11    Q    Just to bring that up, you've never served as
12         a law enforcement officer in the State of
13         Ohio; is that correct?
14    A    That is correct.
15    Q    Sir, was that at Sandusky when you started
16         with the forensic unit?
17    A    I'm sorry, could you repeat that question,
18         please?
19    Q    At Sandusky, is that when you started with the
20         forensic unit?
21    A    No.  I will give you a little background.
22              Sandusky is in the middle of the thumb
23         of the State of Michigan.  I'm 24, 25 years
24         old.  It's in farm country.  After nine
25         o'clock nobody moves.  It's an exceptionally
```

```
1        boring area.  I despised would be a good word
2        being at that post.  There was nothing to do
3        there.  You could go hours without seeing
4        traffic move.  I put in a request multiple
5        times to go to different posts.
6             Finally there was a homicide in
7        Marlette and we had a crime lab.  At that time
8        I didn't even know we had a crime lab.  So I
9        put in a request to go to the crime lab and
10       the fact that I had three years of college,
11       they were trying upgrade their crime lab
12       personnel to have college degrees, so when I
13       interviewed they said if we take you into the
14       crime lab, will you finish your degree.  I
15       said absolutely.  They said what unit do you
16       want to go into.  I said I don't care, put me
17       in anything but latent prints.  That's how I
18       came into the state police crime lab.
19       Essentially was to get out of Sandusky.
20  Q    So, you were encouraged to complete your
21       degree, correct?
22  A    Well, I guess encouraged would be a way to say
23       it.  It became part of the agreement between
24       myself and the department that if they took me
25       to the crime lab, I would finish my degree.
```

1     That's what I agreed to do and that's what I
2     did.
3  Q  So that's when you graduated from Madonna
4     College?
5  A  Correct, in Livonia.
6  Q  You received a BA in social science?
7  A  Correct.  Minor in criminal justice.
8  Q  You did that because it was the easiest,
9     quickest route to get a degree; is that
10    correct?
11           MS. BONHAM:        Objection.  Go ahead.
12 A  I agree.  It was -- I had the opportunity to
13    stay an extra semester and get a criminal
14    justice degree and I declined.  Simply I got a
15    degree, and that was enough.
16 Q  You didn't have a degree in anatomy or
17    physiology; is that correct?
18 A  Correct.
19 Q  There is no degree in forensic pathology?
20 A  No degree in it.  I've been to hundreds of
21    autopsies and actually participated in if not
22    hundreds at least many dozens of autopsies.
23    By participation I mean right there and
24    working with the individual at the time the
25    autopsy is being completed.

| | | |
|---|---|---|
| 1 | Q | So the answer is no, no degree in forensic |
| 2 | | pathology? |
| 3 | A | That's correct, I have no degree in forensic |
| 4 | | pathology. |
| 5 | Q | You have no formal medical training; is that |
| 6 | | correct? |
| 7 | A | Correct. |
| 8 | Q | You indicated that you were a road trooper for |
| 9 | | a time.  Ever have to discharge your weapon |
| 10 | | while you were a police officer? |
| 11 | A | Yes. |
| 12 | Q | When did that happen? |
| 13 | A | The first time I think I discharged my firearm |
| 14 | | would have been in the city of Detroit during |
| 15 | | the Detroit riots in 1967.  Mainly -- I'm sure |
| 16 | | the Statute of Limitations has gone out so |
| 17 | | Detroit Edison won't -- it was not unusual to |
| 18 | | go to a disturbance and shoot out the street |
| 19 | | lights so you weren't a target at that |
| 20 | | particular 1967 riot in Detroit. |
| 21 | | I also, I'm sure I've discharged my |
| 22 | | weapon on several occasions dispatching |
| 23 | | animals.  You know, like a deer that was |
| 24 | | injured lying on the side of the road, a dog |
| 25 | | that had been hit.  I've done that several |

1   times.  I've fired my weapon at a person one

2   time.

3 Q   When did that occur that you had to fire your

4   weapon at a person?

5 A   That was on March 9, 1969.

6 Q   That was the day that you had an incident with

7   a person, correct?

8 A   Right.  I had been dispatched to a -- a

9   two-person car, I was driving, to a burglary

10   alarm at a furniture store.  In those days

11   they used to have an alarm that would go from

12   the store right to the state police post.

13       Dropped my partner off at the front of

14   the store.  I went around to the rear.  Coming

15   up the building I was jumped by a person who

16   began to beat on me.  I screamed for my

17   partner.  Contrary to now, I had a much louder

18   voice back then, could be heard.  This was

19   about 4:00 in the morning.

20       I grabbed him.  We fell to the ground.

21   I was simply holding him, waiting for my

22   partner to show up.  He was beating me about

23   the head and shoulders quite profusely.  It

24   finally dawned on me if I let this go on for a

25   period much longer, regardless how tough you

1  think you are, you are going to lose this

2  particular fight.

3       So I notice that he was hitting me with

4  both fists; therefore, he didn't have anything

5  in his hands.  I had a rifle in one hand and a

6  flashlight in the other.  I dropped both of

7  them or threw them off, kicked them off me.

8  As I went over to jump on him, he apparently

9  landed next to my own flashlight.  A five cell

10  D battery flashlight that he had picked up.

11  As I went towards him, he hit me along the

12  side of the head with a five cell D battery.

13  It stunned me. Apparently made such a good

14  target he hit me again.  At which time the

15  flashlight broke and all the batteries came

16  out.

17       I still tried to move, but my legs were

18  paralyzed.  I simply couldn't move my legs.

19  It was like I was in a bucket of sand.  Fell

20  forward, grabbing at him, ripped his pants.

21  His keys came out, a money clip came out.  He

22  turned around, started to run, and I drew my

23  snub nose revolver from my right pocket and

24  ordered "halt or I'll shoot."

25       He continue to run.  After what

1      appeared to be a long period of time

2      hesitation on my part, I fired two shots at

3      him.  Did not hit him.

4  Q   You told him as he was running away to stop or

5      I'll shoot, or halt or I'll shoot?

6  A   Halt or I'll shoot, yes, I did.

7  Q   You pulled the revolver out of your pocket and

8      pointed it and fired at least two shots?

9  A   I fired two shots.  Not at least.  Two shots.

10  Q   As he was running away?

11  A   Correct.

12  Q   You've indicated that it seemed like a long

13      time but you're not sure if this was a matter

14      of seconds that this all took place?

15  A   I was going through it in my mind should I

16      shoot at this person.  I'm sure that it seemed

17      like a long period of time.  I'm sure was no

18      more than a second or two.

19  Q   We were talking about then when you were with

20      the Michigan State Police -- you eventually

21      retired from Michigan State Police, correct?

22  A   Yes, in '02.

23  Q   So you started your law enforcement career

24      with Michigan State Police, and then you were

25      retired then in 1992, correct?

```
 1   A      Correct.
 2   Q      You did work for Oakland County Sheriff's
 3          office for about 18 months after that,
 4          correct?
 5   A      Correct.
 6   Q      So all of your training as a law enforcement
 7          officer, that was prior to the time you spent
 8          with Oakland County Sheriff's Office, correct?
 9   A      Correct.
10   Q      So we talked about when you were transferred
11          away from Sandusky.  So then were you in fact
12          assigned to the Firearm Identification, Tool
13          Mark, Bomb and Explosive Unit?
14   A      Yes.  It was in Plymouth at the time.  I was
15          originally assigned to go to the Warren
16          laboratory.  But I asked them to make me
17          permanent at Plymouth so I could find a house
18          for my wife and children, which they did.
19          Plymouth eventually moved the laboratory to
20          Northville.  It was the same laboratory, but
21          went from Plymouth up to Northville, Michigan.
22   Q      What were the -- what were your duties with
23          that unit?
24   A      Originally it was training in firearms and
25          crime scenes.  Eventually promoted to
```

1 Detective Sergeant. Continued on and then

2 became actually the unit supervisor in October

3 of 1973 when the individual training me,

4 Mr. O.C. Leedle had a heart attack and died.

5 I was then the head firearms examiner at our

6 Plymouth laboratory, and began to train --

7 they put another person in there that was

8 beginning his training by the name of Marv

9 Bendickson, they eventually promoted Marv

10 Bendickson to unit supervisor for various

11 reasons.

12  Then he quit, and I was promoted to

13 Detective Lieutenant in I believe 1981, in

14 charge of the Firearms Identification, Tool

15 Mark, Bombs and Explosives Unit and that would

16 have been then at the Northville Laboratory.

17 Q What exactly did the unit do at Michigan State

18 Police? It's my understanding that they

19 provide laboratory services when a department

20 doesn't have its own; is that correct?

21 A Well, whether they have their own, in Michigan

22 all the departments can submit evidence and

23 request assistance from the Michigan State

24 Police for anything.

25  So in the laboratory system -- there

1       were six at the time in the state of Michigan.

2       The main laboratory, the original laboratory

3       was in Lansing.  Then there were three

4       satellites that were made initially in Warren,

5       Plymouth and Grand Rapids area.  Then there

6       was a third one put up in Bridgeport and

7       eventually one in Marquette, one in Grayling.

8               What these laboratories did, they

9       provided services to any of the local

10      jurisdictions and police in the area.

11      Plymouth being in the northwest section of the

12      City of Detroit, serviced the State of

13      Michigan, any police units in that area from

14      the state line through Ann Arbor, Brighton

15      area, over to the City of Detroit.  We did not

16      service the City of Detroit unless they

17      requested service.

18              So any of the -- I understand there

19      were maybe 120 different police agencies, give

20      or take, in that particular area, that could

21      request our service.  That's what they did.

22              If they wanted a crime scene for

23      example, for the last 10, 12 years I was in

24      the department, I received all those calls day

25      and night for requests for crime scene

1      investigation and participated in a great

2      number of them.

3          They also brought any of their evidence

4      to our crime laboratory to have it processed.

5      Whether it's drug, or question document,

6      latent prints, firearms, et cetera.  That was

7      all free of charge.  There was never a charge

8      to any submitting agencies.  That's why they

9      utilized the service.

10         The laboratory essentially did I would

11     say at least 80 percent if not more of their

12     laboratory work was for outside agencies other

13     than the Michigan State Police.

14   Q    During that time, that's when you did most of

15     your training relating to collection of

16     evidence and things that you needed for the

17     forensics unit?

18   A    That would be correct.

19   Q    You indicated on your CV that you did a

20     two-day conference in I believe it was 1997

21     with the International Wound Ballistics

22     Association.  Can you tell us about that

23     two-day conference?

24   A    Well, the International Wound Ballistics was

25     an organization formed to look at various

1        items that police officers run into.  You

2        would have I think there was a pathologist who

3        was also a firearms examiner, per se.  He used

4        to do that.  They would run the conference,

5        present various cases to show different types

6        of things, different bullet wounds, unusual

7        things that you get the opportunity, everybody

8        doesn't see all these things, so therefore

9        it's an opportunity to present that type of

10        material to a wider audience.

11   Q    Are you still a part of that organization?

12   A    No, the organization no longer exists.

13   Q    You also indicated that in 1995 through 2004

14        you attended six S.H.O.T. Shows, Shooting,

15        Hunting, Outdoors and Technology?

16   A    Correct.

17   Q    Can you tell us about those sessions you

18        attended?

19   A    Well, those are, it's a major firearms and

20        outdoor hunting type presentation where you

21        have hundreds and hundreds of people, almost

22        every manufacturer of firearms, handguns,

23        rifles, shotguns, ammunition, safes, whatever

24        are all at one location.

25             So, when you go to these things you

1        have the opportunity to view a tremendous

2        amount of new material and literature that you

3        may need in your future presentations or it's

4        nice to know what type of ammunition Remington

5        is making or what Winchester has done.  The

6        firearms, the new technology that was coming

7        out.  Those were the type of things that you

8        would go to, to get that first-hand

9        information to look at, and be familiar with

10       all the new material coming out at that point

11       in time.

12  Q    That's geared more towards a sportsman,

13       correct?

14       MS. BONHAM:      Objection to form.

15  A    It's geared to anybody interested in firearms,

16       et cetera.  Therefore, if you --I would say if

17       you're showing every handgun made in the

18       United States, I will offer to you that the

19       majority of people do not hunt with handguns.

20       So therefore, you have that opportunity to see

21       all those handguns and the types that are

22       being made.

23  Q    On your CV you indicated that you attended a

24       three-day workshop in 1989 regarding blood

25       splatter interpretation?

```
 1   A      Yes.
 2   Q      In a formal setting, was this the only
 3          training seminar that you went to regarding
 4          blood splatter interpretation?
 5                 MS. BONHAM:        Objection, form.
 6   A      It's not the only one.  It's the only one that
 7          was a three-day conference.  Also had
 8          in-service training within the laboratory
 9          units that would discuss that but it would be
10          on a one-day seminar type thing.  This was the
11          initial one that they wanted to go in and
12          cover it.
13                 What the basis was, obviously when you
14          are analyzing crime scenes and looking at the
15          results, blood is always an exceptionally
16          important item at crime scenes, and to be
17          aware of the different types of blood
18          splatter, staining, transfers, et cetera is
19          always important.  So this was intensified
20          three-day seminar to make sure that you're
21          aware of that while you're going on various
22          crime scenes.
23   Q      In a formal setting that was the only
24          three-day seminar that you attended relating
25          to blood splatter interpretation?
```

```
1    A      Correct.
2    Q      Then any other in-service training that you
3           had would have been prior to your retirement
4           in 1992; is that correct?
5    A      Correct.
6    Q      Is there a difference between evidence
7           collection and preservation and shooting
8           reconstruction?
9                  MS. BONHAM:        Objection to form.
10   A      Well, there is certainly a difference between
11          shooting reconstruction and evidence
12          collection and preservation.
13                 Evidence collection and preservation
14          covers any type of thing, whether it's a rape
15          scene or kidnapping, et cetera.  Where
16          shooting interpretation obviously only deals
17          with shooting.
18   Q      When is the last time that you taught a course
19          on shooting reconstruction?
20   A      Probably I think 2002.
21   Q      When is the last time you've attended a course
22          in shooting reconstruction?
23   A      I don't think I've ever attended a class on
24          shooting reconstruction.  I've taught them,
25          but I haven't attended one.
```

```
 1   Q      When is the last time that you taught a course
 2          on the human body's reaction to being struck
 3          by a bullet?
 4   A      I've never taught a class on that.
 5   Q      When's the last time you attended any courses
 6          or training relating to the human body's
 7          reaction to being struck by a bullet?
 8          MS. BONHAM:      Sorry, asked and
 9          answered.
10   A      I'm not sure they teach a class on how people
11          react to being shot.  I think you look at
12          autopsies, and you're attending an autopsy.  I
13          don't recall any class where they teach you
14          this is what happens when you shoot a person.
15   Q      Is there a difference between a flight path of
16          a bullet and a trajectory?
17   A      Yes.
18   Q      What is the difference?
19   A      Trajectory is any time the bullet leaves the
20          firearm until it strikes an object.  After it
21          strikes an object it becomes a flight path,
22          regardless of what object it strikes.
23   Q      So is it my understanding that the trajectory
24          is from the moment that the ballistic leaves
25          the weapon, until it makes contact; flight
```

```
 1           path is whatever path that bullet will take?
 2   A       From the moment of firing, in my opinion of
 3           trajectory is from when the bullet is
 4           discharged, the cartridge is discharged, the
 5           bullet passes out of the barrel, and it's on a
 6           trajectory at that point, until it hits
 7           something.  Once it hits something, that
 8           becomes a flight path.
 9   Q       If a bullet strikes an object does it affect
10           the final resting place of that bullet?
11   A       It can.
12   Q       So it can.  It doesn't always but it can
13           affect where that bullet ultimately --
14   A       To be honest, your question is so ambiguous,
15           it's difficult to answer something like that.
16           If you give me something in particular, I
17           would comment.  Any time a bullet strikes
18           something, even in a minuscule way, it's going
19           to be affected.  I'm not really sure where you
20           are going with that question.
21                   MR. RUSSELL:     Anyone need a restroom
22           break, or are we good to keep going?
23                   MS. BONHAM:      It's up to you guys.
24           I'm good.  Mr. Balash, how are you doing?
25                   THE WITNESS:     I'm fine, thank you.
```

```
 1   Q      Mr. Balash, we had talked about briefly the
 2          report that you prepared in this matter.  Can
 3          you tell us about the -- you have listed here
 4          but tell us about in particular the
 5          methodology used in approaching this subject
 6          matter after you are retained?
 7   A      I'm sorry, you want -- could you repeat that,
 8          please?
 9   Q      Can you tell us about -- I guess there is a
10          less long-winded way of asking the question.
11                 Can you tell us about the methodology
12          you used after you first were retained in this
13          matter, to the time that you prepared your
14          report, how did you approach this?
15   A      Well, I approached it by reviewing all the
16          material that I see.  What the evidence is.
17          What I'm being told took place.  And I try and
18          correlate the evidence with what I'm being
19          told.
20                 I also look at what may or may not have
21          been done from a crime scene evidence
22          collection and preservation aspect, along with
23          submittal to a laboratory.  All that goes
24          hand-in-hand.  That's the way I work it.  I
25          see what I'm being told took place.  Then I
```

```
 1          look at what the evidence is telling me, and I
 2          correlate the two.
 3   Q     You indicated in your methodology that you did
 4          not assign credibility to any witness?
 5   A     Correct.  I simply look at it as what I'm
 6          being told.  Then I let the evidence tell me
 7          what it's telling me.  Then I evaluate between
 8          them.
 9   Q     You indicated in your report that, I can pull
10          it up if you wish --
11               MS. BONHAM:     If it's easier not to
12          screen share, the witness has a copy.  We all
13          have a copy.  Whatever you want to share.
14   A     I have a copy on my other computer here screen
15          of my report.
16   Q     Excellent.  That will certainly make things
17          easier for me.
18   A     Tell me where you're at.
19   Q     You indicated here on page 4, the second
20          paragraph, you said shortly after passing
21          through the intersection, approximately 50 to
22          100 yards, my estimate.  How did you come up
23          with that estimate?
24   A     Looking at the video.
25   Q     Just on the video you estimated that there was
```

1    approximately 50 to 100 yards past the light?

2  A  Let me read that part.

3        Yes, that was my estimate.

4  Q  That was based on the video?

5  A  Yes.

6  Q  You also indicated that the Ford first came

7     abreast of the Honda.  What did you mean by

8     that?

9  A  Well, side by side.  Doesn't mean they were

10    equally together.  They were side by side.

11 Q  Another point in your report, you talk about

12    the examination of the fatal bullet's lead

13    core.  This is not something that you did, you

14    didn't physically examine the --

15 A  Is it something that I typically would

16    examine?  Yes, it is.

17 Q  But you didn't in this case, right?

18 A  That is correct, I didn't look at any physical

19    evidence.

20 Q  In this case there is no question that there

21    was one shooter; is that correct?

22 A  To the best of my knowledge, correct, only one

23    shooter.

24 Q  This case, the shooting took place in a matter

25    of seconds after both cars passed that light,

1          would that be fair to say?

2    A     That would be fair to say, yes.

3    Q     Ballistics after they're fired from a firearm,

4          do they travel usually at 1,000 feet per

5          second?

6    A     Depending on the caliber, bullet weight, et

7          cetera.  In this case it's a 9 millimeter.  I

8          suspect it would be in the area between 9 and

9          1100 feet per second, depending on what the

10         load was.  I don't know whether they were +P

11         or +P+ ammo.  You would have to put them over

12         a chronograph and take an average.  I would

13         say anywhere from probably 950 feet per second

14         to 1100 feet per second would be a normal

15         average.

16              I'm sorry I forgot to disconnect my

17         phone.  I apologize.  My wife got that.

18         Excuse me for just a moment.

19              MR. RUSSELL:      Sure.

20              MS. BONHAM:       Why don't we take a

21         two minute break then, is that okay?  Get a

22         cup of coffee?

23              THE WITNESS:      Very good.  Thank

24         you.

25              (Recess taken.)

1  BY MR. RUSSELL:

2  Q     Mr. Balash, we were beginning to talk a little

3        more about your report that you prepared in

4        this matter.

5              Beginning on page 5 of your report

6        where you start comments and observations.

7        The first sentence right under comments and

8        observations indicates that the quality of the

9        investigation in the shooting death of Desmond

10       Franklin by the Cleveland Police Department,

11       the Cuyahoga County Sheriff's Department,

12       Internal Affairs, the Cuyahoga County Attorney

13       General all appear to this examiner as

14       superficial in nature.

15              Were you asked to render opinion

16       relating to the investigation?

17 A     No, just part of what I saw.  They didn't ask

18       me to do this, no.

19 Q     Why was it that you spent in excess of three

20       pages discussing the nature of the

21       investigation?

22 A     Because the nature of the investigation bears

23       heavily on what it is that transpired and how

24       it's being viewed.  If the evidence is there

25       and you don't examine it, you don't get a

1     chance to do it again.

2          What I saw time after time in handling

3     the investigation, or looking at it, there was

4     never any intent really from what I could see,

5     to understand what happened in this particular

6     case.

7          I don't recall once having anybody ask

8     the officer why don't you show us how this --

9     how you went about grabbing your firearm from

10    your coat for example while you were seated in

11    your car, which would have been an integral

12    part of it.  They didn't seem to be interested

13    in the fact that even until this year Officer

14    Garcia said that his window was only half

15    down, when it was fully down.  These are the

16    types of items that you should clarify, and as

17    an investigator should have been prima facie.

18          You had people looking at the vehicle

19    and saying boy there are four bullet holes in

20    the side of this Ford.  Well, actually there

21    were five, they missed one.

22          Second of all, they start putting

23    trajectory rods in the holes, and yet I don't

24    find a single report that says what was the

25    outcome of this.  If you are going to do it,

```
1            tell people what you did.  What were your
2            results.  There were none of those, and it
3            goes on.
4                  They didn't attempt to put the vehicle,
5            the sideview mirror back together.  They
6            looked for parts of the sideview mirror
7            indicative where the shooting took place, yet
8            I don't see where they looked at all for glass
9            on the roadway.  There is no photographs of
10           glass on the roadway.  And more than likely
11           the damage to the rearview mirror of the
12           officer's car was the last shot fired.  So the
13           shooting didn't happen there.  It happened
14           prior to that.  I mean these are just basic
15           items off the top I'm telling you that weren't
16           done.
17    Q      Did you speak with any of those who conducted
18           the investigation of this matter?
19    A      I did not.
20    Q      The interviews that you viewed, those were the
21           interviews provided to you, correct?
22    A      Correct.
23    Q      So there could have been other interviews that
24           are not on this list that you did not review?
25    A      I'm sure there could have been other
```

```
 1            interviews I haven't seen, yes.
 2   Q      This case, I think we talked about that there
 3            was one shooter.  That no one claimed there
 4            were more than -- shots fired from more than
 5            one weapon in this case, correct?
 6   A      Correct.
 7   Q      You also indicate that the shooting event was
 8            partially captured by surveillance tapes?
 9   A      Correct.
10   Q      You indicated you viewed the multiple
11            interviews of Jose Garcia; is that also
12            correct?
13   A      Correct.
14   Q      You indicate in your report on page 5, one of
15            the items you said that Jose Garcia should
16            have been fully photographed at the scene?
17   A      Absolutely.
18   Q      What would be the purpose of that?
19   A      You have to know -- you don't know what you
20            don't know to begin with.  You've got a
21            shooting involving an officer from the middle
22            of his vehicle.  The clothing that he's
23            wearing becomes very important.  You don't
24            know what's on that clothing.  There may be
25            firearm discharge residue on it.  There may be
```

```
 1          tears to it.  You have to see how his uniform
 2          was on, where his holster was, type of
 3          holster.  All those circumstances dictate that
 4          you formally and absolutely photograph to a
 5          great degree of detail what that officer or
 6          person was wearing at that point in time.  It
 7          may or may not become important.  But if you
 8          don't do it, you don't get -- to be honest
 9          with you, often we go to an autopsy and you
10          take swabs on a homicide shooting where
11          somebody was shot.  Yet you take oral,
12          vaginal, and rectal swabs.  It certainly
13          doesn't have anything to do with the shooting
14          involved but it may or may not be something
15          that would come up later.  If you don't do it
16          then, you don't get the opportunity to do it
17          ever.
18    Q     What would be the importance of you indicated
19          that the -- with the mirror and the other
20          bullet, what would be the importance of that?
21    A     I'm not sure I follow what you mean by the
22          mirror and the other bullet.  Please clarify
23          that.
24    Q     You talked about -- I apologize.  You talked
25          about one of your concerns with the
```

```
 1        investigation was that they didn't attempt to
 2        collect the mirror and piece that back
 3        together; is that fair to say?
 4   A    That's fair to say.
 5   Q    So, what would be the significance of doing
 6        that?
 7   A    Well, you would find a more suitable flight
 8        path or trajectory through the mirror of the
 9        bullet if you had the mirror reconstructed
10        because it will give you a more definitive
11        exit hole, so therefore you would have a more
12        defined flight path through the mirror than
13        you would simply -- if you look at the
14        photograph they took with the trajectory rod
15        through the mirror, there is a wide area of
16        variance.  You can put it on either side.  If
17        you were to reconstruct the parts to find the
18        exit hole in the outer covering, you would
19        have more correctly identified the flight path
20        of the bullet through the mirror.  It's good
21        police work that wasn't done.
22   Q    Other than being good police work that wasn't
23        done, what would be the significance of
24        knowing the flight path of that fifth bullet?
25             MS. BONHAM:        Objection, asked and
```

1        answered.

2  A     It gives you an angle through the mirror, so

3        therefore, you've got five shots that were

4        fired.  You've got four bullet strikes that

5        are identified.  But there is actually five.

6        The one they obviously didn't identify.  So

7        you can begin to correlate which shot goes

8        with which bullet strike in the vehicle

9        itself.

10          So, in this particular instance, when

11       you look at it from my point of view, that had

12       to or probably was the last shot fired because

13       it was at the most acute angle toward the

14       vehicle.

15  Q    As we talk about, as you move on, you have a

16       couple of diagrams on page 8.  Photographs

17       rather, not diagrams.  Tell us about what was

18       the importance of why did you discuss that the

19       window was fully down at the intersection or

20       before?

21  A    Well, it's apparent from Officer Garcia

22       stating that the window was half way down.

23       First of all, the bullet hole through the

24       mirror certainly wouldn't establish that.

25         Second of all, the window was fully

1       down.  If it was half down to begin with at

2       the confrontation out by the beverage truck

3       prior to him turning onto the roadway here,

4       then at some point in time prior to the

5       intersection the window now was fully down.

6       The window was half down at the confrontation

7       position.  Now it's fully down.

8              So that shows intent on Officer

9       Garcia's part that something is coming down,

10      so he's getting prepared for it.  That's the

11      way I view that.  When you continue to say

12      even until this year he said his window was

13      only half way down.  It was not halfway down.

14      It was fully down, which tells me that he was

15      getting prepared to do something in

16      anticipation of that car coming up on him,

17      that he saw coming.

18  Q   Would that be the only reason why someone

19      would put their window down?

20  A   I wouldn't say it was the only reason, no.

21      But in this circumstance, that's what led,

22      adds credence to, when you put everything

23      together, not only the beginning of this

24      incident to this point, but to the shooting

25      itself and the position that I believe his

| | | |
|---|---|---|
| 1 | | weapon was in at the point in time he began to |
| 2 | | shoot, all this correlates together. |
| 3 | Q | Also on page 8 you have the photograph of the |
| 4 | | firearm that was recovered from Desmond |
| 5 | | Franklin's car? |
| 6 | A | Correct. |
| 7 | Q | Were you informed that Desmond Franklin had a |
| 8 | | felony conviction? |
| 9 | A | I may or may not have been.  I know he wasn't |
| 10 | | how should I say a boy scout.  I'm sure he had |
| 11 | | some particular problems.  Whether I totally |
| 12 | | agree was told that he had a felony |
| 13 | | conviction, I don't recall, and maybe well |
| 14 | | have been. |
| 15 | Q | You indicate in your report that the safety is |
| 16 | | on.  What was the significance of you |
| 17 | | discussing the safety being on? |
| 18 | A | The Smith and Wesson, that is both a |
| 19 | | disconnect and a safety.  What that means, you |
| 20 | | can lower the hammer if it's cocked, or you |
| 21 | | can actually -- it's a safe position.  When it |
| 22 | | does that, it disconnects the trigger.  So the |
| 23 | | trigger doesn't function.  It floats free in |
| 24 | | the trigger guard.  So anybody who plans to |
| 25 | | shoot somebody would certainly know if you put |

1   your hand in the trigger that it doesn't

2   engage as such.  The safety is on.

3 Q That wouldn't be apparent to a third person

4   though, would it, that sees the barrel of the

5   gun?

6     MS. BONHAM:  Objection to form,

7   hypothetical.

8 A Would it be apparent to somebody?  I wouldn't

9   think anybody would notice that other than the

10   person handling the weapon themself.

11 Q On page 9 you also have a photograph of the

12   vehicle Desmond Franklin was operating.  What

13   was the significance of that photograph?

14 A Well the significance is that's a bullet

15   strike.  The police department, in their

16   investigation, never identified it as such.

17   That's probably the bullet strike that was

18   fatal to the driver of the vehicle.  To not

19   even notice it goes to the quality of the

20   investigation.

21 Q It's your contention that the investigators

22   didn't specifically identify the window area

23   as being a bullet strike, is that my

24   understand from you?

25     MS. BONHAM:  Objection, misstates.

```
1            Objection, in contention.  Go ahead.
2                 MR. RUSSELL:     That's why I'm trying
3            to get some clarification.
4                 MS. BONHAM:      Sure.
5   A        Correct.  If you go down to the next page of
6            my report, it's the other photograph shows the
7            police photograph with trajectory rods and
8            bullet strikes they identified at three, four,
9            five and six.  They don't identify anything
10           for the one above it, which was probably the
11           fatal bullet strike, yet it's not even
12           recorded.
13  Q        So, you believe that the investigator should
14           have marked that area as number one, being
15           first bullet to strike?
16  A        Well in this sequence, if they started out
17           with three, in this particular sequence I
18           would have probably have put that, and the way
19           they are doing it, I probably would have
20           labeled it number 5, because they are going
21           from bottom to top.  So it would have been 3,
22           4, 5, 6 and 7.  7 would have been -- the last
23           two would have changed numbers.  They should
24           have identified it and they did not.  And it's
25           extremely important.
```

```
 1   Q      Why is it extremely important?
 2   A      How can the bullet strike that probably
 3          resulted in the fatality not be an important
 4          piece of evidence?
 5   Q      On page 11 you also have a photograph, a
 6          couple photographs.  One of Officer Garcia's
 7          vehicle.  What was the significance, why did
 8          you include that photograph in your report?
 9   A      Well, it just shows the flight path that the
10          police depicted through the rearview mirror,
11          outside driver's side rearview mirror in the
12          vehicle.  It's their depiction of it, so
13          that's what I put it in there to show that
14          that shows an angle.  Whether it's a correct
15          angle or not, I don't know, because they
16          didn't reassemble the outside covering, which
17          should have given them a more correct
18          determination of where that bullet passed
19          through that rearview mirror.
20   Q      So I'm understanding you correctly that you
21          indicate the outside cover of that mirror
22          should have been reassembled before they
23          labeled and marked and took this photograph?
24   A      No.  They could have easily taken this
25          particular photograph prior to that being
```

1       reassembled.  But if they wanted an accurate

2       determination of a flight path through that

3       mirror, they should have reassembled it, then

4       reentered that trajectory rod to see what the

5       difference may or may not have been.

6              Actually when you look at it, I'm

7       looking at the photograph, that could be

8       absolutely correct but they have no way of

9       knowing that if they don't take the next step

10      to reconnect that cowling unit, the cover unit

11      and confirming that.

12  Q   It's not your belief that the bullet that

13      passed through the mirror was the fatal shot,

14      is it?

15  A   No, it absolutely was not the fatal shot.

16  Q   What leads you to that conclusion?

17  A   I'm sorry, I did not hear that question.

18  Q   What leads you to that conclusion, Mr. Balash?

19  A   The angle through there is not possible to

20      have struck the victim in the head with that

21      particular angle.  There is no position you

22      can get to on the car.  He would have had to

23      have been probably through the back window.

24      So it's just not possible that one could have

25      been the fatal shot.

1          You could add to that, that you have to

2     couple the other shots that were identified in

3     the side of the vehicle as to their probable

4     angles of entry, which they clearly didn't

5     follow-up on.

6  Q   You also have a photograph from the scene of

7     Officer Garcia.  What is the significance of

8     that photograph for you, Mr. Balash?

9  A   The significance is to identify the jacket he

10    was wearing.  But more importantly, that's

11    really the only photograph that I saw, that's

12    a snippet obviously of a body cam video, of

13    Officer Garcia and what he was wearing at the

14    scene.  I think there is one other passing one

15    where he walks through briefly.  These are

16    just very limited views of what the clothing

17    was that Officer Garcia was wearing.

18          The reason that the moose and sleeve

19    logo are circled, if you go down to the next

20    page, Officer Garcia is wearing the same

21    jacket at one of the Internal Affairs

22    interviews.  Therefore, I can clearly see the

23    label and the logo on there.  You can see them

24    both on the photograph that is apparent on

25    page 11, and so he's wearing this jacket at

1    the time of the shooting, and you can see how

2    the jacket is tucked up into and behind his

3    weapon in the holster on his right side.

4  Q  Why is that significant for you, Mr. Balash?

5  A  Because of the type of jacket that it is, and

6    when you look at -- to be honest with you, I

7    don't know if Officer Garcia was in fact armed

8    when he came into this particular Internal

9    Affairs.  If he were, I can't quite see it

10   from this photograph, but he certainly wasn't

11   wearing his jacket in the same condition.  But

12   the jacket itself is long enough that it would

13   have fallen over, normally fallen over where

14   his holster and gun were to conceal it, which

15   would be a normal process.

16 Q  Is it your contention that Officer Garcia

17   had -- his firearm was concealed when he was

18   inside his own vehicle?

19 A  That would be normal.  I carried a concealed

20   weapon for 25 years.  When I put my seatbelt

21   and shoulder harness on, my weapon was always

22   concealed, whether it was Summer or Winter.

23   It was never exposed while I'm riding in a

24   vehicle.

25        I find it ludicrous to believe that you

| | | |
|---|---|---|
| 1 | | would tuck a jacket behind a firearm when you |
| 2 | | are off duty, driving into your police |
| 3 | | department.  I actually find that ludicrous. |
| 4 | Q | Did you look into the weather conditions that |
| 5 | | day in April of 2020? |
| 6 | A | No.  I can see the clothing that they are |
| 7 | | wearing.  I suspected it was cool to cold. |
| 8 | Q | In your opinion, in your report, you indicate |
| 9 | | on page 15 under conclusions, specifically |
| 10 | | number 4, it's your opinion that the bullet |
| 11 | | that fatally struck Desmond Franklin was the |
| 12 | | first bullet fired by Officer Garcia and this |
| 13 | | bullet entered through the passenger side |
| 14 | | front window.  What were the things you relied |
| 15 | | upon to come to that opinion? |
| 16 | A | I'm sorry, what -- page 15, the first |
| 17 | | paragraph? |
| 18 | Q | Page 15.  First full paragraph, number 4. |
| 19 | A | Yes.  Your question again, if you would, |
| 20 | | please. |
| 21 | Q | Sure.  What did you rely upon to come to that |
| 22 | | opinion that the bullet that fatally struck |
| 23 | | Desmond Franklin was the first bullet fired by |
| 24 | | Officer Garcia? |
| 25 | A | It's the more direct side by side shot. |

1     Mr. Franklin had a bullet strike on the right

2     side of his head that went straight through to

3     left side of his head.  Slightly from back to

4     front according to the medical examiner.

5        You have the bullet strike in the side

6     window that was never identified by the

7     police.  It is my opinion that that was the

8     bullet that went through.  When you align

9     those particular ones up, the cars either had

10    to be very close to parallel, or the Ford was

11    slightly ahead of the Honda at the point in

12    time that shot would have been fired.

13 Q   So that's what lead you to the conclusion that

14    the first shot was the fatal shot?

15 A   Yes.  And the first shot is the fatal in my

16    opinion due to the progressive distances that

17    you see in the bullet strikes in the side of

18    the vehicle that are now recorded into the

19    B-pillar I believe it is.  Then the side, and

20    they get progressively more elongated.  The

21    last one being the most elongated, which I

22    believe was number six identified in the

23    photograph earlier in my report.

24       So the bullet, the first shot, and at

25    most would have been the second shot in my

```
 1            opinion, but I believe it to be the first
 2            shot, would have been the fatal shot.  Then
 3            the car accelerated out from there.  The
 4            subsequent shooting struck the vehicle as it
 5            begins to make distance between the Honda and
 6            the Ford.
 7    Q       Does the bullet fragments at all, did you take
 8            that into consideration when reaching that
 9            opinion?
10    A       Which bullet fragments are you speaking of?
11    Q       In examining any -- did you examine any
12            photographs that were taken of the ballistics
13            that were recovered from the scene?
14    A       Yes, I did.  I saw the bullet fragments that
15            were recovered at the scene.
16    Q       Did that contribute to your opinion at all?
17    A       Well, they certainly weren't part of what the
18            fatal bullet was, so therefore they continue.
19            When you see where they are coming from, and
20            not having physically examined them, they seem
21            to correspond correctly with the bullet
22            strikes from where they were recovered.
23    Q       You also indicate that it's your opinion that
24            Mr. Franklin was looking straight ahead.  What
25            led you to that conclusion?
```

1   A     Well, the fact that the bullet travels from

2          right to left and only slightly forward, you

3          have to be looking straight ahead to get that

4          shot.  That couples with the bullet strike in

5          the side window.  There is no other bullet

6          that would have caused that, except the one

7          through the side window in my opinion.

8          Therefore, when you're parallel to the car

9          when that shot was fired, that means

10         Mr. Franklin's head had to be pointing forward

11         at the point in time that he was struck by

12         that bullet.

13   Q     So I understand you, you're saying that

14         Mr. Franklin had to be looking forward at the

15         time that the bullet, the fatal bullet struck

16         him?

17   A     Mr. Franklin had to be facing forward, with

18         his head toward the front windshield at the

19         point in time he was struck by the fatal

20         bullet.

21   Q     You also indicate on number 3 one of your

22         opinions that Officer Garcia drawing of his

23         weapon, and firing of his weapon, did not

24         match the testimony and interviews that he

25         provided in this case.  What did you rely upon

1        to reach that opinion?

2  A    He simply at one time, he simply tells the

3        investigators, shows to them drawing his

4        weapon.  He draws it within about a half a

5        second.

6             Stop and consider he's in a Honda.

7        It's got bucket seats.  I would assume, and I

8        make the word assume, I understand that,

9        wearing a seatbelt in compliance with the law.

10       He has a heavy jacket on.  You are telling me

11       that within a half a second he drew a gun from

12       that position?  I find that unbelievable.

13  Q    Have you ever timed police officers to see how

14       many shots they can discharge per second?

15  A    I think you can make an average, depending on

16       whether they want to fire quickly and the type

17       of weapon that they are firing, the caliber of

18       the weapon, the weight of the bullet that is

19       involved, but a well-trained officer will

20       routinely be able to fire between three and

21       five shots per second, if that's their intent.

22  Q    My question to you is, have you ever timed a

23       police officer shooting, to see how many

24       rounds he or she can discharge per second?

25  A    Have I ever asked somebody can you fire as

| | | |
|---|---|---|
| 1 | | fast you can and you want me to time that? |
| 2 | | No, I've never done that. |
| 3 | Q | Have you ever timed a police officer to see |
| 4 | | how fast that he or she can draw from their |
| 5 | | holster? |
| 6 | A | I've had one video submitted to me on a case |
| 7 | | where the officer drew and fired five shots |
| 8 | | within about I think it was 1.7 seconds, give |
| 9 | | or take.  He was standing at the time.  That's |
| 10 | | the only one. |
| 11 | Q | That's the only video you ever viewed? |
| 12 | A | He was trying to do it as fast as he could. |
| 13 | | That was the reason he did this.  I've never |
| 14 | | asked anybody to see how fast you can draw and |
| 15 | | fire your weapon, no. |
| 16 | Q | When you were a police officer, were you |
| 17 | | trained that deadly force is justified when an |
| 18 | | offender is armed with a weapon under |
| 19 | | circumstances that may indicate he or she is a |
| 20 | | threat to the officer or others? |
| 21 | A | Correct. |
| 22 | Q | When you were an officer, were you ever |
| 23 | | trained on responding to a threat with a |
| 24 | | firearm from your -- while your firearm is |
| 25 | | located in the holster? |

| | | |
|---|---|---|
| 1 | A | I'm not sure I understand your question. |
| 2 | | Could you please repeat it or reformulate it? |
| 3 | Q | When you were an officer, were you ever |
| 4 | | trained to respond to a threat while your |
| 5 | | firearm was in the holster? |
| 6 | | MS. BONHAM:      Objection to form. |
| 7 | A | The only time I would have -- no, I don't |
| 8 | | recall being trained to do that, no. |
| 9 | Q | Are you aware of police officers being trained |
| 10 | | to respond to threats while firearms are |
| 11 | | located in their holster? |
| 12 | | MS. BONHAM:      Same objection. |
| 13 | A | I am. |
| 14 | Q | Are you aware of officers being trained on |
| 15 | | responding to threats wearing different types |
| 16 | | of clothing? |
| 17 | A | I'm not sure I'm aware that they do that, no. |
| 18 | Q | Number 5, also the opinion you indicate that |
| 19 | | the two cars were parallel to each other, or |
| 20 | | Desmond Franklin's car was slightly ahead of |
| 21 | | Officer Garcia's car when Officer Garcia began |
| 22 | | firing.  What did you rely on to reach that |
| 23 | | opinion? |
| 24 | A | Please tell me where you are at again, please. |
| 25 | Q | I'm on page 15, first full paragraph. |

```
 1   A     First full paragraph, okay.  I see.  Go ahead,
 2         please restate your question.
 3   Q     Yes.  You have the opinion the two cars were
 4         parallel to each other, or Desmond Franklin's
 5         car was slightly ahead of Officer Garcia's car
 6         when Officer Garcia began firing.  What did
 7         you rely upon to reach that opinion?
 8   A     The bullet strikes in Mr. Franklin's car, the
 9         fatal wound and the bullet strike to Officer
10         Garcia's car.
11   Q     Anything else that you relied upon to reach
12         that opinion?
13   A     Of course the video.  My apology, I should
14         have included that to begin with.  The video
15         of the two cars on the road.
16   Q     When you reference video, do you mean the
17         compilation that was used that has different
18         views, or did you focus on one particular
19         source of surveillance video?
20   A     No, I think I saw both.  It's a compilation
21         one, as well as you can highlight and slow it
22         down and look at it.  It's the one where they
23         are at the intersection, they travel that 50
24         to 100 yard area.
25   Q     Forgive me, I just want to be clear on this.
```

```
1              You mean the video that takes the views from
2              the different cameras and puts them together
3              where you first see the interaction at the
4              Convenient store and then you see them -- do
5              you see Officer Garcia take a right turn, is
6              that the video you are referring to?
7                   MS. BONHAM:        Objection to form,
8              asked and answered.
9    A         Yes, that's a video that I looked at.
10   Q         Also on the first paragraph, number 2 in the
11             first full paragraph, you have the opinion
12             that Desmond Franklin was not looking at
13             Officer Garcia when Officer Garcia shot him.
14   A         Correct.
15   Q         What did you rely upon to give that opinion?
16   A         The wound path through the head.  Coupled with
17             the bullet strike in the window, on the
18             passenger side window.
19   Q         So, based on the entrance wound and the window
20             strike, those two factors led you to believe
21             Desmond Franklin was not looking at Officer
22             Garcia when the fatal bullet struck him?
23   A         Yes.
24   Q         Also in that first full paragraph you have
25             number 1, Desmond Franklin was not pointing a
```

| | | |
|---|---|---|
| 1 | | gun when Officer Garcia shot him.  What did |
| 2 | | you rely upon to make that statement? |
| 3 | A | Basically where the blood was on the gun and |
| 4 | | where the gun itself was found.  The gun was |
| 5 | | found on the driver's side.  Mr. Franklin had |
| 6 | | a devastating head injury that would have |
| 7 | | ceased any muscular response from him.  If he |
| 8 | | were pointing it, it would have been out over |
| 9 | | the passenger side of his vehicle.  Therefore, |
| 10 | | when he would have been shot, that gun should |
| 11 | | have been on the passenger side. |
| 12 | Q | So, to reach this, you believe that, to make |
| 13 | | the statement you believe that the firearm was |
| 14 | | not moved at all after the accident, after |
| 15 | | Desmond Franklin's vehicle stopped? |
| 16 | | MS. BONHAM:       Objection, misstates, |
| 17 | | vague. |
| 18 | A | No, the firearm was in fact moved by the |
| 19 | | officers and then replaced back into the car, |
| 20 | | which contaminated whatever was on that |
| 21 | | particular weapon.  But according to the |
| 22 | | individuals that removed it and then replaced |
| 23 | | it, they, quote, put it back in the same |
| 24 | | position it was.  How accurate that is, I |
| 25 | | don't know. |

1  Q    You so are talking when that weapon was
2       recovered.  You also, I believe in your
3       report, you take issue with that, the fact
4       that they moved the firearm; is that correct?
5  A    Yes, I do.
6  Q    What do you believe that the officers should
7       have done when arriving to the scene instead?
8  A    First of all, I would have taken the subject
9       that was behind the wheel, and evaluated where
10      it was at.  It was obvious the person was
11      nonresponsive, unconscious, bleeding
12      profusely.  The evidence at that point he
13      wasn't anything of a threat to the officers at
14      that point in time when they approached it.
15      He had been there for a period of time, prior
16      to them approaching the car, had not moved.
17      So unless you're going to imply he was playing
18      opossum and was going to grab the gun and do
19      something, there was no reason to disturb the
20      scene other than remove the victim from the
21      vehicle in my opinion.
22 Q    So you believe that the -- you don't take
23      issue with EMS attempting to remove the victim
24      from the vehicle?
25 A    I do not.  Whether evidence is contaminated or

1    not, if you are trying to save a person's

2    life, that takes priority.

3  Q   So, it's your contention that you believe that

4    the victim dropped the firearm and it went

5    straight forward after the fatal wound hit him

6    in the temple?

7        MS. BONHAM:        Objection to form,

8    misstates, vague.

9  A   I didn't ever say that he dropped the firearm.

10   I said in my report that the evidence was

11   consistent with the individual stating the

12   weapon was under his leg at the point in time.

13   As he struck various objects, the air bag went

14   off.  Then once the air bag went off, probably

15   when he struck the fence, he then went on to

16   strike the tree.  The fact that the air bag

17   had already deflated, which threw him into the

18   windshield, and shattered the windshield from

19   the inside, lifting him off the seat, I said

20   that was consistent with the gun being found

21   on the floor of the driver's side.

22  Q  Is there anything else that you relied upon to

23   make the statement that Desmond Franklin was

24   not pointing a gun when Officer Garcia shot

25   him?

| | | |
|---|---|---|
| 1 | A | Well, there is the blood that I see on the gun |
| 2 | | was a straight down, which is a result of |
| 3 | | having dripped down from above.  It wasn't |
| 4 | | projected blood.  I didn't see any brain |
| 5 | | matter or anything on the weapon.  I certainly |
| 6 | | would have expected to see that had it been |
| 7 | | pointed out the other way.  More precisely, I |
| 8 | | would have expected it to be found on the |
| 9 | | passenger side. |
| 10 | Q | You didn't inspect that firearm, did you? |
| 11 | A | I did not. |
| 12 | Q | So you are relying on the photographs that you |
| 13 | | reviewed? |
| 14 | A | Correct. |
| 15 | Q | Did you do any testing with someone in a |
| 16 | | position firing a firearm to recreate the |
| 17 | | shooting? |
| 18 | | MS. BONHAM:       Asked and answered. |
| 19 | A | I'm not sure I understand your question. |
| 20 | | Could you please repeat it? |
| 21 | Q | Did you do any testing with having someone |
| 22 | | recreate the shooting that took place? |
| 23 | A | No, I did not. |
| 24 | Q | When you state that Desmond Franklin was not |
| 25 | | pointing the gun when Officer Garcia shot him, |

1        did you rely on any case study or other

2        publication --

3  A     No.

4  Q     -- to support that opinion?

5           MR. RUSSELL:    I may be close.  Why

6        don't we take just a five minute break and

7        then I'll finish up and we'll be on our way.

8           MS. BONHAM:    Sounds good.

9           (Recess taken.)

10  BY MR. RUSSELL:

11  Q     Mr. Balash, I don't recall if I asked this

12        question earlier, forgive me if I did.  My

13        understanding is that you don't have a degree

14        in anatomy or physiology; is that correct,

15        sir?

16  A     That's correct.

17  Q     You don't have any formal training with

18        anatomy or physiology, do you?

19           MS. BONHAM:    This stuff was asked

20        and answered.  Go ahead.

21  A     Formal, no.  Actual experience, yes.

22  Q     Actual experience you mean your time with the

23        Michigan State Police Department prior to

24        1992?

25  A     Well that and a couple of times while at

|   |   |   |
|---|---|---|
| 1 |   | Oakland County attending dozens and dozens of |
| 2 |   | autopsies, and participating in those |
| 3 |   | autopsies, and actually assisting the |
| 4 |   | pathologist to correctly determine bullet |
| 5 |   | paths through the body. |
| 6 | Q | That was at your time with the Michigan State |
| 7 |   | Police; is that my understanding? |
| 8 | A | Yes, there were I think two attendance at |
| 9 |   | autopsy while I was at Oakland County.  I just |
| 10 |   | wanted to include that. |
| 11 | Q | What about do you have any degree in |
| 12 |   | biomechanics? |
| 13 | A | No. |
| 14 | Q | Do you have any formal training with |
| 15 |   | biomechanics? |
| 16 | A | No. |
| 17 | Q | You indicated in your report about the firearm |
| 18 |   | recovered from Desmond Franklin's vehicle. |
| 19 |   | You made an indication a couple of times that |
| 20 |   | the blood splatter on that firearm, that you |
| 21 |   | found significant.  What about the blood |
| 22 |   | splatter patterns specifically do you think |
| 23 |   | were significant in this case? |
| 24 | A | The blood patterns that I saw on the weapon |
| 25 |   | were those that were apparently dripping |

```
 1         straight down on the weapon.  They weren't
 2         projected blood in my opinion from what I saw.
 3         That the blood was coming from above and
 4         downward, not being projected where you would
 5         see a pattern of blood that would be
 6         elongated.
 7    Q    What part of -- you have a photograph of it
 8         there on page 8 of your report, but where in
 9         the pattern specifically are you referring to?
10    A    These are the -- it's along the slide and of
11         course parts of the frame itself, along on the
12         grip.  It's smeared blood all the way around.
13         It's not indicative of having been projected.
14         It simply dropped down on that particular.  To
15         be honest with you, once it was handled at the
16         scene, it really contaminates what you're
17         looking at.  I'm not sure that it was put back
18         exactly the way it was.
19              And the officer picking it up, again
20         I'm not sure of it, I don't see any projected
21         small staining or medium velocity impact
22         splatter on there, which one might expect if
23         it were near a head wound that were expelling
24         either blood, tissue, or brain matter.
25    Q    Are you familiar with the two firearms
```

```
 1          involved with this case; Officer Garcia's
 2          firearm and the firearm recovered from Desmond
 3          Franklin's vehicle?
 4    A     Am I familiar with those type of weapons, yes.
 5    Q     Let's talk about Officer Garcia's weapon.  Do
 6          you know what type of weapon that was used in
 7          this case?
 8    A     It's a 9 millimeter Glock semi-auto pistol.
 9          They call it a safe action.  It's a
10          semi-cocked action.  Requires only a short
11          pull of the trigger.  There is no external
12          safety.  The only safety that they have is in
13          the trigger itself, pivoting piece of plastic.
14    Q     Then the firearm recovered from Desmond
15          Franklin's vehicle, are you familiar with
16          that?
17    A     Smith and Wesson .45 auto, double stack PS,
18          semi-auto pistol.  It's a double action
19          revolver, meaning you can fire it single, or
20          in single action mode as well as double action
21          mode.
22    Q     So my understanding then is that the trigger
23          of that firearm, the one located in Desmond
24          Franklin's vehicle, that firearm, the safety
25          is not released by the trigger; is that
```

1      correct?

2  A    That is correct.

3  Q    The safety can be released there at the top of

4      the firearm, correct?

5  A    It's a combination safety decocker.  It has

6      to -- normally is released by the thumb.

7  Q    Officer Garcia's weapon, you indicate that it

8      can fire multiple rounds then by just

9      continuing to hold on the trigger?

10  A    No, that's a fully auto.  It's a semi-auto

11      meaning you have to pull the trigger each and

12      every time for a shot to be fired, but the

13      cycling sequence is -- on this particular gun,

14      if you are looking at page 8 of my report with

15      the Smith and Wesson, the trigger is in the

16      middle of the trigger guard.  In this

17      position, if the safety were off, it would

18      take a full pull, approximately 10 to 13

19      pounds of pressure to cause the hammer to rise

20      and then drop on the primer, on the firing

21      pin.

22          Officer Garcia's gun, the trigger would

23      be much in the same position but there would

24      be a little plastic insert in the middle of

25      the trigger.  By simply putting your finger on

1          the trigger, it negates that piece of plastic
2          and you now can move the trigger back to the
3          rear of the trigger guard, where it gives you
4          some resistance to your finger.  At that point
5          you need to only pull the trigger maybe a
6          sixteenth of an inch before it will fire at
7          that point.  If you keep it in that relative
8          position, Glocks are able to be fired, they
9          have a cyclic rate of approximately 600 rounds
10         per minute.  Which mean that if it were fully
11         auto, and you had a magazine capacity of 600,
12         which there are none, you pull the trigger on
13         the first one, you could fire all 600 rounds
14         in one minute, the gun would continue to
15         cycle.  At 600 rounds a minute in fully auto,
16         that means can you fire 100 rounds and when
17         you divide it, it's about six rounds a second.
18         10 rounds a second, my apology, in fully auto.
19    Q    When you are referring to the Smith and Wesson
20         firearm located in Desmond Franklin's vehicle,
21         when you talked about the pressure needed, you
22         were referring to the trigger, correct?
23    A    Trigger pressure, yes.
24    Q    Not the safety release, you were talking about
25         the trigger pressure?

| | | |
|---|---|---|
| 1 | A | Trigger pressure only.  Safety release I didn't |
| 2 | | measure that.  I don't know what it is.  I would |
| 3 | | have to check it. |
| 4 | Q | Mr. Balash, you indicated, we talked at the start |
| 5 | | of this deposition that you had reviewed both of |
| 6 | | the expert reports submitted by defendant's |
| 7 | | experts; is that correct, sir? |
| 8 | A | I don't think review is a correct word.  I think |
| 9 | | I read them. |
| 10 | Q | So you read both? |
| 11 | A | Yes. |
| 12 | Q | You read both reports? |
| 13 | A | Yes. |
| 14 | Q | Do you have any issues with any of the opinions |
| 15 | | stated in either of the defendant's reports that |
| 16 | | you read? |
| 17 | | MS. BONHAM:      Objection, vague, but go |
| 18 | | ahead. |
| 19 | A | I do. |
| 20 | Q | What were some of the issues you had with their |
| 21 | | reports? |
| 22 | A | Well one I think they said they recovered all |
| 23 | | five fired cartridge cases at the scene and that |
| 24 | | is not accurate.  Again, I'm not trying to review |
| 25 | | the report for that particular reason.  That one |

1      stuck out.

2              I think there was another that he called

3      on the Smith and Wesson, the decocking was to

4      enable it go from single action to double action,

5      which is incorrect.

6              Their opinions I have disagreements with

7      but I don't -- I haven't reviewed them for that

8      particular reason and I'm not prepared to comment

9      on them because I haven't highlighted them.  I

10     simply read it.  There were some points I

11     disagree with.  If it comes up, I'll discuss it

12     with Ms. Bonham.

13  Q  Anything else jump out at you though as you read

14     through them, anything else that jumps out?

15  A  Apparently I don't have much training in the area

16     of firearms according to one of the people.  I

17     think 50 years possibly qualifies me as being

18     somewhat trained.  The fact that I don't

19     understand that people look sideways also comes

20     to mind as kind of childish to put material like

21     that in a report in my opinion.  But I'm not

22     going to go into much more.

23          MR. RUSSELL:       I have no further

24     questions at this time.

25          Ms. Bonham, you indicated in your email

1     and your objection to start that you would work

2     with us to produce those materials.  That your

3     objection was in large part because you thought

4     that there may be some privileged materials

5     requested.  Then your other part of the objection

6     was on timing.  Are those things that you can

7     produce?

8         MS. BONHAM:     Okay, well I wrote my

9     objection down.  I stated it for the record.

10    That's in its entirety my objection.

11        Subject to that, I would be happy to

12    conduct a review of the materials sought.  To the

13    extent that the defense doesn't already have

14    them, or can't access them just as easily as us,

15    or that they exist and are nonprivileged and

16    responsive, I will certainly work with you guys

17    to get those.

18        THE WITNESS:     May I say something

19    here?  Nobody has a copy of my notes if that is

20    what you are discussing.

21        MS. BONHAM:     I'll get --

22        THE WITNESS:     Just wanted you to be

23    aware of it.

24        MS. BONHAM:     Correct.  I'll get it

25    from you.  The responsive portions of the file is

1        what I'm thinking of.  As he said, he doesn't

2        have billing records at the moment.  When he

3        does, we will produce responsive fee-related

4        documents.  Yeah, anything like that.  This will

5        come up in the Tucker depo I'm sure and we'll

6        have the same position.

7              MR. RUSSELL:     Mr. Balash, thank you

8        again and we will make sure that the check

9        gets to you certainly.

10             THE WITNESS:     I appreciate it.

11       Thank you much.  Thank you for your time.  Are

12       you all set with me?

13             MS. BONHAM:     We're all done.  I've got

14       nothing for you.  Thank you, guys.

15             He'll review it.

16             (Deposition concluded at 11:34 a.m.)

17             (Signature not waived.)

18                     - - -

19

20

21

22

23

24

25

```
 1                    SIGNATURE PAGE

 2   In Re:        Adam Fried, Administrator of the Estate of

 3   Desmond Franklin vs. Jose Garcia

 4   Case Number:  1:22-CV-00061

 5   Deponent:     David Balash

 6   Date:         November 14, 2023

 7

 8   To the Reporter:

 9        I have read the entire transcript of my

10   Deposition taken in the captioned matter or the same

11   has been read to me.  I request that the following

12   changes be entered upon the record for the reasons

13   indicated.

14        I have signed my name to the Errata Sheet and the

15   appropriate Certificate and authorize you to attach

16   both to the original transcript.

17

18                         _____

19                         Davis Balash

20        Subscribed and sworn to before me this

21   _____day of _____, 2023.

22

23                         _____

24                         Notary Public

25        My commission expires:_____.
```

1    I have read the foregoing transcript from page 1

2    through page 95 and note the following corrections:

3    PAGE-LINE      REQUESTED CHANGE              REASON FOR CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    _____    _____

25    David Balash                         Date

```
 1   State of Ohio,          )
                             ) SS:   CERTIFICATE
 2   County of Cuyahoga.     )

 3         I, Constance Versagi, Court Reporter and

 4   Notary Public in and for the State of Ohio, duly

 5   commissioned and qualified, do hereby certify that

 6   the within named witness, David Balash,

 7   was by me first duly sworn to testify the truth, the

 8   whole truth, and nothing but the truth in the cause

 9   aforesaid; that the testimony then given by him was

10   by me reduced to stenotypy/computer in the presence

11   of said witness, afterward transcribed, and that the

12   foregoing is a true and correct transcript of the

13   testimony so given by him as aforesaid.

14         I do further certify that this deposition was

15   taken at the time and place in the foregoing caption

16   specified, and was completed without adjournment.

17         I do further certify that I am not a relative,

18   counsel, or attorney of either party, or otherwise

19   Interested in the event of this action.

20         IN WITNESS WHEREOF, I have hereunto set my

21   hand and affixed my seal of office at Cleveland,

22   Ohio, on this 27th day of November, 2023.

23

24   Constance Versagi, Court Reporter and
     Notary Public in and for the State of Ohio.
25   My Commission expires January 14, 2028.
```

**$**

**$15 (1)**
12:7

**+**

**+P (1)**
54:10
**+P+ (1)**
54:11

**A**

**able (5)**
24:16;30:11;32:4;
74:20;88:8
**above (3)**
65:10;82:3;85:3
**abreast (1)**
53:7
**absolutely (7)**
23:17,21;35:15;
58:17;59:4;67:8,15
**accelerated (1)**
72:3
**accept (6)**
18:19,24;32:2,4,5,6
**accepted (3)**
33:6,8,16
**access (1)**
91:14
**accident (1)**
79:14
**according (3)**
71:4;79:21;90:16
**accordingly (1)**
5:7
**accurate (3)**
67:1;79:24;89:24
**across (1)**
15:23
**action (7)**
86:9,10,18,20,20;
90:4,4
**active (2)**
27:16,18
**Actual (2)**
83:21,22
**actually (8)**
36:21;42:2;56:20;
61:5;63:21;67:6;
70:3;84:3
**acute (1)**
61:13
**add (4)**
17:22;23:25;32:13;
68:1
**additional (2)**
12:7;31:14
**address (1)**
31:17

**adds (1)**
62:22
**advance (1)**
14:12
**Affairs (4)**
22:11;55:12;68:21;
69:9
**affect (2)**
50:9,13
**affected (1)**
50:19
**affidavit (1)**
17:19
**AFTE (1)**
15:14
**Again (13)**
11:20;12:11,17;
19:18,21;20:16;
39:14;56:1;70:19;
76:24;85:19;89:24;
92:8
**age (1)**
4:2
**agencies (3)**
43:19;44:8,12
**ago (3)**
11:19;15:5,8
**agree (3)**
20:11;36:12;63:12
**agreed (1)**
36:1
**agreement (1)**
35:23
**ahead (14)**
7:8;10:22;12:3;
18:21;36:11;65:1;
71:11;72:24;73:3;
76:20;77:1,5;83:20;
89:18
**air (3)**
81:13,14,16
**alarm (2)**
38:10,11
**align (1)**
71:8
**almost (1)**
45:21
**along (5)**
25:25;39:11;51:22;
85:10,11
**always (8)**
20:18;23:17,21;
25:2;47:15,19;50:12;
69:21
**ambiguous (1)**
50:14
**ammo (1)**
54:11
**ammunition (3)**
16:7;45:23;46:4
**amount (2)**
24:1;46:2
**analyses (1)**

4:13
**analysis (3)**
26:2,3;31:25
**analyzing (1)**
47:14
**anatomy (3)**
36:16;83:14,18
**and/or (1)**
8:7
**angle (6)**
61:2,13;66:14,15;
67:19,21
**angles (1)**
68:4
**animals (1)**
37:23
**Ann (1)**
43:14
**answered (6)**
5:7;49:9;61:1;
78:8;82:18;83:20
**anticipation (1)**
62:16
**anymore (1)**
21:2
**apologize (5)**
14:1,3,4;54:17;
59:24
**apology (2)**
77:13;88:18
**apparent (4)**
61:21;64:3,8;68:24
**apparently (5)**
17:3;39:8,13;
84:25;90:15
**appear (3)**
19:16;20:2;55:13
**appearance (1)**
11:4
**appeared (1)**
40:1
**appearing (1)**
11:13
**appears (3)**
20:3;21:11;28:4
**appended (2)**
6:20,25
**applied (1)**
32:25
**apply (2)**
18:8;33:5
**appreciate (4)**
11:13;12:9,11;
92:10
**approach (1)**
51:14
**approached (2)**
51:15;80:14
**approaching (2)**
51:5;80:16
**approximately (5)**
17:14;52:21;53:1;
87:18;88:9

**April (1)**
70:5
**Arbor (1)**
43:14
**area (13)**
9:23;35:1;43:5,10,
13,15,20;54:8;60:15;
64:22;65:14;77:24;
90:15
**areas (1)**
32:7
**armed (2)**
69:7;75:18
**around (5)**
18:12;38:14;39:22;
85:12
**arrived (2)**
11:21;29:25
**arriving (1)**
80:7
**articles (3)**
14:25;15:3,4
**aspect (1)**
51:22
**aspects (1)**
26:21
**assign (1)**
52:4
**assigned (3)**
33:12;41:12,15
**assistance (1)**
42:23
**assisting (1)**
84:3
**Association (5)**
15:14,18;28:8,20;
44:22
**assume (6)**
5:6;8:20;18:18;
29:4;74:7,8
**assumed (1)**
11:17
**assumptions (1)**
18:24
**assure (1)**
11:14
**ATFE (1)**
15:17
**attack (1)**
42:4
**attempt (2)**
57:4;60:1
**attempting (1)**
80:23
**attendance (1)**
84:8
**attended (12)**
27:8;29:2;32:14,
19;45:14,18;46:23;
47:24;48:21,23,25;
49:5
**Attending (3)**
26:19;49:12;84:1

**Attorney (1)**
55:12
**attorneys (2)**
4:10;28:8
**audible (1)**
4:23
**audience (1)**
45:10
**authored (2)**
9:1;14:22
**authorities (1)**
9:5
**auto (7)**
15:24;16:4;86:17;
87:10;88:11,15,18
**autopsies (3)**
36:21,22;49:12;
84:2,3
**autopsy (4)**
36:25;49:12;59:9;
84:9
**autos (1)**
16:2
**available (2)**
25:8;30:12
**average (3)**
54:12,15;74:15
**aware (8)**
24:1;31:15;47:17,
21;76:9,14,17;91:23
**away (3)**
40:4,10;41:11

**B**

**BA (1)**
36:6
**back (13)**
14:14;16:20,25;
19:7;38:18;57:5;
60:2;67:23;71:3;
79:19,23;85:17;88:2
**background (1)**
34:21
**Badley (3)**
22:21,24;23:2
**bag (3)**
81:13,14,16
**BALASH (27)**
4:1,7;5:14,15,18;
6:18;7:11;11:13,18,
22;12:12;16:16;21:8;
23:12;25:12;29:23;
31:10,21;50:24;51:1;
55:2;67:18;68:8;
69:4;83:11;89:4;92:7
**B-A-L-A-S-H (1)**
5:14
**ballistic (1)**
49:24
**Ballistics (4)**
44:21,24;54:3;
72:12

**barrel (2)**
50:5;64:4
**based (3)**
6:25;53:4;78:19
**basic (1)**
57:14
**Basically (1)**
79:3
**basing (1)**
20:16
**basis (8)**
9:6,8,12,19;12:16;
13:24;26:15;47:13
**batteries (1)**
39:15
**battery (2)**
39:10,12
**Bay (2)**
32:14;34:8
**bears (1)**
55:22
**beat (1)**
38:16
**beating (1)**
38:22
**became (3)**
24:1;35:23;42:2
**become (1)**
59:7
**becomes (3)**
49:21;50:8;58:23
**began (5)**
38:16;42:6;63:1;
76:21;77:6
**begin (5)**
17:1;58:20;61:7;
62:1;77:14
**Beginning (6)**
25:13;33:17;42:8;
55:2,5;62:23
**begins (1)**
72:5
**behind (3)**
69:2;70:1;80:9
**belief (2)**
25:4;67:12
**Bend (1)**
33:13
**Bendickson (2)**
42:9,10
**best (1)**
53:22
**beverage (1)**
62:2
**billing (4)**
10:6,11,15;92:2
**biomechanics (2)**
84:12,15
**bit (1)**
7:18
**black (1)**
6:3
**bleeding (1)**

80:11
**blockage (1)**
6:3
**blood (18)**
26:2;31:25;46:24;
47:4,15,17,25;79:3;
82:1,4;84:20,21,24;
85:2,3,5,12,24
**body (2)**
68:12;84:5
**body's (2)**
49:2,6
**Bomb (2)**
28:20;41:13
**bombing (1)**
29:13
**bombs (7)**
25:21;27:22;28:3;
29:18,19;31:24;
42:15
**BONHAM (41)**
6:18;7:15;8:19,22;
9:20;10:7,13,20;
18:15,20;23:7,20;
26:13;31:9;36:11;
46:14;47:5;48:9;
49:8;50:23;52:11;
54:20;60:25;64:6,25;
65:4;76:6,12;78:7;
79:16;81:7;82:18;
83:8,19;89:17;90:12,
25;91:8,21,24;92:13
**boring (1)**
35:1
**both (15)**
20:7;22:1;24:11,
13,17,24;39:4,6;
53:25;63:18;68:24;
77:20;89:5,10,12
**bottom (4)**
6:2;17:13;18:2;
65:21
**boy (2)**
56:19;63:10
**B-pillar (1)**
71:19
**brain (2)**
82:4;85:24
**break (2)**
5:8,8;50:22;54:21;
83:6
**Bridgeport (2)**
34:8;43:6
**briefly (2)**
51:1;68:15
**Brighton (1)**
43:14
**bring (1)**
34:11
**broke (1)**
39:15
**brought (1)**
44:3

**bucket (2)**
39:19;74:7
**building (1)**
38:15
**bullet (60)**
16:6;45:6;49:3,7,
16,19;50:1,3,5,9,10,
13,17;54:6;56:19;
59:20,22;60:9,20,24;
61:4,8,23;64:14,17,
23;65:8,11,15;66:2,
18;67:12;70:10,12,
13,22,23;71:1,5,8,17,
24;72:7,10,14,18,21;
73:1,4,5,12,15,15,20;
74:18;77:8,9;78:17,
22;84:4
**bullets (4)**
15:6;24:4,25;25:10
**bullet's (1)**
53:12
**burden (1)**
7:2
**burglary (1)**
38:9
**business (4)**
5:18;7:1;31:16,21
**byproduct (1)**
14:2

# C

**CABRAL (17)**
11:16,17;12:2,9
**caliber (4)**
15:25;16:8;54:6;
74:17
**call (1)**
86:9
**called (2)**
16:3;90:2
**calls (1)**
43:24
**cam (1)**
68:12
**came (7)**
16:10;35:18;39:15,
21,21;53:6;69:8
**cameras (1)**
78:2
**can (50)**
5:8,12,24;6:1,5,7;
7:8,24;8:22;11:14,
16;14:7;16:16;18:5;
21:9;34:6;42:22;
44:22;45:17;50:11,
12,12;51:2,9,11;52:9;
60:16;61:7;63:20,21;
66:2;67:22;68:22,23;
69:1;70:6;74:14,15,
24,25;75:1,4,14;
77:21;86:19;87:3,8;
88:2,16;91:6

**Canton (2)**
11:6;31:17
**capacity (1)**
88:11
**captured (1)**
58:8
**car (16)**
38:9;56:11;57:12;
62:16;63:5;67:22;
72:3;73:8;76:20,21;
77:5,5,8,10;79:19;
80:16
**care (1)**
35:16
**career (2)**
25:23;40:23
**carried (1)**
69:19
**cars (5)**
53:25;71:9;76:19;
77:3,15
**cartridge (4)**
25:1,9;50:4;89:23
**cartridges (2)**
15:23;16:5
**case (42)**
4:14;7:20;9:2,9;
10:12,17;11:1;14:23;
15:24;17:2,10;18:9,
23;23:24;24:7;25:18;
29:4,25;30:3,19,21,
22,25;31:4,6;32:1,2,
3,5;53:17,20,24;54:7;
56:6;58:2,5;73:25;
75:6;83:1;84:23;
86:1,7
**cases (25)**
13:9,16;17:8;19:2,
12,15;20:3,4,6,7,8,10,
13,17,21,22,24;21:4;
25:1,9;26:24;29:11;
32:11;45:5;89:23
**cause (1)**
87:19
**caused (1)**
73:6
**ceased (1)**
79:7
**cell (2)**
39:9,12
**certainly (15)**
8:9;11:14;12:18;
24:23;30:11;48:10;
52:16;59:12;61:24;
63:25;69:10;72:17;
82:5;91:16;92:9
**certified (1)**
4:3
**cetera (8)**
13:23;25:22;28:3;
44:6;46:16;47:18;
48:15;54:7
**chance (1)**

56:1
**changed (1)**
65:23
**charge (3)**
42:14;44:7,7
**charts (1)**
13:18
**check (4)**
11:2,19;89:3;92:8
**childish (1)**
90:20
**children (1)**
41:18
**chose (1)**
17:4
**chronograph (1)**
54:12
**circled (1)**
68:19
**circumstance (1)**
62:21
**circumstances (2)**
59:3;75:19
**City (4)**
32:14;34:8;37:14;
43:12,15,16
**civil (7)**
20:4,8,10,13,22;
21:3,4
**civilian (1)**
32:12
**civilians (1)**
27:17
**claimed (1)**
58:3
**clarification (3)**
5:1;22:7;65:3
**clarify (4)**
10:24;14:21;56:16;
59:22
**class (4)**
48:23;49:4,10,13
**classes (4)**
27:11,19,22,24
**clear (3)**
30:14;31:2;77:25
**clearly (2)**
68:4,22
**Cleveland (1)**
55:10
**clip (1)**
39:21
**close (2)**
71:10;83:5
**clothing (5)**
58:22,24;68:16;
70:6;76:16
**coat (1)**
56:10
**cocked (1)**
63:20
**coffee (1)**
54:22

**cold (1)**
70:7
**collect (1)**
60:2
**collection (6)**
27:14;44:15;48:7,
12,13;51:22
**College (4)**
32:19;35:10,12;
36:4
**combination (1)**
87:5
**comfortable (1)**
11:25
**coming (9)**
13:24;38:14;46:6,
10;62:9,16,17;72:19;
85:3
**comment (2)**
50:17;90:8
**comments (2)**
55:6,7
**communication (1)**
18:15
**communications (1)**
12:21
**companies (1)**
26:19
**company (3)**
5:19,21;16:3
**compared (1)**
20:13
**compensation (2)**
10:18,24
**compilation (2)**
77:17,20
**complete (1)**
35:20
**completed (1)**
36:25
**compliance (1)**
74:9
**comprehensive (1)**
21:17
**computer (2)**
6:7;52:14
**conceal (1)**
69:14
**concealed (3)**
69:17,19,22
**concerns (1)**
59:25
**concluded (1)**
92:16
**conclusion (5)**
26:11;67:16,18;
71:13;72:25
**conclusions (2)**
21:14;70:9
**condition (1)**
69:11
**conditions (1)**
70:4

**conduct (1)**
91:12
**conducted (1)**
57:17
**conference (4)**
44:20,23;45:4;47:7
**confirm (1)**
7:10
**confirming (1)**
67:11
**confrontation (2)**
62:2,6
**connected (1)**
8:3
**consider (1)**
74:6
**consideration (1)**
72:8
**considered (2)**
12:15,23
**consist (1)**
8:2
**consistent (2)**
81:11,20
**contact (1)**
49:25
**contain (5)**
10:11,16;12:20;
13:20;27:3
**contained (7)**
9:9,17;10:3;11:15;
12:13;13:3,17
**contaminated (2)**
79:20;80:25
**contaminates (1)**
85:16
**contention (4)**
64:21;65:1;69:16;
81:3
**contents (2)**
7:25;8:2
**continue (5)**
29:17;39:25;62:11;
72:18;88:14
**Continued (1)**
42:1
**continuing (1)**
87:9
**Contrary (1)**
38:17
**contribute (1)**
72:16
**Convenient (1)**
78:4
**conviction (2)**
63:8,13
**cool (1)**
70:7
**copies (3)**
8:25;9:4;10:11
**copy (7)**
6:13;13:15;18:5;
52:12,13,14;91:19

**core (1)**
53:13
**correctly (4)**
60:19;66:20;72:21;
84:4
**correlate (3)**
51:18;52:2;61:7
**correlates (1)**
63:2
**correspond (1)**
72:21
**correspondence (5)**
10:16,18,22,23;
12:20
**Coughing (1)**
14:1
**counsel (8)**
6:23;10:17;12:14,
22;13:1,6,11;18:17
**country (1)**
34:24
**County (6)**
41:2,8;55:11,12;
84:1,9
**couple (6)**
7:1;61:16;66:6;
68:2;83:25;84:19
**Coupled (1)**
78:16
**couples (1)**
73:4
**course (5)**
48:18,21;49:1;
77:13;85:11
**courses (1)**
49:5
**court (7)**
4:21;13:15;17:11,
19,21;28:16;31:17
**cover (3)**
47:12;66:21;67:10
**covering (3)**
16:18;60:18;66:16
**covers (1)**
48:14
**cowling (1)**
67:10
**credence (1)**
62:22
**credibility (1)**
52:4
**crime (21)**
25:20;26:21;27:14;
28:2;31:23;32:9;
35:7,8,9,11,14,18,25;
41:25;43:22,25;44:4;
47:14,16,22;51:21
**criminal (5)**
20:8,14,24;36:7,13
**CROSS-EXAMINATION (1)**
4:5
**cup (1)**
54:22

**current (7)**
6:14,16;8:17;14:9,
12,18;18:7
**currently (1)**
31:20
**curriculum (5)**
6:14,15;8:17;14:9;
25:13
**Cuyahoga (2)**
55:11,12
**CV (8)**
6:16;14:13,18;
15:11;26:8;27:2;
44:19;46:23
**cycle (1)**
88:15
**cyclic (1)**
88:9
**cycling (1)**
87:13

### D

**daily (1)**
26:15
**damage (1)**
57:11
**data (7)**
9:8,13,14,15,18;
12:14,21
**date (4)**
8:24;14:15;17:15,
18
**Dated (1)**
14:17
**DAVID (4)**
4:1;5:14,18;31:21
**dawned (1)**
38:24
**day (3)**
38:6;43:24;70:5
**days (2)**
7:1;38:10
**deadly (1)**
75:17
**deal (1)**
26:1
**deals (1)**
48:16
**death (1)**
55:9
**deaths (1)**
29:13
**December (3)**
33:12,22;34:4
**decided (2)**
16:9,25
**declined (1)**
36:14
**decocker (1)**
87:5
**decocking (1)**
90:3

**deer (1)**
37:23
**defendant's (3)**
22:2;89:6,15
**defense (7)**
6:23;20:23,25;
21:5,25;28:8;91:13
**defined (1)**
60:12
**definitive (1)**
60:10
**definitively (2)**
23:5,11
**deflated (1)**
81:17
**degree (14)**
35:14,21,25;36:9,
14,15,16,19,20;37:1,
3;59:5;83:13;84:11
**degrees (1)**
35:12
**Delta (1)**
32:19
**demand (1)**
31:8
**department (11)**
25:25;29:12;33:20;
35:24;42:19;43:24;
55:10,11;64:15;70:3;
83:23
**departments (2)**
27:25;42:22
**Depending (3)**
54:6,9;74:15
**depicted (1)**
66:10
**depiction (1)**
66:12
**depo (2)**
7:2;92:5
**deposition (8)**
5:22;10:1;17:9,12;
22:17,23;89:5;92:16
**depositions (4)**
4:16;17:14,21;
19:11
**describe (1)**
7:24
**Desmond (20)**
4:11;55:9;63:4,7;
64:12;70:11,23;
76:20;77:4;78:12,21,
25;79:15;81:23;
82:24;84:18;86:2,14,
23;88:20
**despised (1)**
35:1
**detail (1)**
59:5
**Detective (2)**
42:1,13
**determination (2)**
66:18;67:2

**determine (1)**
84:4
**Detroit (8)**
27:21;37:14,15,17,
20;43:12,15,16
**devastating (1)**
79:6
**Devin (3)**
22:20,24;23:2
**diagrams (4)**
13:18,22;61:16,17
**dictate (1)**
59:3
**died (1)**
42:4
**difference (5)**
48:6,10;49:15,18;
67:5
**different (11)**
22:14;27:11;30:1;
35:5;43:19;45:5,6;
47:17;76:15;77:17;
78:2
**difficult (1)**
50:15
**difficulty (1)**
11:6
**diploma (1)**
32:17
**direct (1)**
70:25
**disagree (1)**
90:11
**disagreements (1)**
90:6
**discharge (4)**
37:9;58:25;74:14,
24
**discharged (4)**
37:13,21;50:4,4
**disclosed (1)**
8:23
**disconnect (2)**
54:16;63:19
**disconnects (1)**
63:22
**discuss (5)**
4:12;6:19;47:9;
61:18;90:11
**discussed (1)**
8:16
**discussing (4)**
26:21;55:20;63:17;
91:20
**dispatched (1)**
38:8
**dispatching (1)**
37:22
**distance (1)**
72:5
**distances (1)**
71:16
**district (1)**

28:16
**disturb (1)**
80:19
**disturbance (1)**
37:18
**divide (1)**
88:17
**document (9)**
5:25;6:20,24;14:8;
16:17,18;18:6;21:10;
44:5
**documents (8)**
6:12;7:6,12;8:3,7;
13:21;23:9;92:4
**dog (1)**
37:24
**done (14)**
25:24;30:5,8,13,
16;37:25;46:5;51:21;
57:16;60:21,23;75:2;
80:7;92:13
**double (4)**
86:17,18,20;90:4
**down (26)**
4:21;17:4;32:2,4;
56:15,15;61:19,22;
62:1,1,5,6,7,9,13,13,
14,19;65:5;68:19;
77:22;82:2,3;85:1,
14;91:9
**downward (1)**
85:4
**dozens (3)**
36:22;84:1,1
**draw (2)**
75:4,14
**drawing (2)**
73:22;74:3
**draws (1)**
74:4
**drew (5)**
39:22;74:11;75:7
**drilled (1)**
16:1
**drilling (1)**
16:5
**dripped (1)**
82:3
**dripping (1)**
84:25
**drive (5)**
8:4,7,10,11;19:8
**driver (1)**
64:18
**driver's (3)**
66:11;79:5;81:21
**driving (2)**
38:9;70:2
**drop (1)**
87:20
**Dropped (5)**
38:13;39:6;81:4,9;
85:14

**drug (1)**
44:5
**due (1)**
71:16
**duly (1)**
4:2
**during (2)**
37:14;44:14
**duties (2)**
33:15;41:22
**duty (1)**
70:2

**E**

**earlier (3)**
6:15;71:23;83:12
**easier (2)**
52:11,17
**easiest (1)**
36:8
**easily (2)**
66:24;91:14
**Echo (1)**
31:17
**Edison (2)**
27:21;37:17
**either (5)**
34:7;60:16;71:9;
85:24;89:15
**elongated (1)**
71:20,21;85:6
**else (7)**
16:8;31:4,6;77:11;
81:22;90:13,14
**email (1)**
6:22;8:7;90:25
**emails (3)**
8:2,4,10
**EMS (1)**
80:23
**enable (1)**
90:4
**encouraged (2)**
35:20,22
**enforcement (3)**
34:12;40:23;41:6
**engage (1)**
64:2
**enough (3)**
4:23;36:15;69:12
**entered (1)**
70:13
**entire (1)**
8:8
**entirety (1)**
91:10
**entrance (1)**
78:19
**entry (1)**
68:4
**equally (1)**
53:10

**essential (1)**
26:10
**essentially (4)**
26:23;33:19;35:19;
44:10
**establish (1)**
61:24
**Estate (1)**
4:11
**estimate (4)**
20:20;52:22,23;
53:3
**estimated (1)**
52:25
**et (8)**
13:23;25:22;28:3;
44:6;46:16;47:18;
48:15;54:6
**evaluate (1)**
52:7
**evaluated (1)**
80:9
**even (6)**
35:8;50:18;56:13;
62:12;64:19;65:11
**event (1)**
58:7
**eventually (6)**
11:12;40:20;41:19,
25;42:9;43:7
**everybody (2)**
33:9;45:7
**everyone (1)**
34:1
**evidence (25)**
23:23;24:2,6;26:3,
15;27:13,14;30:10;
42:22;44:3,16;48:6,
11,13;51:16,18,21;
52:1,6;53:19;55:24;
66:4;80:12,25;81:10
**exactly (3)**
32:24;42:17;85:18
**examination (3)**
26:22;30:10;53:12
**examinations (2)**
9:24;25:24
**examine (6)**
24:16;25:3;53:14,
16;55:25;72:11
**examined (4)**
4:3;24:6,24;72:20
**Examiner (6)**
15:15;25:19;42:5;
45:3;55:13;71:4
**Examiners (4)**
15:15,18,19;16:10
**examining (4)**
26:3,15,18;72:11
**example (2)**
43:23;56:10
**Excellent (1)**
52:16

**except (1)**
73:6
**exceptionally (2)**
34:25;47:15
**excess (1)**
55:19
**Excuse (1)**
54:18
**Exhibit (10)**
5:24;6:9;12:19;
14:6;16:16;17:25;
19:10;21:8;25:13;
29:23
**exhibits (1)**
13:22
**exist (1)**
91:15
**exists (1)**
45:12
**exit (2)**
60:11,18
**expect (1)**
85:22
**expected (2)**
82:6,8
**expelling (1)**
85:23
**experience (10)**
9:23;25:15,16;
26:1,6,14,25;27:3;
83:21,22
**experiences (1)**
27:4
**expert (4)**
13:10;21:25;22:2;
89:6
**expertise (1)**
9:23
**experts (1)**
89:7
**explain (1)**
9:10
**Explosive (3)**
29:7;32:11;41:13
**explosives (6)**
25:22;27:23;28:3;
31:24;32:8;42:15
**exposed (1)**
69:23
**expressed (1)**
12:24
**extent (4)**
7:5;10:17;23:8;
91:13
**external (1)**
86:11
**extra (1)**
36:13
**extremely (2)**
65:25;66:1

**F**

facie (1)
  56:17
facing (1)
  73:17
fact (11)
  11:24;25:19;35:10;
  41:11;56:13;69:7;
  73:1;79:18;80:3;
  81:16;90:18
factors (1)
  78:20
facts (3)
  12:13,21;18:17
fair (8)
  4:23;20:4,12;28:5;
  54:1,2;60:3,4
faith (2)
  12:3,6
fallen (2)
  69:13,13
familiar (4)
  46:9;85:25;86:4,15
far (2)
  21:3;30:7
farm (1)
  34:24
fast (4)
  75:1,4,12,14
fatal (15)
  53:12;64:18;65:11;
  67:13,15,25;71:14,
  15;72:2,18;73:15,19;
  77:9;78:22;81:5
fatality (1)
  66:3
fatally (2)
  70:11,22
February (1)
  14:17
fee (2)
  18:7,8
feel (1)
  11:25
fee-related (1)
  92:3
feet (4)
  54:4,9,13,14
fell (2)
  38:20;39:19
fellow (1)
  16:9
felony (2)
  63:8,12
fence (1)
  81:15
field (1)
  32:12
fifth (1)
  60:24
fight (1)
  39:2
figured (1)
  20:18

file (20)
  7:20,22;8:1,8,15,
  25;9:4,9;10:3,6,10,
  16;11:15;12:13,20;
  13:3,7,18,20;91:25
filed (1)
  4:11
final (1)
  50:10
Finally (2)
  35:6;38:24
find (7)
  41:17;56:24;60:7,
  17;69:25;70:3;74:12
fine (1)
  50:25
finger (2)
  87:25;88:4
finish (3)
  35:14,25;83:7
fire (10)
  38:3;74:16,20,25;
  75:15;86:19;87:8;
  88:6,13,16
Firearm (32)
  15:14,18;25:7;
  32:7;37:13;41:12;
  49:20;54:3;56:9;
  58:25;63:4;69:17;
  70:1;75:24,24;76:5;
  79:13,18;80:4;81:4,
  9;82:10,16;84:17,20;
  86:2,2,14,23,24;87:4;
  88:20
firearms (21)
  25:6,19;26:2,19,
  22;27:22;28:2;31:23;
  32:10;41:24;42:5,14;
  44:6;45:3,19,22;46:6,
  15;76:10;85:25;
  90:16
fired (20)
  24:25;25:9,10;
  38:1;40:2,8,9;54:3;
  57:12;58:4;61:4,12;
  70:12,23;71:12;73:9;
  75:7;87:12;88:8;
  89:23
firing (7)
  50:2;73:23;74:17;
  76:22;77:6;82:16;
  87:20
firm (9)
  10:8,14,15;19:1,5,
  13,16,20;20:2
first (30)
  4:2;6:13;11:3;
  18:15;27:11;33:10,
  15;34:1;37:13;51:12;
  53:6;55:7;61:23;
  65:15;70:12,16,18,
  23;71:14,15,24;72:1;
  76:25;77:1;78:3,10,

  11,24;80:8;88:13
first-hand (1)
  46:8
fists (1)
  39:4
five (10)
  39:9,12;56:21;
  61:3,5;65:9;74:21;
  75:7;83:6;89:23
flash (4)
  8:4,7,10,11
flashlight (4)
  39:6,9,10,15
flight (10)
  49:15,21,25;50:8;
  60:7,12,19,24;66:9;
  67:2
Flint (1)
  34:8
floats (1)
  63:23
floor (1)
  81:21
focus (1)
  77:18
follow (1)
  59:21
follows (1)
  4:4
follow-up (1)
  68:5
force (1)
  75:17
Ford (4)
  53:6;56:20;71:10;
  72:6
forensic (5)
  34:16,20;36:19;
  37:1,3
forensics (1)
  44:17
Forest (1)
  31:17
Forgive (2)
  77:25;83:12
forgot (1)
  54:16
form (13)
  9:8,14,18,21;
  18:20;26:13;46:14;
  47:5;48:9;64:6;76:6;
  78:7;81:7
formal (6)
  37:5;47:2,23;
  83:17,21;84:14
formally (1)
  59:4
formed (1)
  44:25
forming (2)
  12:15,23
formulated (1)
  12:25

formulating (1)
  26:25
forward (6)
  39:20;73:2,10,14,
  17;81:5
found (6)
  79:4,5;81:20;82:8;
  84:21
four (8)
  16:19,20,22;17:4;
  19:7;56:19;61:4;65:8
fragments (3)
  72:7,10,14
frame (1)
  85:11
frangible (1)
  15:5
Franklin (16)
  4:12;55:10;63:7;
  64:12;70:11,23;71:1;
  72:24;73:14,17;
  78:12,21,25;79:5;
  81:23;82:24
Franklin's (11)
  63:5;73:10;76:20;
  77:4,8;79:15;84:18;
  86:3,15,24;88:20
free (2)
  44:7;63:23
front (4)
  38:13;70:14;71:4;
  73:18
full (8)
  5:13;16:24;70:18;
  76:25;77:1;78:11,24;
  87:18
fully (11)
  56:15;58:16;61:19,
  25;62:5,7,14;87:10;
  88:10,15,18
function (1)
  63:23
furniture (1)
  38:10
further (3)
  16:20;31:13;90:23
future (1)
  46:3

**G**

gained (1)
  26:15
Garcia (27)
  4:10;22:8,10,12,
  15;56:14;58:11,15;
  61:21;68:7,13,17,20;
  69:7,16;70:12,24;
  73:22;76:21;77:6;
  78:5,13,13,22;79:1;
  81:24;82:25
Garcia's (10)
  22:17;62:9;66:6;

  76:21;77:5,10;86:1,
  5;87:7,22
gave (5)
  8:20;17:9,18;
  29:14,16
geared (2)
  46:12,15
General (1)
  55:13
generally (3)
  4:19;7:24,24
gets (1)
  92:9
Gilbert (1)
  18:16
Gilbert's (7)
  10:7,14;19:1,5,13,
  16,20
given (3)
  17:14;27:16;66:17
gives (2)
  61:2;88:3
giving (1)
  18:19
glass (2)
  57:8,10
Glock (1)
  86:8
Glocks (1)
  88:8
goes (6)
  4:19;33:9;51:23;
  57:3;61:7;64:19
Good (11)
  4:7,8,8;35:1;39:13;
  50:22,24;54:23;
  60:20,22;83:8
government (1)
  11:9
grab (1)
  80:18
grabbed (1)
  38:20
grabbing (2)
  39:20;56:9
graduated (4)
  33:11;34:3,4;36:3
Grand (1)
  43:5
grateful (1)
  12:2
Grayling (1)
  43:7
great (5)
  24:1;26:1;32:11;
  44:1;59:5
grip (1)
  85:12
ground (1)
  38:20
groups (1)
  26:21
guard (3)

63:24;87:16;88:3
**guess (3)**
15:12;35:22;51:9
**guest (1)**
28:1
**gun (16)**
64:5;69:14;74:11;
79:1,3,4,4,10;80:18;
81:20,24;82:1,25;
87:13,22;88:14
**guys (3)**
50:23;91:16;92:14

## H

**half (8)**
34:2;56:14;61:22;
62:1,6,13;74:4,11
**halfway (1)**
62:13
**halt (3)**
39:24;40:5,6
**hammer (2)**
63:20;87:19
**hand (2)**
39:5;64:1
**handgun (1)**
46:17
**handguns (3)**
45:22;46:19,21
**hand-in-hand (1)**
51:24
**handled (1)**
85:15
**handling (2)**
56:2;64:10
**hands (2)**
11:21;39:5
**happen (3)**
14:2;37:12;57:13
**happened (4)**
29:11,15;56:5;
57:13
**happens (1)**
49:14
**happy (1)**
91:11
**harness (1)**
69:21
**head (11)**
38:23;39:12;42:5;
67:20;71:2,3;73:10,
18;78:16;79:6;85:23
**hear (2)**
24:14;67:17
**heard (2)**
14:24;38:18
**heart (1)**
42:4
**heavily (1)**
55:23
**heavy (1)**
74:10

**helped (1)**
25:16
**hereinafter (1)**
4:3
**hesitation (1)**
40:2
**High (1)**
32:15
**highlight (1)**
77:21
**highlighted (1)**
90:9
**hit (5)**
37:25;39:11,14;
40:3;81:5
**hits (2)**
50:6,7
**hitting (1)**
39:3
**hold (1)**
87:9
**holding (1)**
38:21
**hole (4)**
16:5;60:11,18;
61:23
**holes (2)**
56:19,23
**hollow (4)**
15:25;16:1,3,7
**holster (5)**
24:25;59:2,3;69:3,
14;75:5,25;76:5,11
**homicide (2)**
35:6;59:10
**Honda (4)**
53:7;71:11;72:5;
74:6
**honest (4)**
50:14;59:8;69:6;
85:15
**hours (1)**
35:3
**house (1)**
41:17
**human (2)**
49:2,6
**hundreds (2)**
25:20,24;36:20,22;
45:21,21
**hunt (1)**
46:19
**Hunting (2)**
45:15,20
**hypothetical (1)**
64:7

## I

**IA (1)**
22:10
**idea (1)**
23:18

**identification (7)**
5:24;14:7;17:25;
21:8;32:8;41:12;
42:14
**identified (8)**
60:19;61:5;64:16;
65:8,24;68:2;71:6,22
**identify (6)**
12:21;21:4;61:6;
64:22;65:9;68:9
**IEDs (1)**
29:18
**illustrious (1)**
11:20
**impact (1)**
85:21
**imply (1)**
80:17
**importance (3)**
59:18,20;61:18
**important (7)**
47:16,19;58:23;
59:7;65:25;66:1,3
**importantly (1)**
68:10
**inch (1)**
88:6
**incident (2)**
38:6;62:24
**include (5)**
8:9;10:6;17:19;
66:8;84:10
**included (2)**
21:22;77:14
**including (1)**
19:8
**incorrect (1)**
90:5
**Indiana (1)**
33:14
**indicate (13)**
21:12,13;28:19;
58:7,14;63:15;66:21;
70:8;72:23;73:21;
75:19;76:18;87:7
**indicated (17)**
8:18;17:13;24:19;
37:8;40:12;44:19;
45:13;46:23;52:3,9,
19;53:6;58:10;59:18;
84:17;89:4;90:25
**indicates (1)**
55:8
**indication (1)**
84:19
**indicative (2)**
57:7;85:13
**individual (3)**
36:24;42:3;81:11
**individually (1)**
19:22
**individuals (1)**
79:22

**information (2)**
30:8;46:9
**informed (1)**
63:7
**initial (1)**
47:11
**initially (1)**
43:4
**injured (1)**
37:24
**injury (1)**
79:6
**insert (1)**
87:24
**in-service (2)**
47:8;48:2
**inside (2)**
69:18;81:19
**inspect (1)**
82:10
**inspection (1)**
13:22
**instance (1)**
61:10
**instead (1)**
80:7
**instructor (1)**
27:5
**integral (1)**
56:11
**intensified (1)**
47:19
**intent (3)**
56:4;62:8;74:21
**intention (1)**
16:21
**Intentional (1)**
16:23
**interaction (1)**
78:3
**interdepartmental (1)**
26:20
**interested (2)**
46:15;56:12
**Internal (4)**
22:11;55:12;68:21;
69:8
**International (3)**
28:20;44:21,24
**interpretation (4)**
46:25;47:4,25;
48:16
**interrupt (1)**
11:16
**intersection (4)**
52:21;61:19;62:5;
77:23
**interview (3)**
22:8,10,11
**interviewed (1)**
35:13
**interviews (9)**
22:15,20;57:20,21,

23;58:1,11;68:22;
73:24
**into (17)**
7:18;9:12;16:1,11;
35:13,16,18;45:1;
69:2,8;70:2,4;71:18;
72:8;79:19;81:17;
90:22
**investigation (12)**
26:22;31:13;44:1;
55:9,16,21,22;56:3;
57:18;60:1;64:16,20
**investigator (2)**
56:17;65:13
**Investigators (3)**
28:21;64:21;74:3
**involved (7)**
24:4;26:5;28:25;
29:14;59:14;74:19;
86:1
**involving (2)**
25:21;58:21
**issue (2)**
80:3,23
**issues (4)**
9:2;14:23;89:14,20
**item (5)**
8:16;12:18;13:20;
30:24;47:16
**items (14)**
21:13;24:8,12,15,
19;25:4;26:23;30:9;
31:3,14;45:1;56:16;
57:15;58:15

## J

**jacket (9)**
68:9,21,25;69:2,5,
11,12;70:1;74:10
**James (1)**
32:15
**January (1)**
18:12
**JJ (1)**
16:3
**join (1)**
33:20
**Jose (3)**
4:10;58:11,15
**Jovino (1)**
16:3
**JR (2)**
4:9;11:16
**judges (1)**
28:16
**jump (2)**
39:8;90:13
**jumped (1)**
38:15
**jumps (2)**
26:8;90:14
**jurisdictions (1)**

43:10
**justice (2)**
36:7,14
**justified (1)**
75:17

## K

**keep (2)**
50:22;88:7
**kept (1)**
8:8
**keys (1)**
39:21
**kicked (1)**
39:7
**kidnapping (1)**
48:15
**kind (1)**
90:20
**knew (3)**
34:1,1,4
**knowing (1)**
60:24;67:9
**knowledge (1)**
53:22

## L

**lab (7)**
35:7,8,9,11,14,18,
25
**label (1)**
68:23
**labeled (2)**
65:20;66:23
**laboratories (2)**
27:15;43:8
**laboratory (16)**
15:24;26:17;41:16,
19,20;42:6,16,19,25;
43:2,2;44:4,10,12;
47:8;51:23
**landed (1)**
39:9
**Lansing (1)**
43:3
**large (1)**
91:3
**last (14)**
6:23;13:15;14:15,
25;15:5;43:23;48:18,
21;49:1,5;57:12;
61:12;65:22;71:21
**lasts (1)**
33:19
**latent (2)**
35:17;44:6
**later (2)**
9:13;59:15
**law (5)**
20:2;34:12;40:23;
41:6;74:9

**lawful (1)**
4:2
**lead (2)**
53:12;71:13
**leads (2)**
67:16,18
**least (5)**
25:6;36:22;40:8,9;
44:11
**leaves (2)**
49:19,24
**lecturer (1)**
28:1
**lecturing (1)**
29:1
**led (3)**
62:21;72:25;78:20
**Leedle (1)**
42:4
**left (2)**
71:3;73:2
**leg (1)**
81:12
**legs (2)**
39:17,18
**less (1)**
51:10
**letter (1)**
13:6
**liability (2)**
5:19,20
**Lieutenant (1)**
42:13
**life (1)**
81:2
**lifting (1)**
81:19
**light (2)**
53:1,25
**lights (1)**
37:19
**liked (1)**
24:23
**likely (1)**
57:10
**limit (1)**
16:21
**Limitations (1)**
37:16
**limited (3)**
5:19,20;68:16
**line (1)**
43:14
**lines (1)**
26:1
**list (13)**
13:8;16:21;19:17;
20:3,10,21;21:4,17,
22;23:9,11;27:3;
57:24
**listed (10)**
7:23;12:19;15:10;
19:11;23:10;26:8;

27:2;28:7,12;51:3
**listing (1)**
17:8
**literature (2)**
9:4;46:2
**litigation (1)**
4:11
**little (6)**
7:18;15:4;16:20;
34:21;55:2;87:24
**Livonia (1)**
36:5
**load (1)**
54:10
**local (2)**
27:25;43:9
**located (4)**
75:25;76:11;86:23;
88:20
**location (1)**
45:24
**logo (2)**
68:19,23
**logs (1)**
10:12
**long (5)**
19:8;40:1,12,17;
69:12
**longer (3)**
33:10;38:25;45:12
**longest (1)**
15:12
**long-winded (1)**
51:10
**look (23)**
19:21,24;30:20,21,
25;31:13,22;32:1,2;
44:25;46:9;49:11;
51:20;52:1,5;53:18;
60:13;61:11;67:6;
69:6;70:4;77:22;
90:19
**looked (4)**
20:15;57:6,8;78:9
**looking (12)**
47:14;52:24;56:3,
18;67:7;72:24;73:3,
14;78:12,21;85:17;
87:14
**lose (1)**
39:1
**louder (1)**
38:17
**lower (1)**
63:20
**ludicrous (2)**
69:25;70:3
**lying (1)**
37:24

## M

**Madonna (1)**

36:3
**magazine (1)**
88:11
**mail (5)**
11:7,25,25;12:1,7
**mailed (1)**
11:11
**main (2)**
31:16;43:2
**mainly (2)**
8:2;37:15
**maintain (2)**
10:10;29:17
**major (1)**
45:19
**majority (2)**
26:14;46:19
**makes (1)**
49:25
**making (1)**
46:5
**mandatory (1)**
33:25
**manufacturer (1)**
45:22
**many (7)**
15:4;19:4;27:24;
32:13;36:22;74:14,
23
**March (1)**
38:5
**Mark (4)**
15:15,19;41:13;
42:15
**marked (8)**
5:23;14:6;16:16;
17:24;21:8;29:23;
65:14;66:23
**marks (1)**
31:25
**Marlette (1)**
35:7
**Marquette (1)**
43:7
**Marv (2)**
42:8,9
**match (1)**
73:24
**material (9)**
6:3;8:10;29:15,15;
45:10;46:2,10;51:16;
90:20
**materials (11)**
8:11,12,15,23;
10:2;21:21,24;23:9;
91:2,4,12
**matter (17)**
7:19;8:13;10:4,19;
18:11;21:14,19;
31:11;40:13;51:2,6,
13;53:24;55:4;57:18;
82:5;85:24
**may (23)**

11:8,8;12:15,23;
14:1;30:1;46:3;
51:20,20;58:24,25;
59:7,7,14,14;63:9,9;
67:5,5;75:19;83:5;
91:4,18
**maybe (5)**
13:17;30:17;43:19;
63:13;88:5
**mean (10)**
22:11;36:23;53:7,
9;57:14;59:21;77:16;
78:1;83:22;88:10
**meaning (2)**
86:19;87:11
**means (3)**
63:19;73:9;88:16
**measure (1)**
89:2
**medical (2)**
37:5;71:4
**medium (1)**
85:21
**meetings (1)**
6:5;26:20
**mentioned (1)**
30:10
**methodology (3)**
51:5,11;52:3
**Michigan (22)**
25:23;26:16;28:8;
29:5;31:18;32:21,25;
33:8;34:9,23;40:20,
21,24;41:21;42:17,
21,23;43:1,13;44:13;
83:23;84:6
**middle (5)**
6:1;34:22;58:21;
87:16,24
**might (4)**
23:25;31:10;32:13;
85:22
**miles (1)**
33:13
**millimeter (2)**
54:7;86:8
**mind (2)**
40:15;90:20
**Minor (1)**
36:7
**minuscule (1)**
50:18
**minute (5)**
54:21;83:6;88:10,
14,15
**mirror (19)**
57:5,6,11;59:19,
22;60:2,8,9,12,15,20;
61:2,24;66:10,11,19,
21;67:3,13
**Miss (1)**
7:15
**missed (1)**

56:21

**missing (7)**
24:2,9,10,12,15,21;
25:5

**misstates (4)**
9:20;64:25;79:16;
81:8

**misunderstanding (1)**
30:18

**mode (2)**
86:20,21

**moment (5)**
29:21;49:24;50:2;
54:18;92:2

**money (1)**
39:21

**months (1)**
41:3

**moose (1)**
68:18

**more (20)**
8:8;11:19;14:2;
40:18;44:11;46:12;
55:3;57:10;58:4,4;
60:7,10,11,19;66:17;
68:10;70:25;71:20;
82:7;90:22

**morning (4)**
4:7,8,14;38:19

**most (6)**
20:3;10;44:14;
61:13;71:21,25

**mostly (1)**
25:21

**move (7)**
7:18;28:7;35:4;
39:17,18;61:15;88:2

**moved (5)**
41:19;79:14,18;
80:4,16

**moves (1)**
34:25

**much (6)**
38:17,25;87:23;
90:15,22;92:11

**multiple (3)**
35:4;58:10;87:8

**muscular (1)**
79:7

**myself (1)**
35:24

**N**

**name (4)**
4:9;5:13,20;42:8

**nature (5)**
15:21;16:12;55:14,
20,22

**near (1)**
85:23

**need (9)**
4:25;5:1,7;11:23;

12:7;14:4;46:3;
50:21;88:5

**needed (1)**
44:16;88:21

**negates (1)**
88:1

**new (3)**
46:2,6,10

**next (4)**
39:9;65:5;67:9;
68:19

**nice (1)**
46:4

**night (2)**
6:23;43:25

**Niles (1)**
33:12,21

**nine (1)**
34:24

**nobody (2)**
34:25;91:19

**none (5)**
9:3;19:15;20:1;
57:2;88:12

**nonprivileged (1)**
91:15

**nonresponsive (1)**
80:11

**nor (1)**
10:25

**normal (3)**
54:14;69:15,19

**normally (3)**
30:21;69:13;87:6

**north (1)**
33:13

**Northville (3)**
41:20,21;42:16

**northwest (1)**
43:11

**nose (2)**
16:6;39:23

**notes (4)**
8:5;13:21,22;91:19

**notice (7)**
6:11,20,25;33:4;
39:3;64:9,19

**noticed (1)**
5:22

**notify (1)**
16:9

**Nuclear (1)**
27:21

**number (15)**
12:18;13:20;18:3,
4;32:11;44:2;65:14,
20;70:10,18;71:22;
73:21;76:18;78:10,
25

**numbers (1)**
65:23

**O**

**Oakland (4)**
41:2,8;84:1,9

**object (5)**
6:24;49:20,21,22;
50:9

**objection (29)**
6:21,22;7:9,10;
9:20;10:20;18:20;
23:7,20;26:13;36:11;
46:14;47:5;48:9;
60:25;64:6,25;65:1;
76:6,12;78:7;79:16;
81:7;89:17;91:1,3,5,
9,10

**objectionable (1)**
7:6

**objects (1)**
81:13

**observations (2)**
55:6,8

**observed (1)**
13:1

**obvious (1)**
80:10

**Obviously (8)**
8:3;17:5;26:18;
31:10;47:13;48:16;
61:6;68:12

**OC (1)**
42:4

**occasionally (2)**
11:6;32:12

**occasions (1)**
37:22

**occur (1)**
38:3

**occurred (1)**
28:5

**o'clock (1)**
34:25

**October (1)**
42:2

**off (11)**
11:3;33:18;38:13;
39:7,7;57:15;70:2;
81:14,14,19;87:17

**offender (1)**
75:18

**offer (2)**
30:22;46:18

**offered (1)**
30:2

**Office (3)**
11:20;41:3,8

**Officer (47)**
22:12,15,17;34:12;
37:10;41:7;56:8,13;
58:21;59:5;61:21;
62:8;66:6;68:7,17,
20;69:7,16;70:12,24;

73:22;74:19,23;75:3,
7,16,20,22;76:3,21,
21;77:5,6,9;78:5,13,
13,21;79:1;81:24;
82:25;85:19;86:1,5;
87:7,22

**officers (7)**
45:1;74:13;76:9,
14;79:19;80:6,13

**officer's (2)**
24:24;57:12

**often (2)**
14:2;59:9

**Ohio (2)**
34:10,13

**old (2)**
29:4;34:24

**once (7)**
11:21;19:9;33:18;
50:7;56:7;81:14;
85:15

**one (60)**
4:9;6:4,13;8:21;
11:5,10,10,14;14:15;
15:5,13;16:8,24,24;
17:5;20:25;21:12;
27:11;38:1;39:5;
43:6,7,7;45:24;47:6,
6,11;48:25;53:21,22;
56:21;58:3,3,5,14;
59:25;61:6;65:10,14;
66:6;67:24;68:14,14,
21;71:21;73:6,21;
74:2;75:6,10;77:18,
21,22;85:22;86:23;
88:13,14;89:22,25;
90:16

**one-day (1)**
47:10

**ones (4)**
27:10;29:14;33:11;
71:9

**only (26)**
7:1;17:3,11;20:16;
27:16,18;47:2,6,6,23;
48:16;53:22;56:14;
62:13,18,20,23;
68:11;73:2;75:10,11;
76:7;86:10,12;88:5;
89:1

**onto (1)**
62:3

**open (1)**
7:20

**operating (1)**
64:12

**opinion (38)**
9:6,9,12,14,19,22;
12:16;13:24;18:19;
21:18,20;26:12;30:3;
50:2;55:15;70:8,10,
15,22;71:7,16;72:1,9,
16,23;73:7;74:1;

73:22;74:19,23;75:3,
7,16,20,22;76:3,21,
21;77:5,6,9;78:5,13,
13,21;79:1;81:24;
82:25;85:19;86:1,5;
87:7,22

**opinions (11)**
12:24,25;25:17;
29:24;30:2,22,23,23;
73:22;89:14;90:6

**opossum (1)**
80:18

**opportunities (1)**
27:5

**opportunity (6)**
36:12;45:7,9;46:1,
20;59:16

**oral (1)**
59:11

**ordered (1)**
39:24

**organization (3)**
44:25;45:11,12

**original (1)**
43:2

**originally (2)**
41:15,24

**others (1)**
75:20

**out (21)**
5:12;16:1;26:8;
35:19;37:16,18;
39:16,21,21;40:7;
46:7,10;50:5;62:2;
65:16;72:3;79:8;
82:7;90:1,13,14

**outcome (1)**
56:25

**outdoor (1)**
45:20

**Outdoors (1)**
45:15

**outer (1)**
60:18

**outside (5)**
9:15;44:12;66:11,
16,21

**outstanding (1)**
31:3

**Over (7)**
19:6;39:8;43:15;
54:11;69:13,13;79:8

**overnighted (2)**
11:22,24

**overview (1)**
7:25

**own (4)**
39:9;42:20,21;
69:18

**P**

**page (24)**
14:14;21:12;22:7,
9;25:14;28:4,4,7;
52:19;55:5;58:14;

61:16;63:3;64:11;
65:5;66:5;68:20,25;
70:9,16,18;76:25;
85:8;87:14

**pages (3)**
8:9;19:24;55:20

**paid (2)**
10:25;11:18

**pants (1)**
39:20

**paragraph (8)**
52:20;70:17,18;
76:25;77:1;78:10,11,
24

**parallel (4)**
71:10;73:8;76:19;
77:4

**paralyzed (1)**
39:18

**part (13)**
6:2;8:12;35:23;
40:2;45:11;53:2;
55:17;56:12;62:9;
72:17;85:7;91:3,5

**partially (1)**
58:8

**participated (2)**
36:21;44:1

**participating (1)**
84:2

**participation (1)**
36:23

**particular (24)**
11:1,7;16:7;19:19;
26:7;37:20;39:2;
43:20;50:16;51:4;
56:5;61:10;63:11;
65:17;66:25;67:21;
69:8;71:9;77:18;
79:21;85:14;87:13;
89:25;90:8

**partner (3)**
38:13,17,22

**parts (4)**
24:10;57:6;60:17;
85:11

**passed (3)**
53:25;66:18;67:13

**passenger (5)**
70:13;78:18;79:9,
11;82:9

**passes (1)**
50:5

**passing (3)**
14:20;52:20;68:14

**past (1)**
53:1

**path (12)**
49:15,21;50:1,1,8;
60:8,12,19,24;66:9;
67:2;78:16

**pathologist (2)**
45:2;84:4

**pathology (3)**
36:19;37:2,4

**paths (1)**
84:5

**pattern (2)**
85:5,9

**patterns (2)**
84:22,24

**pending (1)**
5:10

**people (10)**
27:11;30:20;31:25;
45:21;46:19;49:10;
56:18;57:1;90:16,19

**per (9)**
45:3;54:4,9,13,14;
74:14,21,24;88:10

**percent (3)**
20:15,19;44:11

**perform (1)**
31:21

**period (8)**
11:11;13:15;26:17;
31:1;38:25;40:1,17;
80:15

**permanent (1)**
41:17

**person (12)**
10:1;38:1,4,7,15;
40:16;42:7;49:14;
59:6;64:3,10;80:10

**personnel (4)**
27:17,19;29:10;
35:12

**person's (1)**
81:1

**phone (1)**
54:17

**photograph (19)**
59:4;60:14;63:3;
64:11,13;65:6,7;66:5,
8,23,25;67:7;68:6,8,
11,24;69:10;71:23;
85:7

**photographed (1)**
58:16

**photographs (8)**
8:6;13:21;29:12;
57:9;61:16;66:6;
72:12;82:12

**physical (4)**
23:23;24:2,6;53:18

**physically (4)**
24:16,20;53:14;
72:20

**physiology (3)**
36:17;83:14,18

**picked (1)**
39:10

**picking (1)**
85:19

**piece (4)**
60:2;66:4;86:13;

88:1

**pin (1)**
87:21

**pistol (2)**
86:8,18

**pivoting (1)**
86:13

**place (9)**
6:4,21;40:14;
50:10;51:17,25;
53:24;57:7;82:22

**plaintiff's (3)**
12:14,22;13:11

**plans (2)**
31:12;63:24

**plastic (3)**
86:13;87:24;88:1

**playing (1)**
80:17

**please (12)**
5:2;12:17;24:14;
34:18;51:8;59:22;
70:20;76:2,24,24;
77:2;82:20

**Plymouth (7)**
41:14,17,19,21;
42:6;43:5,11

**pocket (2)**
39:23;40:7

**point (20)**
11:1;16:7,25;29:1;
46:10;50:6;53:11;
59:6;61:11;62:4,24;
63:1;71:11;73:11,19;
80:12,14;81:12;88:4,
7

**pointed (2)**
40:8;82:7

**pointing (5)**
73:10;78:25;79:8;
81:24;82:25

**points (4)**
15:25;16:2,3;90:10

**police (40)**
15:24;25:23;26:16;
27:16,19,24,25;29:5;
33:1,6,8,24;35:18;
37:10;38:12;40:20,
21,24;42:18,24;
43:10,13,19;44:13;
45:1;55:10;60:21,22;
64:15;65:7;66:10;
70:2;71:7;74:13,23;
75:3,16;76:9;83:23;
84:7

**portion (2)**
10:21;27:9

**portions (1)**
91:25

**position (11)**
62:7,25;63:21;
67:21;74:12;79:24;
82:16;87:17,23;88:8;

92:6

**possible (2)**
67:19,24

**possibly (2)**
19:6;90:17

**Post (5)**
11:20;33:13,16;
34:1;35:2;38:12

**postal (2)**
12:3,6

**posts (1)**
35:5

**pounds (1)**
87:19

**practical (1)**
23:22

**precisely (1)**
82:7

**predominantly (2)**
32:7,9

**preferable (1)**
23:18

**preparation (1)**
8:13

**prepare (2)**
13:17;25:17

**prepared (7)**
13:23;51:2,13;
55:3;62:10,15;90:8

**preparing (1)**
26:10

**present (2)**
45:5,9

**presentation (6)**
28:9,15,17,23;
29:9;45:20

**presentations (2)**
28:13;46:3

**preservation (5)**
27:14;48:7,12,13;
51:22

**pressure (5)**
87:19;88:21,23,25;
89:1

**previously (4)**
14:6;16:15;17:24;
21:7

**prima (1)**
56:17

**primarily (1)**
29:18

**primer (1)**
87:20

**printed (1)**
8:6

**prints (2)**
35:17;44:6

**prior (9)**
19:15;41:7;48:3;
57:14;62:3,4;66:25;
80:15;83:23

**priority (1)**
81:2

**privilege (1)**
7:3

**privileged (2)**
10:21;91:4

**probable (1)**
68:3

**probably (13)**
8:8;15:8;23:3;
48:20;54:13;61:12;
64:17;65:10,18,19;
66:2;67:23;81:14

**probation (3)**
33:18,19,21

**probationary (1)**
33:17

**problems (1)**
63:11

**proceed (1)**
6:19

**process (1)**
69:15

**processed (1)**
44:4

**produce (3)**
91:2,7;92:3

**produced (3)**
6:12,15;7:7

**product (1)**
7:3

**professional (2)**
25:14,15

**profusely (1)**
38:23;80:12

**progressive (1)**
71:16

**progressively (1)**
71:20

**projected (5)**
82:4;85:2,4,13,20

**promoted (3)**
41:25;42:9,12

**prompting (1)**
31:5

**proportionality (1)**
7:4

**provide (3)**
18:17,23;42:19

**provided (5)**
12:14,22;13:8,10,
14;14:11;43:9;57:21;
73:25

**providing (1)**
26:9

**PS (2)**
34:9;86:17

**publication (5)**
9:5;15:10,17,21;
83:2

**publications (2)**
9:1;14:22

**published (3)**
14:24;15:2,4

**pull (6)**

52:9;86:11;87:11,
18;88:5,12
**pulled (4)**
6:9;22:9;25:12;
40:7
**pulling (5)**
5:23;14:5;16:15;
17:24;21:7
**purchasing (1)**
16:4
**purpose (1)**
58:18
**purposes (4)**
5:24;14:7;17:25;
21:9
**pursuant (1)**
7:10
**put (21)**
7:8;17:4;34:6,7;
35:4,9,16;42:7;43:6;
54:11;57:4;60:16;
62:19,22;63:25;
65:18;66:13;69:20;
79:23;85:17;90:20
**puts (1)**
78:2
**putting (2)**
56:22;87:25

**Q**

**qualified (2)**
31:22;32:1
**qualifies (1)**
90:17
**quality (2)**
55:8;64:19
**quickest (1)**
36:9
**quickly (1)**
74:16
**quit (1)**
42:12
**quite (3)**
33:2;38:23;69:9
**quote (1)**
79:23

**R**

**ran (1)**
16:11
**rape (1)**
48:14
**Rapids (1)**
43:5
**rate (1)**
88:9
**rather (1)**
61:17
**ratio (1)**
20:13
**reach (6)**

25:17;74:1;76:22;
77:7,11;79:12
**reached (1)**
26:11
**reaching (5)**
21:14,18,20;26:11;
72:8
**react (1)**
49:11
**reaction (2)**
49:2,7
**read (10)**
6:2,7;13:1;53:2;
89:9,10,12,16;90:10,
13
**really (7)**
16:9;19:7;21:1;
50:19;56:4;68:11;
85:16
**rear (2)**
38:14;88:3
**rearview (4)**
57:11;66:10,11,19
**reason (10)**
11:7;16:23;19:19;
62:18,20;68:18;
75:13;80:19;89:25;
90:8
**reasons (1)**
42:11
**reassemble (1)**
66:16
**reassembled (3)**
66:22;67:1,3
**rebuttal (1)**
22:5
**recall (9)**
16:4;19:7,19;21:1;
49:13;56:7;63:13;
76:8;83:11
**receive (1)**
11:7
**received (9)**
7:14;9:25;10:19,
25;11:2;20:18;32:17;
36:6;43:24
**recently (1)**
19:20
**Recess (2)**
54:25;83:9
**reconnect (1)**
67:10
**reconstruct (1)**
60:17
**reconstructed (1)**
60:9
**reconstruction (7)**
31:24;32:10;48:8,
11,19,22,24
**record (8)**
5:13;6:21;7:9,11;
8:23;14:21;31:9;91:9
**recorded (2)**

65:12;71:18
**records (2)**
10:1;92:2
**recovered (12)**
25:1,8,10;63:4;
72:13,15,22;80:2;
84:18;86:2,14;89:22
**recreate (2)**
82:16,22
**recruit (2)**
33:9,10
**rectal (1)**
59:12
**redacted (1)**
18:5
**redaction (1)**
18:1
**reentered (1)**
67:4
**refer (2)**
9:15;24:15
**reference (2)**
14:20;77:16
**referenced (1)**
22:8
**referring (9)**
9:16;24:13,17;
25:12;29:22;78:6;
85:9;88:19,22
**reformulate (1)**
76:2
**regard (1)**
26:4
**regarding (6)**
10:1,12,23;29:10;
46:24;47:3
**regardless (3)**
30:19;38:25;49:22
**regular (1)**
12:1
**related (1)**
29:18
**relates (1)**
10:18
**relating (6)**
9:1;14:22;44:15;
47:24;49:6;55:16
**relative (1)**
88:7
**release (2)**
88:24;89:1
**released (3)**
86:25;87:3,6
**relevance (1)**
7:3
**relied (6)**
9:18,22;10:3;
70:14;77:11;81:22
**rely (8)**
9:13;70:21;73:25;
76:22;77:7;78:15;
79:2;83:1
**relying (2)**

9:6;82:12
**Remington (1)**
46:4
**remove (2)**
80:20,23
**removed (1)**
79:22
**render (1)**
55:15
**repeat (6)**
4:25;24:14;34:17;
51:7;76:2;82:20
**replaced (2)**
79:19,22
**report (30)**
4:12;8:13,24;9:17;
21:11;25:17;26:10;
29:22,24;51:2,14;
52:9,15;53:11;55:3,
5;56:24;58:14;63:15;
65:6;66:8;70:8;
71:23;80:3;81:10;
84:17;85:8;87:14;
89:25;90:21
**reporter (1)**
4:21
**reports (9)**
8:6;13:22;21:25;
22:3,5;89:6,12,15,21
**represent (3)**
8:22;18:1;29:24
**representing (1)**
4:10
**request (11)**
6:20,24;7:7,15;
24:3;34:6,7;35:4,9;
42:23;43:21
**requested (5)**
6:13;7:12;23:25;
43:17;91:5
**requests (2)**
6:12;43:25
**required (1)**
17:3
**Requires (1)**
86:10
**reselling (1)**
16:6
**residue (1)**
58:25
**resistance (1)**
88:4
**respond (3)**
5:5;76:4,10
**responding (2)**
75:23;76:15
**response (4)**
4:23;10:21;30:21;
79:7
**responsibility (1)**
11:18
**responsive (4)**
7:5;91:16,25;92:3

**restate (1)**
77:2
**resting (1)**
50:10
**restroom (1)**
50:21
**result (1)**
82:2
**resulted (1)**
66:3
**results (3)**
32:6;47:15;57:2
**retained (17)**
7:19;13:9;18:11,
14;19:1,4,12,16,20;
20:6,22;21:5;30:6,15,
19;51:6,12
**retainer (1)**
10:25
**retired (3)**
25:25;40:21,25
**retirement (1)**
48:3
**review (13)**
22:1,5,23;23:1,23;
24:3,4;29:4;57:24;
89:8,24;91:12;92:15
**reviewed (16)**
8:12;13:23;21:13,
18,22;22:1,2,14,17,
20;23:5,9,12;82:13;
89:5;90:7
**reviewing (1)**
51:15
**revolver (3)**
39:23;40:7;86:19
**rid (1)**
6:6
**riding (1)**
69:23
**rifle (1)**
39:5
**rifles (1)**
45:23
**right (16)**
17:7;20:1,21;30:2,
12;31:12;36:23;38:8,
12;39:23;53:17;55:7;
69:3;71:1;73:2;78:5
**riot (1)**
37:20
**riots (1)**
37:15
**ripped (1)**
39:20
**rise (1)**
87:19
**Road (5)**
33:17,18;37:8,24;
77:15
**roadway (3)**
57:9,10;62:3
**rod (2)**

60:14;67:4
**rods (2)**
  56:23;65:7
**room (1)**
  27:18
**rounds (8)**
  74:24;87:8;88:9,
  13,15,16,17,18
**route (1)**
  36:9
**routinely (1)**
  74:20
**run (4)**
  39:22,25;45:1,4
**running (2)**
  40:4,10
**RUSSELL (11)**
  4:6,9;12:11;50:21;
  54:19;55:1;65:2;
  83:5,10;90:23;92:7

**S**

**safe (2)**
  63:21;86:9
**safes (1)**
  45:23
**safety (12)**
  63:15,17,19;64:2;
  86:12,12,24;87:3,5,
  17;88:24;89:1
**same (7)**
  41:20;68:20;69:11;
  76:12;79:23;87:23;
  92:6
**sand (1)**
  39:19
**Sandusky (6)**
  34:9,15,19,22;
  35:19;41:11
**Sandusy (1)**
  34:9
**satellites (1)**
  43:4
**save (1)**
  81:1
**saw (8)**
  55:17;56:2;62:17;
  68:11;72:14;77:20;
  84:24;85:2
**saying (2)**
  56:19;73:13
**scene (19)**
  23:14,18,21;26:22;
  31:23;32:9;43:22,25;
  48:15;51:21;58:16;
  68:6,14;72:13,15;
  80:7,20;85:16;89:23
**scenes (8)**
  25:20;27:15;28:3;
  29:13;41:25;47:14,
  16,22
**schedule (2)**

18:7,8
**school (7)**
  27:13;32:15;33:3,
  9,10;34:3,3
**Schoolcraft (1)**
  27:12
**science (1)**
  36:6
**scope (2)**
  7:2;31:20
**scout (1)**
  63:10
**screamed (1)**
  38:16
**screen (3)**
  5:25;52:12,14
**se (1)**
  45:3
**seat (1)**
  81:19
**seatbelt (2)**
  69:20;74:9
**seated (1)**
  56:10
**seats (1)**
  74:7
**second (17)**
  11:17;40:18;52:19;
  54:5,9,13,14;56:22;
  61:25;71:25;74:5,11,
  14,21,24;88:17,18
**seconds (3)**
  40:14;53:25;75:8
**section (1)**
  43:11
**Security (2)**
  18:3,4
**Seeing (3)**
  16:8;17:2;35:3
**seem (2)**
  56:12;72:20
**seemed (2)**
  40:12,16
**sees (1)**
  64:4
**self-employed (1)**
  5:15
**semester (1)**
  36:13
**semi-auto (3)**
  86:8,18;87:10
**semi-cocked (1)**
  86:10
**seminar (5)**
  28:9;47:3,10,20,24
**seminars (2)**
  26:20;27:4
**sense (1)**
  5:10
**sent (7)**
  6:22;7:15;8:5;
  11:14,19;14:11;34:8
**sentence (1)**

55:7
**separate (2)**
  17:22;29:14
**September (1)**
  33:22
**sequence (3)**
  65:16,17;87:13
**Sergeant (1)**
  42:1
**series (2)**
  4:20;6:11
**served (2)**
  7:1;34:11
**service (4)**
  43:16,17,21;44:9
**serviced (1)**
  43:12
**services (2)**
  42:19;43:9
**session (2)**
  28:24,25
**sessions (1)**
  45:17
**set (2)**
  7:22;92:12
**setting (2)**
  47:2,23
**seven (1)**
  27:21
**several (5)**
  22:14;28:1;29:10;
  37:22,25
**share (2)**
  52:12,13
**sharing (1)**
  29:21
**shattered (1)**
  81:18
**Sheriff's (3)**
  41:2,8;55:11
**shoot (9)**
  37:18;39:24;40:5,
  5,6,16;49:14;63:2,25
**shooter (3)**
  53:21,23;58:3
**shooting (24)**
  24:5;25:7;45:14;
  48:7,11,16,17,19,22,
  24;53:24;55:9;57:7,
  13;58:7,21;59:10,13;
  62:24;69:1;72:4;
  74:23;82:17,22
**shootings (1)**
  25:21
**short (1)**
  86:10
**shortly (1)**
  52:20
**SHOT (26)**
  45:14;49:11;57:12;
  59:11;61:7,12;67:13,
  15,25;70:25;71:12,
  14,14,15,24,25;72:2,

2;73:4,9;78:13;79:1,
  10;81:24;82:25;
  87:12
**shotguns (1)**
  45:23
**shots (10)**
  40:2,8,9,9;58:4;
  61:3;68:2;74:14,21;
  75:7
**shoulder (1)**
  69:21
**shoulders (1)**
  38:23
**show (4)**
  38:22;45:5;56:8;
  66:13
**Showed (1)**
  29:12
**showing (1)**
  46:17
**Shows (6)**
  45:14;62:8;65:6;
  66:9,14;74:3
**side (29)**
  6:6;20:25;37:24;
  39:12;53:9,9,10,10;
  56:20;60:16;66:11;
  68:3;69:3;70:13,25,
  25;71:2,3,5,17,19;
  73:5,7;78:18;79:5,9,
  11;81:21;82:9
**sideview (2)**
  57:5,6
**sideways (1)**
  90:19
**sign (1)**
  6:4
**Signature (1)**
  92:17
**significance (8)**
  60:5,23;63:16;
  64:13,14;66:7;68:7,9
**significant (4)**
  26:25;69:4;84:21,
  23
**simply (14)**
  11:25;16:5;30:25;
  32:5;36:14;38:21;
  39:18;52:5;60:13;
  74:2,2;85:14;87:25;
  90:10
**single (4)**
  56:24;86:19,20;
  90:4
**sit (2)**
  23:4;31:12
**site (1)**
  23:14
**six (7)**
  17:6;33:13;43:1;
  45:14;65:9;71:22;
  88:17
**sixteenth (1)**

88:6
**sleeve (1)**
  68:18
**slide (1)**
  85:10
**Slightly (5)**
  71:3,11;73:2;
  76:20;77:5
**slow (1)**
  77:21
**small (1)**
  85:21
**smeared (1)**
  85:12
**Smith (5)**
  63:18;86:17;87:15;
  88:19;90:3
**snippet (1)**
  68:12
**snub (1)**
  39:23
**Social (3)**
  18:3,4;36:6
**somebody (6)**
  16:25;31:7;59:11;
  63:25;64:8;74:25
**someone (3)**
  62:18;82:15,21
**somewhat (1)**
  90:18
**somewhere (1)**
  18:12
**Sorry (9)**
  6:18;9:10;10:9;
  34:17;49:8;51:7;
  54:16;67:17;70:16
**sort (1)**
  6:3
**sought (1)**
  91:12
**Sounds (1)**
  83:8
**source (1)**
  77:19
**South (1)**
  33:13
**speak (1)**
  57:17
**speaking (2)**
  24:10;72:10
**specific (1)**
  30:24
**specifically (6)**
  23:10;24:10;64:22;
  70:9;84:22;85:9
**spend (1)**
  12:7
**spent (2)**
  41:7;55:19
**splatter (9)**
  26:2;31:25;46:25;
  47:4,18,25;84:20,22;
  85:22

**sportsman (1)**
46:12
**Spring (1)**
34:5
**St (1)**
32:15
**stack (1)**
86:17
**staining (2)**
47:18;85:21
**standing (1)**
75:9
**start (6)**
5:12;33:7;55:6;
56:22;89:4;91:1
**started (5)**
34:15,19;39:22;
40:23;65:16
**state (28)**
5:12;12:17;15:23;
25:23;26:16;27:24;
29:5;32:21,25;33:5,8,
24;34:12,23;35:18;
38:12;40:20,21,24;
42:17,23;43:1,12,14;
44:13;82:24;83:23;
84:6
**stated (2)**
89:15;91:9
**statement (5)**
13:13,14;79:2,13;
81:23
**statements (4)**
10:6,11;13:21;23:1
**States (1)**
46:18
**stating (2)**
61:22;81:11
**Statute (1)**
37:16
**stay (1)**
36:13
**step (1)**
67:9
**still (3)**
25:8;39:17;45:11
**stop (3)**
29:21;40:4;74:6
**stopped (1)**
79:15
**store (4)**
38:10,12,14;78:4
**straight (6)**
71:2;72:24;73:3;
81:5;82:2;85:1
**street (1)**
37:18
**strike (14)**
61:8;64:15,17,23;
65:11,15;66:2;71:1,
5;73:4;77:9;78:17,
20;81:16
**strikes (10)**

**struck (12)**
49:2,7;67:20;
70:11,22;72:4;73:11,
15,19;78:22;81:13,15
**stuck (1)**
90:1
**studies (1)**
9:5
**study (1)**
83:1
**stuff (1)**
83:19
**stunned (1)**
39:13
**subject (3)**
51:5;80:8;91:11
**submission (1)**
27:15
**submit (4)**
7:12;8:21;16:24;
42:22
**submittal (1)**
51:23
**submitted (5)**
10:7,13,15;75:6;
89:6
**submitting (1)**
44:8
**subsequent (1)**
72:4
**subsets (1)**
9:13
**suitable (1)**
60:7
**summaries (1)**
9:25
**summary (1)**
30:3
**Summer (1)**
69:22
**superficial (1)**
55:14
**supervisor (2)**
42:2,10
**supplied (2)**
8:18,19
**support (1)**
83:4
**sure (25)**
6:4;18:2;20:24;
32:24;37:15,21;
40:13,16,17;47:20;
49:10;50:19;54:19;
57:25;59:21;63:10;
65:4;70:21;76:1,17;
82:19;85:17,20;92:5,
8
**surgery (1)**
14:3
**surveillance (2)**

**58:8;77:19**
**suspect (5)**
11:11;14:15;25:10;
30:1;54:8
**suspected (1)**
70:7
**swabs (2)**
59:10,12
**sworn (1)**
4:2
**system (4)**
12:3,6;26:17;42:25

**T**

**talk (6)**
7:18;28:2;53:11;
55:2;61:15;86:5
**talked (8)**
8:15;41:10;51:1;
58:2;59:24,24;88:21;
89:4
**talking (3)**
40:19;80:1;88:24
**talks (1)**
25:14
**tapes (1)**
58:8
**target (2)**
37:19;39:14
**taught (5)**
27:20;48:18,24;
49:1,4
**teach (3)**
27:10;49:10,13
**teaching (3)**
27:2,9,12
**tears (1)**
59:1
**technician (1)**
27:13
**techniques (1)**
29:19
**Technology (2)**
45:15;46:6
**Techs (1)**
28:20
**telling (4)**
52:1,7;57:15;74:10
**tells (2)**
62:14;74:2
**temple (1)**
81:6
**testified (5)**
4:3,16;17:2,8;23:8
**testify (1)**
31:10
**testimonies (4)**
16:18;17:11,17;
19:11
**testimony (7)**
13:15;17:18,20,21;
20:7,17;73:24

**testing (2)**
82:15,21
**Thankfully (1)**
32:13
**therefore (14)**
20:18;32:3;34:4,6;
39:4;45:8;46:16,20;
60:11;61:3;68:22;
72:18;73:8;79:9
**thinking (1)**
92:1
**third (2)**
43:6;64:3
**though (2)**
64:4;90:13
**thought (2)**
14:23;91:3
**thousands (1)**
25:20
**threat (4)**
75:20,23;76:4;
80:13
**threats (2)**
76:10,15
**three (10)**
15:4;17:3;19:6;
34:2;35:10;43:3;
55:19;65:8,17;74:20
**three-day (4)**
46:24;47:7,20,24
**threw (2)**
39:7;81:17
**throughout (1)**
25:22
**thumb (2)**
34:22;87:6
**timed (3)**
74:13,22;75:3
**timeliness (1)**
6:25
**times (3)**
19:4;35:5;38:1;
83:25;84:19
**timing (1)**
91:6
**tissue (1)**
85:24
**today (6)**
4:13;7:13;11:13;
23:4;27:1;31:13
**together (7)**
17:23;53:10;57:5;
60:3;62:23;63:2;78:2
**told (8)**
11:5;13:2;40:4;
51:17,19,25;52:6;
63:12
**Tom (1)**
11:17
**took (9)**
35:24;40:14;51:17,
25;53:24;57:7;60:14;
66:23;82:22

**Tool (5)**
15:15,19;31:24;
41:12;42:14
**top (4)**
22:9;57:15;65:21;
87:3
**total (1)**
17:23
**totally (1)**
63:11
**tough (1)**
38:25
**toward (2)**
61:13;73:18
**towards (2)**
39:11;46:12
**traffic (1)**
35:4
**train (1)**
42:6
**trained (7)**
75:17,23;76:4,8,9,
14;90:18
**training (21)**
9:24;25:15,16;
26:4,9,18;28:24,25;
37:5;41:6,24;42:3,8;
44:15;47:3,8;48:2;
49:6;83:17;84:14;
90:15
**trajectory (11)**
26:2;49:16,19,23;
50:3,6;56:23;60:8,
14;65:7;67:4
**transcript (2)**
22:18,23
**transfer (1)**
34:7
**transferred (3)**
33:25;34:5;41:10
**transfers (1)**
47:18
**transpired (1)**
55:23
**travel (2)**
54:4;77:23
**travels (1)**
73:1
**tree (1)**
81:16
**tremendous (1)**
46:1
**trial (1)**
31:11
**tried (1)**
39:17
**trigger (23)**
63:22,23,24;64:1;
86:11,13,22,25;87:9,
11,15,16,22,25;88:1,
2,3,5,12,22,23,25;
89:1
**trooper (4)**

33:17,18,19;37:8
**truck (1)**
62:2
**true (3)**
18:18,19,24
**try (1)**
51:17
**trying (4)**
35:11;65:2;75:12;
81:1;89:24
**tuck (1)**
70:1
**tucked (1)**
69:2
**Tucker (1)**
92:5
**turn (3)**
32:2,4;78:5
**turned (1)**
39:22
**turning (1)**
62:3
**two (28)**
15:4;17:3,22;
19:24;21:1,13;22:2,
20;24:21;29:13,14;
32:19;34:2,2;40:2,8,
9,9,18;52:2;54:21;
65:23;76:19;77:3,15;
78:20;84:8;85:25
**two-day (2)**
44:20,23
**two-person (1)**
38:9
**two-week (1)**
27:13
**type (12)**
9:24;45:9,20;46:4,
7;47:10;48:14;59:2;
69:5;74:16;86:4,6
**types (5)**
45:5;46:21;47:17;
56:16;76:15
**typically (1)**
53:15

**U**

**ultimately (1)**
50:13
**unbelievable (1)**
74:12
**unconscious (1)**
80:11
**under (7)**
5:19,20;27:12;
55:7;70:9;75:18;
81:12
**understood (1)**
5:6
**undue (1)**
7:2
**uniform (1)**

59:1
**Unit (14)**
29:7;17;34:16,20;
35:15;41:13,23;42:2,
10,15,17;44:17;
67:10,10
**United (1)**
46:18
**units (2)**
43:13;47:9
**universities (1)**
28:2
**unless (2)**
43:16;80:17
**unsure (1)**
33:5
**unusual (2)**
37:17;45:6
**up (29)**
5:23;6:9;7:20,22;
8:24;13:24;14:5;
16:15;17:24;21:7;
22:9;25:12;34:11;
38:15,22;39:10;
41:21;43:6;50:23;
52:10,22;59:15;
62:16;69:2;71:9;
83:7;85:19;90:11;
92:5
**upgrade (1)**
35:11
**upon (9)**
9:18;70:15,21;
73:25;77:7,11;78:15;
79:2;81:22
**upwards (1)**
4:16
**used (7)**
9:8;38:11;45:3;
51:5,12;77:17;86:6
**useful (1)**
24:20
**usually (1)**
54:4
**utilized (1)**
44:9

**V**

**vaginal (1)**
59:12
**vague (3)**
79:17;81:8;89:17
**variance (1)**
60:16
**various (8)**
26:19,21;27:10;
42:10;44:25;45:5;
47:21;81:13
**vehicle (23)**
56:18;57:4;58:22;
61:8,14;64:12,18;
66:7,12;68:3;69:18,

24;71:18;72:4;79:9,
15;80:21,24;84:18;
86:3,15,24;88:20
**vehicles (4)**
24:11,13,17,22
**velocity (1)**
85:21
**version (2)**
14:10,12
**victim (5)**
25:7;67:20;80:20,
23;81:4
**video (13)**
52:24,25;53:4;
68:12;75:6,11;77:13,
14,16,19;78:1,6,9
**view (4)**
24:21;46:1;61:11;
62:11
**viewed (4)**
55:24;57:20;58:10;
75:11
**views (3)**
68:16;77:18;78:1
**Virginia (1)**
19:9
**visit (2)**
23:14,15
**vitae (5)**
6:14,15;8:17;14:9;
25:13
**voice (1)**
38:18

**W**

**wait (1)**
31:5
**waiting (1)**
38:21
**waived (1)**
92:17
**walks (1)**
68:15
**Warren (2)**
41:15;43:4
**way (15)**
33:2;34:10;35:22;
50:18;51:10,24;
61:22;62:11,13;
65:18;67:8;82:7;
83:7;85:12,18
**weapon (27)**
37:9,22;38:1,4;
49:25;58:5;63:1;
64:10;69:3,20,21;
73:23,23;74:4,17,18;
75:15,18;79:21;80:1;
81:12;82:5;84:24;
85:1;86:5,6;87:7
**weapons (2)**
24:24;86:4
**wearing (11)**

58:23;59:6;68:10,
13,17,20,25;69:11;
70:7;74:9;76:15
**weather (1)**
70:4
**week (1)**
11:19
**weeks (1)**
33:11
**weight (2)**
54:6;74:18
**well-trained (1)**
74:19
**weren't (6)**
24:16;32:24;37:19;
57:15;72:17;85:1
**Wesson (5)**
63:18;86:17;87:15;
88:19;90:3
**West (1)**
19:9
**what's (6)**
9:17;16:15;17:24;
21:7;31:20;58:24
**wheel (1)**
80:9
**whenever (1)**
34:3
**When's (1)**
49:5
**wide (1)**
60:15
**wider (1)**
45:10
**wife (2)**
41:18;54:17
**willing (1)**
30:20
**Winchester (1)**
46:5
**window (17)**
56:14;61:19,22,25;
62:5,6,12,19;64:22;
67:23;70:14;71:6;
73:5,7;78:17,18,19
**windshield (3)**
73:18;81:18,18
**Winter (1)**
69:22
**wish (2)**
23:21;52:10
**within (5)**
29:17;47:8;74:4,
11;75:8
**without (1)**
35:3
**WITNESS (9)**
11:23;12:5;50:25;
52:4,12;54:23;91:18,
22;92:10
**word (3)**
35:1;74:8;89:8
**words (1)**

31:23
**work (15)**
7:3,6;11:10;20:6;
26:20;30:5,7;31:20;
41:2;44:12;51:24;
60:21,22;91:1,16
**worked (4)**
11:10;13:16;17:10;
25:19
**working (2)**
26:24;36:24
**workshop (1)**
46:24
**worth (1)**
17:5
**Wound (7)**
44:21,24;77:9;
78:16,19;81:5;85:23
**wounds (1)**
45:6
**written (1)**
23:1
**wrote (2)**
16:12;91:8

**X**

**x-ray (1)**
29:19

**Y**

**yard (1)**
77:24
**yards (2)**
52:22;53:1
**year (6)**
18:13;26:17;32:21;
33:20;56:13;62:12
**years (21)**
14:25;15:5,8;
16:19,20,22;17:4,4,6;
19:6,8;26:5;32:19;
33:4;34:2,2,23;
35:10;43:23;69:20;
90:17
**yesterday (3)**
7:14,16;11:8

**0**

**02 (1)**
40:22

**1**

**1 (3)**
8:17;20:12;78:25
**1,000 (1)**
54:4
**1.7 (1)**
75:8
**10 (4)**

14:25;43:23;87:18;
88:18
**100 (4)**
52:22;53:1;77:24;
88:16
**1046-23 (1)**
7:23
**11 (3)**
13:20;66:5;68:25
**11:34 (1)**
92:16
**1100 (2)**
54:9,14
**12 (1)**
43:23
**120 (1)**
43:19
**13 (2)**
33:11;87:18
**133 (1)**
17:17
**15 (6)**
15:8,12;70:9,16,
18;76:25
**16 (1)**
14:17
**18 (1)**
41:3
**1966 (1)**
33:12
**1967 (2)**
37:15,20
**1969 (2)**
34:5;38:5
**1973 (3)**
15:17,22;42:3
**1981 (1)**
42:13
**1989 (1)**
46:24
**1992 (3)**
40:25;48:4;83:24
**1994 (1)**
17:1
**1995 (1)**
45:13
**1997 (1)**
44:20
**1998 (2)**
15:10;28:10
**1999 (1)**
28:10
**19th (1)**
33:22

---

### 2

**2 (4)**
21:12;22:7;33:12;
78:10
**20 (1)**
19:8
**2002 (2)**

---

28:5;48:20
**2004 (1)**
45:13
**2011 (2)**
28:12,15
**2017 (4)**
28:12,12,19;29:4
**2020 (2)**
23:2;70:5
**2023 (1)**
14:17
**20-plus (1)**
26:16
**24 (1)**
34:23
**25 (5)**
15:24;16:2,4;
34:23;69:20
**25-year (1)**
25:22
**2nd (1)**
33:22

---

### 3

**3 (3)**
25:14;65:21;73:21
**30 (1)**
8:9
**36 (1)**
28:15

---

### 4

**4 (4)**
52:19;65:22;70:10,
18
**4:00 (1)**
38:19
**45 (2)**
25:8;86:17

---

### 5

**5 (5)**
55:5;58:14;65:20,
22;76:18
**50 (5)**
26:5;52:21;53:1;
77:23;90:17

---

### 6

**6 (2)**
20:12;65:22
**600 (4)**
88:9,11,13,15
**65 (1)**
33:4
**66 (1)**
33:4

---

### 7

**7 (3)**
28:5;65:22,22

---

### 8

**8 (6)**
12:18;28:7;61:16;
63:3;85:8;87:14
**80 (3)**
20:15,19;44:11
**88 (2)**
4:16;17:14

---

### 9

**9 (5)**
38:5;54:7,8;64:11;
86:8
**950 (1)**
54:13

---